OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR THE PLAINTIFF

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

**BENJAMIN PAVONE**

      PLAINTIFF,

v.

**RICHARD D. FYBEL,**

      DEFENDANT.

**CASE NO.: 2:21-cv-01778**

**COMPLAINT FOR:**

I.    **SUCCESSFUL RETALIATORY INDUCEMENT TO PROSECUTE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAVONE & FONNER, LLP

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................4

II.    PARTIES, FORMER PARTIES AND OTHER PARTICIPANTS ............................7

III.   BASIS FOR FEDERAL JURISDICTION .....................................................7

IV.    STATEMENT OF FACTS - UNDERLYING MARTINEZ ACTION ....................8

    A.  Background of Fernando Martinez ...............................................8

    B.  Background of Stephen O'Hara ...................................................8

        1.    First Bankruptcy – 1986 ...............................................9

        2.    Second Bankruptcy – 1997 ...........................................9

        3.    O'Hara Destroys His Circle of Friends and Associates, Mostly Women, in His Third Bankruptcy during the Great Recession. ........................................................10

            a.  Table 1 - O'Hara 2008-2012 Financial Victims ..............11

            b.  The Representative Experience of the Garrisons ...........12

        4.  Fourth Bankruptcy – 2020 ..............................................12

    C.  The Fraudulent CSCA Website .................................................13

        1.  Fraudulent Website Detail .............................................14

    D.   The Sexual Predator Playbook - O'Hara Grooms Martinez ...........17

    E.   O'Hara Confesses His Misconduct in an Oppressive Non-Disclosure Agreement ..................................22

V.     THE ORANGE COUNTY LITIGATION .....................................................23

VI.    STATE BAR LEGAL PROCEEDINGS ........................................................24

    A.  Count 1 – Succubistic Adoption of the Defense Position ...............24

    B.  Count Two – Thwarting Appellate Review...................................27

    C.  Intellectual Dishonesty ............................................................27

VII.   SUCCESSFUL RETALIATORY INDUCEMENT TO PROSECUTE .................31

    A.     Definition and Etiology of the Term ....................................31

B.   The Meaning of the Phrase the "Ruling's Succubistic Adoption of the Defense Position" is Logically Limited to Criticisms of the Ruling ............................................................................31

C.   Assuming the Word Were Intended to Imply or Refer to the Judge as a Noun, this is still not an Actionable Wrong. ........................33

   1. Derivative Gender Insults................................................................33

D.   The Moral Case for the Criticism in Question ...............................34

E.   Analysis of Count One. ...................................................................36

   1. Rewriting of the Language – Due Process Violation .......................36

   2. Rhetorical Hyperbole ....................................................................37

   3. Unprovable to be True or False......................................................38

   4. "Manifesting Gender Bias" ...........................................................38

F.   Analysis of Count Two – Thwarting Appellate Review...............................39

G.   Counts Three and Four – Arguments in the *Martinez* Appellate Briefs .........................................39

H.   Declaratory Relief..........................................................................40

I.   Judicial Immunity ..........................................................................40

VII.   PRAYER..........................................................................................41

PAVONE & FONNER, LLP

# I.

# **INTRODUCTION**

1.  In seeking to punish a lawyer that offended him for using the adjective "succubistic" to describe a judicial ruling, Fourth District Appellate Justice Richard D. Fybel declared war on undersigned counsel by rejecting his client's appeal, publishing an opinion that singled out counsel, and by referring counsel for a State Bar ethics prosecution.

2.  The problem with Justice Fybel's adjective war is that the word was employed as a rhetorical and hyperbolic – and thus fictional – expression that is well within counsel's constitutional rights. The full sentence reads:

> The ruling's succubistic adoption of the defense position, and resulting validation of the defendant's pseudohermaphroditic misconduct, prompt one to entertain reverse peristalsis unto its four corners.

3.  One can hardly dream up a quip that more constitutes rhetorical hyperbole, one that is more a "lusty and imaginative"[1] expression. Yet Plaintiff has been investigated and prosecuted going on two years. It has cost the parties hundreds of thousands of dollars in attorney time, all for a remark that any First Amendment scholar would recognize as constitutionally protected.[2]

---

[1]   *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438-1440, *citing Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50; *National Ass'n of Letter Carriers v. Austin* (1974) 418 U.S. 264, 286; *Nygard v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1049.

[2]   *See In re Snyder,* 472 U.S. 634, 637 (1985) [where a lawyer felt "appalled," "extremely disgusted" at a court's decision and verbalized his perception of the "extreme gymnastics even to receive the puny amounts which the federal courts authorize for [appointed] work," the ethics charge died on the vine.]

PAVONE & FONNER, LLP

4.    Consequently, Justice Fybel's referral for ethics charges constitutes the tort of "successful retaliatory inducement to prosecute," which is effectively an anti-SLAPP violation.[3]

5.    The problem originally started when Martinez, a young, naïve McDonald's cashier, 19 at the time, fell for the salacious claims on Stephen O'Hara's fraudulent real estate website, one offering him prestigious employment and outsized income.

6.    It actually provided neither; it instead illegally trapped Martinez into a sexual relationship with a man 42 years older than him and provided Martinez a bare minimum of compensation.

7.    In November, 2012, Martinez contacted undersigned counsel for help. Undersigned plaintiff counsel litigated Martinez's sexual harassment case for seven years, in *Martinez v. O'Hara*, Orange County Superior Court Case No. 30-2012-00614932, combatting one mistake after another by the Orange County judiciary, in a pile of errors that reached into the double digits – *some 24 errors in total* – all, incredibly, in service to protect a sexual predator and confidence man, one who spent his life ripping people off to the tune of almost 50 million dollars.

8.    In 2012, O'Hara constructed a complicated system of enticements and traps to lure naïve youth into his orbit – both men and women – so that he could take advantage of them sexually and make money off them.

9.    His 47-page website contained some 34 images of attractive young men and young women.  **Exhibit 1** to this complaint is the website and **Exhibit 2** is a mark-up of the site spotlighting the numerous photos of the youth O'Hara targeted.

10.    There is no debate that his website system was entirely fraudulent: full of. Yet, O'Hara intended to expand it nationally, where he could no doubt take advantage of young, naive and desperate job-seekers across the nation, trapping them, taking advantage of them sexually, monetizing them, and ultimately discarding them.

---

[3]    *Hartman v. Moore* (2006) 547 U.S. 250, 256, 262; *Nieves v. Bartlett* (2019) – U.S. –, 139 S.Ct. 1715, 2019 U.S. Lexis 3557, *9-10 (Case No. 17-1174, March 28, 2019).

11.    Mr. O'Hara's method is reminiscent of other predatory schemes: Cosby drugging his youthful victims; Weinstein promising fame to his young starlets; and Epstein dazzling his teenage victims with fancy surroundings, mature confidantes, and world travel.  Stephen O'Hara's less effective idea was to promise riches to his young victims in the glamorous allure of the California real estate world.

12.    O'Hara's national predatory project never got off the ground, because your undersigned counsel spent 1,000 billable hours attacking him legally.

13.    This was with no help from the Orange County Justice System.  At every turn, judges made it more difficult, more expensive and more time consuming to impose consequences and install preventative measures.  They declined to recognize O'Hara's predatory tactics as important enough to warrant the expenditure of resources to freeze him in place.

14.    But they were wrong to think this way.  The resources were correctly spent.  The "me too" movement has established that these sorts of enterprises are not tolerable, not healthy for society, not good for women, not good for minorities, not good for the poor, not good for a young gay man like Martinez, or whomever is the exploited party, and should be stopped at the earliest possible time

15.    Indeed, in a recent article, a speaker for the modern #metoo movement cautions us that: "What happens is that years go by and unchecked abusive behavior only escalates because we turned our heads *instead of stepping in and intervening in the beginning*,"[4]  Intervening in the beginning is what Plaintiff did toward O'Hara.

16.    Whether or not they are rich, famous, powerful, or at least have enough resources and experience to set up some sort of predatory _system_, as O'Hara certainly did, this entire landscape of tortious and sometimes criminal behavior should be stopped.

17.    All of the consequences to O'Hara and all of the future disincentive were exclusively imposed by Martinez's legal effort.  In contrast, the judicial rulings in the

---

[4]  Terrell, Kellee, "*Black Women Can't Be the Only Ones Holding Men Like R. Kelly Accountable*," Huffington Post (February 17, 2021)

PAVONE & FONNER, LLP

*Martinez* case acted to embolden O'Hara and caused the litigation to require an inordinate amount of time and effort.

18.    This inexplicable protection of O'Hara reflects a rank obscenity hurled at O'Hara's earlier female (financial) victims, hurled at O'Hara's gay sexual misconduct victim (Martinez), and hurled at O'Hara's elderly victims (Garrison and others).

19.    The Fourth District's conversion of the *Martinez* case from one about significant, unremedied predatory behavior to one debating the meaning of a particular adjective serves only to distract from what is important.

## II.

## PARTIES, FORMER PARTIES AND OTHER PARTICIPANTS

20.    Plaintiff Benjamin Pavone (Pavone, Plaintiff, undersigned counsel, counsel, or narrated in the first person) is a 25th year attorney, licensed to practice law in the State of California in good standing in this and all California federal courts, with no record of discipline or any other failure of compliance.

21.    Defendant Justice Richard Fybel is the Orange County appellate court author of the relevant published appellate opinion in *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853.

## III.

## BASIS FOR FEDERAL JURISDICTION

22.    Title 42 United States Code section 1983 provides that every person who, under color of law, causes another to be deprived of any of their constitution rights or protections under federal law may be the subject of an action seeking appropriate relief may file suit in federal district court.

23.    As defendants are located in this district and substantial activity by one party has occurred here, this is a proper venue pursuant to 28 U.S.C. § 1391(b).

24.    Plaintiff seeks declaratory relief: a declaration that Justice Fybel committed the aforementioned tort; but if the courts will not provide aforesaid relief and the only way to obtain a finding that the referral was illegal is by seeking damages,

PAVONE & FONNER, LLP

Plaintiff requests damages in order to have a forum to prove the illegality of Justice Fybel's referral decision.

## IV.

## STATEMENT OF FACTS - UNDERLYING *MARTINEZ* ACTION

### A.  Background of Fernando Martinez

25.    Fernando Martinez was born in 1993, part of a family with four sisters and his mother, and who graduated high school in Paso Robles, California in 2010.

26.    From 2010-2012, he took some classes at Riverside Community College later explaining that, "I wanted to start my own business and I wanted to have a career."

27.    He also worked at Park Cinemas movie theatre in Paso Robles from 2010-2011 as a concession stand worker.

28.    In 2011, he obtained a job as a cashier at a Riverside McDonald's working 35 hours per week for $8.20/hr.

29.    Martinez continued to work at McDonald's for about 18 months, during which time he searched for other jobs that would lead to better career development opportunities as well as higher pay.

30.    Part of his search included posting his resume on the popular job website, Monster.com, which is how Martinez first got connected to Stephen O'Hara.

### B.  Background of Stephen O'Hara

31.    Stephen John O'Hara was born in September, 1951 in the Orange County area of Florida.  Today he is 69 years old.

32.    O'Hara formally changed his name from Stephen John O'Hara to Stephen "Stratton" O'Hara, for the apparent purpose of making it appear that he originated from the upper echelons of society.

33.    Not actually from such a place, he started his career as a used car salesman and claims to have developed a number of used car lots in the 1980's.

PAVONE & FONNER, LLP

34.     O'Hara claims to have invented the concept of a "certified used car," although it seems equally true that even if he did, the warranty he used to back said certification was fraudulent.

35.     O'Hara admits he could not pay thousands of such claims that later came in against the warranties he issued, although he evidently collected the premiums on them.  He filed a Chapter 7 bankruptcy with respect to that enterprise, his first of four.

### 1.  First Bankruptcy - 1986

36.     In 1986, O'Hara filed bankruptcy in Orlando or Tampa, Florida, reportedly running up debts of $43,000,000 by issuing 12,000-mile automobile warranties that he and/or his company could not actually honor.

37.     He subsequently discharged all of these presumably individual creditors, ones who paid hard earned money for an automobile warranty after a used car purchase, only to find that in securing it from O'Hara, it was not worth the paper it was written on.

38.     On or about April 22, 1988, apparently fleeing the Florida auto industry, O'Hara obtained his California real estate license.

39.     In 1993, he worked as a Century 21 real estate broker.

40.     In 1996, O'Hara started a website named OrangeCountyRealEstate.com.

41.     In the 1990's, O'Hara worked for Century 21 and was the proprietor behind Orange County Real Estate, formerly at the URL orangecountyrealestate.com.

### 2.  Second Bankruptcy - 1997

42.     On March 18, 1997, O'Hara filed bankruptcy a second time, this time in Orange County, after he "signed on all kinds of leases [for office space], about – millions of dollars' worth of leases. And they started coming after us.  So that's what that was about."

43.     He had several good years in the early 2000's, heady days in California real estate, which enabled him to purchase a nice home located at 30961 Hunt Club Drive in San Juan Capistrano.

PAVONE & FONNER, LLP

44.     In May, 2006, he claims to have founded CSCA ("Career Solutions and Candidate Acquisitions"), a website to allegedly assist people to seek professional advancement in the real estate field.

45.     However, by 2007, as the California (and national) real estate market started to wither, he lost the San Juan Capistrano home.

46.     On or around 2010, after stealing money from naïve friends and investors, he purchased an upscale condo located at 38 Toulon, Laguna Niguel, California, before filing his third bankruptcy to discharge all of these creditors.

47.     He lost the Toulon condo in 2016.

48.     Today O'Hara lives in an apartment in Aliso Viejo, California.

### 3.  Third Bankruptcy in 2012: O'Hara Destroys His Circle of Friends and Associates, Mostly Women.

49.     The crash of the California real estate economy in 2008 was hard on everyone but was especially destructive for people that trusted Stephen O'Hara.

50.     O'Hara projected to others that he was a kind of real estate oracle offering his circle of mostly female friends profitable opportunities in the declining market.

51.     He solicited them to invest their money with him, on the premise that 'when someone is losing, someone else is winning,' a psychology-101, FOMO type of appeal.

52.     He purported to share amazing opportunities, which appear to have been little more than paper corporations with a benevolent sounding name (*e.g.*, "Parent Relocation Council") that he formed to receive and misappropriate investor funds.

53.     Bottom line, they lost – and he gained – about $3 million, money some of these women at this time could least afford to lose.

54.     Because the investments were illusory, he then strung the investors along through the remainder of the Great Recession, and discharged them *en masse* in a 2012 bankruptcy, his third.[5]

---

[5]   *See In re O'Hara*, Case No. 8:12-bk-10982-TA (C.D. Cal. Bankr. 2012).

PAVONE & FONNER, LLP

55.     After being in the real estate business for 30 years, within his 2012 bankruptcy schedules he claimed to a large number of distressed, individual, and mostly female, creditors that after his career as a so-called billion-dollar agent, he had only amassed $22,000 in assets.

56.     He did not pay back a single penny.

57.     Essentially, O'Hara financed his retirement in 2012 with fraud, leaving a trail of death and hardship in his wake, with particular trauma inflicted on women.

58.     Memorable examples include his friend Brenda Ranney, who lost approximately $750,000, her life savings, and ended up living out of her car.

59.     Patricia Mikkelson lost $350,000 and compared O'Hara to Bernie Madoff.[6]

60.     The stress of non-payment from a $75,000 investment made by the Garrisons contributed to Charles Garrison's heart attack and his resulting death, leaving his wife, Midge Garrison, traumatized and widowed.

61.     According to his 2012 bankruptcy schedules, O'Hara's list of victims is itemized by the following table:

**a.   Table 1 - O'Hara 2008-2012 Financial Victims**

| NO. | CREDITOR | LOSS |
|-----|----------|------|
| 1 | Brenda Ranney | 750,000 |
| 2 | Patricia Mikkelsen | 350,000 |
| 3 | Susan Parsons | 200,000 |
| 4 | Darlene/Charles Garrison | 75,000 |
| 5 | Gosia/Gregg Kawczynski | 200,000 |
| 6 | Lily Chen/Hosheng Tu | 300,000 |

_____

[6]  A 2013 email from Ms. Mikkelson states: "I did have the misfortune to be 'led' into a large personal investment in his real estate 'networking' scheme. I personally feel that his integrity is indeed in question, <u>tantamount to the Bernie Madoff scheme</u> … like many of Madoff's investors, the $$ was a good sized amount and part of my planned retirement that I will never be able to reacquire, and my credit has been greatly affected by this." (Underscore added.)

PAVONE & FONNER, LLP

| NO. | CREDITOR | LOSS |
|---|---|---|
| 7 | Jeanne/Dennis Carpenter | 200,000 |
| 8 | Jan/Dave Congo | 100,000 |
| 9 | Tiffani Trujillo | 35,000 |
| 10 | Mike Der | 100,000 |
| 11 | Marjorie/William Hallett | 35,000 |
| 12 | Michelle/Jeffrey Hebert | 15,000 |
| 13 | Denny Tu | 200,000 |
| 14 | Jaime/Magali Bertran | 15,000 |
| 15 | Dimitry/Oksana Yushkevich | 200,000 |
| 16 | Jerry De Aizna | 25,000 |
| | **TOTAL** | **2,800,000** |

### b. The Representative Experience of the Garrisons

62.     O'Hara's fraudulent proclivities as a solicitor of bogus real estate investments during the Great Recession were well-exemplified in his business dealings with Charles and Darlene Garrison.

63.     In a declaration by Midge Garrison, she details dozens of flowery, over-the-top, overconfident, con-man-caliber representations that O'Hara made to her and her husband to invest, to string them along, and to pretend that the investment was legitimate in the face of the inescapable reality that it was not. (See **Exhibit 3**.)

64.     On January 28, 2010, Darlene wrote to Stephen, because Charles had become too upset to correspond with him directly. "*This is seriously affecting his mental health and physical health so we must have repayment as quickly as possible*.  It is also affecting my relationship with Chuck."  Darlene asked O'Hara specifically what date he (Stephen) expected to be able to pay back the note. (**Exhibit 3**.)

65.     O'Hara did not pay.

66.     On May 4, 2010, Charles Garrison suffered a heart attack and died.

### 4. Fourth Bankruptcy - 2020

67.     The *Martinez* litigation began in November, 2012 and wound out in June, 2019, when the California Supreme Court denied review.

PAVONE & FONNER, LLP

68.    A year later, on May 21, 2020, O'Hara filed bankruptcy a fourth time, this time for the exclusive purpose of discharging the debts created by his defense lawyers during the *Martinez* case.

69.    O'Hara's bankruptcy schedules indicate, that at age 69, he possesses lifetime miscellaneous assets of $81,500, with the largest one consisting of a $35,000 Mazda (with $32,000 owed on it), while saddled with total debt of $306,168.22 in debts, $274,168.22 of which are legal debts from the *Martinez* case, plus the Mazda debt.

70.    His trial level defense lawyers, the San Diego law firm Teeple Hall LLP, led by its namesake trial attorney Grant Teeple and his then-associate attorney Brook Barnes, nevertheless advanced O'Hara $247,175.59 in attorney's fees on credit, while incurring a total of $290,270.34 in fees.

71.    O'Hara paid $43,094.75 according to a declaration by Grant Teeple in a 2019 civil suit it filed against O'Hara, mooted by the bankruptcy.

72.    Similarly, his appellate lawyers advanced him $26,992.63 for the second *Martinez* appeal, also slated for discharge.

73.    Thus, O'Hara incurred a total of (at least) $317,262.97 in defense fees, the financial burden of which his defense attorneys absorbed, for a case that could have been settled for $30,000 in 2012 (and dismantling of the website), and which would have also averted seven years of interim litigation and their own client's bankruptcy.

**C.   The Fraudulent CSCA Website**

74.    After his 2012 bankruptcy discharge, and having alienated his friend and real estate network during the Great Recession, Mr. O'Hara turned his attention to young job seekers.

75.    He dusted off an old corporate entity he had formed, CSCA (which originally stood for something else), and re-purposed it and its acronym to now stand for "Career Solutions and Candidate Acquisitions."

76.    He constructed a website around it, formerly located at www.csca.com, and proposed to place young people into lucrative real estate careers.

77.    The website seemed to be part recruiting website and part sexual fantasy for O'Hara, as it almost exclusively featured young, beautiful men and women pictured on it, as shown below and on **Exhibit 2**.

   

   

   

78.    It was also singularly littered with fraudulent statements, as detailed below.

### 1.    Fraudulent Website Detail

| No. | O'Hara's CSCA Website Representations | TRUTH |
|---|---|---|
| 1 | **Income Representation 1**: Through CSCA, "As an Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more. After your third year, | No one had actually earned a penny with CSCA, much less the lofty, introductory compensation figures as represented. |

PAVONE & FONNER, LLP

| No. | O'Hara's CSCA Website Representations | TRUTH |
|---|---|---|
| | you will have the ability to earn an income of $250K or more per year- so we are very serious about 'who' we select." | |
| 2 | **Income Representation 2** "What can you earn? Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. | No history, evidence or practice of such outcomes. |
| 3 | CSCA graduated an annual class of "30 under 30." | Total fabrication. |
| 4 | CSCA had a national recruiting reach on college campuses | Total fabrication. |
| 5 | CSCA hand selected brokerages that passed its "stringent standards" | CSCA did not have any actual standards and, given Martinez's experience level, its only standard was that the applicant be someone O'Hara found sexually attractive. |
| 6 | CSCA represented companies who were looking to hire | |
| 7 | CSCA was connected to the top, national real estate firms and was placing persons without experience in those firms | |
| 8 | CSCA had an internship program teaching people how to run a CSCA million-dollar busines | Non-existent. |
| 9 | CSCA was in the same league of the biggest recruiting firms | |
| 10 | CSCA has done "some growing" | Non-existent. |
| 11 | CSCA was affiliated with Kendra Todd and/or Donald Trump's TV show "The Apprentice." | Total fabrication. |

PAVONE & FONNER, LLP

| No. | O'Hara's CSCA Website Representations | TRUTH |
|---|---|---|
| 12 | CSCA had a series of professional programs. | Non-existent. |

79.     There were approximately 50 additional representations among CSCA's advertising materials that were false or misleading.

80.     Anyone with any level of sophistication would see the website as some sort of scam or dysfunction, but Fernando Martinez was so young and naïve, that he believed that the opportunities presented in the website were real.

81.     Martinez was led down a long trail of inflated business fantasies by O'Hara, ones in which Martinez would be suddenly making $250,000 or more as a real estate agent.  Martinez completed forms and took a fake aptitude test, which, with no business, life or educational experience, he supposedly aced.

82.     Obviously, O'Hara was not seriously interested in offering Martinez a position as an actual real estate professional, as Martinez did not even have a license.  It would take Martinez months of study and discipline for Martinez to even properly apply for a real job in the real estate field.

83.     Rather, O'Hara was physically attracted to Martinez, understood the magnitude of his naivete, and was leading him on with grandiose ideas about his potential as a real estate professional.

84.     In the larger picture, O'Hara had targeted any and all naive young beauties with his fraudulent website, and happened to lure Martinez.  He sent out an initial blast of 20,000 solicitations intending to create a pipeline of interest.

85.     However, the trial court litigation successfully ended the CSCA enterprise when O'Hara committed to the trial court to shut down the fraudulent enterprise to avoid an injunction shutting it down involuntarily.

**D.    The Sexual Predator Playbook - O'Hara Grooms Martinez**

86.    This is Stephen O'Hara in 2012:



87.    This is Fernando Martinez in 2012:



88.    On August 10, 2012, Martinez received an email with the subject line "I Found You On Monster" from Defendant O'Hara, who signed as its "Executive Search Team" for an entity calling itself Career Solutions & Candidate Acquisitions.  The job advertisement reads:

> Hi Fernando:
>
> I saw your RESUME on MonsterB[oard] and have an interest in you.  I represent CSCA® a Talent Acquisition firm specializing in the real estate sector of the Financial Services Industry. (Experience is NOT necessary, we'll be focusing on your skills and ability to be trained[.])
>
> We have been retained by a large company … who is seeking recent Business & Communications Majors for Intern and Full Time careers.  Our fees are paid by the employer (not you) and they are hiring 'now'.

PAVONE & FONNER, LLP

As a[] Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more.  After your third year, you will have the ability to earn an income of $250K or more per year – so we are very serious about 'who' we select.

Based on your Monster Resume, we feel you might be a fit for the company we represent.  Let me invite you to visit www.CSCA.com.  The site will give you all sorts of information as to the individual talent we are seeking.

After reviewing our site, there is an APPLY NOW button (upper right corner) on the Site which will lead you to our Online Application page.  Once we receive your application, we will pre-screen it and if we feel you have the skill set and personality to succeed with our client, we will invite you to move onto [*sic*] the next step which will be the last step before a face-to-face Interview is scheduled.

If you need to Email me, please take note of my private Email: steve[@]csca.com.

89.     Thus, on the site, O'Hara represented that CSCA was retained by a large company (over 35 offices and over 3,000 employees) in Southern California.

90.     O'Hara also represented that the large company CSCA represented was seeking recent Business & Communication majors for intern and full-time careers.

91.     Of course, Martinez did not have a college degree, much less one focused on business and communication as a major.

92.     At the time, O'Hara represented that CSCA's fees were paid by the large company seeking employees.

93.     O'Hara also specifically represented:

"[a]s an [*sic*] Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more.

> After your third year, you will have the ability to earn an income of $250K or more pear year – so we are very serious about 'who' [sic] we select."

94.    Taking Mr. O'Hara's email as a real, personalized indication that his resume had attracted the attention of a *bona fides* recruiter on behalf of an employer with career opportunities available, Young Martinez followed the email's invitation and went to the CSCA website.

95.    Page after page of the site represented to Martinez that Mr. O'Hara and his "Talent Acquisition Company" were successful, sophisticated, active recruiting professionals whose paying clients were multiple "real estate brokerages across the nation – every brand you can think of" seeking new-hire candidates for current openings.

96.    The CSCA website repeated several of the same projected salary figures that O'Hara's Monster email projected, $45,000 to $65,000 in the first year, presumably including interns as the email stated, and salaries of up to $250,000 in just three years.

97.    On or about August 12, 2012, based on Mr. O'Hara's request for him to apply online, Martinez completed CSCA's online application.

98.    After he applied, he called the CSCA number on its website, which directed him to O'Hara's direct phone line.

99.    Martinez reached O'Hara directly, who indicated he would provide Martinez "assessment tests," while advising him what to look for in the tests, in other words, how to cheat on his own tests.

100.    After Martinez submitted the completed tests, O'Hara called stating that he (Martinez) had impressed O'Hara so much by the results of the tests that he wanted to explain them in person.

101.    This was of course all a pretext, as the idea of "testing" Martinez was nothing more than a way to get Martinez interested in O'Hara and the supposed opportunities he was providing.

102.    On or about September 9, 2012, Martinez became an employee for Stephen O'Hara, as his "personal assistant."

PAVONE & FONNER, LLP

103.    On September 9, 2012, O'Hara commented to Martinez in an email, "[y]ou have the 'it' factor they [persons in the modeling business] would be looking for.  In fact, my contact simply said 'wow' when I showed him your picture.  (And his 'wow' wasn't sleazy or sexual as he is straight, married and very successful.)"

104.    O'Hara's September 9, 2012 email comment was the written definition of sleazy and sexual and he telegraphed that the entire business relationship was not really about a search for the most qualified real estate associate, but a personal project of O'Hara's to find a sexual partner.

105.    However, like almost all of these kinds of victims, the young person is desperate and engages with the predator for lack of sophistication, for lack of better options and without understanding that they will get precious little money and lose something far more important – their dignity.

106.    On or about September 9, 2012, Martinez, excited about the fake real estate opportunity, suggested O'Hara meet him in a public place, Starbucks in particular, but O'Hara rescheduled a couple of times and then pretended that, given these self-created scheduling problems, that they should just meet at O'Hara's private residence.

107.    At the time, this was 38 Toulon, Laguna Niguel 92677, an upscale condo about 10 minutes from Laguna's many famous beaches.

108.    At the Toulon condo, O'Hara and Martinez spent approximately nine hours discussing many topics, mostly business, and how Martinez performed on his "intake assessment" test.

109.    This was in reality a sexual grooming exercise by O'Hara.

110.    During the meeting, O'Hara described the endless possibilities that were within Martinez's reach if he (O'Hara) were permitted to professionally "guide" Martinez within the real estate industry.

111.    Among other things, O'Hara told Martinez he had the ability to make millions of dollars.

PAVONE & FONNER, LLP

112.     Among other things, O'Hara indicated that he wanted Martinez to become the heir to his real estate practice.

113.     After their meeting, O'Hara directed Martinez to return to the Toulon condo the next day.

114.     Martinez was worried and uneasy.  But he agreed to return based on the belief that O'Hara could in fact teach him how to real money in real estate.

115.     In a September 19, 2012 email, O'Hara indirectly asked Martinez to perform fellatio on him, by of all creepy and totally inappropriate things, talking about a song that reminded O'Hara of Martinez's relationship *with his mother*.

116.     O'Hara opens with the following paragraph:

> Fernando, remember 1 played that song that reminded me
> so much of you and your mom? 1 wanted to give you a
> bit more so in a special moment you can play it and
> really SUCK the energy out of the overall song and
> performance.[7]

117.     So, Martinez was supposed to perform fellatio on O'Hara during a song that reminded Martinez *of his mother*.

118.     On September 20, 2012, barely more than a week after Martinez had been hired, O'Hara sent Martinez a link with the subject header entitled "where real men want to go" – an indirect invitation by O'Hara for Martinez to accompany him on a gay cruise.[8]

119.     Martinez's supposed job role continued to change.  At first he was supposed to be handled by "First Team" but as O'Hara became familiar with Martinez (and allegedly his assessment scores), O'Hara said he wanted to keep Martinez for himself.   O'Hara suggested Martinez become O'Hara's "partner."

120.     O'Hara also told Fernando that once Martinez got his real estate license and started selling houses, his income would be around six figures.

_____

[7]   **Exhibit 4**.
[8]   **Exhibit 5**.

PAVONE & FONNER, LLP

121.     O'Hara simultaneously made a concerted effort to get Martinez to quit his real job at McDonald's, which covered Martinez's basic living necessities, and enabled him to provide some support for his family.

122.     O'Hara pushed Martinez toward real estate in part to make Fernando financially dependent on him and thereby more vulnerable to O'Hara's sexual agenda.

123.     While acting as Martinez's employer, O'Hara pushed for Martinez to move closer to him, to Orange County, as distancing himself from his sister was allegedly better for Martinez's career.

124.     O'Hara insisted that if Fernando allowed O'Hara to take him under his wing, he would undoubtedly make millions and that such opportunities do not often happen.

125.     Through September-October, 2012, O'Hara successfully leveraged his employer relationship and O'Hara engaged in eight sexual encounters, 50 telephone calls, and trips to Rodeo Drive, Abbey Food & Bar, through Mulholland Drive, Griffith Observatory and to a sex shop called Chi Chi Larue's, where O'Hara purchased sexually-suggestive undergarments for Fernando.

### E.   O'Hara Confesses His Misconduct in an Oppressive Non-Disclosure Agreement

126.     Martinez initially complied with O'Hara's sexual demands in the September-October, 2012 period, but soon could stand no more of O'Hara's advances and desire for a serious romantic partnership.

127.     Upon this revelation, O'Hara constructively terminated Martinez.

128.     However, O'Hara would not turn over Martinez's final paycheck without Martinez signing a one-sided release agreement.[9]

129.     The release agreement required Martinez to relinquish claims for sexual harassment and included a confidentiality clause that admitted that, if Martinez revealed

_____

[9]     **Exhibit 6**.

PAVONE & FONNER, LLP

1   O'Hara's misconduct toward him, it would cause O'Hara "extreme exposure to various

2   legal claims."

3        130.    Thus, the proposed release agreement essentially rewrote their business

4   relationship to fit a model where Mr. O'Hara had not committed any wrongdoing, based

5   on consideration O'Hara already owed Martinez, and constitutes an admission that

6   O'Hara knew his conduct was so tortious that it created "extreme exposure" for him.

7   **V.**

8   **THE ORANGE COUNTY LITIGATION**

9        131.    Martinez filed suit in November, 2012, and ultimately filed a Fifth

10  Amended Complaint seeking various relief, as reflected by **Exhibit 7.**

11       132.    Martinez ultimately recovered just over $10,000 in damages and secured a

12  formal capitulation by O'Hara to shut down the CSCA website (**Exhibit 8**), which

13  prompted a mootness ruling dated August 1, 2016 (**Exhibit 9**) and a subsequent

14  judgment dated February 21, 2017 (**Exhibit 15**).

15       133.    Martinez subsequently moved for the recovery of attorney's fees on

16  various grounds.  Those briefs are attached as **Exhibits 10, 11 and 12**.

17       134.    On November 30, 2016, the trial court denied the motion in its entirety, by

18  essentially arguing that the litigation had been pointless and that undersigned counsel had

19  exaggerated his billing, as reflected by **Exhibit 13.**

20       135.    The ruling contains numerous legal errors (see **Exhibit 14**), which

21  mirrored the defense's legal position, but mostly it stands for the proposition that an OC

22  trial court thought it was advisable to validate the conduct of a con man and sexual

23  predator, one who had destroyed countless people over his life and racked up nearly

24  $50M in unpaid debt to his victims, while not even paying plaintiff counsel for the

25  comparatively nominal effort required to at least interrupt his current sexual misconduct

26  website.

27       136.    Subsequently, Plaintiff waged an appellate battle against this opinion to

28  illustrate all the ways in which the judiciary disserves the public by not respecting its

PAVONE & FONNER, LLP

paramount obligation to be legally accurate, by detailed filings to the Fourth District Court of Appeal in an opening appellate brief (**Exhibit 17**), a reply brief (**Exhibit 18**), a Petition for Rehearing (**Exhibit 19**), and a Petition for Review to the California Supreme Court, the latter of which included a detailed academic challenge to the harmless error doctrine (**Exhibit 20**).

137.    On February 28, 2019, the Fourth District Court of Appeal, Division Three, filed its opinion: publishing part. (**Exhibit 21**.)  The published part referred counsel for an ethics prosecution for supposedly calling the OC trial court a succubus – reflecting the apparent fact that the opinion's putative ethics scholar, Defendant Justice Richard Fybel, declined to perform the work necessary, or did not care, to distinguish between adjectives and nouns.

## VI.
## STATE BAR LEGAL PROCEEDINGS

138.    Justice Fybel also filed a complaint to the State Bar of California (**Exhibit 21**), which prompted the Bar to initiate an ethics prosecution.

139.    On August 11, 2020, the State Bar's Office of Chief Trial Counsel charged Plaintiff with four counts of violating B&P 6068(b), in its version of a charging document called a "Notice of Disciplinary Charges" or NDC. (**Exhibit 22**.)

140.    The NDC violates Plaintiffs' First Amendment and Fourteenth Amendment rights in that it infringes on permissible advocacy of a practicing attorney.

### A.  Count 1 – Succubistic Adoption of the Defense Position

141.    In particular, in Count 1, Justice Fybel's induced charging document attributes statements made in legal proceedings that criticize a ruling as a personal criticism of the ruling's author, a state court commissioner.

142.    Taking Fybel's baton, the State Bar continued his argument that the ruling reflected a personal gender attack on the commissioner, although the language employed says nothing at all about her personally.  Rather, plaintiff used an adjective to describe a court ruling.

PAVONE & FONNER, LLP

143.    It is Justice Fybel's (and the State Bar's) unwillingness to read the language carefully and as actually stated (or improper decision to convert the language into something it does not expressly state) to reach a conclusion that the comment is a personal attack on the judge's (sexual) character.

144.    It wasn't.  Even if it were, it would have clearly constituted rhetorical hyperbole, protected under the U.S. Constitution.

145.    Detail for this position is set forth in two appellate briefs and three companion motions seeking judicial notice, some offering elementary proofs on the difference between nouns and adjectives, set forth in **Exhibits 23-27**.

146.    The State Bar later went on to accuse counsel of an entire array of gender related wrongs, by ridiculously claiming that the language implied that the OC trial judge was "overly aggressive," "predatory," a "hyperaggressive female demon attempting to engage in carnal intercourse with men," and that counsel had engaged the "insidious tactic of attacking the judicial officer's competence based upon harmful and derogatory stereotypes." (**Exhibit 37**.)

147.    However, even if the language as written conveyed the sentiment that the judge was a succubus – it didn't, if adjective are adjectives – such colorful analogies to mythical creatures have been equally invoked by feminists, notably, by a New York Times journalist named Susan Faludi in 2016.

148.    In her NYT article, Faludi analogized to a female-male political problem as a "two-headed Cerberus," which is a mythical (male-looking) dog. (**Exhibit 35**.)

149.    In particular, Faludi used the term this way:

> Understanding [Secretary Hillary Clinton's] demonization requires admitting her full significance in our political history, for she is not simply a pioneering woman fighting an Ur-misogyny. Mrs. Clinton faces a two-headed Cerberus, an artificial conjoining that occurred in the early 1990s, of wounded Republican invincibility and wounded male prerogative. Our current political crisis won't be resolved until those forces are separated and the Cerberus slain. [Underscore added].

PAVONE & FONNER, LLP

150.    Faludi's language is just as theoretically objectionable as counsel's language, using the interpretative tools adopted by the State Bar.  However, when such an analogy was offered by a feminist NYT journalist, it appears to have been uncontroversial.

151.    More importantly, the State Bar's approach is simply wrong.  Faludi employed the mythical reference figuratively not literally, and so did counsel, and it is a strikingly obtuse approach to reading the English language to read an adjective as a noun, to treat a mythical invocation of that misread noun literally, and to then dream up bogus gender-related offenses associated with that inaccurate literal interpretation.

152.    The entire enterprise is little better than Kee McFarlane-McMartinesque magical thinking, another prototypical dose of the woke psychology that has infected our national discourse with countless absurdities and results in harmful societal dysfunctions like "cancel culture."[10]

153.    Faludi's language was clearly intended to challenge certain larger gender obstacles inherent in the social context of Secretary Clinton's political career – not to call men two-headed dogs.  Counsel's point was clearly to wage an intellectual attack on the accuracy of the ruling in question, not to label a trial judge a gender binary demon spirit that assumes the female form at night to seduce sleeping men.[11]

154.    The idea that this kind of criticism of a judicial ruling was in in truth a "carnal" appeal to "hyperaggressive female sexuality" is preposterous.

155.    Consequently, Justice Fybel's interpretation of the language is wrong; the State Bar's interpretation takes his incorrect interpretation to an absurd next level; and Fybel's referral for ethical prosecution for undersigned counsel's right to use adjectives to criticize judicial rulings is a First Amendment tort.

_____

[10]    Ex. 38: Stephens, Bret, "*Woke Me Up When It's Over*," New York Times (Feb. 23, 2021).

[11]    *See* **Exhibit 21**.

PAVONE & FONNER, LLP

### B. Count Two – Thwarting Appellate Review

156.    Justice Fybel also charged counsel with other non-crimes.  He also alleges that Plaintiff improperly criticized the trial judge as attempting to thwart appellate review because the judge did not serve a signed judgment.  There is no factual dispute that a judgment was presented to her, that she signed it, and then did not serve it on the parties.

157.    Plaintiff drew the inference based on these facts, as they appeared to counsel, that she did not serve the judgment because this was a way to secretly expire Martinez's appellate rights, without Plaintiff knowing the clock had started.

158.    The State Bar infers that this was a false attack on her character, which it's not; regardless Plaintiff disclaimed his perception with the term "apparently" (aka how it appeared to Plaintiff) which by definition makes the statement true and therefore not actionable.

159.    Regardless, lawyers cannot be ethically sanctioned because they choose one inference over another to describe an action of a third party including the action of a judge; lawyers are as a matter of First Amendment advocacy and freedom of thought and speech, entitled to choose any of the reasonable inferences from the evidence of an event, as they believe most conforms to the truth.

160.    The entire idea of this being a "false" statement, a "false" opinion or any other sort of fraudulent act stretches, and breaks, reasonable boundaries for the entire concept of falsity.  Plaintiff did not state as a fact that the trial judge did anything; he stated that this is how the situation appeared to him.

161.    Justice Fybel, acting through the State Bar, proposes to criminalize the terminology thousands of lawyers employ every day to disclaim certainty about an event when they use the word "apparently" to describe what they see.

### C. Intellectual Dishonesty

162.    In the State Bar's Counts 3 and 4, also prompted by Justice Fybel, the State Bar further alleges that Plaintiff recited various statements and made various

PAVONE & FONNER, LLP

arguments in two appellate briefs (**Exhibit 17** and **Exhibit 18**) in the same case that also constitute "disrespect" of the same trial commissioner.

163.    The statements in the two briefs variously allege that the commissioner deviated from the law so clearly, so uniformly and so consistently throughout her opinion, that the ruling was not in fact a detached legal analysis by an independent jurist but represented an intentional decision to deviate from the law, in service to some other master.

164.    The *Martinez* trial court, the OC appellate court and the Bar have all basically defaulted when it comes to actually debating the specific criticisms Martinez levied about the fee ruling in issue:

(1) They argue that *Chavez* bars the request, but Martinez' fee request did not legitimately fall under its "grossly inflated" exception because the $133K request was simply not an unusual or excessive number for a four-year case to run the length of the superior court system, a figure that was dramatically lower less than the ***$870K*** fee request that the *Chavez* "grossly inflated" construct is founded on.[12]

(2) The case did not qualify for treatment under *Chavez's* you-should-have-filed-in-limited-civil criticism because that was ***impermissible*** given Martinez's legal right to pursue injunctive causes of action.[13]

(3) that a case that is successful on a limited basis (here, resulting in termination of a fraudulent enterprise, a small but full recovery on a wage claim, and a small recovery on a FEHA claim) cannot accurately be classified as litigation that is "spectacularly unsuccessful," and in addition, this is a construct that only applies to FEHA claims (as opposed to Labor Code wage claims), where fees can be denied under FEHA 12965(b)'s discretion per *Chavez*.[14]

---

[12] *See Chavez v. Los Angeles* (2007) 47 Cal.4th 970, 975.

[13] *See* Code Civ. Proc., § 86, subds. (a)(7), (a)(8).

[14] *See* Gov. Code, § 12965(b) and *Chavez*.

PAVONE & FONNER, LLP

(4) that the trial court's accusations that counsel invented or exaggerated 15-hour and 25-hour billing entries, and therefore must have inflated the rest of the bill, was arrestingly inaccurate, as effort for the two controverted entries was supported by detailed demurrer opposition filings and easily supported the hours claimed.[15]

(5) that the trial court's finding under *Ling* that wait-time penalties are not wages was plainly inaccurate given the language of Labor Code section 203, an error the appellate court capitulated to.[16]

(6) that the trial court's finding that Martinez was not the prevailing party because O'Hara capitulated to pay the outstanding wage balance at trial is inaccurate, as also capitulated to by the Orange County appellate court.

165.    Apart from the fact that if counsel is right about these disputes, the State Bar hardly has grounds to fault counsel for claiming that the Commissioner ruled against him lawlessly, because it is almost statistically impossible for such a ruling to occur without a judge *not engaging* in intellectual dishonesty.

166.    Moreover, the very idea that a sitting judge does not understand that a lawyer must file any case with an injunctive cause of action in unlimited civil, for example, is itself exceptionally difficult to accept; almost by definition, a judge that faults a lawyer for this reason has some other agenda in mind.

167.    To the extent that this complaint is that counsel should not have litigated to terminate O'Hara's fraudulent website, which effectively functioned as a fraudulent invitation for O'Hara to commit sexual abuse on both young men and young women (*see* **Exhibit 1** and **Exhibit 2)**, reflects a tone-deaf attitude toward modern resistance to predatory sexual behavior.

---

[15]   "In summary, if the Court actually drills down to the legal work underlying the allegedly unreliable billing entries that form the basis of the trial court's and O'Hara's larger accusation that the billing was inflated [record citations], their theory falls apart." (**Exhibit 18:26**.)  The detailed underlying legal work – work that Commissioner Luege implied didn't exist – is included here as **Exhibits 27-34**.

[16]   *See Ling v. P.F. Chang's* (2016) 245 Cal.App.4th 1242.

168.     In other words, if the Commissioner's point was that ending a fraudulent, sexually-problematic website was too frivolous to litigate (*see* **Exhibit 14)**, then (a) she was wrong according to contemporary gender norms; and (b) the State Bar's lawsuit bickering with counsel over the meaning of a single adjective within that lawsuit is monumentally more frivolous.

169.     Even if counsel were wrong as to some or all of the above disputes in the Commissioner's fee ruling, the facts supporting counsel's position were elaborately set forth in the appellate briefs and therefore this is a clear example of protected First Amendment opinion, per facts disclosed.[17]

170.     When the facts are disclosed, then the controversial matter becomes one of inference and attorneys are entitled to draw inferences based on facts.

171.     In summary, when Justice Fybel decided to enter the "metoo" game by labeling Plaintiff a gender villain, he took significant risks.  One of those risks is that in his haste, he did not appreciate the real difference between adjectives and nouns and how mythical references can be legitimately invoked to accentuate real grievances.

172.     A second risk is that mythical, and therefore fictional, references are constitutionally protected, and for similar reasons, all of his grievances against Plaintiff constituted punishment of protected First Amendment expression.

173.     Having embarked down the path of public accusation without needing to do so, Justice Fybel committed an anti-SLAPP violation by punishing a lawyer for the exercise of constitutional rights and thus committed the tort of successful retaliatory inducement to prosecute.

---

[17]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Milkovich v. Lorain* (1990) 497 U.S. 1, 19; *Lewis v. Time* (9th Cir. 1983) 710 F.2d 549, 555; Restatement (Second) of Torts (1977), § 566 (statement of opinion actionable "only if it implies the allegation of *undisclosed* defamatory facts as the basis for the opinion").

PAVONE & FONNER, LLP

# VII.

## FIRST CLAIM FOR RELIEF

### UNITED STATES CONSTITUTION - FIRST AMENDMENT VIOLATION

### SUCCESSFUL RETALIATORY INDUCEMENT TO PROSECUTE

174.    Plaintiff incorporates paragraphs 1-173, as if fully set forth into this cause of action.

175.    Justice Fybel initiated the prosecution in resulting State Bar Case Number SBC 20-O-30496-CV.

176.    The basis of this prosecution is founded on an exercise of Plaintiff's exercise of his constitutional rights, including but not limited to, the First Amendment rights to use English adjectives (and to have them mean what the adjective form of the word logically means), the right to draw inferences from evidence, the right to express oneself in the form of rhetorical hyperbole, the right to express opinions (that cannot be proven true or false), the right to report one's own subjective perception of events (such as a perception that a judge apparently attempted to thwart appellate review), and the right to speak the truth in plain terms.

### A.   Definition and Etiology of the Term

177.    Justice Fybel converts the adjective succubistic to the noun "succubus" as per his *Martinez* appellate opinion, and then elects to define the term as a "demon assuming female form which has sexual intercourse with men in their sleep." While this is a common definition, the meaning, origin, implications and definitions go considerable beyond this one image, especially in modern times, and can be both positive or negative. (**Exhibit 36**.)

### B.   The Meaning of the Phrase the "Ruling's Succubistic Adoption of the Defense Position" is Limited to Criticisms of the Ruling.

178.    A succubus is a noun.   When used as an adjective, in which a judicial ruling was characterized as succubistic, it is not a fair or accurate tactic to simply

overlook this change of grammar roles and act as if the phrase is still a noun and refers to the ruling's author.

179.   It is irresponsible to simply change the meanings of words by jumping from an adjective to a noun, by declining to do the real work of assembling a set of reasonable meanings when a noun is employed as an adjective.

180.   To Justice Fybel, a promiscuous ruling means the judge is promiscuous.  A sanitary ruling means the judge is hygenic.  An incestuous ruling means the judge is sleeping with a sibling.  And a succubistic ruling means the judge is a succubus.

181.   Respectfully, these interpretations represent exegetical nonsense.

182.   The word "succubus" possesses attributes that can be logically applied to a judicial ruling.  As the language itself states, the ruling was an adoption of the defense position, so it would be reasonable to infer that the adjective succubistic adds the thought that the adoption was so close, it was as if the two positions were interlocked, fornicating, or inseparable.  This is consistent with the way the term promiscuous is handled.

183.   A second reasonable interpretation of a succubistic adoption of the defense position is that the adoption is additionally wrongful, evil or taboo.

184.   A third layer of reasonable interpretation is to infer a gender component, by inferring that a judicial ruling's adoption of a defense position was in the context of a female judge's ruling and a male lawyer's defense position, perhaps even to the point where the ruling entreated the defense position.

185.   Because a logical interpretation of the adjective succubistic permits several real and fair qualifiers to the phrase "adoption of the defense position," it is not fair or accurate to simply ignore this reality and act as if a word used as an adjective has jumped out of its sentence and stands alone as a noun.

186.   The sentence in question was clearly written as a criticism *of the ruling* and so Justice Fybel's decision to treat the term as a noun is misguided, by the authority

vested in all persons that understand the role of adjectives and nouns in the English language.

**C.   Assuming the Word Were Intended to Imply or Refer to the Judge as a Succubus, this is still not an Actionable Wrong.**

187.   To the extent that calling a trial judge a succubus implies that she is "demonic," this characterization is simply not, realistically, a factual criticism.  Without being a real attack, such a description clearly falls into the rhetorical hyperbole doctrine, as established in *Hustler*[18] and *Yagman*.[19]

**1.   Derivative Gender Insults**

188.   In prosecuting plaintiff, The State Bar treats the expression in question as an assault on the judge's personal sexual identity.  To the Bar, counsel labeled the OC trial judge "overly aggressive," "predatory," a "hyperaggressive female demon attempting to engage in carnal intercourse with men" (a "deeply misogynistic image"), and engaging the "insidious tactic of attacking the judicial officer's competence based upon harmful and derogatory stereotypes."

189.   Even treating the subject adjective as a direct reference to the judge, this is not a reasonable interpretation.  There is no modern *stereotype* about mythical, demonic women seducing sleeping men.  The folklore of the subject term can be taken only as seriously as any historical fable.[20]

190.   Regardless, the intended meaning can be objectively ascertained.  The subsequent briefs lay out counsel's criticisms in appellate-caliber detail.  There are no gender references in the later briefs; no nefarious appeals to gender stereotypes in order

---

[18]   *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 48

[19]   *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1437-1440; *see also In re Anderson* (1997) 3 Cal. State Bar Ct. Rptr. 775, 1997 Calif. Op. Lexis 5, *16 ["criticism by an attorney which amounts to an attack on the honesty, motivation, integrity, or competence of a judge who has the responsibility to administer the law may still be disciplinable under certain circumstances" [but those circumstances are limited by *Yagman* and may, according to *Anderson*, require impact on the administration of justice, also a fatal problem here].]

[20]   **Exhibit 36**.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

to win the case by the underhanded tactics envisioned by the Bar; no continuation of some idea to sexualize the trial judge, demonize her, paint her as predatory, or invoke stereotypes about "hyperaggressive females."

191.    Petitioner's actual criticism as clarified in the briefs is a logical continuation of the statement in the notice of appeal, one consistently directed at the accuracy of the ruling.

192.    After the notice, which essentially communicated that the ruling was palpably inaccurate, the briefs corroborate and continue a detailed chronicle of the ruling's numerous, particular legal, factual and evidentiary infirmities.

193.    Consequently, the *Martinez* briefs do not support the Bar's hypothesis that counsel actually harbored any of its encyclopedic gender-related grievances with the OC trial judge.

194.    All of counsel's expressions of those grievances throughout the appellate process coalesce around the same basic complaint, to wit, that the ruling was infirm because it was profoundly inaccurate in a litany of particulars – not because somehow the judge's gender warranted any particular consideration.

### D.    The Moral Case for the Criticism in Question

195.    The sentence in question was written as an attack on the judge's ruling. An examination of the circumstances shows that there was moral cause for this.  In other words, if the parties are to litigate whether Plaintiff did not show a judge "due respect," the question of how much respect was "due"[21] requires some reflection.

196.    Plaintiff simply does not believe that Commissioner Luege believes her ruling was an honest installment of completely accurate legal analysis.

---

[21]  Bus. & Prof. Code, § 6068(b) does not simply say that lawyers must treat courts with respect, no matter how courts behave.  The language does not state: "lawyers shall treat courts with respect."  It is actually phrased in a passive, relative fashion that at a minimum permits the inference that an attorney should show the judge as much respect as the court has shown him: "*to maintain the respect due* to the courts of justice and judicial officers."

197.    No one can rationally conclude that across a dozen issues in a ruling, every single one was correctly adjudicated uniformly against one party.

198.    The OC trial court is an experienced lawyer and judge; for her to deny fees on the basis that counsel should have filed the case, for example, in limited civil is to betray the litigant's obligation to file any claim with an injunctive cause of action in superior court.

199.    As far as counsel can discern, the Court's ruling was another way of communicating the message that counsel should not have filed any injunctive cause of action at all; that counsel's effort to dismantle O'Hara's website was too minor an endeavor to litigate.

200.    Apart from the fact that a judge does not have a legal right to dictate which causes of action a lawyer files, such an effort was objectively not too insignificant to litigate.

201.    It certainly was not insignificant as measured against the standards the State Bar in prosecuting Plaintiff.  O'Hara's website was indisputably fraudulent; it contained dozens of over-the-top representations about the quality of the opportunity being offered.  It was the blueprint for a national effort.

202.    As a tool to induce the labor of young, attractive people, since it was interlaced with pictures of them (including plenty of pretty young women), O'Hara proposed to defraud hundreds or thousands of them.[22]

203.    As a solicitation from one much-older gay man to a very young one, it is objectionable as an installment of fraud.  It should be even more objectionable to women if it were a 60-year-old straight man building a national website to lure 19-year-old girls into a financial and sexual trap with fraudulent promises of lucrative employment opportunity.

_____

[22]   **Exhibit 2**.

PAVONE & FONNER, LLP

204.     Considering the recent #metoo movement, with the Weinstein case being the poster child for that protest, an effort to shut down the fraudulent website at the earliest possible time was warranted according to contemporary gender values.

205.     In addition, the OC trial court implied that counsel had not only spent too much time on such a cause but that certain time entries were *invented*.[23]  The court claimed that it had conducted a complete review of the entire file.[24]  If it did so, it should have seen the extensive legal work undergirding the two challenged entries.[25]  But it still held that they were manufactured, a hurtful and inaccurate attack on counsel's industry.[26]

206.     Thus, the OC Court drew first blood by its libelous accusation that counsel was an over-biller, or worse, engaged in outright billing fraud; counsel fired back with the fact that her inaccurate ruling may as well have been written by the defense.  This was a morally fair response.

**E.  Analysis of Count One's Succubus Citation.**

207.     The statement in question falls within the First Amendment for at least four different reasons.  It was not actionable.

**1.  Rewriting of the Language – Due Process Violation**

208.     Justice Fybel rewrote the criticism in question from what it was to something it was not: from "the ruling's succubistic adoption of the defense position," to "a succubus has adopted the defense position."

209.     These two phrases have different meanings.  It is, or must be, an elemental violation of due process to initiate a prosecution based on saying something one clearly did not, especially here, where even if counsel had said what the courts attributed to him, it would still not constitute a violation.[27]

---

[23]  **Exhibit 13:2**.
[24]  **Exhibit 13:2**.
[25]  **Exhibits 27-34**.
[26]  **Exhibit 13:2**.
[27]  *Compare Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440 [lawyer directly called the judge "ignorant," "ill-tempered," a "buffoon," a "right-wing fanatic," a "bully" and "one of the "worst judges in the United States" but did not

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

## 2. Rhetorical Hyperbole

210.    The subject comment is textbook rhetorical hyperbole, which was recognized in *Yagman* as a component of attorney free speech that supersedes state regulations.[28]

211.     The State Bar's theory in response is that if a comment "manifests gender bias" even though it qualifies as rhetorical hyperbole, it is removed from constitutional protection.

212.    Neither Justice Fybel, nor the State Bar, has cited authority for creating an unprecedented exception to bedrock First Amendment jurisprudence.

213.    Fictional criticism is not actionable, because *real* consequences must flow from *real* attacks.  Thinking courts, and the US Supreme Court, simply do not validate ethereal, mythical, or fictional criticisms, ones devoid of an underlying, *actual* critical message.  There is no point to prosecuting such fictional criticisms because the target was never in danger of losing real standing.

214.    Applied here, even if counsel had directly called Commissioner Luege a succubus, no one could actually or reasonably think she is one.  Apart from the appellate court's decision to misread the term as a literal religious attack, the word cannot "reasonably be interpreted as stating actual facts" about the Commissioner.[29]

---

violate 6068(b)]; *National Ass'n of Letter Carriers v. Austin* (1974) 418 U.S. 264, 284 (calling someone a "traitor" not a representation of fact); *Greenbelt v. Bresler* (1970) 398 U.S. 6, 14 [use of word "blackmail" not enough].  Once a charging party starts rewriting the language employed, there is virtually unlimited opportunity for abuse.

[28] *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438-1440, *citing Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50; *National Ass'n of Letter Carriers v. Austin* (1974) 418 U.S. 264, 286; *Nygard v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1049 [working conditions described as "slaved … without a break" among other things, reversed].

[29] *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50.

PAVONE & FONNER, LLP

215.    Even interpreted in Justice Fybel's train of thought, the word in question is so plainly caricaturesque, so obviously an "artificially eloquent exaggeration for effect, not to be taken literally,"[30] it cannot ultimately be received as anything but fiction.

216.    Ultimately, this case is little more than a judicial version of *Hustler*.  The Supreme Court dispenses with such exchanges as First Amendment banter, and as such, the prosecution Justice Fybel initiated constitutes a federal anti-SLAPP tort.

### 3.  Unprovable to be True or False

217.    Apart from the above problems, all of which are fatal, even if counsel had called the OC trial judge a succubus, no one could prove this true or false.  The very notion of even *trying* to prove whether a judge is a mythical creature is absurd and must by definition constitute a protected opinion.

### 4.  "Manifesting Gender Bias"

218.    To the extent the prosecution is based on "manifesting gender bias," at least one other court has deactivated this phrase as a viable foundation to interfere with constitutional free speech rights.[31]

219.    And again, if one actually studies the message that was being communicated, the criticism was not that Plaintiff had a problem with female judges or actually harbors gender bias toward her or any woman, it is that counsel responded to a judicial officer's controversial decision to write a judicial opinion as if one side was 100% correct, the tactic of engaging in "judicial advocacy" and generated a "lusty and imaginative" attack on the accuracy of the ruling.

220.    Regardless, Justice Fybel proposes to label an experienced litigator as a misogynistic Neanderthal, one openly trying to win a case by appealing to gender stereotypes.  The far more nuanced language in reality expresses a point that has almost nothing to do with gender, and was within counsel's constitutional rights.

---

[30]   *Renwick v. News & Observer* (N.C. App. 1983) 63 N.C.App. 200, 219.

[31]   *Greenberg v. Haggerty* (E.D. Pa 2020) Case No. 2:20-cv-03822-CFK, Dkt. 20; RJN, Ex. 6.

PAVONE & FONNER, LLP

### F. Analysis of Count Two – Thwarting Appellate Review.

221.    Justice Fybel's Count Two also fails multiple constitutional barriers.

222.    Twice Justice Fybel rewrote counsel's language, in this instance to a definitive, declaratory pronouncement that it was an unambiguously asserted fact that the trial court attempted to thwart appellate review.

223.    In reality, the sentence is modified by the term "apparently," in other words, how the situation appeared to Plaintiff.

224.    By definition, how a situation appeared to the author cannot be false; and why that situation appeared as it did to Plaintiff was based on undisputed facts: that the court did not serve the signed judgment and so it appeared to Plaintiff as if the Commissioner tried to run out the appellate clock.

225.    Justice Fybel also did not seem to appreciate that even if counsel had stated definitively that the 'thwarting review' criticism was a concrete fact, it could not logically be a criticism of the judge's honesty, integrity or adherence to the law, because such thwarting is legally permissible.[32]

### G. Counts Three and Four – Arguments in the *Martinez* Appellate Briefs

226.    The *Martinez* briefs alleged a uniform and invariable series of major errors.  In response, counsel theorized that the Commissioner was engaged in intellectual dishonesty.

227.    Justice Fybel seems to think that accusations of intellectual dishonesty are categorically impermissible.  This is not the law after *Yagman*.[33]

> **Fact**: The OC trial judge ruled against Martinez on every single issue.

> **Fact**: it is almost statistically impossible that a judge *not engaged* in intellectual dishonesty would have occasion to rule against one party on every single issue in a case with numerous issues; and

---

[32]    *See* California Rules Ct., Rule 8.104(a).

[33]    *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441 *and* fn. 19.

**Fact**: some of the issues were so basic that it is impossible to believe that a sitting judge would *accidentally* make such a mistake.[34]

228.     Given an accurate assessment of the Commissioner's position, there is no possibility that counsel's intellectually-dishonest concerns can be considered so inaccurate that it would fail *New York Times*[35] recklessness standards.

229.     Accordingly, a truthful criticism (or at least one that is not recklessly inaccurate) was within counsel's constitutional rights.  A prosecution for such exercise therefore constitutes a federal anti-SLAPP tort.

### H.  Declaratory Relief

230.     A party seeking declaratory relief must show that he has suffered a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way.[36]

231.     In this case, although Plaintiff does not expect to be the object of additional ethical complaints by Justice Fybel, Fybel's instigation of an ethics complaint for the exercise of Plaintiff's constitutional rights is being relived every day that the State Bar carries out the regulatory enforcement of Fybel's anti-SLAPP tort.

232.     Accordingly, in a very real sense, although only based on one action by Fybel, Plaintiff is being continuously wronged by Fybel's continuing tort, by being the object of an illegal State Bar prosecution every day that it continues to be prosecuted.

233.     For this reason, there is adequate cause to grant Plaintiff declaratory relief.

### I.  Judicial Immunity

234.     Judicial immunity applies for acts that are normally within a judge's judicial duties.

235.     Violating a lawyer's constitutional rights by reporting him for claimed misconduct is not within a judge's regular judicial duties.

---

[34]  For example, chastising counsel for not filing the case in limited civil when that was impermissible given B&P 17200/17500 injunctive causes of action.

[35]  *New York Times v. Sullivan* (1964) 376 U.S. 254, 279-280.

[36]  *Canatella v. California*, 304 F.3d 843, 852 (9th Cir. 2002).

PAVONE & FONNER, LLP

236.     Committing federal torts by instigating illegal prosecutions against attorneys, by rewriting their language to mean something different than what was actually said, is not within the regular duties of a judge.

237.     There is no obligation of judges, and it is not a regular judicial duty, to instigate regulatory prosecutions for conduct that is clearly within the constitutional rights of the accused.

## **PRAYER FOR RELIEF**

*Wherefore*, **Plaintiff seeks the following relief on the first cause of action:**

(1)     a declaration that Justice Fybel committed the tort of successful retaliatory inducement to prosecute;

(2)     if for any reason declaratory relief is unavailable, and there is no other way to prosecute the case except to seek damages, damages for the wrongful inducement;

(3)     costs of suit;

(4)     attorney's fees pursuant to 42 U.S.C. § 1988 or other rule or statute providing for same;

(5)     such other relief as the Court deems just and proper.


Date: February 25, 2021                    PAVONE & FONNER, LLP


                                           Benjamin Pavone, Esq.

                                           Attorneys for Plaintiff

---

PAVONE & FONNER, LLP

# EXHIBIT 1



      Apply Now  |  Find Us

**YOUR CAREER.** **LETS GET IT STARTED.**

**CSCA® is one of the best places to launch your career. If you share our 'DNA' we know you will like what everyone is talking about.**



Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                    Client Access  Terms of Use  Privacy Policy



      Apply Now  |  Find Us

Our Company

- Home
- Our Company
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

Find Us

### From the Desk of our Founder and CEO



**Thank you for visiting CSCA®. You are about to discover a Talent Acquisition Company that offers you a career like no other.**

At CSCA®, all talents apply. We're people who love technology and people who love people. We're also business people, musicians, photographers, mountain climbers, students, and artists whose interests can't be defined by a job description. Whether you're analytical or creative, tech savvy or insightful, there's a place in our Brokerages to share your talents while you learn, develop, and inspire.

I encourage you to tell us about yourself. Join us. Show your passion and expertise as you connect customers with our services and help integrate our services into their lives. Be a part of our team and change the way our customers work, play, create, and live. Our network of fine Brokerages sell a lot more than houses, they sell Lifestyles!

I challenge you to be part of something amazing. CSCA® hand selects the very best Brokerages across the nation (Independent and Franchised) on the basis that they have met our stringent standards, embrace our culture and are looking to the future. In fact, the elite Brokerages who are members of our network are not only the most innovative real estate Brokerages in the world; they represent the best brands and are among the fastest growing. On behalf of our Brokerages, CSCA® is always looking for smart, engaging, supportive, and dynamic people who have a passion for people and serving them as you would want to be served yourself.

We join our Brokerages in sharing the common goal of exceeding the expectations of our customers. That's where YOU come in. We can't do it without the right talent. Consumers can go anywhere for their Financial Services needs; in this case real estate and take their chances or they can enjoy the experience with one of our team members and buy and sell with confidence. That's the CSCA® difference.

Successfully and Warmly,



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**2**



      Apply Now  |  Find Us

Our History

- Home
- Our Company
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

- Find Us

**'Under All is the Land'.** This is the preamble to the REALTORS® Code of Practice. Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara, realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry.

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**3**

Apply Now
|
Find Us

**'Under All is the Land'.** This is the preamble to the REALTORS® Code of Practice. **Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.**

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy

their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry.

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that rewards them financially with the lifestyle they imagine for themselves.

We know that it's hard to find the right company. And, frankly, we know that it's hard for these same companies to find qualified Talent. That's where CSCA® comes in.

CSCA® serves the finest real estate Brokerages brands in the nation who are seeking career oriented College Graduates and recent Military Veterans. We filter the best Talent for our Brokerages and we offer the best Brokerages to our Talent. It's really that simple.



      Apply Now  |   Find Us

Where We're Going

- Home
- Our Company
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

Find Us

## LOOKING FOR SUCCESS? IT STARTS WITH CSCA®

It's what we know best. Our focus is finding the best Candidates for our Brokerages. We work with the Best-of-the-Best; the leader's in the real estate industry, we can take your career just about anywhere. We've put innovative ideas and thinking into the hands of our professionals. And the results have been outstanding.

CSCA® is an acronym for Career Solutions Candidate Acquisition. We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry.

While you may be completing college, coming home from the military, or have had a college background, but may be interested in using your knowledge and experience to take your career to the next level, you might want to SUBMIT YOUR APPLICATION NOW as most of our Brokerages are hiring now.

## BILLIONS OF REASONS TO JOIN US

About $64 Billion is paid each year to real estate professionals across the nation. As a multibillion-dollar industry, we can offer you more than a chance to succeed. This is where you can thrive. The sky really is the limit. Our environment's energetic, our people are motivated and our career paths can take you where you want to GO. No matter where you apply, get ready for something big.

The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara. Nearly all of our team members started in this program. You will learn the Brokerage business from the inside out – taking care of customers, developing marketing plans and working with an energetic team of professionals. You'll see just how much influence you can have on the future of our Brokerage's and



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**6**

## LOOKING FOR SUCCESS? IT STARTS WITH CSCA®

**It's what we know best. Our focus is finding the best Candidates for our Brokerage Network. We work with the Best-of-the-Best; the leader's in the real estate industry, we can take your career just about anywhere. We've put innovative ideas and thinking into the hands of our professionals.          And          the          results          have          been          outstanding.**

**CSCA® is an acronym for Career Solutions Candidate Acquisition. We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry.**

**While you may be completing college, coming home from the military, or have had a college background, but may be interested in using your knowledge and experience to take your career to the next level, you might want to SUBMIT YOUR APPLICATION NOW as most of our Brokerages are hiring now.**

## BILLIONS OF REASONS TO JOIN US

About $64 Billion is paid each year to real estate professionals across the nation. As a multibillion-dollar industry, we can offer you more than a chance to succeed. This is where you can thrive. The sky really is the limit. Our environment's energetic, our people are motivated and our career paths can take you where you want to GO. No matter where you apply, get ready for something big.

The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara. Nearly all of our team members started in this program. You will learn the Brokerage business from the inside out – taking care of customers, developing marketing plans and working with an energetic team of professionals. You'll see just how much influence you can have on the future of our Brokerage's and in your own career. As you progress through the program, you'll see many more career options open to you.

## INTERNSHIPS

Want to start way out in front? Try our Internship Program. As a current university Business and/or Communication Major, you'll learn how to run a million dollar business by working with a team that's actually running one. You'll also gain truly marketable skills that will prepare you for a successful career after graduation.

## IT'S ABOUT YOU AND THE CUSTOMER

**The biggest ideas are often the simplest. We focus the resources of CSCA® on the satisfaction of Consumer Experience with our Brokerages and the success of its Team Members – including management. The rest will take care of itself. Our innovative commitment has held true, and as a result, our Brokerages continue to be recognized for their world-class customer service and the way we advance our professionals.**

## LEADING THE WAY.

As a company, the goal of CSCA® was never to be the biggest – only the best. However, because our people offer the best customer experience, we've done some growing. We serve the best real estate Brokerage brands in the world. And there's no plan to slow down.

## STARTING IN NEIGHBORHOODS.

Since our founding, we've helped our Brokerages market to both their communities and local neighborhoods. In fact, that's what we are about; marketing the best of Talent to the best people in the world, our Brokerages and the customers in the communities they serve. We expanded this local service to other markets, and we continue to build on this base of business – real estate expertise conveniently located right where customers live and work.

## MORE THAN JUST REAL ESTATE.

Our exclusive Brokerages continue to find success in other business areas as well. These revenue streams give them the opportunity to diversify their businesses and, in turn, offer you more career opportunities.

## TECHNOLOGY MAKES US GO.

How committed are we to technology? Every year, our Brokerages invest in their technology infrastructure so they remain on the leading edge. This technology is put in your hands so you can make the customer's experience the absolute best it can be.



      Apply Now  |  Find Us

In The News

Home

**Our Company**

Our History

Where We're Going

In The News

Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

## WE MAKE NEWS.

**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

## Announcing the 2012 Class of '30 Under 30'

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

### Need a Role Model? Meet Ours!



**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old.**

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

9

WE MAKE NEWS.

**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

## Announcing the 2012 Class of '30 Under 30'

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

## Need a Role Model? Meet Ours!



**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the  US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old**.

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".

Kendra is a judge for the Real Estate Apprentice Foundation - a grant program helping 5,000 newly licensed real estate agents every year to succeed in real estate.

Kendra hosts "My House is Worth What?" on HGTV and a regular real estate contributor on Cavuto on Business.

If you are considering Applying with CSCA® you might want to VIEW WHAT KENDRA HAS TO SAY about her journey after her College Years.

## Want to hear MORE FROM KENDRA?

Author Carolyn Castleberry and entrepreneur Kendra Todd talk about "Kingdom Entrepreneurs" and how to become one. Carolyn is an accomplished author and TV News Anchor.



     Apply Now  |  Find Us

Awards & Recognition

Home

Our Company

   Our History

   Where We're Going

   In The News

   Awards & Recognition

Our  Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### Make it yours …

A LITTLE RECOGNITION **GOES A LONG WAY.** A lot of recognition goes even further. Our Brokerages and their Team have received recognition and accolades for every aspect of real estate business. Whether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |   Find Us

Interview Preparation

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
  - Interview Preparations
  - Recruitment Process
  - FAQs
- Guarantee

Find Us

### YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"

For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

### The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

### INSIDERS TIP

**Want a few 'insider' tips?**

1. Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers. (Please
   Click on Link.)

2. If You APPLY to CSCA® TODAY, you can get on the ground floor of the next great
   market; YES, it's already begun! Not only can you be a part of history, but, this knowledge
   can give your career a real power boost!

This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in
economics and really understand the back story to the nation's current financial quagmire
(without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special:
Money, Power and Wall Street; Part One, Two, Three and Four. This link will take you to Part
One and you should find Part's Two, Three and Four on the same page.

## The Markets

Read a few articles each week.
Understand what's going on in the real estate.
Stay up-to-date with financial news.
Know about FHA & VA, FANNIE MAE and FREDIE MAC.
Know about the financial crisis: what happened and why? It is the easiest way to
demonstrate interest in our specific market.
Choose one or two areas of the market that you can discuss with specific knowledge and
enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and
economics.



      Apply Now  |  Find Us

Opportunities

- Home
- Our  Company
- Our  Culture
- Opportunities
    - Training Program
    - What You'll Learn
    - Career Path
    - Rewarding Success
    - Day In The Life
    - Internships
    - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

Find Us

INTEREST IN ANY OF THESE PROFESSIONS? **WE ARE LOOKING FOR YOU!**

Management  Advertising  Marketing  Communications  Public  Relations  Stock  Brokerage  Insurance  Financial Advisors  Real Estate  Appraisal  Recruiting & Staffing  Retail  Banking  Consumer  Loan  Mortgage  Retail  Business Development  Career  Consumer  Credit  School  Counselor  Customer  Service  Commercial  and  Residential Real  Estate  Events  Manager  Telemarketing  Paralegals  Sales  Direct  Marketing  Teacher  Trainer  Coaching Relocation  Real Estate Sales Management

**CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.**

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

**What can you earn?** Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

**It's time to GO.**

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**INTEREST IN ANY OF THESE PROFESSIONS?** WE ARE LOOKING FOR YOU!

Management Advertising Marketing Communications Public Relations Stock Brokerage Insurance Financial Advisors Real Estate Appraisal Recruiting & Staffing Retail Banking Consumer Loan Mortgage Retail Business Development Career Consumer Credit School Counselor Customer Service Commercial and Residential Real Estate Events Manager Telemarketing Paralegals Sales Direct Marketing Teacher Trainer Coaching Relocation Real Estate Sales Management

CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

**What can you earn?** Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

## It's time to GO.

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.

## Right out of school or military?

Take your first step to success. You'll quickly learn that we hired you to eventually run your own business. And you'll have the opportunity to work with people as motivated and driven as you. You'll bring your degree to the table, and we'll help you make crucial business decisions in no time.

## Have some experience already?

We promote based on performance, not seniority. So if you're looking to move quickly, our Restart Training Program is for you. We'll take your existing knowledge and your drive to succeed, and supplement it with tools and training that will help you climb to the top.

### Where leaders learn to lead.

We start with orientation and classroom training. Once you are selected by one of our  local Brokerage Offices, your hands-on training begins. You'll work with and learn from capable mentors who were once in your shoes. Does it work? Absolutely. Nearly all of our managers and corporate executives started out as Trainees -- including our Chairman and CEO.

### EXECUTIVE SEARCH and OTHER OPPORTUNITIES:

Like most businesses, CSCA® and its Brokerages have other positions that need filled from time to time that are not directly sales related.



      Apply Now  |  Find Us

FAQs

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
  - Interview Preparations
  - Recruitment Process
  - FAQs
- Guarantee

Find Us

**Is CSCA® a real estate company?**

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

**When will CSCA® be visiting my campus?**

Please check with your school's career services office for a calendar of events or simply email us.

**Should I apply on CSCA's website or my school's career website?**

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please apply here

**Can I apply to more than one position?**

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

**What happens during the interview process?**

If we meet you at in a job fair or campus environment  your first-round interview may take place on campus and/or at



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

**19**

### Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

### When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply email us.

### Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please apply here.

### Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

### What happens during the interview process?

If we meet you at in a job fair or campus environment, your first-round interview may take place on campus and/or at the job fair. Depending on the position, second and final rounds will take place are always held at the Brokerage with which we place you.

### Is career mobility an option with a CSCA® Brokerage?

Yes, the breadth and scope of the CSCA® Brokerage Network geographic presence enables our team to experience a wide array of career mobility based on their interests and evolving business needs.

### Do you accept applications from disabled persons?

We welcome applications from people with disabilities and are fully committed to supporting individuals through the recruitment process.

While driving and mobility are necessary functions, there are many other situations which would not present any challenge. Feel free to discuss your situation with us. If you believe you can do it, we want to believe in you.

## Do you accept applications for military veterans?

We welcome applications for military veterans. In fact, some of our best team members are former military folks. We invite you to visit our **Military Page** on this website.

## Do I need to be licensed before I submit my application?

Absolutely NOT! If you are placed with one of our Brokerages, helping you get your licensed is part of 'what we do'.

## Do you accept applications from currently licensed real estate professionals.

Yes, we welcome currently licensed real estate professionals, however, we have a special interview process for these situations. Please let us know when you submit your application that you are SEASONED.

To be clear, while CSCA® Brokerage member's represent all the major national and regional companies as well as local Independents, our hiring qualifications are very different. Generally, we are looking for a person that is not the 'typical' real estate agent. We are looking for real professionals, not people who simply write the word professional on their resume.

## Are you hiring interns now?

Absolutely. Interns play an integral role in the success of our Brokerages. We generally hire during your summer vacation – but our Brokers can always make exceptions. Some of our Brokerages, however, do hire interns all year long. **Apply now** to learn more.

## Are internships paid?

Yes. Sometimes. It depends on what your goals are. Interns may also be eligible for incentives and rewards. Talk to our CSCA® Talent Acquisition Manager for more details.

## What are the requirements for internship?

You should be currently enrolled in college. The ideal person should be interested in a management and sales environment and should have strong multi-tasking skills.

## What hours do interns work?

Hours for interns vary from location to location. Summer interns



      Apply Now  |  Find Us

## What You'll Learn

Home

Our  Company

Our  Culture

Opportunities

   Training Program

   What You'll Learn

   Career Path

   Rewarding Success

   Day In The Life

   Internships

   Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### WHERE GO-GETTERS COME AND GET IT.

As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.

**Customer Service**

**"How can I help you?"**

Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to **GO**.

**Marketing**

**"Let's spread the word."**

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

**Financials**



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                                 Client Access  Terms of Use  Privacy Policy

# WHERE GO-GETTERS COME AND GET IT.

**As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.**

## Customer Service

### "How can I help you?"

**Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to GO.**

## Marketing

### "Let's spread the word."

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

## Financials

### Keeping us in the green."

This is the "running a business" part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### "Everything has its place."

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management

techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.

## Financials

### Keeping us in the green.”

This is the “running a business” part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### “Everything has its place.”

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.



      Apply Now  |  Find Us

Career Path

Home

Our  Company

Our  Culture

Opportunities

 Training Program

 What You'll Learn

 Career Path

 Rewarding Success

 Day In The Life

 Internships

 Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's only one way to GO. Anywhere.

There are many opportunities in real estate. We give you the flexibility to find your passion. And, then, follow that path. Where virtually everyone begins is as a trainee, where you GO is really up to you. Real estate has many faces. Residential, Commercial, Property Management, Business Opportunities, Mortgage Financing and the list goes on and on.

It's like changing careers without changing companies. It all depends on how far you want to GO.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**25**



      Apply Now  |   Find Us

Rewarding Success

Home

Our  Company

Our  Culture

Opportunities

   Training Program

   What You'll Learn

   Career Path

   Rewarding Success

   Day In The Life

   Internships

   Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

GREAT PERFORMANCE = **GREAT REWARDS**

As part of our team, you'll be compensated based on your performance. By making your Brokerage fun, and working well with your team, you'll be able to directly influence all areas of your success. You can build on our entrepreneurial model and earn an income that has no ceiling. It's only limited by your innovation, desire and skills. How much can you earn? If you perform, that's up to you.

### Managers

All team members, receive a percentage of the profits generated by their own success. As a manager, you'll earn a highly competitive income that is dependent upon the success of the business you're running. If your business does better, so do you. If you have a true entrepreneurial spirit, there's no limit to what you can earn. How high can you **GO**?





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

**26**



       Apply Now  |   Find Us

Internships

Home

Our  Company

Our  Culture

Opportunities

Training Program

What You'll Learn

Career Path

Rewarding Success

Day In The Life

Internships

Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's Only One Internship Program Like This.

That's because there's only one CSCA®. Every year we turn internships into real, substantial career-building tools. And no, you won't spend your time fetching cups of coffee or making coffee. You'll learn what it takes to run a successful business because that's what you'll help do.



Along the way, you'll also participate in contests and competitions with other interns, building relationships, honing your entrepreneurial skills and gaining experience. You'll take on the same challenges as our first and second year full-time professionals. Even better, at the end of your internship, you'll make a presentation to your management team covering the business topics you learned throughout the program. **Want to GO?**

### You Put The GO In GO-Getter.

As part of our Internship Program, you must be ambitious, creative, personable, resourceful, fun loving and hard working. As you'd imagine, everyone else in the program is just as motivated as you. If you're ready, the business training you'll receive will put your skills, your attitude and your resume way out in front.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |   Find Us

Seasoned  Professional

- Home
- Our  Company
- Our  Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

### There's More Than One Way To Join One Of Our Fine Brokerages Through CSCA®.

Perhaps you are a seasoned real estate professional. By all means, YES! We'd enjoy talking to you about your career. In fact, we have many folks who 'informally' learned a lot about real estate, but their business hit a plateau. This is common. Once they have sold their family and friends, they have exhausted their Sphere-of-Influence (SOI).

You'll learn how our Proprietary System will help you increase your sphere, thereby increasing your opportunities for new business. In fact, doubling or tripling the business you are doing now can be easy if you follow our Sphere-of-Influence Building System™. Taking your business to the next level is exactly what our System is about.

We also hire for numerous positions (Sales Management, Relocation, etc.) that are integral to helping us better serve our customers.

### And, more

We also hire for a variety of administrative positions including full and part-time opportunities. Simply send us your resume and let us know how we can help you. There is always something moving in real estate.

NOTE: The CSCA® Guarantee applies to entry level opportunities only. Be sure to ask your CSCA® Talent Acquisition Director for more information.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |   Find Us

Benefits

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

## WE COVER TODAY AND TOMORROW

Our Brokerages offer you a career-home where you can build your future. And this means more than just a career. Through our various Associations, we offer many benefits packages designed to give you peace of mind today and is flexible enough to grow with you. Just think of it as your foundation for building something truly impressive. As you'd expect, our benefits help you GO much farther.





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.
                                                    Client Access   Terms of Use   Privacy Policy

**29**



      Apply Now  |  Find Us

Job Prep

**Home**

**Our Company**

**Our Culture**

**Opportunities**

**Benefits**

**Job Prep**

   Interview Preparations

   Recruitment Process

   FAQs

**Guarantee**

**Find Us**

Job Prep: **Who We Are Looking For**

CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few.

Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like.

### What CSCA® Looks for in Candidates

The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well.

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

**30**

Job Prep: **Who We Are Looking For**

CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few.

Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like.

## What CSCA® Looks for in Candidates

The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well.

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.

    o  Career-related employment
    o  Internships
    o  Co-op experience
    o  Leadership in organizations
    o  Student organization membership



       Apply Now  |   Find Us

Interview Preparation

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
  - Interview Preparations
  - Recruitment Process
  - FAQs
- Guarantee

Find Us

## YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"

For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

## The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

## INSIDERS TIP

**Want a few 'insider' tips?**

1. Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers. (Please Click on Link.)

2. If You APPLY to CSCA® TODAY, you can get on the ground floor of the next great market; YES, it's already begun! Not only can you be a part of history, but, this knowledge can give your career a real power boost!

This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in economics and really understand the back story to the nation's current financial quagmire (without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special: **Money, Power and Wall Street; Part One, Two, Three and Four**. This link will take you to Part One and you should find Part's Two, Three and Four on the same page.

## The Markets

Read a few articles each week.
Understand what's going on in the real estate.
Stay up-to-date with financial news.
Know about FHA & VA, FANNIE MAE and FREDIE MAC.
Know about the financial crisis: what happened and why? It is the easiest way to demonstrate interest in our specific market.
Choose one or two areas of the market that you can discuss with specific knowledge and enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and economics.



      Apply Now  |   Find Us

Recruitment Process

Home

Our  Company

Our  Culture

Opportunities

Benefits

Job Prep

   Interview  Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

## Attend Our On-Campus Events

Please check with your career services center and student-run organizations for a listing of dates when CSCA® representatives will be at your school. If you're interested in a career with us, please join us for our presentations and other recruiting events held on campus. Take some time to talk with us, and we'll explain the different career opportunities available at a CSCA® Brokerage and share personal observations of the Brokerage, such as why we enjoy working here.

### Apply Online

Complete our **online application.** If you qualify for consideration, we'll contact you to arrange an interview to discuss available opportunities. We ask that all interested candidates complete our online application in addition to applying through your school's system if we have posted a job at your campus.

### Interview With Us

We generally have at least two rounds of interviews. First and final rounds can be conducted by phone, on campus or in our offices.

### If We Don't Visit Your School

Unfortunately, CSCA® representatives can't visit every school. If our on-campus interviews aren't offered on your campus, you should learn as much as you can about our goals in advance by reading our website and then complete our **online application.** for consideration.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |  Find Us

## FAQs

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
  - Interview Preparations
  - Recruitment Process
  - FAQs
- Guarantee

Find Us

### Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

### When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply **email us.**

### Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please **apply here**

### Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

### What happens during the interview process?

If we meet you at in a job fair or campus environment  your first-round interview may take place on campus and/or at



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access Terms of Use  Privacy Policy

**36**



     Apply Now  |  Find Us

Guarantee

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### 'If CSCA® doesn't help you find a job, we'll help pay your bills.'™

We're so confident that (if you have the right skill-set to launch your career with one of our entry level positions, be willing to relocate and we have a brokerage in your market) CSCA® will guarantee that you will find employment with one of our Brokerages within six months of graduation, or, we'll help pay your bills for the next six months. Simple as that. Ask our Talent Acquisition Manager for more details. A written agreement is required.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



       Apply Now  |   Find Us

Apply now

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

Find Us

### Are you on the GO?

With 90% of the U.S. population located within 15 miles of one of our Brokerages, there's a CSCA® Career Consultant waiting to talk to you.

If you have been surfing our site, you have already learned about some of the opportunities at one of our Brokerages. In just a minute, you'll be able to apply for a position online.

Our Brokerages have built a thriving business based on offering exceptional service to their customers and a dynamic and rewarding work environment to their employees.

Interested in a career with one of our fine Brokerages? You'll only need to SUBMIT ONE Application based on where you live and/or plan to work. Applying to more than one position or to multiple locations will slow the process down. Our Career Counselors will work with you to find the position and location that is a perfect fit for your skill set. Thank you for allowing us to respond to your application in a timely fashion!

Thank you for letting CSCA® help you plan your career path!

### OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):

 



- Who Are You?
- Support For Veterans
- Why CSCA?
- Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

## OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):
SELECT APPROPRIATE FIELD
(Select Up to Five Choices)

- [ ] Advertising
- [ ] Appraisal
- [ ] Banking
- [ ] Business Administration
- [ ] Commercial Real Estate
- [ ] Communications
- [ ] Consumer Loan
- [ ] Credit
- [ ] Customer Service
- [ ] Counselor(Career,Credit,School)
- [ ] Development
- [ ] Direct Marketing
- [ ] Events Manager
- [ ] Finance
- [ ] Financial Advisors
- [ ] Insurance
- [ ] Marketing
- [ ] Market Research
- [ ] Marketing & Research
- [ ] Mortgage
- [ ] Paralegals
- [ ] Public Relations
- [ ] Real Estate
- [ ] Retail
- [ ] Retail & Consumer
- [ ] Recruiting & Staffing
- [ ] Sales
- [ ] Stock Broker

- [ ] Stock Brokerage
- [ ] Teacher
- [ ] Trader Trainer
- [ ] Telemarketing
- [ ] Other (Please Describe)

Are You Applying For:

- [ ] Full-Time
- [ ] Intern with Full Time Expectancy
- [ ] Part-Time
- [ ] Other (Please Describe)

Tell Us About Your School / Work History:

- [ ] Business
- [ ] College Graduate
- [ ] Great People Skills
- [ ] Intuitive
- [ ] Marketing
- [ ] Military Veteran
- [ ] Niche Relationships
- [ ] Public Relations
- [ ] Sales
- [ ] Some College
- [ ] Student
- [ ] Other (Please Describe)

Just for The Fun of It, Tell Us Your Yes's and No's

Have You enjoyed and Watched NBC's THE APPRENTICE®?
- [ ] Yes  - [ ] No  - [ ] Never Heard of It

Have You enjoyed and watched ABC's SHARK TANK®?
- [ ] Yes  - [ ] No  - [ ] Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

**Tell Us About Your School / Work History:**

☐ Business

☐ College Graduate

☐ Great People Skills

☐ Intuitive

☐ Marketing

☐ Military Veteran

☐ Niche Relationships

☐ Public Relations

☐ Sales

☐ Some College

☐ Student

☐ Other (Please Describe)

**Just for The Fun of It, Tell Us Your Yes's and No's**

Have You enjoyed and Watched NBC's THE APPRENTICE®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched ABC's SHARK TANK®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

Like many professions (nursing, teaching, contracting, plumbing, law, medical, real estate, stock-brokerage, insurance, etc.), the career for which you are applying requires state licensing, malpractice / Errors and Omissions (E&O) insurance and joining one or more professional associations.

The fees and costs associated with licensing and membership are usually paid by you directly to the state licensing agencies and/or other third parties. **YOU WILL NEVER BE ASKED TO PAY ANY FEES OR COSTS TO CSCA®.**

Exact fees will be discussed with you upon determination of WHICH sector of the Financial Services Industry (banking, insurance, stock-brokerage and/or real estate) for which you will be recommended as well as the state in which you will be working.

With this in mind and setting aside questions about a specific fee, do you understand (conceptually) that many higher level careers require you to obtain a license and ongoing continuing education to maintain your license?

☐ Yes ☐ No

**The Career You Are Applying For Requires State Licensing and a Background Check. Is there anything in your past that might cause you a challenge that would compromise your ability to be licensed or pass a background check?**

☐ Yes ☐ No

100 Words Limitation



Education Qualification

---

College Attended

Type Your Re

Highest Degree Attended

Type Your Re

Graduate Year

Choose Graduation Year ⬦

Available Start Date

Type Your Re

500 Words Limitation

**How would your friends describe you?** (Self-Starter, Needs Motivation, Detail Oriented, People Person, team player, etc.):



500 Words Limitation

If you could change anything about yourself, what would it be?



500 Words Limitation

What do you consider your strengths and weaknesses?



500 Words Limitation

Tell us about a time when you accomplished something that others didn't' think you could do.



500 Words Limitation

When YOU are working with a salesperson (from any industry), what do you think are the most important characteristics the salesperson should have?



500 Words Limitation

Was there ever a time when you had to meet people you didn't know and had to ask them for something or sell them something or present an idea? Describe the situation and what was the outcome?

What other career industries have you considered or have an interest in?



500 Words Limitation

Do you know anyone in the Real Estate / Mortgage Sectors of the Financial Services Industry? Are they successful? Assuming the income potential met your expectations and you had appropriate training, what, if any, are your feelings towards becoming an 'Account Executive / Sales Professional' as a career choice?



500 Words Limitation

If the income potentials are appropriate, but you had to 'arrange your personal time, would you be willing to work evenings and weekends if needed or, are you more comfortable with "9-5"? Explain why.

What 'MATTERS' to you? What are you looking for in a company? What are you looking for in life?



Work Information

---

If You Have Worked, Tell Us About It:

☐  Yes

☐  No Student Only. I've Never Worked.

If you have prior work experience, describe what the job(s) was/were and what you liked the LEAST and MOST about the job(s).

500 Words Limitation

> Type Your Response Here…

Years of Combined Work History

> Type Your Re

Current Employer

> Type Your Re

Current Title

> Type Your Re

Current Salary

> Type Your Re

Would You Consider Relocating

☐ Yes ☐  No

1500 Words Limitation

Work History/Experience (List Current and Past Employers while student or after along with the Tasks and Duties involved with your Job.)

> Type Your Response Here…

500 Words Limitation

Combined Duties of All Listed Work History

Resume Questions

---

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

> Type Your Response Here...

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

> Type Your Response Here...

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?

> Type Your Response Here...

From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One

> $------to  $------

Year Two

> $------to  $------

Year Five

> $------to  $------

☐

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.

Resume Questions

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

> Type Your Response Here...

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

> Type Your Response Here...

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?



From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One

$------to $------

Year Two

$------to $------

Year Five

$------to $------

☐

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.



     Apply Now  |  Find Us

Find Us

Home

Our  Company

Our  Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

**CSCA®**
Career Solutions and Candidate Acquisition
4533 MacArthur Blvd., Suite 100
Newport Beach, CA 92660-2059
USA Toll Free: 1-866-254-7600
Local: 949-644-7600
www.csca.com
CONTACT US





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

# EXHIBIT 2



      Apply Now  |  Find Us

**YOUR CAREER. LETS GET IT STARTED.**

CSCA® is one of the best places to launch your career. If you share our 'DNA' we know you will like what everyone is talking about.



Young Woman #1

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



Young Man #1

Young Woman #2

CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



  Apply Now  |  Find Us

Our Company

Stephen O'Hara



Home

Our Company

Our History

Where We're Going

In The News

Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

**From the Desk of our Founder and CEO**

**Thank you for visiting CSCA®. You are about to discover a Talent Acquisition Company that offers you a career like no other.**

At CSCA®, all talents apply. We're people who love technology and people who love people. We're also business people, musicians, photographers, mountain climbers, students, and artists whose interests can't be defined by a job description. Whether you're analytical or creative, tech savvy or insightful, there's a place in our Brokerages to share your talents while you learn, develop, and inspire.

I encourage you to tell us about yourself. Join us. Show your passion and expertise as you connect customers with our services and help integrate our services into their lives. Be a part of our team and change the way our customers work, play, create, and live. Our network of fine Brokerages sell more than houses, they sell Lifestyles!

I challenge you to be part of something amazing. CSCA® hand selects the very best Brokerages across the nation (Independent and Franchised) on the basis that they have met our stringent standards, embrace our culture and are looking to the future. In fact, the elite Brokerages who are members of our network are not only the most innovative real estate Brokerages in the world; they represent the best brands and are among the fastest growing. On behalf of our Brokerages, CSCA® is always looking for smart, engaging, supportive, and dynamic people who have a passion for people and serving them as you would want to be served yourself.

We join our Brokerages in sharing the common goal of exceeding the expectations of our customers. That's where YOU come in. We can't do it without the right talent. Consumers can go anywhere for their Financial Services needs; in this case real estate and take their chances or they can enjoy the experience with one of our team members and buy and sell with confidence. That's the CSCA® difference.

Successfully and Warmly,



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



Awards & Recognition

Apply Now  |  Find Us

Home
Our Company
    Our History
    Where We're Going
    In The News
    Awards & Recognition
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

**Make it yours …**

A LITTLE RECOGNITION **GOES A LONG WAY. A** lot of recognition goes even further. Our Brokerages and their Team have received recognition and accolades for every aspect of real estate business. Whether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

**12**

Apply Now  |  Find Us

Career Path



Young Man #8

Home

Our  Company

Our  Culture

Opportunities

    Training Program

    What You'll Learn

    Career Path

    Rewarding Success

    Day In The Life

    Internships

    Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's only one way to GO. Anywhere.

There are many opportunities in real estate. We give you the flexibility to find your passion. And, then, follow that path. Where virtually everyone begins is as a trainee, where you GO is really up to you. Real estate has many faces. Residential, Commercial, Property Management, Business Opportunities, Mortgage Financing and the list goes on and on.

It's like changing careers without changing companies. It all depends on how far you want to GO.

Young Woman #6



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**25**



    Apply Now  |  Find Us

Rewarding Success

Young Woman #7

- Home
- Our  Company
- Our  Culture
- Opportunities
    - Training Program
    - What You'll Learn
    - Career Path
    - Rewarding Success
    - Day In The Life
    - Internships
    - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

GREAT PERFORMANCE = **GREAT REWARDS**

As part of our team, you'll be compensated based on your performance. By making your Brokerage fun, and working well with your team, you'll be able to directly influence all areas of your success. You can build on our entrepreneurial model and earn an income that has no ceiling. It's only limited by your innovation, desire and skills. How much can you earn? If you perform, that's up to you.

**Managers**

All team members, receive a percentage of the profits generated by their own success. As a manager, you'll earn a highly competitive income that is dependent upon the success of the business you're running. If your business does better, so do you. If you have a true entrepreneurial spirit, there's no limit to what you can earn. How high can you **GO**?





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**26**

Apply Now  |  Find Us

Internships

Home
Our Company
Our Culture
Opportunities
   Training Program
   What You'll Learn
   Career Path
   Rewarding Success
   Day In The Life
   Internships
   Seasoned Professional
Benefits
Job Prep
Guarantee

Find Us

Young Man #9

Young Woman #9

### There's Only One Internship Program Like This.

That's because there's only one CSCA®. Every year we turn internships into real, substantial career-building tools. And no, you won't spend your time fetching cups of coffee or making coffee. You'll learn what it takes to run a successful business because that's what you'll help do.

Along the way, you'll also participate in contests and competitions with other interns, building relationships, honing your entrepreneurial skills and gaining experience. You'll take on the same challenges as our first and second year full-time professionals. Even better, at the end of your internship, you'll make a presentation to your management team covering the business topics you learned throughout the program. **Want to GO?**

**You Put The GO In**

Young Woman #8

Young Man #10



As part of our Internship Program, you must be ambitious, creative, personable, resourceful, fun loving and hard working. As you'd imagine, everyone else in the program is just as motivated as you. If you're ready, the business training you'll receive will put your skills, your attitude and your resume way out in front.



GO
▶▶▶

Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates

CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy



Young Man #11

      Apply Now  |  Find Us

Seasoned Professional

Home

Our Company

Our Culture

Opportunities

Training Program

What You'll Learn

Career Path

Rewarding Success

Day In The Life

Internships

Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's More Than One Way To Join One Of Our Fine Brokerages Through CSCA®.

Perhaps you are a seasoned real estate professional. By all means, YES! We'd enjoy talking to you about your career. In fact, we have many folks who 'informally' learned a lot about real estate, but their business hit a plateau. This is common. Once they have sold their family and friends, they have exhausted their Sphere-of-Influence (SOI).

You'll learn how our Proprietary System will help you increase your sphere, thereby increasing your opportunities for new business. In fact, doubling or tripling the business you are doing now can be easy if you follow our Sphere-of-Influence Building System™. Taking your business to the next level is exactly what our System is about.

We also hire for numerous positions (Sales Management, Relocation, etc.) that are integral to helping us better serve our customers.

### And, more

We also hire for a variety of administrative positions including full and part-time opportunities. Simply send us your resume and let us know how we can help you. There is always something moving in real estate.

NOTE: The CSCA® Guarantee applies to entry level opportunities only. Be sure to ask your CSCA® Talent Acquisition Director for more information.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**28**



Young Woman #10

Young Man #13

Young Man #12

Young Woman #11

Young Man #14

Young Woman #12

Apply Now | Find Us

Benefits

Home
Our  Company
Our  Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

## WE COVER TODAY AND TOMORROW

Our Brokerages offer you a career-home where you can build your future. And this means more than just a career. Through our various Associations, we offer many benefits packages designed to give you peace of mind today and is flexible enough to grow with you. Just think of it as your foundation for building something truly impressive. As you'd expect, our benefits help you **GO** much farther.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy





Young Women #13

     Apply Now  |  Find Us

Guarantee

Home

Our  Company

Our  Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### 'If CSCA® doesn't help you find a job, we'll help pay your bills.'™

We're so confident that (if you have the right skill-set to launch your career with one of our entry level positions, be willing to relocate and we have a brokerage in your market) CSCA® will guarantee that you will find employment with one of our Brokerages within six months of graduation, or, we'll help pay your bills for the next six months. Simple as that. Ask our Talent Acquisition Manager for more details. A written agreement is required.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

http://www.csca.com/guarantee                                    11/11/2012





f  t  in     Apply Now  |  Find Us

Apply now

Young Woman #14

Home
Our  Company
Our  Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

### Are you on the GO?

With 90% of the U.S. population located within 15 miles of one of our Brokerages, there's a CSCA® Career Consultant waiting to talk to you.

If you have been surfing our site, you have already learned about some of the opportunities at one of our Brokerages. In just a minute, you'll be able to apply for a position online.



Our Brokerages have built a thriving business based on offering exceptional service to their customers and a dynamic and rewarding work environment to their employees.

Interested in a career with one of our fine Brokerages? You'll only need to SUBMIT ONE Application based on where you live and/or plan to work. Applying to more than one position or to multiple locations will slow the process down. Our Career Counselors will work with you to find the position and location that is a perfect fit for your skill set. Thank you for allowing us to respond to your application in a timely fashion!

Thank you for letting CSCA® help you plan your career path!

### OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):



SELECT APPROPRIATE FIELD
(Select Up to Five Choices)



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**38**



Apply Now  |  Find Us

Find Us

Young Woman #15

Home

Our  Company

Our  Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

**CSCA®**
Career Solutions and Candidate Acquisition
4533 MacArthur Blvd., Suite 100
Newport Beach, CA 92660-2059
USA Toll Free: 1-866-254-7600
Local: 949-644-7600
www.csca.om
CONTACT US



GO

Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates

CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

Young Man #16

Young Woman #18

Young Woman #17          Young Woman #16



# EXHIBIT 3

BENJAMIN PAVONE, ESQ.

## DECLARATION OF DARLENE GARRISON

I, Darlene ("Midge") Garrison, if called to testify, could and would testify competently to the following:

1.      I have known Stephen O'Hara for seven years.  He acted as the real estate agent handling the sale of my Aliso Viejo condo in April, 2006.  In addition, Mr. O'Hara was the selling agent for my late husband, Charles Garrison, in 2002 or 2003.

2      Attached to this declaration is a compendium of documents Bates-stamped 1-31, in chronological order, which are true and correct copies of correspondence between myself (and/or my late husband Charles) and Mr. O'Hara (Exhibit A1, A2, etc.)

3.      In an April 14, 2009 email, he contacted me and others by virtue of a blind email he sent to himself seeking investors for a real estate opportunity.  (Exhibit A1.)  In order to entice investors, he made the following claims:

      (a)      And, if you are watching the news, there simply isn't and probably won't be [a] better time to invest in real estate related opportunities than right now.

      (b)      Remember when someone is losing someone else is WINNING!  And, at the risk of sounding arrogant, 'we' are doing well.

      (c)      As I've said before, the stimulus package is having a positive impact on all of this.  My goal is take advantage of as many of these opportunities as we can while we have this window.

      (d)      I know that in a prior email, I stated that any opportunities we take advantage of would most likely payout in Q-l of 2010.  Due to the market up-tic, I've been witnessing, I believe we can get a little more into 2009.

(e)    So, I'm able to offer you a new opportunity which you can expect to payout in September or the first few weeks in October of 2009.

(f)    As in the past, this Opportunity will pay a 15% return. We have only four 'slots' available at $50K per slot. As in the past, I will personally guarantee these funds.

(g)    Take care and please let me know right away if you have an interest in being one of 'the fabulous four'.  (Exhibit A1)

4.    In an April 19, 2009 email, Mr. O'Hara made the following additional claims:

(a)    I'm excited to hear about the foreclosure, I'm raking up on them.

(b)    I'm not sure if you got the invite for the one coming up in May, but it will 'close out' on the 10th.  So sure if you 'in' I'd love to make some money with you guys.

(c)    I sent out a OC Market Update today and things are in the 4th month of 'upswing' so I feel very, very, very good about your foreclosure investment as well as my 'projects.'  (Exhibit A2.)

5.    On Sunday, April 19, 2013, my husband Charles wrote to Stephen advising him that he was interested in a $50K investment but would not be able to participate until after May 7, 2009.   I personally had been very reluctant to take out a loan on our primary residence to fund this adventure, but eventually acquiesced to Charles.  In a return email, Charles commented, "so if you have a good solid project after May 7, please let me know."  (Exhibit A2.)

6.    On Monday, April 20, 2009, O'Hara wrote back stating that his projects "have a soft deadline of the 1st of the month" but explained that this was no problem because "we are not a big fancy company with 'drop dead dates'" and that another investor was not obtaining his investor funds until May 5, so there would be "zero problem."   Stephen also stated:

---

1            (a)    I'm just excited that you and Midge have an interest – I think you

2                   find it fun.  (Exhibit A3.)

3        7.    That same day, on Monday, April 20, 2009, Charles suggested

4 arrangements to make sure our $50K investment would be received by Stephen no

5 later than June 10, 2009. (Exhibit A3.)

6        8.    On Wednesday, April 22, 2009, Stephen wrote to me stating that he had

7 told my husband that he:

8            (a)    "had a couple of spots on the May 'adventure.'  One of my clients

9                   took one a few hours ago and I have one left which you can now

10                   consider YOURS.  Anything else we do will be for 2010, you are

11                   in the last group for a 2009 pay out."  (Exhibit A7.)

12        9.    On Thursday, April 23, 2009, in response to our question of how the

13 funds should be delivered, Mr. O'Hara provided instructions to tender the $50K to by

14 wire transfer or cashier's check.  (Exhibit A8.)

15        10.    On May 5, 2009, Stephen signed an unsecured promissory note payable

16 to Charles Garrison for $50,000, payable at 15% interest.  (Exhibit A9.)   The note

17 called for repayment of the $50,000 "plus interest at the rate of 15% all due and

18 payable on or before December 15, 2009."   This would have required payment to us

19 in the amount of $57,500 on December 15, 2009.

20        11.    Six months later, as the maturity date approached, on December 11,

21 2009, Chuck wrote to Stephen in relevant part asking: "do you need an account

22 number for transferring our funds on the 15th, or just an address to send a check?"

23 (Exhibit A10.)

24        12.    In response, Stephen wrote:  "I am on top of the $50K. As I mentioned

25 to you, this lending environment sucks and is effecting [sic] everything and everyone.

26 It all seems to 'nudge' its way thru the process, but it's painful still.  I'm very sensitive

27 to Midge and her needs as well as yours. So, don't be shy about expressing your

28

1   feelings, etc.  I'm 100% on your side.  I care and respect both of you and we WILL

2   get thru all of this together."  (Exhibit A10.)

3       13.    The next day, on December 12, 2009 at 11 am, Charles wrote back to

4   Stephen:  "I am deeply disappointed in you as a person. You have destroyed my faith

5   in you.  This 'turndown' didn't creep up on you. You knew about this poor economy

6   months ago and, to quote, as you gleefully said: 'When someone's losing, someone

7   else is winning.' Oh, and back somewhere in your e-mails to me I remember you

8   saying this (investment project) was going to be "fun."  [¶] Question: Come Dec. 15,

9   will it be 'fun' for the Garrisons?  Or on Dec. 25 will we be among the 'losers.'  I had

10  a sue a guy over a similar deal many years ago and I still carry the puffy, dripping

11  sores of anger in my gut. You have no idea how poorly I slept last night - painkillers

12  and anti-anxiety medications. [¶] There's no point in pursuing Paseo Laguna any

13  further until ALL of our loan is paid back, either on Dec. 15th or Dec. 25th.  I

14  bragged to Midge about how I trusted and reassured her there would be no problem

15  being paid b back ON TIME. We can counted each day pass. She, with a degree of

16  reluctance, agreed to try this for me with our hard-earned money. Now I am

17  embarrassed before her."  (Exhibit A17.)

18      14.    Stephen wrote back at about 12:30 pm that same day, December 12,

19  2009.  The following statements are relevant in terms of his response:

20      (a)    "My belief in the future is stronger today than it was three, six or twelve

21             months ago."

22      (b)    "At the end of the day, the question isn't 'if' but simply 'when.' "

23      (c)    "I would strongly urge you NOT to borrow trouble that does not exist."

24      (d)    "No one on this planet care more than me about seeing you and/or any of

25             my other friends and clients succeed in any investment or purchase or

26             transaction in which I am involved."

27      (e)    "I told you when we first did this that I would personally guarantee the

28             return of your investment plus interest."

BENJAMIN RAVONE, ESQ.

(f)  "So, again, you have nothing to be concerned about with respect to ever 'losing' your money."

(g)  "Sure if it came to that, I'd have to liquidate some things, etc., but you would never 'lose.'  So, one way or the other, you will be paid as I would never do business any other way."

(h)  "I want to be clear, it is NOT that the transactions never close, it just seems that they are all taking much longer due to underwriting and the new government guidelines, etc. with the lenders."

(i)  "I do hope that you faith in me will return when you learn what I am made of, and, that I do honor my promises."

(j)  "This is all I can say right now because your health, well-being and making you whole is all that matters to me."

(k)  "For me, and many investors, 'fun' is a relatively trouble free (which this has been in comparison to other nightmares we as REALTORS are dealing with these days), where I can make 15% on an investment. Clearly, the reason we earn 15% is because there is a higher risk of 'aggravation.'  So I would beg you to NOT stress over this; it isn't the 15th yet and while I don't see us making the 15th, I do see you getting paid sooner rather than later."

(l)  "Remember, I have openly talked with you about this.  I have NOT left town or anything like that.  In fact, for me, this is 'just another day' in the life of real estate."

(m)  "I want you to understand that I'm intellectually and emotionally very capable of maneuvering these economic times and winning."

(Exhibit A18.)

15.  On December 16, 2009, Stephen wrote in an email time-stamped at 8:52 am:

---

(a)  I'm very, very sorry that your expectations were not met by things closing in a timely manner.

(b)  I want to be dear about one thing – perhaps something I did was the reason.  Here's the issue. I DID have an indication that the buyer was marginal about half way into the escrow.  Remember, the buyer is NOT represented by me.  The loan broker kept leading all of us to believe that he could 'fix' the situation and close the escrow.

(c)  The issue has to do with the equity in the buyers existing home.  Under the new loan guidelines, if the buyer has an existing home, the Guidelines state that they need to have a 20% equity in it to keep it. (These guidelines are to keep people from buying while their credit is still good, then closing and just walking away from their old home.)  At the time the buyer made the offer, the comps indicated their equity was 'marginal but ok'.  Then, as the banks got tighter these past few months, they ordered an appraisal of the buyers existing home, and, well the rest is history.

(d)  Because I knew I had a date certain with you, I chose to keep the deal going because I KNEW that if I killed it, for sure I couldn't meet the deadline we had agreed to.  By continuing, I was told with almost certainty that the deal could be closed. In hindsight, the right business decisions would have been to CANCEL the escrow and pursue another buyer.

(e)  With regard to you receiving your interest: OF COURSE yon will be paid every dime due you for the use of your money. Additionally, there may be a little 'extra' if we can squeeze it out to compensate you for the tardiness'.

(f)    As I have stated, your money is safe – maybe the economic times have compromised timely repayment but, you will get paid.  I would never be a party to anything less than that.

(g)    If it helps you, during these past 9O-days, NOT ONE deal has dosed on time. Each and every hang up has been a lender issue - either with the short sale lender like you are experiencing with Paseo Laguna or the buyers lender like we are experiencing with this investment issue.  Do you realize that Paseo Laguna has gone through over 20 buyers and none of them but us and one other has hung in there.

(Exhibit A20.)

16.    On January 22, 2010, Charles and I wrote to Stephen inquiring about interest details and asking whether Stephen had a "best guess" in terms of the time frame in which they would be paid in full.  (Exhibit A22.)

17.    On January 26, 2010, Stephen wrote back, with the following representations.

(a)    I would be happy to redo the note to reflect a) a new note for $60K which includes the $7500 in interest due on Dec 15 plus the $2500 penalty for a total of $10K and then b) interest on this new $60K balance at the rate of 15% per year.

(b)    The good news is when I make money, I make good money.

(Exhibit A23.)

18.    On January 28, 2010, I wrote to Stephen, because my husband Charles was too upset to correspond with him directly.  "This is seriously affecting his mental health and physical health so we must have repayment as quickly as possible.  It is also affecting my relationship with Chuck."   I asked him specifically what date he (Stephen) expected to be able to pay back the note.  (Exhibit A23.)

19.    On February 2, 2010, Stephen wrote back, providing the following statements:

BENDA MINI AVONE, ESQ.

(a)   While email never conveys 'tone,' I want you to know that this reply may sound one way, but, rest assured, it is with humility and care that I write *every* word.

(b)   You both are 'salt of the earth' good people and none of us deserves to be in this situation right now. I just hope both of you know me and my family well enough to know that being in a debacle like this is NOT normal for me.

(c)   At the end of the day, until I have something concrete, I cannot set you both up for another 'let down' by giving you a date certain as to when you will be paid. Everything in my world is dependent upon third parties.

(d)   This matter has created somewhat of a snowball effect on my overall financial situation that I have to get in order until this particular bump is behind us. In fact to pay my personal bills this month, I had to borrow some money from my family. My 'cash' is that tight.

(e)   To make matters worse, I was going to give you a $25K reduction last week from someone who owes ME money and now they have a delay.

(f)   My goal at this point is to push money to you from whatever source I can get it.

(g)   I was going to surprise Chuck with that, then that failed. I felt awful because I was so excited. I wanted to share this with you so you know I'm very serious about taking care of you over some other people I owe. I KNOW you didn't sign up for this at this time of your life.

(h)   Clearly, I have too much at stake, my reputation, my business and many other things to file for Bankruptcy relief - at this time.

(i)   I have had to tell several people that I now owe that I can only do what I can do and I need each and everyone's cooperation while I fix what is wrong.

(j)   As I have said several times, this isn't a matter of me wanting to repay you, but rather 'when'.

(k)   The good news is when I make money, I make very good money and I know repayment is not a difficult thing.

(l)   I want you to know that EVERY DAY I look north and see the snow capped mountains in the background, I think of you.

(m)   I'm convinced it's God's way of keeping me in check and you both at the forefront of my mind.

(Exhibit A24, A26.)

20.   On February 3, 2010, Chuck wrote to Stephen asking him three questions, whether Stephen remembered making the statement in which O'Hara offered "a new opportunity which you can expect to pay out in September or the first few weeks of October of 2009"; what O'Hara's personal guarantee exactly meant, and questioning Stephen's style of presenting an investment description "filled with positive statements, stated expectations, personal guarantees, market up-tics and a general environment of can't-miss opportunities."   (Exhibit A12-A13.)

21.   Stephen wrote back to me indicating that I "may forward this to Chuck at your own discretion."   This email appears to have been written approximately February 6, 2010.   In it, as relevant, Stephen made a number of statements:

(a)   "I don't connect to 'cold' impersonal communication – from anyone."

(b)   "Business may be business, but people are still people and his tone as well as his words discouraged me."

(c)   "Anyone who knows me well knows this situation is devastating to me."

(d)   "One of my associates has a client who is with a major company. He has a 780 FICO and over $3MM in his bank accounts.  He is relocating from Seattle but because his home in Seattle does NOT have 20% equity, we couldn't get him a loan. We tried for four months.  Now, in his case, he got ticked off at the lenders and wrote a $1.7MM check for the home -

BENJAMIN DAVONE, ESQ.

yes, he just paid cash. But, how many people are in that position?  Not very many at all."

(e)    "You've asked a lot of questions in your email this morning - all fair. However, since you have made this 'all business' honestly, I'm concerned about what I should provide you and what I should not. I can tell you that a) Yes, I have my own money invested in all my projects and b) NO! I haven't seen one cent yet and neither has anyone else.

(f)    "I can tell you that my other investors (friends, family and clients) fully understand that 'I'm not out to hurt them' and they have given me the space I need to fight this battle. All of us understand that it is not in anyone's best interest for me to file a bankruptcy.

(g)    At the end of the day, and as I've said before, I didn't 'plan this economic environment'. I do not have cash sitting around and am refusing to give it to you. I simply have no cash and my equities that I would normally borrow against have all evaporated due to market values. This is my reality.  I hesitate giving ANY dates or commitments simply because I'm not in control of those dates and all it would be is a repeat of Dec.15 - another let down and I can't do that to either of you, or myself.

(Exhibit A11-A12.)

22.    On February 9, 2010, I wrote to Stephen asking for information about the investment.  I asked what kind of property was involved, details about the purchase, number of investors, escrow status and other details.  We requested a credit report for Stephen, and I notated some issues about the interest calculation.   (Exhibit A13.).

23.    On May 4, 2010, Chuck had a fatal heart attack.  That day, Stephen asked for an update on Chuck's condition.  He stated:

   (a)    We are still on track for the 'good faith' payment. Once I get a firm closing date, I'll let you know. I'm expecting that any day now as all other terms and conditions have been met.

(Exhibit A27.)

   24.    On September 21, 2010, at 9:59 am, Stephen wrote an email to Susan Parsons, and copied me on it.  In it, he stated in pertinent part: "I owe Midge the 'non-Broker' share of my commission. I had promised this to her and Chuck a long time ago due to a situation where they had helped me. When I called escrow, they asked if I had gotten permission from 'you'.  We used to do this all the time, why did she ask this?  And, with that in mind, what is your position on it? If I don't give it to her 'in escrow' I have to wait until I get my check, etc. and I don't want to cause Midge any unnecessary delays.  I'm not sure of the amount due to the new selling cost (obviously the commission will be less) and also, I don't think I'm getting a full commission on this one as it was a corporate owned  property. My share will be 60% after E&O Charges are deducted and brokers side. HELP!"

(Exhibit A28.)

   25.    On that same day, September 21, 2010 at 5:05 pm, Susan Parsons wrote back to Stephen, again copied to me: "As far as the broker paid commission to buyer, I think you are much better off doing this after close, and outside of escrow.  This is the lenders biggest issue right now with any funds going from buyer/seller or agents to buyer/sellers.  They are death on this and consider it fraud.  If a seller (not broker) agrees to pay for non recurring [sic] closing costs up front in the initial offer we can get that thru as it is still allowed. With all Midge has been through I don't think it's worth taking a chance of a 'fly in the ointment' at this time. "  (Interestingly enough, my Lake Arrowhead agent gave me a percent of her commission because I had two listings with her, and had no difficulty as described above.  I asked for an accounting of what the $50K investment had been used for and received only vague statements for about a year.)

BENJAMIN SAVONE, ESQ.

26.    On October 13, 2011, Stephen made the following statements to me in an email:

(a)    I can't tell you how much I want the pain of all this to be over. It is very good to hear from you.

(b)    I will get you're a 'note' and back date it for your accountant before Oct. 20th.

(c)    As a legal instrument, the money was loaned to my company.

(d)    What happened after that is moot to the legal instrument - that being a Promissory Note.

(e)    Please let me know how much the CPA was able to mitigate for you so I can get a feel for the 'net damages'. While this may sound weird, it will help me *emotionally* handle the overall debt more tolerable.

(f)    You must know that this is all so embarrassing and emasculating for me.

(g)    With respect to 'rebuilding', I am building that foundation now with the full intent to hit real estate 'hard and heavy' January 2, 2012.

(h)    My spirit is 'clear' and I'm moving forward. In many ways, what I've been thru is like going through the grieving process typically associated with a death. I had to move on ... nothing was going to bring back the 'real estate days' prior to the last few years. Between our government and Wall Street, many people's lives have been altered forever.

(i)    I'm so happy for you that you have a fairly secure job and future. You've paid a huge price to get to 'today' so you deserve things to serve you well the rest of your life.

(j)    For me, I guess God had some more 'lessons I needed to learn'. I know in my heart that at the time I promised anyone anything, I know I believed in what I was saying. So, my spirit is at rest. Bad things can and do happen to good people.

(k)    Keep in mind, ANYONE you send me for real estate needs will be treated fairly and I will see that a significant portion of my commission is paid to you to mitigate this matter. Rest assured of that.

(Exhibit A30.)

27.    I have not emailed or spoken to Mr. O'Hara since this email. He filed bankruptcy in the spring of 2012. I attended the bankruptcy hearing in Santa Ana, California and learned that this was not the first time that Mr. O'Hara has declared bankruptcy. It disturbs me greatly to realize that he has been able to walk away from over a million dollars in debt. After all his lies and broken promises, I would never send anyone to him for real estate needs. It is my belief that he sent nice emails in order to put off any lawsuits in time for him to file bankruptcy.

28.    Business and Professions Code section 10176 permits the commissioner, upon the verified complaint in writing of any person, to investigate the actions of any person engaged in the business or acting in the capacity of a real estate licensee within this state, and he or she may temporarily suspend or permanently revoke a real estate license at any time where the licensee, while a real estate licensee, in performing or attempting to perform any of the acts within the scope of this chapter has been guilty of any of the following:

10176(a):    making any substantial misrepresentation;

10176(b):    making a false promise;

10177(c):    making a false advertisement;

10176(i):    fraud or dishonest dealing in licensed capacity; and

10177(j):    fraud or dishonest dealing as principal

29.    Based on my experience with Stephen O'Hara in the context of my $50,000 loan to him, the following applies:

(a)    In my opinion, the statements in paragraphs 3(a), 14(a), 14(d), 14(m), and 21(f) constitute substantial misrepresentations within the meaning of Business & Professions Code section 10176, subdivision (a).

(b)    In my opinion, the statements in paragraphs 3(a), 3(f), 10, 14(d), 14(f)
14(g), 14(i), 14(m), 17(a), 19 (e), 19(f), 19(g), 19(h), 19(i), 19(l), 19(m), 23(a)
constituted false promises within the meaning of Business & Professions Code
section 10176, subdivision (b).

(c)    In my opinion, the statements in paragraphs 3(b) and 17(b) constituted a
false advertisement within the meaning of Business & Professions Code section
10176, subdivision (c).

(d)    In my opinion, the statements in paragraphs 6,12, 14(k)15 (b), 15 (c),
15(f), 21 (e) constituted fraud or dishonest dealing within the meaning of Business &
Professions Code section 10176, subdivision (i).

(e)    The statement in paragraphs 8(a) constitutes fraud or dishonest dealing
as a principal within the meaning of Business & Professions Code section 10177,
subdivision (j).

30.    By February/March, 2010, my late husband and I believed that we had
been taken in a some sort of Ponzi scheme. We could not get any straight answers
from Stephen O'Hara about what property he had purchased with our investment, and
*never* did. I now think that our funds were used to pay off earlier investors. Mr.
O'Hara used every smarmy trick to make us believe that he was just a few weeks
away from getting us paid back. He has lied so many times in writing about what he
was doing and what he promised to do. No good faith payment ever happened.

I hereby declare under penalty of perjury under the laws of the State of
California that to the best of my knowledge, recollection and review of information,
the foregoing recitation is true and correct.

Date: April 25, 2013                                 *Darlene Garrison*

                                                     Darlene Garrison

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of _Orange_

On _April 25, 2013_ before me, _Hyung S. Ahn, Notary Public_ ,
(Here insert name and title of the officer)

personally appeared _Darlene  Garrison_ ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____        (Notary Seal)
Signature of Notary Public

```
HYUNG S. AHN
COMM. # 1906044
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. Sep. 30, 2014
```

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_Declaration   of  Darlene_
(Title or description of attached document)

_Garrison_
(Title or description of attached document continued)

Number of Pages _14_ Document Date _April 25, 2013_

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgement is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

2008 Version CAPA v12.10.07 800-873-9865 www.NotaryClasses.com

# EXHIBIT A

| Subj: | **Short Term Investment Opportunity** |
| Date: | Tuesday, April 14, 2009 9:40:00 AM |
| From: | steve@steveohara.com |
| To: | steve@steveohara.com |

Hi There!

Happy Spring and Happy Easter!

Your are receiving this message because you are one of several hundred people who have made investments on other projects I'm involved with or you have shown an interest in getting involved with one of these opportunities.

Not only does the stock market seem to be stabilizing, but real estate has been quietly stabilizing for over six months now.   We are up well over double in numbers of transactions from this time last year.

And, if you are watching the news, there simply isn't and probably won't be a better time to invest in real estate related opportunities than right now. Remember, when someone is losing, someone else is WINNING!  And, at the risk of sounding arrogant, 'we' are doing well.

As I've said before, the stimulus package is having a positive impact on all of this. My goal is take advantage of as many of these opportunities as we can while we have this window.

I know that in a prior email, I stated that any opportunities we take advantage of would most likely pay out in Q-1 of 2010. Due to the market up-tic I've been witnessing, I believe we can get a little more into 2009.  So, I'm able to **offer you a new opportunity which you can expect to pay out in September or the first few weeks in October of 2009.**

As in the past, this Opportunity will pay a 15% return.  We have only four 'slots' available at $50K per slot.  As in the past, I will personally guarantee these funds.

Take care and please let me know right away if you have an interest in being one of 'the fabulous four'.  ☺

Stephen

1 of 1

1/28/10 4:54 PM

**EXHIBIT A1**

| Subj: | **RE: Short Term Investment Opportunity** |
|---|---|
| Date: | Sunday, April 19, 2009 8:04:30 PM |
| From: | steve@steveohara.com |
| To: | Fishideas@aol.com |

Now, I think I may have caught you Mr. Wordsmith!! (Aren't you the one always picking at other people writing form?). I believe Yule is actually Euell. Yule is the Christmas Yule – I think. OK, I just had to pick on Chuck. Haha

I'm excited to hear about the foreclosure, I'm raking up on them. If you need any 'advise' you know I have plenty of that for free – of course that may be its value. Seriously, let me know.

With respect to the '$50K' slot, that would be fun. I'm not sure if you got the invite for the one coming up in May, but it will 'close out' on the 10th. So, sure, if you 'in' I'd love to make some money with you guys.

Also, if you didn't get it, let me know. I sent out a OC Market Update today and things are in the 4th month of 'upswing' so I feel very , very, very good about your foreclosure investment as well as my 'projects'.

Love to Miz Midge!

Be well, my friend.

Stephen

**From:** Fishideas@aol.com [mailto:Fishideas@aol.com]
**Sent:** Sunday, April 19, 2009 8:52 PM
**To:** Stephen O'Hara
**Subject:** Re: Short Term Investment Opportunity

Hi Steve,
Midge and I bought a small investment property close by in an area called Arrowhead Villas. It was a Fannie Mae foreclosure offered at $142,000. We offered $135 and were the first bid and it was accepted! The property came out on a Thursday late afternoon, we saw it Friday, again on Saturday and framed an offer on Sunday, submitted Monday morning. The loan broker suggested a refi on our place (it free and clear) and by doing it that way we'll pay cash for the rental property and enjoy a $155,000 refi (we took 20k more than the cash-out price) at 4.75% interest.

It's a sweet deal, but, of course, the key is getting responsible renters. We hope to flip the place in 18 months to two years.

I'm also interested (Midge is coming around) in a $50k slot with you, but we won't be able to participate in such a deal until our escrow closes, after May 7. We have offer-deposit funds coming back ( Fannie Mae wanted 10% deposit in escrow) after the close. So if you have a good, solid project after May 7, please let me know.

1/28/10 4:58 PM

EXHIBIT A2

| Subj: | **RE: Short Term Investment Opportunity** |
|---|---|
| Date: | Monday, April 20, 2009 3:05:48 PM |
| From: | steve@steveohara.com |
| To: | Fishideas@aol.com |

**God you are funny, Chuck.  No wonder you make Midge laugh.**

**Now, about our spelling bee.  There is also Yul Brenner of Broadway (King and I) fame.  So, I do know there are variations. BTW, until the PS, you ALMOST had me. Hahahahaha**

**Stephen**

**PS  Because we are not a big fancy company with 'drop dead dates' or else kind of thing, all of our projects have a soft deadline of the 1st of the month (that allows for situations like yours and also other typical delays, etc.).  There is really no 'hard' deadline, except the fact that if I have all the money in, we have a collective desire to move forward as fast as we can.   I happen to know that one of the others who are on this next one is using funds from a CD that cashes out on the 5th, so for you at the 7th, etc. will be zero problem.  I'm just excited that you and Midge have an interest – I think you find it fun.**

**Just let me know and I'll work with you – after all, you are Word-Master Chuck. ☺**

**From:** Fishideas@aol.com [mailto:Fishideas@aol.com]
**Sent:** Monday, April 20, 2009 3:56 PM
**To:** Stephen O'Hara
**Subject:** Re: Short Term Investment Opportunity

Does "close out" mean that's the deadline for the last of the $50k shares to be in?  If so, I could pick up the funds from escrow on the 7th and take them, plus the others sources of funds we have, and have it all rolled into a cashier's check and, overnighted if need be, to be in your possession on the 10th. Let me know, and if that's the deal, I'll check my calculations one more time and let you know tomorrow for certain about our participation.

EXHIBIT A3

| Subj: | **RE: Short Term Investment Opportunity** |
|---|---|
| Date: | Monday, April 20, 2009 3:51:01 PM |
| From: | steve@steveohara.com |
| To: | Fishideas@aol.com |

Now, Chuck, surely you have SOME other asset that Midge loves about you that would mitigate a divorce over something as trite as 'money'. Hummm, now you are making ME wonder why Debbie (my wife) has put up with me for 27-years now. Haha

Stephen

**From:** Fishideas@aol.com [mailto:Fishideas@aol.com]
**Sent:** Monday, April 20, 2009 4:20 PM
**To:** Stephen O'Hara
**Subject:** Re: Short Term Investment Opportunity

I'll have a definitive answer tomorrow, but anticipate it will be no problem. The only problem will be if this project, God forbid, doesn't perform to expectations. Then you can help me move my things out after the property settlement and pending divorce...

(You are pulling me toward being a venture capitalist. Does this mean all my gold cards now go platinum?)

Thanks for the explanation,
Chuck


**************
Access 350+ FREE radio stations anytime from anywhere on the web. Get the Radio Toolbar! (http://toolbar.aol.com/aolradio/download.html?ncid=emlcntusdown00000003)

**EXHIBIT A4**

I think it is Yule, buddy, because, you'll recall, Mr. Gibbons used to eat a lot of natural stuff like granola and wooden picnic tables (he especially liked redwood), but when he started eating Douglas fir trees around Christmastime, he was renamed "Yule."

(If you believe that, I've got some venture-capital shares and a bridge I'd like to sell you...).

p.s.  You're correct about "Euell."
Chuck


\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Access 350+ FREE radio stations anytime from anywhere on the web. Get the Radio Toolbar! (http://toolbar.aol.com/aolradio/download.html?ncid=emlcntusdown00000003)

1/28/10 5:00 PM

**EXHIBIT A5**

| Subj: | **Investment Opportunity** |
|-------|---------------------------|
| Date: | Wednesday, April 22, 2009 6:03:05 AM |
| From: | midgec@uci.edu |
| To: | steve@steveohara.com |
| cc: | Fishideas@aol.com |

Hello Stephen,
Chuck and I discussed your next investment opportunity last night, and we are interested. We want to talk about it tonight face to face and will call or email you by Thursday a.m. to confirm our commitment to your project.
Talk to you soon,
Midge


Midge Garrison
Department Administrator
Beckman Laser Institute
1002 Health Sciences Road East
Irvine, California  92612
949-824-6291
Fax  949-824-8413

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

1/28/10 5:02 PM

**EXHIBIT A6**

| Subj: | **RE: We're in** |
|---|---|
| Date: | Wednesday, April 22, 2009 6:20:19 PM |
| From: | steve@steveohara.com |
| To: | midgec@uci.edu |

Hi Midge!

I told Chuck that I had a couple of spots on the May 'adventure'. One of my clients took one a few hours ago and I have one left which you can now consider YOURS. Anything else we do will be for 2010, you are in the last group for a 2009 pay out. ☺

I'll just lay low until we get closer to the 7th.

All my best to both of you.

Stephen

---

**From:** Garrison, Midge [mailto:midgec@uci.edu]
**Sent:** Wednesday, April 22, 2009 7:16 PM
**To:** Stephen O'Hara
**Subject:** We're in

Hi Stephen,
We're in if you still have a spot on your next adventure. As Chuck told you a day or so ago, we close escrow on May 7 and will have funds at that time. We'll talk soon.
Midge

Midge Garrison
Department Administrator
Beckman Laser Institute
1002 Health Sciences Road East
Irvine, California  92612
949-824-6291
Fax  949-824-8413

---

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

1/28/10 5:03 PM

**EXHIBIT A7**

| Subj: | **Of Notes and Interest** |
|---|---|
| Date: | Thursday, April 23, 2009 2:09:38 PM |
| From: | steve@steveohara.com |
| To: | Fishideas@aol.com |

Hi Chuck!

Yes, these things are pretty simple.

1. Attached, please find a IRS Form W-9. This will be so my CPA can 1099 The interest you will receive at the end of the opportunity.
2. I need you to tell me who's name you want the Promissory Note in. (You and Midge, You only, a Trust, etc.) Also, the legal address for the name you give me. I will give this to Karen at Laguna Escrow Services who will actually compete the note for me to sign.
3. When you close the escrow, you have several options. You can have escrow wire or cut a check to me, Stephen O'Hara and I can give them wiring instructions. Or, they can wire to your account and you can wire or get a Cashiers Check and either direct deposit into a BofA or overnight to me. (If I have you confused, just let me know as I'm probably giving you too many options, haha.)
4. So, I guess I say all this to say is whatever works well for you is fine with me. Because I will need access to the money, I really would prefer NOT to have a personal check (unless you are with BofA) as they might hold the check for up to two weeks.

   Hope this helps. Just let me know what I can do to make it easier for you and Midge.

   Stephen

Hi Stephen,

Having not done one of these before, we're wondering if a personal check works, or if we should plan on a cashier's check. Just let me know. Our escrow is set to close, as I said, on May 7. They're only a few minutes away so we'll tell them that we'll pick up proceeds at their office on that day and that should move things a tiny bit faster.

Thanks,

Chuck and Midge

**EXHIBIT A8**

## UNSECURED NOTE

**$50,000.00**                                                      **Date: May 5, 2009**

Newport Beach, California

For value received, the undersigned promise to pay to Charles J. Garrison or order, at PO Box 1352, Lake Arrowhead 92352 or a place designated by Beneficiary

the sum of **FIFTY THOUSAND AND NO/100 ($50,000.00)** plus interest at the rate of **15%** all due and payable on or before **December 15, 2009**

Borrower reserves the right to pay this Note in full or in part at any time without any prepayment penalty whatsoever.

In the event payment is not paid within 10 days of the due date, Borrower shall pay to Beneficiary a Late Charge of 5% of the amount due.

Principal and interest payable in lawful money of the United States.  If action be instituted on this note, I promise to pay such sum as the Court may fix as attorney's fees.

Stephen O'Hara
26012 Marguerite Parkway, Ste H-200
Mission Viejo, CA 92692

**EXHIBIT A9**

| Subj: | **Update** |
|---|---|
| Date: | Friday, December 11, 2009 11:35:34 AM |
| From: | steve@steveohara.com |
| To: | Fishideas@aol.com |

Hi Chuck!

I'm back at the 'command center'. I'm glad I could talk to you. As I understand it, I am to ask the listing agent:

1. Property next door status (BTW, it does not appear in the MLS at all.)
2. Does HOA include RV access or is there an additional charge
3. Where is the RV Parking located.
4. Is there a waiting list or is there always space available.

If I am missing something, let me know.

 Also, I am on top of the $50K. As I mentioned to you, this lending environment sucks and is effecting everything and everyone. It all seems to 'nudge' its way thru the process, but, it's painful still. I'm very sensitive to Midge and her needs as well as yours. So, don't be shy about expressing your feelings, etc. I'm 100% on your side, I care and respect both of you and we WILL get thru all of this together. ☺

As I learn the answers to all of your questions, I'll be back in touch with you. I have calls in to David the listing agent, but as you know, he is a bit slow.

More soon.

Stephen

---

**From:** Fishideas@aol.com [mailto:Fishideas@aol.com]
**Sent:** Friday, December 11, 2009 9:48 AM
**To:** Stephen O'Hara (PRC); Stephen O'Hara; midgec@uci.edu
**Subject:** Payment of Note

Greetings from the Northlands:
Finally got all the snow cleared away in the more impotant areas of both of our properties. Now it's off in a little while to get my fixed-up Tacoma after handing Cedar Glen Collission Center a $3000+ check. If you want to have a thriving auto-collison business, locate it in snow country...

 Say, do you need an account number for transferring our funds on the 15th, or just an address to send a check? If you need an address, we only have post-office boxes up here (so the feds don't have to wear snowshoes). Our address: Chuck and Midge Garrison (Charles and Darlene, legally), P. O. Box 1352, Lake Arrowhead, CA 92352

Thanks, Steve
Chuck

**EXHIBIT A10**

Hi Midge!

You may forward this to Chuck at your own discretion.

Below is an Email I received from Chuck a few days ago.  From what I can tell, unless he bcc'd it, I can't tell if you received it.  I don't connect to 'cold' impersonal communication –from anyone.  It has remained unanswered for obvious reasons.  Business may be business, but people are still people and his tone as well as his words discouraged me.  Right now, I need hope and support to lead us out of this mess.  I guess it's the adage 'you get more flies with honey than vinegar.'  It meant a lot for me to write the email to which Chuck is referring to you both; and to be 'dissed' by it – well, I guess it doesn't matter much how I feel.  Anyone who knows me well knows this situation is devastating to me.

I have been confused during some of our communicating.  In one email, Chuck uses one tone, then two days later it's an entirely different tone.  I don't know who I'm communicating with.

I understand where both of you are at.  Since we began this venture, a lot has changed in the mortgage banking industry which has affected EVERYONE – not just me and you.  Call any mortgage professional and they will tell you that in the last 120-days, there have been more changes than you can count.  Literally the pendulum has swung 180-degrees.  Even where money is available (lower end properties) the underwriting requirements are almost impossible.  Above that price range, loans are simply almost impossible.  Let me give you an example:

One of my associates has a client who is with a major company.  He has a 780 FICO and over $3MM in his bank accounts.  He is relocating from Seattle, but because his home in Seattle does NOT have 20% equity, we couldn't get him a loan.  We tried for four months.  Now, in his case, he got ticked off at the lenders and wrote a $1.7MM check for the home – yes, he just paid cash.  But, how many people are in that position?  Not very many at all.  I could go on and on with these examples.  Again, you can ask anyone who is in either mortgage or real estate and you will hear nightmares like this.  This is all – 100% - due to the 'Wall Street / Main' street debacle in Washington, DC.  In my 30+ years of this business, I've never seen anything like it.  And, no, neither I nor anyone I know anticipated this coming.

of 4                                                                                                    2/9/10 6:52 PM

EXHIBIT A11

I personally had a rather large transaction that fell out of escrow yesterday simply because the stock market fell below 10K again. The buyers got nervous. Will they return? I have no idea. Peoples confidence is simply 'not there'. Of course, we hear this stuff all over the news, so none of this should be unexpected to any of us.

Anyway, you probably don't want to hear all this – I offer it only to inform you that in no way did you or I create the mess, but we are left to work the mess out.

You've asked a lot of questions in your email this morning – all fair. However, since you have made this 'all business' honestly, I'm concerned about what I should provide you and what I should not. I can tell you that a) Yes, I have my own money invested in all my projects and b) NO! I haven't seen one cent yet and neither has anyone else.

I have told you this and I'll tell you once again. While 'caring' doesn't matter to Chuck, it DOES matter to me. I found in life that we do things because we WANT to, not because we 'have to'. So, given the choice of paying an institution or someone I cared about, I can assure you it would be someone I cared about. This is the piece of 'me' that Chuck 'erodes' when he responds to me in a terse, non empathetic tone. When he stated that he wouldn't even accept good faith 'payments' towards what he is owed, I nearly fell out of my chair.

I can tell you that my other investors (friends, family and clients) fully understand that "I'm not out to hurt them" and they have given me the space I need to fight this battle. All of us understand that it is not in anyone's best interest for me to file a bankruptcy.

At the end of the day, as I've said before, I didn't 'plan this economic environment'. I do not have cash sitting around and am refusing to give it to you. I simply have no cash and my equities that I would normally borrow against have all evaporated due to market values. This is my reality. Also, as I've said before, I hesitate giving ANY dates or commitments simply because I'm not in control of those dates and all it would be is a repeat of Dec. 15 – another let down and I can't do that to either of you, or myself.

I will continue to communicate with you and/or Chuck providing the tone is as it is in your email and not Chucks. He wrote me one like this right after Dec. 15, but I didn't say anything about it. I have to now, however. I will NOT respond to anything like what Chuck has written below. I'm a human, not a 'stone' or Charles Manson.

I wanted to get this out to you right away so you don't think I am avoiding you. I'm not wired to avoid, I'm wired to resolve. I may have additional answers for you after I calm down a bit. I have a very busy day and I need to focus on that. Moving forward is what is important so we can all get paid.

Warmly,

Stephen


**From:** Fishideas@aol.com [mailto:Fishideas@aol.com]
**Sent:** Wednesday, February 03, 2010 3:14 PM
**To:** Stephen O'Hara
**Subject:** 3 Questions:

Question #1 (documented in your e-mail of April 14, 2009, 9:40 AM): Remember this paragraph, repeated verbatim below and including your own boldfacing?

"I know that in a prior email, I stated that any opportunities we take advantage of would most likely pay out in Q-1 of 2010. Due to the market up-tic I've been witnessing, I believe we can get a little more into 2009. So, I'm able to **offer you a new opportunity which you can expect to pay**

2/9/10 6:52 PM

**EXHIBIT A12**

out in September or the first few weeks in October of 2009."

Question #2 (since you received our money way back on May 6, 2009 and now you have failed to perform and say you are broke, please explain just what "personally guaranteed" (by you) means?

#3 If your business is largely "controlled" by third parties, you should have disclosed that to us, rather than present an investment description filled with positive statements, stated expectations, personal guarantees, market up-tics and a general environment of can't-miss opportunities.  Do you think that if you cautioned that your control was substantially limited, we would have participated? (Ask me if you don't know the answer.)

And, if you'll indulge me another minute: I do *not* care about:
-- "tone" in an e-mail;
-- you feeling humility;
-- you "knowing Midge and I are salt-of-the-earth, good people";
-- you looking every day at the mountains and thinking of us;
-- you having to borrow money to pay your bills;
-- you saying the good news is that when you make money, you make "good money."
-- receiving partial payments.

I make only $1250 a month via Social Security. *You have missed two loan-investment deadlines and have twice, when asked, refused to provide us with any payoff date whatsoever.* Please send my loving (disappointed and hurt) wife and myself some of that "good" money.  In fact, send  all that we are owed.

**From:** Garrison, Midge [mailto:midgec@uci.edu]
**Sent:** Tuesday, February 09, 2010 7:13 AM
**To:** Stephen O'Hara
**Cc:** Fishideas@aol.com
**Subject:** Questions on the investment

Dear Stephen,

To help us try to understand the current situation with the unpaid note, we need information about the investment, i.e., where our money went, its current disposition and your plans to pay back your personally-guaranteed Promissory Note, with all interest.  Please provide answers to our questions below:

1.  What type of property – commercial or residential, brief physical description, foreclosure, short sale or equity – was purchased for this investment?

2. What was the purchase price, down payment, improvement costs, and anticipated selling price?

3. How many investors are in this project, at what amount each, have any been repaid, and did you invest yourself?

4. Have all of your other investors, from prior projects such as this one, been paid in full?

5. On January 15, 2010 you reported to us in an e-mail that you were hoping to open a new escrow on this project, but if that failed you had a back-up buyer you would be contacting.  Is there an escrow going, and if so, what is its status and closing date?

6. If the property is not in escrow, what other properties do you currently have in escrow, when are they scheduled to close and what funds from them do you expect will be available to pay us?  If you don't foresee paying us back with escrow proceeds in the next 30 to 60 days (or less), what alternate sources of money can you use to satisfy this debt?

**EXHIBIT A13**

We also want to see a current credit report for you, from any of the three major reporting agencies.

7. Please answer the email of January 22 specifically addressing the interest calculation past the due date December 25. Do you agree with these terms?

8. We invested money in this project on May 6, 2009 anticipating a six-month note, however, the Promissory Note had a due date of December 15, 2009 – seven months plus – not six months. Please explain the change.

It is unfortunate that the Promissory Note goes unpaid and that our personal relationship has been affected but, at this point, the issue is solely a business matter. Our $50,000 share in this project has now extended more than nine months since you received our money and the accumulated principal and interest, as of today, has reached $61,833.38.

We look forward to answers to all of these questions, so that we can try to draw some degree of comfort and reaffirmation from this financial nightmare.
Thank you,
Midge and Chuck

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

2/9/10 6:52 PM

**EXHIBIT A14**

Dear Stephen,

To help us try to understand the current situation with the unpaid note, we need information about the investment, i.e., where our money went, its current disposition and your plans to pay back your personally guaranteed Promissory Note, with all interest.  Please provide answers to our questions below:

1.  What type of property – commercial or residential, brief physical description, foreclosure, short sale or equity – was purchased for this investment?

2.  Where is the property located?

3.  What were the terms of the acquisition – purchase price (by you), amount paid down, monthly payments?

4.  What amount of money (if any) was spent for repairs and/or improvements?

5.  What is the hoped–for selling price?

6.  How many investors are involved in this investment?  Did each put up an equal amount of money?  Five investors @ $50,000 each or?

7.  Have any of them been repaid?

8.  Did you invest any money of your own?

9.  Have all of your other investors, from prior projects such as this one, been paid in full?

10.  On January 15, 2010 you reported to us in an e–mail that you were hoping to open a new escrow on this project, but if that failed you had a back–up buyer you would be contacting.  Is there an escrow going, and if so, what is its status?

11.  If the property is in escrow, when is the closing date?

12.  If the property is not in escrow, what other properties do you currently have in escrow, when are they scheduled to close and

what funds from them do you expect will be available to pay in full your debt to us?

13.  For the third time, we are asking what you think a reasonable time span will be in which you will pay off the Promissory Note in full?

We also want to see a current credit report for you, from the three major reporting agencies.

On another point, we stated what was a fair and reasonable continuing interest rate on the overdue note, but you did not confirm agreement.  The rate, we believe, is fair at reverting to 15% (based on a six-month time frame) or $7500 per 6 months, or $1250 per 30-day period (or prorated, $41.67 per day).  This seems much more beneficial to you than continuing the agreed-to 5% "overdue" rate, which was the established value of our money in effect from December 15, 2009 to December 25, 2009.  The latter rate works out to $7500 *per month*.

It seems you either agree with these terms, or you don't?  Please advise.

Finally, another gnawing question.  You always described our participation in this project loan in terms of a six-month (or less) timeframe.  You received our money on May 6, 2009 – after providing in an e-mail an expected pay-off time of "late October or early November" and yet dated the Promissory Note to pay off (first deadline) on December 15, 2009.  That is seven months and nine days, not six months.  Please explain this unilateral change.

It is unfortunate that the Promissory Note goes unpaid and that our personal relationship has been affected but, at this point, the issue is solely a business consideration.  Our $50,000 share in this project has now extended more than nine months since you received our money and the accumulated principal and interest, as of today, has reached $61,833.38.

We look forward to answers to all of these questions, so that we can try to draw some degree of comfort and reaffirmation from this financial nightmare.

EXHIBIT A16

| Subj: | **Re: Update** |
|---|---|
| Date: | Saturday, December 12, 2009 10:57:55 AM |
| From: | Fishideas@aol.com |
| To: | steve@steveohara.com, midgec@uci.edu |

Okay, as you asked, I won't be shy about expressing my feelings: I am deeply disappointed in you as a person. You have destroyed my faith in you  This "turndown" didn't creep up on you.  You knew about this poor economy months ago and, to quote, as you gleefully said: "When someone's losing, someone else is winning."  Oh, and back somewhere in your e-mails to me I remember you saying this (investment project) was going to be "fun."

Question: Come Dec. 15, will it be "fun" for the Garrisons? Or on Dec. 25 will we be among the "losers."  I had a sue a guy over a similar deal many years ago and I still carry the puffy, dripping sores of anger in my gut.  You have no idea how poorly I slept last night – painkillers and anti-anxiety medications.

There's no point in pursuing Paseo Laguna any further until <u>ALL</u> of our loan is paid back, either on Dec. 15th or Dec. 25th.

I bragged to Midge about how I trusted and reassured her there would be no problem  being paid b back ON TIME.  We can counted each day pass.  She, with a degree of reluctance, agreed to try this for me with our hard-earned money.  Now I am embarrassed   before her.

Charles J. Garrison

(And knock-off the "sensitive to her needs crap." I don't want to hear another word of it.   I don't think you really want to make me mad.)

**EXHIBIT A17**

| Subj: | **Moving Forward...** |
|---|---|
| Date: | Saturday, December 12, 2009 12:22:53 PM |
| From: | steve@steveohara.com |
| To: | Fishideas@aol.com |
| cc: | midgec@uci.edu |

Hi Chuck!

Thank you for your email. And I mean that.

Of course there is opportunity months ago, and yes, this is the time to be buying. No selling. My belief in the future is stronger today than it was three, six or twelve months ago. At the end of the day, the question isn't "if" but simply 'when'. I would strongly urge you NOT to borrow trouble that does not exist.

No one on this planet cares more than me about seeing you and/or any of my other friends and clients succeed in any investment or purchase or transaction in which I am involved. That said, the realities that have impacted us all these past few months are just that, a reality. The process as we know it today has been evolving over the past three or four months – long after we invested the $50K.

I told you when we first did this that I would personally guarantee the return of your investment plus interest. So, again, you have nothing to be concerned about with respect to ever 'losing' your money. Sure if it came to that, I'd have to liquidate some things, etc., but, you would never 'lose'. So, one way or the other, you will be paid as I would never do business any other way.

I know you've heard me complain about this lending environment these past few months. I want to be clear, it is NOT that the transactions never close, it just seems that they are all taking much longer due to underwriting and the new government guidelines, etc. with the lenders.

Anyway, to say that I've 'destroyed' your faith in me impacts me deeply. Perhaps you have been wronged by someone in the past and they have abandoned you. I don't know. I do hope that your faith in me will return when you learn what I am made of, and, that I do honor my promises. This is all I can say right now because your health, well-being and making you whole is all that matters to me.

To me, 'fun' is NOT earning 2% on a CD. That won't even keep up with inflation. For me, and many investors, 'fun' is a relatively trouble free transaction (which this has been in comparison to other nightmares we as REALTORS® are dealing with these days), where I can make 15% on an investment. Clearly, the reason we earn 15% is because there is a higher risk of 'aggravation'. So, I would beg you to NOT stress over this; it isn't the 15th yet and while I don't see us making the 15th, I do see you getting paid sooner than later. My focus will be on that: getting you and others paid.

Again, thank you for expressing yourself. You have every right to feel the way you feel. But, in this case, Chuck, I'm not out to hurt you or Midge, and I never have been. Therefore, I'd ask that you filter this situation through the years that we HAVE known each other, not on other situations that didn't work out well. Remember, I have openly talked with you about this. I have NOT left town or anything like that. In fact, for me, this is 'just another day' in the life of real estate. Certainly I'm not 'minimizing'; I understand that I work in this environment every day, so all of this is easy for me to say.

I want you to understand that I'm intellectually and emotionally very capable of maneuvering these economic times and winning. That said, sometimes I have fight a few battles in order to win the war.

Needless to say, I'll keep you updated. Thank you for your patience with me and this situation, it will all be all right. You loaned me money in good faith and you will be repaid in good faith. Period.

EXHIBIT A18

| Subj: | **Re: Moving Forward...** |
| Date: | Monday, December 14, 2009 3:16:17 PM |
| From: | Fishideas@aol.com |
| To: | steve@steveohara.com, midgec@uci.edu |

Please copy my wife Midge on every piece of e-mail you send to me, because she is just as harmed and is just as emotionally upset over this as I am.  She's now, for the first time in her life, on prescriptions for Ativan and Zooloft.  Welcome to real estate. as you paraphrased.

Charles Garrison

1 of 1

1/9/10 9:05 AM

**EXHIBIT A19**

| Subj: | **Moving Forward** |
|---|---|
| Date: | Wednesday, December 16, 2009 8:52:06 AM |
| From: | steve@steveohara.com |
| To: | fishideas@aol.com, midgec@uci.edu |

OMG Chuck!

Thank you for your VERY kind letter.

This is the final blow for me emotionally to know that to top everything else, you have lost your sister. I can assure you that you, Midge and your family will be in my prayers.

Chuck, I understand you more than you know. I'm very, very sorry that your expectations were not met by things closing in a timely manner. I want to be clear about one thing – perhaps something I did was the reason. Here's the issue. I DID have an indication that the buyer was marginal about half way into the escrow. Remember, the buyer is NOT represented by me. The loan broker kept leading all of us to believe that he could 'fix' the situation and close the escrow. The issue has to do with the equity in the buyers existing home. Under the new loan guidelines, if the buyer has an existing home, the Guidelines state that they need to have a 20% equity in it to keep it. (These guidelines are to keep people from buying while their credit is still good, then closing and just walking away from their old home.) At the time the buyer made the offer, the comps indicated their equity was 'marginal but ok'. Then, as the banks got tighter these past few months, they ordered an appraisal of the buyers existing home, and, well the rest is history.

BECAUSE I KNEW I HAD A DATE CERTAIN WITH YOU, I chose to keep the deal going because I KNEW that if I killed it, for sure I couldn't meet the deadline we had agreed to. By continuing, I was told with almost certainty that the deal could be closed. In hindsight, the right business decisions would have been to CANCEL the escrow and pursue another buyer.

Your email this morning has made me realize that life is way too short to screw around, so I'm going to give the other agent a Notice to Perform. Of course, they have a short time to 'perform' and then I'm going to get another buyer. Buyers are pretty plentiful for anything under $750K as you know. Yes, this will add time, but I know it's the right thing. Of course, buyer #1 could pull a rabbit out of the hat, too.

**With regard to you receiving your interest: OF COURSE you will be paid every dime due you for the use of your money. Additionally, there may be a little 'extra' if we can squeeze it out to compensate you for the tardiness'.**

As I have stated, your money is safe – maybe the economic times have compromised timely repayment but, you will get paid. I would never be a party to anything less than that.

You are correct, 'my world' is very stressful in this way. If it helps you, during these past 90-days, NOT ONE deal has closed on time. Each and every hang up has been a lender issue – either with the short sale lender like your are experiencing with Paseo Laguna or the buyers lender like we are experiencing with this investment issue. Do you realize that Paseo Laguna has gone through over 20 buyers and none of them but us and one other has hung in there. Clearly, time is on our side. At the end of the day, I handle my stress by reminding myself that 'it is what it is' and my job is to keep on keeping on..

Your family will be in my prayers today.

Stephen

**From:** fishideas@aol.com [mailto:fishideas@aol.com]
**Sent:** Wednesday, December 16, 2009 8:28 AM
**To:** Stephen O'Hara; midgec@uci.edu
**Subject:** Moving Forward

**EXHIBIT A20**                                    1/9/10 9:14 AM

aolrich://877991090/

| Subj: | **Several Matters & Update** |
|---|---|
| Date: | Wednesday, January 6, 2010 12:45:48 PM |
| From: | steve@steveohara.com |
| To: | Fishideas@aol.com, midgec@uci.edu |

Hi Chuck and Midge!

First, with regard to the $50K, I wanted to let you know that we have successfully terminated the other buyer and are now talking to the back up buyers to see who we can close the fastest. More about that soon. (I'm so glad we are done with the holidays as it has been nearly impossible to conduct business during the past few weeks.)

Second, ATTACHED, is a copy of the MLS on the property you asked me to check out. Note the area I have circled. It went into escrow on 11/10/09. It appears to be a solid escrow, however, they are nowhere near having the banks approval. I don't recommend that you get to excited about it.

Honestly, unless you receive it from me and the 'real' MLS, I would try to stay away from all these real estate sites on the Internet, you will only get confused. Their SOLE goal is to snare you as a buyer and SELL your name to an agent who, in turn will tell you 'that home is NOT avail, but can I show you others'. In other words, these are 'lead generation' sites. Not healthy for you and Midge.

Finally, I hope 2010 is kicking off better for you both than how 2009 ended. I can assure you for me, if 2010 goes as it has begun, we could end as a 'banner year'. And, my dear friends, this is such good news after the multi-month 'drought' we have endured. UGH.

More soon, as you know. ☺

Stephen

**EXHIBIT A21**

| Subj: | **Promissory Note** |
|-------|---------------------|
| Date: | Friday, January 22, 2010 2:58:02 PM |
| From: | fishideas@aol.com |
| To: | steve@steveohara.com |

January 22, 2010

Hi Stephen,

Thanks for the update you sent recently regarding our loan to you. It's unfortunate that real-estate market forces have moved us past both due dates stated in the Promissory Note; we're sure it was something you didn't envision and we hope its impact on you is as minimal as possible. We continue to appreciate the excellent service you have provided us through the years.

We believe we need to establish an agreement about the ongoing interest rate on our $50,000 (principal) loan to you. The *initial* period of interest on the loan, due December 15, 2009, was 15% or $7500. The *extended* 10-day period of interest, if needed, from December 16, 2009 through December 25, 2009 was an additional 5% interest on the $50,000, or $2500. However, we have not discussed the *continuing* interest rate beyond the 10-day extension period, other than you mentioning in general that we will be paid interest up until the time the loan is paid off or that when the loan is paid off there may be a "bonus" included.

It will soon be 30 days (from December 26, 2009 through January 25, 2010) since our last period of *undetermined* interest was earned. Do you have an interest rate/per month figure in mind that you feel is fair and you would like to suggest? And your thoughts on whether interest will be simple or compounded?

Also, because we have financial considerations of our own to meet, we're wondering if you have a "best guess" time frame in which we will be paid in full?

Thanks,

Chuck and Midge Garrison

1/22/10 3:03 PM

EXHIBIT A22

aolrich://1892181154/

Subj:    **RE: Promissory Note**
Date:    Thursday, January 28, 2010 4:48:48 PM
From:    midgec@uci.edu
To:       Fishideas@aol.com

Hello Stephen,

I am writing this email for Chuck as he is too upset to correspond with you right now. This is seriously affecting his mental and physical health so we must have repayment as quickly as possible. It is also affecting my relationship with Chuck.

We do not want or need a revised note. We do need to know the date you expect to be able to pay back the note. We have a number of critical financial deadlines looming which is adding to our stress level. Please let me know as soon as possible a date you will be able to repay the note.

Thanks very much,
Midge and Chuck

**From:** Stephen O'Hara [mailto:steve@steveohara.com]
**Sent:** Tuesday, January 26, 2010 2:47 PM
**To:** fishideas@aol.com; Garrison, Midge
**Subject:** RE: Promissory Note

Hi Chuck and Midge!

I have finally had a chance to get to your file. Everything you have said is correct and more than fair. Of course, there is no interest rate that can compensate you for the emotional stress this is causing you both – as well as myself and my family.

While I let this email confirm this intent if this is acceptable to you, I would be happy to redo the note to reflect a) a new note for $60K which includes the $7500 in interest due on Dec. 15 plus the $2500 penalty for a total of $10K and then b) interest on this new $60K balance at the rate of 15% per year. Because I have a third party do notes, and such and because we are at month's end and everyone is busy, I'll get this to you, if acceptable to you, in the next few weeks or sooner.

The good news is when I make money, I make good money. We are going into spring and summer, so I am expecting things to begin to move forward. My intent would be to pay 'something' from other sources (ie: other escrow closings) as they become a reality. Like everyone, this 'hole' we've our country has dug for itself and each other will necessitate a lot of hard work and patience to redeem ourselves from.

Let me know and thank you both for your patience and understanding. I can assure you that this matter has impacted me more than you know. But, as I've said, this too shall pass.

Stephen

**From:** fishideas@aol.com [mailto:fishideas@aol.com]
**Sent:** Friday, January 22, 2010 2:58 PM
**To:** Stephen O'Hara
**Subject:** Promissory Note

January 22, 2010

Hi Stephen,

Thanks for the update you sent recently regarding our loan to you. It's unfortunate that real-estate

1 of 2                                    **EXHIBIT A23**                                    1/28/10 5:43 PM

aolrich://312181028/

| Subj: | **Repayment of Note** |
|---|---|
| Date: | Tuesday, February 2, 2010 11:44:33 AM |
| From: | steve@steveohara.com |
| To: | midgec@uci.edu |
| cc: | Fishideas@aol.com |

Hi Midge and Chuck:

While email never conveys 'tone', I want you to know that this reply may sound one way, but, rest assured, it is with humility and care that I write *every* word. You both are 'salt of the earth' good people and none of us deserves to be in this situation right now.  I just hope both of you know me and my family well enough to know that being in a debacle like this is NOT normal for me.

I fully understand your words and your situation.  There seems to be no words that I can offer (other than: 'I have your money') that will allow you to live comfortably day-to-day while we get through these times.  Chucks letter to me about clarifying the terms of the note was written with such kindness and compassion that I assumed that both of you were accepting where we are for the time being and giving me the space I need to move forward.  I got the feeling that, for now, you were treating this note as 'another investment' of yours. Please accept 'my assuming' as my mistake.  I had no idea that, emotionally, and financially, things had escalated to this situation for both of you.  I guess in my world, 'stuff happens' and I just deal with it.  (If you go back and read that email, I feel you will understand how I came to have this feeling.)

At the end of the day, until I have something concrete, I cannot set you both up for another 'let down' by giving you a date certain as to when you will be paid.  Everything in my world is dependent upon third parties.  This matter has created somewhat of a snowball effect on my overall financial situation that I have to get in order until this particular bump is behind us.  In fact, to pay my personal bills this month, I had to borrow some money from my family.  My 'cash' is that tight.

To make matters worse, I was going to give you a $25K reduction last week from someone who owes ME money and now they have a delay.  My goal at this point is to push money to you from whatever source I can get it.  I was going to surprise Chuck with that, then that failed.  I felt awful because I was so excited.  I wanted to share this with you so you know I'm very serious about taking care of you over some other people I owe.  I KNOW you didn't sign up for this at this time of your life.

With regard to the 'math' and the way that you are calculating the interest below, I need to look at that – and I don't have time right now.  I know the note is based upon 15% Annual Interest.  I have a feeling it is me not understanding your

1 of 3                                   **EXHIBIT A24**                                   2/3/10 1:54 PM

**Subject:**

Hello Stephen,

I am writing this email for Chuck as he is too upset to correspond with you right now. The unpaid note is seriously affecting his mental and physical health so we must have repayment as quickly as possible. The stress of this is also affecting my relationship with Chuck.

As far as accumulating interest, we think it's fair to you that the rate *revert* to 15%, or $1250 per month. That would be *retroactive* to December 25, 2009, so as of January 25, 2010, the total payment of the note is now $61,250; on February 25, it will be $62,500. This rate is based on simple interest only and is far less than continuing the extended-period rate of last December (December 15 to December 25) that was 5% for an additional 10 days - or the equivalent of $7500 interest per month.

We do not want or need a revised note from you. Chuck did ask in a prior e-mail when we could expect payment, but this was not addressed. We need to know the date(s) you expect to be able to pay back the note. We have a number of critical financial deadlines looming which is adding to our stress level. Please let me know as soon as possible the date(s) when you will be able to repay the note.

Thanks very much,

Midge


Midge Garrison
Department Administrator
Beckman Laser Institute
1002 Health Sciences Road East
Irvine, California  92612

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

2/3/10 1:54 PM

EXHIBIT A25

terminology.  However, this is something we can clarify later, right now, I just wanted to get you some sort of a reply so you know I'm not ignoring either of you.

<u>I need to humbly ask that both of you give me the space I need in both time and emotion to get this fixed.</u>  I think both of you know that this is NOT a matter of me having $50K sitting somewhere but not wanting to part with it.  This is simply not the case.  Just as this matter is pressure to you, it is pressure to me to owe it, but, I need to focus on making money and repaying it.  At the end of the day, this is what we all want.  A year ago, $50K was an easy number to spend or receive, today, getting $50-cents in this economic environment is like pulling teeth.

Clearly, I have too much at stake, my reputation, my business and many other things to file for Bankruptcy relief – at this time.  I have had to tell several people that I now owe that I can only do what I can do and I need each and everyone's cooperation while I fix what is wrong.   As I have said several times, this isn't a matter of me wanting to repay you, but rather 'when'.  My intent never was to hurt anyone, and I still feel the exact same way.  I say this because I need you to understand that I am doing all I can.  The good news is when I make money, I make very good money and I know repayment is not a difficult thing.

When I read Chucks last email about the clarification of the note, I felt (from his message) that you both had gotten to a place where you understood that, indeed, my intent IS to pay you and you were giving me the space – via vis a new note, etc. – to do just that, for which I was very grateful.

So, while this email probably means little to you (because you want to know when you will receive your money), and I understand, I want you to know that you mean everything to me and I will keep you updated as to my situation.  Again, one way or the other, you will be paid so long as I am moving forward and staying focused on making money, which is exactly what I am doing.  I want you to know that EVERY DAY I look north and see the snow capped mountains in the background, I think of you.  I'm convinced it's God's way of keeping me in check and you both at the forefront of my mind.

I'll have an update for you soon.

Stephen

---

**From:** Garrison, Midge [mailto:midgec@uci.edu]
**Sent:** Tuesday, February 02, 2010 9:29 AM
**To:** Stephen O'Hara
**Cc:** Fishideas@aol.com

2/3/10 1:54 PM

EXHIBIT A26

**Garrison, Midge**

| | |
|---|---|
| **From:** | Stephen O'Hara [steve@steveohara.com] |
| **Sent:** | Tuesday, May 04, 2010 4:11 PM |
| **To:** | Garrison, Midge |
| **Subject:** | Update |

Hi Midge!

I wanted to know if you could update me on Chuck's condition.  We are still on track for the 'good faith' payment.  Once I get a firm closing date, I'll let you know.  I'm expecting that any day now as all other terms and conditions have been met.

Thanks for all you do for ALL of us. ☺

Stephen

**Garrison, Midge**

| | |
|---|---|
| **From:** | Stephen O'Hara [steve@steveohara.com] |
| **Sent:** | Tuesday, September 21, 2010 9:59 AM |
| **To:** | Susan Parsons |
| **Cc:** | Garrison, Midge |
| **Subject:** | Important Concerning Miz Midge... |

Hi Susan!

Two things and I need a fast answer.

1) Midge is going on a vacation in a few days – I think she leaves on my BD (25th). How close are we to closing? We don't want her to be gone and the docs expire??? Seller is expecting us to close now that this appraisal is in, etc.

 2) I owe Midge the 'non-Broker' share of my commission. I had promised this to her and Chuck a long time ago due to a situation where they had helped me. When I called escrow, they asked if I had gotten permission from 'you'. We used to do this all the time, why did she ask this? And, with that in mind, what is your position on it? If I don't give it to her 'in escrow' I have to wait until I get my check, etc. and I don't want to cause Midge any unnecessary delays. I'm not sure of the amount due to the new selling cost (obviously the commission will be less) and also, I don't think I'm getting a full commission on this one as it was a corporate owned property. My share will be 60% after E&O Charges are deducted and brokers side. HELP!

Also, let me know when you expect DOCS so we can accommodate Midge's vacation.

Thanks!

Stephen

1
**EXHIBIT A28**

**Garrison, Midge**

| | |
|---|---|
| **From:** | Susan Parsons [sandpar@cox.net] |
| **Sent:** | Tuesday, September 21, 2010 5:05 PM |
| **To:** | 'Stephen O'Hara' |
| **Cc:** | Garrison, Midge |
| **Subject:** | RE: Important Concerning Miz Midge... |

Hi Midge and Stephen,

I'm checking with my processor now that the appraisal is in; as to how long it will take us to get the loan docs. I should have that answer shortly. I'm guessing docs next week to close by months end. To know when Midge is back from vacation will be helpful.

As far as the broker paid commission to buyer, I think you are much better off doing this after close, and outside of escrow. This is the lenders biggest issue right now with any funds going from buyer/seller or agents to buyer/sellers. They are death on this and consider it fraud. If a seller (not broker) agrees to pay for non recurring closing costs up front in the initial offer we can get that thru as it is still allowed. With all Midge has been through I don't think it's worth taking a chance of a 'fly in the ointment' at this time. Let me know your thoughts.

I will send over the new payment information for you next Midge.

Thanks,

**Susan Parsons**
949.545.6883 direct
949.625.8115 fax
DRE #01367598

sandpar@cox.net

*Life...isn't about waiting for the storm to pass,*
*It's about learning to dance in the rain...*

**From:** Stephen O'Hara [mailto:steve@steveohara.com]
**Sent:** Tuesday, September 21, 2010 9:59 AM
**To:** Susan Parsons
**Cc:** Garrison, Midge
**Subject:** Important Concerning Miz Midge...

Hi Susan!

Two things and I need a fast answer.

**Garrison, Midge**

| | |
|---|---|
| **From:** | Stephen O'Hara [steve@steveohara.com] |
| **Sent:** | Thursday, October 13, 2011 3:19 PM |
| **To:** | Garrison, Midge |
| **Subject:** | Thank you for your email... |

Midge, I can FEEL your message is 'couched' in the right spirit. I can't tell you how much I want the pain of all this to be over. It is very good to hear from you.

I will get you're a 'note' and back date it for your accountant before Oct. 20th. As a legal instrument, the money was loaned to my company. What happened after that is moot to the legal instrument – that being a Promissory Note.

Please let me know how much the CPA was able to mitigate for you so I can get a feel for the 'net damages'. While this may sound weird, it will help me *emotionally* handle the overall debt more tolerable. You must know that this is all so embarrassing and emasculating for me.

With respect to 'rebuilding', I am building that foundation now with the full intent to hit real estate 'hard and heavy' January 2, 2012. My spirit is 'clear' and I'm moving forward. In many ways, what I've been thru is like going through the grieving process typically associated with a death. I had to move on…nothing was going to bring back the 'real estate days' prior to the last few years. Between our government and Wall Street, many people's lives have been altered forever.

I'm so happy for you that you have a fairly secure job and future. You've paid a huge price to get to 'today' so you deserve things to serve you well the rest of your life. For me, I guess God had some more 'lessons I needed to learn'. I know in my heart that at the time I promised anyone anything, I know I believed in what I was saying. So, my spirit is at rest. Bad things can and do happen to good people.

I love you, Midge. Always have.

Keep in mind, ANYONE you send me for real estate needs will be treated fairly and I will see that a significant portion of my commission is paid to you to mitigate this matter. Rest assured of that.

Stephen

---

**From:** Garrison, Midge [mailto:midgec@uci.edu]
**Sent:** Thursday, October 13, 2011 1:01 PM
**To:** Stephen O'Hara
**Subject:** thank you for your email

Dear Stephen,

Thank you for your September 26th response to my email.

I have searched, but cannot locate, any records from you that that identify the source and application of how our $50,000.00 investment funds were utilized by you.
I need your help in order to properly classify the $50,000 investment funds we provided to you. For IRS purposes, I need for you to identify and provide in writing to me an explanation of how you applied our investment funds and how they were utilized. My CPA must have this information about the investment funds in order for me to properly file with the IRS. Please respond in writing by October 20, 2011, so I can provide the requested information for preparation of the tax return.

I sincerely hope life is going better, smoother and more financially successful for you now.

Midge


Midge Garrison
Chief Administrative Officer
Beckman Laser Institute
1002 Health Sciences Road East
Irvine, California  92612
949-824-6291
Fax 949-824-8413

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

# EXHIBIT 4

## Something Specail For You... (Let me know if you connet to this one.)

From: **Stephen O'Hara** (steve@steveohara.com)
Sent: **Wed 9/19/12 9:09 PM**
To: 'infinates@hotmail.com' (infinates@hotmail.com)

Fernando, remember 1 played that song that reminded me so much of you and your mom? 1 wanted to give you a bit more so in a special moment you can play it and really SUCK the energy out of the overall song and performance.

Due to your age, I'm not sure if you know 'who' Liza Minnelli is, but she is the daughter of Judy Garland as in Dorothy in The Wizard of Oz . Frankly, if you do NOT know, they should REVOKE your °G-Card'lll

This is from a Broadway show called Gypsy. It's based upon a true story. 1 actually would highly recommend you renting the movie version with a young Natalie Wood playing the role of Gypsy.

Why do 1 feel you will relate? It's the story of 'Mama Rose' who is a single mom raising her kids against all odds and WITHOUT her family's support. They all think Momma is nuts. The truth is Mamma is a survivor. In this song, her daughter June has an opportunity to be a Broadway star and Mamma is trying to borrow $88 (about $1000 in today's money from her dad who wants her to just settle down and live a boring life.

While I've never (and won't be a'single mom' in many other ways, 1 connect to this song because my family thought 1 was nuts. They wanted me to have a boring $35K year job working 9-5. To this day, they think that the $1.5 to $2 Million 1 made per year in the real estate industry 'is not a REAL job'.

Have 1 had to enjoy the $1.50 Hot Dog and Coke at COSTCO on my way up the ladder? Yes, my dear, 1 have done all it takes to do to get where 1 got as 1 was born with nothing.

**But, like Momma Rose, 1 did what 1 had to do and 1 made it the 'the Broadway of Real Estate'.**

**1 watch this several times each week to remember where 1 came from. Now sit back and read the words while you enjoy: Some People :**

http://www.youtube.com/watch?v=-oGRNoGZk-k

**LYRRICS WHILE YOU WATCH:**

Some people can
get a thrill, knitting
sweaters and sitting
still That's OK for
some people don't
know they're alive
Some people can
thrive and bloom,
living life in a living
room That's perfect
for some people of
one hundred and five
But I, at least gotta
try

When I think of all the sights that I gotta see
And all the places I
gotta play, All the
things that I gotta be
at Come on papa,
what'd ya say?

Some people can be
content, playin' bingo
and payin' rent That's
livin' for some people,
for some hum-drum
people, too be But
some people, ain't me

I had a dream, a wonderful dream, papa
All about June in the Orpheum circuit
Give me a chance, I know I can work it, Uhh, what a dream
And it was just as real as could be, papa

Well just listen to me, there I was in Mr
Orpheum's office (a big Broadway
Producer) And he was sat'in' to me, Rose!
Get yourself some new
orchestrations, new routines and
red velvet curtains Get a
feathered hat for the baby,
photographed in front of the
theater
Get an agent and in jig time, you'll be being booked in the big time

Oh what a dream, a wonderful dream, papa
And all that I
need is
eighty-eight
bucks, Papa,
that's it That's
what he said
papa, only
eighty-eight
bucks, papa

It's uh, yeah, but it's only eighty-eight bucks
It's not like I'm askin' for a second mortgage on this place
What do ya gettin' so crick, why you
gettin' crazy, its eighty-eight lousy
bucks What do you mean I ain't
gettin' eighty-eight cents out of you
Well, I'll get it, and I'll get my kids, out, now

Goodbye, to blueberry pies, good ridance to all the socials I had to go to
All the lodges that I had to play, all the shriners (a men only club

# EXHIBIT 5

## Where Real Men Want To Be...

From: **Stephen O'Hara** (steve@steveohara.com)
Sent: **Thu 9/20/12 8:56 AM**
To:    'infinates@hotmail.com' (infinates@hotmail.com)

http://www.celebritycruises.com/specials/promotions.do?
paaename=limited time offers aateway&tab&ecid=em 19495299&rid=145170480&mes=Celebrity%20Equinox%202-
Da %20Sale%2OSe . tember%202012 %20EM&emsc=CPRUSOOOOOOOYEM&em . f=Y&emct=&Inldd=SPECIALS E 12DAYSALE-
GHOSTAimited time offers overview tab/limitedtimeoffers/OfferDetails.do?promoTvpe=58&pa8ename=lto 58

# EXHIBIT 6

## Your Resignation Settlement

From: **Stephen O'Hara** (steve@steveohara.com)
Sent: Wed 10/24/12 12:45 pm
To: 'infinates@hotmail.com' (infinates@hotmail.com; Fernando Martinez (contactfernandomartinez@gmail.com

**Hi Fernando!**

**I hope you are well.  In order to Deposit your final check for the services rendered as an intern, I will need you to REPLY to this Email and APPROVE IT AS WRITTEN.**

**Once I receive your REPLY, I will instruct Accounting to release monies due you per this Agreement as per this Agreement within five (5 business days after I receive the following back from you.**

**I think the following is more than fair when you consider all the facts.  I hope after you digest the following, you will agree and be very happy.**

**Needless to say, you represent a great loss to me.  I wish you the very best and will miss you.**

**If you need to talk with me to clarify anything, feel free to text me and I'll call you back ASAP.**

**Many thanks, Fernando.**

**Stephen**

## AGREEMENT

I, Fernando Martinez hereby agree and stipulate to the following:

1.  On or About August or September, 2012, I applied to CSCA® for a job that was offered to me in the real estate business.  I was additionally offered a job to work at a Corporate level with Stephen O'Hara with the future intent of being employed Full Time on or about January 2, 2013.  I understand that I needed to get my real estate license in order to receive money for performing the Acts of a Real Estate  Licensee.

2.   I was going to work for McDonald's between September 2012 and December 31, 2012.  However, it was my personal decision to NOT work at McDonald's and use this time to a) get my real estate license and b) work part time 'while I learn' as a paid Intern, for Stephen O'Hara and his Group of Companies.

3.   I had agreed to accept $1,500 per month (as an Independent Contractor).  I understand
     that I will be responsible for any taxes due the Federal Government or the State of
     California.

4.   At the time I resigned, I was owed $750.00 representing the period from Oct. 1 to Oct.
     15, 2012.

5.   During the first few weeks I worked, I had asked for and received in total about $300.00
     that I authorized to be taken out of my future check.  I had also needed more money,
     therefore, Stephen O'Hara actually overpaid me $250.00 on my prior check and told me
     that he would NOT deduct the $300 until a future check.  Additionally, on Oct 13, 2012
     during a trip to Los Angeles, Stephen gave me an cash advance of $100.00.

     With the above in mind, all total, I have received $650.00 over and above that which I
     was told I would be paid.  Based upon this paragraph alone, Stephen O'Hara actually
     owes me $100.00.

6.   It is a fact that Stephen O'Hara took a personal interest in my success.  As a result,
     Stephen purchased many other items for me including admission to the CAR
     Convention and other items.  It is my understanding that Stephen has NOT charged me
     back or asked for any repayment for these expenses.

7.   While I am probably NOT owed any money, Stephen O'Hara has offered me $525.00 in
     Liquidated Damages for anything that might arise as a result of my relationship with
     Stephen and, more importantly, to help me get re-started.

8.   I understand that by accepting this $525.00 I agree that I will not discuss in ANY form of
     communication with ANY third-party ANY and ALL proprietary, business, personal and /
     or confidential information for which I gained access to during my tenure with Stephen
     O"Hara and his Group of Companies.

     I understand that any discussion of same could cause irreparable damage to the
     parties and that violation of this paragraph eight would cause extreme exposure to
     various legal claims for the parties.  I understand fully that this Paragraph Eight will,
     therefore, be prosecuted to the fullest extent of the law should it be violated.

9.   By accepting $525.00 as Liquidated Damages and Payment in Full, I hereby waive any
     past, present, or future claim for damages, business or personal and hereby FULLY
     RELEASE Stephen O'Hara and his Group of Companies from any and all claims and/or
     liability prior to, during and after my resignation of my Internship with Stephen O'Hara.

10.      In accepting these Terms and Conditions as Final Settlement, I represent that I am of sober mind and have considered all facts relating to this matter and therefore have given this matter my full consideration and fully agree to the Terms and Conditions as stated herein.

I will also remove my involvement with CSCA® or Stephen O'Hara from ALL Social Media Sites and return all BUSINESS materials (in my possession) that belong to Stephen O'Hara or any of his Group of Companies.

I will permanently delete and and all emails between me and Stephen O'Hara and/or his Group of Companies that involve business matters.

Sincerely,


Fernando Martinez

345 W El Norte' Pkwy

Escondido, CA 92026

(Electronic Signature: REPLY and state that you accept the following as written, then email back to me.)

# EXHIBIT 7

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**08/05/2013** at 10:35:00 AM

Clerk of the Superior Court
By Enrique Veloz, Deputy Clerk

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

## BENJAMIN PAVONE, ESQ.

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE:  619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ, ACTING
INDIVIDUALLY AND ON A REPRESENTATIVE BASIS

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF ORANGE

FERNANDO MARTINEZ,

    INDIVIDUALLY AND,
    IN A REPRESENTATIVE
    CAPACITY,

v.

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA;

CAREER SOLUTIONS AND
CANDIDATE ACQUISITIONS (CSCA);

O'HARA FAMILY TRUST;

OCRE, INC.;

PROFESSIONAL REALTY
COUNCIL, INC;

PACIFIC VALLEY REALTY, INC.;

and DOES 4-10,

    DEFENDANTS.

CASE NO.  30-2012-614932

## FIFTH AMENDED COMPLAINT

**I.  FRAUD**
   **(Civil Code § 1710)**

**II.  FALSE ADVERTISING**
   **(Bus. & Prof. Code § 17500)**

**III.  UNFAIR BUSINESS  PRACTICES**
    **(Bus. & Prof. Code § 17200)**

**IV.  LABOR CODE VIOLATION**
    **(Lab. Code §§ 203/2699.3)**

**V.  SEXUAL HARASSMENT**
    **(Gov't Code § 12940(j)(1))**

**VI.  REQUEST FOR ALTER**
    **EGO FINDINGS**
    **(Code Civ. Proc., § 187)**

BENJAMIN PAVONE, ESQ.

# TABLE OF CONTENTS

**Internal Page # / PDF Page #**

COVER ............................................................... unnumbered/1

TABLE OF CONTENTS................................................ i/2

I.      INTRODUCTION..................................................... 1/4

II.     PARTIES................................................................ 1/4

III.    FACTUAL ALLEGATIONS...................................... 3/6

    A.      O'Hara Background. ...................................... 3/6

    B.      Facts Relating to Martinez-O'Hara Relationship............ 4/7

    C.      Facts Regarding the Parties'
       Unconsummated Separation Agreement .......................... 7/10

    D.      Factual Allegations Relating to Punitive Damages. ........... 9/12

IV.     CAUSE OF ACTION FOR FRAUD. .......................... 11/14

    A.      Fraud Liability of Mr. O'Hara............................. 14/17

    B.      Fraud Liabilty of CSCA.................... ............................... 14/17

    C.      Fraud Liability of PRC.................................... 15/18

    D.      Fraud Liability of PVRI................................... 16/19

    E.      Damages for Fraud Cause of Action. ................ 16/19

V.      CAUSE OF ACTION FOR FALSE ADVERTISING................ 19/22

    A.      Representative Allegations. ............................... 19/22

    B.      The Class is Numerous and Ascertainable.......................... 21/24

    C.      Common Interest Questions....................................... 22/25

BENJAMIN PAYONE, ESQ.

D.    Significant Benefit. .......... ..................................    24/27

E.    Factual Representations Relating to False
      Advertising Cause of Action................................    25/28

VI.    CAUSE OF ACTION FOR
       UNFAIR BUSINESS PRACTICES................................    39/42

VII.   CAUSE OF ACTION FOR
       LABOR CODE VIOLATION.......................................    41/44

VIII.  CAUSE OF ACTION FOR SEXUAL HARASSMENT.............    44/47

IX.    REQUEST FOR ALTER EGO FINDINGS. ...............................    46/49

BENJAMIN PAVONE, ESQ.

# I.

## INTRODUCTION

1.    This is a consumer case in which plaintiff seeks to remedy fraud and false advertising, interlaced with sexual misconduct, by an Orange County real estate agent named Stephen O'Hara.  Martinez brings fraud, labor code, and sexual harassment claims individually, and brings false advertising and unfair business practices claims on a representative basis.

# II.

## PARTIES

2.    Plaintiff Fernando Martinez is a resident of the Ventura area and brings this action partly on his own behalf and partly on a in a representative capacity, within the meaning of Business and Professions Code section 17203 and Code of Civil Procedure section 382.

3.    Defendant Stephen O'Hara is a resident of Laguna Niguel and presently resides at 38 Toulon in Orange County, 92677.

4.    Defendant CSCA is an unincorporated entity/website, and was a trade name used by, and property of, Mr. O'Hara in 2012.  Its principal address is 4533 MacArthur Blvd., Suite 100, in Newport Beach, California.  CSCA, though operating presently with some affiliation to the PRC corporate entity, was property of Mr. O'Hara at the time of the events in question relating to Mr. Martinez.  Mr. O'Hara recently testified that CSCA is currently a trade name for Professional Realty Council, Inc.  However, he acknowledged that CSCA was not actually a trademark for "Career Solutions and Candidate Acquisitions," a main actor in the present lawsuit, but an entity called "Certified Schools and Community Advisor," an entity that O'Hara was affiliated with 7-8 years before.

5.    Defendant Professional Realty Council, Inc. (PRC) is a California corporation also with a business address of 4533 MacArthur Blvd., Suite 100, in

BENJAMIN PAYONE, ESQ.

Newport Beach, California.   It's officer and directors are Stephen O'Hara.  CSCA claims to have been operating since 2006, while PRC was only formed in 2012.

6.      Defendant Pacific Valley Realty, Inc. (PVRI) is a California corporation whose listed business address is P.O. Box 7515, Newport Beach, California, with a registered agent for service, Mr. O'Hara, listed at 26012 Marguerite Parkway H200, Mission Viejo, California 92692.

7.      Defendant OCRE, Inc. is a California corporation that was formed on October 8, 2012, whose agent for service of process is listed as Stephen O'Hara and whose office is located at 30100 Town Center Drive, Suite O-100, Laguna Niguel, CA 92677.  It is the successor corporation to Pacific Valley Realty, Inc., which was utilized by Mr. O'Hara to run his real estate practice.

8.      Defendant O'Hara Family Trust is an entity of unknown organizational form, likely a private trust, and appears on Mr. O'Hara's OCRE website: "CSCA® is a Registered Trademark and used by permission of the O'Hara Family Trust." However, whether that statement refers to the CSCA that is a main defendant in this case, the headhunter school, or whether it refers to its apparently true trademark, "Certified Schools and Community Advisor," is unclear by virtue of Mr. O'Hara's intentionally confusing use of the same acronym to describe two different entities. The O'Hara Family Trust is the potential owner and responsible party for conduct committed in the CSCA educational entity's name.

9.      The true names and capacities, whether individual, corporate, associate or otherwise, of defendants named as Does 4 through 10, inclusive, are unknown to plaintiff who therefore sues such defendants by fictitious names.  Plaintiff will seek leave of this Court to amend this Complaint with the true names and capacities of the Doe defendants when the true names and capacities become known to plaintiff. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously-named defendants is responsible in some manner for the claims, obligations, and damages sued upon herein.

10.    Plaintiff is informed and believes, and thereon alleges that at all relevant times, unless specifically otherwise alleged, each of the defendants was the agent, servant and employee of each of the remaining defendants and was at all times relevant, acting within the course and scope of their authority as agent, servant, and/or employee and with the permission and consent of each of the remaining defendants.

### III.

### FACTUAL ALLEGATIONS

### III(a).

### O'Hara Background

11.    Stephen John O'Hara was born in September, 1951 in the Orange County area of Florida.  Today he is approximately 62 years old.

12.    O'Hara formally changed his name from Stephen John O'Hara to Stephen Stratton O'Hara.

13.    O'Hara appears to be the driving force, and sole owner, officer, director, trustee, and/or manager of the various entities in question: Career Solutions and Candidate Acquisitions (CSCA), Professional Realty Council, Inc. (PRC), Pacific Valley Real Estate, Inc. (PVRI), Orange County Real Estate (OCRE, Inc.), and O'Hara Family Trust.

14.    O'Hara became registered with the National Association of Realtors, License 2055012, in May, 1989.

15.    On or about April 22, 1988, O'Hara obtained his California real estate license.

16.    On or about November 9, 1990, he obtained his California real estate broker license, number 988103.

17.    He became a certified residential specialist with the National Association of Realtors, License 550126, in March, 1991.

18.    In 1993, he worked as a Century 21 real estate broker.

BENJAMIN PAVONE, ESQ.

19.    In 1996, Stephen started a website named OrangeCountyRealEstate.com, which he continues to operate at present.

20.    In May, 2006, he claims to have founded CSCA ("Career Solutions and Candidate Acquisitions"), a website to allegedly assist people to seek professional advancement in the real estate field.

### III(b).

### Facts Relating to Martinez-O'Hara Relationship

21.    Fernando Martinez is a 21-year-old, clean-cut young man, and oriented toward the same sex.

22.    Martinez lives with his mother in Ventura and has lived in the San Diego area.

23.    He has a high school education.

24.    In approximately September, 2010, Martinez applied to work at McDonald's and obtained a job working (35) hours per week for roughly $8/hr.

25.    Martinez worked at McDonald's for approximately (18) months.

26.    While working at McDonald's, Fernando uploaded a resume to Monster.com, an employment website.

27.    On August 10, 2012, he received a response to his resume post from Stephen O'Hara, who purported to represent CSCA, a "Talent Acquisition firm."

28.    On August 10, 2012, in an email authored by O'Hara to Martinez, O'Hara represented that CSCA was retained by a large company (over 35 offices and over 3,000 employees) in Southern California.

29.    On August 10, 2012, O'Hara represented that the large company CSCA represented was seeking recent Business & Communication majors for intern and full time careers.

30.    On August 10, 2012, O'Hara represented that CSCA's fees were paid by the large company seeking employees.

31.    On August 10, 2012, O'Hara represented "[a]s an [sic] Full Time Intern

BENJAMIN PAVONE, ESQ.

or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more.   After your third year, you will have the ability to earn an income of $250K or more pear year – so we are very serious about 'who' [sic] we select."

32.    On or about August 12, 2012, based on Mr. O'Hara's request for him to apply online, Martinez completed CSCA's online application.

33.    After he applied, he called the CSCA number on its website, which directed him to O'Hara's phone.

34.    Martinez reached O'Hara, who indicated he would provide Martinez assessment tests and instructed him what to look for in the tests.

35.    After Martinez submitted the completed tests, O'Hara called stating that he (Martinez) had impressed O'Hara so much by the results of the tests that he wanted to explain them in person.

36.    On September 9, 2012, O'Hara commented to Martinez in an email, "[y]ou have the 'it' factor they [persons in the modeling business] would be looking for.  In fact, my contact simply said 'wow' when I showed him your picture.  (And his 'wow' wasn't sleazy or sexual as he is straight, married and very successful.)"

37.    Martinez suggested they meet at Starbucks, but O'Hara changed the location and instead they met at O'Hara's home, presently at 38 Toulon, Laguna Niguel, 92677, on or about September 9, 2012.

38.    Some of the incidents and interactions between Martinez and O'Hara took place at the Toulon condo.

39.    At the Toulon condo, O'Hara and Martinez spent approximately (9) hours discussing many topics, mostly business, and how Martinez performed on his "intake assessment" test.

40.    O'Hara described the remarkable possibilities that were within Martinez's reach if he (O'Hara) were able to professionally guide Martinez within the

BENJAMIN PAYONE, ESQ.

real estate industry.

41.    O'Hara told Martinez he had the ability to make millions.

42.    O'Hara indicated that he wanted Fernando to take over his business and gave his word that in a few years Fernando would be making millions.

43.    O'Hara directed Martinez to return to the Toulon condo the next day.

44.    Martinez was worried and uneasy but agreed to return based on the belief that O'Hara could in fact teach him how to make millions in real estate.

45.    In a September 19, 2012 email to Fernando, O'Hara made a statement, not reprinted verbatim here, which amounted to a request for sexual gratification by O'Hara toward plaintiff.

46.    On September 21, 2012, O'Hara sent Martinez a link with the subject header entitled "where real men want to go."  The link was to a celebrity cruise ship website.  Mr. O'Hara wanted Fernando to accompany him on a gay cruise.

44.    Fernando's supposed job role continued to change.  First he was supposed to be handled by "First Team" but as O'Hara became familiar with Fernando (and allegedly his assessment scores), Stephen said he wanted to keep Fernando for himself.   O'Hara suggested he become Stephen's partner.

45.    O'Hara told Fernando that once he got his real estate license and started selling houses, his income would be around 6-figures.

46.    O'Hara made a concerted effort to get Fernando to quit his job at McDonald's, which was the job that covered Fernando's basic living necessities, and included some assistance to his low income family.

47.    On information and belief, O'Hara pushed this idea to make Fernando financially dependent on him and thereby more vulnerable to O'Hara's sexual agenda.  (See Original Verified Complaint, ¶¶ 66-67.)

48.    In a similar fashion, O'Hara pushed for Fernando to live with him or move to Orange County, as distancing himself from his sister was allegedly better for Fernando's career.

BENJAMIN PAYONE, ESQ.

49.    O'Hara insisted that if Fernando allowed O'Hara to take him under his wing, he would undoubtedly make millions and that such opportunities do not often happen.

50.    Through September-October, 2012, O'Hara and Martinez spent time together, which included (8) sexual encounters, 50 telephone calls, and a few trips, such as to Rodeo Drive, Abbey Food & Bar, through Mulholland Drive, Griffith Observatory and to a sex shop called Chi Chi Larue's, where O'Hara purchased sexually-suggestive undergarments for Fernando.

### III(c).

### Facts Regarding The Parties'
### Unconsummated Separation Agreement

51.    Fernando initially complied with O'Hara's sexual demands in the September-October period, but soon elected to decline O'Hara's advances and desire for a romantic partnership.

52.    After that, O'Hara constructively terminated Fernando and requested Fernando to sign a release agreement liberating O'Hara from any legal responsibility for his conduct.

53.    The document contains (10) paragraphs.   It proposes in paragraph (2) to have Fernando agree that "it was my personal decision to not work at McDonald's," even though O'Hara was lobbying for Fernando to quit.

54.    In paragraph (3), O'Hara proposed for Martinez to sign away his right to be considered an employee for tax purposes, even though Fernando knew nothing about real estate and would be taking sole, exclusive and complete direction from O'Hara.

55.    In paragraph (4), O'Hara acknowledged that he owed Fernando $750 for the period from October 1 through October 15 (O'Hara paid him $1,750 for the month of September), which was when Fernando (supposedly) "resigned."

BENJAMIN PAYONE, ESQ.

56.    Fernando did not resign.  He was constructively terminated for not participating in a quid pro quo sexual relationship and/or succumbing to the sexually compliant work environment O'Hara desired of Martinez.

57.    In paragraph (5) of the release agreement, during a trip to Los Angeles, O'Hara gave Fernando $100 in cash, a gift.  O'Hara suggested he had the right to deduct the $100 from the $750 in wages owed.

58.    Based on other deductions O'Hara decided to enforce, O'Hara proposed that he actually owed Fernando just $100.

59.    In paragraph (6), O'Hara suggested that he could deduct the entrance fee for Fernando's admission to the convention for the California Association of Realtors and "many other items."

60.    In paragraph (6), O'Hara proposed that Fernando sign a statement acknowledging that "[i]t is a fact that Stephen O'Hara took a personal interest in my success."

61.    In paragraph (7), O'Hara offered Martinez $525 as "liquidated damages for anything that might arise as a result of my relationship with Stephen."

BENJAMIN PAYONE, ESQ.

**III(d).**

**Factual Allegations Relating to Punitive Damages**

62.     In paragraph (8) of O'Hara's proposed release agreement, O'Hara desired a broad non-disclosure agreement: "I will not discuss in ANY form of communication with ANY third-party ANY and ALL proprietary, business, personal and/or confidential information for which I gained access to during my tenure with Stephen O'Hara and his group of companies.  [¶]  I understand that any discussion of same could cause irreparable damage to the parties and that *violation of this paragraph would cause extreme exposure to various legal claims for the parties*.  I understand fully that this Paragraph Eight will, therefore, be prosecuted to the fullest extent of the law should it be violated." (Emphasis added.)

63.     Paragraph (8)'s language acknowledging the possibility of "extreme exposure" if Martinez discussed O'Hara's conduct reveals that O'Hara knew he had committed wrongdoing and evidences Martinez's right to punitive damages within the meaning of Civil Code section 3294(c).

64.     Paragraph (8) concludes with language traditionally associated with a criminal violation, to the effect that any breach of the non-disclosure agreement will be "prosecuted to the fullest extent of the law," a threat.

65.     Paragraph (9) purports to be the formal waiver of Fernando's claims. Fernando did not sign the document and there is no 1542 language, a requirement in California to effectuate a valid waiver of unknown claims.

66.     The proposed release agreement was an attempt by Mr. O'Hara to whitewash his conduct and contributes to plaintiff's case for punitive damages under Civil Code section 3294(c)(2) ("despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights"), in addition to punitive damages under section 3294(c)(3) plaintiff seeks for O'Hara's fraudulent representations relating to the proffered employment opportunity.

BENJAMIN PAYONE, ESQ.

67.     O'Hara's release agreement came with an introductory note, "I think the following is more than fair when you consider all the facts.  I hope after you digest the following, you will agree and be very happy."  Fernando did not think it was fair and retained a lawyer in response.

68.     On O'Hara's Orange County website, he observes that "real estate agents don't usually get the job based[d] upon their technique or track record.  It's rather sad, actually."  This is evidence that O'Hara acknowledges a level of guilt about his own conduct, because Martinez did not get a job with O'Hara based on his technique or track record, but because of O'Hara's sexual interest in him.

69.     O'Hara has made a practice of issuing inflated financial claims as a real estate professional, not only to Fernando Martinez through the CSCA website vehicle, but to friends and long-time associates.  To his friends and associates, he collected approximately $4M in unsecured personal loans from 2008-2011.  He never paid this money back.  Reportedly he lived glamorously in this period, and then discharged the debts in his 2012 bankruptcy.  In the process, he caused serious financial harm to a number of people, including but not limited to, Midge Garrison ($75,000), Tiffany Trujillo ($35,000), and Patricia Mikkelson ($350,000).  He also reaped devastation to one of his (formerly) closest friends, Brenda Ranney, who lost her pension and life savings ($750,000 as claimed by O'Hara), and which resulted in her becoming homeless and living out of her car.

70.     Pursuant to Evidence Code section 1101 relating to other misconduct, and as relevant to the issue of punitive damages under Civil Code section 3294(c), Plaintiff announces this information, makes demand for discovery of O'Hara's net worth, and reserves his right to a bifurcated punitive damage hearing to set a reasonable figure with respect to such damages.

BENJAMIN PAYONE, ESQ.

# IV.

## CAUSE OF ACTION FOR FRAUD

### (Civil Code § 1710)

71.    Plaintiff incorporates the allegations of paragraph 1-70 and the allegations of paragraphs 139-240, as if fully set forth into this cause of action.  This cause of action is brought against defendants O'Hara, CSCA, and Professional Realty Council, Inc., and the O'Hara Family Trust, to the extent it holds property belonging to any of the aforementioned individuals or entities.

72.    Mr. O'Hara, through the CSCA website, made a series of representations, including: "Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000, you can expect to earn between $45,000 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year."

73.    Mr. O'Hara also made a series of representations to Fernando Martinez, memorialized in an August 10, 2012 email in response to Martinez's Monster resume post, which is included hereto as Exhibit A, stating that Martinez would be offered a job where he could make $35K-$65K/year as a full-time intern, $35K-65K year once Fernando obtained his salesperson real estate license, a $55K-$125K salary as a second year, and $250K or more after his third year, and O'Hara gave his word that Fernando would make millions in a matter of a few years.

74.    A number of these representations were in writing,

75.    As documented herein as Exhibit A, these statements indicated that Martinez could make a professional salary (from $35-65K in an intern or first year, to $55-125K/year in year 2, to $250K+/year beyond year 3), and that there were millions of dollars to be earned if Fernando agreed to work under Stephen O'Hara's tutelage.   These statements were either false, were based on no track record of tutoring persons to these income levels in that short of a period, or O'Hara had no

BENJAMIN PAYONE, ESQ.

reasonable basis for asserting them as O'Hara himself was bankrupt, his recent history of making money was by misappropriating it from others, and he has apparently never himself made "millions" of dollars in a given year.

76.    The representations stated in the August 10, 2012 email were authored by O'Hara and were made by him in the context of him purporting to represent CSCA.

77.    In terms of Stephen's representations that Fernando would make millions in a few years, these representations were made orally by O'Hara, acting as a real estate tutor in the context of Fernando's "internship" with Pacific Valley Realty, Inc.  As such, responsibility for these representations befalls to O'Hara personally and Pacific Valley.

78.    Stephen made the promises that Fernando would make millions within a few years, in a September 19, 2012 email to Fernando, because he took the trouble to recount how he connected with a song: "I connect to this song because my family thought I was nuts.  They wanted me to have a boring $35K year job working 9-5.  To this day, they think that the $1.5 to $2 Million I made per year in the real estate industry 'is not a REAL job.' "   Thus, Stephen claims the right to teach people how to make millions in real estate by virtue of this claim.

79.    Thus, Stephen was representing to Fernando that he consistently made $1.5-$2M per year in the real estate business and was promising to teach Fernando how to similarly earn such an income.

80.    At the time, O'Hara was himself only making $72K/year according to his 2012 bankruptcy schedules, and he had just finished causing serious financial harm to a number of his friends and business associates with his borrowing power over them and later Chapter 7 discharge of their debts.

81.    The specific statements include, but are not limited to, Mr. O'Hara's August 10, 2012 written response to Fernando's resume on Monster.com, a copy of which is included here as Exhibit A:

BENJAMIN PAYONE, ESQ.

(a)     "I saw your RESUME on Monster® and have an interest in you."

(b)     "I represent CSCA® a Talent Acquisition firm specializing in the real estate sector of the Financial Services Industry**."**

(c)     "Experience is NOT necessary, we'll be focusing on your skills and ability to be trained."

(d)     "We have been retained by a large company (over 35 offices and over 3,000 employees) in Southern California who is seeking recent Business & Communications Majors for Intern and Full Time careers."

(e)     "Our fees are paid by the employer (not you) and they are hiring 'now'."

(f)     "As an [sic] Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more."

(g)     "After your third year, you will have the ability to earn an income of $250K or more per year -- so we are very serious about 'who' [sic] we select."

(h)     "Based upon your Monster Resume, we feel you might be a fit for the company we represent.  Let me invite you to visit www.CSCA.com. The site will give you all sorts of information as to the individual talent we are seeking."

82.     These statements were false and/or misleading: O'Hara's interest in Fernando was not professional, the talent acquisition firm appears to be a hollow shell, experience is not necessary because O'Hara is not really looking for a real estate employee, the large company either does not exist or O'Hara does not have the connections to it he claims, the large company was not hiring on the terms and conditions O'Hara claimed, O'Hara/CSCA was not hired, it was not getting paid, the claimed income was speculative at best and came with sexual strings, and O'Hara was only a "fit" for the company because O'Hara had a romantic interest in him.

83.     O'Hara knew the statements were false or made them with reckless disregard for their truth, given O'Hara's own sworn, financial circumstances, the fact

that CSCA did not actually represent a national real estate firm, the fact that the entire website appears to be an illusion, and because O'Hara had an unstated sexual agenda, which was a precondition of his continued interest in Fernando.  O'Hara intended to defraud Martinez because he lured him into a sexual relationship by making him promises about potential employment, promises that were not true, were not as they were presented, were based on an illusion of a website, and were exaggerated, speculative and/or patently invented.

84.    Martinez reasonably relied on O'Hara's promises because he started working for him.   O'Hara adeptly held himself out as being a real estate mogul and claimed to have consistently made millions of dollars, at a time when he was recently bankrupt and had survived in the previous years by stealing from his friends.

85.    Martinez's reliance on O'Hara's representations was a substantial factor in causing Fernando harm, in that Fernando capitulated to a sexual relationship, he accepted the lower (non-national, prestigious) employment as a personal intern, and he was never paid, and never even got close, to securing any sort of employment commensurate with the representations in the Monster Ad or on the CSCA website.

## IV(a).

## Fraud Liability of Mr. O'Hara

86.    Mr. O'Hara is the underlying author, maker and utterer of every false representation alleged to support a finding of fraud: he is the author of the salary prediction statements on the CSCA website, he is the author of the Exhibit A email, and he was the one who told Fernando Martinez in person that the latter would be making millions of dollars in a few years under his tutelage.

## IV(b).

## Fraud Liability of CSCA

87.    CSCA is an unincorporated entity; therefore as a legal matter, it is merely property belonging to Mr. O'Hara.  However, because parties can place assets

BENJAMIN PAYONE, ESQ.

in the name of even unincorporated entities, Martinez seeks a judgment in CSCA's name of as well as O'Hara's name.  (See alter ego allegations, *infra*.)

88.     In terms of its fraudulent conduct, CSCA directly represented on its website that Martinez could earn specific salary figures.  This is not a form of vicarious liability.  They are statements directly made by the entity itself.

89.     With respect to the statements in the Exhibit A email, these are statements made by O'Hara, with O'Hara claiming that he "represent[s]" CSCA.  However, at the time, CSCA was not a legally-recognized separate entity – it was O'Hara's property.  Since CSCA and O'Hara are one in the same in this situation, liability of O'Hara necessarily translates to liability of CSCA.

## IV(c).

## Fraud Liability of PRC

90.     PRC was incorporated on July 25, 2013, but was not connected to CSCA's operation as of December 10, 2012, which is the version of the CSCA website snapshot that appears as Exhibit B to the complaint, and after the fraudulent representations were made to Martinez.

91.     Thereafter, Martinez took a partial snapshot of the CSCA website on February 17, 2013 and it contained a marking at the bottom "© 2013 Professional Realty Council, Inc. All Rights Reserved."

92.     O'Hara owned the CSCA website as personal property through 2012, and intended to move it into the PRC corporation in 2013.   However, no paperwork was generated in 2012 as it "would be perfected this year."  (In 2013.)    In Mr. O'Hara's mind, CSCA is now (as of his June, 2013 deposition) property of PRC, though no paperwork supported that.

93.     PRC is liable for the fraudulent conduct of Mr. O'Hara/CSCA if CSCA's assets and liabilities are ultimately transferred to PRC, as Mr. O'Hara claims will occur.  If PRC only succeeds to the assets of CSCA, then PRC is only liable on an alter ego theory.

## IV(d).

### Fraud Liability of PVRI

94.     In terms of Stephen's representations that Fernando would make millions in a few years, these representations were made orally by O'Hara, acting as a real estate tutor in the context of Fernando's "internship" with Pacific Valley Realty, Inc.  O'Hara is a founder, owner, officer and director of PVRI.  As such, responsibility for these representations befalls to O'Hara personally and to Pacific Valley, on a direct liability theory.

## IV(e).

### Damages for Fraud Cause of Action

95.     At the time of the representations, Mr. O'Hara and CSCA were offering an employment placement service for Martinez -- an agency relationship and thus a fiduciary relationship -- for purposes of securing him a position with the large company CSCA purported to represent.

96.     In the August 10, 2012 post, Mr. O'Hara referred Martinez to CSCA for more information about what CSCA was offering.

97.     On CSCA's website, it purports to be a "Talent Acquisition Company" – a talent agency – which is a fiduciary relationship.

98.     By definition, a person who is "acquired" by another is represented by the acquiring party, here CSCA.

99.     On CSCA's website, it claims to be "one of the best places to launch your career," which reflects that CSCA acts in a cooperative relationship with the employee/talent.

100.    It thus created an agency relationship and a fiduciary relationship, as opposed to engaging employees at arms-length, e.g., employer-employee transaction.

101.   On CSCA's website, it states, "[w]e know that it's hard to find the right company.  And, frankly, we know that it's hard for these same companies to find qualified Talent.  That's where CSCA® comes in."

BENJAMIN PAYONE, ESQ.

BENJAMIN PAYONE, ESQ.

102.   Based on this statement, CSCA acts as a middleman between the employee and the employer, which creates a fiduciary relationship for it as to both the employee and the employer.

103.   CSCA's website states: "we filter the best Talent for our Brokerages and we offer the best Brokerages to our Talent.  It's really that simple."

104.   CSCA reported on its site: "… we can take your career just about anywhere."

105.   Based on these statements, and numerous others on CSCA's site, it proposes to offer a service in which it nurtures the employee, through its "Professional Training Program" (which educates the employee on how to take care of customers, to help him or her develop marketing plans and "work with an energetic team of professionals"), through a "culture that breeds your success," and through its top-notch standing in the industry (the "Best-of-the-Best"), all of which point to a fiduciary relationship between Martinez and O'Hara/CSCA/PRC.

106.   The California Supreme Court announced in its 2004 *Robinson Helicopter v. Dana* decision: "In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future.  Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for predictability about the cost of contractual relationships, fraud plaintiffs may recover 'out-of-pocket' damages *in addition to* benefit-of-the bargain damages." (*Robinson Helicopter v. Dana* (2004) 34 Cal.4th 979, 997, citing *Lazar v. Superior Court,* 12 Cal.4th 631, 646 [emphasis added].)  Thus, the Supreme Court resolved the conflicting damage rules as between the appellate courts in fraud cases in favor of authorizing both remedies because "California has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices." (*Robinson*, *supra*, at 992, citing *Diamond Multimedia v. Superior Court* (1999) 19 Cal.4th 1036, 1064.)  Consequently, the law allows Martinez to seek that which was

promised: a $35K-65K/year first year salary as a full-time intern, a 35K-65K salary as a first year licensed real estate agent, a $55-125K salary as a second year real estate agent, and a $250K or more salary after the third year, subject to reasonable limitations to account for speculative damages. (*Helmer* v. *Bingham Isuzu* (2005) 129 Cal.App.4th 1121, 1129-1130, citing *Toscano v. Greene* (2004) 124 Cal.App.4th 685, 693-696.)

107.   As such, plaintiff seeks damages in terms of the value of what was promised him under a benefit-of-the-bargain damage theory: a job with a national real estate firm that pays $35-65K as a first year intern, a $35K-65K salary as a first year real estate agent, a $55K-$125K salary as a second year real estate agent, and $250K+ salary after the third year, complete with all the bells and whistles associated with the claims on the website, professional training, membership in a "team of energetic professionals," etc.  O'Hara's promise that Martinez would make millions under his tutelage is also incorporated into this calculus.  The amortized value of such a job/career is itself worth approximately $250K, and as such, plaintiff seeks a minimum $250K in fraud damages for this cause of action, plus punitive damages.

108.   Plaintiff seeks punitive damages within the meaning of Civil Code section 3294(c) in that defendants' conduct was oppressive, fraudulent and/or malicious because the representations emanating from CSCA were seriously misleading, painted a false picture of the employment opportunity that was actually being offered, contained an improper element of obligatory sexual reciprocation within it, and upon discharge, displayed a level of callous disregard for the young McDonald's employee's financial situation, by proposing Martinez not only sign off on a false document but essentially waive all his rights, solely in order to get his last paycheck, a fundamental right under California law.

BENJAMIN PAYONE, ESQ.

# V.

## CAUSE OF ACTION FOR FALSE ADVERTISING

### (Business & Professions Code § 17500)

### (Brought as an Injunctive Class Action Pursuant to B&P 17203)

109.   Plaintiff incorporates the allegations of paragraph 1-108 as if fully set forth into this cause of action.

## V(a).

## Representative Allegations

110.   This cause of action is brought by Martinez in a representative capacity in that he acts individually, on behalf of the General Public of the State of California, and on behalf of all others similarly situated, within the meaning of Business & Professions Code section 17203 and Code of Civil Procedure section 382.

111.   This cause of action is alleged against defendants O'Hara, CSCA, and Professional Realty Council, Inc.

112.   Plaintiff Martinez seeks to stop defendants from continuing their false advertising of CSCA's placement services.  He does not seek disgorgement or restitution on behalf of other persons.

113.   Martinez is one of many individuals who was solicited by a mass email "blast" to Monster.com by CSCA, as reflected by Exhibit A attached hereto.  As explained by Martinez, he received an email response to a resume he posted on Monster, noted that CSCA was looking for potential employees, and then he went to its website and "read every word."

114.   Martinez noted that CSCA represented a company that maintained (35) offices and 3,000 employees and that it was "pretty prestigious and established."

115.   Martinez learned that CSCA paid for all fees, that it had multiple training programs, and that it could launch your career, something he was "mainly interested in."

BENJAMIN PAYONE, ESQ.

116.   Martinez applied online to CSCA because of these factors and for other reasons, such as CSCA's presentation that Kendra Todd, who is affiliated with Donald Trump and his show "The Apprentice," was one of the CSCA graduates under (30); that Martinez was familiar with the show "The Apprentice," had watched the first season, and was "pretty impressed" that she had been a CSCA graduate.

117.   Based on the content of the website, Martinez responded to the mass email, which in turn, prompted O'Hara to request that Martinez complete the online application.  Martinez applied online and subsequently had several meetings with Mr. O'Hara before Martinez started to work for him.

118.   As explained by Mr. O'Hara, "when we first do our first ... broadcast, the level of membership that I have with, like Monster allows me to – like, if you have an application on Monster's board, I have the type of membership that I can actually communicate directly to you.  So I forced down 20,000 – a blast of like 20-some thousand of a generic letter."  Thus, approximately 20,000 emails of the type Fernando Martinez received were sent out through Monster's mass communication device.

119.   Mr. O'Hara illuminated his marketing plans for CSCA: "it would be aggregating the stuff from Monster ...  I would have proudly had him to be part of the PRC project, the CSCA project, as you know it, but with PRC, because I had the East Coast covered with Ali, but I would have loved to have somebody on the West Coast in 2013."  This meant that he had Ali, his niece in Florida, collecting leads from the email blasts described above and that he was considering having Fernando perform the same function on the West Coast.   In other words, Mr. O'Hara's plan is to continue to mass email persons posting resumes on Monster.com with CSCA's advertisements, in increments of approximately 20,000 communications per exercise.

120.   The plan was interrupted, however, by this lawsuit:

Q:     Is that still the intent?

A:     Yes.  But now moved up to 2014 when I'm done with you.

BENJAMIN PAYONE, ESQ.

Q:    So you're planning on being done, I guess, within six months?

A:    *A long time before that, my friend.*

121.   Thus, Mr. O'Hara has testified that he predicts this litigation will be adversely disposed against Martinez long before the end of 2013, such that he can continue to issue his 20,000-person mass email communications of the type seen in Exhibit A, on both the East Coast and the West Coast.

122.   Section 382 provides that "when the question is one of common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defraud for the benefit of all."

123.   Given these circumstances, Martinez proposes the following three sub-classes of affected individuals:

(1) All residents of California who were exposed to Defendants' approximately 20,000-person mass email communication on Monster.com.

(2) All residents of California who will be exposed to Defendants' future mass email communications, on Monster.com or otherwise.

(3) All residents of California who were, or will be, exposed to Defendants' representations on the CSCA website.

### V(b).

### The Class Is Numerous and Ascertainable

124.   The proposed classes are sufficiently numerous that it is impracticable to bring all plaintiffs before the Court.  Though the identities of the class members are unknown at this time, they number approximately 20,000 persons in the prior mass email communications alone.  Mr. O'Hara intends to continue this practice of mass advertising, which means that he could be sending hundreds of thousands of individual email communications.

125.   The identities of the first class could be ascertained from Monster's records, and class members could be notified about the pendency of this action

BENJAMIN PAYONE, ESQ.

through a notice in Monster.com's system, much the same way as Mr. O'Hara himself advertised to all of its constituent resume posters, though notice in this type of injunctive action is not necessary to protect absent class members.

### V(c).

### Common Interest Questions

126.  In order to determine if there is a well-defined community of interest such that the question is one of a common or general interest, a court should consider: (1) whether common questions of law and facts predominate; (2) whether the class representative's claims or defenses are typical of the class; and (3) whether the class representatives can adequately represent the class.

127.  This action presents questions of law and facts common to the class within the meaning of *Washington Mutual* v. *Superior Court* (2001) 24 Cal.4th 906, 913-914, including but not limited to, the following: whether the statements recited in CSCA's advertising emails, and on its referring website, as detailed herein and documented on Exhibit A and B respectively, were false or misleading within the meaning of Business and Professions Code section 17500.

128.  Martinez's claims are typical of the claims of the members of the class because the injunctive request pertains to the legality of the same representations made in the same writing to all class members, as reflected in Exhibit A.

129.  Similarly, Martinez's claims are typical of the claims of the members of the class because the injunctive request pertains to the legality of the same or similar representations made to all class members, as reflected by the website depicted in Exhibit B.

130.  Martinez will fairly and adequately represent the class because he possesses  actual standing under traditional fraud principles, within the meaning of *In re Tobacco II* (2009) 46 Cal.4th 298, 307, 325-327.  He relied on CSCA's email representations, he did in fact read the contents of the website before going forward, and based on those representations, he personally engaged the CSCA employment

BENJAMIN PAVONE, ESQ.

placement service and did accept and work at, albeit briefly, the inferior job offered by defendants through CSCA.   So too, the class members' claims would involve proving that the statements on the Exhibit A advertising email, and the claims on the website, were false or misleading within the meaning of Business and Professions Code section 17500.

132.   Martinez is also capable of fairly and adequately representing and protecting the interest of the class, because he has no interest or arguments that are antagonistic to it, nor has any position that irreconcilably conflicts with those of other class members, and he is capable of prosecuting, through counsel,  a 17200/17500 representative action of this scope and nature.

133.   A representative action is superior to other available methods for the fair and efficient adjudication of Martinez's and the class members' claims.  It is superior to preserve class member injunctive claims, as they would undoubtedly forego litigation given the burden and expense of individual prosecution of such claims, particularly since this case only involves the pursuit of injunctive relief and does not prejudice or foreclose any class member's right to pursue monetary or other pecuniary forms of relief.

134.   Individualized litigation would burden the courts, would increase the delay and expense to all parties and the Court, would produce the potential for inconsistent or contradictory determinations and would establish incompatible standards of conduct for defendants.

135.   The individual prosecution of separate actions would create a risk of adjudications which may be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Injunctive relief is appropriate against defendants with respect to members of a class as a whole, as opposed to individual injunctions.

## V(d).

## Significant Benefit

## (Code Civ. Proc., § 1021.5)

136.   As explained by *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 43, the fundamental objective of the private attorney general doctrine is to encourage suits effectuating a strong public policy by awarding attorney's fees to those who successfully bring public interest lawsuits and thereby bring about benefits to a broad class of citizens.

136.   Martinez has obtained a measure of relief in this litigation by Mr. O'Hara's announcement that he has suspended CSCA's mass marketing effort until this lawsuit is resolved.  Effectively, Martinez has already won for the class a de facto preliminary injunction.

137.   Should the Court enter a permanent injunction against CSCA by precluding further mass email communications, such as the 20,000-person mass email communication in Exhibit A, and/or order CSCA's website to be taken down, this will create a significant non-pecuniary benefit for a large number of persons within the meaning and parameters discussed in *Woodland Hills* v. *City Council* (1979) 23 Cal.3d 917, 939-940.

138.   A large number of persons were exposed to the fraudulent statements in the mass email communication.   According to Wikipedia, Monster.com is the world's largest employment website and hosts over 63 million job seekers per month. Mr. O'Hara, who has testified that he has the ability and intention to circulate more of these mass email communications to a large number of job seekers on Monster.com (on both the East and West Coast), will necessarily advertise, falsely, to many thousands of young and naive employment seekers.  Apart from demoralizing or disappointing them when they determine the reality of CSCA's actual employment capabilities, or being trapped into unpleasant employment situations as happened to class representative Martinez himself, the false advertisements will at a minimum

BENJAMIN PAYONE, ESQ.

waste the class members' time, money and resources, by the fact that defendants are falsely luring in candidates by advertising for prestigious, lucrative, top-tier jobs that do not actually exist.

## V(e).

## Factual Representations Relating to
## <u>False Advertising Cause of Action</u>

139.   Plaintiff was contacted by Mr. O'Hara, representing CSCA, which may now be property of Professional Realty Council, Inc., as reflected by the email in Exhibit A.

140.   In Exhibit A, O'Hara referred Martinez, a potential consumer of employment placement services, to CSCA's website, at www.csca.com, which made a series of public advertising representations.

141.   Generally speaking, the CSCA website, as of a December 10, 2012 capture included herewith as Exhibit B, purports to be an elite and cutting-edge career placement service and proposes to guide the career of aspiring young professionals toward a rewarding and lucrative lifestyle, but mostly contains an innumerable stream of meaningless business catchphrases.

142.   The website contains a number of young professionals shown to be celebrating, engaged in outdoor activity, living the "good life" (fine wine, nice clothing, attractive people), and engaging in successful, lucrative and rewarding business activity.

143.   None of the people shown are in any way actually connected to CSCA.

144.   CSCA purports to be a large organization with many employees: it identifies Mr. O'Hara as the manager and founder; it claims to have "corporate executives," "managers," "career counselors," a "talent acquisition manager," a "talent acquisition director," an "executive search team," an annual "class of 30" graduates, six separate orientation and training programs, a formal promotion system, a trademarked "Sphere-of-Influence Building System," a claim it hires for numerous

and varied positions besides real estate agents ("Sales Management, Relocation and a "variety of administrative positions"), a classroom where orientation and training is provided, a recruiting reach that allows it to visit college campuses around the nation, and a national geographic presence of its graduates.

145.  CSCA claims that its broker members represent all of the major national and regional real estate companies.

146.  Based on the facts alleged herein, and discovery conducted to date which does not corroborate the size or complexity of the CSCA organization as claimed, Plaintiff believes, and thereon asserts, that CSCA is a "front," a supposed elite talent agency with 10-50 employees, but is actually a vehicle by which Mr. O'Hara either induces a pipeline of young men to explore and potentially satisfy his sexual appetite, or at best, is a gross exaggeration of the employment opportunity actually being offered, if it even exists.  On this basis, every advertising statement detailed herein is untrue and/or misleading because the true underlying motivation and business reality is not announced or disclosed.

147.  Based on the facts alleged herein, Mr. O'Hara, CSCA and Professional Realty Council, Inc., know that they are engaged in a false advertising scheme, that the statements made on CSCA's website (as partly recited herein) are untrue and/or misleading, and that they are attempting to induce young persons to get involved with CSCA by submitting their career ambitions to it under the false belief that it is a large, established, top-tier, connected, national, and recognized organization.

148.  Ultimately, a job seeker may be solicited for sexual purposes or may find the grandiose claims on CSCA's website to be in contrast to what is actually a small 1-3 person operation.

149.  When plaintiff counsel called CSCA's office in an effort to settle the case before a filing, Mr. O'Hara personally picked up the phone.

150.  If not solicited for sex, the job opportunity, if any, offered to the young person is not possessed of all the amazing qualities described in the website, because

BENJAMIN PAVONE, ESQ.

CSCA is not nearly the complex, prestigious, sizeable, national, top-tier placement agency it poses as.

151.   The bulk of CSCA's representations are made on the internet, at www.csca.com.

152.   The representations reflected in paragraphs 153-244 are either untrue or can be demonstrated to be misleading for other reasons as well, as discussed below. Plaintiff has identified and discussed the first (36) false advertising claims, and then refers to Exhibit B, which highlights a total of (28) additional false claims for a total of (64) claims.

153.   False Advertising Statement #1: "CSCA® is one of best places to launch your career."

154.   A place that requires sexual submission to the organization's president is not one of the best places to launch a career.

155.   Because of the fragility of sexual relationships, and their tendency to often end quickly as was the case here, CSCA was not one of the best places Martinez could have attempted to launch his career.

156.   CSCA is not a national, prestigious, recognized, awarded, large or complex organization and thus cannot under be described under any definition of the word "best" as one of the best places to launch a career, given true, serious and established career and employment placement organizations, such as ones from major colleges and universities.

157.   False Advertising Statement #2: "If you share our 'DNA', we know you will like what everyone is talking about."

158.   Even in the colloquial sense (as opposed to the literal sense), everyone is not talking about CSCA.  There is no evidence that CSCA has been in the news or is the subject of any public discussion.  It has no known public presence other than the website itself.  Based on information and belief, and some discovery to date, it does not represent a large company seeking to hire employees for the figures as claimed to

Martinez in Exhibit A, rather there was an idea that CSCA would collect employment leads and farm them to Chris Pollinger at First Team Real Estate, but this was not a real "employment" opportunity, as the end result is the creation of real estate agents who must independently generate their own business, whereby both First Team and CSCA take a cut of the agent's business.

158.   In its section entitled, "In the News," which suggests that CSCA has been the subject of public interest, the actual text reveals that it has not been in the news for anything.

159.   In its section entitled, "In the News," it purports to announce the "2012 Class of '30 Under 30' and then discusses Kendra Todd, the apparent winner of NBC's "The Apprentice" during Season 3.   The page implies that Ms. Todd was in CSCA's "class of '30 under 30'."

160.   However, a careful reading of the website text reveals that Kendra is merely its "role model," CSCA does not actually state that she enrolled in any CSCA "class" (nor graduated from it), nor does CSCA appear to have any actual connection, relationship or affiliation to Ms. Todd (or to Donald Trump, pictured with her).

161.   Thus, CSCA is using the name and likeness of celebrities Todd and Trump as part of its advertising materials (perhaps in violation of Civil Code section 3344), by giving the impression that it enrolled and graduated Kendra Todd from CSCA's class of 30 persons (under 30 years old), without having any actual connection to her, without having an annual graduating class of 30 or at all, or having a training program that contains a class of enrollees.

162.   <u>False Advertising Statement #3</u>: "You are about to discover a Talent Acquisition company that offers you a career like no other."

163.   At best, CSCA is offering a rather traditional career, as a real estate agent.

BENJAMIN PAVONE, ESQ.

164.   <u>False Advertising Statement #4</u>: "We're also business people, musicians, photographers, mountain climbers, students and artists whose interests can't be defined by a job description."

165.   There is no evidence that CSCA consists of anyone but Mr. O'Hara individually or that he regularly, or has ever, "acquired" any of the aforementioned types of people or a large number of people, as suggested.

166.   <u>False Advertising Statement #5</u>: "CSCA$^®$ hand selects the very best Brokerages across the nation (Independent and Franchised") on the basis that they have met our stringent standards, embrace our culture and are looking to the future."

167.   CSCA does not hand select the very best brokerages across the nation, as there is no indication that CSCA is a national entity or has any ability to access or determine the best "brokerages," (which it defines as, some sort of real estate professional "representing a variety of real estate companies that serve as an intermediary for buyers and sellers").

168.   There is no evidence that anyone at, affiliated with, or who allegedly graduated from, CSCA has connections to the best "brokerages" in the nation, much less the right to select among them.

169.   CSCA does not distinguish between independent and franchised brokerage and it appears that it had, at best, the beginning of an idea for a referral service to First Team Real Estate.

170.   There is no indication, as particularly exemplified by the Martinez case, that CSCA employs "stringent standards," or has any documented standards.

171.   <u>False Advertising Statement #6</u>: "Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices.  Like CSCA$^®$ itself, our Brokerages are very progressive.  We take what we do seriously and we are consumer driven."

172.   There is no evidence, as suggested, that CSCA has a web of brokerage relationships and that it has instilled a consistent progressive marketing policy across them.

BENJAMIN PAYONE, ESQ.

173.   Underline: False Advertising Statement #7: "College Graduates and Military Veterans are finding it hard to find employment that fulfills [sic] their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that rewards them financially with the lifestyle they imagine for themselves."

174.   This statement is doubtfully at all true, for reasons previously stated.

175.   False Advertising Statement #8: "We know it's hard to find the right company.  And frankly, we know that it's hard for these same companies to find qualified Talent.  That's where CSCA® comes in."

176.   CSCA has no known history of successfully acting as the middleman between individuals and companies and has refused to disclose any information about its actual performance.

177.   CSCA does not specialize or focus in seeking college graduates or military veterans, Martinez was neither of those, and CSCA has no track record of matching college graduates with like-minded real estate firms with a similar "culture."

178.   False Advertising Statement #9: "CSCA® serves the finest real estate Brokerages brands in the nation who are seeking career oriented College Graduates and recent Military Veterans."

179.   CSCA has no established business relationship with "the finest real estate Brokerages brands in the nation" who are seeking a particular type of employee."  It apparently had one connection to one guy at a recognized real estate outfit.

180.   False Advertising Statement #10: "We work with the Best-of-the-Best, the leader's [sic] in the real estate industry…"

181.   There is no indication that CSCA has any connection to the top, national real estate firms in the United States or that it regularly places employees with top

BENJAMIN PAVONE, ESQ.

national real estate firms with lucrative employment offers like the one suggested to Martinez in Exhibit A.

182.    False Advertising Statement #11: "We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry."

183.    There is no evidence that CSCA specializes in any particular trade, nor that it has a track record of connecting persons with a specific skill set to the real estate sector.

184.    False Advertising Statement #12: "...most of our Brokerages are hiring now."

185.    There is no indication that CSCA is connected to a number of brokerages, nor that they are hiring, nor that they were willing to hire persons like Mr. Martinez.

186.    Mr. Martinez was never offered nor introduced to any real estate brokerage, nor one willing to hire him.

187.    False Advertising Statement #13: "The sky really is the limit.  Our environment's energetic, our people are motivated and our career paths take you where you want to go."

188.    There is no evidence that there is an "environment," as CSCA is not a real company and does not have "people."  CSCA acknowledges that not a single person is an actual witness to any of the activity between O'Hara and Martinez.

189.    For Fernando Martinez, as evidenced by his experience with O'Hara, "the sky is the limit" meant working for Stephen O'Hara as a sexual apprentice for $1,500/mo.

190.    False Advertising Statement #14: "The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara.  Nearly all of our team members started in this program."

BENJAMIN PAYONE, ESQ.

191.   There is no basis to infer that CSCA has the ability to place an employee into a brokerage training program, that it has done so in thousands of cases, or that there are "team members."  The training program given to Fernando largely consisted of emails from Stephen in which he slowly explained some aspects of the real estate business, along with providing a number of Joel Osteen prayer messages.

192.   <u>False Advertising Statement #15</u>: "[a]s you progress through the program, you'll see many more career options open to you."

193.   There is no evidence to date that any other career options became open to Fernando Martinez, much less "many more" options.

194.   <u>False Advertising Statement #16</u>:"Want to start way out in front?  Try out Internship Program.  As a current university Business and Communication Major, you'll learn how to run a million dollar business by working with a team that's actually running one."  The O'Hara "team" is not running one, as he reported in his 2012 bankruptcy schedules that his real estate business generated $72/K year in business.

195.   <u>False Advertising Statement #17</u>: "We focus the resources of CSCA® on the satisfaction of Consumer Experience with our Brokerages and the success of its Team Members – including management."

196.   CSCA does not have "team members" and does not have separate management.  It appears to be all one man, O'Hara, posing as a much larger organization, except for some involvement of his niece, Ali, in Florida.

197.   CSCA is not working with a team that is running a million dollar business, as the O'Hara real estate business was bankrupt at the time of this statement.

198.   <u>False Advertising Statement #18</u>: "As a company, the goal of CSCA® was never to be the biggest – only the best."

199.   The suggestion falsely implies that CSCA is of at least a significant size, more than a couple of people.

BENJAMIN PAYONE, ESQ.

200.   <u>False Advertising Statement #19</u>: "However, because our people offer the best customer experience, we've done some growing.  We serve the best real estate Brokerage brands in the world."

201.   None of this appears to have any truth to it.  The growing Mr. O'Hara mentioned was that it entered into a single contract with Chris Pollinger at First Team to potentially refer employment leads to it.  CSCA has not "grown" as measured by any traditional indicators.

202.   <u>False Advertising Statement #20</u>: "In fact, that's what we are about; marketing the best of Talent to the best people in the world, our Brokerages and the customers in the communities they serve."

203.   There is no indication, particularly given the example of Mr. Martinez, that CSCA attracts top-tier aspiring young real estate professionals, like Ms. Todd, nor connects such persons to "the best people in the world."

204.   The statement suggests that CSCA is a sizeable entity, just not as large as some entities constituting the largest of companies.  It has no basis in size to compare itself to large companies.

205.   <u>False Advertising Statement #21</u>: "We make news."

206.   There is no known information to suggest CSCA has been in the news, or the center of any public discussion.

207.   As discussed in earlier paragraphs, CSCA's "in the news" section reveals that CSCA is not in the news and is misappropriating the newsworthiness of celebrities it has no connection to.

208.   <u>False Advertising Statement #22</u>: "Announcing the 2012 Class of '30 Under 30.'  Success in real estate takes many paths.  These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive and innovative spirit."

BENJAMIN PAYONE, ESQ.

209.    The CSCA website does not actually announce a class of 30 graduates from CSCA's training school.  It mentions one person, Kendra Todd, who is suggested to be a graduate of CSCA.  She is not.

210.    <u>False Advertising Statement #23</u>:"Need a Role Model?  Meet Ours!"

211.    Pictured below this statement is a photograph of Donald Trump with Kendra Todd.  O'Hara has admitted that CSCA has no connection to Donald Trump or Kendra Todd in any way.

212.    <u>False Advertising Statement #24</u>: "awards and recognition … [w]hether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation."

213.    There is no evidence that any of this is real.  A large number of detailed and specific discovery requests about CSCA's operations were met with a virtual across-the-board refusal to tender any substantive corroboration for any of the claims on the website.

214.    There is no indication or evidence that CSCA is a national organization or that awards are being won around the nation.

215.    <u>False Advertising Statement #25</u>: "What can you earn?  Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year."

216.    There is no evidence that CSCA has a "typical" track record of placing first and second years at these income levels, or that CSCA has actually mentored anyone at all into a lucrative real estate career.

216.    <u>False Advertising Statement #26</u>: "Whether you're right out of school, the military or looking for something more out of your current career, our

Brokerage's Management Training Program is designed to put you in a position to succeed immediately."

217.    There is no evidence there is a real management training program.

218.    <u>False Advertising Statement #27</u>: "We promote based on performance, not seniority.  So if you're looking to move quickly, our Restart Training Program is for you."

219.    There is no evidence to indicate that CSCA actually has numerous, functioning "programs": on the website, it claims to have six different training programs: an orientation program, "Internship Program," "Training Program," "Professional Training Program," "Management Training Program," and the instant "Restart Training Program."

220.    <u>False Advertising Statement #28</u>: "We start with orientation and classroom training."

221.    CSCA does not have any classrooms, nor a real orientation program. Mr. Martinez's "classroom training" included driving around with Mr. O'Hara to Macy's and Chi-Chi Larue lingerie shop.

222.    <u>False Advertising Statement #29</u>: "We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent."

223.    There is no evidence that CSCA places persons nationally, or at all.

224.    <u>False Advertising Statement #30</u>: "Because we pride ourselves in screening the very best job applicants, we are very selective as to which Brokerages with whom we choose to work."

225.    There is no proof that CSCA obtains, has access to, qualifies or interviews the very best job applicants or has any brokerages from which to select from.

226.    <u>False Advertising Statement #31</u>: "we will only represent one brokerage in each market."

BENJAMIN PAVONE, ESQ.

227. CSCA does not have a national presence such that it would break it down by market.

228. <u>False Advertising Statement #32</u>: "You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®."

229. There is no evidence this statement has any truth to it, whatsoever.

230. <u>False Advertising Statement #33</u>: "[Q:] When will CSCA® be visiting my campus?  [A:]  Please check with your school's career services office for a calendar of events or simply email us."

231. Given that the internet reaches all persons attending any college in the United States and CSCA's conversation assuming that any given applicant might reasonably be able to check with their college career office to verify that CSCA will visit its campus, plaintiff does not believe, and thereby disputes, that CSCA maintains a presence, or has the ability, to conduct interviews at any given college in the nation. According to Mr. O'Hara, CSCA will not actually appear at any college anywhere for this purpose, but First Team might.  In other words, Mr. O'Hara has apparently commandeered First Team's credentials and claimed them as his own.

232. <u>False Advertising Statement #34</u>: "[Q:] Should I apply on CSCA's website or my school's career website?  [A:]  If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings."

233. This statement attempts to paint a false picture that CSCA has a specific required protocol for college applicants, and a national recruiting presence, none of which is true.

234. <u>False Advertising Statement #35</u>: "Can I apply to more than one position?  Yes, but keep in mind you will be required to explain your interests in and demonstrate your understanding of each of the positions that you have applied to."

BENJAMIN PAYONE, ESQ.

235.   The statement suggests that this is a legitimate question, as if CSCA has multiple job openings available at a given student's college admissions office anywhere in the nation, all of which is untrue.

236.   <u>False Advertising Statement #36</u>: "We encourage you to explore our program descriptions by asking questions during your interview."

237.   The response falsely suggests that CSCA conducts interviews on college campuses on a national scale.

238.   There are several dozen more statements that are untrue and/or misleading and that CSCA knows to be untrue and/or misleading, and that are intended to induce young persons seeking employment to contact CSCA, so it can in some way capitalize on them with its grandiose promises, inducements and stated top-tier professional standing.

239.   In total, there are at least (64) false claims of advertising, with similar implausible claims that CSCA is a nationally-functioning, omnipresent, multiple program, structured-training system educational entity, seeking only the most highly qualified individuals, connecting them to top-tier real estate professionals, and nurturing them to lucrative million dollar careers.

240.   Plaintiff has identified and discussed (36) false statements individually within this cause of action and has highlighted the text and utilized red arrow pointers to identify at least (64) false claims in total, documented throughout Exhibit B, which are incorporated herein by reference.

241.   Plaintiff was actually deceived by these representations.

242.   Plaintiff reasonably relied on the claims by CSCA, as they were presented to him in writing, existed formally on a website, and were backed by a person that appeared to be a successful real estate broker.

243.   Plaintiff was damaged by his futile pursuit of employment with the CSCA entity, which ended within a couple of months, in that the net result was O'Hara push for a personal relationship with Martinez, and the latter was not placed

BENJAMIN PAYONE, ESQ.

with the top-tier, uber-professional, nationally-recognized, multi-layered complex educational organization portrayed on the website.  Evidently this was because there were no openings at First Team for non-licensed persons, and even if Martinez were licensed, it would still be questionable whether there was anywhere to potentially place him.  Thus, most of CSCA's brokerages were clearly not hiring now, as represented.   Plaintiff was also injured by the fact that he was lured into a sexual relationship with O'Hara in pursuing the lucrative, established and attractive corporate employment dangled by O'Hara and CSCA in Exhibit A and on CSCA's website.

244.   Plaintiff lost money or property as a result of the false allegations because he had to travel to Mr. O'Hara and incurred some out-of-pocket expenses in the course of working for O'Hara.  According to the CSCA agreement with First Team, Mr. O'Hara intended to collect 25% of the income of persons referred to it.

245.   Pursuant to Business & Professions Code section 17535, plaintiff seeks injunctive relief.

BENJAMIN PAVONE, ESQ.

BENJAMIN PAYONE, ESQ.

# VI.

## CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES

### (Business & Professions Code § 17200)

### (Brought as an Injunctive Class Action Pursuant to B&P 17203)

246.   Plaintiff incorporates the allegations of paragraph 1-245 as if fully set forth into this cause of action.

247.   This cause of action is alleged against defendants O'Hara, CSCA, and Professional Realty Council, Inc.

248.   Defendants are involved in the practice of soliciting young people to submit themselves to them, under the guise of inviting them to apply for lucrative employment by a nationally-recognized, top-tier, selective, complex corporate organization.

249.   The invitation is false, because CSCA is not the entity it purports to be: it does not have a legitimate multi-tiered educational advancement system, connection to a national network of the top real estate companies, a national presence on college campuses, a track record of financial performance consistent with its representations, or the host of other features it purports to describe on its website (formal orientation, multiple training programs, various separate employment positions within the company, annual 30-person enrollee or graduating classes, formal classroom, etc.)

250.   Many of the statements on CSCA's website are untrue and/or misleading. Therefore defendants are engaged in a practice of presenting a public image that is essentially false, in violation of section 17500, and therefore unlawful within the meaning of section 17200.

251.   The false statements documented herein, including the statements made to Martinez in the Exhibit A response to his resume posting, which align with CSCA's statements on its website, are also unfair within the meaning of section 17200.

252.   The statements described herein are also fraudulent within the meaning of section 17200, as they are untrue and/or misleading and are likely to deceive members of the public, particularly younger members of the public like Martinez, who do not have sufficient world and life experience to "see through" the illusion of CSCA's website, may be blinded to the illusion by the need for gainful employment and are thus more susceptible and vulnerable to claims of this nature.

253.   Pursuant to section 17203, in addition to the relief requested under section 17500, plaintiff requests an injunction shutting down the CSCA website, barring further of its mass email communications, and barring O'Hara from putting up another employee placement service, either through himself or any entity he controls, during the permissible duration of a permanent injunction.

# VII.

## CAUSE OF ACTION FOR LABOR CODE VIOLATION

### (Labor Code §§ 203.5, 2699.3)

254.    Plaintiff incorporates the allegations of paragraph 1-107 as if fully set forth into this cause of action.

255.    This cause of action is alleged against defendants O'Hara and Pacific Valley Realty, Inc.

256.    Plaintiff was employed by O'Hara and Pacific Valley Realty, Inc. in that Martinez was effectively a personal employee of O'Hara while Pacific Valley wrote the check reflecting his compensation dated September 27, 2012, in the amount of $1,000, check 8544, drawn on a Bank of America account in its name.

257.    Plaintiff was constructively discharged from defendants' employment on or about mid-October, as reflected by an October 24, 2012 email in which O'Hara offered Martinez a release agreement to wind up their affairs.

258.    On November 16, 2012, plaintiff counsel contacted Mr. O'Hara by email prior to filing suit to discuss resolution of the dispute prior to a formal filing. Counsel provided Mr. O'Hara a copy of the draft complaint.  No response was received.

259.    On November 20, 2012, plaintiff counsel followed up by calling Mr. O'Hara directly at CSCA's telephone number, a call Mr. O'Hara personally answered.  Counsel advised O'Hara there was a potential lawsuit being filed and resent the email of November 16, 2013.

260.    On November 27, 2012, having not received a response, counsel sent a final email stating that the lawsuit would be filed if an immediate response to discuss resolution was not forthcoming.  No response was returned.

261.    On November 28, 2012, counsel filed suit on behalf of Martinez, which included a cause of action under the Labor Code.

BENJAMIN PAVONE, ESQ.

262.    In response to the Labor Code cause of action, Mr. O'Hara's initial position, consistent with O'Hara's proposed release agreement submitted directly to Martinez on October 24, 2012, was that Fernando was an independent contractor.

263.    On December 31, 2012, Martinez filed a claim with the California Department of Labor Standards Enforcement.

264.    On January 10, 2013, the Labor Board set a hearing for February 25, 2013 for a hearing on the matter in San Diego.

265.    On January 18, 2013, the law firm of Teeple Hall, LLP wrote a check from its trust account for $975 payable to Fernando Martinez.

266.    On January 23, 2013, the Labor Board wrote back to Martinez, "[t]he enclosed check is payment we received from your former employer in settlement of your wage claim. Our records indicate that is for: … [a]n amount the employer concedes to be due you. If the amount is not acceptable as settlement of your claim, please send us in writing, within (10) days, further evidence and facts in support of your complaint and we will continue our investigation of the matter." The Notice was signed by Mark Meeker, Deputy Labor Commissioner.

267.    Martinez did not consider the amount tendered acceptable as settlement of the claim and submitted a detailed response on February 2, 2013 seeking additional penalties and fines based on the failure to timely remit Mr. Martinez's wages under Labor Code section 203 and for intentionally misclassifying him as an independent contractor in the proposed release agreement, pursuant to Labor Code section 226.8.

268.    In a February 14, 2013 submission, Martinez requested a continuance of the February 25, 2013 hearing date to allow him to conduct discovery in order to prove up his case for penalties for misclassifying him as an independent contractor.

269.    In a February 19, 2013 response, the Labor Board denied the continuance request without explanation.  In response to that, on the same day February 19, 2013, Martinez responded, "[c]onsidering the detail in my office's motion to continue, and your unsubstantiated and frankly terse denial of the request, I

am going to have to insist on a decision that provides a reason and a supporting legal analysis."

270.   Having gotten no response, on February 20, 2013, Martinez followed up: "We are not ready to appear for this conference.  We have made formal, detailed legal requests that require more investigation of the defendants in order to be ready to appear for this, to take responsible and supportable positions, and accordingly, we will not be rushed into appearing for this matter.  We do not intend to appear."

271.   On May 21, 2013, the Labor Board closed its file because "the dispute is lengthy, complicated, and in some respects ambiguous.   As a consequence, resolution of the parties' dispute will require discovery and also application of various complex legal doctrines pertinent to the issue that have been raised."  As such, Martinez's remedy through the Labor Board system has been denied as beyond its capacity, and thus requiring litigation.

272.   Labor Code section 203 provides in relevant part that, "if an employer willfully fails to pay … any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

273.   Because no payment was made within (30) days from the time of Martinez's discharge in October, his wages continued as a penalty against O'Hara and PVRI for (30) days.  Martinez's additional wages for (30) days equated to $1,500, plus the original $750 owed from the period of October 1-October 15, 2012.

274.   Offsetting the trust payment from Teeple Hall of $975, Martinez is still owed $1,275 in outstanding wages.

275.   Martinez tendered an administrative claim to the Labor and Workforce Development Agency on April 24, 2013 pursuant to Labor Code section 2699.3(a)(1), which was denied on June 18, 2013.

BENJAMIN PAVONE, ESQ.

276.   Accordingly, plaintiff requests judgment in the amount of $1,275 in outstanding Labor Code penalties, along with recovery of attorney's fees pursuant to Labor Code section 218.5, 1194 or other Labor Code section authorizing the recovery of attorney's fees for such violation.

BENJAMIN PAYONE, ESQ.

# VIII.

## CAUSE OF ACTION FOR SEXUAL HARASSMENT

### (California Government Code § 12940(j)(1))

277.   Plaintiff incorporates the allegations of paragraph 1-107 as if fully set forth into this cause of action.

278.   This cause of action is alleged against defendants O'Hara and CSCA. Plaintiff has exhausted all necessary administrative remedies.  He obtained his right to sue letter from the California Department of Fair Employment and Housing on February 8, 2013.

279.   Fernando applied for a job and provided services pursuant to an employment contract with Mr. O'Hara and/or one of these entities that paid him $1,500/month as a real estate intern.   In that there was a sexual relationship and a lot of personal interaction, Martinez was arguably a personal employee intern to Mr. O'Hara; on the other hand, the employment was solicited through Mr. O'Hara's website, CSCA, a claimed employment placement agency (now perhaps owned by Professional Realty Council, Inc).  On the other hand to that, at least one of the wage checks issued to Martinez was tendered by Pacific Valley Real Estate, Inc. Therefore, because of the overlap, Martinez alleges an employment relationship against all (4) defendants.

280.   Although there was initial reciprocation, O'Hara's sexual conduct was ultimately unacceptable, unwanted and severe.  Martinez was unable to easily end the relationship with defendants.

281.   O'Hara made unwanted sexual advances to Martinez and engaged in other verbal and physical conduct of a sexual nature.

282.   Job benefits, and continued employment, were conditioned by words or conduct on Fernando's compliance with O'Hara's sexual agenda.

283.   An employment decision to terminate Martinez was made because of Martinez's refusal to continue the sexual relationship.

284.   At the time of O'Hara's conduct, he was Martinez's boss.

285.   Martinez was harmed in a number of ways including unwanted sexual attention, undesired sexual compliance, the loss of his wages, the loss of his job, and the disappointment of O'Hara's broken promises, which provided Fernando the hope and prospect of a professional career and financial security.

286.   O'Hara's conduct was a direct factor in causing Martinez's harm. [CACI 2520]

# IX.

## REQUEST FOR ALTER EGO FINDINGS

287. Plaintiff incorporates the allegations of paragraph 1-286 as if fully set forth into this request for findings.

288. This is not a listing of a cause of action. It is a legal request to establish, if necessary, the alternate liability of the various parties in relation to one another, to wit:

(a) that if a judgment gets entered against any one of the entities, and it cannot satisfy the judgment, that the entity will be deemed to be the alter ego of Mr. O'Hara or one of the other entities, such that plaintiff can look to his or its assets to satisfy the judgment.

(b) that if judgment gets entered against Mr. O'Hara, and if he cannot satisfy the judgment, plaintiff can look to one or all of the entities' assets to satisfy the judgment, including the O'Hara Family Trust.

289. To the extent a judgment against any of the entities is not collectible, pursuant to *Sonora Diamond* v. *Sonora High* (2000) 83 Cal.App.4th 523, 538, plaintiff seeks alter ego findings that the following alter ego relationships exist because (1) each of the entities have a unity of interest in between the corporate entity and its equitable owner (O'Hara) that the separate personalities of the corporation and O'Hara do not in reality exist; (2) there will be an inequitable result if the misconduct in question is treated as that of the corporation alone (such that a judgment against the corporation is uncollectible because O'Hara has looted it, stripped it, or otherwise abandoned it), or vice-versa, if O'Hara's misconduct is attributed to him personally and he shifts his assets out of his name into a corporation, which has the same effect of rendering the judgment uncollectible by virtue of his intentional misuse of the corporate form:

(a) that PVRI is an alter ego relationship with Mr. O'Hara. O'Hara is the founder, sole owner of the stock, and occupies each officer and board position of

BENJAMIN PAVONE, ESQ.

PVRI, according to his testimony. O'Hara simply stopped using PVRI in favor of using OCRE, the latter of which took over his real estate practice, without filing a certificate of dissolution for PVRI, representing that all creditor claims have been paid, and without setting aside sufficient funds to cover all liabilities. As such, PVRI has not complied with California law for the wind-up of corporations and its liabilities should be imputed to its principal, Mr. O'Hara.

(b)     that CSCA is in an alter ego relationship with Mr. O'Hara. CSCA, in the relevant time period relating to Martinez, is property belonging to O'Hara. O'Hara states that he intends to backdate paperwork to move CSCA under the PRC corporate umbrella, but had not done so at the time of his deposition, and such backdating gives O'Hara the improper flexibility to deem property owned either by himself or by the corporation on a specific date to be owned by PRC, depending on when how far he backdates it. This exercise should be deemed an abuse of the corporate privilege and preclude CSCA from being considered PRC's property in 2012.

(c)     that PRC is an alter ego relationship with O'Hara. O'Hara's operation of PRC, a corporation he wholly owns and occupies each seat in, is just another entity which he manipulates for his personal benefit. In addition to the backdating above, he has been sprinkling its existence into the various claims above, which again, appears to be intended to afford him flexibility to take the position that PRC is the liable party for misconduct he commits, depending on how the outcome of the lawsuit turns out.

(d)     that PRC is in an alter ego relationship with CSCA. PRC and CSCA appear to overlap as entities, as discussed above, with CSCA becoming PRC property, based on a backdating project O'Hara intends to perform.

(e)     that CSCA is in alter ego relationship with PVRI. O'Hara paid Martinez from PVRI's account for his services as a real estate intern for a job that was supposedly offered to him by CSCA, but was actually for a position that O'Hara

BENJAMIN PAVONE, ESQ.

describes as Martinez acting in a personal capacity.   Thus, O'Hara blurred the distinction between the corporation and himself by using corporate funds to pay for his personal employment needs.

(f)    that OCRE is in an alter ego relationship with Mr. O'Hara and PVRI.  It appears that OCRE is the successor corporation to PVRI, that there was no legitimate legal basis to change out the corporation other than the liability created by the Martinez problem and that O'Hara's personal interests are the same as PVRI's and OCRE's, in terms of being essentially his own real estate practice.  (See *McClellan v. Northridge* (2001) 89 Cal.App.4th 746, 752-753.)

(g)    that to the extent Mr. O'Hara has moved his personal assets, or corporate assets from any of his various entities, into the O'Hara Family Trust, that the property in the trust be subject to liquidation and collection as property that functionally belongs to O'Hara himself.

(h)    that all other combinations of entities and persons discussed above are the alter ego of one another, because it is all a product of Mr. O'Hara controlling them and manipulating them for his personal benefit, to avoid liability in some fashion for the claims in this lawsuit.

290.   If a judgment is entered against any of these entities and is not collectible, plaintiff will prove, and hereby alleges, that there is such a unity of interest that the separate personalities of the corporations no longer exist; and that an inequitable result will follow if the corporate separateness is respected.

291.   In the event O'Hara, who is effectively in control of these entities, shifts, moves or hides assets away from himself to avoid payment of a judgment against himself personally, plaintiff requests findings to extinguish any distinction between himself and the entity holding his assets under *Taylor v. Newton* (1953) 117 Cal.App.2d 752 and *McLoughlin v. Bloom* (1962) 206 Cal.App.2d 848, 852-853.

*Wherefore*, plaintiff requests damages as follows:

(1)    fraud damages in a minimum amount of $250,000;

(2)    punitive damages in relation to the fraud cause of action in a minimum amount of $250,000, given the volume of fraud in connection with Mr. O'Hara's online presentation, given Mr. O'Hara's own assessment of his wrongdoing in characterizing it as "extreme exposure to various legal claims for the parties," in seeking for Martinez to agree to an unconscionable release agreement covering up that wrongdoing with a series of lies, and for any of the other causes of action that permit punitive damages given a large volume of intentional, and often, fraudulent misconduct detailed herein;

(3)    an injunction taking down the CSCA website and barring O'Hara, and any entity he controls, from putting up another employment placement for the duration of the permanent restraining order period, within the broad, preventative language of Business & Professions Code section 17203;

(4)    payment of $1,250 in outstanding labor code penalties;

(5)    minimum damages of $50,000 for sexual harassment (a reduced figure given the initially consensual nature of it) and wrongful termination based on O'Hara's decision to lure Martinez into a sexual relationship using an employment opportunity, constructively discharging him when the latter declined to continue the sexual relationship, along with an equal punitive award, for that obscenely one-sided proposed release agreement circulated by Mr. O'Hara on October 24, 2013;

(6)    attorney's fees for time expended from the inception to the conclusion of the litigation, based on the fee shifting provisions permitted under the private attorney general doctrine in Code of Civil Procedure, section 1021.5 , the fee shifting provisions of Civil Government Code section 12965(b) for sexual harassment and resulting wrongful termination, and Labor Code sections 203, 218.5, 1194, 2699.3, or other Labor Code sections for the outstanding penalty and recovery of attorney's fees,

BENJAMIN PAYONE, ESQ.

time which is collectively reported at present as a minimum of 441.2 billable hours, as of August 1, 2013.

> (7)    interest on all counts, pursuant to section 3287, et seq.;

> (8)    costs, to be fixed after trial by memorandum; and

> (9)    such other relief as the court deems just and proper.

Date: August 5, 2013                                    LAW OFFICES OF
                                                        BENJAMIN PAVONE, PC

                                                        \s\Benjamin Pavone, Esq.

                                                        Attorney for Plaintiff
                                                        Fernando Martinez, individually
                                                        and on a representative basis

BENJAMIN PAVONE, ESQ.

# EXHIBIT A

## I Found You On Monster

From: **Stephen O'Hara via Monster** (letters@route.monster.com)
Sent: Fri 8/10/12 12:03 PM To:
infinateS@hotmail.com

Hi Fernando:

I saw your RESUME on MonsterB and have an interest in you. I represent CSCA® a Talent Acquisition firm specializing in the real estate sector of the **Financial Services Industry.** (Experience is NOT necessary, we'll be focusing on your skills and ability to be trained)

We have been retained by a large company (over 35 offices and over 3,000 employees) in Southern California who is seeking recent Business & Communications Majors for Intern and Full Time careers. Our fees are paid by the employer (not you) and they are hiring 'now'.

As an Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more. After your third year, you will have the ability to earn an income of $250K or more per year- so we are very serious about 'who' we select.

Based upon your Monster Resume, we feel you might be a fit for the company we represent. Let me invite you to visit **www.CSCA.com**. The site will give you all sorts of information as to the individual talent we are seeking.

After reviewing our site, there is an APPLY NOW button (upper right corner) on the Site which will lead you to our Online Application page. Once we receive your application, we will pre-screen it and if we feel you have the skill set and personality to succeed with our client, we will invite you to move onto the next step which will be the last step before a face-to-face Interview is scheduled.

If you need to Email me, please take note of my private Email: **steveQcsca.com**. In

the meantime, know that we wish you the very best in your Career Search.


Warmly,

CAREER SOLUTIONS & CANDIDATE ACQUISITION




Stephen O'Hara

Executive Search Team


Letter Value: 5B87ED-1451CEE

# EXHIBIT B



  Apply Now | Find Us

YOUR CAREER. **LETS GET IT STARTED.** 1

**CSCA® is one of the best places to launch your career. If you share our 'DNA' we know you will like what everyone is talking about.** 2



Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us



**GO**
▶▶▶

Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



    Apply Now  |  Find Us

Our Company

- Home
- Our Company
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our  Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

- Find Us

**From the Desk of our Founder and CEO**

Thank you for visiting CSCA®. You are about to discover a Talent Acquisition Company that offers you a career like no other.

At CSCA®, all talents apply. We're people who love technology and people who love people. We're also business people, musicians, photographers, mountain climbers, students, and artists whose interests can't be defined by a job description. Whether you're analytical or creative, tech savvy or insightful, there's a place in our Brokerages to share your talents while you learn, develop, and inspire.

I encourage you to tell us about yourself. Join us. Show your passion and expertise as you connect customers with our services and help integrate our services into their lives. Be a part of our team and change the way our customers work, play, create, and live. Our network of fine Brokerages sell more than houses, they sell Lifestyles!

I challenge you to be part of something amazing. CSCA® hand selects the very best Brokerages across the nation (Independent and Franchised) on the basis that they have met our stringent standards, embrace our culture and are looking to the future. In fact, the elite Brokerages who are members of our network are not only the most innovative real estate Brokerages in the world; they represent the best brands and are among the fastest growing. On behalf of our Brokerages, CSCA® is always looking for smart, engaging, supportive, and dynamic people who have a passion for people and serving them as you would want to be served yourself.

We join our Brokerages in sharing the common goal of exceeding the expectations of our customers. That's where YOU come in. We can't do it without the right talent. Consumers can go anywhere for their Financial Services needs; in this case real estate and take their chances or they can enjoy the experience with one of our team members and buy and sell with confidence. That's the CSCA® difference.

Successfully and Warmly,



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |   Find Us

## Our History

**'Under All is the Land'.** This is the preamble to the REALTORS® Code of Practice. Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry.

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that

### Navigation (sidebar)

- Home
- Our Company
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee
- Find Us



GO ▶▶▶

Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

Apply Now
|
Find Us

**'Under All is the Land'.** **This is the preamble to the REALTORS® Code of Practice. Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.**

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy

their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry.

☐ 7

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that rewards them financially with the lifestyle they imagine for themselves.

☐ 8

We know that it's hard to find the right company. And, frankly, we know that it's hard for these same companies to find qualified Talent. That's where CSCA® comes in.

CSCA® serves the finest real estate Brokerages brands in the nation who are seeking career oriented College Graduates and recent Military Veterans. We filter the best Talent for our Brokerages and we offer the best Brokerages to our Talent. It's really that simple.

☐ 9



## LOOKING FOR SUCCESS? IT STARTS WITH CSCA®

**It's what we know best. Our focus is finding the best Candidates for our Brokerage Network. We work with the Best-of-the-Best; the leader's in the real estate industry, we can take your career just about anywhere. We've put innovative ideas and thinking into the hands of our professionals.        And        the        results        have        been        outstanding.**

**CSCA® is an acronym for Career Solutions Candidate Acquisition. We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry.**

**While you may be completing college, coming home from the military, or have had a college background, but may be interested in using your knowledge and experience to take your career to the next level, you might want to SUBMIT YOUR APPLICATION NOW as most of our Brokerages are hiring now.**

## BILLIONS OF REASONS TO JOIN US

About $64 Billion is paid each year to real estate professionals across the nation. As a multibillion-dollar industry, we can offer you more than a chance to succeed. This is where you can thrive. The sky really is the limit. Our environment's energetic, our people are motivated and our career paths can take you where you want to GO. No matter where you apply, get ready for something big.

The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara. Nearly all of our team members started in this program. You will learn the Brokerage business from the inside out – taking care of customers, developing marketing plans and working with an energetic team of professionals. You'll see just how much influence you can have on the future of our Brokerage's and in your own career. As you progress through the program, you'll see many more career options open to you.

15

## INTERNSHIPS

16



Want to start way out in front? Try our Internship Program. As a current university Business and/or Communication Major, you'll learn how to run a million dollar business by working with a team that's actually running one. You'll also gain truly marketable skills that will prepare you for a successful career after graduation.

## IT'S ABOUT YOU AND THE CUSTOMER



The biggest ideas are often the simplest. **We focus the resources of CSCA® on the satisfaction of Consumer Experience with our Brokerages and the success of its Team Members – including management.** The rest will take care of itself. Our innovative commitment has held true, and as a result, our Brokerages continue to be recognized for their world-class customer service and the way we advance our professionals.

## LEADING THE WAY.

As a company, the goal of CSCA® was never to be the biggest – only the best. However, because our people offer the best customer experience, we've done some growing. We serve the best real estate Brokerage brands in the world. And there's no plan to slow down.

## STARTING IN NEIGHBORHOODS.

Since our founding, we've helped our Brokerages market to both their communities and local neighborhoods. In fact, that's what we are about; marketing the best of Talent to the best people in the world, our Brokerages and the customers in the communities they serve. We expanded this local service to other markets, and we continue to build on this base of business – real estate expertise conveniently located right where customers live and work.

## MORE THAN JUST REAL ESTATE.

Our exclusive Brokerages continue to find success in other business areas as well. These revenue streams give them the opportunity to diversify their businesses and, in turn, offer you more career opportunities.

## TECHNOLOGY MAKES US GO.

How committed are we to technology? Every year, our Brokerages invest in their technology infrastructure so they remain on the leading edge. This technology is put in your hands so you can make the customer's experience the absolute best it can be.



Apply Now  |  Find Us

### In The News

**21**

**22**



**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

**Announcing the 2012 Class of '30 Under 30'**

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

**23**

**Need a Role Model? Meet Ours!**

**Home**

**Our Company**
   Our History
   Where We're Going
   In The News
   Awards & Recognition

**Our Culture**

**Opportunities**

**Benefits**

**Job Prep**

**Guarantee**

**Find Us**

**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old**.

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

## WE MAKE NEWS.

**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

## Announcing the 2012 Class of '30 Under 30'

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

## Need a Role Model? Meet Ours!



**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the  US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old**.

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".

Kendra is a judge for the Real Estate Apprentice Foundation - a grant program helping 5,000 newly licensed real estate agents every year to succeed in real estate.

Kendra hosts "My House is Worth What?" on HGTV and a regular real estate contributor on Cavuto on Business.

If you are considering Applying with CSCA® you might want to VIEW WHAT KENDRA HAS TO SAY about her journey after her College Years.

## Want to hear MORE FROM KENDRA?

Author Carolyn Castleberry and entrepreneur Kendra Todd talk about "Kingdom Entrepreneurs" and how to become one. Carolyn is an accomplished author and TV News Anchor.



     Apply Now   |   Find Us

24

**Awards & Recognition**

Home

Our Company

   Our History

   Where We're Going

   In The News

   Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### Make it yours …

A LITTLE RECOGNITION **GOES A LONG WAY.** A lot of recognition goes even further. Our Brokerages and their Team have received recognition and accolades for every aspect of real estate business. Whether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation.

24





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



       Apply Now  |  Find Us

Interview Preparation

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
   Interview Preparations
   Recruitment Process
   FAQs
Guarantee

Find Us

## YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"

For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.
Client Access   Terms of Use   Privacy Policy

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

## The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

## INSIDERS TIP

**Want a few 'insider' tips?**

1. Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers. (Please Click on Link.)

2. If You APPLY to CSCA® TODAY, you can get on the ground floor of the next great market; YES, it's already begun! Not only can you be a part of history, but, this knowledge can give your career a real power boost!

This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in economics and really understand the back story to the nation's current financial quagmire (without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special: **Money, Power and Wall Street; Part One, Two, Three and Four**. This link will take you to Part One and you should find Part's Two, Three and Four on the same page.

## The Markets

Read a few articles each week.
Understand what's going on in the real estate.
Stay up-to-date with financial news.
Know about FHA & VA, FANNIE MAE and FREDIE MAC.
Know about the financial crisis: what happened and why? It is the easiest way to demonstrate interest in our specific market.
Choose one or two areas of the market that you can discuss with specific knowledge and enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and economics.



        Apply Now  |  Find Us

Opportunities

Home
Our Company
Our Culture
Opportunities
   Training Program
   What You'll Learn
   Career Path
   Rewarding Success
   Day In The Life
   Internships
   Seasoned Professional
Benefits
Job Prep
Guarantee

Find Us

INTEREST IN ANY OF THESE PROFESSIONS? **WE ARE LOOKING FOR YOU!**

Management  Advertising  Marketing  Communications  Public  Relations  Stock  Brokerage  Insurance  Financial Advisors  Real Estate  Appraisal  Recruiting & Staffing  Retail  Banking  Consumer  Loan  Mortgage  Retail  Business Development  Career  Consumer  Credit  School  Counselor  Customer  Service  Commercial and  Residential Real  Estate  Events  Manager  Telemarketing  Paralegals  Sales  Direct  Marketing  Teacher  Trainer  Coaching  Relocation  Real Estate  Sales  Management

**CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.**

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

What can you earn? Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

25    26

**It's time to GO.**

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

**INTEREST IN ANY OF THESE PROFESSIONS?** WE ARE LOOKING FOR YOU!

Management Advertising Marketing Communications Public Relations Stock Brokerage Insurance Financial Advisors Real Estate Appraisal Recruiting & Staffing Retail Banking Consumer Loan Mortgage Retail Business Development Career Consumer Credit School Counselor Customer Service Commercial and Residential Real Estate Events Manager Telemarketing Paralegals Sales Direct Marketing Teacher Trainer Coaching Relocation Real Estate Sales Management

CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

**What can you earn?** Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

## It's time to GO.

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.

## Right out of school or military?

Take your first step to success. You'll quickly learn that we hired you to eventually run your own business. And you'll have the opportunity to work with people as motivated and driven as you. You'll bring your degree to the table, and we'll help you make crucial business decisions in no time.

## Have some experience already?

27

We promote based on performance, not seniority. So if you're looking to move quickly, our Restart Training Program is for you. We'll take your existing knowledge and your drive to succeed, and supplement it with tools and training that will help you climb to the top.

### Where leaders learn to lead.

28

We start with orientation and classroom training. Once you are selected by one of our  local Brokerage Offices, your hands-on training begins. You'll work with and learn from capable mentors who were once in your shoes. Does it work? Absolutely. Nearly all of our managers and corporate executives started out as Trainees -- including our Chairman and CEO.

### EXECUTIVE SEARCH and OTHER OPPORTUNITIES:

Like most businesses, CSCA® and its Brokerages have other positions that need filled from time to time that are not directly sales related.



f  t  in    Apply Now  |  Find Us

## FAQs

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
  - Interview Preparations
  - Recruitment Process
  - FAQs
- Guarantee

Find Us

### Is CSCA® a real estate company?

**29**

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

**31**

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

**30**

### When will CSCA® be visiting my campus?

**32**

Please check with your school's career services office for a calendar of events or simply email us.

### Should I apply on CSCA's website or my school's career website?

**33**

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings.
If the CSCA® job postings are not listed on your school's career website, please apply here

**34**

### Can I apply to more than one position?

**35**

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

**36**

### What happens during the interview process?

If we meet you at in a job fair or campus environment  your first-round interview may take place on campus and/or at



**Who Are You?**
**Support For Veterans**
**Why CSCA?**
**Job Availability Updates**



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access Terms of Use Privacy Policy

## Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

## When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply email us.

## Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please apply here.

## Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

## What happens during the interview process? `37`

If we meet you at in a job fair or campus environment, your first-round interview may take place on campus and/or at the job fair. Depending on the position, second and final rounds will take place are always held at the Brokerage with which we place you. `38`

## Is career mobility an option with a CSCA® Brokerage?

Yes, the breadth and scope of the CSCA® Brokerage Network geographic presence enables our team to experience a wide array of career mobility based on their interests and evolving business needs. `39`

## Do you accept applications from disabled persons?

We welcome applications from people with disabilities and are fully committed to supporting individuals through the recruitment process.

While driving and mobility are necessary functions, there are many other situations which would not present any challenge. Feel free to discuss your situation with us. If you believe you can do it, we want to believe in you.

**Do you accept applications for military veterans?** 

We welcome applications for military veterans. In fact, some of our best team members are former military folks. We invite you to visit our **Military Page** on this website.

## Do I need to be licensed before I submit my application?

Absolutely NOT! If you are placed with one of our Brokerages, helping you get your licensed is part of 'what we do'.

## Do you accept applications from currently licensed real estate professionals.

Yes, we welcome currently licensed real estate professionals, however, we have a special interview process for these situations. Please let us know when you submit your application that you are SEASONED.

To be clear, while CSCA® Brokerage member's represent all the major national and regional companies as well as local Independents, our hiring qualifications are very different. Generally, we are looking for a person that is not the 'typical' real estate agent. We are looking for real professionals, not people who simply write the word professional on their resume.

## Are you hiring interns now? 

Absolutely. Interns play an integral role in the success of our Brokerages. We generally hire during your summer vacation – but our Brokers can always make exceptions. Some of our Brokerages, however, do hire interns all year long. **Apply now** to learn more.

## Are internships paid? 

Yes. Sometimes. It depends on what your goals are. Interns may also be eligible for incentives and rewards. Talk to our CSCA® Talent Acquisition Manager for more details.

## What are the requirements for internship?

You should be currently enrolled in college. The ideal person should be interested in a management and sales environment and should have strong multi-tasking skills.

## What hours do interns work?

Hours for interns vary from location to location. Summer interns



     Apply Now  |   Find Us

What You'll Learn

- Home
- Our  Company
- Our  Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

## WHERE GO-GETTERS COME AND GET IT.

As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.

### Customer Service

**"How can I help you?"**

**43**

Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to GO.

### Marketing

**"Let's spread the word."**

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

### Financials



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

# WHERE GO-GETTERS COME AND GET IT.

**As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.**

## Customer Service

### "How can I help you?"

**Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to GO.**

## Marketing

### "Let's spread the word."

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

## Financials

### Keeping us in the green."



This is the "running a business" part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### "Everything has its place."

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management

techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.

## Financials

### Keeping us in the green."

This is the "running a business" part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### "Everything has its place."

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.



       Apply Now  |   Find Us

Career Path

Home

Our  Company

Our  Culture

Opportunities

   Training Program

   What You'll Learn

   Career Path

   Rewarding Success

   Day In The Life

   Internships

   Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's only one way to GO. Anywhere.

There are many opportunities in real estate. We give you the flexibility to find your passion. And, then, follow that path. Where virtually everyone begins is as a trainee, where you GO is really up to you. Real estate has many faces. Residential, Commercial, Property Management, Business Opportunities, Mortgage Financing and the list goes on and on.

It's like changing careers without changing companies. It all depends on how far you want to GO.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



     Apply Now  |  Find Us

## Rewarding Success

45

**GREAT PERFORMANCE = GREAT REWARDS**

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

As part of our team, you'll be compensated based on your performance. By making your Brokerage fun, and working well with your team, you'll be able to directly influence all areas of your success. You can build on our entrepreneurial model and earn an income that has no ceiling. It's only limited by your innovation, desire and skills. How much can you earn? If you perform, that's up to you.

**Managers**    46

All team members, receive a percentage of the profits generated by their own success. As a manager, you'll earn a highly competitive income that is dependent upon the success of the business you're running. If your business does better, so do you. If you have a true entrepreneurial spirit, there's no limit to what you can earn. How high can you **GO**?





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      **Apply Now**  |  **Find Us**

Internships

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

Find Us

### There's Only One Internship Program Like This.  [47]

That's because there's only one CSCA®. Every year we turn internships into real, substantial career-building tools. And no, you won't spend your time fetching cups of coffee or making coffee. You'll learn what it takes to run a successful business because that's what you'll help do.

[48]

Along the way, you'll also participate in contests and competitions with other interns, building relationships, honing your entrepreneurial skills and gaining experience. You'll take on the same challenges as our first and second year full-time professionals. Even better, at the end of your internship, you'll make a presentation to your management team covering the business topics you learned throughout the program. Want to GO? [49]

### You Put The GO In GO-Getter.

As part of our Internship Program, you must be ambitious, creative, personable, resourceful, fun loving and hard working. As you'd imagine, everyone else in the program is just as motivated as you. If you're ready, the business training you'll receive will put your skills, your attitude and your resume way out in front.

[50]





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



     Apply Now  |  Find Us

### Seasoned  Professional

Home
Our  Company
Our  Culture
Opportunities
  Training Program
  What You'll Learn
  Career Path
  Rewarding Success
  Day In The Life
  Internships
  Seasoned Professional
Benefits
Job Prep
Guarantee

Find Us

### There's More Than One Way To Join One Of Our Fine Brokerages Through CSCA®.

Perhaps you are a seasoned real estate professional. By all means, YES! We'd enjoy talking to you about your career. In fact, we have many folks who 'informally' learned a lot about real estate, but their business hit a plateau. This is common. Once they have sold their family and friends, they have exhausted their Sphere-of-Influence (SOI).

You'll learn how our Proprietary System will help you increase your sphere, thereby increasing your opportunities for new business. In fact, doubling or tripling the business you are doing now can be easy if you follow our Sphere-of-Influence Building System™. Taking your business to the next level is exactly what our System is about.

We also hire for numerous positions (Sales Management, Relocation, etc.) that are integral to helping us better serve our customers.

### And, more

We also hire for a variety of administrative positions including full and part-time opportunities. Simply send us your resume and let us know how we can help you. There is always something moving in real estate.

NOTE: The CSCA® Guarantee applies to entry level opportunities only. Be sure to ask your CSCA® Talent Acquisition Director for more information.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

http://www.csca.com/seasoned_professional

11/11/2012



    Apply Now  |   Find Us

Benefits

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### WE COVER TODAY AND TOMORROW

Our Brokerages offer you a career-home where you can build your future. And this means more than just a career. Through our various Associations, we offer many benefits packages designed to give you peace of mind today and is flexible enough to grow with you. Just think of it as your foundation for building something truly impressive. As you'd expect, our benefits help you GO much farther.

55





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |  Find Us

Job Prep

| | |
|---|---|
| Home | |
| Our Company | |
| Our Culture | |
| Opportunities | |
| Benefits | |
| Job Prep | |
|   Interview  Preparations | |
|   Recruitment Process | |
|   FAQs | |
| Guarantee | |
| Find Us | |

**Job Prep: Who We Are Looking For**

CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few.

Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like.

**What CSCA® Looks for in Candidates**

The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well.

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

Job Prep: **Who We Are Looking For**

CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few.

Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like.

## What CSCA® Looks for in Candidates

The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well.

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.

   - o   Career-related employment
   - o   Internships
   - o   Co-op experience
   - o   Leadership in organizations
   - o   Student organization membership



     Apply Now  |  Find Us

Interview Preparation

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
    Interview Preparations
    Recruitment Process
    FAQs
Guarantee

Find Us

### YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"

For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

## The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

## INSIDERS TIP

**Want a few 'insider' tips?**

1. [Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers](). (Please Click on Link.)

2. If You [APPLY]() to CSCA® TODAY, you can get on the ground floor of the next great market; YES, it's already begun! Not only can you be a part of history, but, this knowledge can give your career a real power boost!

**This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in economics and really understand the back story to the nation's current financial quagmire (without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special: Money, Power and Wall Street; Part One, Two, Three and Four. This link will take you to Part One and you should find Part's Two, Three and Four on the same page.**

## The Markets

**Read a few articles each week.**
**Understand what's going on in the real estate.**
**Stay up-to-date with financial news.**
**Know about FHA & VA, FANNIE MAE and FREDIE MAC.**
**Know about the financial crisis: what happened and why? It is the easiest way to demonstrate interest in our specific market.**
**Choose one or two areas of the market that you can discuss with specific knowledge and enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and economics.**



f  t  in    Apply Now  |  Find Us

Recruitment Process

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
    Interview  Preparations
    Recruitment Process
    FAQs
Guarantee

Find Us

### Attend Our On-Campus Events

56

Please check with your career services center and student-run organizations for a listing of dates when CSCA® representatives will be at your school. If you're interested in a career with us, please join us for our presentations and other recruiting events held on campus. Take some time to talk with us, and we'll explain the different career opportunities available at a CSCA® Brokerage and share personal observations of the Brokerage, such as why we enjoy working here.

### Apply Online

57

Complete our online application. If you qualify for consideration, we'll contact you to arrange an interview to discuss available opportunities. We ask that all interested candidates complete our online application in addition to applying through your school's system if we have posted a job at your campus.

58

### Interview With Us

We generally have at least two rounds of interviews. First and final rounds can be conducted by phone, on campus or in our offices.

### If We Don't Visit Your School

59

Unfortunately, CSCA® representatives can't visit every school. If our on-campus interviews aren't offered on your campus, you should learn as much as you can about our goals in advance by reading our website and then complete our online application. for consideration.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

http://www.csca.com/recruitment_process

11/11/2012



Guarantee



   Apply Now  |  Find Us

Home

Our  Company

Our  Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

**'If CSCA® doesn't help you find a job, we'll help pay your bills.'™**

60

We're so confident that (if you have the right skill-set to launch your career with one of our entry level positions, be willing to relocate and we have a brokerage in your market) CSCA® will guarantee that you will find employment with one of our Brokerages within six months of graduation, or, we'll help pay your bills for the next six months. Simple as that. Ask our Talent Acquisition Manager for more details. A written agreement is required.

61





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

http://www.csca.com/guarantee

11/11/2012



    Apply Now  |  Find Us

Apply now

**Are you on the GO?**

62



With 90% of the U.S. population located within 15 miles of one of our Brokerages, there's a CSCA® Career Consultant waiting to talk to you.

If you have been surfing our site, you have already learned about some of the opportunities at one of our Brokerages. In just a minute, you'll be able to apply for a position online.

Our Brokerages have built a thriving business based on offering exceptional service to their customers and a dynamic and rewarding work environment to their employees.

Interested in a career with one of our fine Brokerages? You'll only need to SUBMIT ONE Application based on where you live and/or plan to work. Applying to more than one position or to multiple locations will slow the process down. Our Career Counselors will work with you to find the position and location that is a perfect fit for your skill set. Thank you for allowing us to respond to your application in a timely fashion!

63

Thank you for letting CSCA® help you plan your career path!

**OK, Let's Get Started! What Are Your Career Interests?**

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):

Home
Our Company
Our  Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates

CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

# OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):
SELECT APPROPRIATE FIELD
(Select Up to Five Choices)

- [ ] Advertising
- [ ] Appraisal
- [ ] Banking
- [ ] Business Administration
- [ ] Commercial Real Estate
- [ ] Communications
- [ ] Consumer Loan
- [ ] Credit
- [ ] Customer Service
- [ ] Counselor(Career,Credit,School)
- [ ] Development
- [ ] Direct Marketing
- [ ] Events Manager
- [ ] Finance
- [ ] Financial Advisors
- [ ] Insurance
- [ ] Marketing
- [ ] Market Research
- [ ] Marketing & Research
- [ ] Mortgage
- [ ] Paralegals
- [ ] Public Relations
- [ ] Real Estate
- [ ] Retail
- [ ] Retail & Consumer
- [ ] Recruiting & Staffing
- [ ] Sales
- [ ] Stock Broker

- [ ] Stock Brokerage
- [ ] Teacher
- [ ] Trader Trainer
- [ ] Telemarketing
- [ ] Other (Please Describe)

Are You Applying For:

- [ ] Full-Time
- [ ] Intern with Full Time Expectancy
- [ ] Part-Time
- [ ] Other (Please Describe)

Tell Us About Your School / Work History:

- [ ] Business
- [ ] College Graduate
- [ ] Great People Skills
- [ ] Intuitive
- [ ] Marketing
- [ ] Military Veteran
- [ ] Niche Relationships
- [ ] Public Relations
- [ ] Sales
- [ ] Some College
- [ ] Student
- [ ] Other (Please Describe)

**Just for The Fun of It, Tell Us Your Yes's and No's**

Have You enjoyed and Watched NBC's THE APPRENTICE®?

- [ ] Yes  [ ] No  [ ] Never Heard of It

Have You enjoyed and watched ABC's SHARK TANK®?

- [ ] Yes  [ ] No  [ ] Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

**Tell Us About Your School / Work History:**

☐ Business

☐ College Graduate

☐ Great People Skills

☐ Intuitive

☐ Marketing

☐ Military Veteran

☐ Niche Relationships

☐ Public Relations

☐ Sales

☐ Some College

☐ Student

☐ Other (Please Describe)

**Just for The Fun of It, Tell Us Your Yes's and No's**

Have You enjoyed and Watched NBC's THE APPRENTICE®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched ABC's SHARK TANK®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

Like many professions (nursing, teaching, contracting, plumbing, law, medical, real estate, stock-brokerage, insurance, etc.), the career for which you are applying requires state licensing, malpractice / Errors and Omissions (E&O) insurance and joining one or more professional associations.

The fees and costs associated with licensing and membership are usually paid by you directly to the state licensing agencies and/or other third parties. **YOU WILL NEVER BE ASKED TO PAY ANY FEES OR COSTS TO CSCA®.** 64

Exact fees will be discussed with you upon determination of WHICH sector of the Financial Services Industry (banking, insurance, stock-brokerage and/or real estate) for which you will be recommended as well as the state in which you will be working.

With this in mind and setting aside questions about a specific fee, do you understand (conceptually) that many higher level careers require you to obtain a license and ongoing continuing education to maintain your license?

☐ Yes ☐ No

**The Career You Are Applying For Requires State Licensing and a Background Check. Is there anything in your past that might cause you a challenge that would compromise your ability to be licensed or pass a background check?**

☐ Yes ☐ No

100 Words Limitation

> If Yes, Please explain..

Education Qualification

---

College Attended

> Type Your Re

Highest Degree Attended

> Type Your Re

Graduate Year

> Choose Graduation Year

Available Start Date

> Type Your Re

500 Words Limitation

**How would your friends describe you?** (Self-Starter, Needs Motivation, Detail Oriented, People Person, team player, etc.):

> Type Your Response Here…

500 Words Limitation

If you could change anything about yourself, what would it be?



500 Words Limitation

What do you consider your strengths and weaknesses?



500 Words Limitation

Tell us about a time when you accomplished something that others didn't' think you could do.



500 Words Limitation

When YOU are working with a salesperson (from any industry), what do you think are the most important characteristics the salesperson should have?



500 Words Limitation

Was there ever a time when you had to meet people you didn't know and had to ask them for something or sell them something or present an idea? Describe the situation and what was the outcome?

What other career industries have you considered or have an interest in?



500 Words Limitation

Do you know anyone in the Real Estate / Mortgage Sectors of the Financial Services Industry? Are they successful? Assuming the income potential met your expectations and you had appropriate training, what, if any, are your feelings towards becoming an 'Account Executive / Sales Professional' as a career choice?



500 Words Limitation

If the income potentials are appropriate, but you had to 'arrange your personal time, would you be willing to work evenings and weekends if needed or, are you more comfortable with "9-5"? Explain why.

What 'MATTERS' to you? What are you looking for in a company? What are you looking for in life?

> Type Your Response Here…

## Work Information

If You Have Worked, Tell Us About It:

☐ Yes

☐ No Student Only. I've Never Worked.

If you have prior work experience, describe what the job(s) was/were and what you liked the LEAST and MOST about the job(s).

500 Words Limitation

> Type Your Response Here…

Years of Combined Work History

> Type Your Re

Current Employer

> Type Your Re

Current Title

> Type Your Re

Current Salary

> Type Your Re

Would You Consider Relocating

☐ Yes  ☐ No

1500 Words Limitation

Work History/Experience (List Current and Past Employers while student or after along with the Tasks and Duties involved with your Job.)

> Type Your Response Here…

500 Words Limitation

Combined Duties of All Listed Work History

Resume Questions

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

> Type Your Response Here...

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

> Type Your Response Here...

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?

> Type Your Response Here...

From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One

$------to  $------

Year Two

$------to  $------

Year Five

$------to  $------

☐

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.

Resume Questions

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

> Type Your Response Here...

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

> Type Your Response Here...

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?



From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One

$------to $------

Year Two

$------to $------

Year Five

$------to $------

☐

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.

Csca.com



      Apply Now  |  Find Us

Find Us

Home

Our  Company

Our  Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us



**CSCA®**
Career Solutions and Candidate Acquisition
4533 MacArthur Blvd., Suite 100
Newport Beach, CA 92660-2059
USA Toll Free: 1-866-254-7600
Local: 949-644-7600
www.csca.com
CONTACT US



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA 92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

FERNANDO MARTINEZ,                      CASE NO. 30-2012-614932

v.                                      **PROOF OF SERVICE**

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA

     I am a resident of the San Diego County. I am over the age of eighteen years and not a party to the within entitled action. My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108. On August 3, 2013, I served the following:

     \*     Fifth Amended Complaint; Declaration in Support of Fifth Amended Complaint

Garrison/Teeple/Swope
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121                      (Electronic Service)

     I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 3rd day of August 3, 2013 that the foregoing is true and correct.



---

MARTINZ v. O'HARA – CASE NO. 30-2012-614932
PROOF OF SERVICE

# EXHIBIT 8

1  Grant G. Teeple, Esq. SBN 144760
   Gregory M. Garrison, Esq. SBN 165215
2  Frederick M. Reich, Esq. SBN 157028
   Julia M. Williams, Esq. SBN 244400
3  TEEPLE HALL, LLP
   9255 Towne Centre Drive, Suite 500
4  San Diego, CA 92121
   Telephone: (858) 622-7878
5  Facsimile: (858) 622-0411

6  Attorneys for Defendants Stephen Stratton O'Hara fka Stephen John O'Hara, Career Solutions
   and Candidate Acquisitions, Pacific Valley Realty, Inc, O'Hara Family Trust, and Professional
7  Realty Council, Inc.

8                    SUPERIOR COURT OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF ORANGE

10

11  FERNANDO MARTINEZ,                    ) Case No. 30-2012-00614932-CU-FR-CJC
                                          )
12              Plaintiffs,               ) DECLARATION OF STEPHEN O'HARA
                                          ) IN SUPPORT OF DEFENDANTS'
13       vs.                              ) CLOSING BRIEF ON INJUNCTIVE
                                          ) CLAIMS
14  STEPHEN STRATTON O'HARA fka           )
    STEPHEN JOHN O'HARA; CAREER           )
15  SOLUTIONS AND CANDIDATE               )
    ACQUISITIONS; PACIFIC VALLEY          ) Judge: Hon. Carmen Luege
16  REALTY, INC.; AND DOES 1-10,          ) Dept. C-61
                                          )
17              Defendants.               )
                                          )
18

19       I, Stephen O'Hara, declare as follows:

20       I have personal knowledge of the facts stated in this declaration and, if called as a

21  witness, I could and would testify competently thereto under oath. I declare as follows:

22       1.    I am a defendant in the above entitled action.

23       2.    I first came in contact with Plaintiff Fernando Martinez ("Mr. Martinez") in

24  approximately mid-August 2012 on the telephone. Mr. Martinez had seen the CSCA website

25  and was making further inquiry.

26       3.    During the initial telephone call, I told Mr. Martinez that I was just getting the

27  real estate business described on the CSCA website off the ground, that it was in the R & D

28  phase, and that it would not launch until January 2013 if everything went according to plan.

                                        1

Teeple Hall, LLP

4. Mr. Martinez informed me that he did not have a real estate license. I informed Mr. Martinez that he would need a license to sell real estate.

5. Mr. Martinez called me a few more times wherein I reiterated that CSCA wasn't planned to launch until January 2013 and that he needed a real estate license to work in this field.

6. In early September 2013 Mr. Martinez and I again spoke over the telephone. He told me that he was quitting his job at McDonalds. Mr. Martinez said that he wanted to meet me in person to further discuss the real estate business and I agreed.

7. Mr. Martinez and I then met at my house at which time I offered Mr. Martinez a job as an assistant in my office and he accepted.

8. In approximately December 2015, I requested Pratap Shrotiya, of Splendor Technology in India who is the webmaster in control of the CSCA website to shut down the CSCA website.

9. To the best of my knowledge and belief, the CSCA website has not been viewable by the general public since that time.

10. In March 2016 I learned for the first time that pages of the CSCA website could still be accessed by typing in the entire URL for the specific pages even though a general search would show that the site was no longer active.

11. I then contacted Mr. Shrotiva and requested that he completely shut down the CSCA website and remove all access to it.

12. I have no intention of re-publishing the content in question on the CSCA website.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this  10  day of June 2016, in  Newport Beach California.

By: _____
Stephen O'Hara, Declarant

2

Martinez v. O'Hara, et al.
Declaration of Stephen O'Hara

Case No. 30-2012-00614932-CU-FR-CJC

Teeple Hall, LLP

# EXHIBIT 9

## SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CENTRAL JUSTICE CENTER

### MINUTE ORDER

DATE: 08/01/2016                TIME: 02:46:00 PM        DEPT: C61

COMMISSIONER: Carmen Luege
CLERK: Ryan Castillo
REPORTER/ERM:
BAILIFF/COURT ATTENDANT: Bryce Burton

CASE NO: **30-2012-00614932-CU-FR-CXC** CASE INIT.DATE: 11/28/2012
CASE TITLE: **Martinez vs. O'Hara**
CASE CATEGORY: Civil - Unlimited    CASE TYPE: Fraud

---

EVENT ID/DOCUMENT ID: 72419984
**EVENT TYPE:** Under Submission Ruling

---

**APPEARANCES**

---

There are no appearances by any party.

The Court, having taken the above-entitled matter under submission on 07/05/2016 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

**Ruling:**

This case raised multiple claims, including sexual harassment and false advertising causes of action. Prior to the commencement of the trial the parties agreed to bifurcate the trial, the sexual harassment claims would be tried by jury and the false advertising claims, particular the request for injunctive relief, would be decided by the judge. On March 10, 2016 the jury returned a verdict in favor of plaintiff in the sum of $8,080. The issue before the court now is whether plaintiff is entitled to injunctive relief based on the false advertising claims.

In deciding the disposition of plaintiff's request for injunctive relief, the court considered the evidence presented during the jury trial, as well as supplemental evidence submitted by the parties in the form of declarations relevant to the false advertising claims. The court also reviewed the legal briefs submitted by the parties addressing the injunctive relief request. Based on the court's review of the evidence, applicable statutes, and case law, the court denies plaintiff's request for injunctive relief. The court decision is based on the following findings of fact and law:

  - Plaintiff established that defendant's website, the Career Solutions and Candidate Acquisitions ("CSCA") website, contained materially false statements in violations of statutes that prohibit false advertising under Business and Professions Code Section 17200 et. seq.

---

DATE: 08/01/2016                    MINUTE ORDER                        Page 1
DEPT: C61                                                        Calendar No.

CASE TITLE: Martinez vs. O'Hara                    CASE NO: **30-2012-00614932-CU-FR-CXC**

- The court rejects defendant's argument that the court's decision, during trial, to grant a directed verdict on the fraud cause of action requires the court to dismiss the false advertising claim under Section 17200 et. seq. The standard that applies under Section 17200 claims "has no relation to common law fraud." *See Cal. Civ. Prac. Business Litigation, Section 60.10* (citations omitted).

- Defendant lacks standing to maintain a Section 17200 violation. Under Section 17204, the statute states that to have standing a person must have "suffered injury in fact and has lost money or property as a result of the unfair competition." Plaintiff's position that he suffered economic injury by travelling from Escondido, CA to Orange County for a job interview with defendant, based on false representations in the website, does not establish standing. Driving 60 minutes from one town to another for a job interview does not equate with economic injury.

- Even if the court were to find that plaintiff had standing, the court denies the injunction because plaintiff failed to prove that the public currently has access to the CSCA website. The general rule is that "injunctive relief will be denied if at the time of the order or judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct." *California Service Station & Auto Repair Ass'n v. Union Oil Co. of Calif.* (1991) 232 Cal.App.3d 44, 57. In other words, to get an injunction, plaintiff must show there is a threat that the wrongful conduct will continue. The court finds that plaintiff's evidence did not meet this burden.

For all the foregoing reasons, the court finds that plaintiff is not entitled to injunctive relief.

The Court directs Plaintiff to prepare the judgment.

Court orders Clerk to give notice.

1  Grant G. Teeple, Esq. SBN 144760
   Gregory M. Garrison, Esq. SBN 165215
2  Frederick M. Reich, Esq. SBN 157028
   Julia M. Williams, Esq. SBN 244400
3  TEEPLE HALL, LLP
   9255 Towne Centre Drive, Suite 500
4  San Diego, CA 92121
   Telephone: (858) 622-7878
5  Facsimile: (858) 622-0411

6  Attorneys for Defendants Stephen Stratton O'Hara fka Stephen John O'Hara, Career Solutions
   and Candidate Acquisitions, Pacific Valley Realty, Inc, O'Hara Family Trust, and Professional
7  Realty Council, Inc.

8                          SUPERIOR COURT OF CALIFORNIA

9                       IN AND FOR THE COUNTY OF ORANGE

10

11  FERNANDO MARTINEZ,                    )   Case No. 30-2012-00614932-CU-FR-CJC
                                          )
12               Plaintiffs,              )   DECLARATION OF STEPHEN O'HARA
                                          )   IN SUPPORT OF DEFENDANTS'
13        vs.                             )   CLOSING BRIEF ON INJUNCTIVE
                                          )   CLAIMS
14  STEPHEN STRATTON O'HARA fka           )
    STEPHEN JOHN O'HARA; CAREER           )
15  SOLUTIONS AND CANDIDATE               )
    ACQUISITIONS; PACIFIC VALLEY          )   Judge: Hon. Carmen Luege
16  REALTY, INC.; AND DOES 1-10,          )   Dept. C-61
                                          )
17               Defendants.              )
                                          )
18

19        I, Stephen O'Hara, declare as follows:

20        I have personal knowledge of the facts stated in this declaration and, if called as a

21  witness, I could and would testify competently thereto under oath. I declare as follows:

22        1.    I am a defendant in the above entitled action.

23        2.    I first came in contact with Plaintiff Fernando Martinez ("Mr. Martinez") in

24  approximately mid-August 2012 on the telephone. Mr. Martinez had seen the CSCA website

25  and was making further inquiry.

26        3.    During the initial telephone call, I told Mr. Martinez that I was just getting the

27  real estate business described on the CSCA website off the ground, that it was in the R & D

28  phase, and that it would not launch until January 2013 if everything went according to plan.

                                          1

Martinez v. O'Hara, et al.                      Case No. 30-2012-00614932-CU-FR-CJC
Declaration of Stephen O'Hara

4.    Mr. Martinez informed me that he did not have a real estate license. I informed Mr. Martinez that he would need a license to sell real estate.

5.    Mr. Martinez called me a few more times wherein I reiterated that CSCA wasn't planned to launch until January 2013 and that he needed a real estate license to work in this field.

6.    In early September 2013 Mr. Martinez and I again spoke over the telephone. He told me that he was quitting his job at McDonalds. Mr. Martinez said that he wanted to meet me in person to further discuss the real estate business and I agreed.

7.    Mr. Martinez and I then met at my house at which time I offered Mr. Martinez a job as an assistant in my office and he accepted.

8.    In approximately December 2015, I requested Pratap Shrotiya, of Splendor Technology in India who is the webmaster in control of the CSCA website to shut down the CSCA website.

9.    To the best of my knowledge and belief, the CSCA website has not been viewable by the general public since that time.

10.    In March 2016 I learned for the first time that pages of the CSCA website could still be accessed by typing in the entire URL for the specific pages even though a general search would show that the site was no longer active.

11.    I then contacted Mr. Shrotiva and requested that he completely shut down the CSCA website and remove all access to it.

12.    I have no intention of re-publishing the content in question on the CSCA website.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 10 day of June 2016, in Newport Beach California.

By: _____
Stephen O'Hara, Declarant

2

Teeple Hall, LLP

# EXHIBIT 10

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ., SBN 181826**
**WILLIAM MOND, ESQ., SBN 299865**
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# ORANGE COUNTY SUPERIOR COURT

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>PLAINTIFF,<br><br>v.<br><br>STEPHEN STRATTON O'HARA<br>aka<br>STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND<br>CANDIDATE ACQUISITIONS;<br><br>O'HARA FAMILY TRUST;<br><br>OCRE, INC.;<br><br>PROFESSIONAL REALTY<br>COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.;<br><br>and DOES 4-10, | CASE NO.: 30-2012-614932-CU-FR-CJC<br><br>**MARTINEZ'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF FERNANDO MARTINEZ'S MOTION FOR AWARD OF ATTORNEY'S FEES AND COSTS**<br><br>**DATE:** November 4, 2016<br>**TIME:** 8:30 am<br>**DEPT:** 32<br>**JUDGE:** Hon. Carmen Luege |

PAVONE & FONNER, LLP

**INTRODUCTION**

Fernando Martinez prevailed on two causes of action that statutorily require fee shifting: sexual harassment and a wage claim.  Martinez also prevailed as a practical matter on two injunctive claims, which do not involve fee shifting, and lost a common law fraud claim in a mid-trial ruling.  In light of this mixed bag of outcomes, he has apportioned as fee shifting work 1/3 of the total time spent on this case.  He requests his attorney's straight hourly rate – no multiplier and no interest or other adjustment for a delay in compensation for what is now four years – as his way of displaying proper, fractional apportionment and reasonable billing judgment.

By way of background, on November 28, 2012, Martinez filed suit against Stephen O'Hara and his several companies.  The lawsuit stemmed from interactions several months before while Martinez was seeking employment and was later employed by O'Hara.  It most notably involved a website with a series of misrepresentations about the stature, prestige and operational status of O'Hara's putative headhunter agency, CSCA.  The defense fought a long and protracted legal battle resisting the case, filed numerous demurrers and other procedural challenges, raised myriad defenses at every turn, and fended its way through a trial.

Just before trial started, and after four years of resistance, O'Hara paid the outstanding wages due to Martinez.  Martinez then prevailed at trial by proving that O'Hara sexually harassed him by virtue of O'Hara's conditioning Martinez's continued employment on an ongoing sexual relationship, with the jury awarding Martinez just over $8,000 in damages.

**I.**

**MARTINEZ IS ENTITLED TO RECOVER ATTORNEY'S FEES INCURRED IN OBTAINING RELIEF FOR HIS WAGE WITHHOLDING CLAIM**

Cause of Action Four in the Fifth Amended Complaint alleged that O'Hara wrongfully withheld Martinez's wages after Martinez's termination. (Dkt. 237.) Martinez alleged that this violated California Labor Code section 203.5, which entitled

PAVONE & FONNER, LLP

Martinez to the wages and a thirty-day penalty.   Accordingly, Martinez sought payment of $750 for the outstanding work and $1,500 in penalties for a total of $2,250.

On January 18, 2013, O'Hara tendered a check for $975 to the California Labor Board, a random and insufficient figure to settle the balance due.  A few days before the trial was to begin, some three and one-half years after the lawsuit was filed, O'Hara produced a check for the $1,300 balance. (Pavone, ¶ 3.)

Labor Code section 218.5, subdivision (a) provides: "In any action brought for the nonpayment of wages ... the court shall award reasonable attorney's fees and costs to the prevailing party...."  O'Hara is expected to argue that Martinez was not the prevailing party because the Court did not itself award him the outstanding wages.

However, this tactic does not change the prevailing party analysis.  If a party to litigation reaches his "sought-after destination," then he prevails regardless of the particular route taken. (*Graham v. DaimlerChrysler* (2004) 34 Cal.4th 553, 570-571, citing *Buckhannon v. West Virginia* (2001) 532 U.S. 598, 633-634, 121 S.Ct. 1835, 149 L.Ed.2d 855.)  This is determined based on which party succeeded on a practical level. (*Graciano v. Robinson,* 144 Cal.App.4th 140, 150 citing *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1018.)   Under this approach, "the court exercises its discretion to determine the prevailing party by analyzing which party realized its litigation objectives." (*Castro,* at p. 1019, 10 Cal. Rptr.3d 865.)." *Graciano,* 50 Cal.Rptr.3d at 281-282.)  After four years of litigation, Martinez was finally paid in full on his labor claim and thus neatly achieved the full measure of his objectives. (Pavone, ¶ 3.)

Nor does the small recovery change the analysis.  In *Graciano*, the Fourth District analyzed "prevailing party" language from a comparable consumer statute (comparable to Labor Code § 218.5) stating that: "The provision for recovery of attorney's fees allows consumers to pursue remedies in cases as here, where the compensatory damages are relatively modest. To limit the fee award to an amount less than that reasonably incurred in prosecuting such a case, would impede the legislative purpose underlying section 1780." (*Graciano,* 144 Cal.App.4th 140, 150, citing *Hayward v, Ventura Volvo* (2003)

PAVONE & FONNER, LLP

108 Cal.App.4th 509, 512.)  The California Legislature similarly enacted the Labor Code's fee shifting provisions to allow employees to hold employers liable for non-payment of wages, often in small amounts. (*Kirby v. Immoos* (2012) 53 Cal.4th 1244, 1257.)  For these reasons, the time spent on this cause of action is compensable notwithstanding O'Hara's 11th-hour tactic of purchasing his way out of a formal judgment. (Pavone, ¶ 3.)[1]

## II.
## MARTINEZ IS ENTITLED TO RECOVER ATTORNEY'S FEES INCURRED IN LITIGATING HIS SEXUAL HARASSMENT CLAIM.

Martinez prevailed on his Fifth Cause of Action for sexual harassment. (Gov. Code, § 12940, subd. (j)(1).)  The jury found that O'Hara conditioned Martinez's employment on Martinez's submission to a sexual relationship with O'Hara. (Pavone, ¶ 4 [Exhibit 1].)

FEHA permits attorney's fees to a successful plaintiff. (Gov. Code, § 12965, subd. (b).)   In this respect, "a trial court should ordinarily award attorney fees to a prevailing plaintiff unless special circumstances would render a fee award unjust." (*Young v. Exxon* (2008) 168 Cal.App.4th 1467, 1474; *Steele v. Jensen Instrument* (1997) 59 Cal.App.4th 326, 331.)   In *Chavez v. Los Angeles*, the Supreme Court noted that, in FEHA actions, attorney fee awards make it easier for plaintiffs of limited means to pursue meritorious cases. (*Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 984, citing *Cummings v. Benco* (1992) 11 Cal.App.4th 1383, 1387.)  Such incentives are intended to encourage litigation of valid sexual harassment claims. (*Chavez,* 47 Cal.4th 970, 984; *Flannery v. Prentice* (2001) 26 Cal.4th 572, 584.)  While the award here was small, the sexual harassment claim was valid as determined by the jury. (Pavone, ¶ 4 [Exhibit 1].)

---

[1]  In private correspondence, O'Hara argued that because he (arguably) obtained the greater relief in the action, he was the prevailing party.  However, this type of analysis flows from a 1717 contract theory.  Fee shifting when driven by statute does not ask this question; it asks who prevailed on the statutory cause of action. (Gov't Code, § 12965, subd. (b); *Weeks v. Baker MacKenzie* (1998) 63 Cal.App.4th 1128, 1171.)

PAVONE & FONNER, LLP

None of the documented reasons that might otherwise make a fee award unjust within the special circumstances language of *Chavez* are present in this case.   The main defense in this area revolves around discretion a court may apply to plaintiffs who obtain an award within limited civil jurisdiction, and yet who failed to file in the lower venue. (Code Civ. Proc., §§ 1033, subd. (a); 1032, 1033.5, subd. (a)(10)(B); *Chavez*, *supra,* 47 Cal.4th 970, 975-976.)

However, this rule does not apply because this case evolved early on to include 17200/17500 injunctive causes of action and therefore could not have been prosecuted in limited civil. (*Ytuarte v. Superior Court* (2005) 129 Cal.App.4th 266, 275, citing Code Civ. Proc., § 86, subds. (a)(7), (a)(8).)   Furthermore, this was no technical adjustment in that, while not validated by this Court per se, those claims did in fact eliminate CSCA's controversial website from the marketplace. (Pavone, ¶ 5; *see Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 976.)   Martinez should not be penalized for bringing the action in civil unlimited when he did in fact achieve objectives uniquely associated with relief only available in unlimited – O'Hara's eventual capitulation to dismantle the CSCA website. (Pavone, ¶ 5.)

Nor do the settlement offer dynamics give the Court any reason to dismiss Martinez's claim for fees.   Throughout most of the case, the highest offer by O'Hara was $1,000. (Pavone, ¶ 6.)   A few months before trial in a CMC statement, O'Hara upped his offer to $2,500, for everything. (Pavone, ¶ 7.)   As the jury found, this was not full compensation for the sexual harassment, much less payment of the outstanding balance on the wage claim, much less recognition for the time and effort involved to get to that point.   Indeed, O'Hara's paltry settlement offer did not even cover the $16K in out-of-pocket costs. (S*ee* Cost Memorandum.)   Thus, O'Hara's pre-trial settlement positions provide no reason for the Court to conclude that Martinez had an easier or alternative path to be made whole.

Nor, unlike the overly ambitious plaintiff in *Chavez*, has Martinez sought the moon and stars based on the comparatively small harassment verdict.   There, Chavez sought

PAVONE & FONNER, LLP

over $870,000 in fees and costs based on a verdict of $11,500. (*Chavez*, at 976.)   The Supreme Court in *Chavez* metaphorically gasped at the disproportion between the fee claim and the verdict. (*Ibid*.)  Here, Martinez has apportioned his time, abandoned numerous hours that he could seek compensation for[2], has sought no multiplier, has sought no interest for the delay, and has thus requested a figure in line with the necessity of having to go the distance of the civil justice system by trying the case. (Pavone, ¶¶ 8, 12.)

Finally, courts may consider a plaintiff's good faith in bringing the action in unlimited, in a sort of retrospective assessment of his tactical judgment based on what he knew at filing. (*See Chavez*, 47 Cal.4th 970, 984, citing *Dorman v. DWLC* (1995) 35 Cal.App.4th 1808, 1816-1817; *Valentino v. Elliott* (1988) 201 Cal.App.3d 692, 702; *Greenberg v. Pacific Tel* (1979) 97 Cal.App.3d 102, 108.)

According to *Chavez,* "[i]n determining whether a FEHA action should have been brought as a limited civil case, the trial court should consider FEHA's underlying policy of encouraging the assertion of meritorious FEHA claims, and it should evaluate the entire case in light of the information that was known, or should have been known, by the plaintiff's attorney when the action was initially filed and as it developed thereafter. …. If, based on the available information, the plaintiff's attorney might reasonably have expected to be able to present substantial evidence supporting a FEHA damages award in an amount exceeding the damages limit (now $25,000) for a limited civil case, or if the plaintiff's attorney might reasonably have concluded that the action could not be fairly and effectively litigated as a limited civil case, the trial court should not deny attorney

---

[2] Martinez is not asking the Court for compensation for the effort to shut down the website – though he could.  The Court's adverse ruling on this point was based on a commitment by O'Hara to shut it down voluntarily, not because the website did not violate the false advertising law.  Thus, Martinez could make the argument that he achieved his litigation objectives, albeit via O'Hara's capitulation, and could argue that he provided a 1021.5/*Serrano* public service.  Thus, in asking the Court to pay him for only 1/3 of the time spent, Martinez is lopping off a big chunk of arguably compensable time related to the injunctive causes of action.  The detail to support such a finding is presented herein for the record and Martinez reserves the right to revisit the issue. (Pavone, ¶ 8.)

PAVONE & FONNER, LLP

fees merely because, for example, the trier of fact ultimately rejected the testimony of the plaintiff's witnesses or failed to draw inferences that were reasonably supported, although not compelled, by the plaintiff's evidence." (*Chavez,* 47 Cal.4th 970, 986-987. )

Here, counsel will note that at the time of filing, Martinez's exact level of consent to the sex acts between him and O'Hara was unknown. (Pavone, ¶ 9.)  Based on counsel's knowledge at the time, none, some or all of the sex they engaged in could have been considered as lacking consent or be deemed affirmatively coerced by O'Hara's superior bargaining position. (Pavone, ¶ 9.)  As such, and unlike many sexual harassment cases where mere improper comments constitute the corpus of the tort, there was a bulk of actual sex here. (Pavone, ¶ 9.)  Counsel could not rule out the possibility this conduct would be deemed non-consensual – indeed, the jury's *quid pro quo* sexual finding does make the sex illegal and unlawful sex forms a standard foundation in these cases for damages beyond the $25,000 civil unlimited bar. (Pavone, ¶ 9.)  The fact that there were sex acts that occurred, and ones that were at least arguably coerced according to the plaintiff's testimony, required plaintiff's counsel to preserve the possibility of a significant damage verdict. (Pavone, ¶ 9.)[3]

Thus even if Martinez could have filed this case in limited civil – he would have had to transfer it to unlimited given the 17200/17500 causes of action included in the First Amended complaint – it would have been irresponsible of counsel to assume

---

[3] Also, only a lawyer or judge who has regularly litigated plaintiffs' cases can appreciate how much you have to read the tea leaves.  What stuck out to this lawyer in deciding to file this case is that O'Hara was trying to stiff some obviously destitute kid out of a few hundred bucks by leveraging him into a release of all claims as a condition to receiving his last paycheck.  This signaled to counsel that O'Hara had an "anything goes" mindset in dealing with people and foreshadowed a larger world of potential misconduct to explore. (Pavone, ¶ 10.)  Counsel did not know whether there was just 1 or 25 Fernando Martinez's being taken advantage of within O'Hara's moth-to-bright-light website; counsel did not know whether O'Hara was a full-time con man or – no offense – the sort of lonely guy that he came across as at deposition and in trial. Again, this uncertainty required counsel to keep his client's procedural options open in terms of how to pursue the case.  With the benefit of hindsight, it was the correct call given Martinez's subsequent and serious pursuit of injunctive relief. (Pavone, ¶ 10.)

PAVONE & FONNER, LLP

Fernando's perception (that the sex was not consensual) would be rejected and that he, counsel, should file in a venue that automatically precluded significant damages for these multiple, penetrating sex acts. (Pavone, ¶ 9.)

For all of these reasons, there is nothing about this case such that the usual rule of awarding fees to a litigant that prevails on a statutory fee shifting cause of action, even with a comparatively small award, should be denied compensation for the effort based on *Chavez's* special circumstances exception language.

## III.
## THE TIME INCURRED AND HOURLY RATE WERE STANDARD AND REASONABLE FOR A CASE PROSECUTED THROUGH THE LENGTH OF THE CIVIL JUSTICE SYSTEM.

### A.  Time To Litigate the Case

Both Labor Code section 218.5 and Government Code section 12965(b) include language requiring the Court to award reasonable attorney fees and costs.  In California, as established in *Serrano III*, the lodestar method is used to determine such fees. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 48, fn. 23.)   In applying this method, the Court first calculates the lodestar figure. (*Press v. Lucky Stores* (1983) 34 Cal.3d 311, 322.)

The lodestar figure is obtained by multiplying the hours reasonably worked by a reasonable hourly rate for those services. (*Serrano III*, 20 Cal.3d 25, 48.)   The California Supreme Court has explained that an attorney fee award should ordinarily include compensation for all hours reasonably spent, including those relating to the fee application. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133, 1135, citing *Serrano v. Unruh* (1982) 32 Cal.3d 621, 624, 639 (*Serrano IV*); *Redondo v. Redondo* (2012) 203 Cal.App.4th 852, 870.)

Here, the bulk of the legal effort was primarily performed by Attorney Pavone, with some work by comparably experienced attorney Kimberley Fonner, who together dedicated at least 969.6 billable hours to Martinez's case. (Pavone, ¶ 11 [Exhibit 2].) However, as acknowledged above, only two of the five causes of action involve fee shifting.  Complicating the analysis is that the time to investigate and litigate the sex

PAVONE & FONNER, LLP

claim, the wage claim, the fraud claim and the injunctive claims is difficult to separate. (Pavone, ¶ 12.)  The evidence is overlapping. (Pavone, ¶ 12.)  There are many tasks common to all claims. (Pavone, ¶ 12.)   As counsel sees it, and in attempting to truly be reasonable, he has apportioned the case into thirds: a third of the time for the sex/wage claims, a third for the 17200/17500 causes and a third for the fraud claim. (Pavone, ¶ 12.)

Martinez is asking for 1/3 of the total hours to be paid.  This translates to 323.2 hours compensable, which includes a bulk of time that is generally necessary for any case to run the length of the system (e.g., filing/amending complaints, service, basic discovery, resisting demurrers, complying with various court-imposed obligations and trial). (Pavone, ¶ 12.)

Review of the effort deconstructing the CSCA website is a good lens by which to review this 1/3 dichotomy.  On its face, its most obvious application is to the injunctive claims; after all, the website was ultimately their target.  Similarly, the fraud claim was based on statements within the website.  But even the sex and wage claims were closely tied to this body of evidence, because they provided the foundation for the personal contact that enabled O'Hara's sexual agenda. (Pavone, ¶ 15.)

Without the emails and the website, Martinez would not have applied for a job; without Martinez interviewing as a result of his participation within the website, he would not have had the kind of direct contact with O'Hara that set the stage for the sexual advances; and without the continuing enticements bolstered by the glamour of the CSCA website, Martinez probably would not have fallen so easily for O'Hara's sexual advances.  Time was devoted to developing and deconstructing the CSCA website; and that effort was necessary and instrumental to litigating all three aspects of the case.

Counsel's regular rate is $425 per hour. (Pavone, ¶ 2.)  His law school roommate is also a small firm practitioner currently charging $600/hr in LA. (Pavone, ¶ 2.)   A rate of $425 is thus by any objective indicia a reasonable rate for a 20-year trial lawyer. (Pavone, ¶¶ 1-2.)  Counsel routinely attracts and retains clients at this rate. (Pavone, ¶ 2.)  At 323.2 hours with a mix of $350 and $425/hr time divided into a third, a lodestar figure of

PAVONE & FONNER, LLP

$133,887 is requested.  That used to be a lot of money; it's not anymore. (Pavone, ¶ 13.) It does not even represent one of the innumerable $200K bad investments made by O'Hara's former friends in his real estate schemes, among $4M in personal debt O'Hara BK'd in 2012. (Pavone, ¶ 13.)

As indicated above, Martinez is not asking for a multiplier; he is not asking for interest for the 4-year delay in payment. (Pavone, ¶ 8.)   He is only asking for straight hourly compensation for 1/3 of the effort, which given the time invested, reflects a highly unprofitable case for counsel's law firm. (Pavone, ¶ 13.)

### B.  Time to Prepare this Fee Motion

The draft pleadings were prepared by a third year attorney, William Mond, who dedicated 25 hours to researching the issues, compiling the necessary data, and preparing the pleadings. (Dec. W. Mond, ¶¶ 1-3 [Exhibit 2].)  He is asking for a young attorney rate of $175 per hour. (Mond, ¶ 2.)   Attorney Pavone completed the draft papers and requests an additional 15.7 hours for the finalization of the moving papers at counsel's regular rate, for a total of $11,047. (*See* Exhibit 2, Nos. 305, 313-315.)

### C.  Costs

Per the accompanying filings, Martinez is requesting $16,011.84 in costs.  To the extent any costs do not fit within traditional 1033.5 guidelines, the recoverable costs are broader when requested pursuant to a cause of action that permits fee and cost shifting. (*See* Gov. Code, § 12965, subd. (b).)

In summary, Martinez requests total fees of $144,934 for the moving papers and costs of $16,011.84.

Respectfully:

Date: October 6, 2016                         PAVONE & FONNER, LLP

                                              Benjamin Pavone, Esq.
                                              William Mond, Esq.
                                              Attorneys for Plaintiffs

PAVONE & FONNER, LLP

# EXHIBIT 11

Grant G. Teeple, Esq.  SBN 144760
Gregory M. Garrison, Esq. SBN 165215
Frederick M. Reich, Esq. SBN 157028
TEEPLE HALL, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121
Telephone: (858) 622-7878
Facsimile: (858) 622-0411

Attorneys for Defendants Stephen Stratton O'Hara fka Stephen John O'Hara, Career Solutions, Candidate Acquisitions, and Pacific Valley Realty, Inc.

# SUPERIOR COURT OF CALIFORNIA

# IN AND FOR THE COUNTY OF ORANGE

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>        Plaintiffs,<br><br>     vs.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA; CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS; PACIFIC VALLEY REALTY, INC.; AND DOES 1-10,<br><br>        Defendants. | Case No.  30-2012-00614932-CU-FR-CJC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF FERNANDO MARTINEZ' MOTION FOR ATTORNEY FEES AND COSTS**<br><br>Judge:  Hon. Carmen Luege<br>Dept. C32<br><br>Date:  November 4, 2016<br>Time: 8:30 a.m. |

*Teeple Hall, LLP*

Martinez v. O'Hara, et al.                    Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

Defendants Stephen O'Hara, Career Solutions and Candidate Acquisitions, O'Hara Family Trust, OCRE, Inc., Professional Realty Council, Inc., and Pacific Valley Realty, Inc. (collectively "Defendants" or "O'HARA") submit the present Opposition to Plaintiff Fernando Martinez' ("Plaintiff" or "MARTINEZ") Motion for Attorney Fees and Costs.

## I.  INTRODUCTION

MARTINEZ' Motion for Attorney Fees and Costs fails in numerous respects.  First, Plaintiff was paid all of his wages that he claimed long ago and he is not entitled to attorney fees and costs as to any waiting time penalties that may be been due.  Second, as to the single FEHA upon which MARTINEZ obtained a modest jury award, the request should be denied as a matter of discretion because he filed the action as an unlimited jurisdiction matter when it should been filed as a limited civil case.  He recovered only $8,080 after more than three years of overblown litigation.  He presented little evidence of trial and his present fee request is exaggerated.  Finally, even if MARTINEZ is entitled to some amount of fees and costs on his FEHA claim, which he is not, he has not properly accounted for and allocated those fees and costs to the one cause of action upon which he prevailed.  A thorough review of his Time Sheets and Memorandum of Costs reveals that only a small amount of time and costs can be allocated to his one successful claim at trial.

## II.      A BRIEF PROCEDURAL HISTORY

Plaintiff initiated this action on November 28, 2012.  Over the course of the next several years, Plaintiff amended his complaint five times.  In his Fifth Amended Complaint, Plaintiff, for the first time, sought class certification on his false advertising claim.  The case was declared complex.  His motion for class certification was denied.  Plaintiff unsuccessfully appealed the trial court's ruling.  The complex designation was removed as a result.

Finally, in March of 2016, the matter proceeded to jury trial on two cause of action only – fraud and sexual harassment.  The fraud cause of action was eliminated on Defendants' motion for non-suit after Plaintiff testified he did not rely on Defendant's representations.   The harassment cause of action went to the jury which awarded Plaintiff $8,080.  Thereafter, following briefing by the parties, the Court denied Plaintiff's injunctive claims.

*Teeple Hall, LLP*

1

Now, Plaintiff seeks to recover $162,600 in attorney fees and costs.

## III.    GENERAL PRINCIPLES REGARDING FEE AWARDS

The prevailing party must establish a predicate contract or statute actually providing for an award of attorneys' fees.  *Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966.

A trial court is afforded wide latitude in ruling on fee motions and it ruling is reviewed by the abuse of discretion standard.   The trial court's determination:

"…will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice." ' " (*citation*) As with all orders and judgments, this fee order "is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance." (*citation*). "[A]scertaining the fee amount is left to the trial court's sound discretion. (*citation*s); Trial judges are entrusted with this discretionary determination because they are in the best position to assess the value of the professional services rendered in their courts. (*citations*); Thus, the court's fee award " 'will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*citation*).  *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 882, *as modified (Aug. 14, 2013), as modified on denial of reh'g (Sept. 10, 2013).*

In determining the reasonableness of attorney fees requested, the court should consider:

[T]he nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed. *Clayton Development Co. v. Falvey* (1988) 206 Cal.App.3d 438, 447 (quoting *Clejan v. Reisman* (1970) 5 Cal.App.3d 224, 241 (internal citations omitted)).

Furthermore, whether a case is difficult or involves a novel question or questions of law is important in determining the reasonableness of the attorney fees.  *Olson v. Cohen* (2003) 106 Cal.App.4th 1209, 1218.

/ / /

/ / /

/ / /

2

Teeple Hall, LLP

**III.    NO FEES OR COSTS ARE RECOVERABLE FOR WAITING TIME PENALTIES – THEY ARE NOT "WAGES"**

It is undisputed that Plaintiff has been paid all the wages (and more) that were due. Plaintiff seeks to recover his attorney fees based on Labor Code § 218.5 which provides that the prevailing party in "any action brought for the nonpayment of *wages*, fringe benefits, or health and welfare or pension fund contributions" shall be awarded reasonable attorney's fees and costs. Labor Code § 218.5 (emphasis added). Labor Code § 203 *waiting time penalties are not wages* and therefore section 218.5 does not apply. As the Court of Appeal explained:

> We reject plaintiff's argument that a section 203 waiting time claim based on section 226.7 premium pay is an "action [ ]brought for the non-payment of wages" under section 218.5 We understand that the remedy for a section 226.7 violation is an extra hour of pay, but the fact that the remedy is measured by an employee's hourly wage does not transmute the remedy into a wage as that term is used in section 203, which authorizes penalties to an employee who has separated from employment without being paid. Section 203, subdivision (b) provides for suit to be filed "for these penalties at any time before the expiration of the statute of limitations on an action for the wages from which the penalties arise." *Kirby* concluded that "a section 226.7 action is brought for the *nonprovision of meal and rest periods,* not for the 'nonpayment of wages.' " (*Kirby, supra,* 53 Cal.4th at p. 1255, 140 Cal.Rptr.3d 173, 274 P.3d 1160, italics in original.) Following *Kirby,* section 226.7 cannot support a section 203 penalty because section 203, subdivision (b) tethers the waiting time penalty to a separate action for wages. Because a section 203 claim is purely derivative of "an action for the wages from which the penalties arise," it cannot be the basis of a fee award when the underlying claim is not an action for wages.
> *Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal.App.4th 1242, 1261 [200 Cal.Rptr.3d 230, 244], *review denied (July 13, 2016).*

Thus, the law is clear – a party cannot recover fees and costs where the only damages constitute Labor Code § 203 penalties.

Long ago Plaintiff was paid all wages he claimed were due. Prior to trial, Defendant paid Plaintiff an additional $1,300 to resolve the issue of waiting time penalties to eliminate that minor issue from trial. As such, Plaintiff is not entitled to attorney fees on his wage claim.

/ / /

/ / /

/ / /

**Teeple Hall, LLP**

Martinez v. O'Hara, et al.                                    Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

Teeple Hall, LLP

# IV.    ATTORNEYS FEE FOR FEHA CLAIM

## A.    In a Proper Exercise of Its Discretion, the Court Should Deny the Request for Attorney Fees and Costs

Fee and costs awards are discretionary as to the only cause of action in which MARTINEZ prevailed at trial – his FEHA claim.  "In civil actions brought under this section, the court, in its discretion, may award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert witness fees."  Govt. Code § 12965(b).  Further, Code of Civil Procedure "section 1033(a), which grants the trial court discretion to deny costs to a plaintiff who recovers damages that could have been recovered in a limited civil case, applies to actions asserting FEHA claims." *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989.  "Section 1033(a)'s purpose is to encourage plaintiffs to bring their actions as limited civil actions whenever it is reasonably practicable to do so. (citation). This purpose does not require or involve a characterization of the underlying claim as major or minor or as significant or insignificant; rather, what it requires is a realistic appraisal of the amount of damages at issue and whether the action might fairly have been litigated using the streamlined procedures of limited civil actions.  Id at 988.

Here, MARTINEZ grossly exaggerated his claims, including the FEHA claim, and ultimately prevailed on only that one cause of action at trial after more than three years of litigation.  This matter should have been brought as a limited civil case.  He recovered less than one-third of the limited jurisdictional limit.  In fact, the award is within small claims jurisdiction.

The case of *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970 provides many similarities to the present case and is highly instructional.   There, Chavez filed an action alleging several FEHA claims.  Following a five-day trail, the jury awarded Chavez $1,500 in economic damages and $10,000 in noneconomic damages. Id. at 980.  In the present, case the jury award MARTINEZ $1,080 in economic damages and $7,000 in noneconomic damages.

Chavez then filed motions for attorney fees and costs.   The trial court denied these motions.  Chavez appealed and the Court of Appeal reversed.  Id. at 981.

Martinez v. O'Hara, et al.                                    Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

The California Supreme granted defendants' petition for review and reversed the Court of Appeal decision, upholding the trial court's denial of the fee and cost motions. Id. at 992. The Court concluded that "in light of plaintiff's minimal success and grossly inflated attorney fee request, the trial court did not abuse its discretion in denying attorney fees. Id. at 976.

In reaching this conclusion, the Court observed:

Under federal law, when determining a prevailing plaintiff's attorney fee in an action for violation of civil rights (42 U.S.C. § 1988), the extent of a plaintiff's success is a crucial factor. (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 440, 103 S.Ct. 1933, 76 L.Ed.2d 40.) If a plaintiff has prevailed on some claims but not others, fees are not awarded for time spent litigating claims unrelated to the successful claims, and the trial court "should award only that amount of fees that is reasonable in relation to the results obtained." (*Ibid.*) Although attorney fees need not be strictly proportionate to the damages recovered (*Riverside v. Rivera* (1986) 477 U.S. 561, 574, 106 S.Ct. 2686, 91 L.Ed.2d 466), "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief [citation], the only reasonable fee is usually no fee at all" (*Farrar v. Hobby* (1992) 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494).
On this point, California law is consistent with federal law. Although fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431, 69 Cal.Rptr.3d 1), "under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success" (*Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 249, 261 Cal.Rptr. 520; accord, *990 *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1674, 39 Cal.Rptr.2d 189; see also *Harrington v. Payroll Entertainment Services, Inc.* (2008) 160 Cal.App.4th 589, 594, 72 Cal.Rptr.3d 922).

In the present case, MARTINEZ' success was even more modest than that of *Chavez*. MARTINEZ was awarded $8,080 compared to the award $11,500 award in *Chavez*.

Moreover, other factors exist in the present case that did not exist in *Chavez* that further support the denial of discretionary attorney fees and cost. As the court docket makes abundantly clear, MARTINEZ engaged in a substantial amount of fruitless litigation over the course of more than three years. The vast majority of this litigation had nothing to do with the single FEHA claim. He amended his complaint six times. He unsuccessfully appealed the adverse class certification ruling. As this Court observed first hand, most of the trial was aimed at the fraud cause of action – which was dismissed on motion for non-suit. Just like *Chavez*, MARTINEZ

Martinez v. O'Hara, et al.                                    Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

Teeple Hall, LLP

presented "sparse" evidence at trial on his FEHA claim.  Of course, this is understandable because the FEHA claim was never his primary claim.

The Supreme Court also noted that:

Whether plaintiff was entitled to an award of attorney fees for time spent litigating the single successful claim requires consideration of another established principle governing attorney fee awards: "A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 635, 186 Cal.Rptr. 754, 652 P.2d 985; accord, *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1137, 104 Cal.Rptr.2d 377, 17 P.3d 735.)
*Id. at* 990.

As evidenced by Plaintiff's Time Sheet and Memorandum of Costs, his request is glaringly inflated since most of the entries have nothing to do with his FEHA.  These submissions are analyzed more fully below and in Defendants' Objections to Time Sheet and Objections to Memorandum of Costs filed concurrently herewith.

Also, MARTINEZ's FEHA claim (and all his other claims for that matter) were severely lacking in one essential element – damages.  The wrongful conduct alleged occurred over a very short period of time.  MARTINEZ present very little evidence of damages.  He presented no expert witnesses.  Similarly, the trial court in *Chavez* "could, and did, reasonably conclude that this action should have been brought as a limited civil case. As the trial court carefully explained in its statement of decision, plaintiff's evidence in support of the FEHA retaliation claim was seriously deficient on one essential element: damages." Id. at 991.

For these reasons and in the proper use of the Court's discretion, Defendant respectfully requests that Plaintiff's Motion for Attorney Fees and Costs as to his one modestly successful FEHA claim be denied.

## V.   PROPER ALLOCATION OF FEES AND COSTS TO THE ONE FEHA CLAIM

Finally, assuming only for the sake of argument that MARTINEZ is entitled to recover some amount, he grossly exaggerates the both the attorney fees and costs attributable only to the prosecution of his one successful claim.

"[A] trial judge deciding attorney fees may appropriately "allocate" or "apportion" fees..." *Ritter & Ritter, Inc. v. Churchill Condominium Ass'n* (2008) 166 Cal.App.4th 103, 129.

Martinez v. O'Hara, et al.                                  Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

Teeple Hall, LLP

1  "Apportionment of a fee award between fees incurred on a contract cause of action and those

2  incurred on other causes of action is within the trial court's discretion." *Abdallah v. United*

3  *Savings Bank* (1996) 43 Cal.App.4th 1101, 1111, as modified on denial of reh'g (Mar. 22, 1996).

4  In the similarly applicable context of a contractual attorney fees, the California Supreme

5  Court has observed that:

> Where a cause of action based on the contract providing for attorney's fees is joined with
> other causes of action beyond the contract, the prevailing party may recover attorney's
> fees under section 1717 only as they relate to the contract action. (*McKenzie v. Kaiser-
> Aetna* (1976) 55 Cal.App.3d 84, 88-90, 127 Cal.Rptr. 275; *see Schlocker v. Schlocker*,
> supra, 62 Cal.App.3d 921, 923, 133 Cal.Rptr. 485.) Describing the attorney's fees
> provision, section 1717 specifically refers to fees "incurred to enforce the provisions of
> such contract." A litigant may not increase his recovery of attorney's fees by joining a
> cause of action in which attorney's fees are not recoverable to one in which an award is
> proper. *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-30.

12  Under California law, trial courts should exercise its discretion to apportion attorney fee

13  award in at least two circumstances: (1) in cases in which fees are contractually or statutorily

14  recoverable on some but not all causes of action; and (2) in cases in which the prevailing party

15  was unsuccessful on portion of its suit. *In re Gorina* (Bankr.C.D.Cal.2002) 296 B.R. 23, 32–

16  33.

17  Partial success, however, *reduces* the awardable fees and costs; and the party seeking

18  attorney fees bears the burden of demonstrating to the court the time and costs expended on the

19  claims on which it prevailed. *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1016-

20  1020; *Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173, 177-178; *Lyons v. Chinese Hosp.*

21  *Ass'n* (2006) 136 Cal.App.4th 1331, 1344.

22  **A.    The Attorney Fee Time Sheet Is Excessive, Vague, and Shows that Most of**

23  **the Work Was Spent on Tasks Unrelated to the FEHA Claim**

24  Over the course of Plaintiff's six amended complaints, he alleged a total of eight causes

25  of action.  Thus, as an initial matter, Plaintiff erroneously claims to have been successful on two

26  out of five causes of action.  Rather, he prevailed in one of the eight causes of action he

27  prosecuted.

28

Teeple Hall, LLP

Martinez v. O'Hara, et al.                                    Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

However, even that analysis does not properly allocate the work that was performed solely on the FEHA claim. The best method to determine the hours spent on the FEHA claim is to review and analyze Plaintiff's time records which should indicate the amount of time devoted to the FEHA claim. However, one difficulty that is immediately apparent is that Plaintiff's counsel block billed and his task descriptions are, by and large, very vague. Although "block billing" is not objectionable per se, its use may undercut the credibility of the fee application. *Christian Research Institute v. Alnor* (2008) 165 CA4th at 1325, 1329 ("counsel may not submit a plethora of noncompensable, vague, block-billed attorney time entries and expect particularized, individual deletions as the only consequence. The trial court could reasonably conclude counsel made no effort to prune the fee request to comply with the law. Counsel erred grievously by attempting to transfer that responsibility onto the trial court. The trial court could reasonably conclude counsel's disregard for the law undercut the credibility of their fee request and, as officers of the court, warranted a severe reaction").[1]

Filed concurrently herewith are Defendants' Objections to Plaintiff's Time Sheets which analyzes each of the entries to determine whether it can be allocated to the FEHA claim or not. Several conclusions become immediately apparent. First, the vast majority of entries have nothing to do with the sole successful harassment claim. A majority of the entries are unrelated. A large portion of the entries relate to the false advertising claim and Plaintiff's ineffectual efforts to obtain class certification and other unrelated issues. Plaintiff's "1/3 of the total fees claimed" approach is unreasonable even upon a casual examination of his Time Sheet.

Second, a majority of the entries are extremely vague. It is Plaintiff's burden to demonstrate the specific work performed. He has failed to do so.

Third, many of the entries are patently excessive. Plaintiff's counsel claims to have worked *more than 25 hours a day*. Plaintiff's counsel also claims a 19-hour day, 18.5-hour day, 17.5-hour day, and more. It is difficult to believe that he spent the amount of time claimed given the results. Even if he did spend that much time, the amount of time spent was unreasonable

---

[1] Remarkably, Plaintiff's counsel claims to have spent <u>more than 24 hours a day</u> on two occasions.

Martinez v. O'Hara, et al.                                    Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

Teeple Hall, LLP

given the nature of the claim which was confirmed by the very modest jury verdict.  Again, the Court will recall the sparse evidence presented at trial.

Fourth, Plaintiff *does not submit actual time records.*  Instead, he presents a summary chart.  There is no evidence that these entries were made at or near the time of the work.  Plaintiff's counsel does not authenticate the Time Sheet.  As such, it has little evidentiary value.

In the event the Court is inclined to award Plaintiff some amount of fees on the his FEHA claim, Defendants submit that reasonable amount can be calculated as follows:

| TOTALS | | |
|---|---|---|
| *4.8 hours at $425/hr. = $2,040*<br>*3 hours at $175/hr. = $525* | **$2,565** | **$2,565** |
| *109.8 hours at $425/hr. = $46,665*<br>*22 hours at $175/hr. = $3,850* | **$50,515** | $50,515<br>÷ 8 Causes of Action<br>**$6,314.38** |
| *296.8 hours at $425/hr. = $126,140*<br>*8.8 hours at $350/hr. = $3,080* | **$129,220** | $129,220<br>÷ 2 (50% Reduction for Excessive Time)<br>$64,610<br>÷ 8 Causes of Action<br>**$8,076.25** |
| GRAND TOTAL: | | $16,955.63 |

## B.    The Memorandum of Costs Contains Mostly Unrelated and Non-Recoverable Items

It appears that Plaintiff is seeking to have Defendant pay for *all of Plaintiff's out-of-pocket costs* – whether they relate to the FEHA claim or not – whether they constitute a recoverable cost or not.  Plaintiff does not even include his "1/3" position to these items.  He simply wants Defendants to pay for all his costs.  Of course, the law does provide for such a result.

Filed concurrently herewith are Defendants' Objections to Plaintiff's Memorandum of Costs which details the objectionable costs.   As detailed, Plaintiff is only entitled to recover $1,074.00, if at all.  The fact that Plaintiff seeks nearly $16,000.00 in costs plainly demonstrates that Plaintiff's "request…appears unreasonably inflated [which] is a special circumstance permitting the trial court to reduce the award or deny one altogether."  *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 990.

9

Teeple Hall, LLP

1    In light of the highly inflated request for costs contained in Plaintiff's Memorandum of

2  Costs, Defendant respectfully requests that they should be denied altogether.

3

4    **VI.  CONCLUSION**

5    Plaintiff has made a mountain out of a mole hill.  His litigation tactics from the beginning

6  of the matter to the present have been excessive.  His claims have been exaggerated.  His rhetoric

7  inflammatory.  In the end, he obtained a small jury award on a single cause of action that should

8  have brought as a limited civil case.  One of the purposes of fee-shifting statutes is to encourage

9  reasonable pursuit of lawful remedies.  The purpose is not to encourage attorneys to unreasonably

10  over-litigate relatively minor grievances.  Yet, Plaintiff's ruminations aside, that is exactly what

11  happened.  Plaintiff's Motion for Fees and Costs abundantly supports this conclusion.  Plaintiff

12  overreached in the prosecution of this action as a general matter and overreaches in his present

13  Motion.  Plaintiff requests an inordinate amount attorneys fees which have nothing to do with his

14  one modest victory.  He makes little effort to properly and credibility account for his time.  His

15  Time Sheets are vague and reflect excessive time spent mostly on tasks unrelated to this FEHA

16  claim.   His Cost Memorandum improperly request more than $15,000 in costs that are

17  unrecoverable under any theory.  These circumstances warrant the denial of Plaintiff's request in

18  its entirety.

19    Based on the foregoing reasons and authorities, Defendants respectfully request that

20  Plaintiff's Motions for Attorney Fees and Costs be denied.

21

22  Dated: October 21, 2016                    TEEPLE HALL, LLP

23

24                                      By:

25                                          Grant G. Teeple, Esq.
                                            Gregory M. Garrison, Esq.
26                                          Frederick M. Reich, Esq.
                                            Attorneys for Defendants Stephen
27                                          O'Hara, Career Solutions and Candidate
                                            Acquisitions, and Pacific Valley Realty,
28                                          Inc.

*Teeple Hall, LLP*

10

Martinez v. O'Hara, et al.                              Case No. 30-2012-00614932-CU-FR-CJC
Defendants' Opposition to Plaintiff's Motion for Attorney Fees and Costs

# EXHIBIT 12

OFFICES OF

**PAVONE &** **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ., SBN 181826**
**WILLIAM MOND, ESQ., SBN 299865**
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## ORANGE COUNTY SUPERIOR COURT

| | |
|---|---|
| FERNANDO MARTINEZ, <br><br> PLAINTIFF, <br><br> v. <br><br> STEPHEN STRATTON O'HARA aka STEPHEN JOHN O'HARA; <br><br> CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS; <br><br> O'HARA FAMILY TRUST; <br><br> OCRE, INC.; <br><br> PROFESSIONAL REALTY COUNCIL, INC; <br><br> PACIFIC VALLEY REALTY, INC.; <br><br> and DOES 4-10, | CASE NO.: 30-2012-614932-CU-FR-CJC <br><br> **MARTINEZ'S REPLY BRIEF ON MOTION FOR ATTORNEY'S FEES & COSTS** <br><br> **DATE:**  November 4, 2016 <br> **TIME:**  8:30 am <br> **DEPT:**  32 <br> **JUDGE:**  Hon. Carmen Luege |

# TABLE OF CONTENTS

I.     THE COURT MAY AWARD FEES BASED ON RECOVERY OF WAGES AND WAIT TIME PENALTIES.................................................4

II.    THE COURT SHOULD AWARD FEES BECAUSE MARTINEZ COULD NOT HAVE FILED IN LIMITED CIVIL AND THE REQUEST IS REASONABLE. ............................................5

    A.    Introduction.................................................................5

    B.    Injunctive Relief Was Legitimately Sought and Obtained by Capitulation. Therefore, the Action Could Not Have Been Filed as a Limited Civil Action. ..................................6

    C.    The Fee Request Is Reasonable Given the Net Outcome of the Case. .......................7

    D.    O'Hara's Billing Objection is Deeply Flawed. ............................8

III.   THE COSTS INCURRED TO PROSECUTE THE CASE WERE STANDARD FOR A CASE TRAVERSING THE LENGTH OF THE CIVIL JUSTICE SYSTEM.. ............................................10

PAVONE & FONNER, LLP

# TABLE OF AUTHORITIES

## Cases

*Chavez v. Los Angeles*
(2010) 47 Cal.4th 970 ........................................................................... 5-7

*Christiansburg Garment v. EEOC*
(1978) 434 U.S. 412 ................................................................................5

*Ketchum v. Moses*
(2001) 24 Cal.4th 1122 ...........................................................................5

*Ling v. P.F. Chang's*
(2016) 245 Cal.App.4th 1242 ..............................................................4, 10

*Robinson Helicopter v. Dana*
(2004) 34 Cal.4th 979 .............................................................................6

*Serrano v. Unruh*
(1982) 32 Cal.3d 621 ..............................................................................5

*Williams v. Chino Valley*
(2015) 61 Cal.4th 97 ........................................................................5, 8, 10

## Statutes & Other Authorities

Bus. & Prof. Code

       section 17001 ...................................................................................6

Code Civ. Proc.

       section 86 ........................................................................................6

       section 1032 ..................................................................................10

       section 1033.5 ...............................................................................10

Labor Code

       section 203 ......................................................................................4

       section 218.5 ...................................................................................4

**INTRODUCTION**

Mr. O'Hara contends that fees should be denied because this case could have been brought as a limited civil action and the fee request is exaggerated.  It could not have been brought in limited civil in light of the injunctive causes.  The effort was reasonable.  The time spent was reduced by 2/3, down to a sum that reflects the necessary hours, fronted, and advancement of costs, also fronted, to prosecute a case for almost four years to verdict.

**I.**

**THE COURT MAY AWARD FEES BASED ON RECOVERY OF WAGES AND WAIT TIME PENALTIES.**

Mr. O'Hara argues that his capitulation at trial to pay the $1,500 in outstanding wait time penalties may not support an award of attorney's fees, by citing *Ling v. P.F. Chang's* (2016) 245 Cal.App.4th 1242. (Opp., p. 3:1.)  There, an arbitrator awarded an employee about $1,000 for missed meal periods and about $7,600 in associated wait time penalties.  After bouncing back and forth between the arbitrator and the courts, the Sixth District held that Ms. Ling could not recover her attorney's fees based on these awards. (*Id*., at 1261.)

Mr. O'Hara says that *Ling's* reasoning is founded on the premise that wait time penalties are not wages within the meaning of section 203.  *Ling* does not stand for this proposition.  Rather, it held that Ms. Ling's claim for missed meal breaks did not constitute wages, and a request for attorney's fees must be based on non-payment of wages under 218.5.  "Because a section 203 claim is purely derivative of an action for the wages from which the penalties arise, it cannot be the basis of a fee award when the underlying claim is not an action for wages." (*Id*. at 1261.)

Here, in contrast, the underlying claim was for non-payment of Martinez's wages and the $1,500 penalty derived from O'Hara's failure to timely pay those wages.  The language of section 203 answers O'Hara's contention: if an employer fails to pay wages, "the wages of the employee shall continue as a penalty."  Thus, the code considers the penalty to be continuing wages.  *Ling* does not suggest otherwise.  The code allows for attorney's fees in this case because wait time penalties are technically wages under the code.

PAVONE & FONNER, LLP

## II.

## THE COURT SHOULD AWARD FEES BECAUSE MARTINEZ COULD NOT HAVE FILED IN LIMITED CIVIL AND THE REQUEST IS REASONABLE.

### A.    Introduction

The primary point in O'Hara's opposition brief is that a trial court has essentially unfettered discretion to grant or deny a motion for attorney's fees in a FEHA case, and he urges the Court to deny fees by invoking that discretion. (Opp., p. 2.)  But this is a general statutory rule.  The California Supreme Court has delineated a more exact analysis by directing trial courts to presumptively pay such claims in cases where the plaintiff prevails, except for certain situations that constitute "special circumstances." (*Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 984; *Williams v. Chino Valley* (2015) 61 Cal.4th 97, 100; *Christiansburg Garment v. EEOC* (1978) 434 U.S. 412, 418.)

The main circumstance under this exception is where the Plaintiff obtains an award below the $25K unlimited civil minimum and could have otherwise filed the case as a limited civil action. (*Chavez*, 988.)  *Chavez's* reasoning is driven by a belief that the Plaintiff should have taken advantage of the streamlined procedures and thus litigated more efficiently. (*Ibid*.) The damage figures in this case fit this exception, except for the fact that Martinez was required to pursue the case in unlimited civil given the injunctive causes of action.  Therefore, there was no *Chavez* efficiency to be had.

The other documented basis to find special circumstances is where the plaintiff exaggerates the fee request, as Robert Chavez did by asking for over $870,000 in fees against an $11,000 award. (*Chavez*, at 990, citing *Serrano v. Unruh* (1982) 32 Cal.3d 621, 635 and *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1137.)

O'Hara does not establish that this latter basis applies.  He deploys an arsenal of epithets at Martinez's effort, variously calling it "overblown," "fruitless," "unsuccessful," "unreasonably inflated," and "glaringly inflated." (Opp., pp. 1:11, 5:24, 5:26, 9:26, 5:3.)  However, an examination of the net outcome and the actual fee request does not support his position. Martinez's injunctive claims were legitimate causes to pursue and the fee request is otherwise reasonable.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

**B.      Injunctive Relief Was Legitimately Sought and Obtained by Capitulation. Therefore, the Action Could Not Have Been Filed as a Limited Civil Action.**

By his own testimony, O'Hara issued thousands of solicitations to job seekers – ones that irrefutably contained false advertising – and he planned to employ CSCA's controversial business methods nationally. (Reply Dec., ¶ 2 [Exhibits 2-3].)   None of this will happen now. According to O'Hara's commitment to this Court, the website has been dismantled. (Reply Dec., ¶ 1 [Exhibit 1, ¶ 8].)  Many people will therefore be spared CSCA's illusory business training program. (Reply Dec., ¶ 1.)  Thus, as against O'Hara's contention that Martinez's effort was fruitless, it was only after years of hard-fought litigation that O'Hara actually capitulated to stop the national mass advertising campaign he envisioned and initiated for CSCA. (Reply Dec., ¶ 1 [Exhibit 1].)

Martinez is not strictly seeking compensation for the time spent stopping O'Hara given this Court's decision not to issue a formal injunctive order, but asks that the inclusion of injunctive causes of action be considered in response to Mr. O'Hara's assertions that the overall effort was fruitless.  Eliminating fraud and misrepresentation in the marketplace (here, taking the form of false advertising) is a public policy of the State of California. (*See Robinson Helicopter v. Dana* (2004) 34 Cal.4th 979, 984 [policy of deterring intentional fraud in the California economy merited both tort and contract remedies]; *see* Bus. & Prof. Code, § 17001.)

Consequently, Martinez's legitimate pursuit of injunctive relief (even though ultimately obtained by capitulation rather than decree) precluded the case from being litigated as a limited civil action. (Code Civ. Proc., § 86, subds. (a)(7), (a)(8).)  Mr. O'Hara ignores these citations and also ignores the fact that if those causes of action had not been brought, CSCA would be operational today.

With the benefit of several years of legal effort, perhaps O'Hara's CSCA business can now be understood as a fledgling enterprise (and maybe part fantasy), but the website did not present this way.  It came across as a vibrant, sophisticated, brick-and-mortar enterprise, albeit with a list of dubious advertising claims.  Additionally, the man behind it, O'Hara, had been involved in a number of published books about real estate.  He could not be dismissed as a dreamer.  He was a licensed real estate broker.  It was entirely unclear at the time of filing how

big or small the CSCA operation actually was, such that Martinez could have known to rule out the need for injunctive relief at the inception of the case. Consequently, Martinez followed through by obtaining it and the world is a slightly better place now that CSCA is gone.

*Chavez* observes: "Section 1033(a)'s purpose is to encourage plaintiffs to bring their actions as limited civil actions whenever it is reasonably practicable to do so." (*Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 988.) It was not only not reasonably practicable for Martinez to file this case as a limited civil action, it was improper for him to do so given the pursuit of injunctive relief. The limited civil exception from *Chavez* is therefore not applicable to this type of action.

## C.    The Fee Request Is Reasonable Given the Net Outcome of the Case.

On the other exception, O'Hara basically argues that the case was unsuccessful, and from this premise, contends that the time was inflated. He compares the facts to *Chavez*, but the differences are stark: Robert Chavez could have permissibly brought his case in limited civil. Mr. Chavez also sought $870,000 in attorney's fees, after winning an $11,000 verdict. O'Hara insists that the two situations are similar, without acknowledging that the fee request in this case is $700,000 less than what the *Chavez* plaintiff sought.

Mr. O'Hara has no actual basis to say that Martinez could have litigated this case through the OC civil justice system for less than the roughly $150,000 he seeks. (Indeed, the actual overall effort was 3x times this and so the hours were cut by 2/3.) This is especially so in light of O'Hara's strategy to nitpick every aspect of the complaint. (*See* Dkt. 14-20, 59-67, 164-173.) For example, one of O'Hara's innumerable pleading grievances was that Martinez's exhaustion of administrative remedies did not name two of the entities. (*See* Dkt. 165:6:13.) Ultimately however, O'Hara stipulated that all of the involved entities were alter egos of himself.

O'Hara cites no authority to support his position that a fee request lower than $200,000 for a door-to-door civil legal effort is excessive. Martinez has canvassed the published and unpublished case law and has found no case holding as such.

Mr. O'Hara also diminishes the $8,080 recovery (ignoring another $2,250 that the legal effort inspired him to pay) and while $8,000 is of little financial consequence to Mr. O'Hara,

PAVONE & FONNER, LLP

$8,000 is a large sum of money to this plaintiff, Fernando Martinez.  Martinez is the definition of a plaintiff of "limited means" for which the fee shifting rules were enacted. (*Williams v. Chino Valley,* 61 Cal.4th 97, 101.)  This is apparent by virtue of the fact that Martinez was relegated to begging O'Hara for his last paycheck, a mere $750, yet O'Hara could not see fit to pay him even that much. (Pavone Reply Dec., ¶ 3 [Exhibit 4].)  Instead, O'Hara decided that he would pay Martinez only $525, if and only if Martinez relinquished all of his other rights. (Pavone Reply Dec., ¶ 3 [Exhibit 4].)

So again, while $8,000 is obviously a modest recovery, perhaps a better question in this particular case is whether Mr. O'Hara would be as cavalier about this figure if it was the difference *for him* between keeping and losing his housing and keeping and losing his vehicle, consequences Martinez did in fact suffer.  For Fernando Martinez, $8,000 covers about six months of living expenses, while he tries to elevate himself out of poverty.[1]

In any event, a fee request under $150,000 to litigate a cause of action against a resistant defendant, from pre-filing investigation, administrative exhaustion, pleading challenges, discovery and depositions, conferences and case management, trial fits and starts, through jury selection to verdict – start to finish, door-to-door, lasting for four years – should not be interpreted as excessive.

### D.    O'Hara's Billing Objection is Deeply Flawed.

Mr. O'Hara claims the billing entries are excessive.  He offers a colored chart purporting to identify those entries that are wholly or partly compensable for the FEHA claim.

His methodology is deeply flawed.

First and foremost, all entries were cut by 2/3.  O'Hara ignores numerous tasks necessary to competently prosecute any lawsuit, simply because they do not specifically refer to the FEHA

---

[1] O'Hara also characterizes the evidence of damages as sparse (Opp. pp. 5:26-6:2), but he declines to comment on the fact that there was actual sex that was found by the jury to be illegal.  Such conduct is by definition tortious.  While the jury did not compensate Martinez because it also implicitly found the sex acts were consensual, a responsible plaintiff attorney cannot assume that outcome at the outset.  Counsel was required as a matter of professional responsibility to preserve his client's chance at a damage recovery that provided compensation for illegal sexual acts.  Again, it is easy to be a critic with the benefit of hindsight.

PAVONE & FONNER, LLP

claim. (*See, e.g.*, Defense Bill Objection, Entries 1 [general investigation], 3 [collection research], 21, 52, 77, 80, 84-87, 89-90, 94, 106, 112, 116, 129 [discovery], 34 [client management], 35 [FEHA administrative compliance], 49, 55, 152 [contact with Court/req't filings], 68 [legal research]; 118-120 [general motion work].)

He divides the time entries he gives partial credit for (in yellow) by *eight*, even though early on in the case (as of the First Amended Complaint in February, 2013), there were consistently five causes of action, two of which were essentially identical. (*See* Dkt. 51, 152, 237.) [2] He characterizes virtually every request requiring a chunk of time – including court appearances where counsel had to drive to Orange County, crucial trial preparation study days, and even the time spent in trial – as excessive. (*See, e.g.*, Entries 64, 278-280, 284-286, 289, 291-292, 294.) O'Hara claims that editing and finalization of a series of written discovery requests, billed at just 2.0 hours, is excessive. (*See, e.g.*, Entry 25.) He claims that 12.3 hours of preparation in anticipation of Mr. O'Hara's deposition – the most important depo in the case – is excessive. (*See* Entry 133.) He inexplicably characterizes as excessive the actual time your undersigned spent on the detailed moving papers before the Court, a mere 12.7 hours finishing the draft work prepared by an associate. (*See* Entries 313-315.) Basically, Mr. O'Hara's position is that Martinez's counsel should have committed legal malpractice by spending so little time that substandard pleadings would be filed and counsel would be unprepared throughout.

For a case that lasted four years and required hundreds of hours of work to prepare and win at trial, he only considers 7.8 hours as directly "related" (in green) to the FEHA claim. (*See* Bill Objection, p. 19.) O'Hara does not even consider the closing argument at trial – which was exclusively dedicated to the FEHA cause of action – to be related to prosecution of the FEHA claim. (*See* Entries 291-292, 294.) These positions are positively absurd.

---

[2] Only three of the five amended complaints were actually filed. (Dkt. 51 (1st), 152 (4th), 237 (5th).) Each of them, and in fact all the amended complaints, list the same five causes of action, with a sixth item being a request for alter ego findings. If the sixth item is considered a cause of action, it is one that was both successful and closely tied to the FEHA claim in terms of protecting the ability to collect. The two identical claims were of course the 17200 and 17500 causes.

PAVONE & FONNER, LLP

In short, the defense billing objection lacks credibility.  Instead, Martinez's request for 1/3 of the overall time spent, $150K basically, is a fair and reasonable reduction and apportionment for a case that was required to be filed in civil unlimited, resulted as a practical matter in termination of the offending conduct, required trial by jury, and returned $10,000 in payments and damages for a poverty-stricken plaintiff.

For these reasons, Martinez respectfully requests the Court to grant the motion.

### III.
### THE COSTS INCURRED TO PROSECUTE THE CASE WERE STANDARD FOR A CASE TRAVERSING THE LENGTH OF THE CIVIL JUSTICE SYSTEM.

Mr. O'Hara claims that Martinez's $16,000 cost bill is excessive. (Opp. 9:25.)  On the contrary, it is an extraordinarily ordinary figure for these kinds of cases. (*Williams v. Chino Valley*, 61 Cal.4th 97, 112-113.)

O'Hara argues that Martinez failed to apportion his costs in line with the prevailing FEHA cause of action. (Opp., 9:17.)  He misstates the law.  Unlike attorney's fees, costs are not subject to apportionment.  Rather, the prevailing party for purposes of costs is the party that obtains the net monetary recovery. (Code Civ. Proc., § 1032, subd. (a)(4); *Ling v. P.F. Chang's*, 245 Cal.App.4th 1242, 1253-1254.)  Martinez is by definition the prevailing party in this respect. (Code Civ. Proc., § 1032, subd. (a)(4); Pavone Dec., ¶ 1, Ex. 1 [special verdict].)  As such, he is entitled as a matter of right to recover all costs "reasonably necessary to the conduct of the litigation" and "reasonable in amount." (Code Civ. Proc., § 1032, subd. (b); *Williams v. Chino Valley* (2015) 61 Cal.4th 97, 100.)  These include filing fees, deposition costs, jury fees, and service expenses. (Code Civ. Proc., § 1032, subd. (b); *see* Code Civ. Proc., § 1033.5, subds. (a)(1)-(a)(4).)

O'Hara does not itemize any specific filing expenses that were not reasonably incurred. He claims he cannot tell what some filing costs were for, though he could have matched up the dates with the docket to determine the nature of any filing.  Or he could have reviewed the docket to identify any unwarranted legal work in light of what Plaintiff knew at the time of filing.   Filing fees, depositions and service of process are necessary to prosecute any case. $16,000 in costs, including the expenses associated with a trial, reflects a garden variety legal

PAVONE & FONNER, LLP

effort.  O'Hara's argument is primarily limited to arguing that costs were not incurred in direct support of the FEHA cause of action.  But that is not the law.

In a few situations, he claims the cost is not a recoverable item under the code.  O'Hara challenges service of process and other costs. (Opp. 2:11, 3:4.)   Copying and mailing are obviously necessary to properly serve a court filing.  Martinez is unaware of how he could logistically try a case in Orange County without securing overnight lodging for the exercise.

In summary, Martinez asks the Court to award the figures requested in the moving papers: $144,934 in fees and $16,011.84 in costs, plus 12 hours for the reply brief and 4 hours for another trip to Orange County, for a total request of $167,265.84.


Respectfully:


Date: October 28, 2016                          PAVONE & FONNER, LLP


                                                Benjamin Pavone, Esq.

                                                William Mond, Esq.
                                                Attorneys for Plaintiffs



OFFICES OF

# PAVONE & FONNER

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ., SBN 181826**
**KIMBERLEY FONNER, ESQ., SBN 191208**
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR PLAINTIFF
<u>FERNANDO MARTINEZ</u>

## STATE OF CALIFORNIA, COUNTY OF ORANGE

## ORANGE COUNTY SUPERIOR COURT

FERNANDO MARTINEZ,

v.

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA, et al.

CASE NO. 30-2012-614932

**PROOF OF SERVICE**

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108.  On October 28, 2016, I served the following:

     *     Reply Brief and Declaration

Grant Teeple, Esq.
Frederick Reich, Esq.
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121               (Electronic Service)

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 28th day of October, 2016 that the foregoing is true and correct.





BENJAMIN PAVONE, ESQ.

# EXHIBIT 13

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/30/2016          TIME: 11:15:00 AM          DEPT:  C61

COMMISSIONER: Carmen Luege
CLERK:  Ryan Castillo
REPORTER/ERM:
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2012-00614932-CU-FR-CXC**  CASE INIT.DATE: 11/28/2012
CASE TITLE: **Martinez vs. O'Hara**
CASE CATEGORY: Civil - Unlimited          CASE TYPE: Fraud

EVENT ID/DOCUMENT ID: 72490569
**EVENT TYPE**: Under Submission Ruling

---

**APPEARANCES**

---

There are no appearances by any party.

The Court, having taken the above-entitled matter under submission on 11/10/2016 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

Plaintiff seeks to recover over $160,000 in attorneys' fees based on his FEHA claim, pursuant to Government Code Section 12965(b), and his nonpayment of wages claim, pursuant to Labor Code Section 281.5. In addition, plaintiff seeks costs in the total sum of $15,966.94.

**Procedural History**

Plaintiff filed the complaint in this case on November 28, 2012. Plaintiff amended his complaint five times. In his fifth Amended Complaint, plaintiff, for the first time, sought class certification on his false advertising claim. The case was declared complex. Eventually, the court denied plaintiff's class certification request, at least in part, because plaintiff had not shown that there were multiple victims of the alleged false advertising. Plaintiff appealed the court's ruling, but the court of appeal affirmed the trial court's decision to deny class certification. At that point, the complex designation was removed from the case.

In March of 2016, the case finally proceeded to jury trial before this court. At that point there were two remaining causes of action, fraud and sexual harassment. After defendant testified that he did not rely on defendant's allegedly false representations, this court granted defendant's motion for non-suit on the fraud cause of action. The sexual harassment cause of action went to the jury and the jury awarded plaintiff damages in the sum of $8,080, $1,080 in economic damages and $7,000 in noneconomic

---

CASE TITLE: Martinez vs. O'Hara                              CASE NO: **30-2012-00614932-CU-FR-CXC**

---

damages. Thereafter, this court denied plaintiff's request for injunctive relief.

## Court Denies Attorney's Fees Pursuant to Labor Code Section 281.5

Labor Code Section 281.5 provides that the prevailing party in "any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions" shall be awarded reasonable attorney's fees and cost. It is undisputed that long before this case came before this court for trial, defendant had paid plaintiff all his wages. Thus, the issue of wages was not before the court when the case proceeded to trial and plaintiff cannot be considered the prevailing party on the wages claim.

The only issue that remained related to the wages claim was a waiting time penalty claim in the sum of $1,300. Before the commencement of the trial, the parties represented that days earlier, defendant paid plaintiff an additional $1,300 to resolve the issue of waiting time penalties and thereby eliminate the issue from trial. Under Labor Code Section 203, waiting time penalties are not wages. *See Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal. App. 4th 1242, 1261. Accordingly, defendant's decision to pay the waiting time penalties does not make plaintiff a prevailing party pursuant to Section 281.5.

## Court Denies Attorney's Fees Based on the FEHA Claim

The award of attorney's fees in a FEHA is discretionary. Govt. Code Section 12965(b). Having spent time reviewing the complete record in this case, including the class certification portion of the litigation, the court finds that plaintiff over litigated this case. The factual similarities between the instant matter and the facts in the California Supreme Court decision *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, are striking. In *Chavez,* the plaintiff filed an action alleging several FEHA claims. Following a five-day trial, the jury awarded Chavez $1,500 in economic damages and $10,000 in noneconomic damages. Chavez then sought attorney's fees in excess of $400,000 which he subsequently amended to approximately $870,000. In *Chavez* the Supreme Court concluded that "in light of plaintiff's minimal success and grossly inflated attorney's fee request, the trial court did not abuse its discretion in denying attorney fees." *Id.* at 976. In reaching this decision, the court noted that Chavez's success on a single FEHA claim did not have "any broad public impact or resulted in significant benefit to anyone other than himself." *Id.* at 990.

Here, the jury awarded plaintiff Martinez $1,080 in economic damages and $7,000 in noneconomic damages. Plaintiff Martinez's request for attorney's fees is based on a calculation of approximately $414,407 in fees and plaintiff is asking the court to award more than one third of that sum. The court, however, finds the figure of $414,407 very unreliable. Plaintiff's counsel admitted during the hearing that he had not maintained contemporaneous billable hours and that he based the legal fee calculation on a reconstruction of the amount of hours plaintiff's counsel believes he spent working on the case. Although block billing is not invalid per se, its use may undercut the credibility of the fee application. *Christian Research Institute v. Alnor* (2008) 165 Cal. App. 4th 1325, 1329. In this particular case, the reconstructed time sheets plaintiff submitted show that on one specific day counsel billed 25 hours of work performed. On multiple days counsel billed in excess of 15 hours of work performed per day. These entries raise serious questions about the accuracy of counsel's alleged reconstruction of the time he spent working on this case. Taking into consideration the unreliability of the figures provided with the nominal damages the jury awarded, asking the court for more than $160,000 in legal fees, seems as excessive as the legal fees plaintiff requested in the *Chavez* case. *See also Serrano v. Unruh* (1982) 32 Cal.3d 621 ("a fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether"). Moreover, like in *Chavez,* this is not a claim that had a broad public impact or resulted in significant benefit to anyone other than plaintiff Martinez, further

---

CASE TITLE: Martinez vs. O'Hara                    CASE NO: **30-2012-00614932-CU-FR-CXC**

justifying the court's decision to deny plaintiff attorney's fees.

In addition, the court notes that plaintiff in this case was spectacularly unsuccessful. The court's records make clear that plaintiff engaged in fruitless litigation, with many adverse court rulings that underscored the weaknesses in plaintiff's case. Most of the litigation had nothing to do with the FEHA claim which probably explains why the evidence plaintiff presented at trial in support of the FEHA claim was so sparse. Most of the entries in counsel's time sheet have nothing to do with this one FEHA claim. A large portion of the entries relate to the false advertising claim and the unsuccessful efforts to obtain class certification.

The weakest evidence plaintiff presented at trial was on the issue of damages. The wrongful conduct at issue occurred over a matter of weeks, which made proving significant economic damages almost impossible. At trial, counsel asked the jury to return damages in excess of $500,000, yet failed to present evidence in support of such outlandish figure. Like in *Chavez*, plaintiff's counsel in this case should have determined long before trial that realistically the case was worth no more than $25,000 and should have pursued the case as a civil limited matter.

Following *Chavez*, the court denies plaintiff's request for attorney's fees.

**Plaintiff's Costs Requests Are also Unreasonably Inflated**

Filing and Motion Fees

The court finds that plaintiff's memorandum of costs seeks to recover filing and motion costs which are not supported by the record. The court carefully reviewed plaintiff's documentation submitted to support plaintiff's claim of $5,633.63 in motion costs. The court found that plaintiff seeks recovery of a "filing fee –appeal" in the sum of $775 on 6/30/2013. The court has searched the records in this case and there is no payment receipt generated by the court to show that plaintiff paid $775 on 6/30/13. Plaintiff seeks recovery of a filing fee in the sum of $875 on 9/11/14. The court found a payment receipt that supports this amount, which shows $775 paid for the appeal and $100 for the transcript on appeal. From these entries, the court infers that plaintiff sought double recovery of the $775 appeal fee. Plaintiff also seeks recovery of $103 as a filing fee paid on 11/4/2013. The court's receipt shows that on 11/4/2013, plaintiff paid $90, not $103 as plaintiff claims. The court also notes that on 11/4/2013 plaintiff claims an additional fee in the sum of $103.91, paid to One Legal; thus plaintiff is double billing the $103 figure. For filing fees and motion fees, the court is disallowing the following charges: the $775 allegedly paid on 6/30/13 for which there is no court receipt on record; the $875 paid for the unsuccessful class action certification appeal; the $1009.95 complex fee; the $206.91 fees paid on 11/4/2013 which represent double billing $103 filing fee. The total figure for disallowed cost is $2,866.86. Thus, the court finds that only $2,766.77 is recoverable under this category.

Jury Fees

Based on court receipts, the jury fees paid to the court is a total of $898.28, not the $936.26 that plaintiff claims in the memorandum of costs.

Service of Process

---

DATE: 11/30/2016                    MINUTE ORDER                    Page 3
DEPT: C61                                                           Calendar No.

CASE TITLE: Martinez vs. O'Hara          CASE NO: **30-2012-00614932-CU-FR-CXC**

Plaintiff claims $2,792.13 for service of process. On its face the figure appears excessive. Plaintiff did not produce any supporting documents to justify this figure. Given the fact that plaintiff's counsel has shown a tendency to overstate or inflate costs and attorney's fees, the court denies recovery of this sum in its entirety.

Other $3,155.09

Plaintiff seeks recovery of general travel expenses, hotel accommodations and parking fees. None of these items are recoverable costs and therefore the court denies recovery of these expenses.

For all the foregoing reasons, the court allows recovery of the following costs:

| | |
|---|---|
| Filing and motion fees | $2,766.77 |
| Jury fees | $898.28 |
| Deposition costs | $2,614.70 |
| Court ordered transcripts | $207.50 |
| Models, blowup, exhibits | $427.68 |
| Court reporter fees | $130 |
| **TOTAL COSTS:** | **$7,044.93** |

Accordingly, the court orders defendant to pay plaintiff costs in the sum of $7,044.93. For the reasons stated in this order, the court denies in its entirety plaintiff's request for attorney's fees.

Court orders Clerk to give notice.

# EXHIBIT 14



     Apply Now  |  Find Us

**YOUR CAREER. LETS GET IT STARTED.**

**CSCA®** is one of the best places to launch your career. If you share our 'DNA' we know you will like what everyone is talking about.



Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



    Apply Now  |  Find Us

Our Company

Home

Our Company

   Our History

   Where We're Going

   In The News

   Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### From the Desk of our Founder and CEO



**Thank you for visiting CSCA®. You are about to discover a Talent Acquisition Company that offers you a career like no other.**

At CSCA®, all talents apply. We're people who love technology and people who love people. We're also business people, musicians, photographers, mountain climbers, students, and artists whose interests can't be defined by a job description. Whether you're analytical or creative, tech savvy or insightful, there's a place in our Brokerages to share your talents while you learn, develop, and inspire.

I encourage you to tell us about yourself. Join us. Show your passion and expertise as you connect customers with our services and help integrate our services into their lives. Be a part of our team and change the way our customers work, play, create, and live. Our network of fine Brokerages sell a lot more than houses, they sell Lifestyles!

I challenge you to be part of something amazing. CSCA® hand selects the very best Brokerages across the nation (Independent and Franchised) on the basis that they have met our stringent standards, embrace our culture and are looking to the future. In fact, the elite Brokerages who are members of our network are not only the most innovative real estate Brokerages in the world; they represent the best brands and are among the fastest growing. On behalf of our Brokerages, CSCA® is always looking for smart, engaging, supportive, and dynamic people who have a passion for people and serving them as you would want to be served yourself.

We join our Brokerages in sharing the common goal of exceeding the expectations of our customers. That's where YOU come in. We can't do it without the right talent. Consumers can go anywhere for their Financial Services needs; in this case real estate and take their chances or they can enjoy the experience with one of our team members and buy and sell with confidence. That's the CSCA® difference.

Successfully and Warmly,



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                                    Client Access    Terms of Use    Privacy Policy

**2**



       Apply Now  |  Find Us

Awards & Recognition

Home

Our Company

Our History

Where We're Going

In The News

Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### Make it yours …

A LITTLE RECOGNITION **GOES A LONG WAY.** **A lot of recognition goes even further. Our Brokerages and their Team have received recognition and accolades for every aspect of real estate business. Whether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation.**





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**12**



      Apply Now  |  Find Us

Career Path

Home

Our Company

Our Culture

Opportunities

   Training Program

   What You'll Learn

   Career Path

   Rewarding Success

   Day In The Life

   Internships

   Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's only one way to GO. Anywhere.

There are many opportunities in real estate. We give you the flexibility to find your passion. And, then, follow that path. Where virtually everyone begins is as a trainee, where you GO is really up to you. Real estate has many faces. Residential, Commercial, Property Management, Business Opportunities, Mortgage Financing and the list goes on and on.

It's like changing careers without changing companies. It all depends on how far you want to GO.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**25**



     Apply Now   |   Find Us

Rewarding Success

Home

Our Company

Our Culture

Opportunities

    Training Program

    What You'll Learn

    Career Path

    Rewarding Success

    Day In The Life

    Internships

    Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

GREAT PERFORMANCE = **GREAT REWARDS**

As part of our team, you'll be compensated based on your performance. By making your Brokerage fun, and working well with your team, you'll be able to directly influence all areas of your success. You can build on our entrepreneurial model and earn an income that has no ceiling. It's only limited by your innovation, desire and skills. How much can you earn? If you perform, that's up to you.

### Managers

All team members, receive a percentage of the profits generated by their own success. As a manager, you'll earn a highly competitive income that is dependent upon the success of the business you're running. If your business does better, so do you. If you have a true entrepreneurial spirit, there's no limit to what you can earn. How high can you **GO?**





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |  Find Us

Internships

Home
Our Company
Our Culture
Opportunities
    Training Program
    What You'll Learn
    Career Path
    Rewarding Success
    Day In The Life
    Internships
    Seasoned Professional
Benefits
Job Prep
Guarantee

Find Us

### There's Only One Internship Program Like This.

That's because there's only one CSCA®. Every year we turn internships into real, substantial career-building tools. And no, you won't spend your time fetching cups of coffee or making coffee. You'll learn what it takes to run a successful business because that's what you'll help do.

Along the way, you'll also participate in contests and competitions with other interns, building relationships, honing your entrepreneurial skills and gaining experience. You'll take on the same challenges as our first and second year full-time professionals. Even better, at the end of your internship, you'll make a presentation to your management team covering the business topics you learned throughout the program. **Want to GO?**



### You Put The GO In GO-Getter.

As part of our Internship Program, you must be ambitious, creative, personable, resourceful, fun loving and hard working. As you'd imagine, everyone else in the program is just as motivated as you. If you're ready, the business training you'll receive will put your skills, your attitude and your resume way out in front.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



       Apply Now  |  Find Us

Seasoned Professional

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

Find Us

## There's More Than One Way To Join One Of Our Fine Brokerages Through CSCA®.



Perhaps you are a seasoned real estate professional. By all means, YES! We'd enjoy talking to you about your career. In fact, we have many folks who 'informally' learned a lot about real estate, but their business hit a plateau. This is common. Once they have sold their family and friends, they have exhausted their Sphere-of-Influence (SOI).

You'll learn how our Proprietary System will help you increase your sphere, thereby increasing your opportunities for new business. In fact, doubling or tripling the business you are doing now can be easy if you follow our Sphere-of-Influence Building System™. Taking your business to the next level is exactly what our System is about.

We also hire for numerous positions (Sales Management, Relocation, etc.) that are integral to helping us better serve our customers.

### And, more

We also hire for a variety of administrative positions including full and part-time opportunities. Simply send us your resume and let us know how we can help you. There is always something moving in real estate.

NOTE: The CSCA® Guarantee applies to entry level opportunities only. Be sure to ask your CSCA® Talent Acquisition Director for more information.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates

CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access     Terms of Use     Privacy Policy



       Apply Now   |   Find Us

Benefits

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

## WE COVER TODAY AND TOMORROW

Our Brokerages offer you a career-home where you can build your future. And this means more than just a career. Through our various Associations, we offer many benefits packages designed to give you peace of mind today and is flexible enough to grow with you. Just think of it as your foundation for building something truly impressive. As you'd expect, our benefits help you GO much farther.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



Guarantee

       Apply Now  |   Find Us

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### 'If CSCA® doesn't help you find a job, we'll help pay your bills.'™

We're so confident that (if you have the right skill-set to launch your career with one of our entry level positions, be willing to relocate and we have a brokerage in your market) CSCA® will guarantee that you will find employment with one of our Brokerages within six months of graduation, or, we'll help pay your bills for the next six months. Simple as that. Ask our Talent Acquisition Manager for more details. A written agreement is required.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**37**



       Apply Now  |   Find Us

Apply now

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

Find Us

### Are you on the GO?

With 90% of the U.S. population located within 15 miles of one of our Brokerages, there's a CSCA® Career Consultant waiting to talk to you.

If you have been surfing our site, you have already learned about some of the opportunities at one of our Brokerages. In just a minute, you'll be able to apply for a position online.

Our Brokerages have built a thriving business based on offering exceptional service to their customers and a dynamic and rewarding work environment to their employees.

Interested in a career with one of our fine Brokerages? You'll only need to SUBMIT ONE Application based on where you live and/or plan to work. Applying to more than one position or to multiple locations will slow the process down. Our Career Counselors will work with you to find the position and location that is a perfect fit for your skill set. Thank you for allowing us to respond to your application in a timely fashion!

Thank you for letting CSCA® help you plan your career path!

### OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):


SELECT APPROPRIATE FIELD
(Select Up to Five Choices)




- Who Are You?
- Support For Veterans
- Why CSCA?
- Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**38**



      Apply Now  |  Find Us

Find Us

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

**CSCA®**
Career Solutions and Candidate Acquisition
4533 MacArthur Blvd., Suite 100
Newport Beach, CA 92660-2059
USA Toll Free: 1-866-254-7600
Local: 949-644-7600
www.csca.com
CONTACT US





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                    Client Access   Terms of Use   Privacy Policy

**47**

# EXHIBIT 15

ELECTRONICALLY RECEIVED
Superior Court of California,
County of Orange
01/30/2017 at 08:50:00 AM
Clerk of the Superior Court
By Enrique Velez,Deputy Clerk

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

FEB 21 2017

DAVID H. YAMASAKI, Clerk of the Court

BY:_____DEPUTY

# STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

# ORANGE COUNTY SUPERIOR COURT

FERNANDO MARTINEZ,

    PLAINTIFF,

v.

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA;
CAREER SOLUTIONS AND
CANDIDATE ACQUISITIONS;
O'HARA FAMILY TRUST;
OCRE, INC.;
PROFESSIONAL REALTY
COUNCIL, INC;
PACIFIC VALLEY REALTY, INC.;
and DOES 4-10,

    DEFENDANTS.

CASE NO.: 30-2012-614932-CU-FR-CJC

**JUDGMENT**

Judge Geoffrey T. Glass

PAVONE & FONNER

This case was filed on November 28, 2012 by Plaintiff Fernando Martinez who

claimed that Defendant Stephen O'Hara committed several torts and other wrongs.

Mr. O'Hara paid $975 toward a labor claim and then $1,300 shortly before trial.

Prior to trial, Martinez and Defendants stipulated that O'Hara's companies

would be co-extensively liable with his liability.

1    The jury returned a verdict on a sexual harassment claim in favor of Martinez in

2    the amount of $8,080.

3    After trial, Martinez moved for attorney's fees and costs. The Court denied

4    fees and awarded $7,044.93 in costs.

5    Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that

6    Plaintiff Fernando Martinez shall have judgment against Stephen O'Hara and Career

7    Solutions and Candidate Acquisitions, O'Hara Family Trust, OCRE, Inc.,

8    Professional Realty Council, Inc, and Pacific Valley Realty, Inc. in the total amount of

9    $15,124.93.

10    IT IS SO ORDERED.

11

12    Date: 2/2/    , 2017

13    Hon. _____
     Judge Presiding

14    CARMEN R. LUEGE.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAVONE & FONNER

# EXHIBIT 16

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
7676 HAZARD CENTER DRIVE, SUITE 500
SAN DIEGO, CALIFORNIA 92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

# STATE OF CALIFORNIA, COUNTY OF ORANGE

# ORANGE COUNTY SUPERIOR COURT

|  |  |
|---|---|
| FERNANDO MARTINEZ,<br><br>           PLAINTIFF,<br><br>v.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS;<br><br>O'HARA FAMILY TRUST;<br><br>OCRE, INC.;<br><br>PROFESSIONAL REALTY COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.; and DOES 4-10,<br><br>           DEFENDANTS. | **CASE NO.:** 30-2012-614932-CU-FR-CJC<br><br>## NOTICE OF APPEAL<br><br>**DEPT**:    C32<br>**JUDGE:** Comm. Carmen Luege |

PAVONE & FONNER

1    Pursuant to Code of Civil Procedure section 904.1 *et seq*, Plaintiff Fernando Martinez

2  hereby appeals from the lower court's disgraceful order dated November 30, 2016, as

3  incorporated into a reported judgment dated February 21, 2017, and as such, technically

4  appeals from that judgment.   The ruling's succubustic adoption of the defense position, and

5  resulting validation of the defendant's pseudohermaphroditic misconduct, prompt one to

6  entertain reverse peristalsis unto its four corners.

7    Evidence of the docket entry reflecting the judgment is attached hereto as Exhibit A.

8    Plaintiff never actually received a copy of a signed judgment, though a stipulated

9  judgment was prepared for the commission court's signature, as it apparently cynically

10  attempted to suppress notice of the judgment in order to thwart review.

11

12  Date: April 14, 2017                          PAVONE & FONNER, LLP

13

14                                                Benjamin Pavone, Esq.

15                                                Attorneys for Fernando Martinez

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 17

# Fourth District Court of Appeal
## for the
# State of California

FERNANDO MARTINEZ,

        APPELLANT,

v.

STEPHEN O'HARA,

        RESPONDENT.

FOURTH DISTRICT COURT OF APPEAL CASE NO. G054840

SAN DIEGO SUPERIOR COURT CASE NO. 30-2012-614932

ON REVIEW FROM THE SAN DIEGO SUPERIOR COURT
COMMISSIONER CARMEN LUEGE, JUDGE PRESIDING
JUDGE KIMBERLY DUNNING, JUDGE PRESIDING
JUDGE GREGORY MUNOZ, JUDGE PRESIDING

## Appellant's Opening Brief

OFFICES OF

PAVONE &  FONNER, LLP

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ., SBN 181826**
**WILLIAM MOND, ESQ., SBN 299865**
550 WEST C STREET, STE. 1670
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................... 7

II.    STATEMENT OF APPEALABILITY ............................................. 10

III.   SUMMARY OF FACTS ................................................................. 10

       A.  Stephen O'Hara's Personal Background ................................ 11

       B.  O'Hara Recruits Martinez ..................................................... 12

       C.  O'Hara Pressures, and Martinez Capitulates to, a Sexual Relationship ... 14

       D.  Termination of the O'Hara-Martinez Relationship ................. 14

IV.    RELEVANT PROCEDURAL EVENTS ........................................ 15

       A.  Pleadings ............................................................................... 15

       B.  Discovery Dispute Goes Haywire ......................................... 16

       C.  Judge Munoz Struggles Through a Sanction Hearing ............ 17

       D.  Class Certification Effort Fails. ............................................ 21

       E.  Jury Trial and Verdict .......................................................... 21

           1.  Labor Code Violations Get Paid Days Before Trial. ........ 21

           2.  Jury Trial on Fraud Claim ............................................... 22

           3.  Jury Verdict on Sexual Harassment Claim ...................... 22

       F.  Bench Ruling on Injunctive Claim ........................................ 22

V.     THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING
       ATTORNEY'S FEES BY ERRORS IN NUMEROUS
       PARTICULARS. ........................................................................... 23

       A.  Inventory of Outcomes.......................................................... 23

       B.  Summary of Trial Court's Ruling on Fee Motion ................. 23

       C.  Standard of Review ............................................................... 24

       D.  The Trial Court Concluded that Labor Code Penalties Are Not
           Wages.  It Abused Its Discretion Because It Misunderstood the
           Law. ....................................................................................... 25

E.  The Trial Court Abused Its Discretion by Denying Fees on the Sexual Harassment Cause of Action by Misapplying the Principles of *Chavez*. ................................................................. 27

   1.  The Trial Court Did Not Apply the Correct Legal Analysis Pursuant to the Requirements of *Chavez*. ............................................ 28

   2.  The Trial Court's Comparison of this Case to *Chavez* Was Categorically Unreasonable Given the Disparate Fee Requests. ............................................................. 29

   3.  The Trial Court's Attack on the Success of the Litigation Is Contradicted by the Record of Actual Outcomes. ............................. 29

   4.  Martinez Was Improperly Defamed by Untrue Claims that Martinez Did Not Pay Off Earlier Sanctions Awards. ........................ 31

   5.  Even if Reconstructed Billing Records Are Less Accurate than Contemporaneous Ones, Martinez's Decision to Cut the Bill by 2/3 Was More than Adequate to Compensate for any Margin of Error Given the Principles of *Chavez*. ............................. 33

F.  The Trial Court's Finding that the Case Benefitted No One But Martinez Disregards the Reality that Martinez Stopped an Intended National Mass False Advertising Campaign. ............................ 35

G.  The Lower Court Criticized Martinez for Bringing the Case as an Unlimited Civil Action when a Filing in Limited Civil Was Impermissible. ............................................................. 36

V.  CONCLUSION ................................................................. 38

# TABLE OF AUTHORITIES

## Cases

*Abdallah v. United Savings Bank*
(1996) 43 Cal.App.4th 1101 ............................................................. 34

*Bell v. Vista Unified*
(2000) 82 Cal.App.4th 672 ............................................................... 34

*Branick v. Downey Savings*
(2006) 39 Cal.4th 235 ...................................................................... 35

*Buckhannon v. West Virginia*
(2001) 532 U.S. 598 ......................................................................... 26

*Castro v. Superior Court*
(2004) 116 Cal.App.4th 1010 .......................................................... 26

*Cates v. Chiang*
(2013) 213 Cal.App.4th 791 ............................................................ 33

*Chavez v. Los Angeles*
(2010) 47 Cal.4th 970 .............................................................. passim

*Church & Dwight v. S.C. Johnson*
(D.N.J.1994) 873 F.Supp. 893 ......................................................... 35

*Cummings v. Benco*
(1992) 11 Cal.App.4th 1383 ............................................................ 27

*Dabney v. Dabney*
(1942) 54 Cal.App.2d 695 ............................................................... 25

*Drouin v. Fleetwood Enterprises*
(1985) 163 Cal.App.3d 486 ............................................................. 34

*Fine v. Fine*
(1946) 76 Cal.App.2d 490 ......................................................... 25, 29

*Flannery v. Prentice*
(2001) 26 Cal.4th 572 ............................................................... 27, 30

*Frei v. Davey*
(2004) 124 Cal.App.4th 1506 .......................................................... 24

*Graciano v. Robinson*
(2006) 144 Cal.App.4th 140 ................................................. 26, 27, 34

*Graham v. DaimlerChrysler*
    (2004) 34 Cal.4th 553 ................................................................. 26, 35

*Hayward v. Ventura Volvo*
    (2003) 108 Cal.App.4th 509 .............................................................. 27

*Huong Que v. Luu*
    (2007) 150 Cal.App.4th 400 .............................................................. 24

*Imperial Merchant Services v. Hunt*
    (2009) 47 Cal.4th 381 ....................................................................... 25

*Kennedy Industries v. Aparo*
    (E.D.Pa. 2005) 416 F.Supp.2d 311 ................................................... 35

*Kirby v. Immoos*
    (2012) 53 Cal.4th 1244 ............................................................... 25, 27

*Lazzarotto v. Atchison Railway*
    (1958) 157 Cal.App.2d 455 .............................................................. 25

*Lin v. Jeng*
    (2012) 203 Cal.App.4th 1008 ........................................................... 33

*Ling v. P.F. Chang's*
    (2016) 245 Cal.App.4th 1242 ........................................................... 25

*Lopez v. Routt*
    (2017) __ Cal.App.5th __, 2017 WL 5787294 ................................. 28

*O'Connell v. Superior Court*
    (2006) 141 Cal.App.4th 1452 ........................................................... 24

*Pellegrino v. Robert*
    (2010) 182 Cal.App.4th 278 ............................................................. 24

*People v. Black Hawk Tobacco*
    (2011) 197 Cal.App.4th 1561 ........................................................... 24

*POM v. Purely Juice*
    (C.D.Cal.2008) 2008 WL 4222045
    aff'd, 362 F. App'x 577 (9th Cir. 2009) ........................................... 35

*Republic Molding v. B.W. Photo*
    (9th Cir. 1963) 319 F.2d 347 ........................................................... 35

*San Jose v. Medimarts*
    (2016) 1 Cal.App.5th 842 ................................................................. 24

*Santisas v. Goodin*
    (1998) 17 Cal.4th 599 ..................................................................... 25

*Steele v. Jensen Instrument*
    (1997) 59 Cal.App.4th 326 ........................................................... 28

*Strategix v. Infocrossing West*
    (2006) 142 Cal.App.4th 1068 ...................................................... 24

*Toshiba v. Superior Court (Lexar)*
    (2004) 124 Cal.App.4th 762 ........................................................ 29

*Young v. Exxon*
    (2008) 168 Cal.App.4th 1467 ...................................................... 27

*Zador v. Kwan*
    (1995) 31 Cal.App.4th 1285 ........................................................ 29

## Statutes & Other Authority

9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594 ............................ 26

Bus. & Prof. Code, 17200 ..........................................9, 16, 21-22, 29

Bus. & Prof. Code, 17500 ................................................... 16, 29

CACI 1900(5) ........................................................................ 22, 23

CACI 1900(7) ........................................................................ 22, 23

California Rules Court

    Rule 8.104(a)(1)(A) .................................................................. 10

    Rule 8.204(a)(2)(A) .................................................................. 10

    Rule 8.204(a)(2)(B) .................................................................. 10

    Rule 8.204(a)(2)(C) .................................................................. 11

Civ. Code, § 3295, subd. (c) .......................................................... 37

Code Civ. Proc., § 86 ................................................................. 38

Gov. Code, § 12965, subd. (b) ...................................................... 27

Lab. Code, § 203 ................................................................... 26-27

Lab. Code, § 218.5 ................................................................ 25, 27

# I.

# <u>INTRODUCTION</u>

After 20 years of street fighting in the legal system, and old enough now to speak truth to power and weather the consequences, you notice a few things about judicial rulings.  One thing you learn is that there are basically two kinds: rulings premised on judicial advocacy and ones based on judicial analysis.

The advocacy rulings are the product of a judge taking sides.  They are in favor of the party being sided with and the ruling comes out as observations in support of the favored party in every way plausible.  For the side the ruling is adverse to, virtually everything said by that party is wrong, every argument incorrect, correct arguments are ignored or minimized, the disfavored party is bad, his lawyer is incompetent, and the cause is nefarious.  It is advocacy on the judicial level.  Opinions are the legal vehicle by which to achieve desired outcomes, no matter what the law is.

In contrast, the analytical rulings do not reveal allegiance to any given party.  They are interpersonally agnostic.  They are motivated by the legal analytics governing the issue, not identity politics. These rulings come in as a mixed bag of observations and analytical paths.  There is no discernable pattern in their outcomes, which is consistent with the reality that almost all disputes have a basket of merits and demerits.  You win some, you lose some, but you get an honest broker's assessment of the facts applied to the law.

Advocacy is, of course, advocacy.  Judges are not supposed to behave as advocates, but it is perhaps part-understandable occupational hazard and part-understandable ideological loyalty.  For example, and most commonly, judges with law enforcement backgrounds tend to rule in favor of law enforcement litigants.  It is a natural and expected symptom of the human condition.

However, judicial advocacy marks a considerable transgression of the principle that the United States was founded on a government of laws rather than men.  Each time an advocacy ruling is issued, an announcement is made that the law does not really

matter.  These rulings declare to the public that what matters is who you are to the individual judge you are appearing before, not what the law is given the facts you have presented.

From this lawyer's perspective, this Court's most memorable opinion, *Mabry*, was a singularly astonishing piece of literature.  It affirmed and explained a series of principles amidst a warlike battle between furious individual litigants attacking, and being attacked by, an equally merciless banking industry.  During the Great Recession, there was a state-wide, trial-court-level defense of the banks – a lot of advocacy as a perceived response to a consumer attack on the banking system – and then amidst all the confusion and anger and upheaval, this Court issued an elegant clarification of how real estate foreclosure is supposed to work.

Its analysis of tender in particular, which had been used as a ruthless legal club against plaintiffs to knock out otherwise meritorious claims, was one of the most refreshing, accurate pieces of legal writing, drafted in an impossible political environment, that this lawyer has ever had the privilege to read.

All lawyers and judges should aspire to have that kind of detracted perspective on challenging legal problems.  All litigants should aspire to analyze problems amidst the often-confusing morality, politics and uncertainty of legal disputes in this manner. *Mabry* marks the gold standard for analytical judicial decision in a world where advocacy is often incentivized.  It captures the broader adjustment in judicial decision-making Martinez is trying to catalyze with this appeal, even if it upsets the powers that be.

Turning to this case, Martinez was first assigned to a historically well-regarded trial judge, Hon. Judge Gregory Munoz.  Unfortunately, in the months prior to his retirement, he stopped personally attending to the details of his docket.  His rulings became an increasing exercise in abdication.  In the process, he damaged Martinez's case.  The scars from it managed to corrupt the ruling being reviewed herein, almost three years after he left the bench.

The second judge, Judge Dunning, ruled, respectfully, as an advocate. Her strategy across an entire day of motion rulings being observed seemed to focus on generating arguments to bat down plaintiffs' various requests. In Martinez's case, she issued a ruling denying 17200 certification that was little more than a series of adversarial criticisms putatively representing independent judicial analysis.

But this Court, on appeal, apparently did not think Martinez's cause was important enough to merit 17200 relief despite many errors, the certification presentation did have its weaknesses, and it found a defensible way to affirm the lower court's decision.

The case thereafter went to trial on sexual harassment and other individual torts with a third judge, Commissioner Carmen Luege, presiding. Judge Luege generally ruled during trial like a disinterested broker. The jury awarded Martinez a modest judgment for O'Hara's violation of certain sexual harassment laws.

However, her tenor changed during oral argument on Martinez's post-trial motion requesting attorney's fees. She apparently perceived that Martinez insulted former Judge Munoz, and then as a response, translated her anger into an attack on Martinez's fee motion. She issued a mindlessly one-sided ruling – a ruling founded in advocacy rather than analysis if ever there was one – and littered with legal errors, as they always are. This is the ruling that is the subject of the present appeal.

The errors will be detailed. Like Judge Dunning's certification ruling, there is not a whole lot to debate. And like the 17200 ruling, if this Court so desires, it can find a way to affirm it for no other reason than through discretionary deference to the lower court. But should it do so; is that getting it right given all the facts and historical circumstances of this case.

Regardless of the many errors in the ruling at issue, reversal is warranted because the ruling is not a product of good judicial decision making. It's an exercise in advocacy directed at one party founded on a desire to champion a colleague, rather than

strictly and accurately following established legal analysis governing the recovery of attorney's fees in these types of situations.

Consequently, the ruling is wrong not just because it is wrong, but because the underlying motivation for issuing this wrongful ruling was also wrong. Commissioner Luege acted as if Martinez disrespected Judge Munoz, but the truth is the opposite – Judge Munoz disrespected Martinez, and a whole bunch of other litigants, by abdicating rulings to his research clerk.

Consequently, the criticism Martinez levied about him in front of Judge Luege – upon being provoked by defense counsel with a false accusation of contempt of his rulings – was not cause for her to overreact by circling the wagons around Munoz and abandoning her duty to fairly and accurately analyze the legal issues before her.

Nonetheless, she did resort to advocacy by mercilessly attacking Martinez's case in her ruling. The style of it reveals this. Combined with the numerous factual and legal errors, in its totality it represents a quintessential case of abuse of discretion.

## II.

## STATEMENT OF APPEALABILITY

This appeal challenges a ruling denying attorney's fees and costs issued on November 30, 2016 (*see* 2 A 1105), which captured events and rulings by Judges Gregory Munoz, Kim Dunning, and Carmen Luege. (2 A 468; Cal. Rules Ct., Rule 8.204(a)(2)(A); *see* 1 A 252; 2 A 794.)

The ruling was formalized into a final judgment signed on February 21, 2017. (2 A 1110; Cal. Rules Ct., Rule 8.204(a)(2)(B).)

This appeal was timely filed on April 14, 2017. (2 A 1113; Cal. Rules Ct., Rule 8.104(a)(1)(A).)

## III.

## SUMMARY OF FACTS

Martinez offers a summary of the facts of the case based on matters in the appellate record, as relevant to the ruling being reviewed, which comes partly from

---

facts admitted at trial but also from facts established during other parts of the case. (Cal. Rules Ct., Rule 8.204(a)(2)(C).)

### A.  Stephen O'Hara's Personal Background

Stephen John O'Hara, later changed to Stephen Stratton O'Hara, was a 61-year-old used car salesman by trade in Florida, before he moved to California in the 1980's to become a real estate agent. (1 A 12; 1 A 287; 2 A 715; *see Martinez v. O'Hara* (2017) Case No. G054840, Dkt. 9, p. 2, ¶ 3.)

He pursued what appears to be a mostly-successful career as a real estate agent, was featured in several how-to marketing books, including one notable publication called "Billion Dollar Agent." (1 A 13.)

The crash of the California real estate economy in 2008 was hard on professionals in that field but was treated by him as an opportunity: by selling his friends and associates on his proclaimed visionary real estate abilities through purported private opportunities in a rapidly-changing market, they lost – and he gained – about $3 million. (1 A 14, 55, 461; 3 A 1165, 1183-1191.)

He then strung his investors along through the Great Recession, and discharged them *en masse* in a 2012 bankruptcy, his third, claiming that after a lifetime he had only amassed $22,000 in assets. (1 A 13-14; 3 A 1165, 1183-1191; 1 A 409-456.)

Essentially, O'Hara blew out his reputation to finance his retirement, leaving a trail of hardship in his wake.  His friend Brenda Ranney lost $750,000 and ended up living out of her car. (1 A 55, 170, 294; 3 A 1183.)  The stress of non-payment partly contributed to Charles Garrison's heart attack and resulting death. (1 A 55-56; 1 A 409-456; 3 A 1167; 3 A 1184.)  Women were usually the ones taken advantage of. (1 A 294; 3 A 1183-1191.)

After his 2012 discharge, and having alienated his real estate network, Mr. O'Hara turned his attention to young job seekers. (1 A 14; 2 A 863-908.)  He built a website called Career Solutions and Candidate Acquisitions ("CSCA"), www.csca.com, and proposed to place young people into real estate careers. (2 A 863-908.)



He sent out an initial blast of 20,000 solicitations intended to get the attention of a national audience and solicit interest in CSCA from job seekers on both coasts. (1 A 502-503, 513, 518, 529; 2 A 653-655, 677, 687, 754, 764-768, 798, 829-830, 1016, 1022, 1060-1061; 3 A 1718, 1811, 1813.)

However, the instant litigation ended the CSCA enterprise when O'Hara committed to the trial court to shut down the fraudulent enterprise to avoid an injunction shutting it down involuntarily. (3 A 1803-1804.)

**B.  O'Hara Recruits Martinez**

In July 2012, Fernando Martinez, 21 from San Diego, was working at a McDonalds, thirty-five hours per week at $8 per hour. (2 A 813.)  He uploaded a resume to Monster.com. (1 A 16; 2 A 796, 813; 3 A 1215-1216.)

On August 10, 2012, he received an auto-generated response from O'Hara representing himself as an executive at CSCA, looking to potentially hire him in a real estate position. (2 A 796, 813; 3 A 1213.)  The email contained a number of false advertisements. (2 A 813-814; 1 A 514-516; 1 A 521-522; 3 A 1213.)

For example, CSCA was telling Martinez (and the public) that within two years he could expect to be making $125K/year and 250K/year within three as a real estate professional, but O'Hara, who had been in the business for 30 years, reported his previous two years' of income as $72K and $85K. (2 A 813-814; 1 A 514-516; 2 A 821, 879; 3 A 1166; 3 A 1213; 3 A 1598-1599.)

O'Hara's introductory email referred Martinez to CSCA's elaborate website, in which another dozen grandiose false claims were made: it purported to be an industry leader with six separate orientation and training programs; it announced itself as an established career launching pad that only works with the "best of the best." (3 A 1591-1599; 2 A 869, 870, 875, 879, 881.)  It claimed to have physical classrooms and an annual "class of 30" graduating students. (2 A 872, 873, 881; 3 A 1595-1597.)  It projected an affiliation with Kendra Todd, a celebrity contestant, and the current US

president in connection with the TV show "The Apprentice." (2 A 873, 881; 2 A 1031-1032; 3 A 1595-1596.)

For employees, CSCA claimed to have Mr. O'Hara, its CEO, business partners, various team members, corporate executives, managers, an executive search team, a talent acquisition director, a talent acquisition manager, and enough career counselors and staff to potentially visit nearly every college campus in the country. (2 A 861, 865, 870, 870, 871, 881, 882, 884, 899; 3 A 1591.)

As enticement for potential applicants, CSCA claimed applicants could expect to make $35-65K/yr to start as a real estate intern, $125K or more after their second year as a licensed real estate agent, and $250K or more after their third year. (2 A 862, 2 A 879; 2 A 1034-1034.)  CSCA also claimed to have been successful enough to have "done some growing." (2 A 1028; 3 A 1747.)

However, none of this was remotely true. (3 A 1591-1599.)

CSCA was little more than a marketing idea in Mr. O'Hara's head and the website itself.  The growing O'Hara claims the company had undergone consisted of his decision to share his idea with two other persons. (2 A 1028; 3 A 1592; 3 A 1747.)  It had no track record of placing candidates, it had not placed anyone in the compensation categories referenced; it had no office, no classrooms, no yearly class, no affiliation with Trump's Apprentice, no national presence, no organizational team, no college recruitment history, and was composed as a structural matter of a mailbox, Mr. O'Hara's home-office, and the website. (2 A 1027-1035; 3 A 1591-1599.)

Unaware of this, the introductory email lured Martinez with its lucrative compensation claims, lack of any upfront fees, and prestigious-sounding size and affiliations. (2 A 810; 3 A 1213.)

O'Hara lived as a residential matter in an upscale condo in Laguna Niguel. (1 A 12; 2 A 810.).  On September 9, 2012, he invited Martinez to discuss employment opportunities. (2 A 814.)  Initially the meeting was contemplated to occur at Starbucks,

but at the last minute, O'Hara changed it to his residence. (1 A 17; 2 A 814; 3 A 1580.) He offered his tutelage and told Martinez he could make millions. (1 A 18-19; 2 A 815.)

However, Mr. O'Hara did not place Fernando with the loose-collection of independent real estate agents associated with the one firm CSCA had been retained by, First Team Real Estate, as that required a sales license. (2 A 813, 828; 3 A 1209-1211, 1213, 1587, 1651.) Instead, he decided to keep Martinez for himself. (1 A 18; 1 A 290; 2 A 815.) O'Hara had him work physically next to him in his Laguna Hills home office on a daily basis. (1 A 57-58; 2 A 797.)

### C. O'Hara Pressures, and Martinez Capitulates to, a Sexual Relationship

The sexual comments, emails, and other overtures in close proximity started promptly. (1 A 17; 3 A 1226; 3 A 1580; 2 A 797.) Stephen invited Fernando on a gay cruise. (3 A 1270; 2 A 797.) He began touching him. (1 A 57; 3 A 1580.) O'Hara cited a Liza Manelli song and included an overt sexual reference in his interpretation of it. (1 A 18; 1 A 57-58; 1 A 632; 3 A 1266.)

O'Hara telegraphed that it would be better for Martinez's career if they became romantic partners, as well as business partners. (1 A 17-19; 1 A 58; 1 A 291; 2 A 718-719.)

O'Hara began to pressure Martinez to abandon his job at McDonald's and to devote his full energy to the real estate internship, then-paying $1,500/month. (1 A 18; 1 A 57; 2 A 797.) Martinez ultimately capitulated to trade sex for employment, which made him financially dependent on O'Hara. (1 A 18-19, 57, 291; 2 A 797; 1 RT 58.)

Through late September and early October 2012, O'Hara and Martinez spent time together, which included eight physical encounters, and included various flowery text communications. (1 A 19; 2 A 815-816; 3 A 1569-1578.)

### D. Termination of the O'Hara-Martinez Relationship

After a few weeks, Martinez declined O'Hara's advances and disclaimed an interest in a continuing romantic partnership. (1 A 19; 2 A 797; 1 RT 48.)

---

MARTINEZ v. O'HARA – 14


*Appellant's Opening Brief*

On October 15, 2012, Martinez desired to come into the Laguna Hills condo to pick up his second and final paycheck, $750 owed. (1 A 20, 58; 3 A 1574.)

O'Hara had expressed his feelings of true love for Martinez, and upon their break-up, characterized the loss as "the saddest day of my life." (1 A 58; 3 A 1574.) However, his projected despair did not slow him down from simultaneously contacting his accountant and deciding not to pay the outstanding $750 in wages. (1 A 58; 3 A 1574, 1580.)

Upset that he had recently spent about a thousand dollars entertaining Martinez, O'Hara proposed that he sign a confidential release agreement that protected O'Hara against "extreme exposure" to legal claims if their interactions were revealed to others, in exchange for a final $525 payment. (1 A 21, 32, 58, 121, 171, 293; 2 A 731, 797-798, 817, 1008, 1039; 3 A 1278, 1664, 1745.)

The agreement threatened to "prosecute" Martinez if he signed an NDA and then disclosed any confidential information. (2 A 797-798; 3 A 1278.)

In other words, instead of just paying Martinez's outstanding wages, O'Hara decided to leverage Martinez's financial desperation by paying Martinez only part of what O'Hara already owed Martinez on condition of Martinez releasing all claims against O'Hara. (3 A 1276-1278.)

However, Martinez did not sign. Instead, he weathered the loss of his housing, lost his car, harmed his credit and ended up sleeping on his sister's couch, and suffered embarrassment and body issues, which the jury fixed as $8,080 in compensatory damages. (3 A 1859; 1 RT 51-54, 59.)

## IV.

## RELEVANT PROCEDURAL EVENTS

### A.  Pleadings

Martinez sued O'Hara in November 2012, asserting individual causes of action for rape (dismissed), sexual harassment, fraud, Labor Code violations, and wrongful termination. (1 A 11-35; 2 A 1116.)

After one substantive amendment (and other minor tweaks such that the second and third versions were not filed but merged into a Fourth Amendment), Martinez ultimately filed a Fifth Amended Complaint, the operative pleading, in August 2013. (2 A 807-909; 2 A 1116, 3 A 1902 [first]; 1 A 284, 2 A 1126 [fourth]; 2 A 806, 2 A 1132 [fifth].)

The Fifth Amended Complaint alleged causes of actions for fraud, false advertising (B&P 17500), unfair business practices (B&P 17200), Labor Code violations, sexual harassment, and sought alter ego findings. (2 A 807-909.)

## B.    Discovery Dispute Goes Haywire

In January 2013, Defendants noticed Martinez's deposition and included (19) document requests in the notice. (1 A 81; 1 A 93-98.)  Plaintiff objected to the problematic requests on numerous grounds. (1 A 81; 1 A 100-110.)

Your undersigned and then-defense-counsel Brook Barnes spoke telephonically on February 14, 2013 in an extended meet-and-confer conference to resolve the requests. (1 A 81; 1 A 90; 1 A 175.)  A number were improper because they requested all documents supporting a particular cause of action. (*See* 1 A 102-109.)  Among other problems, this approach is not permitted by the code's statutory specificity requirements. (Code Civ. Proc., § 2025.220(a)(4).)

However, because a timely correction to the defective requests did not come in time before the deposition was set to go forward, and Martinez could not ratify the propriety of the anticipated amended requests, Martinez filed a motion for protective order on February 19, 2013, set for April 4, 2013, and which automatically stayed the deposition. (1 A 72-89; 1 A 76.)

The defense argued that Martinez did not meet-and-confer, but that position was plainly contradicted by the record, which reflected a detailed, telephonic, meet-and-confer conversation. (1 A 90, 121-133, 46.)

Despite a lot of generalized vitriol by Attorney Barnes complaining that Martinez was throwing wrenches into O'Hara's spokes, there was no real challenge to the

---



dispositive issue – that the document requests were in fact improper and had not been timely corrected. (1 A 146-151; *see* 1 A 153-161.)

On April 3, 2013, the day before the hearing, Attorney Barnes corrected his deposition notice by eliminating all of the document requests, in a second deposition notice. (1 A 199, 204, 382-383.)

By definition, the substantive objective of the motion – to eliminate O'Hara's improper document requests – had resulted in relief in Martinez's favor by subsequent action. (1 A 199, 382.)  There was no point in going forward with a motion moot on the merits except as to the issue of if and how much in sanctions Martinez would be entitled to collect; as to driving to Orange County solely in pursuit of sanctions, counsel preferred to simply take a moot motion off-calendar. (1 A 194, 197, 234-235, 253, 382-383.)

However, this decision was interpreted by Judge Munoz's clerk and by Attorney Barnes as nefarious.  Munoz's clerk advised Attorney Barnes to file a motion for sanctions, in violation of about ten different laws. (1 A 62-64, 207, 384, 394.)  Attorney Barnes filed the lower court's requested motion the next day, on April 5, 2013, with a hearing ultimately occurring on May 16, 2013. (1 A 209-230; 2 A 921.)

Martinez explained the reasons for his actions in opposition papers, repeating his points about it being moot (1 A 232-235), which were met with O'Hara's arguments insisting that counsel should have done more to alert O'Hara's lawyers that the deposition would not go forward without correcting or eliminating the errant document requests first. (1 A 249-250.)

### C.    Judge Munoz Struggles Through a Sanction Hearing.

Judge Munoz issued a tentative ruling awarding $1,800 in sanctions against Martinez. (1 A 272.)  The ruling provided no legal analysis or basis supporting its result. (1 A 272, 383.)

The hearing, on May 16, 2013, revealed information why Judge Munoz was potentially unfit to continue sitting on the bench. The exchange first revealed that he no



longer had a grasp of the content of his own tentative rulings.  He impossibly thought that a tentative that contained no actual content should be "self-explanatory" as to its reasoning. (1 A 252; 1 A 269:11-20.)

He couldn't seem to follow a conversation.  The inquiry being pressed by counsel was to ascertain the legal basis for the ruling. (1 A 269:12-19.)  Instead of providing the legal basis, Judge Munoz proceeded to tell counsel that, basically, counsel was fortunate because his research clerk suggested awarding twice as much in sanctions ($3,600) but he, the judge, thought that was too much and settled on $1,800. (1 A 269:20-23.)

This position was non-responsive.  It was not a legal basis but a non-sequitur, a sort-of-related-to-the-issue observation about a private negotiation in chambers between the judge and his clerk about the negotiated process by which the outcome had been arrived at as an administrative matter, not the underlying, expected, published legal analysis to support it.  There was no legal explanation at all in this reported private exchange, much less one that was self-explanatory.

It was also impossible that a private conversation between Judge Munoz and his law clerk could result in an understanding, much less a self-evident one, by a litigant who was not a party to, or present for, that conversation. (1 A 269:20-23.)

The revelation of this conversation provided further cause to question Judge Munoz's fitness.  Upon being informed of this internal negotiation, counsel responded by asking the judge whether he was referring to an unpublished internal memorandum.  Judge Munoz responded "no," and then, confirmed that indeed he was referring to an internal "legal research report." (1 A 269:24 – 1 A 270:2.)

Confronted with the reality that an internal report self-evidently would not reveal to the litigants what the public legal basis of the ruling was, Judge Munoz changed the subject to defend the ruling by referring to the defense brief.

Thus, instead of simply acknowledging that he possibly needed to study this particular ruling further because he did not personally know the legal basis for it (was



there even one?), and thereby continuing the hearing to a future date, Judge Munoz tried to BS his way out of the problem:

| | |
|---|---|
| Judge Munoz: | Did you look at the request by defense with regard to their costs of attorney's fees? |
| Pavone: | I read the moving papers and the reply papers. I wrote the opposition papers. I didn't agree with any of their arguments. I don't know why any of them are [correct]. |
| The Court: | Okay.  Well, I do.  I agree with it, but I don't think that they are entitled to receive what they requested. |
| Mr. Pavone: | I understand that you agree with the defense. My request is for a thorough ruling so that I can understand the legal basis. |
| The Court: | You are not going to get any more material than what I produced in the tentative. |

There is no indication that Judge Munoz actually read any of the briefs.  His own questions improperly presupposed that the relevant issue was to debate the amount the defense was entitled to. (1 A 270:8-9.)  It appeared based on the totality of his comments that he skimmed an internal memorandum and briefly negotiated with his clerk by settling on a lower figure than requested.  Thus, when he claimed to have read the defense brief, this did not appear to be true since he had no idea what the actual arguments in the defense brief were upon being repeatedly pressed for _any_ legal basis to support his ruling. (1 A 269-270.)

Worse, Judge Munoz then deteriorated into a sort-of invocation of his Fifth Amendment rights: "You are not going to get any more material than what I produced in the tentative." (1 A 270:20-21.)

He had not given any material in the tentative. (1 A 252.)

Judge Munoz had just been told that there was no material in the tentative.  (1 A 269:16-17.)

It was also unusual for a judge to effectively terminate discussion of an issue that had literally consumed about 30 seconds of his time and two pages of transcript.  It was apparent to counsel at the time that Judge Munoz was struggling through the hearing –

that he had no idea what the legal basis for the ruling was and was dodging and deflecting the inquiry – while simultaneously taking the impossible position that the legal grounds for sanctions were self-explanatory, in the face of the undeniable fact that the legal basis was clearly not only not self-explanatory, it was non-existent. (1 A 252, 269-270.)

 Judge Munoz had apparently stopped personally attending to the details of his motion rulings; in Martinez's case, his clerk had sanctioned the wrong party.  Judge Munoz then simultaneously revealed a series of troubling dynamics about the way he was conducting business, by crossing lines into abdication, while simultaneously trying to pin the dysfunction on the litigant. (1 A 269-270; 1 A 49-69.)

 Martinez was not the first person raising concerns about judicial abdication. (1 A 387.)  If it was happening frequently enough, and for a long enough time, such that this sentiment appeared in a hard copy publication, it means that rulings like the one at issue had probably been going out of Judge Munoz's chambers for months and possibly years. (1 A 387.)

 Martinez moved to disqualify for cause, which bubbled up to this Court in a Writ it denied in July, 2013. (1 A 49-69; *Martinez v. O'Hara*, Case No. G048651.)  It is not known exactly why Judge Munoz retired just six months later. (2 A 667.)  It seems difficult to imagine that no one besides Martinez noticed these problems.

 As relevant here, in reviewing the totality of these circumstances, counsel had cause to feel aggrieved in light of the fact Judge Munoz had disrespected him, and perhaps many litigants, by abdicating his job to staff and by trying to blame his failure to understand his own rulings on the litigant.  It was an $1,800 sanction fine Martinez both had to pay and report to the State Bar.

 Nonetheless, this would not have been a big deal in the grand scheme of things, an $1,800 speeding ticket so to speak, if Judge Munoz's handling of the case did not come up again, at the hearing on the attorney's fees motion which is currently under review.



As discussed *infra*, the mention of this open wound set off a series of exchanges between counsel and Judge Luege that appears to have motivated the instant advocacy-based ruling presently under review, at the expense of disciplined legal analysis.[1]

### D.   Class Certification Effort Fails.

About a year after the flap with Judge Munoz, Martinez moved in November, 2014 to certify a 17200 class to stop O'Hara's false advertising campaign, which started with the original blast of 20,000 emails and contemplated hundreds of thousands more solicitations. (1 A 491-637; 2 A 834, 1006.)  However, the sitting judge, Hon, Kim Dunning, denied it on a perceived failure to define a sufficiently ascertainable class and on typicality grounds. (2 A 799.)

This Court, in an opinion authored by Acting Justice Rylaarsdam, affirmed Judge Dunning's denial of certification on June 25, 2015. (2 A 795-805.)

### E.   Jury Trial and Verdict

The remaining claims – based on Labor Code violation, sexual harassment, fraud and for individual injunctive relief – were thereafter slated for trial.  However, shortly before trial, the defense resolved the Labor Code violation by payment which mooted its need to be addressed before the jury. (2 A 1110.)

### 1.  Labor Code Violations Get Paid Days Before Trial.

In the original 2012 suit, Martinez claimed $2,250 in Labor Code violations, $750 in outstanding wages and $1,500 in penalties, for failure to timely pay an

---

[1] By criticism of the judges who handled this case, counsel does not want to give this Court the impression that he is unsympathetic to the challenges of being a trial judge.  Every Friday morning in San Diego, the 330 bench goes through its calendar with each judge seamlessly getting his or her head into 10-75 legal situations and working to some sort of outcome.  It is a feat of intellectual focus that is awe-inspiring to observe, bolstered by some judges who, with an almost miraculous feat of work product the day before, also upload 20 pages of written tentative rulings.  How they find the energy to do this in light of how they spend the rest of their time – being in an almost continuous state of trial – is hard to fathom, from one who occasionally tries cases and then collapses from exhaustion afterwards.  Counsel deeply respects and admires the acumen and industry of trial judges as a general matter.

employee's outstanding wages. (1 A 32.)  About a month after the lawsuit was filed, O'Hara paid $975 leaving a balance of about $1,300. (1 A 180, 320; 2 A 1110.)

A couple of days before the 2016 jury panel was set to be seated, and after 3-1/2 years of litigation, the defense paid another $1,300 in order to moot that issue before the panel. (2 A 930, 1110.)  Thus, by definition, Martinez obtained a full recovery on the labor cause of action.

### 2.  Jury Trial on Fraud Claim

The fraud and sexual harassment claims went to trial before the jury, with the individual injunctive cause of action reserved for consideration by the bench. (3 A 1872, 3 A 1888.)

After Martinez testified, Judge Luege eliminated the fraud claim on request via defense motion on the basis that Martinez knew O'Hara's website was different than advertised as of their initial meeting on September 9, 2012, but he, Martinez, still proceeded to accept employment with O'Hara, thus breaking causative reliance on O'Hara's various misrepresentations. (2 A 1105; *See* CACI 1900, Nos. 5, 7; 3 A 1213; 3 A 1281; *see* 2 A 864-903; 3 A 1633.)

### 3.  Jury Verdict on Sexual Harassment Claim

Martinez obtained a jury's decision on the remaining sexual harassment claim.  It found that O'Hara made unwanted sexual advances and conditioned Martinez's employment on them, awarding $8,080 in compensatory damages and declining punitive damages. (3 A 1868-1870.)

### F.  Bench Ruling on Injunctive Claim

After receiving written submissions (3 A 1579-1866), the Court ruled that Martinez did not lose money or property so as to have 17200 standing, and alternately found that there was no reasonable probability that the false advertising on the website would recur, since O'Hara took it down. (1 A 745.)  Although Martinez could establish that this ruling was wrong, the exact legal outcome is basically irrelevant in light of O'Hara's capitulation to end the CSCA enterprise. (3 A 1804.)



## V.

## THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING ATTORNEY'S FEES BY MAKING ERRORS IN NUMEROUS PARTICULARS AS A PRODUCT OF JUDICIAL ADVOCACY RATHER THAN ANALYSIS.

### A.  Inventory of Outcomes

Martinez brought five causes of action and a (sixth) request for alter ego findings in the operative Fifth Amended Complaint with corresponding outcomes as follows:

(1) **Fraud**: dismissed for causation problems during trial by Judge Luege. (2 A 1105; 2 A 807, 820; *see* CACI 1900, Nos. 5, 7.)

(2) **False Advertising**: the CSCA website was found by Judge Luege to be fraudulent with O'Hara representing after trial that he took the site down and that further solicitations would not occur. (3 A 1803-1804, 1898-1899.) Class certification had been previously denied by Judge Dunning and affirmed on appeal. (2 A 807, 828; 2 A 795-805.) Judge Luege denied an individual injunction on the basis that future violations were found unlikely to recur, relying on O'Hara's post-trial commitment. (3 A 1804.)

(3) **Unfair Business Practices** – same as (2). (2 A 807, 828; 2 A 795-805; 3 A 1803-1804; 3 A 1898-1899.)

(4) **Labor Code**: $2,250 as requested in the complaint was paid in full just before the jury was seated. (1 A 180, 320; 2 A 807, 850, 852, 1110.)

(5) **Sexual Harassment**: jury verdict for $8,080. (2 A 807, 854; 3 A 1868-1870.)

(6) **Alter Ego**.  The complaint requested alter ego findings as O'Hara's conduct and various representations were executed in conjunction with five different entities. (1 A 169, 172-174, 218.)  O'Hara stipulated before trial that they were co-extensively liable with him. (2 A 1110.)

### B.  Summary of Trial Court's Ruling on Fee Motion

Judge Luege ruled on Martinez's post-trial motion for fees and costs. (2 A 1106-1107; 2 A 914, 928, 954, 961.)

On the Labor Code claim, she found that O'Hara paid the outstanding wages early on and that the outstanding Labor Code penalty paid by O'Hara just prior to trial did not constitute wages; accordingly, Martinez was not a prevailing party on that cause of action. (2 A 1106.)



On the sexual harassment claim, the trial judge denied all compensation by finding that Martinez's effort requesting $144,000 in attorney's fees was comparable in its excess to *Chavez v. Los Angeles* (2010) 47 Cal.4th 970. (2 A 1106.)

She further argued that "plaintiff's counsel in this case should have determined long before trial that realistically the case was worth no more than $25,000 and should have pursued the case as a civil limited matter." (2 A 1107.)

On the false advertising and unfair business practices claims, she found that no public interest was served, by characterizing the overall effort as "spectacularly unsuccessful." (2 A 1106-1107.)

The trial court further paid less than half the costs Martinez incurred, finding that he double billed certain items such as appellate filing fees. (2 A 1107; 1 A 49, 2 A 795.)

### C.  Standard of Review

Generally speaking, the standard of review for issues relating to a trial court's assessment of attorney's fees and costs is whether the lower court abused its discretion. (*Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1512; *Pellegrino v. Robert* (2010) 182 Cal.App.4th 278, 287-288).

Appellate courts rarely superimpose their interpretation on issues the trial judge was uniquely in a position to assess, such as witness credibility, or in settling conflicting factual information. (*People v. Black Hawk Tobacco* (2011) 197 Cal.App.4th 1561, 1568.)

However, if factual information is misunderstood or legal principles are misapplied, a trial judge's discretionary ruling is subject to reversal. (*San Jose v. Medimarts* (2016) 1 Cal.App.5th 842, 850; *Huong Que v. Luu* (2007) 150 Cal.App.4th 400, 408; *Strategix v. Infocrossing West* (2006) 142 Cal.App.4th 1068, 1072; *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463.)

Additionally, an appellate court will review the trial court's ruling on a motion for attorney fees *de novo* to the extent that it turns on an issue of statutory


*Appellant's Opening Brief*

construction. (*Kirby v. Immoos* (2012) 53 Cal.4th 1244, 1250; *Imperial Merchant Services v. Hunt* (2009) 47 Cal.4th 381, 387-388.)

Judicial motivation may be considered, if done professionally, in deciding whether an amount of error surpasses the threshold such that the lower court's discretion was abused. (*Fine v. Fine* (1946) 76 Cal.App.2d 490, 495-496 [finding that inquiry into judge's motives was not necessary when ruling was "so unreasonable"]; *Lazzarotto v. Atchison Railway* (1958) 157 Cal.App.2d 455, 462-463 [criticizing appellant for impugning the trial court's motives in a rancorous, improper fashion]; *Dabney v. Dabney* (1942) 54 Cal.App.2d 695, 702.)

### D.   The Trial Court Concluded that Labor Code Penalties Are Not Wages.  It Abused Its Discretion Because It Misunderstood the Law.

Of a $2,250 labor claim composed of $750 in outstanding wages and $1,500 in penalties, at first O'Hara tried to get Martinez to admit he was an independent contractor, then he denied that Martinez was owed any compensation, then he paid the outstanding wages shortly after Martinez filed suit. (1 A 181.)

However, Mr. O'Hara did not pay the penalties.  He reserved his independent contractor argument for the next four years of litigation, up to the start of trial, when he issued a second check to cover the outstanding balance. (2 A 1110.)

Labor Code section 218.5 provides "[i]n any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party..." (Lab. Code, § 218.5; *see Santisas v. Goodin* (1998) 17 Cal.4th 599, 606.)

The trial court denied fees on the basis that they were not recoverable as to the payment of penalties, by citing *Ling v. P.F. Chang's* (2016) 245 Cal.App.4th 1242, 1261.

In *Ling*, an arbitrator awarded an employee about $1,000 for missed meal periods and about $7,600 in associated wait time penalties. After bouncing back and



forth between the arbitrator and the courts, the Sixth District held that Ling could not recover her attorney's fees based on these awards. (*Id.*, at 1261.)

*Ling* held that the employee's claim for missed meal breaks did not constitute wages. "Because a section 203 claim is purely derivative of an action for the wages from which the penalties arise, it cannot be the basis of a fee award when the underlying claim is not an action for wages." (*Id.*, at 1261.)

Here, in contrast, the underlying claim was tethered to an action for wages. The $1,500 penalty derived from O'Hara's failure to timely pay Martinez's last check. The language of section 203 answers O'Hara's contention: if an employer fails to pay wages, "the wages of the employee shall continue as a penalty." (Lab. Code, § 203.) Thus, the Code considers the penalty to be continuing wages.  *Ling* does not suggest otherwise.

Yet, the trial court did not address or explain why she thought *Ling* was valid authority for the opposite proposition, which marks this particular decision as the first of many red flags suggesting the ruling was a product of advocacy rather than analysis.

Because a ruling can be upheld on any basis supported by the record (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627), Martinez also reviews a different argument, one raised by Mr. O'Hara.

O'Hara argued below that Martinez was not the prevailing party because the Court memorialized but did not award the outstanding wages as part of the judgment. (2 A 1110.)  However, this argument does not change the prevailing party analysis. If a party to litigation reaches his sought-after destination, then he prevails regardless of the particular route taken. (*Graham v. DaimlerChrysler* (2004) 34 Cal.4th 553, 570-571; *Buckhannon v. West Virginia* (2001) 532 U.S. 598, 633-634.)

This is determined based on which party succeeded on a practical level. (*Graciano v. Robinson*, 144 Cal.App.4th 140, 150 citing *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1018.)  After four years of litigation, Martinez was



finally paid the full $2,250 on his labor claim and thus achieved the objectives stated in the complaint. (1 A 180, 320; 2 A 930, 1110.)

Nor does the small recovery change the analysis.  In *Graciano*, Division One analyzed "prevailing party" language from a comparable consumer statute (comparable to Labor Code § 218.5) stating that: "The provision for recovery of attorney's fees allows consumers to pursue remedies in cases as here, where the compensatory damages are relatively modest.  To limit the fee award to an amount less than that reasonably incurred in prosecuting such a case, would impede the legislative purpose underlying section 1780." (*Graciano*, 144 Cal.App.4th 140, 150, citing *Hayward v. Ventura Volvo* (2003) 108 Cal.App.4th 509, 512.)

The California Legislature enacted the Labor Code's fee shifting provisions to allow employees to hold employers liable for nonpayment of wages, often in small amounts. (*Kirby v. Immoos* (2012) 53 Cal.4th 1244, 1257.)

For these reasons, the time spent on this cause of action was compensable because penalties are treated as wages, notwithstanding O'Hara's tactic of purchasing his way out of a formal judgment days before the jury panel was seated, and regardless of the small amount at stake. (2 A 930, 1110.)

### E.  The Trial Court Abused Its Discretion by Denying Fees on the Sexual Harassment Cause of Action by Misapplying the Principles of *Chavez.*

The Fair Employment Housing Act ("FEHA") permits attorney's fees to be awarded to a successful plaintiff. (Gov. Code, § 203, subd. (b).)  The purpose of such awards is to make it easier for plaintiffs of limited means to pursue meritorious cases. (*Cummings v. Benco* (1992) 11 Cal.App.4th 1383, 1387).  Such incentives are intended to encourage litigation of valid sexual harassment claims. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 584.)

Trial courts should ordinarily award attorney fees to a prevailing plaintiff unless special circumstances would render an award unjust. (*Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 987; *Young v. Exxon* (2008) 168 Cal.App.4th 1467, 1474;



*Steele v. Jensen Instrument* (1997) 59 Cal.App.4th 326, 331).  The trial court must give due consideration to the policies and objectives of the FEHA in general and of its attorney fee provision in particular. (*Chavez,* at 987.)

This case, and Martinez's circumstances, fall into the mischief FEHA was intended to rectify: he was terminated because he refused to have a continuing sexual relationship with his employer, O'Hara. (3 A 1868-1870.)

The trial court gave three basic reasons for denying fees:

(1)  it argued that Martinez over-litigated the case in a similar fashion to *Chavez v. Los Angeles* (2 A 1106);

(2)  it argued that the case did not result in any public benefit (2 A 1107);

(3)  it cited plaintiff counsel for an allegedly excessive damage request and thus faulted him for not bringing the action as a limited civil matter (2 A 1107.)

These reasons do not hold up under scrutiny.

Furthermore, and considering judicial motivation (delicately), it appears Commissioner Luege was offended that Martinez criticized Judge Munoz's competency, and issued a ruling founded in advocacy as a result. (2 A 1094-1096.) This is detectable because a number of findings and rulings are plainly indefensible: they inexplicably ignore dispositive facts, circumstances and authority tendered to the lower court prior to its issuance of the ruling, limitations that should have changed the analysis had they been seriously dealt with.

### 1.  The Trial Court Did Not Apply the Correct Legal Analysis Pursuant to the Requirements of *Chavez*.

The trial court analyzed the fee issue under the assumption that it had unfettered discretion to award (or not award) attorney's fees, by citing the statute. (2 A 1106.)  While the statute uses the term discretion, the legal analysis has been clarified to create an expectation that fees will ordinarily be awarded unless the trial judge finds a special circumstance to deny them. (*Chavez*, 47 Cal.4th 970, 987; *Lopez v. Routt* (2017) __ Cal.App.5th __, 2017 WL 5787294, *4.)

The lower court did not start from a place in which an award of fees was expected.  It treated the matter as if it were merely an option. (*See Chavez.* 987; 2 A 1106.)  Furthermore, it never gave any recognition to the policies and objectives of FEHA or its attorney fee provision as also required by *Chavez*. (*Ibid.*; *see Toshiba v. Superior Court (Lexar)* (2004) 124 Cal.App.4th 762, 772; 2 A 921, 1005, 1106-1107; *Zador v. Kwan* (1995) 31 Cal.App.4th 1285, 1303.)

### 2.   The Trial Court's Comparison of this Case to *Chavez* Was Categorically Unreasonable Given the Disparate Fee Requests.

The most prominent feature of the trial court's ruling was to compare this case to *Chavez*. (2 A 1106.)  The plaintiff in *Chavez* requested ***$870,000***; Martinez requested $144,000. (2 A 927, 1106.)  Martinez's request was 16.6% of Chavez's request.  The two cases are categorically incomparable.  (2 A 1093-1094.)  Comparing a fee request that is 6 times as large on a relative basis and $710,000 more on an absolute one is facially "so unreasonable" that the trial court's comparison to *Chavez* is itself an abuse of discretion. (*See Fine v. Fine* (1946) 76 Cal.App.2d 490, 495-496; 2 A 1094-1095.)

### 3.   The Trial Court's Attack on the Success of the Litigation Is Contradicted by the Record of Actual Outcomes.

The trial court went on to observe that the factual similarities between this case and *Chavez* were "striking." (2 A 1106.)   It never exactly identified what was so strikingly similar, but it did cite the modest damage award, argued that there was only one successful claim, was over-litigated, and did not result in significant benefit to anyone besides Martinez. (2 A 1106.)

Granted, the modest damage award was similar to *Chavez*.  That's it.  Martinez prevailed on the Labor Code claim (1 A 180, 320, 2 A 1110), he got the relief he requested with the B&P 17200/17500 actions as a practical matter (since O'Hara shut down CSCA and its website, 3 A 1803-1804, 1898-1899) and he won on the sexual harassment claim (3 A 1868-1870).



O'Hara tried to dilute Martinez by operating through alter ego corporate entities, but O'Hara capitulated at trial to have all of them be co-extensively liable as himself. (2 A 1110.)  The only claim that was a clear loss was the fraud claim, which Commissioner Luege herself removed from the jury's consideration. (2 A 1105.)  It is not clear whether a jury would have reached the same conclusion, had the matter been put to it.[2]

Chavez filed twelve causes of action and prevailed on one. (*Chavez*, 978-979, 990.)  Martinez brought six claims, and obtained relief on five. (2 A 807; 2 A 1110-1111; 3 A 1804, 1868-1870.)  There is no comparison to *Chavez* on these criteria.

These dynamics also speak to the trial court's criticism that the action was "spectacularly unsuccessful." (2 A 1107.)  Really?  Martinez obtained a verdict from a jury that O'Hara committed sexual harassment by leveraging employment in exchange for sexual submission, a considerable wrong according to contemporary standards, in litigation which is almost automatically treated as in the public interest. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 584; 3 A 1868-1870.)

In addition, after four years of dodging, delaying and defending, Martinez obtained a full recovery on the Labor Code violations. (1 A 180, 320; 2 A 1038-1040, 1110.)

O'Hara's website contained more fraud than Madoff's books and Martinez unraveled all of it; some 36 claims were impeached. (3 A 1898; 2 A 834-847; 2 A 864-903; 1 A 514-568; 3 A 1280, 1329, 1342, 1401, 1403, 1651.)  This ultimately resulted in a legal finding that the website was indeed fraudulent with O'Hara

---

[2] Even if the fraud claim was arguably defective on the reliance element, to criticize Martinez for including it among a sea of O'Hara's misrepresentations falls into the Supreme Court's admonition against engaging in hindsight bias. (*Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 986-987; 2 A 1105; 2 A 1087; 3 A 1212; 2 A 864-904.)

thereafter abandoning his precious recruitment and sexual-pipeline tool. (3 A 1898; 3 A 1803-1804; 2 A 862-908.)[3]

At the same time, the litigation ended O'Hara's anticipated national marketing campaign for CSCA and necessarily prevented many thousands of future false advertisements that would potentially wreak havoc on the lives of naïve young job seekers. (3 A 1803-1804; 1 A 502-503, 513, 518, 529; 2 A 653-655, 677, 688, 754, 764-768, 798, 829-830, 1016, 1022, 1061-1062; 3 A 1718, 1811, 1813.)[4]

For the trial court to characterize this litigation as spectacularly unsuccessful is not only unsupported in light of the record of outcomes, reflecting relief obtained on a number of fronts, but another indication that the ruling was a product of judicial advocacy rather than detached analysis. (2 A 1110-1111; 3 A 1804 [¶¶ 8-12].)

### 4. Martinez Was Improperly Defamed by Untrue Claims that Martinez Did Not Pay Off Earlier Sanctions Awards.

The trial court was possibly thrown off because the defense blackened Martinez with several comments that were untethered to the truth.  Attorney Teeple

---

[3] Over Martinez's objection, the trial court refused to allow Martinez to argue that O'Hara's website was partly intended to create a sexual pipeline for him to lure young men into his orbit (3 A 1889-1890), yet any considered review of CSCA's site and related evidence indicates that O'Hara had some sort of unusual craving to be around young, attractive men and women. (3 A 1653, 1668, 1677, 1679, 1692-1694, 1696, 1704-1705, 1714.)

[4] Martinez is hesitant to further discuss the (sore) subject of Judge Munoz, but some might make the argument that triggering a review of his continued fitness by virtue of the 2013 Writ, and which may have been part of the reason his tenure properly ended (if that is true), also provided a service to the public, albeit one that a practicing lawyer takes no pleasure in reporting, personally cost him $2,500 in sanctions to document, and ultimately cost him all of his political capital with the judge that presided over the trial. (1 A 49-67; 2 A 405-414; *compare* 2 A 416-450 *to* 2 A 458-460.)

In addition, Martinez also put together a body of evidence establishing that O'Hara was in fact behaving as a confidence man, although the public benefit of that has yet to be detected in a discrete form. (1 A 13-15, 55-56, 170, 294, 409-461; 3 A 1165-1167, 1183-1191.)

claimed: "He did six amendments. He didn't tell you which of those six amendments he finally added that claim. It's an afterthought claim. In fact, the case had been alive for two years by the time he [added] that claim." (2 A 1088.)

Martinez actually filed an original complaint and three amendments (First, Fourth and Fifth) but had made minor internal changes several times such that the operative complaint was denominated a Fifth Amended Complaint. (2 A 807; 1 A 284; 2 A 1119.) The broader idea of six amendments is fiction; the complaint was only slightly modified after the First Amended Complaint (*compare* 3 A 1902 to 2 A 807) and only required any revisions because Judge Munoz was essentially deferring to Teeple Hall's *seriatim* demurrers.

More importantly, the sexual harassment claim was listed as a cause of action in the original complaint and carried through in every amendment. (1 A 11; 3 A 1902; 1 A 285; 2 A 807.) For Attorney Teeple to claim that sexual harassment was only brought as a two-years-later afterthought represents a cynical exploitation of the trial judge's unfamiliarity with the history of the case. (2 A 1088.)

Attorney Teeple also slammed Martinez as a deadbeat litigant, one who did not pay the $1,800 discovery sanction ordered by Judge Munoz and who was thus in contempt of court for three years, when in fact the money had been paid exactly according to the 2013 order. (2 A 1043-1050, 1089-1090.)[5]

Singularly or collectively, the hearing on the fee motion contained an unusual amount of false accusation by the defense lawyer, which likely contributed on some level to the harsh ruling. (2 A 469-471; 2 A 450-457.)

---

[5] During the same 2013 interval, Judge Munoz sanctioned Martinez a second time, for filing a motion to reconsider the $1,800 sanction order he had never properly ruled on, which Judge Munoz denied, and which resulted in another $700 in sanctions. (2 A 1126, 1132.) Attorney Teeple of course told Commissioner Luege that Martinez also did not pay those sanctions (2 A 1089-1090), Attorney Teeple's claim was also of course untrue (2 A 1050), and of course O'Hara paid no price for these misrepresentations.

**5. Even if Reconstructed Billing Records Are Less Accurate than Contemporaneous Ones, Martinez's Decision to Cut the Bill by 2/3 Was More than Adequate to Compensate for any Margin of Error Given the Principles of *Chavez*.**

In *Chavez*, the Supreme Court faced a plaintiff seeking $870,000 in compensation based on an $11,500 recovery. (*Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 976.)  Chavez pursued twelve causes of action in two lawsuits, a few of which involved fee shifting, he obtained relief on one claim, and spent a total of $1,851 hours while seeking a 2x multiplier. (*Id.*, 979-981.)

In contrast, Martinez spent half that much time, sought no multiplier, prevailed on some level on 5/6 claims, and asked for 1/3 of the actual time spent. (2 A 290, 315.)

The trial court cited the fact that about half of the billing records were reconstructed rather than reported contemporaneously finding them to be "very unreliable." (2 A 447, 469.)  However, reconstruction of time records in preparation of an attorney's fee motion is permissible. (*Cates v. Chiang* (2013) 213 Cal.App.4th 791, 821; *Lin v. Jeng* (2012) 203 Cal.App.4th 1008, 1026.)

Here, lead counsel and his team reviewed the case file antecedent to the attorney's fees motion, and assigned value to expenditures of time throughout the proceedings. (2 A 302-315.)  With the file being fully intact, there was adequate information to assign time estimates to the numerous and various tasks performed in order to reach reasonable estimates of the work performed. (2 A 302-315.) Counsel's experience included about 60 appeals for the various panels; there was a familiarity with the assignment of time to specific legal tasks aside from contemporaneous reporting.

A few undeniable matters: the case spanned four years of litigation at the trial level (2 A 479, 514); the defense was aggressive as reflected by repeated demurrers and motions to strike (2 A 479, 482-483, 490-491); it involved a class action certification motion (1 A 490-637); an appeal of the adverse ruling (2 A 156); the

---



case was designated complex (2 A 501); there were 594 docket entries through the trial level (2 A 514); and it required a jury trial (2 A 299-301).

The trial court's finding that 1,000 billable hours for all the detailed legal work necessary to advance these efforts is an unreliable estimate or inflated itself reflects blatant intellectual dishonesty about what is common knowledge experienced plaintiff lawyers share about the real amount of time it takes to responsibly prosecute all aspects of a civil lawsuit against a resistant defendant.  Furthermore, the lower court's observation incomprehensibly ignores the fact that Martinez then cut the gross amount of time down by *two thirds*.

Actually, the ruling is easily comprehensible.  The lower court abandoned any interest in utilizing detached legal analysis.  Rather, she had decided that the penalty for insulting one of the Orange County Superior Court's historically well-regarded judges was death and that her death sentence would be carried out by a wholesale, advocacy-based denial of all compensation. (2 A 458-459, 468-471.)

That's what happened.

Such a dynamic defines what it means for a trial court to abuse its discretion.

The legal basis for the lower court's ruling on overbilling was premised on nitpicky complaints about alleged overbilling. (2 A 469-470.)  Whatever. Reconstruction exercises are inherently imperfect. (2 A 302-315.)  Counsel represented that the actual hours were within a 10% margin of error of the time reported using reconstruction. (2 A 448.)   The gross amount of time was then reduced by **2/3's** to account for all imperfections in that method despite case law that did not necessarily require wholesale apportionment. (*Drouin v. Fleetwood Enterprises* (1985) 163 Cal.App.3d 486, 493; *Bell v. Vista Unified* (2000) 82 Cal.App.4th 672, 687; *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111; *Graciano v. Robinson* (2006) 144 Cal.App.4th 140, 158-159.)

What more can any *reasonable* judge have wanted.



Today, the idea of a $150K fee request for four years of litigation is plainly, clearly and obviously not an excessive request.

Reasonable judges do not whack half of a *cost* bill, by making mistakes like failing to realize that there was a writ and an appeal – two appellate fees – against the lower court's accusation that Martinez double billed the costs for the certification appeal. (2 A 470; *Martinez v. O'Hara*, Case No. G048651; *Martinez v. O'Hara*, Case No. G050710.)[6]

Decisions like this announce advocacy over analysis as openly as wearing a bandana on one's arm.

### F.   The Trial Court's Finding that the Case Benefitted No One But Martinez Disregards the Reality that Martinez Stopped an Intended National Mass, False Advertising Campaign.

The trial court found that the case did not have a broad public impact or result in significant benefit to anyone other than Martinez. (2 A 469-470.)  To be sure, compensable public interest litigation requires an important right to be vindicated. (*Graham v. DaimlerChrysler* (2004) 34 Cal.4th 553, 565-566; *Branick v. Downey Savings* (2006) 39 Cal.4th 235, 239, fn. 2.)

Enforcement of false advertising laws is considered in the public interest. (*POM v. Purely Juice* (C.D.Cal.2008) 2008 WL 4222045, aff'd, 362 F. App'x 577 (9th Cir. 2009); *Kennedy Industries v. Aparo* (E.D.Pa. 2005) 416 F.Supp.2d 311, 317); *Church & Dwight v. S.C. Johnson* (D.N.J.1994) 873 F.Supp. 893, 912 [granting injunction: "the public has a right not to be deceived or confused"]; *Republic Molding v. B.W. Photo* (9th Cir. 1963) 319 F.2d 347, 349.)

Applied here, while it may be a difficult to measure the value of something that was prevented from happening, O'Hara certainly had big plans for his fraudulent website. (1 A 518, 536-537, 543, 3 A 1281-1391, 1898.)  He had also demonstrated a

---

[6] The trial court also denied recovery for the $1,009.95 filing fee *imposed* on Martinez when the lower court *sua sponte* designated the case complex. (2 A 1107, 1138.)  Lovely.

historic ability to destroy the people that did business with him. (1 A 13-14, 55-56, 170, 294, 409-456; 3 A 1165-1167, 1183-1191.)  Accordingly, stopping a confidence man from implementing his next destructive project should not have been so cavalierly disregarded as a public dfservice by the lower court. (2 A 469-470.)

Either way, given the amount of prevarication associated with the website, particularly the purported size and sophistication of O'Hara's CSCA enterprise, characterizing the interruption and termination of it as insignificant, or limited in benefit to Martinez, by reviewing the matter in 2016 constituted a hindsight violation. (*Chavez v. Los Angeles* (2010) 47 Cal.4th 970, 986-987; 2 A 226-266.)  In the lower court:

> I would just leave you with the parting thought, Your Honor, that every plaintiff's lawyer has to look into a crystal ball and take a chance. And it's a really difficult exercise.  I've been doing it for 20 years. And cases fall out for one reason or another, and it's a really challenging thing to do.  And I would just ask the Court to consider that when you think about what this case looked like when I started. I had a guy who was doing some pretty bad things, who was certainly prevaricating up and down on his website, who was pretending he was something that he's not.  Maybe now we know it doesn't -- you know, it was a grand Wizard of Oz, but at the time I filed this case, and [only] as we pursued it, we learned that. (2 A 450; *see also* 2 A 295 [¶ 10].)

## G. The Lower Court Criticized Martinez for Bringing the Case as an Unlimited Civil Action when a Filing in Limited Civil Was Impermissible.

In *Chavez*, the Supreme Court observed that discretion to award costs rests in the trial court for those actions in which the damage award falls below the $25,000 jurisdictional limit and thus could have been brought as a limited civil action. (*Id.*, 975-976.)

The trial court cited this dynamic in ruling that, "[l]ike in *Chavez*, plaintiff's counsel in this case should have determined long before trial that realistically the case



was worth no more than $25,000 and should have pursued the case as a civil limited matter." (2 A 470.)

This Court should also reconsider the entire notion of holding plaintiff lawyers responsible to predict a jury's outcome. Although it might seem like a logical check on a lawyer that applies an unreasonable amount of zealous advocacy to a small matter, the reality is that the courts are effectively putting counsel in an intractable position.

No responsible plaintiff's lawyer can automatically assume that his client's story will be impeached or its impact on a jury minimized; that the long-term emotional trauma, sadness, manipulation and dismay that accompanies sexual mistreatment will be disregarded by the trier-of-fact in denying significant compensation.

Recent public events reveal that the scars of sex accomplished by illegal means lay dormant and festering in the psyche of their victims for years, sometimes decades. These kinds of dynamics were in play in this case, in that it was unclear how much of the sex between Martinez and O'Hara might ultimately be deemed illegally coerced. (2 A 286-287, 294 [¶ 9].)

No plaintiff lawyer can just brush off his client's reported victimization and assume that the claim cannot possibly be worth more than $25,000. The lawyer cannot also risk the idea that the defendant may come across as a terrible person and his client a Boy Scout, such that the jury wants to award a punitive damage multiplier. (Civ. Code, § 3295, subd. (c).)

If for any reason, a jury issued an award that exceeded $25,000 given the lawyer's decision to file in limited, he would be facing a malpractice lawsuit. It would be akin to insurance bad faith where the lawyer would be essentially insuring on a malpractice basis any excess award by having foreclosed it by his own initial litigation decisions, ones that will seem totally misguided from the convenient position of hindsight.


*Appellant's Opening Brief*

From a plaintiff lawyer's standard accounting of zealous advocacy, ethical obligations, malpractice risk and basic belief-in-one's-cause perspective, the idea of predicting at the outset whether a jury verdict will be above or below $25,000 – which is famously known in legal circles to be an exercise fraught with unpredictability – and then internally foreclosing compensation above the $25K threshold is a total non-starter.  We don't make these kinds of irreversible decisions at the outset of a case, guys.

Regardless, Martinez pursued an injunctive cause of action. (2 A 169, 221, 366.)  He was required to file his lawsuit in unlimited civil. (Code Civ. Proc., § 86, subds. (a)(7), (a)(8).)  Martinez explained this in the papers below and cited the relevant authority. (2 A 369-371.)  The trial court still inexplicably found that Martinez should have filed it as a limited action. (2 A 470.)[7]

The lower court faced a difficult analytical path to reach that conclusion. (2 A 470; Code Civ. Proc., § 86, subds. (a)(7), (a)(8).)  Yet, it did not confront these statutory limitations at all. (2 A 470.)  It simply defaulted on this point. (2 A 470.)

Rulings premised on judicial advocacy typically do not deal with these kinds of difficult obstacles, and this decision also inadvertently revealed that an abuse of discretionary power was at work.

## CONCLUSION

As detailed above, the trial court's ruling contained numerous factual and legal errors and can be detected to be the product of advocacy rather than analysis.

It was founded on analogizing this case to *Chavez*, when the two were simply not in the same league in terms of their alleged relative excess.

---

[7] It also seems wildly unrealistic to have expected Martinez to have filed this case in limited civil, when the lower court itself *sua sponte* designated it at one point as complex. (2 A 1138.)

It was similarly premised on treating the litigation as a spectacular failure, when any fair assessment of the matter returned the reality that it was moderately successful: relief on a number of claims, but not big relief.

The lower court made many mistakes, from misapplying *Ling*, refusing to credit O'Hara's capitulation to injunctive relief, interpreting Martinez's minor victory as a part of a massive loss, assessing the fraud claim as another loss despite being the one that debatably ruled it wasn't viable, starting from the wrong place on fees and failing to make the findings respecting their principles as contemplated by *Chavez,* and treating the inherent imprecision in permissibly reconstructed billing records as cause to deny all fees while not accounting for the massive downward adjustment Martinez built in to account for it.

The trial judge also minimized the value of interrupting the destructive projects of conmen, when every practicing lawyer knows that they cause at least a third of the mischief in the legal system.

Finally, the trial court claimed that Martinez overreached by not filing in limited while declining to address the dispositive dynamics that required Martinez to file in unlimited.

Aggregating these mistakes, along with what would be a profound improvement in our legal system if trial judges would try to minimize the dangerous appetite of engaging in judicial advocacy, the overall ruling represents an example of discretion that has been abused.

Martinez requests it to be reversed and for the case to be remanded for a re-determination of fees and costs.

Respectfully:

Date: December 11, 2017                PAVONE & FONNER, LLP

Benjamin Pavone, Esq.

William Mond, Esq.
Attorneys for Appellant

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to the California Rule of Court, Rule 8.204(c), I certify that the foregoing combined brief is proportionally spaced, has a typeface of 14 points, is double-line spaced, and based upon the word count feature contained in the word processing program used to produce that brief (Microsoft Word 2010), contains approximately 11,500 words excluding tables.

Date: December 11, 2017                    PAVONE & FONNER, LLP

                                          Benjamin Pavone, Esq.
                                          William Mond, Esq.
                                          Attorneys for Appellant

TO BE FILED IN THE COURT OF APPEAL **APP-008**

| COURT OF APPEAL    4th **APPELLATE DISTRICT, DIVISION** 3 | COURT OF APPEAL CASE NUMBER: G054840 |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:            STATE BAR NUMBER: 181826
NAME: Benjamin Pavone, Esq.
FIRM NAME: Pavone & Fonner, LLP
STREET ADDRESS: 550 West C Street, Ste. 1670
CITY: San Diego                    STATE: CA    ZIP CODE: 92101
TELEPHONE NO: 619 224 8885        FAX NO: 619 224 8886
E-MAIL ADDRESS: bpavone@cox.net
ATTORNEY FOR (name):  Fernando Martinez

SUPERIOR COURT CASE NUMBER:
30-2012-614932

APPELLANT/ Fernando Martinez
PETITIONER:

RESPONDENT/        Stephen O'Hara
REAL PARTY IN INTEREST:

### CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

*(Check one):*   [X] INITIAL CERTIFICATE    [ ] SUPPLEMENTAL CERTIFICATE

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party *(name)*: Martinez

2. a.  [X]  There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b.  [ ]  Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

**The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).**

Date: December 6, 2017

Benjamin Pavone, Esq.
(TYPE OR PRINT NAME)                    ►            (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]     **CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**     Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ., SBN 181826**
550 WEST C STREET, SUITE 1670
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR APPELLANT

# FOURTH DISTRICT COURT OF APPEAL

# STATE OF CALIFORNIA

| | |
|---|---|
| **MARTINEZ,** | CASE NO. G054840 |
| Appellant, | **PROOF OF SERVICE** |
| v. | |
| **O'HARA,** | |
| Respondent. | |

I, Benjamin Pavone, declare as follows:

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 550 West C Street, Ste. 1670, San Diego, California 92101.

On December 11, 2017, I served the following

\*    AOB plus three volumes of Appendices

on the following service list:

## SERVICE LIST

Mr. Marc Alexander, Esq.
Mr. William Michael Hensley, Esq.
Alvarado Smith APC
1 MacArthur Place, Ste. 200                      By Electronic Service
Santa Ana, CA 92707                              Rule 2.251(b)(1)(B)

*Attorneys for O'Hara*

Grant Teeple, Esq.
Frederick M. Reich, Esq.
Teeple Hall LLP
9255 Towne Centre Drive, Suite 500               By Electronic Service
San Diego, California 92121                      Rule 2.251(b)(1)(B).

*Former Attorneys for O'Hara (Courtesy Copy)*

Orange County Superior Court
Chambers Hon. Carmen Luege
700 West Civic Center Dr., Dept. 61              Via First Class Mail
Santa Ana, CA 92701                              (Brief Only)

*Trial Court*

These documents were sent as indicated above.

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 11th day of December, 2017 that the foregoing is true and correct.



# EXHIBIT 18

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically RECEIVED on 4/6/2018 at 10.04.32 PM

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 4/6/2018 by Alex Reynoso, Deputy Clerk

# Fourth District Court of Appeal
## for the State of California

---

FERNANDO MARTINEZ,

     PLAINTIFF & APPELLANT,

v.

STEPHEN O'HARA;
CAREER SOLUTIONS AND
CANDIDATE ACQUISITIONS;
O'HARA FAMILY TRUST;
OCRE, INC.;
PROFESSIONAL REALTY
COUNCIL, INC; and
PACIFIC VALLEY REALTY, INC.;

    DEFENDANTS & RESPONDENTS.

FOURTH DISTRICT COURT OF
APPEAL CASE NO. G054840

SAN DIEGO SUPERIOR COURT
CASE NO. 30-2012-00614932

ON REVIEW FROM THE SAN DIEGO SUPERIOR COURT
COMMISSIONER CARMEN LUEGE, JUDGE PRESIDING
JUDGE KIMBERLY DUNNING, JUDGE PRESIDING
JUDGE GREGORY MUNOZ, JUDGE PRESIDING

---

## *Appellant's Reply Brief*

---

OFFICES OF

PAVONE &  FONNER, LLP

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
550 WEST C STREET, STE. 1670
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 5

II.  SUMMARY OF FACTS ....................................................... 8

III. OUTCOME OF THE CASE ................................................. 9

    A.  Human Behavior Outcomes – O'Hara ............................ 10

    B.  Trial Judges ................................................................ 10

        1.  Judge Gregory Munoz ............................................ 10

        2.  Judge Kim Dunning ............................................... 12

        3.  Commissioner Carmen Luege ................................. 13

    C.  Case Outcomes ........................................................... 14

        1.  Fraud Claim ......................................................... 14

        2.  False Advertising/17200/17500 ............................. 14

        3.  Labor Code .......................................................... 16

        4.  Sexual Harassment. ............................................. 18

IV. THE TRIAL COURT ABUSED ITS DISCRETION BY INTENTIONALLY MAKING MISTAKES IN ITS ANALYSIS IN SERVICE TO A JUDICIAL ADVOCACY AGENDA ................. 20

    A.  The Trial Court's Comparison to *Chavez* Defines an Abuse of Judicial Power. ......................... 22

V.  THE LOWER COURT MADE MORE MISTAKES IN SEEKING OUT WAYS TO CRITICIZE MARTINEZ'S BILLING RECORDS. ........ 24

VI. THE DOCTRINE OF HARMLESS ERROR DOES NOT SOLVE THE PROBLEM OF NUMEROUS ERRORS IN THE TRIAL COURT'S RULING. ......................................................... 27

CONCLUSION ...................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*BMW v. Gore*
(1996) 517 U.S. 559 .......................................................................... 19

*Buckhannon v. West Virginia*
(2001) 532 U.S. 598 .......................................................................... 16

*Chavez v. Los Angeles*
(2010) 47 Cal.4th 970 ........................................................... 19, 22, 23

*Graciano v. Robinson*
(2006) 144 Cal.App.4th 140 .............................................................. 17

*Hayward v. Ventura Volvo*
(2003) 108 Cal.App.4th 509 .............................................................. 17

*Graham v. DaimlerChrysler*
(2004) 34 Cal.4th 553 ........................................................................ 16

*Harris v. Grimes*
(2002) 104 Cal.App.4th 180 .............................................................. 17

*Hustler Magazine v. Falwell*
(1988) 485 U.S. 46 ............................................................................ 29

*Hutton v. Fidelity*
(2013) 213 Cal.App.4th 486 .............................................................. 22

*In re Autozone*
(N.D.Cal.2016) 2016 WL 4208200 ................................................... 21

*Ling v. P.F. Chang's*
(2016) 245 CaI.App.4th 1242 ............................................................ 21

*Martinez v. O'Hara*
(2014) Fourth Dist. CoA Case No. G050710 .................................... 26

*Neder v. United States*
(1999) 527 U.S. 1 .............................................................................. 15

*People v. Alvarez*
(1997) 178 Cal.App.4th 999 .............................................................. 18

*People v. Benavides*
(2005) 35 Cal.4th 69 .......................................................................... 22

*People v. Branch*
    (2001) 91 Cal.App.4th 274 ................................................................. 23

*People v. Fitzgerald*
    (1973) 29 Cal.App.3d 296 ................................................................. 18

*People v. Giminez*
    (1975) 14 Cal.3d 68 ......................................................................... 23

*People v. Harrison*
    (1989) 48 Cal.3d 321 ....................................................................... 18

*People v. Linkenauger*
    (1995) 32 Cal.App.4th 1603 ............................................................ 22

*People v. Molina*
    (2000) 82 Cal.App.4th 1329 ............................................................ 15

*Smith, et al. v. Schwarzenegger, et al.,*
    (9th Cir. 2015) Case No. 15-17155 .................................................. 24

*Westside Community v. Obledo*
    (1983) 33 Cal.3d 348 ....................................................................... 22

## Statutes & Other Authority

Bus. & Prof. Code, 17200 ....................................................... 14, 15, 17, 22

Bus. & Prof. Code, 17500 ....................................................... 10, 14-17, 22

Civ. Code, § 3294 ............................................................................... 19

Civ. Code, § 3521 ............................................................................... 16

Civ. Code, § 3520 ............................................................................... 16

Civ. Code, § 3517 ............................................................................... 16

Code Civ. Proc., § 382 ................................................................... 15, 16

Code Civ. Proc., § 1021.5 ................................................................... 15

Lab. Code, § 203 ................................................................................ 21

Lab. Code, § 218.5 ............................................................................. 21

# I.

## __INTRODUCTION__

As a nation, we have spent 250 years to date building this remarkable system of human governance called the Rule of Law.  The Rule of Law theoretically allows our citizenry to be treated fairly, no matter who they are, how unpopular they are, what they look like, or how connected their family is to the governing power.  This feature itself is an incredible, radical idea as far as societies go.  The Rule of Law provides a method to reach similar outcomes in similarly-situated cases which facilitates peaceful resolutions. This itself is another breathtaking feature uniquely associated with sustainable societies. The Rule of Law is one way we align and regulate incentives toward the highest productive function of our society's resources so that we can all row in the same direction for the collective good.  The first great effort to have a Rule of Law society etched the 1500-year Roman empire into a reputation as the most tolerant and successful society in history.

Our diligent and more advanced construction of a Rule of Law in the United States allows us to challenge the Roman Empire to become an even greater, more humane, more productive and more dominant society – to unseat the Roman Empire in becoming the greater, and thus greatest, Empire – ever.

Critical to building this inconceivably-valuable national resource is for those persons entrusted to carry it out, including most importantly trial judges, to follow it to the absolute best of their ability.  Without proper and good-faith daily enforcement, the Rule of Law is meaningless, and our precious system will deteriorate into the ugliness, violence and inefficiency of anarchy.

These realities make this small matter ideal as a case study.  It is a vessel to review three different paths by which different trial judges deviated from the Rule of Law.  Understanding why they sometimes do this is critical to preventing it.  We learn as a society from our mistakes, we do our best to find ways to correct them, and we strive for a more perfect union.  And in fairness, ownership of those mistakes is not



focused singularly on trial judges.  The behavior that triggered all of this controversy, by the litigants and the lawyers, including this lawyer, needs to be acknowledged, studied and corrected as well.

All of the human flaws in this story that led to deviations from our Rule of Law need to be reviewed dispassionately, to further the goal of preventing them in the future and thus allowing our Rule of Law society to work incrementally better, because that is how these things are done: "brick by brick, my citizens, brick by brick," as the celebrated Roman Emperor Publius Aelius Hadrianus – Hadrian – once famously said.

This case provides good fodder because given Respondent's brief, there is so much noise, and so much distracting anger and accusation, it is almost reminiscent (on a smaller scale) of *Mabry*.  Like *Mabry*, this Court is presented with much frustration by the parties.  This Court has another opportunity to ever-so-elegantly assess all of the circumstances and merits and then identify the governing analysis that should prevail in these kinds of situations.

So as against Respondent's marquee contention that Martinez is before the Court merely to "vent his spleen," respectfully, O'Hara and his lawyers are missing the point. True, there is frank criticism of the conduct and decisions of certain trial judges.  But if we cannot deal in the truth by being candid with each other, how can we expect to understand our mistakes, much less learn from them and avoid them in the future. Besides, all of the criticism is academic in nature.  It is based on the case file.  Indeed, for the most part, O'Hara complains about (and curiously catalogues) Martinez's criticisms and then fails to dispute their underlying merits.

Along similar lines, it is true that Martinez, possessing no other explanation for what was received as a uniquely antagonistic fee ruling by the lower court, has waded into the dangerous waters of judicial motivation.  O'Hara believes that this is the defining fact toward a conclusion that Martinez is blindly attacking trial judges.  He is incorrect.  There are plenty of rulings that go against a lawyer without being so noticeably (and surprisingly) antagonistic.  Counsel has three other civil cases on



appeal right now and none of those lower court rulings read like the mindless attack of the instant ruling. It is clearly out of the ordinary in terms of dozens if not hundreds of trial rulings that counsel regularly sees and occasionally appeals.

The question of why this trial judge was motivated to light Martinez up is the subject of relevant appellate inquiry, and as Martinez sees it, there is an explanation in the case file. Understanding that motivation and contrasting it to Rule-of-Law principles and methods is a worthy exercise in Martinez's humble opinion.

It is also true as O'Hara points out that this case, narrowly viewed, requires the Court to merely pass on the merits of a fee ruling. The merits will of course be discussed in detail, the many factual errors confirmed and understood, and so forth. On a straight legal analysis, the trial court's ruling represents an abuse of discretion because she barely got any of the facts straight. But this wasn't incompetence; it was intention. An exercise in judicial advocacy, which is blatantly obvious here, by definition means that the trial judge has elected to subordinate legal accuracy.

For his part, Martinez acknowledges that he too could have done better in terms of the optics or diplomacy of his lawyer's performance. But judges are supposed to develop a constitution for litigants and lawyers that behave imperfectly, or even rebelliously. It is a common occurrence at the trial level and certainly not grounds for a trial judge to degrade into advocacy.

Regrettably, Respondent's brief offers several dog-whistle criticisms that reiterate views already in the record but provide little additional insight in terms of helping the Court adjudicate this case. O'Hara refuses to acknowledge, much less discuss – and in certain instances even tries to obscure – the basic, common facts that are so important to fairly and accurately decide the disputed legal issues.

Inasmuch as there were correctable deviations from the law, including principally as Martinez contends a decision in the ultimate ruling to feed the lower court's appetite to engage in judicial advocacy, there is hardly any feature of judicial decision-making that needs more to be understood and disincentivized. Judicial advocacy throws the



whole Rule-of-Law method back into a primitive state of personality, tribalism and power, and those are ingredients that cause societies to fail.

We can do better.

## II.

## SUMMARY OF FACTS

In the Opening Brief, Martinez offered a standard statement detailing the facts of the case. (AOB 10-14.)   In it, several factual realities were established.  For one, O'Hara was engaged in a quantum of investor fraud, enough so that he destroyed a swath of his friends and business contacts during the Great Recession in order to finance his retirement.

This is undisputed.

O'Hara was also deeply engaged in a detailed false advertising construct in creating a website and marketing system to lure young job seekers into his orbit with numerous grandiose promises.  These representations were objectively false.  He sent out 20,000 false advertising emails and was planning to take his system nationally. (*See* AOB 11-14.)

This is also undisputed.

Finally, the Statement of Facts also establishes that, as an older gentleman facing the increasing challenges of finding sexual partners, he resorted to the tactic of illegally leveraging a low-level employee's survival needs in exchange for sex.

This body of evidence is also undisputed by O'Hara.

However, for his part, Martinez essentially capitulated to that agenda out of financial desperation, even though trading sex for money (even if it is the oldest profession) is illegal in California.  But O'Hara's behavior was more egregious than merely becoming an indirect, or perhaps *de facto*, purchaser of sexual services.  He illegally retaliated by terminating Martinez's employment when Martinez ended the sexual aspect of the relationship and then tried to force Martinez to agree to an NDA conditioned on Martinez's need for at least part payment of his last paycheck. (AOB



14-15.)  That was pretty oppressive.  No corporate employer would dare to attempt such a brazen move.

Although O'Hara does not dispute these matters, he does characterize this detail as painting a "tabloid picture." (RB 17.)  He also repeatedly protests that Martinez is personally attacking him. (RB 9, 12, 17.)[1]

However, these are the facts of the case, and they are undisputed.

## III.

## OUTCOME OF THE LITIGATION

In the Opening Brief, Martinez offered an inventory of the trial outcomes. (AOB 23.)  O'Hara claims in various iterations that the litigation was not successful, and in certain instances, tries to obscure what the real outcome was.  Thus, an accounting of the net result of this litigation accounting for O'Hara's points and responses is set forth below.

It starts with correcting one of many O'Hara's mistaken assertions.  He says that the case went to trial on only two claims. (RB 37.)  The case went to trial on four claims.  Despite three expensive and time-consuming rounds of demurrers and motions to strike, no cause of action had been eliminated. (*Compare* 3 A 1902 to 2 A 805.)   Of five causes pled, O'Hara first capitulated by paying the labor claim before trial. (2 A 930.)  Of the remaining four, the fraud claim was eliminated mid-trial by the lower court; there was a jury verdict on the FEHA claim; and a bench verdict on the two injunctive causes of action. (RB 37; 3 A 1867, 1897.)

---

[1] O'Hara does take issue with one factual assertion. (RB 17.)  Martinez argued that O'Hara agreed to shut down the fraudulent (CSCA) website. (AOB 12.)  O'Hara says the record does not support this. (RB 17.)  The trial judge made a finding that the website was fraudulent. (3 A 1898.)  That the website contained a mountain of fraud cannot be seriously disputed. (AOB 12-13.)  To moot the need for a formal injunction, O'Hara promised the Court that he took the website down. (3 A 1803-1804.)  To the extent that O'Hara now builds a narrative around the idea that Martinez is overreaching as a result of this alleged record inaccuracy, his single citation to support it is wrong and his narrative must necessarily collapse. (RB 17-18.)



### A. Human Behavior Outcomes – O'Hara

As a matter of human behavior, the extensive damage O'Hara caused to others during the Great Recession is done.  It could not be corrected with this litigation.  The most Martinez could do on this front was to document it. (*See* AOB 11-12.)

As a salesman by trade, if the lines between permissible and impermissible advertising were unclear, this misunderstanding was surely corrected by this litigation.  O'Hara ultimately committed to terminate the fraudulent website. (3 A 1803-1804, 1898.)[2]

On the sexual misconduct front, it is doubtful that O'Hara will resort in the future to such endeavors given their potential expense.  Flights to Nevada are dramatically less costly than litigating the legality of pressured sexual encounters.

### B. Trial Judges

#### 1. Judge Gregory Munoz

In the Opening Brief, Martinez documented concerns about the functionality of a retired trial judge, Hon. Gregory Munoz.  This would have been irrelevant to the fee motion except that it was counsel's perception during oral argument that discussion of this issue triggered Judge Luege to generate the advocacy opinion she issued.

O'Hara catalogues this list of criticisms in an effort to portray Martinez as needlessly attacking the judiciary (RB 14-16), but this does not hold water since the Munoz problem affected the ruling under review.  To this, and after his high-profile protest that Martinez is needlessly criticizing Munoz, *O'Hara says nothing about the merits*.  He does not address or dispute the problematic dynamics with Judge Munoz's professional competency on display in the discovery dispute; nor does he contest the

---

[2] Another one of O'Hara's many factual mistakes is his claim that there were not multiple victims. (RB 24.)  O'Hara sent out 20,000 email solicitations, thus committing by definition 20,000 17500 violations, and he planned to send many more. (2 A 1060-1061.)  Another mistake is O'Hara's contention that Martinez initially sought $400,000 in fees. (RB 23, 27.)  At all times Martinez sought 1/3 of that. (2 A 927; 2 A 1149 [RoA 554:10].)

---



assertion that Judge Luege was in fact triggered by discussion of these events at oral argument.

This latter observation is important because, from Martinez's viewpoint, the entire structure of the fee ruling by Judge Luege is built around an improper motivation – a product of judicial advocacy in electing to defend Munoz's honor by shooting the messenger – which utterly defeats the governing principles of a Rule-of-Law legal system.

But returning to Judge Munoz specifically, the point Martinez would like to impress on this Court is that there is a point in time when senior judges, no matter how dedicated, fair or responsible they were in their prime (as is the consensus for Judge Munoz) cannot handle the work load of a sitting trial judge's docket.[3]  Detection systems should be in place before a catastrophe like the one here occurs, or a string of them (inevitably) occur once a trial judge finds the papers too burdensome to read. Martinez asks in all sincerity: if he had not taken the step of filing the 2013 Writ, how long would this have gone on?  Was anybody watching the till?

All involved in this appeal agree that the work load for a sitting trial judge is formidable. (*See* AOB 21, fn. 1; RB 13, fn. 3.)  In Judge Munoz's case, there appears to

---

[3] After the Writ was adjudicated, and even though it was denied, it was something Judge Munoz noticed and took seriously.  His rulings after the Writ, before he retired and the case was transferred, were noticeably more detailed and accurate. (*See* 3 A 1132 [RoA 229].)  O'Hara can scream all day long that Martinez is attacking the judiciary, but sycophants don't make the system any better.  The fact is that, after the criticism documented by the Writ, Judge Munoz returned to better practices.  Martinez is not here to impugn the man or the judiciary but merely to establish that this particular judge was in fact having work capacity issues toward the end of his judicial career.  That problem had real effects: it altered a ruling by another judge, some three years later.  It has provoked another two years of appellate litigation.  Given the potential ripple effect of a single dysfunction in the process of ruling as shown here, it is important to have timely detection systems by the monitoring body.  As relevant here, and because she did not really understand the back story, Judge Luege should have resisted the desire (but did not) to champion Judge Munoz because it came at the expense of the integrity of her ruling.

have been a failure of detection.  Maybe the monitoring system worked given the subsequent retirement.  Maybe Martinez's Writ played a part in that; maybe it was a coincidence.  But if the former did play a part, and to the extent that such efforts help to alert the Court to be cognizant of how demanding a trial judge's docket can be on a senior judge, unpleasant as the subject may be for everyone involved and as unpopular as this may make Martinez and his lawyer, it does add value to an understanding of how imperfections in our legal system arise.

And of course, to the extent that a sitting jurist is triggered to champion a colleague, although the motivation may be laudable, when it results in a ruling that is intentionally imbalanced, it doesn't adhere to the greater purpose of Judge Luege's existence as an important servant in our Rule-of-Law paradigm.

## 2.    Judge Kim Dunning

During the case, as noted in the Opening Brief, Martinez observed Judge Dunning to be systematically ruling against Plaintiffs.  The observation was anecdotal in nature and observed solely over a single day's motion docket, and admittedly, it is not strictly relevant to the fee motion in question.

However, Martinez felt, and still feels, that it was disconcerting enough to bring to this Court's attention.  Notably, Martinez does not feel the problem lies with Judge Dunning.  Judge Dunning is not a rogue actor.  If she is methodically batting down plaintiffs, it is counsel's experience that this is a directive that comes from this Court, respectfully.

O'Hara has nothing intelligent to offer here.  He again elects to dismiss it as another needless attack on the judiciary. (RB 16.)  Martinez does not know enough about the aerial dynamics by which plaintiff cases, or maybe potential class action cases, are evaluated by the local Orange County judiciary, but it hardly requires further discussion to say that trial judges who are inclined, or implicitly directed, to focus on



finding flaws in plaintiff presentations, and are systematically rejecting them, is not a healthy or fair way of running a Rule-of-Law legal system.[4]

### 3.    Commissioner Carmen Luege

Martinez's concerns about judicial advocacy by Judge Luege were noted in the Opening Brief and mentioned above.  As will be established more fully below, judicial advocacy is at work here.  The reason this is detectable, and indirectly confirmed by O'Hara, is that he repeatedly re-states what Teeple Hall and Judge Luege's existing criticisms were, without dealing with the facts that undermine those positions. O'Hara's brief is essentially an exercise in doubling down on the points made below, by adding an additional layer of critical characterization to them, coupled with a staggering amount of repetition.[5]

However, neither of these two tactics actually advance a common understanding of what is important for purposes of decision in this appeal.  His brief merely reiterates the established ammunition in the event this Court decides to write its own judicial advocacy opinion.[6]

However, if the Court wants to reach some level of objective truth before deciding what legal conclusion to attach to it, the Court – unlike O'Hara – will have to address and dispose of some difficult facts.

The first difficult fact is that it is effectively undisputed – or at least not addressed with any thoughtfulness – that Judge Luege was triggered to hostility by the

---

[4] As noted in the brief *infra*, O''Hara's appeal to dog-whistle criticisms about plaintiff class actions inadvertently admits that he thinks there is hostility to them in Orange County.  Thus, despite his claim that this is misguided criticism, O'Hara is simultaneously and rather blatantly trying to harness what must be his own perception that the Orange County judiciary harbors some amount of hostility to class actions.

[5] It appears that O'Hara repeated each of the salient points he is making on appeal an average of five times.

[6] In that case, and intending a modicum of levity, this Court could save itself the drafting time by simply cutting and pasting the lower court's ruling and adding the words "Affirmed" at the bottom.



Judge Munoz flap and this resulted in an opinion that is structurally composed as an exercise in judicial advocacy.

Even if the Court agrees with some of Commissioner Luege's conclusions (which seems tough given that her characterizations are almost-uniformly premised on mistakes in the facts), and even acknowledging the deference the law affords to lower court fee rulings, if this Court concludes that the Commissioner undertook to write this opinion by succumbing to an appetite for judicial advocacy, *it must reverse*. There is no path by which a Court of Appeal could, consistent with Rule-of-Law principles, validate a lower court ruling whose structural approach consists of first deciding to impose the harshest possible outcome and then discarding or even contorting the established legal analysis to achieve it. (*See Neder v. United States* (1999) 527 U.S. 1, 8-9; *People v. Molina* (2000) 82 Cal.App.4th 1329, 1334-1335.)

### C. Case Outcomes

In the Opening Brief, Martinez took inventory of the actual case outcomes. (AOB 23.)  O'Hara offers a volume of commentary basically calling the overall litigation wasteful. (RB 18, 20, 36, 51.)  However, this conclusion suffers from a number of points and facts O'Hara declines to address.

### 1. Fraud Claim

This argument was dismissed by the trial judge without being permitted to go to a jury.  To say that the decision to bring a fraud cause of action was wasteful seems inappropriate given the magnitude of fraud that O'Hara was indisputably engaged in. (*See* AOB 12-13.)

### 2. False Advertising/17200/17500

O''Hara claims that Martinez tried to file a "mega-class action 'cash in' for himself and others." (RB 7.)  Salacious.  However, counsel has been in the legal business for 25 years and has never heard the term "mega class action."  That said, if resistance to class actions in Orange County appears to be some sort of dog whistle possibly related to why Judge Dunning appeared to be systematically batting down



class/complex-designated plaintiff cases, then this Court should appreciate that this case was not within the perceived abuses O'Hara is appealing to.

Certain kinds of damage-based class actions, in some instances involving credit cards and so forth where plaintiff lawyers seek and are awarded more than $1M in fees in court-approved settlements, may be understandably unpopular among a pro-business Orange County community.  Here, however, counsel sought to simply stop O'Hara's well-documented, and nationally-focused, false advertising machine by obtaining injunctive relief. (*See* AOB 12-14; 2 A 826-846.)  Such action at most results in hourly pay. (*See* Code Civ. Proc., § 1021.5.)   There was no prospect of a million-dollar fee. This Court did not certify the class, but O'Hara nevertheless ultimately abandoned the enterprise as a result of this case. (3 AA 1803-1804.)

Given O'Hara's lawyers' misunderstanding, or intentional mischaracterization, of this aspect of the litigation, O'Hara foregoes any meaningful discussion of whether there is a societal benefit to halting false advertising, especially by someone who is planning to send out hundreds of thousands of false email advertisements on a national scale.  He does label it "cracking a peanut." (RB 21.)  Reasonable minds can differ on whether O'Hara had the means to inflict real damage on a national scale.  Regardless, Business & Professions Code section 17500 still sits on the books.  By any fair assessment, this was a standard false advertising case.  Martinez tried to litigate the matter this way and unsuccessfully tried to overcome the onerous Prop 64 class certification hurdle.  The point is that there was nothing "mega" about this case. Martinez does not appreciate O'Hara pandering to this Court's perceived prejudices in some sort of greedy-plaintiff-lawyer narrative.

That said, after the debacle with certain actually-unethical LA plaintiff lawyers, their knee-jerk 17200 filings based on administrative citations, and the resulting disbarments and Prop 64 legislation, it appears that traditional, real 17200/17500 actions are not as viable because of the imposition of traditional 382 class action certification requirements.  That seems unfortunate given the daily inundation of junk

---



email that requires an entire country to constantly screen, identify and eliminate a relentless onslaught of unwanted electronic communications.

Notwithstanding, the net effect here, even with the failed certification effort, was that Martinez's 17500 action resulted in the early termination of O'Hara's budding national false advertising enterprise.  It is disingenuous for O'Hara to portray his capitulation to stop committing false advertising as wasteful.  Furthermore, that capitulation did not come until after four years of litigation.  In terms of who should pay for Martinez's effort to get to that point, traditional allocation-of-risk concepts in the law typically place that burden on the wrongdoer, not the victim. (*See* Civ. Code, §§ 3521, 3520, 3517.)

### 3.    Labor Code

In the original 2012 suit, Martinez claimed $2,250 in Labor Code violations, consisting of $750 in outstanding wages and $1,500 in penalties. (1 A 32.) About a month after the lawsuit was filed, O'Hara paid $975 leaving a balance of about $1,300. (1 A 180, 320; 2 A 1110.)

Four years later, and a couple of days before the 2016 jury panel was set to be seated, the defense paid another $1,300 in order to moot that issue. (2 A 930, 1110.) Thus, by definition, Martinez obtained a recovery on the labor cause of action, albeit in gross a small amount of money.

O'Hara makes an effort to obscure the reality of these events.  He makes dozens of references – variously characterizing it as untried, moot, paid before trial, and unadjudicated – that the wage claim was something less than it actually was: capitulation. (2 AA 919; *see, e.g.*, RB 22, 30-31, 31, 43, 45, 48, 49, 50, 52; *Graham v. DaimlerChrysler* (2004) 34 Cal.4th 553, 570-571; *Buckhannon v. West Virginia* (2001) 532 U.S. 598, 633-634.)  Moreover, it was capitulation on the eve of trial which required plaintiff to prosecute the claim through the four-year length of the system. (2 AA 919.)



If the Court accepts that the 17200/17500 injunctive causes of action were legitimate claims to bring, even if 382 certification did not succeed, then it cannot in good conscience deny the wage claim as something that should have been prosecuted in small claims court. (*See* RB 26, 50.)  Given a legitimate decision to bring a 17500 cause of action, one in which actual relief was obtained, Martinez was then required to litigate all claims in superior court.

Furthermore, the wage claim was closely related to the sexual harassment claim. Martinez's termination of the sexual relationship prompted O'Hara's decision to illegally deny his wages.  Martinez was not at liberty to split the wage claim off as a separate small claims action. (*See, e.g., Harris v. Grimes* (2002) 104 Cal.App.4th 180, 188.)

Surely this Court can understand that there is a certain minimum threshold of required time to prosecute any claim to the point of trial: investigation, complaint, demurrers, case management, discovery, dealing with opposing counsel, trial filings, trial preparation. (2 A 1077-1078.)  To dismiss the wage claim as too small to merit relief in fees because it was litigated in superior court ignores the procedural requirements Martinez was required to adhere to in this case.[7] (*See Graciano v. Robinson* (2006) 144 Cal.App.4th 140, 150; *Hayward v. Ventura Volvo* (2003) 108 Cal.App.4th 509, 512.)

Furthermore, to dismiss Martinez's opinion that the required minimum effort reflected about 10% of the overall legal effort (*see* RB 51) is not to just reject the opinion of the most knowledge person about this issue, to wit an experienced lawyer,

---

[7] O'Hara claims this case was "grossly misevaluated" (RB 44, fn. 10), and it is true counsel was none too pleased about a sexual harassment verdict that only came in at only $8K, but O'Hara never explains what quick-and-easy legal mechanism – *that Martinez should have known in advance of discovery* – would have revealed to him that he should reject O'Hara's own "extreme exposure" characterization, would have enabled Martinez to deconstruct and injunctively shut down O''Hara's fraudulent advertising enterprise, rectify the sexual misconduct that Martinez was claiming to be rape, and get his wages paid. (*See* 1 A 10-37.)

*Appellant's Reply Brief*

but to reject the opinion of the *only* person with personal knowledge of how much relative burden the wage claim presented in comparison to all of the other claims. (*See* 2 A 1071.)

Finally, to expect a numerical or systematic billing method to apportion the effort associated with the wage claim, or any claim, is unrealistic. It would skyrocket the cost of litigation to prepare fee applications with such precision. Similarly, with due respect to those who think that block billing is too imprecise, time will eventually reveal what all real-time practicing attorneys privately know to be true: block billing is necessary in order to maintain lawyer sanity.

For the record, counsel's estimate of 10% was fair for the wage claim in what appellate counsel, looking back down at trial counsel, considers to be a reasonable explanation tendered to the lower court. (2 AA 1076:2-1078:21.)[8]

### 4. Sexual Harassment.

The jury awarded Martinez a modest $8,080 in damages for this claim. (2 A 807, 854.) O'Hara compares this to Martinez's $250,000 compensatory request to the jury, and matching request for punitive damages, to say that counsel's positions were outlandish. (RB 8, 30, 44.) He provides no authority that this is a proper consideration on a subsequent fee application. Weighing against it are standard competency obligations that create an expectation for plaintiff counsel to press for the highest plausible recovery. (*See People v. Fitzgerald* (1973) 29 Cal.App.3d 296, 310.)

Martinez's theory of damages was based on the idea if the sex was illegal, even if consensual at that moment, then a jury might assess damages in a qualitatively different way than just looking at the logistic consequences for Martinez upon being terminated. (*See People v. Alvarez* (1997) 178 Cal.App.4th 999, 1007; *People v. Harrison* (1989) 48 Cal.3d 321, 331-332; 2 A 931)

---

[8] This assertion is conditioned on replacing the term "wage claim" with "sex claim" at page 1078, lines 11-12.



On punitive damages, O'Hara's entire fraudulent construct, built around the grandiosity of a recruiting company that he projected to, but did not actually, exist in a brick-and-mortar reality, was legitimate grounds for seeking punitive damages. (Civ. Code, § 3294, subd. (c)(3); *see* AOB 12-14.)  A request for a 1x multiplier of compensatory damages is hardly controversial for such a situation. (*BMW v. Gore* (1996) 517 U.S. 559, 580-582.)  O'Hara characterized his own conduct as creating "extreme exposure." (1 A 171; 3 A 1278.)

In short, O'Hara can point out that the jury did not agree with Martinez's theory of damages but the logical price of a jury argument that does not fly should be limited to the fact that Martinez did not get the requested award.  To cite this as a basis to deny fees for the victory that was achieved, especially when counsel's theory of damages was plausible given the facts of the case and existing legal principles, is another dog whistle appeal to the greedy-plaintiff-lawyer narrative.  O'Hara is again inadvertently conveying his belief that the Orange County courts are hostile toward plaintiffs, for the observation is not otherwise a logical component of disciplined legal analysis in determining how much of a legal effort is compensable.

Recovery of attorney's fees are not governed by a 1717 greater relief/prevailing party paradigm.  They are statutory pursuant to the FEHA laws.  A plaintiff with a non-nominal recovery is presumptively entitled to fees under the Government Code and interpretive rules laid down by the *Chavez* opinion.  Martinez's damage requests to the jury is hardly a proper analytical basis to unseat that presumption.

The Court should adjudicate this case with the benefit of an accurate understanding of the dynamics in the lower court and the outcomes on net.

## IV.

## THE TRIAL COURT ABUSED ITS DISCRETION BY INTENTIONALLY MAKING MISTAKES IN THE LEGAL ANALYSIS IN SERVICE TO A JUDICIAL ADVOCACY AGENDA.

On the wage claim, the trial judge found that O'Hara paid the outstanding wages early on and that the outstanding Labor Code penalty (paid by O'Hara just prior to trial) did not constitute wages; accordingly, Martinez was not a prevailing party on that cause of action. (2 A 1106.)

O'Hara did not pay either the wages or the penalty until after Martinez retained counsel and initiated litigation. (1 A 2 AA 930; 1 AA 11.)  His capitulation on the eve of trial defines an exercise in victory.  Furthermore, while O'Hara and the trial court both emphasize that full payment was received without a trial, O'Hara resisted liability on the basis that Martinez was an independent contractor. (1 AA 171, 181; 2 AA 726; 3 A 1277-1278; 3 AA 1788.)  Thus, for the trial court (and O'Hara) to be dismissive of the idea that it might have required $30,000 to $40,000 to prosecute a disputed wage claim through the length of the superior court system, with O'Hara kicking and screaming the entire time, is to intentionally disbelieve something that was in reality factual. (RB 11; 2 A 1077; *see* 2 AA 1154 [reflecting _641_ docket entries].)[9]

O'Hara next argues that penalties, as distinct from wages, cannot support a fee award.  But first he cites the trial court's intentionally mistaken belief that

---

[9] Why is it always the plaintiff being accused of over-litigating a case, when the defense, and in particular this defense, is equally equipped and far more incentivized to engage in such abuses.  For example, O'Hara's business construct involved four entities.  He elected to require litigation against all of them throughout the case until he capitulated at trial that they were all his alter ego. (2 A 805; 2 A 1110.)

Indeed, on a broader note about which party was doing the driving in terms of the cost of litigation, O'Hara points out that Martinez amended the complaint five times, without seeming to have any appreciation for the fact that these amendments were necessitated by O'Hara's extensive *seriatim* demurrer filings. (RB 19, 36; 2 A 1116-1117, 1120, 1127-1128 [RoA 11-21, 59-67, 164-173].)

---



Martinez was not the prevailing party simply because O'Hara capitulated to pay the wages before the case came up for trial, as if a plaintiff can only prevail by securing a verdict. (RB 39; 2 A 1106.)  The point is so utterly lacking in merit among any sophisticated legal mind that Martinez sees this as an example of intentional intellectual dishonesty being generated as an undesirable by-product of judicial advocacy.

It is also hard to understand how either O'Hara or the trial judge could, in any sort of honest reading of *Ling*, see it as authority in support of a view that penalties based on failure to pay wages are not included in section 218.5's enforcement purview.  *Ling* basically says that when the underlying action was for non-payment of wages, the continuing wages accruing as a section 203 penalty *can* be the subject of a fee award. (*Ling v. P.F. Chang's* (2016) 245 CaI.App.4th 1242, 1261; *see also* Lab. Code, § 203 ['upon non-payment of wages, an employee's wages continue to accrue as a penalty.')  Again, the trial court appears to have made intentional mistakes at the knowing expense of legal accuracy in service to a higher agenda of ruling against Martinez for his perceived political offenses.

As O'Hara implicitly acknowledges (by forthrightly citing *Autozone*), the remaining debate seems to be whether penalties for denials of meals and rest breaks are considered wages, not whether continuing wages based on non-payment of wages are wages. (*In re Autozone* (N.D.Cal.2016) 2016 WL 4208200, *6-7.)

O'Hara points out that the IRS does not treat money obtained as a penalty as compensation for purposes of several federal laws that anchor certain employer obligations and insurance benefits on an employee's wages. (*See* IRS Memorandum 201522004; IRS Information Letter 2016-0026.)  The Service takes the understandable view that for purposes of its insurance and withholding calculations, this money is in fact a penalty – a fine calculated by the metric of wages, designed to punish the employer for not timely compensating an employee. (*Ibid*.)



But that's not how California sees it. California has statutorily decided that wages "continue" for an employee if not timely paid (up to a month), even if the employee did not continue working. (Lab. Code, § 203.) Martinez understands and respects the Service's substance-over-form view of these issues, but California has the right to define for itself what constitutes wages and it has decided by legislative fiat that section 203 penalties are additional wages.[10] (Lab. Code, § 203.)

### A. The Trial Court's Comparison to *Chavez* Defines an Abuse of Judicial Power.

The trial court cited the $870K fee request in *Chavez v. Los Angeles* (2010) 47 Cal.4th 970 as grounds to find Martinez's $144K fee request – which required a jury trial – as comparably excessive in its magnitude. (2 A 1107.)

O'Hara repeats the trial court's idea by similarly citing *qualitative* features of *Chavez*. (RB 31-32.) But what they are both silent about is the $726,000 difference between the two requests. It's as if objective numbers do not matter to them. This too marks another example of the trial court's mindless antipathy toward Martinez. *The trial judge intentionally analyzed a quantitative issue – an allegedly excessive request for fees – by resorting to citation of qualitative features.*

When a trial court abuses its discretion, it may engage in several types of flawed thinking. The Court may lose control over its exercise of power. (*Westside Community v. Obledo* (1983) 33 Cal.3d 348, 355.) Its logic may fall outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.) Its argument may be arbitrary, whimsical or capricious. (*People v. Linkenauger* (1995) 32 Cal.App.4th

---

[10] O'Hara also proposes to characterize what the case was 'really about,' that the fee shifting causes of action were an "afterthought," and that Martinez's "true objectives" were non-compensable 17200/17500 claims. (RB 25, 28.) The operative pleading defines a case's scope. (*Hutton v. Fidelity* (2013) 213 Cal.App.4th 486, 499.) The Fifth Amended Complaint included a cause of action for unpaid wages and sexual harassment. (2 A 805). Counsel attested in the papers and honestly on the spot that these claims comprised 10% and 23% of the total work respectively (2 A 931, 1071, 1078), and thus the case was by definition "about" these issues to this 1/3 extent.

1603, 1614; *People v. Branch* (2001) 91 Cal.App.4th 274, 282; *see People v. Giminez* (1975) 14 Cal.3d 68, 72.)  It may exceed the limitations of the legal principles governing the subject. (*Westside Community,* 33 Cal.3d 348, 355.)

Here, the trial judge was motivated to rule against Martinez in what must be the intoxicating effects of wielding the power to break the law, in order to reach a desired result.  The lower court relied on the *Chavez* comparison certainly knowing it was a totally – numerically – imbalanced comparison.  Yet it forged forward with this comparison riding some sort of superseding objective that subordinated her obligations as a jurist to rule analytically and dispassionately.

For the trial court to not even *acknowledge* the mathematical difference between Chavez's $870,000 fee request and Martinez $144,000 request reveals that she ruled without being able to responsibly wield the extraordinary power to make legal findings.  Basically, the trial court engineered the result she wanted, *regardless of the law*, by intentionally analogizing to a case that even a first-year law student would understand to be distinguishable.

And for what.  Because Martinez dared to question the competency of one of her colleagues?  As the record stands before this Court, Judge Munoz's competency issues at the described moment are *undisputed.*  Yet, the Orange County judiciary as Commissioner Luege perceives it is so fragile and so intolerant of any suggestion of an unpopular truth – in contravention of Canons of Judicial Performance that require judges to have immovably thick hides, see Canon 3[11] – that when Plaintiff formalized the perception and she apparently saw this material in her "complete review of the file," (2 A 1106), this triggered her Henry-the-Eighth exercise against Martinez.

In short, Commissioner Luege's comparison to *Chavez* without addressing the *objective, numerical, quantitative* difference between the two fee requests

---

[11] Code of Judicial Conduct, Canon 3 states, "A judge shall be faithful to the law regardless of partisan interests, public clamor, or fear of criticism, and shall maintain professional competence in the law,"

provides a window into a way of thinking that defines what it means to abuse judicial power.  (*Fine v. Fine* (1946) 76 Cal.App.2d 490, 495-496; 2 A 1094-1095.)

## V.

## THE LOWER COURT MADE MORE MISTAKES IN SEEKING OUT WAYS TO CRITICIZE MARTINEZ FOR RECONSTRUCTED BILLING RECORDS.

The trial court issued more criticism about counsel's decision to partially use billing reconstruction as a method of reaching a reasonable figure for the fee application.  However, as was customary throughout the opinion, in her zeal for advocacy, she made additional mistakes because she operated based on a misunderstanding of how billing reconstruction works.

O'Hara reiterates these criticisms, which revolve around two factual accusations repeated *ad nauseam*: that Martinez billed several 15-hour days, which the lower court felt was implausible, and that Martinez billed 25 hours on one particular date, which was received as a logistic impossibility and thus proof of Martinez's alleged overbilling. (2 A 1106; RB 11, 25, 29-30, 38, 47, 52; *see* 2 A 950 [No. 266])

However, some days required extensive work on a deadline. (*See* 2 A 943 [Billing Entry 101], 2 A 1123 [RoA 103-105], *see* Contemporaneous Augment Motion ("AUG"), Exs. 81-83, AUG 1-129; 2 A 945 [Billing Entries 144-145], 2 A 1131 [RoA 214-217], Exs. 91-92, AUG 678-828.)

Others were the aggregation of a well-known large number of tasks. (*See* 2 A 940 [Billing No. 7] [19.0 hours billed for all tasks, including investigation, antecedent to filing of original complaint], 1 A 10-37; 2 A 940 [No. 21] [18.5 hours billed for preparation of 11 sets of (tedious) custom-tailored written discovery requests].)

Martinez asks the Court to quickly review the observable filings that represent key examples of the lower court's and O'Hara's alleged 15-hour-day overbilling criticisms.  It can determine for itself whether 15.8 hours for one set of opposition papers and 15.9 and 14.5 hours respectively over two days (for a total of 30.4 hours) for a second set of opposition papers is implausible for that quality of work. (*See* 2 A 943 [Entry 101], 2 A 1123 [RoA 103-105], Exs. 81-83, 1 AUG 3-12, 13-30, 31-129

[reflecting 124 pages of briefing and supporting materials]; *see also* 2 A 945 [Entries 144-145], 2 A 1131 [RoA 214-217], Exs. 91-92, AUG 678-828 [reflecting 147 pages of opposition filings, 30.4 hours billed].)[12]

Indeed, the time entry for the July 8, 2013 opposition-filing effort reflects that it was one of those days where meeting the filing deadline required "hundreds of citations" and work "all day, all night." (2 A 945 [Entry 145].)

Other filings also represent an extensive bulk of detailed legal work underlying the subject billing entries. (2 A 944 [Entry 119], 2 A 1128 [RoA 178, 183-185], Exs. 84-87, 1 AUG 134-249; 2 A 945 [Entry 138], Exs. 88-90, AUG 250-677.)

For other tasks, Martinez assigned a formula to an associate to measure the time to prepare various motions and other work in the case file. (2 A 1084.) As noted in the opening brief, this was performed consistent with the principles that the appellate projects use to calculate compensation for panel attorneys. (AOB 33[13]; *see* 1 A 90; 2 A 1084.)[14] The panels assign time estimates by looking at the length and complexity of the papers themselves. Thus, when reconstruction is employed, a single motion or filing gets assigned a certain number of compensable hours. *Even if a motion took three days to write, one date will be entered in the time log representing all the hours it took to write that motion.* This explains why a single date may exceed the 24-hour threshold because in reality, the work was performed over several days

---

[12] With all due respect to the trial court's and O'Hara constant attempts to portray Martinez's counsel as some sort of schlocky, slippery plaintiff's lawyer, this firm has been privately noted by a number of credible observers to put out some of the highest quality appellate work in the State. (*See, e.g., Smith, et al. v. Schwarzenegger, et al.* (9th Cir. 2015) Case No. 15-17155, Docket 63.)

[13] There were several citations in the AOB to "2 A 302-315." The correct citation is 2 A 939-952, as pages 302-315 were the Adobe .pdf references.

[14] If any of the assigned justices are unfamiliar with panel billing (at least as it was practiced in the 1990's), it might consider asking O'Hara's appellate counsel about it, for these lawyers are surely familiar with criminal appellate work to make such a big deal out of harmless error in a civil case. (RB 10, 30-31, 34-35, 52.)

*but the assignment of time was fixed based on the date of the document.* (*See* 2 A 950 [Entry No. 266]; Ex. 95, AUG 829-872.)

In looking at the specific allegedly-impossible entry, the opening brief on the certification appeal, Attorney Fonner's initial draft required 30.8 hours, with another 25 hours (over several days, obviously) contributed by Attorney Pavone for a total of 65.8 hours to finalize and file the AOB, CCIS, and the Appendices. (2 A 950 [Nos. 259-265, 266]; *see* Ex. 95, AUG 829-872.)  This is not a controversial amount of time for this kind of project.[15]

The 25.0 entry wasn't even reconstructed.  It's too high on a block-billing basis for a single entry but to make a legal finding that it is impossible this time was incurred because of the date, and thus find the overall bill inflated, is to ignore the very work product that necessarily requires that kind of time. (*See Martinez v. O'Hara* (2014) CoA Case No. G050710 [AOB, 10/21/14 docket entry]; Ex. 95, AUG 829-872.)

In summary, if the Court actually drills down to the legal work underlying the allegedly unreliable billing entries that form the basis of the trial court's and O'Hara's larger accusation that the billing was inflated (2 A 1106, RB 10-11, 18, 23, 27-31, 38, 45-48, 51-52), their theory falls apart.

Put in appellate terminology, the factual underpinnings supporting the adverse conclusions assigned by O'Hara and the lower court to Martinez's billing are clearly erroneous. (*See People v. Overstock* (2017) 12 Cal.App.5th 1064, 1091.)

---

[15] Back in the panel days, you'd generally get credit for about 2 hours of work for each finished page of text.  The first AOB, relating to class certification, contained 34 pages of text, which returns a presumptive figure of 68 compensable hours.  65.8 hours billed comes in slightly under.  For comparison sake, this brief is 24 pages of text and will be complete in about 51 hours, contemporaneously billed.  So whether you reconstruct at 2 hours/page or bill it contemporaneously, you usually end up in about the same place. It's a paradigm that has withstood the test of time.

These examples further document the lower court's superimposition of its judicial advocacy agenda over accurate legal work.  It appears she did not look at the underlying filings; she skimmed the bill, criticized a few easy targets within it and then figured that was enough to label Martinez's lawyer a liar in terms of billing.

But she picked the wrong lawyer to accuse of this.  Had she actually looked at the underlying filings in her so-called complete review of the case file, she would have known that this firm does the work.  But she did not.

Accordingly, the trial court's mistakes premised on its superficial review of the billing entries form additional reasons to conclude that the trial court's overall opinion represents an abuse of discretion.

## VI.
## THE DOCTRINE OF HARMLESS ERROR DOES NOT SOLVE THE PROBLEM OF NUMEROUS ERRORS IN THE TRIAL COURT'S RULING.

O'Hara contends the judgment can be affirmed citing the doctrine of harmless error. (RB 10, 30-31, 34-35, 52.)  He cites no authority to establish that this is the correct analysis on the appeal of a motion in a civil case, with the traditional civil analysis allowing an appellate court to affirm if the judgment can be defended as ultimately correct for an independently valid reason, one different than the incorrect aspect of the one the lower court employed. (*See* RB 34-35.)

In this case, O'Hara seems to be saying that even if the trial court was wrong to cite *Ling* in denying compensation on the fee claim, the allegedly-problematic billing records provide an independent legal basis to reject the entire application. (RB 51-52.) However, as established above, the lower court got the facts wrong on the entries she cited to support that conclusion, so the independent-basis theory of affirmance falls apart.

Moreover, once again, all of this controversy is in service to the greater point that a $144K bill is excessive for a case that spanned four years.   This figure represented 1/3 of the overall effort against a steadfastly resistant defendant and time itself; and Martinez unilaterally took another third of the bill off the table as a matter



of billing judgment to account for the moderate nature of the relief obtained. (*See* 2 A 931, ¶ 8.)  The fact that both the trial court and O'Hara project mortification about a $144K bill represents either pretense or ignorance about the modern cost of litigating against a resistant defendant.  The former possibility is ten times as likely as the latter.

O'Hara's legal team's feigned outrage of $144K as some sort of aberrant fee request is contradicted by the existence of the *Chavez* case and common legal practice. This Court undoubtedly sees mid-6-figure fee applications all the time.  As a side project in 2013, your undersigned counsel used to harvest all of the SD, OC and SF trial court tentative rulings and also routinely noted such requests.  Now and then there was a 7-figure one.

In short, no amount of cherry picking the subject bill for large entries to criticize (and making mistake after mistake after mistake about them, including a blatant error in falsely accusing Martinez of double billing the appellate costs, 2 A 1107, AUG 657, 830) can change the reality that although Martinez utilized a less common method to construct part of his fee request, it was legally permissible and it did work: the requested fee is proportionate to the overall legal effort O'Hara required on defense.  The billing record tendered represents a reasonable – and upon scrutiny of the challenged entries, reasonably accurate – summary of that effort.

For these narrow legal reasons, namely that the lower court made too many factual mistakes in the underlying formation of her resultingly-incorrect adverse opinions, the case should be remanded for a re-determination of fees.

## CONCLUSION

The lower court made numerous factual errors.   Its ruling cannot be considered a responsible exercise in discretionary adjudication with so much foundational error.  Moreover, these mistakes were not the product of it being incapable of understanding the law or applying the facts to them.  It was because she intentionally decided to let her master for this motion be not the law, but an

---



adversarial agenda to rule against one party regardless of it. This is why there are so many mistakes in the opinion: because accuracy was not the goal: outcome was.

Submission to such an appetite reveals that the lower court did not wield power responsibly. Such an opinion is structurally reversible because, *a fortiori*, it abandons analytical discipline in favor of political or interpersonal objective. We have a political system: the legislature. The judicial system is supposed to run on facts, evidence and rules, not personality, popularity or majority. Commissioner Luege's decision to not respect this distinction constitutes a failure of restraint.

An enduring legal system reaches outcomes by minimizing the politics of identity or arguably rebellious behavior of a litigant. Indeed, that is a prime feature of what allows it to endure. It processes criticism, frustration, protest and dissent for the usefulness that it may serve in terms of improving its function, and thus translates all energy, positive and negative, systematically and unemotionally into an appropriate, Rule-of-Law based outcome all can respect and peacefully accept. (*See, e.g., Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 53-55.)

When practiced correctly, removed of the understandable (if not acceptable) human appetites that sometimes subvert the axioms that make it operate correctly, we have and will continue to build a legal system that is more fortified, more majestic, more tolerant, more just and ultimately worthy of enough deference and respect by the citizenry to last another 1250 years, and ideally long after that.

Regrettably, this incredible governance system failed in this particular instance. This occurred for a lot of reasons, but principally because the lower trial court became distracted by side issues and did not assiduously respect the axiomatic principles that govern the issue it was tasked with adjudicating.

That said, for whatever human and behavioral flaws this Court assigns to the various actors in this story, including your undersigned's, we don't throw each other out with the bathwater.  We try again.

Respectfully Submitted:

Date: April 6, 2018                   PAVONE & FONNER, LLP

Benjamin Pavone, Esq.

Attorneys for Appellant Martinez

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to the California Rule of Court, Rule 8.204(c), I certify that the foregoing combined brief is proportionally spaced, has a typeface of 14 points, is double-line spaced, and based upon the word count feature contained in the word processing program used to produce that brief (Microsoft Word 2010), contains approximately 8,626 words excluding tables and ancillary documents, and thus well-within the stated 2018 permissible limit of 14,000 words for a brief. (Cal. Rules Ct., Rule 8.204(c)(1).)

Date: April 6, 2018                                       PAVONE & FONNER, LLP

                                                          Benjamin Pavone, Esq.
                                                          Attorneys for Appellant

TO BE FILED IN THE COURT OF APPEAL

APP-008

| COURT OF APPEAL    4th **APPELLATE DISTRICT, DIVISION** 3 | COURT OF APPEAL CASE NUMBER:<br>G054840 |
|---|---|

| ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NUMBER: 181826 | SUPERIOR COURT CASE NUMBER:<br>30-2012-00614932 |
|---|---|

NAME: Benjamin Pavone, Esq.
FIRM NAME: Pavone & Fonner, LLP
STREET ADDRESS: 550 West C Street, Ste. 1670
CITY: San Diego    STATE: CA    ZIP CODE: 92101
TELEPHONE NO.: 619 224 8885    FAX NO.: 619 224 8886
E-MAIL ADDRESS: bpavone@cox.net
ATTORNEY FOR (name): Fernando Martinez

APPELLANT/ Fernando Martinez
PETITIONER:

RESPONDENT/        Stephen O'Hara, et al.
REAL PARTY IN INTEREST:

### CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):    [ X ]    INITIAL CERTIFICATE    [ X ]    SUPPLEMENTAL CERTIFICATE

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party (name ): Martinez

2. a. [ X ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [  ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested<br>entity or person | Nature of interest<br>(Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[  ] Continued on attachment 2.

**The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).**

Date: April 6, 2018

Benjamin Pavone, Esq.
(TYPE OR PRINT NAME)

(SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

**CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

OFFICES OF

**PAVONE &  FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
550 WEST C STREET, STE. 1670
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR APPELLANT

# FOURTH DISTRICT COURT OF APPEAL

# STATE OF CALIFORNIA

| | |
|---|---|
| **MARTINEZ,** | CASE NO. G054840 |
| Appellant, | **PROOF OF SERVICE** |
| v. | |
| **O'HARA,** | |
| Respondent. | |

I, Benjamin Pavone, declare as follows:

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 550 West C Street, Ste. 1670, San Diego, California 92101 (E: bpavone@cox.net).

On April 6, 2018, I served or arranged for service of the following:

\*    Martinez's Reply Brief; Motion to Augment plus 875 pages of augment materials in one volume

on the following service list:

MARTINEZ v. O'HARA – 32

*Appellant's Reply Brief*

## SERVICE LIST

Mr. Marc Alexander, Esq.
Mr. William Michael Hensley, Esq.
Alvarado Smith APC                            By Electronic Service
1 MacArthur Place, Ste. 200          malexander@alvaradosmith.com
Santa Ana, CA 92707                   mhensley@alvaradosmith.com

*Appellate Attorneys for O'Hara*

Orange County Superior Court
Chambers Hon. Carmen Luege
700 West Civic Center Dr., Dept. 61          Via First Class Mail
Santa Ana, CA 92701                           (Reply Brief Only)

*Trial Court*

Orange County Superior Court
Chambers Hon. Kim Dunning
700 West Civic Center Dr., Dept. 1          Via First Class Mail
Santa Ana, CA 92701                           (Reply Brief Only)

*Trial Court*

Hon. Gregory Munoz (Ret.)
c/o Judicate West
1851 East First Street
Ste. 1600                                     Via First Class Mail
Santa Ana, CA 92705                           (Reply Brief Only)

*Trial Court*

Fernando Martinez                              (Via Electronic Mail)
                                  contactfernandomartinez@gmail.com

*Appellant*

These documents were sent on or about this same date as indicated above by my copy service, in that a request is initiated by me by email on this date and is typically carried out on the same day.

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 6th day of April, 2018 that the foregoing is true and correct.



# EXHIBIT 19

Case 2:21-cv-01778-FMO-PD Document 1 Filed 02/25/21 Page 421 of 1093 Page ID #:421

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically RECEIVED on 3/14/2019 at 2:15:16 PM

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 3/14/2019 by Alex Reynoso, Deputy Clerk

# Fourth District Court of Appeal
## for the State of California

FERNANDO MARTINEZ,

      PLAINTIFF & APPELLANT,

v.

STEPHEN O'HARA;
CAREER SOLUTIONS AND
CANDIDATE ACQUISITIONS;
O'HARA FAMILY TRUST;
OCRE, INC.;
PROFESSIONAL REALTY
COUNCIL, INC; and
PACIFIC VALLEY REALTY, INC.;

    DEFENDANTS & RESPONDENTS.

FOURTH DISTRICT COURT OF
APPEAL CASE NO. G054840

SAN DIEGO SUPERIOR COURT
CASE NO. 30-2012-00614932

ON REVIEW FROM THE SAN DIEGO SUPERIOR COURT
COMMISSIONER CARMEN LUEGE, JUDGE PRESIDING
JUDGE KIMBERLY DUNNING, JUDGE PRESIDING
JUDGE GREGORY MUNOZ, JUDGE PRESIDING

## *Petition for Rehearing*

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
501 WEST BROADWAY, STE. 800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## <u>TABLE OF CONTENTS</u>

I.    PETITION FOR REHEARING....................................................................... 6

II.    CONSIDERING THE PANEL'S POSITIONS, AN ACCURATE
LEGAL ANALYSIS REVEALS THAT MARTINEZ WAS
ENTITLED TO RECOVER ATTORNEY'S FEES FOR
PROSECUTING THE WAGE CLAIM. ............................................................ 6

    1.    Obstacle 1 – Wages v. Wait Time Penalties ......................................... 7

    2.    Obstacle 2 – Wages - Independent Contractor Defense ........................ 7

    3.    Obstacle 3 – Prevailing Party. ............................................................. 7

    4.    Obstacle 4 – *Chavez* Limitations. ........................................................ 7

        a.    Special Circumstance - Larger Unsuccessful Effort. ................ 8

        b.    Special Circumstance - Grossly Inflated Fee Request ............... 9

    5.    Obstacle 5 – Fees Must be Based on Adequate Billing Records......... 11

    6.    Obstacle 6 – Apportionment ............................................................. 12

III.    AN ACCURATE LEGAL ANALYSIS REVEALS THAT MARTINEZ
WAS ENTITLED TO RECOVER ATTORNEY'S FEES FOR
PROSECUTING THE SEXUAL MISCONDUCT CLAIM. .......................... 13

IV.    A STUDY OF THE PANEL'S GENDER DISCRIMINATION
CONTENTION REVEALS THAT IT NOT ONLY DOES NOT
HAVE LEGAL MERIT, BUT THAT THE PANEL COMMITTED
A SIMILAR PROFESSIONAL RESTRAINT VIOLATION.. ...................... 16

    A.    Introduction ......................................................................... 16

    B.    Importing a Permissible Description of a Thing to a Person
Constitutes Invalid Reasoning as a Cause to Find Statutory
Disrespect under 6068(m). ................................................... 18

    C.    The Panel Decision to Accuse Counsel of Gender Discrimination,
and Publish that False Accusation, Marks a Textbook Failure of
Judicial Restraint. ............................................................... 20

    D.    The Citation to Misconduct on Appeal Does Not Work Because
Martinez Remarks Were Made in the Trial Court. ............................ 21

    E.    Section 6068(m)'s "Disrespect" Terminology

        Is Too Vague to be Enforceable. ........................................................ 22

F.     The Panel Ruling's Decision Not to Address Martinez' Core Contention Represents a Failure of Accurate Judicial Decision Making. .................................................................. 22

CONCLUSION ...................................................................................... 26

## TABLE OF AUTHORITIES

### Cases

*Andrews v. Agricultural Labor Relations Bd.*
    (1981) 28 Cal.3d 781 .......................................................................... 23

*Chavez v. Los Angeles*
    (2010) 47 Cal.4th 970 ................................................................... passim

*De La Cuesta v. Benham*
    (2011) 193 Cal.App.4th 1287 ............................................................... 7

*Gallagher v. Municipal Court*
    (1948) 31 Cal.2d 784, 795-796 ..................................................... 19-20

*International Wkrs. v. N.L.R.B.*
    (D.C. Cir. 1971) 455 F.2d 1357 ......................................................... 23

*Labor Board v. Pittsburg*
    (1949) 337 U.S. 656 ...................................................................... 22-23

*Ling v. P.F. Chang's*
    (2016) 245 CaI.App.4th 1242 .............................................................. 7

*Martino v. Deveni*
    (1986) 182 Cal.App.3d 553 ....................................................... 11-15, 25

*Matter of Swan*
    (C.D.Cal.1993) 833 F.Supp. 794 ....................................................... 19

*Mixon v. Fair Employment and Housing Com.*
    (1987) 192 Cal.App.3d 1306 ............................................................. 21

*New York Times v. Sullivan*
    (1964) 376 U.S. 254 .......................................................................... 26

*People v. Rongetti*
    (1931) 344 Ill. 107, 176 N.E. 292 ...................................................... 19

*People v. Cooks*
    (1983) 141 Cal.App.3d 224 ............................................................... 21

*People v. Kozel*
    (1982) 133 Cal.App.3d 507 ............................................................... 21

*People v. McWhorter*
    (2010) 47 Cal.4th 318 ....................................................................... 21

*Royal Bahamian v. QBE*
(S.D.Fla.2010) 744 F.Supp.2d 1297 ................................................... 26

*San Francisco v. Holbrook*
(1917) 35 Cal.App. 460 ..................................................................... 20

*Thayer v. Wells Fargo*
(2001) 92 Cal.App.4th 819................................................................ 26

## Statutes & Other Rules

CACI 2500 ................................................................................................. 21

California Rules Prof. Resp.

Rule 8.4.1(a) ...................................................................................... 21

California Code of Civil Procedure

Section 1033 ........................................................................................ 7

California Government Code

section's 12965(b) ............................................................................. 13

California Labor Code

section 203 ........................................................................................... 7

section 218.5 ............................................................................. 6, 7, 10

Code Judicial Ethics

Canon 1 ............................................................................................... 21

Canon 3 ............................................................................................... 21

Colman, C., Thomas Dreams of Separability
(2018) 9 Harv. J. Sports & Ent. L. 83 ...................................... 18

Oswald, Contempt of Court, 3d Ed., pp. 56 ................................. 19

## I.

## <u>PETITION FOR REHEARING</u>

Pursuant to California Rules of Court, rule 8.268, Martinez submits this petition for rehearing.  He challenges all findings of the panel opinion.

## II.

## CONSIDERING THE PANEL'S POSITIONS, AN ACCURATE LEGAL ANALYSIS REVEALS THAT MARTINEZ WAS ENTITLED TO RECOVER ATTORNEY'S FEES FOR PROSECUTING THE WAGE CLAIM.

In this case, whether they are viewed as elements, sub-elements, defenses or other limiting criteria, there are effectively six obstacles that Martinez had to overcome to capture Labor Code section's 218.5 statutory right to a specific dollar amount of attorney's fees:

(1) the outstanding compensation must be wages as opposed to some other form of employee compensation (such as assertedly non-wage "waiting time" penalties).

(2) the outstanding balance must constitute wages as opposed to independent contractor compensation;

(3) Martinez must be considered the prevailing party as to those wages, including in a case where the defendant pays on the eve of trial;

(4) If the amount recovered fits within the monetary jurisdiction of a limited civil action, the recovery must satisfy the limitations imposed by *Chavez*, in that no special circumstances must defeat the application, such as an assertedly larger unsuccessful effort or a grossly inflated fee request;

(5) the fees must be reasonable in that they are based on reliable records, by in this case, reconstructed billing records supported by an adequate declaration;

(6) in *Chavez* situations, if there are multiple claims, the fees should be apportioned between fee shifting and non-fee-shifting claims

A review of the law governing the issues that the panel opinion challenged, and documenting the reality of those that it capitulated to, reveals that these six criteria were satisfied.

### 1.      Obstacle 1 – Wages v. Wait Time Penalties

As against O'Hara's and the trial court's position that wait time penalties are not wages, relying on *Ling*, this Court did not challenge Martinez's argument that wait time penalties count as wages per Code. (Lab. Code, § 203.)

### 2.      Obstacle 2 – Wages - Independent Contractor Defense

As against O'Hara's defense that Martinez was an independent contractor, O'Hara abandoned it when he capitulated at trial to pay the outstanding balance of $1,300. (*De La Cuesta v. Benham* (2011) 193 Cal.App.4th 1287, 1296.)

### 3.      Obstacle 3 – Prevailing Party.

As against O'Hara's defense and the trial court's position that Martinez was not the prevailing party because O'Hara paid the outstanding $1,300 balance (immediately) prior to trial, this Court did not challenge the idea that capitulation to the amount a plaintiff seeks is equivalent to his prevailing at trial. (*De La Cuesta,* 1296.)

### 4.      Obstacle 4 – *Chavez* Limitations.

*Chavez v. Los Angeles* (2010) 47 Cal.4th 970 holds that in a sexual misconduct case, where the statute awarding fees is phrased permissively and in light of language in the cost statutes also containing permissive language (Code Civ. Proc., § 1033, subd. (a)), fee awards in these kinds of cases may be denied in the trial court's discretion by the plaintiff's failure to file in limited civil, if the case also otherwise contains certain special circumstances.

However, Martinez's authorizing Labor Code fee claim statute is phrased in mandatory language. (Lab. Code, § 218.5.)  Doubtfully assuming 1033.5's discretionary language prevails over 218.5's mandatory language, faulting Martinez for not bringing the action in limited civil is still a non-starter: Martinez was required to file in superior court in light of the 17200/17500 injunctive causes of action.  This Court's response is to point out that the trial court soundly rejected them.  But that is hardly a fair characterization of what happened, and more importantly, legally irrelevant.



The characterization is unfair because Martinez brought these claims to shut down O'Hara's CSCA website and conclusively proved they were mired in fraud. Upon being faced with an injunction to compel the website's termination, O'Hara informed the Court that he had already shut it down. The trial court took O'Hara at his word. Martinez therefore succeeded by capitulation.

It is nevertheless irrelevant even though the trial court declared the need for an injunctive order moot. This Court characterized Martinez's victory by capitulation as the trial court's sound rejection of those claims, in insisting that Martinez should have filed in limited civil. This analysis in untenable.

To validate it, this Court is essentially arrogating to a defendant the ability to obtain relief as if he had prevailed, by simply capitulating. It is not accurate to criticize Martinez's decision to file in superior court due to inclusion of fundamentally meritorious injunctive causes of action, ones eventually resulting in capitulation, regardless of whether an injunctive order was not entered due to that capitulation. Martinez clearly possessed and proved meritorious injunctive claims, no matter what the trial court said or did in response. By definition, at the time of filing, he was <u>required</u> to file in superior court. To hold otherwise, as the panel has done, amounts to the validation of implausible "heads I win, tails you lose" logic.

### a.    Special Circumstance - Larger Unsuccessful Effort.

Assuming *Chavez's* underlying theory still, its special circumstances construct is maybe still a basis to deny fees because the outcome was nevertheless less than $25,000. This is potentially still the rule even if the action was requisitely litigated in superior court.

The two special circumstances identified in this case are a larger unsuccessful effort and a grossly inflated fee request.

Turning to the former, in reviewing the effort, the 17200/17500 effort resulted in the CSCA website's demise by capitulation.



A full recovery on the wage claim, albeit only for $2,250, was obtained by capitulation.

The fraud claim was dismissed by the trial court.

The sexual misconduct claim resulted in an $7,080 verdict.

Given the extent of O'Hara's grandiose representations on CSCA's website containing national marketing aspirations, and the fact that damages on the sexual misconduct claim could have been higher because illegal sodomy repeatedly occurred, this case falls into *Chavez*'s caution against hindsight bias. (2 AA 930-931.)

It is too easy in retrospect to conclude that Martinez should have known this was a Wizard-of-Oz case. O'Hara resisted it vigorously thereby continuously telegraphing by his commitment of resources that he was seriously dedicated to CSCA's future, national advancement.

This is not a case like *Chavez* where everything else was lost besides the minor fee shifting recovery. O'Hara ultimately capitulated to virtually every claim Martinez pled after requiring Martinez to traverse the length of the legal system, and then he additionally suffered a small sexual misconduct damage verdict. Most importantly, O'Hara's dedication to preserve and advance the fraudulent CSCA enterprise was ultimately met with his capitulation. The only distinctively lost cause was the fraud claim. Given these various realities, it is simply not accurate to pigeonhole this case as a *Chavez* 'spectacularly unsuccessful effort' special circumstance. Winning is winning, even when the winning is not glorious in its extent or its accoutrements, and even if it only eliminates fraud by the process of removing one fraudster's enterprise at a time.

### b. Special Circumstance - Grossly Inflated Fee Request

The *Chavez* case involved an $870,000 fee request. This case involved a $144,000 request. The Court declined to address this difference in magnitude, though the point was clearly raised in the lower court and on appeal. The consistent refusal of the courts to address such an important distinction raises questions discussed in Martinez's challenge to the professional misconduct finding. Unaddressed, this



represents a singularly dispositive basis to distinguish *Chavez* – the analytical equivalent of capitulation.

The $144,000 fee request must also be viewed in light of the requirement to litigate this action in superior court as established above. It was not a permissible forum option to only incur $20,000 or $40,000 in time by capitalizing on the expedited procedures of the limited civil form of action.

For these reasons, the panel's holding that Martinez made a grossly inflated fee request is not sustainable as a *Chavez* special circumstance, because, simply, $144K is clearly and unquestionably not an unusual or grossly excessive request for any case tried to verdict to a superior court jury.

Those that might try to litigate a superior court case from client interview to jury verdict, for, say, a third or half that, are nothing more than defense cannon fodder. They can be easily defeated by the defense's higher commitment and development of its case. Indeed, to sweepingly hold that $144K is too much time and investment to try a small case to a superior court jury is to provide, like this Court's no-way-to-win injunctive construct, the defense a way to guarantee itself victory no matter the trier-of-fact's outcome: all it has to do is litigate vigorously.

In so doing, it can either win on the merits or it can lose on the merits. Even if it loses, it can still avoid all exposure to plaintiff's fees on the basis that the fee request is arguably "inflated." The defense can easily cause a plaintiff's trial effort to become six-figure expensive and therefore arguably inflated; indeed, any zealous defense will result in this kind of request as against any competent plaintiff lawyer.

By validating another "heads-I-win, tails-you-lose" construct, this Court has essentially excised Labor Code section 218.5's mandatory fee shifting language for any case resulting in an outcome less than $25,000. This is true even if the plaintiff filed in the only permissible forum, here superior court, and the defense ultimately capitulated to the principal outstanding balance due. This Court is ultimately holding that there is no way for a lawyer to be compensated for small wage-claim victories. Yet, excision of

a provision of state law is a function exclusively reserved for the California Legislature, absent constitutional deficiency.

### 5.      Obstacle 5 – Fees Must be Based on Adequate Billing Records

O'Hara and the trial court relied on certain billing entries as the factual basis to accuse Martinez of fabricating entries and thus tendering an unreliable bill.  This Court did not address the issue.  Both the defense and the trial court effectively accused plaintiff of dishonesty, by a superficial citation to time entries neither understood, nor studied, before indiscriminately levying moral criticism.  On appeal, this Court does not address the issue; once again, its position is the analytical equivalent of capitulation.

Its solution is to invoke harmless error principles.  The panel opinion offers a new, *sua sponte* theory of criticism.  It holds that counsel's declaration was insufficiently detailed because it did not state "in more than general terms, the extent of services rendered to the client." (Slp. Opn, 13, citing *Martino v. Deveni* (1986) 182 Cal.App.3d 553, 559.)

This contention is not tenable.  The work performed here was extensively detailed in the reconstruction document (2 A 940-952), which was incorporated into counsel's declaration (2 A 930-934).  There are numerous entries chronicling the work performed, including litigation of O'Hara's several wage defenses and generally vigorous defense. (2 A 940-952.)  True, some of the *time entries* in a partial reconstruction exercise were calculated by a (historically reliable) formula (which was not argued to be unreasonable by this Court), but *the line item descriptions* of the specific tasks are conventionally reported. (2 A 940-952.)

To say that Martinez's reconstruction was inadequate because there was not enough detail to inform the courts what work was performed is to essentially hold that reconstruction is impermissible.  However, such a holding would be in derogation of the existing case law cited in the underlying briefs.

*Martino's* counsel relied on a general "feeling" about the case to estimate his time.  In contrast, this case presents a level of factual detail about the work performed

that is categorically more accurate, rich and precise. Accordingly, criticism of the billing records on the Court's *Martino* criteria is not sustainable, and the practice of generating some other *unlitigated* criticism after the central contention of a trial court's ruling fails, instead of remanding the matter for a proper record of the contentions raised by the parties, would seem to defeat a central appellate postulate of giving all parties a structured opportunity to set forth their best argument on every contested issue.

### 6.    Obstacle 6 – Apportionment

A study of *Chavez* reveals that a litigant can collect fees for fee-shifting and non-fee-shifting claims if they are intertwined. However, those fees should be reduced if the success of the case is below the superior court minimum threshold. In other words, if Chavez had recovered $150,000, he could have sought payment for the entire $870,000 even though much of that time was not strictly related to a fee shifting cause of action. Chavez did not do so well; consequently, he should have, but did not, apportion the fees attributable to the single successful claim. On an $870K request that should have been an order of magnitude lower through apportionment, he sought everything and got nothing.

Martinez's request cannot be fairly analogized to Chavez's overreach. Martinez never sought compensation for all of his time. Unlike Chavez, Martinez acknowledged that the recovery was modest and therefore apportioned. Martinez only sought the apportioned amount, as best as he could segregate it on a percentage basis from the larger effort.

Using apportionment, Martinez sought one third of the total time to cover two fee shifting causes of action, both of which reached trial and one which reached verdict. In terms of some greater exercise or more detailed apportionment than the 10% and 23% figures counsel represented to be fair allocations, and were not disputed with any serious or significant opposition showing, it is not reasonable to have required a more discounted or segregated request. No lawyer facing a serious and dedicated opponent in superior court, one that requires you to push the case all the way to the eve of trial, can

obtain a positive monetary verdict at numbers materially different than the roughly $40K (apportioned) wage claim here.

O'Hara could have paid the full wage claim, just $1,300 more, when he tendered the $975 partial payment early on in the case; but he elected to cynically require Martinez to litigate through the length of the superior court system – over a mere $1,300 – and thus required litigation of discovery disputes, case management conferences, and pre-trial preparation.  Martinez is not statutorily obligated to bear the transaction cost of O'Hara's multi-year, intentional obstinance on the wage claim, particularly based on a statute with mandatory fee shifting.

In summary, the key facts underlying Martinez's entitlement to fees for a wage claim – the mandatory nature of wage claim fee shifting, the requirement to file in superior court, the implosion of the defense fabricated-entry theory, the inaccurate criticism of the injunctive causes, the exponentially lower numerical request relative to *Chavez*, and descriptions of work categorically more acceptable than *Martino* – reflect a panel conclusion whose foundation does not rest on pillars of legal accuracy.

## III.
### AN ACCURATE LEGAL ANALYSIS REVEALS THAT MARTINEZ WAS ENTITLED TO RECOVER ATTORNEY'S FEES FOR PROSECUTING THE SEXUAL MISCONDUCT CLAIM.

A similar but slightly different analysis reveals, in the wake of the panel opinion, that Martinez is also entitled to recover fees for the sexual misconduct claim. Here, there are effectively four obstacles that Martinez had to overcome to capture Government Code's section's 12965(b)'s permissive right to a specific dollar amount of attorney's fees:

(1)  Martinez must be considered the prevailing party on this claim;

(2)  the recovery must satisfy the limitations imposed by *Chavez* for modest recoveries;

(3)  the fees must be reasonable in that they are based on reliable records, by in this case, reconstructed billing records supported by an adequate declaration describing the work;



(4)  the fees must be reasonable in that if there are multiple claims, the fees should be apportioned between fee shifting and non-fee-shifting claims.

In light of the panel's position, an accurate analysis of the law reveals that these criteria were satisfied.

As to one, Martinez is the prevailing party with a non-nominal verdict in his favor.

With respect to two, Martinez was required to file in superior court as discussed above.  The criticism of Martinez's larger litigation effort depends fundamentally on the injunctive causes, with the panel's ruling resting on "heads I win, tails you lose" logic.  The idea of the fee request being itself grossly inflated cannot be numerically reconciled with *Chavez*, in light of this Court's capitulation to the reality that the lower court's and defense's fabricated-entry theory is inaccurate.

On three, the two key criticisms of the time and billing records fail: Martinez could not capitalize on the limited civil procedure.  The defense fabricated-entry theory failed upon consideration of the augmented materials.  The description of the work performed was unquestionably sufficient relative to *Martino*, including most obviously, time necessary to litigate the case to a jury verdict.

Lastly, four, fees were apportioned using the only reasonably available method, given the close relationship of the claims to each other: counsel's professional opinion.  To the extent an inquiry into the success of the larger effort is a permissible *criticism* under *Chavez*, the considerable time spent to unravel the fraudulent CSCA enterprise must necessarily be a proper *ingredient* in terms of assessing that success.

It should not fall on a litigant to know that a fraudulent website proclaiming a business' prominence, excellence and dominance in the industry is in fact entirely an illusion; indeed, that is precisely what private attorney general litigation is designed to unearth, and as appropriate, eliminate from the marketplace.

In summary, the central criticisms of the Martinez effort simply do not hold up under scrutiny: if the courts decline to acknowledge the *Chavez* numerical difference, the inflated-bill criticism cannot stand.  The limited civil objection fails.  The no-

injunctive-order observation does not wash.  As an alternative to the lower court's failed fabricated-entry theory, the panel's *Martino* point does not hold up.

Without these criticisms being valid, the courts are essentially rewriting the sexual misconduct statute to preclude the recovery of fees in all cases with an outcome under $25K.  The courts cannot expect plaintiff lawyers to walk some perfect line, with the exact right amount of effort to both win and not trigger claims of excessive effort.  A request for basically $100K door-to-door on the sexual misconduct claim is well within the accepted standard deviation a resistant defendant can expect to face after requiring a plaintiff to go the distance of the superior court system.

Furthermore, all of this criticism about the effort is Monday-morning quarterbacking an admittedly not great victory, but not either one that merits this quantum of scorn.  Plaintiff lawyers lose cases.  They win cases.  It always looks in hindsight that the losing cases were always losers and that plaintiff counsel should have known better to even file it.  Winning cases are usually not as good as first presented, so the later victory also cannot be credited to talent in the original case selection.  It's always an imperfect guessing game.  The entire precept of judging a case's initial merit by looking to the outcome is largely a fallacy, nothing more than an invalid iteration of confirmation bias.

In cases of mixed outcomes, like this one, the legal system would be better served to not treat professional, experienced plaintiff attorneys like they were off the reservation for pushing hard toward a possibly greater victory, even when the outcome was ultimately more modest.  It does not mean they should lose all protection of the statutory fee recovery rights provided for by the California legislature.

Respectfully, if this Court is simply following the *outcome* telegraphed by *Chavez*, it only does so by the disservice of not explaining why an exponentially

---

lower fee request still merits the caustic attitude the Supreme Court took toward the plaintiff in that case.

## IV.

## A STUDY OF THE PANEL'S GENDER DISCRIMINATION CONTENTION REVEALS THAT IT NOT ONLY DOES NOT HAVE LEGAL MERIT, BUT THAT THE PANEL COMMITTED A SIMILAR PROFESSIONAL RESTRAINT VIOLATION.

### A. Introduction

Turning to the professional misconduct referral, Martinez understands the Court's larger concern, and will regulate overly combative text to avoid future criticism, but legally, the panel's argument contains a veritable encyclopedia of intellectual flaws.

The panel's centerpiece accusation of gender discrimination is facially invalid. It is not a viable contention as the panel opinion openly admits in the ultimate footnote, since the applicable rule was not in effect at the time of the remark.

Even if it were in effect, 'insulting a female judge' – if that is the true nature of the charge – is simply not gender discrimination as understood by the sexual harassment statutes incorporated into the current Rules of Professional Responsibility. Indeed, as set forth in more detail below, the decision to publish such an accusation, knowing it to be facially invalid, is itself an arguable violation of the Code of Judicial Ethics.

The alternative basis for the Court's argument, disrespect toward a judicial officer, does not work because Martinez's language described the ruling, not the judge.

The citation to professional misconduct "on appeal" is also questionable because the offending remarks were contained in the notice of appeal, which is a document filed in the trial court.

Perhaps most importantly, the panel opinion marks another example of a legal professional succumbing to a personal feeling where the normal remedy is "not



enough." It was "not enough" for the trial judge to simply rule against Martinez; her ruling was written as a blatant excoriation of every conceivable aspect of the motion, almost completely in error.

In response, Martinez's counsel felt that it was "not enough" to simply file a regular notice of appeal given the quantum of surprise, caustic criticism the trial court blindsided him with in real time.

This Court also obviously felt that simply issuing an adverse ruling on appeal was "not enough." It decided that it would treat a trial court document as an appellate one, publicly shame Martinez's counsel for violation of a rule not then in existence, based on the questionable linguistic mutation of treating a criticism of a thing as a criticism of a person.

When contemplated at any length, the panel opinion's public citation is in actuality an even greater display of the very flaw of professional restraint that it is ironically accusing Martinez of committing.

If this Court had just cited counsel for violation of Business & Professions Code section 6068, it would be on understandable footing. An argument can be made and there are potential defenses; regardless of the technical legal merit of the charge, counsel understands the criticism and will promptly adapt better practices.

But the panel did not just refer the matter under 6068. It did not restrain itself from taking a garden-variety 6068 issue and exaggerating it into a facially and knowingly invalid charge of gender discrimination. That decision represents an equally if not more pointed lack of professional restraint since the Court not only succumbed to the same "not enough" appetite, but decided to broadcast its ethical violation to the largest possible audience.

For comparison sake, Martinez did not include the Notice of Appeal as part of a press release. Rather, over time, Martinez attempted to repeatedly walk back his self-described political mistakes in the reply brief. In contrast, this Court effectively held a press conference displaying for the entire legal community its inability to formulate

a proportionate legal position.  Consequently, the panel ruling is no Solomonic demonstration of elevated judicial wisdom.  Its public gender discrimination charge marks a textbook abuse of power.  In fairness, this petition represents its first feedback about the matter in a process that is not complete.

Having made a similar mistake of professional restraint and a second mistake of broadcasting it to an exponentially larger audience, Martinez therefore requests the Court to reconsider the matter.

### B.    Importing a Permissible Description of a Thing to a Person Constitutes Invalid Reasoning as a Cause to Find Statutory Disrespect under 6068(m).

The Court equates the description of a ruling's intellectual relationship to the defense position with a direct observation about the trial court's persona.  It may not do this without generating a futile semantic debate about the permissible language a litigant may invoke to describe inanimate objects.

For example, Martinez is not the first litigant to discuss a ruling in vaguely sexual terms: many legal positions and writings are described as "promiscuous" – a term usually referring to a person's lack of sexual discipline but also occasionally invoked as an intellectual observation of a writing. (*See, e.g.*, Colman, C., Thomas Dreams of Separability  (2018) 9 Harv. J. Sports & Ent. L. 83, 99.)  If the lower court ruling had happened to contain such intellectual promiscuity (it did not), this Court would have been on unstable legal ground to conclude that Martinez was questioning the trial judge's personal chastity.

The cited language is in actuality a criticism of the ruling's overly close relationship to the defense position.  O'Hara cited the 15/25 entries, the trial court adopted it in error; O'Hara cited *Ling*, the trial court adopted it in error; O'Hara cited *Chavez* without addressing the numerical difference; the trial court did the same.

In other words, if a trial court hypothetically cut and pasted the defense argument into its court order, the algorithmic overlay between the two might be viewed as so interlocked as to be analogous to intellectual intercourse.  Martinez is

effectively saying the trial court adopted the defense position without independently analyzing its legal merit, essentially saying the ruling was the intellectual mirror equivalent of a romantic partner's physical position.

As noted by the Supreme Court long ago, "[a]ttorneys must be given a substantial freedom of expression in representing their clients. An advocate is at liberty, when addressing the Court in regular course, to combat and contest strongly any adverse views of the Judge or Judges expressed on the case during its argument, to object to and protest against any course which the Judge may take and which the advocate thinks irregular or detrimental to the interests of his client … [a]n advocate ought to be allowed freedom and latitude both in speech and in the conduct of his client's case." (*Gallagher v. Municipal Court* (1948) 31 Cal.2d 784, 795-796, citing Oswald, Contempt of Court, 3d Ed., pp. 56, 57 and *People v. Rongetti*, 344 Ill. 107, 122, 176 N.E. 292.)

The fundamental criticism of the trial court ruling is a fair one; the panel's decision to export it as a personal criticism of the trial judge's character cannot be inferred from the actual language employed.  The idea of a trial court being literally accused of the subject term is facially absurd; counsel is at most guilty of a lampoon offense, which comes with it resulting *Hustler/Flynt* problems.

Much as the panel may publicly project that the trial court's position was completely accurate (while simultaneously and with considerable subtlety validating the lower court's outcome only by repeated avoidance and harmless error techniques), and much as Martinez may provoke this Court's ire by continuously protesting these rulings, there is nothing professionally violative about raising the lack of independent analysis as an intellectual criticism to the merit of a trial court's position.  Particularly if the criticism is accurate; the lower court ruling contains numerous, capitulated-to errors.

If the courts go down the path of transmogrifying intellectual criticisms of things into *ad hominem* criticisms of persons, it invites a slippery slope of



unenforceable vagary.  Actual gender bias does not require such mental gymnastics. (*Matter of Swan* (C.D.Cal.1993) 833 F.Supp. 794, 796.)

If the panel's position is that referring even to a ruling as succubistic constitutes disrespect of any (female) judge, then the result is that any reference to a ruling in vaguely pejorative sexual terms, such as calling a ruling, for example, "exegetical prostitution," must necessarily also be a professional violation.[1] (*Contrast San Francisco v. Holbrook* (1917) 35 Cal.App. 460, 465 [long list of conspiracy accusations by attorney toward judicial officers, including "criminal, corrupt, and wicked conspiracies," "criminal confederates," "colossal and confident insolence," "criminal prosecution," "calculated brutality," "corrupt deadfall" and similar phrases repeatedly uttered deemed sufficient offense for professional discipline].)

However, this logic is faulty because basic due process notions and First Amendment principles require more advance notice of what words and terms are prohibited when the verbiage employed is not literally a direct personal criticism of the judge, even when treated as one cannot be taken literally, the term appears in standard published English dictionaries, and is not itself slang. (*Cf. Gallagher,* 795-796.)

## C.    The Panel Decision to Accuse Counsel of Gender Discrimination, and Publish that False Accusation, is a Textbook Failure of Judicial Restraint.

The panel apparently could not resist *publicly* citing counsel for gender discrimination, while admitting in a footnote that this was not an ethical violation at the time the statement was made.  It is thus apparently (and knowingly) seeking to

---

[1] For the record, even if Martinez had directly described the trial judge with the subject term, not all females would take umbrage to it.  It can imply an attractive and sexually potent person and thus overshadow its (fictional) pejorative implications.  The Court does not appear to appreciate its positive implications in certain segments of popular American culture.  Nor does the panel (or anyone beside perhaps Mr. O'Hara) have any idea whatsoever of what counsel actually meant by the term "pseudohermaphroditic misconduct," much less to have foundational right to cite him for it.

publicly shame a lawyer before the Court with an accusation it knows to be legally invalid, in violation of rules that require restraint and temperance on the part of judicial officers. (Code Jud. Ethics, Canons 1, 3; *People v. Cooks* (1983) 141 Cal.App.3d 224, 286; *People v. Kozel* (1982) 133 Cal.App.3d 507, 521; *People v. McWhorter* (2010) 47 Cal.4th 318, 373.)

Even if the current rule were in effect, no serious legal mind could conclude that a single insult of a female trial judge in the sometimes-combative atmosphere of litigation rises to the level of actionable gender discrimination. A single comment, one vaguely invoking a gender demarcation, by a male lawyer toward a female judge does not remotely qualify as the kind of systematic mistreatment, by persons withholding something the discriminated person is legally entitled to such as employment or housing, necessary to cross legal lines. (CACI 2500; Rules Prof. Resp., 8.4.1(a); *Mixon v. Fair Employment and Housing Com.* (1987) 192 Cal.App.3d 1306, 1317.)

Viewed another way, the trial court could have issued her opinion in a much less controversial fashion. She didn't; she attacked one side. Martinez could have responded less controversially, but he too overreacted. This Court could have cited 6068 proportionally for that overreaction, but it didn't – it too has overreacted by formally publishing a wild accusation of gender discrimination, one it openly admits is invalid as an actual legal contention. Consequently, it does not appear that anyone has a superior moral claim to professional restraint in this situation.

### D. The Citation to Misconduct on Appeal Does Not Work Because Martinez Remarks Were Made in the Trial Court.

The cited language appears in the Notice of Appeal, which is a document filed in the lower court. (Cal. Rules Ct., 8.100(a)(1).)

Thus, by definition, this Court is faulting Martinez for statements made in the lower court that are, by definition, included as part of a notice to O'Hara and the trial court. It is doubtfully a legitimate view that it can seize on any and every document in



the lower court file and strategically extract it as one of its own for purposes of finding ethical violations on appeal.

The fact that the Notice of Appeal becomes part of the appellate court's case file, like a lot of documents filed below, hardly seems like a serious jurisdictional basis for this Court to treat it as a source of direct appellate misconduct.

It would also seem to this lawyer that if a case is going to be made that a lawyer disrespected a judge, and given that "disrespect" is itself a subjective perception by the person offended, that this is a statute that needs to be enforced in the first instance by the aggrieved judicial officer, not by the perception of a different judicial officer.

The second officer, here the panel, must necessarily be assuming that the first judicial officer has subjectively concluded that she has been disrespected, and secondarily, that the first judicial officer wants to enforce a remedy for the perceived offense. In other words, Appellant is questioning the validity of 6068 allegations that are based on the transitive property of perceived judicial disrespect.

### E. Section 6068(m)'s "Disrespect" Terminology Is Too Vague to be Enforceable.

As an additional argument, it may sit on the books as state law but it is fundamentally an unworkable proposition to legislate "respect." Respect, from anyone worth being respected by in this business, is accomplished through accuracy, analysis and acumen.

### F. The Panel Ruling's Decision Not to Address the Core Contention Represents a Failure of Accurate Judicial Decision Making.

The reason Martinez had trouble with the trial court's ruling and has the same difficulty with this Court's ruling is because both are textbook examples of what Martinez is calling "judicial advocacy": everything one litigant says is wrong, there is not a single argument where he is confirmed to be right and therefore it rules unanimously for the other party.



This mathematically implausible and often maddeningly impossible logic, seen time and time again throughout court rulings in the American legal system, raises legitimate questions of serious judicial defect, although taken alone, does not represent a sufficient basis to establish judicial bias. (*Labor Board v. Pittsburg* (1949) 337 U.S. 656, 659; *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 795-796; *see also International Wkrs. v. N.L.R.B.* (D.C. Cir. 1971) 455 F.2d 1357, 1368.)

In raising the issue Martinez illustrates his point by example.  In the lower court, Martinez cited *Chavez's* numerical difference as the key distinction.  This is Martinez's central protest in this case.  The trial court did not address it.  This Court did not address it.  No serious legal mind can think that this is at least a potentially dispositive basis to distinguish the *Chavez* case and therefore justify the opposite outcome.

What can Martinez safely call the adjudicative decision to ignore such a significant distinction?  There is certainly something not right about it.  It may be technically permissible; there is no known rule that says a judge must address every argument a litigant makes.

However, when the adjudicator apparently does not want to address a substantial flaw in its preferred legal position, and he or she apparently prefers to treat that flaw as if it does not exist and ultimately chooses to not address it in the final professional product, there is something profoundly dissatisfying about the ruling, well beyond the mere fact of an adverse outcome.

In the lower court, Martinez viewed it as capitulation to the correctness of Martinez's position.  Electing to still cite the *Chavez* case, Martinez interpreted the trial court's position as an intentional misapplication of the law.  With the benefit of the labor case authority located above, this characterization is admittedly a bridge too far; regardless, the label is irrelevant.  The underlying objection is definitely a problematic feature for any ruling to be considered a dispositive legal analysis.

This Court also similarly declined to address the stated flaw, obscurely contending that the "principles" of *Chavez* still apply. On this logic, it relied on an alternative basis to defend the trial court's citation. But in any considered assessment of this Court's '*Chavez* principles' idea applied here, this is, respectfully, not a viable or satisfactory legal position.

Consider by analogy a speeding car. *Chavez* holds that a car going 870 miles per hour is far too fast. Is *Chavez* then dispositive authority for a car going 1/6th the speed, 144 mph, the same speed as traffic? Does 144 mph still fit into *Chavez's* "grossly" speeding rubric?

Of course not. It is not a satisfactory response to say that *Chavez's* "principle" of penalizing those who grossly speed based on 870 mph travel can be summarily stamped on to a car going the same speed as traffic and at a fraction of that speed, without explaining why such a dramatic reduction is still unacceptable. If the factual difference is not explained, the citation to *Chavez* is effectively meaningless. Everyone is grossly speeding. Every plaintiff lawyer with a small recovery must be bastardized in his fee application.

Yet courts, including this Court, embrace this method all the time. The kind of judicial decision making that satisfyingly ends the dispute would seem to require something more than just avoiding the central contention between the parties and generically announcing that one side's position is correct. That is not truly adjudicative, not analytical; it is electoral. It feels a bit dictatorial, respectfully.

What we label this adjudicative method is irrelevant. What is important is that it marks the difference between a system that resolves disputes in a way that all litigants can live with, have respect for, and move on from, versus one that incentivizes society to resort to alternative methods of dispute resolution because no satisfactory answer to the debate is provided by the judiciary, after much effort.

Here, effectively, the courts are validating a game of "heads-I-win, tails-you-lose." Even if the litigant is right upon an analysis of the applicable legal principles,

the court avoids that reality and instead resorts to a *sua sponte*, unlitigated theory to conclude he is wrong. This method does not enhance a lasting rule-of-law system.

It marks one instead comprised of individual judicial fiefdoms that, again respectfully, do not appear to organically respect the accepted method of legal analysis. Instead, case outcomes are based on unpublished criteria, personal incantation, political favoritism (or disfavoritism) or other unknown dynamic, by ignoring the dispositive legal analysis and reverse engineering the desired outcome through the sophistry of harmless error techniques. This may not be illegal per the labor cases cited above, but nor does it seem to serve the larger philosophy behind independent, analytical adjudication.

By utilizing these avoidance and harmless error methods, *especially when the independent basis for affirming the judgment was not litigated*, appellate courts can arrive at the result they prefer no matter whether the favored party's legal position is legally accurate or not. This is exactly antithetical to the central premise of why a rule-of-law legal system stabilizes society. Indeed, such methods are not stabilizing; they are destabilizing because they are displays of power, not reason.

Martinez has no interest in being referred to the bar for further criticism in light of this continuing protest, or further excoriated for what he perceives as a significant flaw in the way courts do business, but neither is he willing to abandon the central grievance, however labeled, merely because the Court has elected to publicly focus on a linguistic offense and has also elected to ratify, without response or explanation, the advocacy paradigm Martinez protested in the original ruling and repeated on appeal.[2]

## CONCLUSION

In considering the large number of mistakes the trial court made, and in light of the large amount of capitulation to those mistakes this Court tacitly acknowledges, and given the clearly inaccurate alternative basis the panel invoked

---

[2] Appellant will unilaterally submit this brief to the State Bar in conjunction with the other ones and serve this Court with notice.

for harmless error purposes under *Martino*, the matter should be remanded for the issue of fees and costs to be redone accurately.

Courts should be "sensitive to the need to encourage 'private attorneys general' willing to challenge injustices in our society. Adequate fee awards are perhaps the most effective means of achieving this salutary goal. Courts should not be indifferent to the realities of the legal marketplace or unduly parsimonious in the calculation of such fees." (*Thayer v. Wells Fargo* (2001) 92 Cal.App.4th 819, 839.)

As far as the professional misconduct referral goes, in criticizing counsel for using a word that literally describes a thing and not a person, Martinez will commit to speak less combatively.  That said, Martinez respectfully submits that this Court's knowingly-invalid gender discrimination accusation marks an intellectually-identical failure of professional restraint, one that is in fact more problematic because it broadcast this obvious judicial violation to the entire California legal community.

If it were not for the litigation privilege and other immunities, the Court's publication of a gender discrimination finding on this record would represent actionable tortious defamation, easily satisfying traditional *New York Times* criteria for malice. (*New York Times v. Sullivan* (1964) 376 U.S. 254, 279-280.)  As Benjamin Franklin is inaccurately credited with coining, and professionally speaking, 'those in glass houses should not throw stones." (*Royal Bahamian v. QBE* (S.D.Fla.2010) 744 F.Supp.2d 1297, 1302, fn. 8.)

Finally, by far the most important issues in this litigation are questions raised about adjudicative methods, utilized by both the lower court and this Court.  Here, Martinez can only hope to impress on the courts that disposition without analysis, by ruling unanimously for one party only by refusing to address the contention that the applicable legal paradigm calls for and instead resorting to harmless error techniques, profoundly fails to serve the higher goals of a rule-of-law dispute

resolution system.

Respectfully:

Date: March 14, 2019                    PAVONE & FONNER, LLP

Benjamin Pavone, Esq.

Attorneys for Appellant Martinez

## CERTIFICATE OF WORD COUNT

Pursuant to the California Rule of Court, Rule 8.204(c), I certify that the foregoing combined brief is proportionally spaced, has a typeface of 14 points, is double-line spaced, and based upon the word count feature contained in the word processing program used to produce that brief (Microsoft Word 2010), contains approximately 6,800 words excluding tables and ancillary documents, and thus well-within the stated 2018 permissible limit of 14,000 words for a brief. (Cal. Rules Ct., Rule 8.204(c)(1).)

Date: March 14, 2019                    PAVONE & FONNER, LLP

Benjamin Pavone, Esq.
Attorneys for Appellant

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
550 WEST C STREET, STE. 1670
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR APPELLANT

# FOURTH DISTRICT COURT OF APPEAL

# STATE OF CALIFORNIA

| | |
|---|---|
| **MARTINEZ,** | CASE NO. G054840 |
| Appellant, | **PROOF OF SERVICE** |
| v. | |
| **O'HARA,** | |
| Respondent. | |

I, Benjamin Pavone, declare as follows:

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 501 West Broadway, Ste. 800, San Diego, California 92101 (E: bpavone@cox.net).

On March 14, 2019, I served or arranged for service of the following:

\*    Martinez Petition for Rehearing

on the following service list:

## <u>SERVICE LIST</u>

Mr. Marc Alexander, Esq.
Mr. William Michael Hensley, Esq.
Alvarado Smith APC                            By Electronic Service
1 MacArthur Place, Ste. 200        malexander@alvaradosmith.com
Santa Ana, CA 92707                mhensley@alvaradosmith.com

*Appellate Attorneys for O'Hara*

Orange County Superior Court
Chambers Hon. Carmen Luege
700 West Civic Center Dr., Dept. 61            Via First Class Mail
Santa Ana, CA 92701

*Trial Court*

Fernando Martinez                          (Via Electronic Mail)
                          contactfernandomartinez@gmail.com

*Appellant*

     These documents were sent on or about this same date as indicated above by my copy service, in that a request is initiated by me by email on this date and is typically carried out on the same day.

     I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 14th day of March, 2019 that the foregoing is true and correct.



# EXHIBIT 20

SUPREME COURT OF CALIFORNIA
Electronically RECEIVED on 4/3/2019

S255071

# In the Supreme Court
# of California

| | |
|---|---|
| **FERNANDO MARTINEZ,**<br><br>          **PETITIONER,**<br>v.<br><br>**STEPHEN O'HARA***;*<br>**CAREER SOLUTIONS AND**<br>**CANDIDATE ACQUISITIONS;**<br>**O'HARA FAMILY TRUST;**<br>**OCRE, INC.;**<br>**PROFESSIONAL REALTY**<br>**COUNCIL, INC; and**<br>**PACIFIC VALLEY REALTY, INC.;**<br><br>          **RESPONDENTS.** | **SUPREME CT. NO. _____**<br><br>**FOURTH DISTRICT COURT OF**<br>**APPEAL CASE NO. G054840**<br><br>**SAN DIEGO SUPERIOR COURT**<br>**CASE NO. 30-2012-00614932** |

ON REVIEW FROM THE SAN DIEGO SUPERIOR COURT
COMMISSIONER CARMEN LUEGE, JUDGE PRESIDING
JUDGE KIMBERLY DUNNING, JUDGE PRESIDING
JUDGE GREGORY MUNOZ, JUDGE PRESIDING

*Petition for Review*

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
501 WEST BROADWAY, STE. 800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

# TABLE OF CONTENTS

I.   STATEMENT OF THE ISSUES AND
     GROUNDS FOR REVIEW ..................................................................... 8

     Issue No. 1:  Improperly Methodology in Resorting
                   to the Harmless Error Doctrine ....................................... 8

        Grounds for Review ................................................................... 8

     Issue No. 2:  Are Trial Courts in Labor Code Section 218.5
                   Fee Applications Permitted to Deny Attorney's Fees
                   to a Prevailing Party Based on the Application of
                   Chavez v. Los Angeles (2007) 47 Cal.4th 970? ............. 9

        Grounds for Review ................................................................... 9

II.  PETITION FOR REHEARING ............................................................ 9

III. STATEMENT OF APPEALABILITY ................................................. 9

IV.  THE COURT SHOULD GRANT REVIEW TO ENFORCE
     THE PROPER STATUTORY ADJUDICATIVE PROCEDURE
     UNDER THE HARMLESS ERROR DOCTRINE APPLICABLE
     TO MOTION RULINGS. ..................................................................... 10

     A.  Statement of Facts. .................................................................. 10

     B.  Procedural History ................................................................... 10

     C.  Fee Application ........................................................................ 11

     D.  Trial Court Ruling .................................................................... 11

     E.  Appellate Court Ruling ............................................................ 12

     F.  Petition for Rehearing .............................................................. 13

     G.  Resort to Harmless Error with Respect to a Civil Post-Trial Motion
         Requires a Structured Analysis under CCP 475 and Forecloses
         Reliance on Unlitigated Grounds First Raised in the Panel Opinion............ 14

         1.  Introduction ....................................................................... 14

         2.  Authority of the Harmless Error Doctrine............................. 15

                a.  Article I, Section 13 .............................................. 16

                b.  CCP Section 475..................................................... 17

c. Evidence Code Section 353/354 .......................................... 17

3. Analysis of CCP Section 475 .................................................... 18

4. Section 475 Analysis - Overview. ........................................... 18

5. Prong (a) – "Substantial Rights" Query .................................... 19

6. Prong (b) – Prejudicial Error. ................................................. 23

7. Prong (c) – Substantial Injury ................................................. 23

8. Prong (d) – Different Result Probable. ..................................... 23

II. LABOR CODE SECTION 218.5 FEE SHIFTING IS MANDATORY. COURTS MAY NOT SUMMARILY DENY ALL COMPENSATION IN RELIANCE ON *CHAVEZ.* ........................................................ 30

CONCLUSION .................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Aguerre v. American Guarantee*
(1997) 59 Cal.App.4th 6 .......................................................................... 25, 27, 28

*Alzamora v. Dep't of Corr.*
(11th Cir. 2012) 463 F. App'x 816 .................................................................. 24

*Andrews v. Agricultural Labor Relations Bd.*
(1981) 28 Cal.3d 781 ...................................................................................... 29

*Arizona v. Fulminante*
(1991) 499 U.S. 279 ........................................................................................ 28

*Beard v. Beard*
(1999) 71 Cal.App.4th 753 ............................................................................. 25

*Bed, Bath & Beyond v. La Jolla Village Square*
(1997) 52 Cal.App.4th 867 ............................................................................. 22

*Brison v. Brison*
(1891) 90 Cal. 323 .......................................................................................... 27

*Cahill v. SDGE*
(2011) 194 Cal.App.4th 939 ..................................................................... 16, 25

*Chabot v. Tucker*
(1870) 39 Cal. 434 .......................................................................................... 25

*Chapman v. California*
(1967) 386 U.S. 18 .......................................................................................... 23

*Chavez v. Los Angeles*
(2010) 47 Cal.4th 970 .............................................................................. passim

*Davey v. Southern Pacific*
(1897) 116 Cal. 325 ..................................................................................... 25-26

*Dunn v. Stringer*
(1941) 41 Cal.App.2d 638 .............................................................................. 23

*Fine v. Fine*
(1946) 76 Cal.App.2d 490 .............................................................................. 21

*F.P. v. Monier*
(2017) 3 Cal.5th 1099 .......................................................................... 8, 23, 27, 30

*Hutchings v. Castle*
    (1874) 48 Cal. 152.......................................................................... 23, 30

*In re R.T.*
    (2017) 3 Cal.5th 622....................................................................... 8

*In re Watkins' Estate*
    (1940) 16 Cal.2d 793....................................................................... 18

*International Wkrs. v. N.L.R.B.*
    (D.C. Cir. 1971) 455 F.2d 1357 ...................................................... 29

*Labor Board v. Pittsburg*
    (1949) 337 U.S. 656 ........................................................................ 29

*Ling v. P.F. Chang's*
    (2016) 245 CaI.App.4th 1242 .......................................................... 12

*Loeffler v. Medina*
    (2009) 174 Cal.App.4th 1495 .......................................................... 25

*Martino v. Deveni*
    (1986) 182 Cal.App.3d 553.............................................. 12, 13, 15, 27

*Mountain Air v. Sundowner*
    (2017) 3 Cal.5th 744........................................................................ 8

*Murphy v. Bennett*
    (1886) 68 Cal. 528............................................................................ 30

*People v. Birch Securities*
    (1948) 86 Cal.App.2d 703................................................................ 23

*People v. Chun*
    (2009) 45 Cal.4th 1172.................................................................... 16

*People v. Martinez*
    (2017) 2 Cal.5th 1093...................................................................... 8

*People v. Mil*
    (2012) 53 Cal.4th 400...................................................................... 22

*People v. Sivongxxay*
    (2017) 3 Cal.5th 151........................................................................ 16

*Planned Protective Services v. Gorton*
    (1988) 200 Cal.App.3d 1 ........................................................... 26, 31

*San Jose Ranch v. San Jose Land & Water*
    (1899) 126 Cal. 322 ....................................................................26-27

*Serrano v. Unruh*
    (1982) 32 Cal.3d 621 ..................................................................... 20

*Western Mutual v. Yamamoto*
    (1994) 29 Cal.App.4th 1474 ........................................................ 26

*Young v. California Fish & Game*
    (2018) 24 Cal.App.5th 1178 .................................................. 16, 25

## Statutes & Other Rules

California Constitution

    Article I, section 13 ...............................................................15-17

California Code of Civil Procedure

    Section 86, subd. (a)(7) ........................................................13-14

    Section 86, subd. (a)(8) ........................................................13-14

    Section 475 ...................................................................... passim

    Section 656 ............................................................................ 16

    Section 657 ............................................................................ 16

    Section 1033 .......................................................................... 30

California Evidence Code

    section 353 ............................................................................ 17

    section 354 ............................................................................ 17

California Government Code

    section's 12965(b) ................................................................ 30

California Labor Code

    section 203 ............................................................................ 13

    section 218.5 ..................................................................... 9, 30

California Rules of Court

    Rules 8.366(b)(1) ................................................................... 9

---

Rule 8.500(b) ............................................... 9

Rule 8.500(e)(1) ........................................... 9

Rule 8.504(b)(1) ........................................... 8

Code Jud. Ethics

Canon 1, Adv. Note .................................... 30

Canon 3B(8) ............................................. 30

Bibas, The Psychology of Hindsight and After-the-Fact Review of
Ineffective Assistance of Counsel (2004) 2004 Utah L. Rev. 1 ................. 31

Findley & Scott, The Multiple Dimensions of Tunnel Vision
in Criminal Cases (2006) 2006 Wis. L. Rev. 291 ...................................... 31

Fallon, Legitimacy and the Constitution
(2005) 118 Harv. L. Rev. 1787 ...................................................... 31

Solomon, Causing Constitutional Harm: How Tort Law Can Help
Determine Harmless Error in Criminal Trials
(2005) 99 NW. U. L. Rev. 1053 ................................................ 31

Wallace & Kassin, Harmless Error Analysis: How Do Judges Respond to
Confession Errors (2012) 36 Law & Hum. Behav. 151 ............................ 22

Winkelman, An Empirical Method for Harmless Error
(2014) 46 Ariz. L.J. 1405 .................................................. 16, 22, 28, 31-32

## I.
## STATEMENT OF THE ISSUES AND
## GROUNDS FOR REVIEW

Pursuant to California Rules of Court, Rule 8.504(b)(1), Petitioner raises three issues summarized below.

### Issue No. 1
### Improper Methodology in Relying on the Harmless Error Doctrine

**Issue Number One:** This Court grants review for essentially two reasons. One, there is a conflict among the courts of appeal about the particular rules governing a subject. (*Mountain Air v. Sundowner* (2017) 3 Cal.5th 744, 750-751; *In re R.T.* (2017) 3 Cal.5th 622, 624; *People v. Martinez* (2017) 2 Cal.5th 1093, 1099.) Or two, as applicable here, there is an important public policy issue relating to the exact rules applicable to invoke the harmless error doctrine. (*See F.P. v. Monier* (2017) 3 Cal.5th 1099, 1110.)

This Court should review the question of whether appellate courts in the civil motion context are required to follow the analytical structure of the harmless doctrine pursuant to CCP section 475 or whether they can resort to the unstructured exercise practiced in the common law.

Courts are advised pursuant to the common law to rule on all of the issues presented. Appellate courts nevertheless sometimes decline to adjudicate a material issue, in situations where the trial court also did not adjudicate it. In light of the applicable statute, and in a post-trial motion where this is a central issue, appellate courts do not have the statutory prerogative to affirm a ruling based on avoiding adjudication of a material issue by instead relying on alternative, unlitigated grounds.

**Grounds for Review**: This issue should be reviewed because it presents an important question of law. When parties have spent considerable time and resources, measured in years of effort, dedicated to a case, they expect to have the material issues raised to be adjudicated. When appellate courts avoid these central disputes, and instead resort to unlitigated grounds on a harmless error basis to both affirm a



ruling and not answer the central issues raised by the parties, it undermines the public's confidence in the integrity of the legal system.

### Issue No. 2

### Are Trial Courts in Labor Code Section 218.5 Fee Applications Permitted to Deny Attorney's Fees to a Prevailing Party Based on the Application of *Chavez v. Los Angeles* (2007) 47 Cal.4th 970?

As applicable here, there is an important public policy issue relating to whether limitations on fee applications traceable to a statutory right founded in discretion can be imported to the wage context where attorney's fees are statutorily mandated. (*See Chavez v. Los Angeles* (2007) 47 Cal.4th 970, 975.)

**Grounds for Review**: This issue should be reviewed because it is an important question of law as acceptance of *Chavez* defenses would change employees' statutory rights vis-à-vis employers by essentially rewriting (or excising) the mandatory language of section 218.5.

## II.
## PETITION FOR REHEARING

Pursuant to California Rules of Court, Rule 8.500(b), Martinez filed a petition for rehearing on March 14, 2019, which was denied on March 22, 2019.

## III.
## STATEMENT OF APPEALABILITY

A Petition for Review must be filed within forty days of the Court of Appeal's final opinion. (Cal. Rules Ct., Rules 8.366(b)(1), 8.500(e)(1).)  The Court of Appeal's denial of Martinez's Petition for Rehearing occurred on March 22, 2019.  The instant petition is timely. (Cal. Rules Ct., Rule 8.500(e)(1).)



## IV.

## THE COURT SHOULD GRANT REVIEW TO ENFORCE THE PROPER STATUTORY ADJUDICATIVE PROCEDURE UNDER THE HARMLESS ERROR DOCTRINE APPLICABLE TO CIVIL, POST-TRIAL MOTION RULINGS.

### A. Statement of Facts

Simplified to its essence, Plaintiff Fernando Martinez, a young job seeker, responded to a real estate headhunter website containing a series of grandiose, fraudulent representations including exorbitant compensation expectations. (1 A 505-506, 512-524.)

He was not offered any path consistent with the representations on the website. (1 A 18; 1 A 57; 2 A 797.)  Instead, he was offered a job with its founder, Stephen O'Hara, as O'Hara's personal assistant at a fraction of the advertised compensation levels. (1 A 18; 1 A 290; 2 A 815.)

Martinez was thereafter leveraged into an illegal sexual relationship with O'Hara, which resulted in Martinez's premature, unlawful discharge and O'Hara's improper withholding of outstanding wages. (1 A 17-19, 57-58, 291; 2 A 718-719, 797; 3 A 1226, 1580; 1 RT 58.)

### B. Procedural History

Martinez filed suit in November, 2012 alleging claims related to fraud and constructive discharge, which eventually resulted in an operative complaint filed on August 5, 2013 alleging fraud, false advertising, a labor code violation, sexual harassment and alter ego findings. (1 A 11-35; 2 A 1116; 2 A 806-909; 2 A 1132.)

The fraud claim was dismissed at trial due to Martinez's knowledge, before accepting the personal assistant position, that the (grandiose) representations on the website were not applicable to him. (2 A 1105; See CACI 1900, Nos. 5, 7; 3 A 1213; 3 A 1281; *see* 2 A 864-903; 3 A 1633.)

Martinez unsuccessfully sought to certify the false advertising claims in a B&P 17200/17500 consumer class action, based on O'Hara's mass advertising of, and



national ambitions for, the real estate website. This decision was affirmed by the Fourth District Court of Appeal, Division Three in 2014 based on its finding that there was an insufficient showing that the certification effort satisfied the CCP 382 class action requirements. (*Martinez v. O'Hara*, Fourth District Case No. G050710.)

Thereafter Martinez pursued these claims as individual, injunctive matters, which resulted in O'Hara's eventual capitulation to take the fraudulent website down. (3 A 1804.)

The labor code claim resulted in O'Hara eventually paying Martinez $750 in outstanding wages and $1,500 in labor code penalties for a total of $2,250. (1 A 180-181.)

The sexual harassment claim went to trial, with a jury awarding Martinez $8,080 in damages. (3 A 1868-1870.)

O'Hara stipulated at trial to treat all of his various entities as alter egos of himself. (2 A 1110.)

## C.  Fee Application

Martinez filed an application for the recovery of principal attorney's fees on October 10, 2016 premised on prevailing on the Labor Code wage claim and the sexual harassment (FEHA) claim. (2 A 914.)  He sought $133,887 in fees for the legal effort and $12,747 for the fee application for a total claim of $146,634. (2 A 927.)

Counsel opined that the wage claim constituted 10% of the total legal effort ($40,567 of the $133,887 principal fee claim) and that the FEHA claim, which went to verdict, constituted 23% of the total legal effort ($93,919 of the $133,887 principal fee claim). (2 A 927, 931, 1071, 1078, 1106.)

The remainder of the legal effort was not subject to statutory fee shifting and Martinez did not seek compensation for it.

## D.  Trial Court Ruling

The trial court denied all recovery of fee compensation by holding as follows:

(1)   that the case was over-litigated in violation of an exception in *Chavez v. Los*



*Angeles* because Martinez did not file the case as a limited civil action, and in addition, the subject $133K fee request was grossly inflated within the meaning of *Chavez*' special circumstance language (2 A 1107-1108);

(2)  that Martinez was not entitled to any fee because the larger litigation effort was "spectacularly unsuccessful" and thus also qualified as a *Chavez* special circumstance exception warranting wholesale denial of any fee recovery (2 A 1107);

(3)  that Martinez's billing records were unreliable, and therefore no fee was earned, because two entries of 15 hours and 25 hours billed on two days were thought to be fabricated (2 A 1106);

(4)  that Martinez could not collect fees for recovery of wait-time penalties under *Ling v. P.F. Chang's* (2016) 245 CaI.App.4th 1242 (2 A 1106); and

(5)  that Martinez was not the prevailing party on the wage claim because O'Hara capitulated to pay the outstanding wages due before trial. (2 A 1106.)

### E.  Appellate Court Ruling

Division Three of the Fourth District Court of Appeal held in response to the trial court's findings:

(1)  it <u>agreed</u> that *Chavez's* special circumstance construct applied because Martinez $133K fee request was grossly inflated and he did not file suit in limited civil (Opn., 12-13);

(2)  it <u>agreed</u> that Martinez was not entitled to any fee under *Chavez* because the larger litigation effort was spectacularly unsuccessful (Opn, 15, fn. 8);

(3)  it <u>agreed</u> that Martinez's billing records were unreliable, not because the 15/25-hour entries were inaccurate (it capitulated that they were not fabricated), but on the alternate basis that the fee declaration did not contain a sufficient description of the work performed under *Martino v. Denevi* (1986) 182 Cal.App.3d 553 (Opn. 18-19);

(4)  it <u>disagreed</u> with the trial court, which had cited *Ling*, by capitulating that Martinez could collect fees for recovery of wait-time penalties (Opn. 19); and

(5)  it <u>disagreed</u> with the trial court by capitulating that Martinez was the prevailing party on the wage claim even though O'Hara paid the outstanding wages due before the trial started (Opn, 19).



### F.  Petition for Rehearing

As to each of the criticisms above, Martinez sought rehearing on the basis that:

(1)  Martinez' fee request did not fall under the *Chavez* "grossly inflated" exception because $133K is simply not an unusual or excessive number for a small case to run the length of the superior court system, which O'Hara required, and was dramatically and exponentially less than the $870K fee request that the *Chavez* "grossly inflated" construct is founded on. (Pet. Reh., 9-10);

Furthermore, the case did not qualify for treatment under *Chavez* because it was impermissible for Martinez to file suit in limited civil given his pursuit of injunctive causes of action, ones that O'Hara ultimately capitulated to. (Pet. Reh., 8; Code Civ. Proc., § 86, subds. (a)(7), (a)(8); 2 A 1007.)

(2)  that a case that is successful on a limited basis (here, resulting in termination of a fraudulent enterprise, a small but full recovery on a wage claim, and a small recovery on a FEHA claim) cannot accurately be classified as litigation that is "spectacularly unsuccessful" (Pet. Reh., 9), and in addition, this is a construct that only applies to FEHA claims (as opposed to wage claims), where fees can be denied as a matter of discretion under 12965(b) and *Chavez* (Pet. Reh., 7);

(3)  that the trial court's citation to the 15/25 billing entries was inaccurate (as effort for those entries was supported by significant motion filings) and that the appellate court's resort to harmless error principles under *Martino* to say that an insufficient declaration was an alternate basis to affirm the denial of all compensation, without that issue having been litigated and without the difference in magnitude between the $870K fee request in *Chavez* versus the $133K one here being addressed, is a violation of the harmless error doctrine (Pet. Reh., 11-12);

(4)  that the trial court's finding under *Ling* that wait-time penalties are not wages is legally inaccurate given the language of Labor Code section 203, as the appellate court capitulated to (Pet. Reh., 7);

(5)  that the trial court's finding that Martinez was not the prevailing party because O'Hara capitulated to pay the outstanding wage balance at trial is inaccurate, as capitulated to by the appellate court (Pet. Reh., 7).

The panel denied the petition for rehearing without substantive comment.



### G. Resort to Harmless Error with Respect to a Post-Trial Motion Requires a Structured Analysis under CCP 475 and Forecloses Reliance on Unlitigated Grounds.

#### 1. Introduction

Courts may not resort to the statutory harmless error doctrine as a way to avoid ruling on a reversible error.  Rather, they must satisfy a four-pronged statutory analysis that ultimately prohibits an appellate court from affirming a decision on a basis that was never litigated.

Preliminarily, there were two ordinary legal errors and a material omission that are prefatory to this discussion: one, the finding in both courts that Martinez should have filed the case as a limited civil action. (2 A 1107; Opn, 10.)  As Martinez's operative complaint included injunctive causes of action, it was impermissible for him to file it in the expedited forum. (2 806; Code Civ. Proc., § 86, subds. (a)(7), (a)(8); 2 A 1007.)

Two, the characterization of the litigation as spectacularly unsuccessful is untenable.  Martinez obtained relief on every cause of action he filed, except one (fraud).  While the litigation results may not have been spectacularly successful, a case resulting in modest relief virtually across the board, including the case's primary purpose of terminating O'Hara's fraudulent real estate enterprise, is categorically excluded from the characterization of being spectacularly unsuccessful.

Uniformly modest relief simply cannot be equated with a spectacular lack of it.

Three, both lower courts refused to rule on the "magnitude" issue.  Can reliance on *Chavez* to deny all compensation actually be valid given the magnitude of the two fee requests?  In *Chavez,* the applicant sought $870K for a $10K recovery; here Martinez sought $133K for the same $10K recovery, a $737K difference of magnitude in the fee requests that logically demands an explanation before the pejorative *Chavez* "grossly inflated" exception can or should apply.

For a fee request to be viewed as "grossly inflated," there must seemingly be some reconciliation with *Chavez* as to why $133K qualifies for such treatment when



the Martinez case traversed the length of the system and was tried to a superior court jury verdict against a resistant defendant.  This sort of fee request is not dissimilar from most any case involving such an extensive legal journey.

Assuming these three issues are errors, the lower court decision could still be affirmed on two alternate grounds both relating to alleged billing irregularities.  The first asserted billing mistake was raised by the trial court in citing two allegedly impossible 15 and 25-hour entries as seemingly fabricated. (2 A 1106.)  However, this contention was unraveled on appeal upon presentation of the supporting (detailed) legal work and was therefore not a legally accurate basis to support the trial court's overbilling accusation. (*See* Reply Brief, p. 24.)

The second alternate billing basis was the asserted insufficiency of counsel's declaration under *Martino v. Denevi* (1986) 182 Cal.App.3d 553, first advanced by the appellate panel in its disposition. (Opn. 13.)  However, that criticism was also inaccurate as a legal matter: *Martino* held that a litigant's 'feeling' to support a particular fee was insufficient (*Martino*, 559); in contrast, Martinez tendered a detailed, chronological itemization of the tasks performed, which was incorporated into the supporting declaration. (2 A 933, 940-952.)

The appellate court's invocation of harmless error principles in resorting to its unlitigated *Martino* theory, apart from being facially inaccurate, without first directly addressing the *Chavez* magnitude problem, is a violation of the properly-understood mechanics of the statutory harmless error doctrine.

An analysis under the statute suggests that an appellate court may not peruse a record, skipping over a dispositive contention by one party, by relying on unlitigated theories to affirm a lower court ruling.

### 2.   Authority of the Harmless Error Doctrine

The legislative authority for the harmless error doctrine emanates from three legislative sources: *(i)* the California Constitution, in Article I, section 13; *(ii)* Code of Civil Procedure, section 475; and *(iii)* Evidence Code sections 354 and 355.



### a. Article I, Section 13

As to the constitutional provision, the authorizing language states that:

> No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.

On its face, the language of this provision applies to requests to set aside a judgment, which in a civil context would seemingly relate to motions brought under CCP section 657, or to grant a new trial under CCP sections 656/657. More importantly, the focus of the doctrine, especially the "miscarriage of justice" language, seems to be almost exclusively directed at errors made during (criminal) trials that result in a (manifestly) inaccurate verdict. (*See, e.g., People v. Sivongxxay* (2017) 3 Cal.5th 151, 211 (Conc. Opn., Liu, J); *People v. Chun* (2009) 45 Cal.4th 1172, 1201; *see* Winkelman, An Empirical Method for Harmless Error (2014) 46 Ariz. L.J. 1405, 1408.)

Martinez did not file motions seeking to set aside the judgment or for new trial. Rather, he sought only for that portion of a civil judgment denying fees in a post-trial motion to be remanded for a more accurate consideration of the applicable legal principles.

Section 13 trial errors can be juxtaposed with inaccurate legal analysis manifested in such motions, because in the former there is a statistically-unavoidable amount of error. In contrast, civil motions seem to be more closely governed by a common law, rather than constitutional, version of harmless error. (*Young v. California Fish & Game* (2018) 24 Cal.App.5th 1178, 1192-1193; *Cahill v. SDGE* (2011) 194 Cal.App.4th 939, 956.)



Consequently, Section 13 does not appear to be a particularly compelling basis from which to analyze the proper methodology to sustain civil motion decisions on harmless error grounds.

### b. CCP Section 475

Code of Civil Procedure section 475 reads as a better source of authority in this context, stating:

> The court must, *in every stage of an action*, disregard any error, *improper ruling*, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties. No judgment, *decision*, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown. [Italics added.]

The language here contains no obvious limitation in terms of applying to a civil post-trial motion.

### c. Evidence Code Sections 353/354

The third source of authority, Evidence Code sections 353 and 354, appears to relate to evidence admitted at trial.  Section 353 states that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence" unless a miscarriage of justice occurred.

Section 354 similarly states that "verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence" unless the trial resulted in a miscarriage of justice.



Petition for Review

Martinez was not questioning the outcome of the trial, nor does this problem easily fit a query of whether a miscarriage of justice resulted.  Therefore, Petitioner premises his argument on the most applicable legislative authority, CCP section 475.

### 3.   Analysis of CCP Section 475

Assuming section 475 is the strongest and best statutory authority for application of the harmless error doctrine with respect to a civil post-trial ruling (*see, e.g.*, *In re Watkins' Estate* (1940) 16 Cal.2d 793, 799), the Court should grant review to require courts to more assiduously follow the statutory construct.  In so doing, it will set better and more consistent standards for when and how the harmless error doctrine is validly applied.  This is especially so in a situation like the instant case, where both the trial court and the appellate court declined to address a central, material issue, one that statutorily qualified as prejudicially impacting Martinez's substantial rights.

This is also especially important when resort to an alternative, harmless-error ground was not itself litigated.  In these situations, the appellate court is making *sua sponte* findings on appeal that are not founded upon a structured legal analysis, nor first addressed by the parties.  In this case, the appellate court's unlitigated theory was also clearly without merit, again manifesting the elevated risk of erroneous adjudications when not premised on first soliciting the position and legal analysis of the parties.

### 4.   Section 475 Analysis - Overview.

The applicable language of section 475, restated in a broken-down fashion, states:

> The court must:
>
> *[a]*, in every stage of an action, <u>disregard any error</u>, improper ruling, instruction, or defect, in the pleadings or proceedings <u>which</u>, in the opinion of said court, <u>does not affect the substantial rights of the parties</u>.
>
> *[b]* [*Assuming [a], that substantial rights are involved*] No judgment, decision, or decree shall be reversed or affected by



reason of any error, ruling, instruction, or defect, unless it shall appear from the record that <u>such error</u>, ruling, instruction, or defect <u>was</u> *[b]* <u>prejudicial</u>; <u>*and*</u>

*[c]* also that <u>by reason of</u> <u>such error</u>, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered *[c]* <u>substantial injury</u>, <u>*and*</u>

*[d]* that <u>a different result would have been probable</u> if such error, ruling, instruction, or defect had not occurred or existed. [Emphasis added.]

In other words, there is a four-pronged analysis that is foundational to a proper statutory harmless error conclusion. As will be established below, appellate courts cannot, consistent with the statute, summarily dispose of cases on harmless error grounds by omitting to address a central litigated issue and resorting to unlitigated conclusions. They must follow the rigors of the method set forth by the statute.

### 5. Prong (a) – An Error Affecting Substantial Rights

To satisfy prong (a), there must first be an error. Here, there are technically three applications of *Chavez* that all seem to constitute error, or at least erroneous omission: one, the lower courts' insistence that Martinez should have filed in limited civil, which was illegal for him to do; two, the panel conclusion that the litigation was spectacularly unsuccessful, which confuses uniformly minor relief with absolutely no relief; and three, the larger *Chavez* construct itself, which is factually founded on an $870K fee request, as opposed to a relatively common number for a small case, such as $133K.

Assuming one and two are errors, it also seems to be erroneous to rely on the *Chavez* case for the idea that $133K was necessarily a "grossly-inflated" fee request, and therefore subject to summary denial of all compensation, without some explanation of how such a large magnitude between it and Chavez's $870K request still makes the exception applicable.



Neither lower court was willing to directly confront the geometric difference in the fees requested between the *Chavez* case and this case, which was requisitely litigated in superior court and traversed the full length of the system to a jury verdict.

This is despite at least six separate attempts by which Martinez prompted the lower courts to address the magnitude issue:

- **Moving Papers, Fee Motion**: Nor, unlike the overly ambitious plaintiff in *Chavez*, has Martinez sought the moon and stars based on the comparatively small verdict. There, Chavez sought over $870,000 in fees and costs based on a verdict of $11,500. (*Chavez*, at 976.) The Supreme Court in Chavez seemed to gasp at the disproportion between the verdict and the fee claim. (*Ibid*.) Here, Martinez has apportioned his time, abandoned numerous hours that he could seek compensation for, has sought no multiplier, has sought no interest for the delay, and has thus requested a figure in line with the necessity of having to traverse the length of the civil justice system by trying the case. (2 A 922-923.)

- **Reply in Fee Motion:** The other documented basis to find special circumstances is where the plaintiff exaggerates the fee request, as Robert Chavez did by asking for over $870,000 in fees against an $11,000 award. (*Chavez*, at 990, citing *Serrano v. Unruh* (1982) 32 Cal.3d 621, 635 and *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1137.) O'Hara does not establish that this latter basis applies. He deploys an arsenal of epithets at Martinez's effort, variously calling it "overblown," "fruitless," "unsuccessful," "unreasonably inflated," and "glaringly inflated." (Opp., pp. 1:11, 5:24, 5:26, 9:26, 5:3.) However, an examination of the net outcome and the actual fee request does not support his position. Martinez's injunctive claims were legitimate causes to pursue and the fee request is otherwise reasonable. (2 A 1006.)

- **Oral Argument**: Apart from the defense essentially rereading the papers, the difference between this case and the *Chavez* case is $700,000. So the comparison is completely unfair. I mean, [Chavez's request is] almost $900,000. It effectively sought as much money as all of my hours, when I sought one-third of that. So I don't know how any reasonable person can compare this case to *Chavez* where there's $870,000 sought, and I'm seeking 150-. Those numbers are two ends of the spectrum. (2 A 1094-1095.)

- **AOB**: The most prominent feature of the trial court's ruling was to compare this case to *Chavez*. (2 A 1106.) The plaintiff in *Chavez* requested $870,000;

Martinez requested $144,000. (2 A 927, 1106.) Martinez's request was 16.6% of *Chavez's* request. The two cases are categorically incomparable. (2 A 1093-1094.) Comparing a fee request that is 6 times as large on a relative basis and $710,000 more on an absolute one is facially "so unreasonable" that the trial court's comparison to *Chavez* is itself an abuse of discretion. (*See Fine v. Fine* (1946) 76 Cal.App.2d 490, 495-496; 2 A 1094-1095.) (AOB, p. 28.)

- **Reply Brief**: The trial court cited the $870K fee request in *Chavez v. Los Angeles* (2010) 47 Cal.4th 970 as grounds to find Martinez's $144K fee request – which required a jury trial – as comparably excessive in its magnitude. (2 A 1107.)  O'Hara repeats the trial court's idea by similarly citing qualitative features of *Chavez*. (RB 31-32.)  But what they are both silent about is the $726,000 difference between the two requests.  It's as if objective numbers do not matter to them. (Reply Brief, p. 22.)

- **Petition for Rehearing**.  The *Chavez* case involved an $870,000 fee request.  This case involved a $144,000 request.  The Court declined to address this difference in magnitude, though the point was clearly raised in the lower court and on appeal.  The consistent refusal of the courts to address such an important distinction raises questions….  (Pet. Reh., p. 9.)

In light of so many attempts to obtain an adjudication of the magnitude issue, and the consistent decision by the lower courts not to address or explain their reliance on *Chavez*, along with the ultimate decision by the appellate court to rely on an alternative (unlitigated) basis about the sufficiency of the supporting fee declaration (which is also clearly not tenable), Martinez has undertaken in this petition to analyze whether this method of judicial reasoning is truly acceptable given the underlying legislation that authorizes harmless error.

The reason this is so important, and worthy of this Court's review, is that, if the panel's method of reasoning is validated, there is little point to having a rule-of-law legal system.  Under the common law harmless error method as it can be practiced by the courts, the law is <u>irrelevant</u>.  Accurate legal reasoning is <u>irrelevant</u>.  Any appellate court, in its unfettered discretion, can rule as a matter of right against any party in any case regardless of the merit of a party's correct legal position by simply avoiding that

issue and identifying some other alternative, inaccurate, unlitigated legal basis which it claims to support the disposition on a harmless error basis.

In such situations, the legal system moves toward one that does not exist as a legal meritocracy, but upon "heads-I-win, tails-you-lose" fiefdom-like logic, with the whimsy of arbitrary judicial perceptions deciding the outcomes of disputes instead of the discipline of structured legal analysis. (*See* Winkelman, An Empirical Method for Harmless Error (2014) 46 Ariz. L.J. 14051410 [describing resort to harmless error as in one case not analytically based on the facts presented but more on a "categorical mode of reasoning"], citing Wallace & Kassin, Harmless Error Analysis: How Do Judges Respond to Confession Errors (2012) 36 Law & Hum. Behav. 151, 156.)

Turning to section 475, to dismiss Martinez's magnitude objection, the appellate court was required to first reach, and presumably state, an opinion: that reliance on *Chavez* (without any explanation about the magnitude issue) is in fact an error.  Under prong (a) above, it may then turn to the question of whether that error affects the substantial rights of the aggrieved party.

Sometimes an error is simply too minor to warrant intervention by the appellate court; in other words, the substantial rights of the parties are not impacted. (*People v. Mil* (2012) 53 Cal.4th 400, 414; *Bed, Bath & Beyond v. La Jolla Village Square* (1997) 52 Cal.App.4th 867, 884; *Marriage of Goddard* (2004) 33 Cal.4th 49, 58-60 [judgment affirmed despite failure to comply with mandatory requirement that proof of service of notice of trial date on absent party be introduced into evidence since it was clear from the record that notice was in fact given].)

In this case, however, the rights impacted were substantial: the statutory right to recover the transaction cost for several causes of action.  Therefore, the 475 (prong (a)) analysis initially reveals that the Martinez case could not be dismissed by simply treating the *Chavez* error as too trivial to further litigate.

Consequently, the appellate court was required to turn to prongs (b), (c) and (d) in a continued statutory analysis to resort to other grounds to validate its disposition.



### 6.  Prong (b) – Prejudicial Error.

Prong (b) asks whether the error was prejudicial.  This typically means that the error is one that, had it not been made, was capable of changing the outcome.  (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1110; *Hutchings v. Castle* (1874) 48 Cal. 152, 156.)

Here, if a court applies *Chavez* to a fee request that cannot reasonably be construed as grossly inflated, that is an error that disposes of the case – in error.  A court may not summarily deny all compensation to a winning FEHA litigant without valid application of the *Chavez* exception.  By definition, reliance on it in error is a prejudicial mistake.

### 7.  Prong (c) – Substantial Injury

Prong (c) asks whether the complaining party suffered a "substantial injury." This seems like an overlap of prongs (a) and/or (b) – and might be as to (a) – but as to (b) one can imagine where an error in denying a fee request for $25 was technically prejudicial, in that the error changed the outcome, but $25 is not substantial enough of an actual loss to merit relief by the appellate court.

Here of course that is not the case.  Denial of all compensation was an objectively substantial loss of Martinez's economic rights, over $100K.

### 8.  Prong (d) – Different Result Probable.

Prong (d) asks whether a different result would have been probable.  The proper analysis in terms of making that determination allows for several different types of reasoning.

The most common one is where the adjudicating body (judge or jury) omits to make a required finding, but there is evidence in the record to sufficiently support that very finding.  Consequently, an appellate court may safely conclude that, had the adjudicative body expressly ruled on that issue, and in light of the evidence in the record, the outcome would still have been adverse to the appellant.  (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1110-1111, 1114; *People v. Birch Securities* (1948) 86



Cal.App.2d 703, 710; *Chapman v. California* (1967) 386 U.S. 18, 23-24; *Dunn v. Stringer* (1941) 41 Cal.App.2d 638, 646.)

In other cases, and strikingly, the harmless error determination is prioritized to such a degree that the appellate court does not consider the merits of the underlying error alleged. (*See, e.g., Alzamora v. Dep't of Corr.* (11th Cir. 2012) 463 F. App'x 816, 818 ["We need not reach this question because we conclude that the failure to give this instruction, under the facts of this case, constituted harmless error…."].)

Here, the trial court declined to address the *Chavez* magnitude issue, other than to cite the case. It did explain under the *Chavez* grossly-inflated idea that the billing improperly included 15 and 25-hour entries. But that reliance was ultimately invalid given augmented materials showing the actual work on those days, as the appellate court capitulated to.

The trial court secondarily concluded that the larger effort was spectacularly unsuccessful. However, this is also an untenable conclusion. Martinez ('injunctively') terminated O'Hara's fraudulent enterprise by virtue of O'Hara's capitulation. (3 A 1804.) Martinez also recovered $10K, a more-than-nominal amount of money. Unlike *Chavez*, where only one cause of action among a dozen resulted in any relief, here every cause of action but one resulted in some relief, either by capitulation or judgment. (2 A 930, 935, 1804.)

The fact that it required a lot of legal effort to achieve this outcome is attributable to O'Hara's resistant posture and is properly a question in regard to the amount to be awarded, not whether any amount should be awarded, given a careful assessment of logic of *Chavez*.

Consequently, there is no basis among the several alternate theories relied on by the trial court to uphold the failure to deal with the *Chavez* magnitude issue. In the absence of a valid *Chavez* exception theory (including a valid alternate overbilling theory), it can be safely concluded that a different result by the trial court would have been probable, for the simple reason that it would have been legally required – there

are no other available legal theories to summarily deny all compensation to a
prevailing FEHA plaintiff.

However, this analysis only takes one halfway.  There is a long line of common
law authority that holds that, in reviewing a motion ruling, an appellate court may
affirm a trial court ruling based on any valid reason reflected in the record, even if the
theories the trial court relied on are incorrect. (*Young v. California Fish & Game*
(2018) 24 Cal.App.5th 1178, 1192-1193; *Cahill v. SDGE* (2011) 194 Cal.App.4th
939, 956.)

Nonetheless, there are serious problems with the application of this common law
doctrine, in at least three ways.  First, this line of cases is not founded on any
legislative authority.  It is traceable to a terse decision by this Court in *Chabot v.
Tucker* (1870) 39 Cal. 434, 435-436, which was two years prior to the passage of
section 475 in 1872.

Nonetheless, the common law doctrine was further developed twenty years later
in *Davey v. Southern Pacific* (1897) 116 Cal. 325, 329, without reference to the
statute.  *Davey* and its progeny were consistently cited through the next century and
*Davey* itself is still cited by cases in the modern age. (*Aguerre v. American Guarantee*
(1997) 59 Cal.App.4th 6, 15-16; *Beard v. Beard* (1999) 71 Cal.App.4th 753, 776.)

Even though *Davey* is not founded on legislative authority, this of course is not
necessarily a fatal defect, as the common law is a valid adjunct to precedent-based
statutory interpretation.  But there seems to be an irreconcilable conflict between the
common law authority, which permits alternate theories to be relied on in a dispositive
manner without a structured legal analysis, and CCP section 475, which statutorily
contemplates a systematic consideration of several codified variables to reach the
same outcome.

Secondarily, the *Davey* line of authority contains a relatively consistent
supposition: that the parties had the opportunity to litigate the issue.  In other words,
appellate courts affirm rulings where the trial court's ruling was in error, but the



defending party raised and argued the alternate ground. (*See, e.g., Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504, fn. 11.)  In those situations, the aggrieved party at least had the chance to educate the Court about its position along with tendering its view of the appropriate legal analysis.

The same cannot be said when an appellate court rules based on a harmless error theory that is only raised for the first time in the appellate panel's ruling.  This dynamic raises due process questions. (*Cf. San Jose Ranch v. San Jose Land & Water* (1899) 126 Cal. 322, 325-326.)

In *San Jose Ranch*, a case was tried to the bench and the trial court thereafter summarily dismissed it based on granting a nonsuit.  On review, the Supreme Court questioned the validity of section 475 by observing that a literal application would require it to affirm even where a party had been denied a jury trial in violation of its due process rights, since it could not be proven by the record that the error was prejudicial.  It reversed the case by essentially observing that the dismissal was too severe a departure from normative legal practice to stand. (*Id.*, 327.)

*San Jose Ranch* marks an example where the stated basis for the disposition is too far from normative adjudicative methods to be consistent with due process. Martinez is arguing that reliance on unlitigated theories marks a similar departure, founded in the same notice concerns. (*See Planned Protective Services v. Gorton* (1988) 200 Cal.App.3d 1, 12-13.)

There is also language throughout this line of authority that it is 'incumbent on appellant to show error' (*Davey*, 329), that alternative grounds must be "urged" by the defending party (*Western Mutual v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481) and that parties may not rely on alternate grounds to defend a fee compensation ruling (*Planned Protective Services v. Gorton* (1988) 200 Cal.App.3d 1, 12-13).

These impediments create further obstacles to the legitimate invocation of the common law doctrine in cases where the appellate court, for the first time in the panel ruling, tenders a theory that the appellant had no chance to show is an error (*Davey*),

was not urged by respondent (*Western Mutual*), and improperly deviates from the litigated grounds (*Planned Protective*) – and for the record, is also clearly inaccurate. (Pet. Reh, pp. 11-12; 2 A 930-934, 940-952.)

In these situations, where like here the appellate court holds for the first time in its opinion that *Martino's* insufficient-declaration theory was a harmless error ground to affirm the judgment, Martinez is aggrieved on a due process basis: he had no opportunity to address or challenge this theory, other than resort to the dismissive procedure of petitioning for rehearing. (*Cf. San Jose Ranch v. San Jose Land & Water* (1899) 126 Cal. 322, 325-326.)

Returning to the mechanics of the statute, to establish prong (d), the appellate court must ask: what is the probability that, had this prejudicial error not occurred, this would have changed the outcome at the trial level.  Specifically, the appellate court must find that: had the trial court not been able to rely on *Chavez's* grossly-inflated exception to summarily deny all compensation, would the appellate court's *Martino* idea about an insufficient declaration probably have resulted in no compensation at the trial level anyway?

To ask the question answers it.  The trial court never raised the appellate court's *Martino* idea.  *It wasn't litigated*.  Therefore, no one can say on a probability basis that the same result would have occurred.  It is rank speculation to declare what a lower court would have decided on an issue that it was never presented with to adjudicate, especially when that theory facially appears to be inaccurate.

Under the statute, the trial court has to be confronted with the *Martino* criticism in the first instance to first state its analysis and decision on that matter, and assuming it agrees *Martino* is an applicable (dispositive) criticism, only then can an appellate court legitimately validate it as an alternate harmless error theory; relying on other correct – litigated – findings is an indisputably valid harmless error construct. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1114; *Brison v. Brison* (1891) 90 Cal. 323, 328.)

Under the common law version of the harmless error doctrine, this analysis is not usually evident.  Appellate courts instead affirm trial rulings on the precept that the ruling, as opposed to the reasoning, is what is reviewed for accuracy. (*Aguerre v. American Guarantee* (1997) 59 Cal.App.4th 6, 15-16.)  Ergo, as long as the outcome is correct, the reasoning does not matter.

However, this observation is, respectfully, nonsense.  A ruling is only accurate if, upon working through the applicable legal analysis, the analysis returns a result that can be justified.  Accurate reasoning for a legal ruling is inextricably intertwined with, and a necessary predicate to, any conclusion that the ruling is accurate.

In this way, the *Aguerre* logic presupposes that legal outcomes are like a math problem.  In mathematics, we can definitively state that even though the student used the wrong methodology to reach a numerical answer, say 153, 153 is still objectively the right answer to the problem.  The student's answer is unquestionably correct despite the error in reasoning.  The student's inaccurate methodology can be quantitatively confirmed as harmless.

There is no numerically accurate solution to a legal issue.  When an appellate court declares the legal answer on some other unknown or alternate basis, admitting that the methodology utilized was done so inaccurately, it is not offering a mathematically certain disposition.  It is merely the appellate court's verbal opinion; opinions for qualitative questions are necessarily dependent on accurate reasoning. (*See Arizona v. Fulminante* (1991) 499 U.S. 279, 307-308] [suggesting that trial level errors might be quantitatively examined, without subsequent corroboration of the concept].)

Without such reasoning, the answer is merely a feeling, an intuition, a perception or a guess.  Accurate dispositive outcomes cannot logically rely on them.  The American legal system does not validate *ad hoc* perceptions, even when they emanate from appellate justices. (Winkelman, 1410 [many have worried "that appeals court judges are ill-equipped by intuition" to evaluate the effect of lower court error].)  In

point of fact, accurate legal analysis necessarily determines accurate legal outcomes in our method system of adjudicating qualitative rights.

If alternate grounds potentially exist to save the erroneous application of the trial court's litigated legal analysis, the alternate ground should be subjected to the same rigors of the method system's adversarial process: input from the parties, their competing legal positions and analysis, trial court adjudicative analysis and its ultimate conclusion, subject to review.

This is particularly true here, where every issue of every lower court ruling was uniformly adjudicated adverse to Martinez, which has historically raised concerns about judicial bias, and perhaps more worrisome, suggests "mental contamination" of the adjudicative process. (*See Labor Board v. Pittsburg* (1949) 337 U.S. 656, 658-659; *Andrews v. Agricultural Labor Relations Bd*. (1981) 28 Cal.3d 781, 795-796; *see also International Wkrs. v. N.L.R.B.* (D.C. Cir. 1971) 455 F.2d 1357, 1368-1369; *see* Winkelman, 1411 [discussing inability of individuals to remove bias from their decisions].)[1]

To coronate appellate courts with the legal right to declare alternate, unlitigated grounds as summarily sufficient to uphold an otherwise-erroneous trial court methodology, without input from the parties and without the structure and discipline of formal litigated legal analysis, is to sacrifice the method system of adjudication in favor of the arbitrariness of a fiefdom system.

Martinez respectfully submits that the harmless error doctrine merits scrutiny in this regard. It provides too easy a path for any judge, court or panel, or any human being in general, to reach his or her desired outcome by resorting to unstructured and therefore unreviewable observations resulting in summary disposition.

---

[1] Martinez takes the position that issues the trial court and appellate court declined to address were issues adjudicated in his favor by capitulation. But because the lower courts did not expressly state this, and declined to acknowledge such perceived capitulation, it is fair to simultaneously maintain that every issue they actually decided was adjudicated adversely to Petitioner.

The common law harmless error doctrine as practiced in the civil motion context is largely without structure or real intellectual discipline. This is despite the fact that there is an applicable CCP statute that supplies an analytical methodology.

In conclusion, the courts should consider rethinking whether the harmless error doctrine should be conformed to adjudicative methods consistent with what the legislature has declared as the requisite statutory legal analysis, or, whether the courts accept that a common law method of undisciplined decision making should trump the will of the people.

## II.
## LABOR CODE SECTION 218.5 FEE SHIFTING IS MANDATORY. COURTS MAY NOT SUMMARILY DENY ALL COMPENSATION IN RELIANCE ON *CHAVEZ*.

The statutory premise the lower courts relied on to deny all compensation was the *Chavez* exception, which in turn, is premised on California Government Code section 12965(b)'s statutory discretion in awarding fees.

In cases where the case could have been brought in limited civil, it might arguably be authority under section 1033's statutory discretion.

However, in cases like this, where Martinez was prohibited from filing in limited civil, and where part of the fee compensation was based on a different, mandatory fee shifting statute (Labor Code section 218.5), the lower courts could not summarily deny all compensation based on citing *Chavez*.

Both lower courts concluded did. The matter should be reviewed to clarify that fee applications based on wages may not be denied in reliance on *Chavez*.

## CONCLUSION

Courts are expected to rule on the contentions presented by the parties. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1110; *Murphy v. Bennett* (1886) 68 Cal. 528, 530; *Hutchings v. Castle* (1874) 48 Cal. 152, 156; Code Jud. Ethics, Canon 1, Adv. Note ["The basic function of an independent, impartial, and honorable judiciary is to



maintain the utmost integrity in decisionmaking"); Code Jud. Ethics, Canon 3B(8) [right of litigants to have their matters "fairly adjudicated"].)

The very idea of an unlitigated basis for disposition, first disclosed in the panel ruling, becoming the controlling legal basis to dismiss years of hard work, as reflected by a fee application founded upon a legal right to statutory fee shifting, is anathema to a legal system founded on intellectual rigor and scrutinized reasoning.

As noted in one commentary, "[i]t is striking to see a case that may have incurred millions of dollars of attorneys' time, and risks life or death for a litigant, all come down to the *ipse dixit* of a panel of judges concluding that admitted errors in the trial process seem harmless to them. All the rest of due process can seem like cheap trappings for what is ultimately a conclusory disposition. In this sense, our contemporary method for applying harmless error doctrine has a fundamental problem of legitimacy." (Winkelman, 1414; *see* Fallon, <u>Legitimacy and the Constitution</u> (2005) 118 Harv. L. Rev. 1787, 1794-1798 [surveying legal, moral, and sociological notions of legitimacy].).

Section 475 supplies the methodology to prevent this kind of arbitrariness: trial courts must address material issues. Appellate courts must address material issues. There must be a structured and rigorous legal analysis by an appellate court according to the statute's requirements to justify affirming a decision based on harmless error principles.

In cases of civil motions where the proposed alternate basis was not raised until the panel ruling itself, a finding of harmless error on that alternate basis by the appellate court in the first instance is statutorily foreclosed. (*See Planned Protective Services v. Gorton* (1988) 200 Cal.App.3d 1, 12-13.)

The case must instead be remanded for a decision by the trial court in the first instance in order for an appellate court to later conclude that an original prejudicial error probably would have not changed the outcome, consistent with the statute's requirements. (*See*, Winkelman, 1412-1413, citing Solomon, <u>Causing Constitutional</u>



Harm: How Tort Law Can Help Determine Harmless Error in Criminal Trials (2005) 99 NW. U. L. Rev. 1053, 1065 [observing that 20% of judges analyzed a harmless error problem, the remainder made "something like a gestalt, all-things-considered judgment call."]

The harmless error doctrine has consistently attracted controversy, in comments ranging from a "regrettable necessity," to "one of the supreme ironies of our time," to a "beast that swallowed the Constitution." (Winkelman, 1408.)   One scholar observed that "the very enterprise of after-the-fact review is doomed to failure.  Judges simply cannot see the errors because psychological biases make it hard to imagine that cases could have come out any differently." (Bibas, The Psychology of Hindsight and After-the-Fact Review of Ineffective Assistance of Counsel (2004) 2004 Utah L. Rev. 1, 2; see also Findley & Scott, The Multiple Dimensions of Tunnel Vision in Criminal Cases (2006) 2006 Wis. L. Rev. 291, 350-351.).

Given the doctrine's various permutations, which logically require tailored harmless-error methodologies, and continuing challenges to the doctrine's empirical validity, the courts should institute measures to bolster its analytical legitimacy.  In choosing in the civil motion context between a foundation based on rigorous and structured statutory reasoning as opposed to the more-or-less eyeball applications emanating from the common law, the Court is respectfully asked to grant this petition to consider the matter carefully.


Respectfully:


Date: April 3, 2019                    PAVONE & FONNER, LLP



                                        Benjamin Pavone, Esq.
                                        Attorneys for Petitioner Martinez

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to the California Rule of Court, Rule 8.204(c), I certify that the foregoing combined brief is proportionally spaced, has a typeface of 14 points, is double-line spaced, and based upon the word count feature contained in the word processing program used to produce that brief (Microsoft Word 2010), contains approximately 9350 words including tables and ancillary documents, and thus well-within the stated 2018 permissible limit of 14,000 words for a brief. (Cal. Rules Ct., Rule 8.204(c)(1).)

Date: April 3, 2019                              PAVONE & FONNER, LLP

                                                 Benjamin Pavone, Esq.
                                                 Attorneys for Appellant

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
550 WEST C STREET, STE. 1670
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR APPELLANT

## FOURTH DISTRICT COURT OF APPEAL

## STATE OF CALIFORNIA

| | |
|---|---|
| **MARTINEZ,** | CASE NO. G054840 |
| Appellant, | **PROOF OF SERVICE** |
| v. | |
| **O'HARA,** | |
| Respondent. | |

I, Benjamin Pavone, declare as follows:

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 501 West Broadway, Ste. 800, San Diego, California 92101.

On April 3, 2019, I served or arranged for service of the following:

\*    Martinez Petition for Rehearing; Appendices, Vols 1-3.

on the following service list:

## <u>SERVICE LIST</u>

Mr. Marc Alexander, Esq.
Mr. William Michael Hensley, Esq.
Alvarado Smith APC                                    By Electronic Service
1 MacArthur Place, Ste. 200                 malexander@alvaradosmith.com
Santa Ana, CA 92707                           mhensley@alvaradosmith.com
                                                          (Petition & Appendices Only)

*Appellate Attorneys for O'Hara*

Orange County Superior Court
Chambers Hon. Carmen Luege
700 West Civic Center Dr., Dept. 61              Via First Class Mail
Santa Ana, CA 92701                                  (Petition Only)

*Trial Court*

Fernando Martinez                                  (Via Electronic Mail)
                                            contactfernandomartinez@gmail.com
*Appellant*                                            (Petition Only)

These documents were sent on or about this same date as indicated above by my copy service, in that a request is initiated by me by email on this date and is typically carried out on the same day.

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 3rd day of April, 2019 that the foregoing is true and correct.



# EXHIBIT 21

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 2/28/2019 by Alex Reynoso, Deputy Clerk

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FERNANDO MARTINEZ, | |
| Plaintiff and Appellant, | G054840 |
| v. | (Super. Ct. No. 30-2012-614932) |
| STEPHEN STRATTON O'HARA et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Carmen Luege, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Offices of Pavone & Fonner, Benjamin Pavone and William Mond for Plaintiff and Appellant.

AlvaradoSmith, William M. Hensley and Marc D. Alexander for Defendants and Respondents.

\*          \*          \*

---

[*]  Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Background section and parts I., II., III., and IV. of the Discussion section.

INTRODUCTION

In the published portion of this opinion, we conclude that the plaintiff's attorney committed misconduct on appeal, including manifesting gender bias, and we report him to the State Bar.  In the unpublished portion of this opinion, we affirm the trial court's denial of a motion for attorney fees.

Following the termination of his employment, Fernando Martinez (plaintiff) sued Stephen Stratton O'Hara (O'Hara), Career Solution and Candidate Acquisitions (CSCA), O'Hara Family Trust, OCRE, Inc., Professional Realty Council, Inc., and Pacific Valley Realty, Inc. (collectively defendants) alleging five employment-related claims.  Plaintiff's wage claim was resolved before trial and his fraud claim was dismissed when the trial court granted defendants' motion for nonsuit.  A jury returned a verdict awarding a total of $8,080 in damages on the claim for sexual harassment in violation of the California Fair Employment and Housing Act (FEHA).  Following a bench trial of plaintiff's remaining claims seeking an injunction for unfair advertising and unfair business practices, the trial court found in favor of defendants.

Plaintiff filed a motion under Government Code section 12965, subdivision (b) and Labor Code section 218.5, requesting an award of attorney fees in the amount of $133,887 for "litigating the case" plus $12,747 for fees incurred in bringing the motion itself, for a total attorney fee award of $146,634.

Plaintiff appeals from the trial court's order denying his motion for attorney fees.  We affirm because the trial court properly exercised its discretion under section 1033, subdivision (a) of the Code of Civil Procedure and followed the legal principles set forth in *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970 (*Chavez*).

As explained in section V of the Discussion *post*, as required by the California Code of Judicial Ethics, we are reporting plaintiff's attorney Benjamin Pavone to the California State Bar for manifesting gender bias.  The notice of appeal signed by Mr. Pavone on behalf of plaintiff referred to the ruling of the female judicial officer as

2

"succubustic."  A succubus is defined as a demon assuming female form which has sexual intercourse with men in their sleep.  We publish this portion of the opinion to make the point that gender bias by an attorney appearing before us will not be tolerated, period.

We also report Mr. Pavone to the State Bar for the statement in the notice of appeal suggesting the trial court attempted to thwart service of the signed judgment on plaintiff in an effort to evade appellate review and statements in the appellate briefs he signed on behalf of plaintiff accusing the judicial officer who ruled on the motion for attorney fees of *intentionally* refusing to follow the law.  None of these serious charges is supported by any evidence.

BACKGROUND

Our record includes the transcript of the final day of the five-day jury trial and the transcript of the hearing on the motion for attorney fees only.  We therefore begin our background section by restating the Facts and Procedural Background section of the prior unpublished opinion issued in this case in *Martinez v. Stephen Stratton O'Hara* (June 25, 2015, G050710).

"In 2012, plaintiff, a high school graduate and college student working at a McDonald's restaurant, posted his resume on Monster.com, an Internet-based employment search service.  O'Hara sent plaintiff an e-mail, stating he represented CSCA, 'a Talent Acquisition firm specializing in the real estate sector of the Financial Services Industry' (boldface omitted), which had 'been retained by a large company . . . seeking recent Business & Communications Majors for Interns and Full Time careers.' O'Hara believed plaintiff 'might be a fit for the company we represent' based on his Monster.com resume.  He invited plaintiff to visit CSCA's Web site and apply if interested.  Both the e-mail and the Web site provided anticipated starting salaries of $35,000, as an intern or a licensed agent in real estate.

3

"Plaintiff read the Web site and completed the online application. After a few days, he called the number on the CSCA Web site and spoke to O'Hara. O'Hara told plaintiff his "scores were absolutely . . . off the charts." O'Hara had plaintiff complete an assessment test and asked plaintiff to send a resume and photograph of himself to O'Hara's personal e-mail. Upon receiving the results of the assessment test, O'Hara called plaintiff to tell him how impressed he was with them and that he wanted to explain them to him in person. They ultimately decided to meet at O'Hara's home, about 60 miles from where plaintiff was living, where they talked about plaintiff's various options.

"O'Hara told plaintiff one option was to be placed with a broker, which was the position plaintiff had applied for. The downfall to that was it entailed a six-month process during which plaintiff would have to pay for and obtain a real estate license and go through a training program for which there were associated costs. The second option was for plaintiff to be part of CSCA, but that would not be up and running until 2013. The final option was for plaintiff to become O'Hara's assistant. O'Hara offered plaintiff the position because plaintiff said he needed money.

"Plaintiff accepted the job as O'Hara's personal assistant for $1,500 a month. They initially agreed plaintiff would work at O'Hara's home from 9:00 a.m. to 5:00 p.m., but the hours were flexible to allow plaintiff to work around his schedule at McDonald's. Later, O'Hara pressured plaintiff into quitting his job at McDonald's. Plaintiff agreed to their business relationship because he believed he would be enrolled in training programs that would no longer require him to go to O'Hara's home.

"Around the third week of plaintiff's employment, O'Hara made sexual advances towards plaintiff and invited him to go with him on a gay cruise. Shortly thereafter, plaintiff wanted to end the personal relationship but still work for O'Hara. The employment relationship nevertheless ended as well.

"Before giving plaintiff his final paycheck, O'Hara required plaintiff to sign a release agreeing: (1) it was plaintiff's personal decision to quit his job at

4

McDonald's; (2) he had worked as an independent contractor; (3) he had resigned; (4) although he was owed $750 at the time of resignation, cash advances reduced the amount to $100; and (5) in exchange for a payment of $525, plaintiff would (a) keep confidential all business and personal information related to O'Hara, a violation of which 'would cause extreme exposure to various legal claims' and prosecution 'to the fullest extent of the law,' and (b) 'waive any past, present or future claim for damages' and fully release O'Hara and his companies from any claim or liability.

"Plaintiff sued defendants in November 2012, asserting individual causes of action for rape (later dismissed), sexual harassment, fraud, Labor Code violations, and wrongful termination.  After several amendments, plaintiff filed a fifth amended (operative) complaint in August 2013, alleging causes of actions for fraud, false advertising, unfair business practices,[1] Labor Code violations, sexual harassment, and a request for alter ego findings.  The cause of action for false advertising contained class action allegations that had not been pled in the prior complaints.  Defendants moved to strike the class allegations from the operative complaint because plaintiff had not filed a motion for class certification and the allegations were insufficient.

"Plaintiff moved for class certification in November 2013 . . . .  [¶] . . . [¶] The court denied the motion for class certification, based in part on the lack of an ascertainable class or a representative with claims typical of the class.  The denial of the certification motion rendered defendants' motion to strike moot."[2]

Plaintiff appealed the trial court's ruling, and this court affirmed the order denying class certification.  The parties agreed to bifurcate the trial on plaintiff's claims

---

[1]  Consistent with plaintiff's references in the opening brief in the instant appeal, we refer to plaintiff's claims for false advertising and unfair business practices together as the claims for injunctive relief.

[2]  The complex case designation that had been assigned to the case when the class action allegations were included in plaintiff's operative pleading was removed after the trial court denied the motion for class certification.

by first trying the sexual harassment and fraud causes of action to a jury and then trying the claims for injunctive relief to the court.[3]

In March 2016, plaintiff's sexual harassment and fraud claims were tried to the jury. After plaintiff testified that he had not relied on the alleged false representations underlying his fraud claim, the trial court granted O'Hara's motion for nonsuit as to the fraud cause of action. The jury found O'Hara liable on the sexual harassment claim and awarded plaintiff damages in the total amount of $8,080, consisting of $1,080 in economic damages and $7,000 in noneconomic damages. The jury found O'Hara's conduct was not committed with malice, oppression, or fraud.

Plaintiff's claims for injunctive relief were thereafter tried to the court. The trial court concluded plaintiff lacked standing to maintain a claim for violation of Business and Professions Code section 17200. The court's minute order stated: "Under Section 17204, the statute states that to have standing a person must have 'suffered injury in fact and has lost money or property as a result of the unfair competition.' Plaintiff's position that he suffered economic injury by traveling from Escondido, CA to Orange County for a job interview with defendant, based on false representations in the website, does not establish standing. Driving 60 minutes from one town to another for a job interview does not equate with economic injury."

Even if plaintiff had standing to pursue claims under the unfair competition law, the trial court denied his request for an injunction "because plaintiff failed to prove

---

[3]  In his claim for Labor Code violations, plaintiff alleged defendants failed to timely pay him his final wages upon the termination of his employment in violation of Labor Code section 203. As explained in plaintiff's motion for attorney fees, on January 18, 2013 (about two months after this lawsuit was filed in November 2012), defendants paid plaintiff all claimed owed wages ($750) and a portion of the waiting time penalties provided for in Labor Code section 203, by making a total payment of $975 to plaintiff. Defendants paid plaintiff the remaining amount of claimed waiting time penalties (in an amount of $1,300) shortly before trial. Thus, plaintiff's claim for Labor Code violations was not tried.

that the public currently has access to the CSCA website.  The general rule is that 'injunctive relief will be denied if at the time of the order or judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct.'  [Citation.]  In other words, to get an injunction, plaintiff must show there is a threat that the wrongful conduct will continue.  The court finds plaintiff's evidence did not meet that burden."[4]

Plaintiff filed a motion for an order awarding prevailing party attorney fees and costs pursuant to Labor Code section 218.5 and Government Code section 12965, subdivision (b), on the ground he was the prevailing party as to his Labor Code violations claim and his sexual harassment claim; he also argued he "prevailed as a practical matter on two injunctive claims."  In his motion, plaintiff asserted:  "In light of this mixed bag of outcomes, he has apportioned as fee shifting work 1/3 of the total time spent on this case.  He requests his attorney's straight hourly rate—no multiplier and no interest or other adjustment for a delay in compensation for what is now four years—as his way of displaying proper, fractional apportionment and reasonable billing judgment."  Plaintiff sought attorney fees in the amount of $133,887 for litigating the case plus $12,747 in fees to prepare the motion itself.  Plaintiff also requested an award of costs and submitted a memorandum of costs seeking a total costs award of $15,966.94.

Defendants filed an opposition to plaintiff's motion for attorney fees and request for costs.

---

[4]  Plaintiff has not challenged the jury's findings or the court's bench trial findings on liability or damages in this appeal.

The trial court awarded plaintiff total costs in the amount of $7,044.93[5] but denied his motion for attorney fees.  Judgment was entered in favor of plaintiff and against defendants[6] in the amount of $8,080 plus $7,044.93 in costs.  Plaintiff appealed.

## DISCUSSION

### I.

#### STANDARD OF REVIEW

"""The standard of review on issues of attorney's fees and costs is abuse of discretion.  The trial court's decision will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice.  If the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence.""" (*Pellegrino v. Robert Half Internat., Inc.* (2010) 182 Cal.App.4th 278, 287-288.)

### II.

#### GENERAL LEGAL PRINCIPLES

"'Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding.'  (Code Civ. Proc., § 1032, subd. (b).)  The litigation costs that the prevailing party may recover include attorney fees when recovery of such fees is authorized by statute.  (*Id.*, § 1033.5, subd. (a)(10)(B).)" (*Chavez, supra,* 47 Cal.4th at p. 975.)

---

[5]  Although in his appellate briefing plaintiff expresses disagreement with the court's costs award and includes in the conclusion of his opening brief that the court reverse the judgment and remand the case for a redetermination of fees and costs, plaintiff has forfeited any challenge to the costs award by failing to provide any meaningful analysis and citation to legal authority in support of any such challenge.

[6]  Before trial, plaintiff and defendants stipulated that "O'Hara's companies would be co-extensively liable with his liability."

The general rule that the prevailing party may recover costs, including attorney fees, when authorized by statute, has exceptions.  One such exception applies when "'the prevailing party recovers a judgment that could have been rendered in a limited civil case,' and the action was not brought as a limited civil case," in which case "Code of Civil Procedure section 1033's subdivision (a) . . . states that '[c]osts or any portion of claimed costs shall be as determined by the court in its discretion.'"  (*Chavez, supra,* 47 Cal.4th at pp. 975-976, fn. omitted; see *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1053 [Code of Civil Procedure section 1033, subdivision (a) makes an award of costs discretionary in unlimited civil cases when the judgment awarded an amount of damages that is less than what may be recovered in a limited civil case].)

The limit of what may be recovered in a limited civil case is codified at Code of Civil Procedure section 85, which provides in relevant part:  "An action or special proceeding shall be treated as a limited civil case if all of the following conditions are satisfied, and, notwithstanding any statute that classifies an action or special proceeding as a limited civil case, an action or special proceeding shall not be treated as a limited civil case unless all of the following conditions are satisfied:  [¶] (a) The amount in controversy does not exceed twenty-five thousand dollars ($25,000)."  The California Supreme Court has expressly rejected the argument that Code of Civil Procedure section 1033, subdivision (a) does not apply to a motion for prevailing party attorney fees in the context of a FEHA claim, stating:  "[S]ection 1033(a), interpreted according to its plain meaning, gives a trial court discretion to deny attorney fees to a plaintiff who prevails on a FEHA claim but recovers an amount that could have been recovered in a limited civil case.  In exercising that discretion, however, the trial court must give due consideration to the policies and objectives of the FEHA in general and of its attorney fee provision in particular."  (*Chavez, supra,* 47 Cal.4th at p. 976.)  The parties do not cite any authority, and we have found none, suggesting that Code of Civil Procedure section 1033,

subdivision (a) does not similarly apply to motions for attorney fees brought under Labor Code section 218.5.

III.

THE TRIAL COURT DID NOT ERR BY DENYING PLAINTIFF ATTORNEY FEES UNDER FEHA.

In his opening brief, plaintiff argues the trial court erroneously denied him prevailing party attorney fees under FEHA after the jury awarded him $8,080 in damages on his FEHA claim.  For the reasons we explain, plaintiff has failed to show the trial court's ruling constituted an abuse of discretion.

Plaintiff's motion for attorney fees as it related to his FEHA claim was based on Government Code section 12965, subdivision (b), which provides in part:  "In civil actions brought under this section, the court, in its discretion, may award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert witness fees."  The California Supreme Court has held that "in a FEHA action a trial court should ordinarily award attorney fees to a prevailing plaintiff *unless special circumstances would render a fee award unjust*."  (*Chavez, supra*, 47 Cal.4th at p. 976, italics added.)

As discussed *ante*, a FEHA "plaintiff's failure to take advantage of time- and cost-saving features of the limited civil case procedures may be considered a special circumstance that would render a fee award [in favor of a plaintiff] unjust."  (*Chavez, supra,* 47 Cal.4th at p. 986.)  Also in the FEHA context, "'[a] fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether.'"  (*Id.* at p. 990.)

The trial court explained its ruling denying plaintiff's motion for attorney fees in its minute order:  "Having spent time reviewing the complete record in this case, including the class certification portion of the litigation, the court finds that plaintiff over litigated this case.  The factual similarities between the instant matter and the facts in the California Supreme Court decision *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970,

10

are striking.  In *Chavez*, the plaintiff filed an action alleging several FEHA claims.

Following a five-day trial, the jury awarded Chavez $1,500 in economic damages and

$10,000 in noneconomic damages.  Chavez then sought attorney fees in excess of

$400,000 which he subsequently amended to approximately $870,000.  In *Chavez*, the

Supreme Court concluded that 'in light of plaintiff's minimal success and grossly inflated

attorney's fee request, the trial court did not abuse its discretion in denying attorney fees.'

[Citation.]  In reaching this decision, the court noted that Chavez's success on a single

FEHA claim did not have 'any broad public impact or result[] in significant benefit to

anyone other than himself.'  [Citation.]

         "Here, the jury awarded plaintiff Martinez $1,080 in economic damages

and $7,000 in noneconomic damages.  Plaintiff Martinez's request for attorney's fees is

based on a calculation of approximately $414,407 in fees and plaintiff is asking the court

to award more than one third of that sum.  The court, however, finds the figure of

$414,407 very unreliable.  Plaintiff's counsel admitted during the hearing that he had not

maintained contemporaneous billing hours and that he based the legal fee calculation on a

reconstruction of the amount of hours plaintiff's counsel believes he spent working on the

case.  Although block billing is not invalid per se, its use may undercut the credibility for

the fee application.  [Citation.]  In this particular case, the reconstructed time sheets

plaintiff submitted show that on one specific day counsel billed 25 hours of work

performed.  On multiple days counsel billed in excess of 15 hours of work performed per

day.  These entries raise serious questions about the accuracy of counsel's alleged

reconstruction of the time he spent working on this case.  Taking into consideration the

unreliability of the figures provided with the nominal damages the jury awarded, asking

the court for more than $160,000 in legal fees, seems as excessive as the legal fees

plaintiff requested in the *Chavez* case.  See also *Serrano v. Unruh* (1982) 32 Cal.3d 621

('a fee request that appears unreasonably inflated is a special circumstance permitting the

trial court to reduce the award or deny one altogether').  Moreover, like in *Chavez*, this is

not a claim that had a broad public impact or resulted in significant benefit to anyone other than plaintiff Martinez, further justifying the court's decision to deny plaintiff attorney's fees.

"In addition, the court notes that plaintiff in this case was spectacularly unsuccessful. The court's records make clear that plaintiff engaged in fruitless litigation, with many adverse court rulings that underscored the weaknesses in plaintiff's case. Most of the litigation had nothing to do with the FEHA claim which probably explains why the evidence plaintiff presented at trial in support of the FEHA claim was so sparse. Most of the entries in counsel's time sheet have nothing to do with this one FEHA claim. A large portion of the entries relate to the false advertising claim and the unsuccessful efforts to obtain class certification.

"The weakest evidence plaintiff presented at trial was on the issue of damages. The wrongful conduct at issue occurred over a matter of weeks, which made proving significant economic damages almost impossible. At trial, counsel asked the jury to return damages in excess of $500,000, yet failed to present evidence in support of such [an] outlandish figure. Like in *Chavez*, plaintiff's counsel in this case should have determined long before trial that realistically the case was worth no more than $25,000 and should have pursued the case as a civil limited matter.

"Following *Chavez*, the court denies plaintiff's request for attorney fees."

Plaintiff has failed to show the trial court's determination that plaintiff's request for attorney fees was excessive—a special circumstance recognized in *Chavez* in which a prevailing plaintiff may be properly denied attorney fees under FEHA[7]—

---

[7] Plaintiff argues that in denying attorney fees on his FEHA claim, the trial court did not apply the correct legal analysis provided in *Chavez*. He argues "the trial court analyzed the fee issue under the assumption that it had unfettered discretion to award (or not award) attorney's fees, by citing the statute." The court's minute order does not support plaintiff's argument. The court's ruling with regard to the FEHA claim was based on the court's determination that two separate special circumstances to the general rule that a

constituted an abuse of discretion.  Our record, even as augmented, does not contain the entire trial court record.  It includes the transcript of only one day of the five-day trial in this case; consequently, we are unable to review the strength of the evidence presented at trial to prove plaintiff's FEHA claim and in particular, the strength of the evidence supporting his request for damages.  It appears that our record does not include several of the minute orders issued by the trial court recording its rulings on various law and motion matters throughout the case.  The trial court, however, had the entire record before it and expressly stated in its minute order that it had reviewed the entire record before ruling on the motion for attorney fees.

The trial court found plaintiff's counsel's time records, filed in support of the motion, unreliable.  At the hearing on the motion, plaintiff's counsel admitted his office did not keep contemporaneous time and billing records throughout about half of the four-year litigation and that time records submitted in support of the motion for attorney fees were retrospectively created "at the end of the case."  Contemporaneous records are not required to support a motion for attorney fees.  (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375; *Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559.)  Without such time records or billing statements, however, a motion for attorney fees must be supported by declarations explaining, "in more than general terms, the extent of services rendered to the client."  (*Martino v. Denevi, supra,* at pp. 559-560.)

The trial court did not abuse its discretion in concluding plaintiff's counsel's declaration was insufficient to support the motion for attorney fees based, in significant part, on retrospectively created time and billing records.  Plaintiff's counsel

_____

prevailing FEHA plaintiff is awarded attorney fees applied—that plaintiff sought an excessive amount of fees and plaintiff recovered less than what could be recovered in a limited civil case and should have prosecuted the case as a limited civil case.  (See *Chavez, supra,* 47 Cal.4th at pp. 986, 990.)  Such a determination effectively acknowledges the general rule.

filed a declaration in support of the attorney fees motion claiming that at least 969.6 billable hours were spent working on the case on behalf of plaintiff. In his declaration, he defended his failure to show which portion of those hours was for services related to the litigation of the FEHA claim: "Complicating the analysis is that the time to investigate and litigate the sex claim, the wage claim, the fraud claim and the injunctive claims is difficult to separate. The evidence is overlapping." Instead of providing more specific information and analysis, counsel's declaration proposed: "As I see it, and in attempting to truly be reasonable, I have apportioned the case into thirds: a third of the time for the sex/wage claims, a third for the 17200/17500 causes and a third for the fraud claim. A third of the total fee turns out to be $133,887, as reflected by a computation I ran aggregating the hours at the respective hourly rates, plus $12,747 to prepare these moving papers." There is no explanation as to why this is a reasonable allocation other than that, in counsel's unsubstantiated opinion, the amount of time reflected in that fee amount is what is "generally necessary for any case to run the length of the system."

Plaintiff further argues that while reconstructed billing records are less accurate than those created contemporaneously, his counsel's proposal to cut his bill by two-thirds was more than adequate to compensate for any margin of error that might be attributed to the produced records. In support of his argument, plaintiff claims to have prevailed "on some level" on five of his six claims. Not true. The trial court ruled against plaintiff on the claims for injunctive relief. Plaintiff claims he prevailed to some degree as to the claims for injunctive relief because defendants agreed to take down the Web site upon which the claims were based. Plaintiff has failed to identify any order or injunction compelling defendants' action now or in the future. Plaintiff's fraud claim was dismissed during trial. His wage claim was resolved before trial; a mere $1,300 in penalties remained at stake from the early days of the litigation until the eve of trial as to that claim. Plaintiff has not challenged the outcome of any of these causes of action on

appeal.[8]  The trial court was well within its discretion to reject plaintiff's requested one-third of a total amount of claimed incurred attorney fees the court found unreliable in the first place, based on an inflated view of plaintiff's litigation success.

Plaintiff also argues that the trial court's ruling reflects a punishment for plaintiff's counsel's personal and conclusory attacks on one of the trial judges, who presided earlier in the case and had previously issued sanctions against plaintiff, during the hearing on the motion for attorney fees.  Plaintiff states in his opening brief that the trial court's denial of the motion for attorney fees constituted "a mindlessly one-sided ruling—a ruling founded in advocacy rather than analysis if ever there was one—and littered with legal errors, as they always are."

We have reviewed the transcript of the hearing on the motion for attorney fees and the court's minute order containing its ruling and find no support for plaintiff's assertion.  At the hearing, plaintiff's counsel complained to the trial court that he had been improperly sanctioned by the prior trial court judge, stating that trial judge "was off in a crazy place.  Thank God he's gone now.  No offense."  The trial court explained to counsel that while the court did not need counsel to agree whether the prior trial judge was a great judge, "we have to show, you know, some level of respect for the judicial process."  The court further stated it "underst[ood] [counsel's] passion" but attacking the prior trial judge's abilities "is not a very persuasive way of addressing that."  Plaintiff's argument is without any support in the record.

---

[8]  In his opening brief, plaintiff objects to the trial court's characterization in the minute order of the prosecution of his claims as "spectacularly unsuccessful."  The trial court's comment appears to have been rooted in an overview of the lengthy litigation of multiple claims (four years) which indisputably included a failed class action bid, an unsuccessful appeal, an unsuccessful writ petition, and a bifurcated trial, culminating in a modest judgment of $8,080 in favor of plaintiff and the payoff of $1,300 in waiting time penalties.  Given that procedural history, the trial court's comment was reasonable.

In sum, the record supports the trial court's application of the special circumstance of an excessive request for attorney fees and thus supports the court's exercise of discretion in denying prevailing party attorney fees on the FEHA claim.  The record, however, also shows the trial court's exercise of discretion in denying the motion was supported by the existence of another special circumstance—that plaintiff recovered less than the maximum recoverable in a limited civil case.

In *Chavez*, the Supreme Court explained that in exercising its discretion under Code of Civil Procedure section 1033, subdivision (a) to grant or deny attorney fees to a plaintiff who has recovered FEHA damages in an amount that could have been recovered in a limited case, "the trial court must give due consideration to the policies and objectives of the FEHA and determine whether denying attorney fees, in whole or in part, is consistent with those policies and objectives."  (*Chavez, supra,* 47 Cal.4th at p. 986.)

The Supreme Court in *Chavez* continued:  "In determining whether a FEHA action should have been brought as a limited civil case, the trial court should consider FEHA's underlying policy of encouraging the assertion of meritorious FEHA claims, and it should evaluate the entire case in light of the information that was known, or should have been known, by the plaintiff's attorney when the action was initially filed and as it developed thereafter.  [Citation.]  In making this evaluation, the trial court should exercise caution to avoid 'hindsight bias,' which is the recognized tendency for individuals to overestimate or exaggerate the predictability of events after they have occurred.  [Citations.]  If, based on the available information, the plaintiff's attorney might reasonably have expected to be able to present substantial evidence supporting a FEHA damages award in an amount exceeding the damages limit (now $ 25,000) for a limited civil case, or if the plaintiff's attorney might reasonably have concluded that the action could not be fairly and effectively litigated as a limited civil case, the trial court should not deny attorney fees merely because, for example, the trier of fact ultimately

16

rejected the testimony of the plaintiff's witnesses or failed to draw inferences that were reasonably supported, although not compelled, by the plaintiff's evidence.  But if, to the contrary, the trial court is firmly persuaded that the plaintiff's attorney had no reasonable basis to anticipate a FEHA damages award in excess of the amount recoverable in a limited civil case, and also that the action could have been fairly and effectively litigated as a limited civil case, the trial court may deny, in whole or in part, the plaintiff's claim for attorney fees and other litigation costs."  (*Chavez, supra,* 47 Cal.4th at pp. 986-987.)

Again, our review of the strength of plaintiff's FEHA claim, which the trial court viewed as quite weak, is impeded by the limited trial record that has been designated on appeal.  Our record does not suggest the court's assessment to have been erroneous.  Plaintiff argues he could not have pursued this action as a limited civil case because his claim for injunctive relief could not be tried in that way.  Plaintiff's claims, however, were soundly rejected by the court.  Plaintiff's total recovery in this case (even including the amounts received from defendants on his wage claim) measured less than half the maximum amount of recovery available in a limited civil case.  Plaintiff has failed to show the court's findings regarding the applicability of special circumstances supporting the denial of prevailing party attorney fees on the FEHA claim constituted an abuse of discretion.

IV.

THE TRIAL COURT DID NOT PREJUDICIALLY ERR BY DENYING THE MOTION FOR
ATTORNEY FEES UNDER LABOR CODE SECTION 218.5.

Plaintiff challenges the trial court's denial of his motion for prevailing party attorney fees under Labor Code section 218.5, as to plaintiff's claim defendants owed him final wages and waiting time penalties under Labor Code section 203.  Labor Code section 203, subdivision (a) provides:  "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 201.9, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the

17

employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

Labor Code section 218.5, subdivision (a) authorizes the recovery of prevailing party attorney fees in wage claim cases as follows:  "In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action.  However, if the prevailing party in the court action is not an employee, attorney's fees and costs shall be awarded pursuant to this section only if the court finds that the employee brought the court action in bad faith."

The trial court denied plaintiff's motion for attorney fees with respect to his Labor Code section 203 claim, stating in its minute order:  "It is undisputed that long before this case came before this court for trial, defendant had paid plaintiff all his wages. Thus, the issue of wages was not before the court when the case proceeded to trial and plaintiff cannot be considered the prevailing party on the wages claim.  [¶] The only issue that remained related to the wages claim was a waiting time penalty claim in the sum of $1,300.  Before the commencement of the trial, the parties represented that days earlier, defendant paid plaintiff an additional $1,300 to resolve the issue of waiting time penalties and thereby eliminate[d] the issue from trial.  Under Labor Code Section 203, waiting time penalties are not wages.  See *Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal.App.4th 1242, 1261.  Accordingly, defendant's decision to pay the waiting time penalties does not make plaintiff a prevailing party pursuant to Section 2[18].5."

Plaintiff argues the trial court erred in concluding he was not eligible as a prevailing party to recover attorney fees and further argues the trial court misapplied *Ling v. P.F. Chang's China Bistro, Inc.* in determining that waiting time penalties do not constitute "wages" within the meaning of Labor Code section 218.5.

18

We do not need to address plaintiff's legal arguments because even if the trial court so erred, on this record, any such error was harmless. Plaintiff's wage claim was based on the allegation he had not been paid his final wages ($750) and that the delay triggered liability for the waiting time penalty of 30 days' wages ($1,500). Of the amount of wage and penalties combined, $1,300 remained unpaid to plaintiff until the eve of the jury trial. Our record does not show there was much to litigate regarding the amount of wages accrued or the rate of wages plaintiff had earned during his employment that would be factored into the calculation of the waiting time penalty of 30 days' wages. Although in the complaint plaintiff alleged he was misclassified as an independent contractor, citing Labor Code section 2699.3, he has not sought overtime compensation or any other recovery related to that alleged misclassification.

The trial court found plaintiff's billing records to be unreliable. Plaintiff fails to explain in his appellate briefing how much of the fees generated over four years of litigation is properly attributed to the prosecution of this rather straightforward wage claim. Furthermore, as discussed *ante*, plaintiff's overall recovery (including amounts he received to resolve the wage claim) was less than half the amount recoverable in a limited civil case, vesting the trial court with discretion to deny even a prevailing party attorney fees claim under Labor Code section 218.5. For all of these reasons, even if the trial court erred in its reasoning for denying the motion, any such error was harmless.

V.

MISCONDUCT BY PLAINTIFF'S COUNSEL PAVONE

Business and Professions Code section 6068, subdivision (b) provides that it is the duty of an attorney to "maintain the respect due to the courts of justice and judicial officers." Disrespectful statements made in court papers are grounds for attorney discipline and/or contempt. (See *Ramirez v. State Bar* (1980) 28 Cal.3d 402 [attorney suspended for brief falsely accusing appellate justices of acting illegally as a result of their alleged bias in favor of financially strong opposing party]; *In re Koven*

(2005) 134 Cal.App.4th 262, 270-277 [attorney's brief falsely accusing appellate court of
"deliberate judicial dishonesty" resulted in contempt proceedings, monetary fine, and
referral to the California State Bar].)

Canon 3B(6) of the California Code of Judicial Ethics provides: "A judge
shall require lawyers in proceedings before the judge to refrain from (a) manifesting, by
words or conduct, bias, prejudice, or harassment based upon race, sex, gender, gender
identity, gender expression, religion, national origin, ethnicity, disability, age, sexual
orientation, marital status, socioeconomic status, or political affiliation, or (b) sexual
harassment against parties, witnesses, counsel, or others. This canon does not preclude
legitimate advocacy when race, sex, gender, gender identity, gender expression, religion,
national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic
status, political affiliation, or other similar factors are issues in the proceeding."

Canon 3D(2) of the California Code of Judicial Ethics provides:
"Whenever a judge has personal knowledge, or concludes in a judicial decision, that a
lawyer has committed misconduct or has violated any provision of the Rules of
Professional Conduct, the judge shall take appropriate corrective action, which may
include reporting the violation to the appropriate authority." The advisory committee
commentary accompanying canon 3D(2) instructs that California law imposes on judges
mandatory reporting requirements to the State Bar regarding lawyer misconduct.

A.

*The Notice of Appeal*

Instead of using the Judicial Council notice of appeal form, plaintiff's
counsel Pavone signed the plaintiff's notice of appeal which stated in full: "Pursuant to
Code of Civil Procedure section 904.1 et seq., Plaintiff Fernando Martinez hereby
appeals from the lower court's disgraceful order dated November 30, 2016, as
incorporated into a reported judgment dated February 21, 2017, and [as] such, technically
appeals from that judgment. The ruling's succubustic adoption of the defense position,

and resulting validation of the defendant's pseudohermaphroditic misconduct, prompt one to entertain reverse peristalsis unto its four corners.

"Evidence of the docket entry reflecting the judgment is attached hereto as Exhibit A.

"Plaintiff never actually received a copy of a signed judgment, though a stipulated judgment was prepared for the commission court's signature, as it apparently cynically attempted to suppress notice of the judgment in order to thwart review."

Webster's Third New International Dictionary (2002) at page 2282, column 3, defines the term "succubus" as "**1:** a demon assuming female form to have sexual intercourse with men in their sleep—compare incubus  **2:** demon, fiend  **3:** strumpet, whore."  (Capitalization omitted.)

B.

*Plaintiff's Appellate Briefs*

Every day appellate courts evaluate litigants' contentions of trial court error regarding issues of fact and law.  Plaintiff's appellate briefs, signed by Pavone, contain many statements, however, that cannot be fairly characterized as acts of zealous advocacy in an effort to challenge the ruling on plaintiff's motion for attorney fees.  Instead, plaintiff's appellate briefs repeatedly accuse the judicial officer who ruled on that motion of *intentionally* refusing to follow and apply the law.  There is no support in the record for such a serious charge.  Examples of such statements include that the judicial officer (1) "made *intentional* mistakes at the knowing expense of legal accuracy in service to a higher agenda of ruling against [plaintiff] for his perceived political offenses"; (2) displayed "mindless antipathy toward [plaintiff]" having "*intentionally* analyzed a quantitative issue . . . by resorting to citation to qualitative features"; (3) "should have resisted the desire (but did not) to champion [another judicial officer] because it came at the expense of the integrity of her ruling"; and (4) "*intentionally* decided to let her master

21

for this motion be not the law, but an adversarial agenda to rule against one party regardless of it."  (Italics added.)

## C.

*Conclusions*

The notice of appeal's reference to the ruling of the female judicial officer, from which plaintiff appealed, as "succubustic" constitutes a demonstration "by words or conduct, bias, prejudice, or harassment based upon . . . gender" and thus qualifies as reportable misconduct.[9]

The statements in plaintiff's appellate briefs accusing the trial court of intentionally refusing to follow the law, as detailed *ante*, and the statement in the notice of appeal suggesting the trial court tried to prevent plaintiff from receiving notice of the signed judgment in an effort to thwart appellate review of its decision, also made without any support in the record, constitute reportable misconduct.  We further note that many of the words and phrases in the notice of appeal have no place in a court filing.  We cannot understand why plaintiff's counsel thought it wise, much less persuasive, to include the words "disgraceful," "pseudohermaphroditic misconduct," or "reverse peristalsis" in the notice of appeal.

---

[9] We note rule 8.4.1 of the California Rules of Professional Conduct prohibits an attorney, in his or her representation of a client, from unlawfully harassing or unlawfully discriminating against persons on the basis of protected characteristics including gender. Plaintiff's notice of appeal was filed in April 2017, and thus before rule 8.4.1 became effective on November 1, 2018.  Had rule 8.4.1 been in effect at the time the notice of appeal was filed, Pavone's reference to the judicial officer's ruling as "succubustic" would have constituted a violation of that rule as well as misconduct under section 6068 of the Business and Professions Code.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.

Pursuant to canon 3D(2) of the California Code of Judicial Ethics, we hereby report Attorney Benjamin Pavone, counsel for plaintiff and appellant Fernando Martinez, to the State Bar of California for his misconduct as described in part V of this opinion's Discussion.  The clerk of this court is directed to send copies of this opinion, the notice of appeal filed in this court on April 14, 2017, plaintiff's appellate opening brief, and plaintiff's appellate reply brief to the State Bar of California.  The clerk is further directed to send a copy of this opinion to Attorney Benjamin Pavone, State Bar No. 181826, at his address listed by the State Bar.


FYBEL, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.

23

# EXHIBIT 22

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 2/28/2019 by Alex Reynoso, Deputy Clerk

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FERNANDO MARTINEZ, | |
| Plaintiff and Appellant, | G054840 |
| v. | (Super. Ct. No. 30-2012-614932) |
| STEPHEN STRATTON O'HARA et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Carmen Luege, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Offices of Pavone & Fonner, Benjamin Pavone and William Mond for Plaintiff and Appellant.

AlvaradoSmith, William M. Hensley and Marc D. Alexander for Defendants and Respondents.

\*          \*          \*

---

[*] Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Background section and parts I., II., III., and IV. of the Discussion section.

INTRODUCTION

In the published portion of this opinion, we conclude that the plaintiff's attorney committed misconduct on appeal, including manifesting gender bias, and we report him to the State Bar. In the unpublished portion of this opinion, we affirm the trial court's denial of a motion for attorney fees.

Following the termination of his employment, Fernando Martinez (plaintiff) sued Stephen Stratton O'Hara (O'Hara), Career Solution and Candidate Acquisitions (CSCA), O'Hara Family Trust, OCRE, Inc., Professional Realty Council, Inc., and Pacific Valley Realty, Inc. (collectively defendants) alleging five employment-related claims. Plaintiff's wage claim was resolved before trial and his fraud claim was dismissed when the trial court granted defendants' motion for nonsuit. A jury returned a verdict awarding a total of $8,080 in damages on the claim for sexual harassment in violation of the California Fair Employment and Housing Act (FEHA). Following a bench trial of plaintiff's remaining claims seeking an injunction for unfair advertising and unfair business practices, the trial court found in favor of defendants.

Plaintiff filed a motion under Government Code section 12965, subdivision (b) and Labor Code section 218.5, requesting an award of attorney fees in the amount of $133,887 for "litigating the case" plus $12,747 for fees incurred in bringing the motion itself, for a total attorney fee award of $146,634.

Plaintiff appeals from the trial court's order denying his motion for attorney fees. We affirm because the trial court properly exercised its discretion under section 1033, subdivision (a) of the Code of Civil Procedure and followed the legal principles set forth in *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970 (*Chavez*).

As explained in section V of the Discussion *post*, as required by the California Code of Judicial Ethics, we are reporting plaintiff's attorney Benjamin Pavone to the California State Bar for manifesting gender bias. The notice of appeal signed by Mr. Pavone on behalf of plaintiff referred to the ruling of the female judicial officer as

2

"succubustic."  A succubus is defined as a demon assuming female form which has sexual intercourse with men in their sleep.  We publish this portion of the opinion to make the point that gender bias by an attorney appearing before us will not be tolerated, period.

We also report Mr. Pavone to the State Bar for the statement in the notice of appeal suggesting the trial court attempted to thwart service of the signed judgment on plaintiff in an effort to evade appellate review and statements in the appellate briefs he signed on behalf of plaintiff accusing the judicial officer who ruled on the motion for attorney fees of *intentionally* refusing to follow the law.  None of these serious charges is supported by any evidence.

## BACKGROUND

Our record includes the transcript of the final day of the five-day jury trial and the transcript of the hearing on the motion for attorney fees only.  We therefore begin our background section by restating the Facts and Procedural Background section of the prior unpublished opinion issued in this case in *Martinez v. Stephen Stratton O'Hara* (June 25, 2015, G050710).

"In 2012, plaintiff, a high school graduate and college student working at a McDonald's restaurant, posted his resume on Monster.com, an Internet-based employment search service.  O'Hara sent plaintiff an e-mail, stating he represented CSCA, 'a Talent Acquisition firm specializing in the real estate sector of the Financial Services Industry' (boldface omitted), which had 'been retained by a large company . . . seeking recent Business & Communications Majors for Interns and Full Time careers.' O'Hara believed plaintiff 'might be a fit for the company we represent' based on his Monster.com resume.  He invited plaintiff to visit CSCA's Web site and apply if interested.  Both the e-mail and the Web site provided anticipated starting salaries of $35,000, as an intern or a licensed agent in real estate.

3

"Plaintiff read the Web site and completed the online application.  After a few days, he called the number on the CSCA Web site and spoke to O'Hara. O'Hara told plaintiff his "scores were absolutely . . . off the charts."  O'Hara had plaintiff complete an assessment test and asked plaintiff to send a resume and photograph of himself to O'Hara's personal e-mail.  Upon receiving the results of the assessment test, O'Hara called plaintiff to tell him how impressed he was with them and that he wanted to explain them to him in person.  They ultimately decided to meet at O'Hara's home, about 60 miles from where plaintiff was living, where they talked about plaintiff's various options.

"O'Hara told plaintiff one option was to be placed with a broker, which was the position plaintiff had applied for.  The downfall to that was it entailed a six-month process during which plaintiff would have to pay for and obtain a real estate license and go through a training program for which there were associated costs.  The second option was for plaintiff to be part of CSCA, but that would not be up and running until 2013. The final option was for plaintiff to become O'Hara's assistant.  O'Hara offered plaintiff the position because plaintiff said he needed money.

"Plaintiff accepted the job as O'Hara's personal assistant for $1,500 a month.  They initially agreed plaintiff would work at O'Hara's home from 9:00 a.m. to 5:00 p.m., but the hours were flexible to allow plaintiff to work around his schedule at McDonald's.  Later, O'Hara pressured plaintiff into quitting his job at McDonald's. Plaintiff agreed to their business relationship because he believed he would be enrolled in training programs that would no longer require him to go to O'Hara's home.

"Around the third week of plaintiff's employment, O'Hara made sexual advances towards plaintiff and invited him to go with him on a gay cruise. Shortly thereafter, plaintiff wanted to end the personal relationship but still work for O'Hara. The employment relationship nevertheless ended as well.

"Before giving plaintiff his final paycheck, O'Hara required plaintiff to sign a release agreeing:  (1) it was plaintiff's personal decision to quit his job at

4

McDonald's; (2) he had worked as an independent contractor; (3) he had resigned; (4) although he was owed $750 at the time of resignation, cash advances reduced the amount to $100; and (5) in exchange for a payment of $525, plaintiff would (a) keep confidential all business and personal information related to O'Hara, a violation of which 'would cause extreme exposure to various legal claims' and prosecution 'to the fullest extent of the law,' and (b) 'waive any past, present or future claim for damages' and fully release O'Hara and his companies from any claim or liability.

"Plaintiff sued defendants in November 2012, asserting individual causes of action for rape (later dismissed), sexual harassment, fraud, Labor Code violations, and wrongful termination.  After several amendments, plaintiff filed a fifth amended (operative) complaint in August 2013, alleging causes of actions for fraud, false advertising, unfair business practices,[1] Labor Code violations, sexual harassment, and a request for alter ego findings.  The cause of action for false advertising contained class action allegations that had not been pled in the prior complaints.  Defendants moved to strike the class allegations from the operative complaint because plaintiff had not filed a motion for class certification and the allegations were insufficient.

"Plaintiff moved for class certification in November 2013 . . . .  [¶] . . . [¶] The court denied the motion for class certification, based in part on the lack of an ascertainable class or a representative with claims typical of the class.  The denial of the certification motion rendered defendants' motion to strike moot."[2]

Plaintiff appealed the trial court's ruling, and this court affirmed the order denying class certification.  The parties agreed to bifurcate the trial on plaintiff's claims

---

[1]  Consistent with plaintiff's references in the opening brief in the instant appeal, we refer to plaintiff's claims for false advertising and unfair business practices together as the claims for injunctive relief.

[2]  The complex case designation that had been assigned to the case when the class action allegations were included in plaintiff's operative pleading was removed after the trial court denied the motion for class certification.

by first trying the sexual harassment and fraud causes of action to a jury and then trying the claims for injunctive relief to the court.[3]

In March 2016, plaintiff's sexual harassment and fraud claims were tried to the jury. After plaintiff testified that he had not relied on the alleged false representations underlying his fraud claim, the trial court granted O'Hara's motion for nonsuit as to the fraud cause of action. The jury found O'Hara liable on the sexual harassment claim and awarded plaintiff damages in the total amount of $8,080, consisting of $1,080 in economic damages and $7,000 in noneconomic damages. The jury found O'Hara's conduct was not committed with malice, oppression, or fraud.

Plaintiff's claims for injunctive relief were thereafter tried to the court. The trial court concluded plaintiff lacked standing to maintain a claim for violation of Business and Professions Code section 17200. The court's minute order stated: "Under Section 17204, the statute states that to have standing a person must have 'suffered injury in fact and has lost money or property as a result of the unfair competition.' Plaintiff's position that he suffered economic injury by traveling from Escondido, CA to Orange County for a job interview with defendant, based on false representations in the website, does not establish standing. Driving 60 minutes from one town to another for a job interview does not equate with economic injury."

Even if plaintiff had standing to pursue claims under the unfair competition law, the trial court denied his request for an injunction "because plaintiff failed to prove

---

[3] In his claim for Labor Code violations, plaintiff alleged defendants failed to timely pay him his final wages upon the termination of his employment in violation of Labor Code section 203. As explained in plaintiff's motion for attorney fees, on January 18, 2013 (about two months after this lawsuit was filed in November 2012), defendants paid plaintiff all claimed owed wages ($750) and a portion of the waiting time penalties provided for in Labor Code section 203, by making a total payment of $975 to plaintiff. Defendants paid plaintiff the remaining amount of claimed waiting time penalties (in an amount of $1,300) shortly before trial. Thus, plaintiff's claim for Labor Code violations was not tried.

that the public currently has access to the CSCA website.  The general rule is that 'injunctive relief will be denied if at the time of the order or judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct.' [Citation.]  In other words, to get an injunction, plaintiff must show there is a threat that the wrongful conduct will continue.  The court finds plaintiff's evidence did not meet that burden."[4]

Plaintiff filed a motion for an order awarding prevailing party attorney fees and costs pursuant to Labor Code section 218.5 and Government Code section 12965, subdivision (b), on the ground he was the prevailing party as to his Labor Code violations claim and his sexual harassment claim; he also argued he "prevailed as a practical matter on two injunctive claims."  In his motion, plaintiff asserted:  "In light of this mixed bag of outcomes, he has apportioned as fee shifting work 1/3 of the total time spent on this case.  He requests his attorney's straight hourly rate—no multiplier and no interest or other adjustment for a delay in compensation for what is now four years—as his way of displaying proper, fractional apportionment and reasonable billing judgment."  Plaintiff sought attorney fees in the amount of $133,887 for litigating the case plus $12,747 in fees to prepare the motion itself.  Plaintiff also requested an award of costs and submitted a memorandum of costs seeking a total costs award of $15,966.94.

Defendants filed an opposition to plaintiff's motion for attorney fees and request for costs.

---

[4]  Plaintiff has not challenged the jury's findings or the court's bench trial findings on liability or damages in this appeal.

The trial court awarded plaintiff total costs in the amount of $7,044.93[5] but denied his motion for attorney fees.  Judgment was entered in favor of plaintiff and against defendants[6] in the amount of $8,080 plus $7,044.93 in costs.  Plaintiff appealed.

## DISCUSSION

### I.

### STANDARD OF REVIEW

“““The standard of review on issues of attorney's fees and costs is abuse of discretion.  The trial court's decision will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice.  If the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence.”””  (*Pellegrino v. Robert Half Internat., Inc.* (2010) 182 Cal.App.4th 278, 287-288.)

### II.

### GENERAL LEGAL PRINCIPLES

“‘Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding.’  (Code Civ. Proc., § 1032, subd. (b).)  The litigation costs that the prevailing party may recover include attorney fees when recovery of such fees is authorized by statute.  (*Id.*, § 1033.5, subd. (a)(10)(B).)”  (*Chavez, supra,* 47 Cal.4th at p. 975.)

---

[5]  Although in his appellate briefing plaintiff expresses disagreement with the court's costs award and includes in the conclusion of his opening brief that the court reverse the judgment and remand the case for a redetermination of fees and costs, plaintiff has forfeited any challenge to the costs award by failing to provide any meaningful analysis and citation to legal authority in support of any such challenge.

[6]  Before trial, plaintiff and defendants stipulated that “O'Hara's companies would be co-extensively liable with his liability.”

The general rule that the prevailing party may recover costs, including attorney fees, when authorized by statute, has exceptions.  One such exception applies when "'the prevailing party recovers a judgment that could have been rendered in a limited civil case,' and the action was not brought as a limited civil case," in which case "Code of Civil Procedure section 1033's subdivision (a) . . . states that '[c]osts or any portion of claimed costs shall be as determined by the court in its discretion.'"  (*Chavez, supra,* 47 Cal.4th at pp. 975-976, fn. omitted; see *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1053 [Code of Civil Procedure section 1033, subdivision (a) makes an award of costs discretionary in unlimited civil cases when the judgment awarded an amount of damages that is less than what may be recovered in a limited civil case].)

The limit of what may be recovered in a limited civil case is codified at Code of Civil Procedure section 85, which provides in relevant part:  "An action or special proceeding shall be treated as a limited civil case if all of the following conditions are satisfied, and, notwithstanding any statute that classifies an action or special proceeding as a limited civil case, an action or special proceeding shall not be treated as a limited civil case unless all of the following conditions are satisfied:  [¶] (a) The amount in controversy does not exceed twenty-five thousand dollars ($25,000)."  The California Supreme Court has expressly rejected the argument that Code of Civil Procedure section 1033, subdivision (a) does not apply to a motion for prevailing party attorney fees in the context of a FEHA claim, stating:  "[S]ection 1033(a), interpreted according to its plain meaning, gives a trial court discretion to deny attorney fees to a plaintiff who prevails on a FEHA claim but recovers an amount that could have been recovered in a limited civil case.  In exercising that discretion, however, the trial court must give due consideration to the policies and objectives of the FEHA in general and of its attorney fee provision in particular."  (*Chavez, supra,* 47 Cal.4th at p. 976.)  The parties do not cite any authority, and we have found none, suggesting that Code of Civil Procedure section 1033,

subdivision (a) does not similarly apply to motions for attorney fees brought under Labor Code section 218.5.

III.

THE TRIAL COURT DID NOT ERR BY DENYING PLAINTIFF ATTORNEY FEES UNDER FEHA.

In his opening brief, plaintiff argues the trial court erroneously denied him prevailing party attorney fees under FEHA after the jury awarded him $8,080 in damages on his FEHA claim.  For the reasons we explain, plaintiff has failed to show the trial court's ruling constituted an abuse of discretion.

Plaintiff's motion for attorney fees as it related to his FEHA claim was based on Government Code section 12965, subdivision (b), which provides in part:  "In civil actions brought under this section, the court, in its discretion, may award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert witness fees."  The California Supreme Court has held that "in a FEHA action a trial court should ordinarily award attorney fees to a prevailing plaintiff *unless special circumstances would render a fee award unjust*."  (*Chavez, supra*, 47 Cal.4th at p. 976, italics added.)

As discussed *ante*, a FEHA "plaintiff's failure to take advantage of time- and cost-saving features of the limited civil case procedures may be considered a special circumstance that would render a fee award [in favor of a plaintiff] unjust."  (*Chavez, supra,* 47 Cal.4th at p. 986.)  Also in the FEHA context, "'[a] fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether.'"  (*Id.* at p. 990*.*)

The trial court explained its ruling denying plaintiff's motion for attorney fees in its minute order:  "Having spent time reviewing the complete record in this case, including the class certification portion of the litigation, the court finds that plaintiff over litigated this case.  The factual similarities between the instant matter and the facts in the California Supreme Court decision *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970,

10

are striking.  In *Chavez*, the plaintiff filed an action alleging several FEHA claims.

Following a five-day trial, the jury awarded Chavez $1,500 in economic damages and

$10,000 in noneconomic damages.  Chavez then sought attorney fees in excess of

$400,000 which he subsequently amended to approximately $870,000.  In *Chavez*, the

Supreme Court concluded that 'in light of plaintiff's minimal success and grossly inflated

attorney's fee request, the trial court did not abuse its discretion in denying attorney fees.'

[Citation.]  In reaching this decision, the court noted that Chavez's success on a single

FEHA claim did not have 'any broad public impact or result[] in significant benefit to

anyone other than himself.'  [Citation.]

   "Here, the jury awarded plaintiff Martinez $1,080 in economic damages

and $7,000 in noneconomic damages.  Plaintiff Martinez's request for attorney's fees is

based on a calculation of approximately $414,407 in fees and plaintiff is asking the court

to award more than one third of that sum.  The court, however, finds the figure of

$414,407 very unreliable.  Plaintiff's counsel admitted during the hearing that he had not

maintained contemporaneous billing hours and that he based the legal fee calculation on a

reconstruction of the amount of hours plaintiff's counsel believes he spent working on the

case.  Although block billing is not invalid per se, its use may undercut the credibility for

the fee application.  [Citation.]  In this particular case, the reconstructed time sheets

plaintiff submitted show that on one specific day counsel billed 25 hours of work

performed.  On multiple days counsel billed in excess of 15 hours of work performed per

day.  These entries raise serious questions about the accuracy of counsel's alleged

reconstruction of the time he spent working on this case.  Taking into consideration the

unreliability of the figures provided with the nominal damages the jury awarded, asking

the court for more than $160,000 in legal fees, seems as excessive as the legal fees

plaintiff requested in the *Chavez* case.  See also *Serrano v. Unruh* (1982) 32 Cal.3d 621

('a fee request that appears unreasonably inflated is a special circumstance permitting the

trial court to reduce the award or deny one altogether').  Moreover, like in *Chavez*, this is

not a claim that had a broad public impact or resulted in significant benefit to anyone other than plaintiff Martinez, further justifying the court's decision to deny plaintiff attorney's fees.

"In addition, the court notes that plaintiff in this case was spectacularly unsuccessful.  The court's records make clear that plaintiff engaged in fruitless litigation, with many adverse court rulings that underscored the weaknesses in plaintiff's case.  Most of the litigation had nothing to do with the FEHA claim which probably explains why the evidence plaintiff presented at trial in support of the FEHA claim was so sparse.  Most of the entries in counsel's time sheet have nothing to do with this one FEHA claim.  A large portion of the entries relate to the false advertising claim and the unsuccessful efforts to obtain class certification.

"The weakest evidence plaintiff presented at trial was on the issue of damages.  The wrongful conduct at issue occurred over a matter of weeks, which made proving significant economic damages almost impossible.  At trial, counsel asked the jury to return damages in excess of $500,000, yet failed to present evidence in support of such [an] outlandish figure.  Like in *Chavez*, plaintiff's counsel in this case should have determined long before trial that realistically the case was worth no more than $25,000 and should have pursued the case as a civil limited matter.

"Following *Chavez*, the court denies plaintiff's request for attorney fees."

Plaintiff has failed to show the trial court's determination that plaintiff's request for attorney fees was excessive—a special circumstance recognized in *Chavez* in which a prevailing plaintiff may be properly denied attorney fees under FEHA[7]—

---

[7] Plaintiff argues that in denying attorney fees on his FEHA claim, the trial court did not apply the correct legal analysis provided in *Chavez*.  He argues "the trial court analyzed the fee issue under the assumption that it had unfettered discretion to award (or not award) attorney's fees, by citing the statute."  The court's minute order does not support plaintiff's argument.  The court's ruling with regard to the FEHA claim was based on the court's determination that two separate special circumstances to the general rule that a

constituted an abuse of discretion. Our record, even as augmented, does not contain the entire trial court record. It includes the transcript of only one day of the five-day trial in this case; consequently, we are unable to review the strength of the evidence presented at trial to prove plaintiff's FEHA claim and in particular, the strength of the evidence supporting his request for damages. It appears that our record does not include several of the minute orders issued by the trial court recording its rulings on various law and motion matters throughout the case. The trial court, however, had the entire record before it and expressly stated in its minute order that it had reviewed the entire record before ruling on the motion for attorney fees.

The trial court found plaintiff's counsel's time records, filed in support of the motion, unreliable. At the hearing on the motion, plaintiff's counsel admitted his office did not keep contemporaneous time and billing records throughout about half of the four-year litigation and that time records submitted in support of the motion for attorney fees were retrospectively created "at the end of the case." Contemporaneous records are not required to support a motion for attorney fees. (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375; *Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559.) Without such time records or billing statements, however, a motion for attorney fees must be supported by declarations explaining, "in more than general terms, the extent of services rendered to the client." (*Martino v. Denevi, supra,* at pp. 559-560.)

The trial court did not abuse its discretion in concluding plaintiff's counsel's declaration was insufficient to support the motion for attorney fees based, in significant part, on retrospectively created time and billing records. Plaintiff's counsel

---

prevailing FEHA plaintiff is awarded attorney fees applied—that plaintiff sought an excessive amount of fees and plaintiff recovered less than what could be recovered in a limited civil case and should have prosecuted the case as a limited civil case. (See *Chavez, supra,* 47 Cal.4th at pp. 986, 990.) Such a determination effectively acknowledges the general rule.

filed a declaration in support of the attorney fees motion claiming that at least 969.6 billable hours were spent working on the case on behalf of plaintiff. In his declaration, he defended his failure to show which portion of those hours was for services related to the litigation of the FEHA claim: "Complicating the analysis is that the time to investigate and litigate the sex claim, the wage claim, the fraud claim and the injunctive claims is difficult to separate. The evidence is overlapping." Instead of providing more specific information and analysis, counsel's declaration proposed: "As I see it, and in attempting to truly be reasonable, I have apportioned the case into thirds: a third of the time for the sex/wage claims, a third for the 17200/17500 causes and a third for the fraud claim. A third of the total fee turns out to be $133,887, as reflected by a computation I ran aggregating the hours at the respective hourly rates, plus $12,747 to prepare these moving papers." There is no explanation as to why this is a reasonable allocation other than that, in counsel's unsubstantiated opinion, the amount of time reflected in that fee amount is what is "generally necessary for any case to run the length of the system."

Plaintiff further argues that while reconstructed billing records are less accurate than those created contemporaneously, his counsel's proposal to cut his bill by two-thirds was more than adequate to compensate for any margin of error that might be attributed to the produced records. In support of his argument, plaintiff claims to have prevailed "on some level" on five of his six claims. Not true. The trial court ruled against plaintiff on the claims for injunctive relief. Plaintiff claims he prevailed to some degree as to the claims for injunctive relief because defendants agreed to take down the Web site upon which the claims were based. Plaintiff has failed to identify any order or injunction compelling defendants' action now or in the future. Plaintiff's fraud claim was dismissed during trial. His wage claim was resolved before trial; a mere $1,300 in penalties remained at stake from the early days of the litigation until the eve of trial as to that claim. Plaintiff has not challenged the outcome of any of these causes of action on

appeal.[8]  The trial court was well within its discretion to reject plaintiff's requested one-third of a total amount of claimed incurred attorney fees the court found unreliable in the first place, based on an inflated view of plaintiff's litigation success.

Plaintiff also argues that the trial court's ruling reflects a punishment for plaintiff's counsel's personal and conclusory attacks on one of the trial judges, who presided earlier in the case and had previously issued sanctions against plaintiff, during the hearing on the motion for attorney fees.  Plaintiff states in his opening brief that the trial court's denial of the motion for attorney fees constituted "a mindlessly one-sided ruling—a ruling founded in advocacy rather than analysis if ever there was one—and littered with legal errors, as they always are."

We have reviewed the transcript of the hearing on the motion for attorney fees and the court's minute order containing its ruling and find no support for plaintiff's assertion.  At the hearing, plaintiff's counsel complained to the trial court that he had been improperly sanctioned by the prior trial court judge, stating that trial judge "was off in a crazy place.  Thank God he's gone now.  No offense."  The trial court explained to counsel that while the court did not need counsel to agree whether the prior trial judge was a great judge, "we have to show, you know, some level of respect for the judicial process."  The court further stated it "underst[ood] [counsel's] passion" but attacking the prior trial judge's abilities "is not a very persuasive way of addressing that."  Plaintiff's argument is without any support in the record.

---

[8]  In his opening brief, plaintiff objects to the trial court's characterization in the minute order of the prosecution of his claims as "spectacularly unsuccessful."  The trial court's comment appears to have been rooted in an overview of the lengthy litigation of multiple claims (four years) which indisputably included a failed class action bid, an unsuccessful appeal, an unsuccessful writ petition, and a bifurcated trial, culminating in a modest judgment of $8,080 in favor of plaintiff and the payoff of $1,300 in waiting time penalties.  Given that procedural history, the trial court's comment was reasonable.

In sum, the record supports the trial court's application of the special circumstance of an excessive request for attorney fees and thus supports the court's exercise of discretion in denying prevailing party attorney fees on the FEHA claim.  The record, however, also shows the trial court's exercise of discretion in denying the motion was supported by the existence of another special circumstance—that plaintiff recovered less than the maximum recoverable in a limited civil case.

In *Chavez*, the Supreme Court explained that in exercising its discretion under Code of Civil Procedure section 1033, subdivision (a) to grant or deny attorney fees to a plaintiff who has recovered FEHA damages in an amount that could have been recovered in a limited case, "the trial court must give due consideration to the policies and objectives of the FEHA and determine whether denying attorney fees, in whole or in part, is consistent with those policies and objectives."  (*Chavez, supra,* 47 Cal.4th at p. 986.)

The Supreme Court in *Chavez* continued:  "In determining whether a FEHA action should have been brought as a limited civil case, the trial court should consider FEHA's underlying policy of encouraging the assertion of meritorious FEHA claims, and it should evaluate the entire case in light of the information that was known, or should have been known, by the plaintiff's attorney when the action was initially filed and as it developed thereafter.  [Citation.]  In making this evaluation, the trial court should exercise caution to avoid 'hindsight bias,' which is the recognized tendency for individuals to overestimate or exaggerate the predictability of events after they have occurred.  [Citations.]  If, based on the available information, the plaintiff's attorney might reasonably have expected to be able to present substantial evidence supporting a FEHA damages award in an amount exceeding the damages limit (now $ 25,000) for a limited civil case, or if the plaintiff's attorney might reasonably have concluded that the action could not be fairly and effectively litigated as a limited civil case, the trial court should not deny attorney fees merely because, for example, the trier of fact ultimately

rejected the testimony of the plaintiff's witnesses or failed to draw inferences that were reasonably supported, although not compelled, by the plaintiff's evidence.  But if, to the contrary, the trial court is firmly persuaded that the plaintiff's attorney had no reasonable basis to anticipate a FEHA damages award in excess of the amount recoverable in a limited civil case, and also that the action could have been fairly and effectively litigated as a limited civil case, the trial court may deny, in whole or in part, the plaintiff's claim for attorney fees and other litigation costs."  (*Chavez, supra,* 47 Cal.4th at pp. 986-987.)

Again, our review of the strength of plaintiff's FEHA claim, which the trial court viewed as quite weak, is impeded by the limited trial record that has been designated on appeal.  Our record does not suggest the court's assessment to have been erroneous.  Plaintiff argues he could not have pursued this action as a limited civil case because his claim for injunctive relief could not be tried in that way.  Plaintiff's claims, however, were soundly rejected by the court.  Plaintiff's total recovery in this case (even including the amounts received from defendants on his wage claim) measured less than half the maximum amount of recovery available in a limited civil case.  Plaintiff has failed to show the court's findings regarding the applicability of special circumstances supporting the denial of prevailing party attorney fees on the FEHA claim constituted an abuse of discretion.

IV.

THE TRIAL COURT DID NOT PREJUDICIALLY ERR BY DENYING THE MOTION FOR
ATTORNEY FEES UNDER LABOR CODE SECTION 218.5.

Plaintiff challenges the trial court's denial of his motion for prevailing party attorney fees under Labor Code section 218.5, as to plaintiff's claim defendants owed him final wages and waiting time penalties under Labor Code section 203.  Labor Code section 203, subdivision (a) provides:  "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 201.9, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the

employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

Labor Code section 218.5, subdivision (a) authorizes the recovery of prevailing party attorney fees in wage claim cases as follows:  "In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action.  However, if the prevailing party in the court action is not an employee, attorney's fees and costs shall be awarded pursuant to this section only if the court finds that the employee brought the court action in bad faith."

The trial court denied plaintiff's motion for attorney fees with respect to his Labor Code section 203 claim, stating in its minute order:  "It is undisputed that long before this case came before this court for trial, defendant had paid plaintiff all his wages.  Thus, the issue of wages was not before the court when the case proceeded to trial and plaintiff cannot be considered the prevailing party on the wages claim.  [¶] The only issue that remained related to the wages claim was a waiting time penalty claim in the sum of $1,300.  Before the commencement of the trial, the parties represented that days earlier, defendant paid plaintiff an additional $1,300 to resolve the issue of waiting time penalties and thereby eliminate[d] the issue from trial.  Under Labor Code Section 203, waiting time penalties are not wages.  See *Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal.App.4th 1242, 1261.  Accordingly, defendant's decision to pay the waiting time penalties does not make plaintiff a prevailing party pursuant to Section 2[18].5."

Plaintiff argues the trial court erred in concluding he was not eligible as a prevailing party to recover attorney fees and further argues the trial court misapplied *Ling v. P.F. Chang's China Bistro, Inc.* in determining that waiting time penalties do not constitute "wages" within the meaning of Labor Code section 218.5.

18

We do not need to address plaintiff's legal arguments because even if the trial court so erred, on this record, any such error was harmless.  Plaintiff's wage claim was based on the allegation he had not been paid his final wages ($750) and that the delay triggered liability for the waiting time penalty of 30 days' wages ($1,500).  Of the amount of wage and penalties combined, $1,300 remained unpaid to plaintiff until the eve of the jury trial.  Our record does not show there was much to litigate regarding the amount of wages accrued or the rate of wages plaintiff had earned during his employment that would be factored into the calculation of the waiting time penalty of 30 days' wages.  Although in the complaint plaintiff alleged he was misclassified as an independent contractor, citing Labor Code section 2699.3, he has not sought overtime compensation or any other recovery related to that alleged misclassification.

The trial court found plaintiff's billing records to be unreliable.  Plaintiff fails to explain in his appellate briefing how much of the fees generated over four years of litigation is properly attributed to the prosecution of this rather straightforward wage claim.  Furthermore, as discussed *ante*, plaintiff's overall recovery (including amounts he received to resolve the wage claim) was less than half the amount recoverable in a limited civil case, vesting the trial court with discretion to deny even a prevailing party attorney fees claim under Labor Code section 218.5.  For all of these reasons, even if the trial court erred in its reasoning for denying the motion, any such error was harmless.

V.

MISCONDUCT BY PLAINTIFF'S COUNSEL PAVONE

Business and Professions Code section 6068, subdivision (b) provides that it is the duty of an attorney to "maintain the respect due to the courts of justice and judicial officers."  Disrespectful statements made in court papers are grounds for attorney discipline and/or contempt.  (See *Ramirez v. State Bar* (1980) 28 Cal.3d 402 [attorney suspended for brief falsely accusing appellate justices of acting illegally as a result of their alleged bias in favor of financially strong opposing party]; *In re Koven*

(2005) 134 Cal.App.4th 262, 270-277 [attorney's brief falsely accusing appellate court of "deliberate judicial dishonesty" resulted in contempt proceedings, monetary fine, and referral to the California State Bar].)

Canon 3B(6) of the California Code of Judicial Ethics provides:  "A judge shall require lawyers in proceedings before the judge to refrain from (a) manifesting, by words or conduct, bias, prejudice, or harassment based upon race, sex, gender, gender identity, gender expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, or (b) sexual harassment against parties, witnesses, counsel, or others.  This canon does not preclude legitimate advocacy when race, sex, gender, gender identity, gender expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, political affiliation, or other similar factors are issues in the proceeding."

Canon 3D(2) of the California Code of Judicial Ethics provides: "Whenever a judge has personal knowledge, or concludes in a judicial decision, that a lawyer has committed misconduct or has violated any provision of the Rules of Professional Conduct, the judge shall take appropriate corrective action, which may include reporting the violation to the appropriate authority."  The advisory committee commentary accompanying canon 3D(2) instructs that California law imposes on judges mandatory reporting requirements to the State Bar regarding lawyer misconduct.

A.

*The Notice of Appeal*

Instead of using the Judicial Council notice of appeal form, plaintiff's counsel Pavone signed the plaintiff's notice of appeal which stated in full:  "Pursuant to Code of Civil Procedure section 904.1 et seq., Plaintiff Fernando Martinez hereby appeals from the lower court's disgraceful order dated November 30, 2016, as incorporated into a reported judgment dated February 21, 2017, and [as] such, technically appeals from that judgment.  The ruling's succubustic adoption of the defense position,

20

and resulting validation of the defendant's pseudohermaphroditic misconduct, prompt one to entertain reverse peristalsis unto its four corners.

"Evidence of the docket entry reflecting the judgment is attached hereto as Exhibit A.

"Plaintiff never actually received a copy of a signed judgment, though a stipulated judgment was prepared for the commission court's signature, as it apparently cynically attempted to suppress notice of the judgment in order to thwart review."

Webster's Third New International Dictionary (2002) at page 2282, column 3, defines the term "succubus" as "**1:** a demon assuming female form to have sexual intercourse with men in their sleep—compare incubus **2:** demon, fiend **3:** strumpet, whore." (Capitalization omitted.)

B.

*Plaintiff's Appellate Briefs*

Every day appellate courts evaluate litigants' contentions of trial court error regarding issues of fact and law. Plaintiff's appellate briefs, signed by Pavone, contain many statements, however, that cannot be fairly characterized as acts of zealous advocacy in an effort to challenge the ruling on plaintiff's motion for attorney fees. Instead, plaintiff's appellate briefs repeatedly accuse the judicial officer who ruled on that motion of *intentionally* refusing to follow and apply the law. There is no support in the record for such a serious charge. Examples of such statements include that the judicial officer (1) "made *intentional* mistakes at the knowing expense of legal accuracy in service to a higher agenda of ruling against [plaintiff] for his perceived political offenses"; (2) displayed "mindless antipathy toward [plaintiff]" having "*intentionally* analyzed a quantitative issue . . . by resorting to citation to qualitative features"; (3) "should have resisted the desire (but did not) to champion [another judicial officer] because it came at the expense of the integrity of her ruling"; and (4) "*intentionally* decided to let her master

for this motion be not the law, but an adversarial agenda to rule against one party regardless of it."  (Italics added.)

C.

*Conclusions*

The notice of appeal's reference to the ruling of the female judicial officer, from which plaintiff appealed, as "succubustic" constitutes a demonstration "by words or conduct, bias, prejudice, or harassment based upon . . . gender" and thus qualifies as reportable misconduct.[9]

The statements in plaintiff's appellate briefs accusing the trial court of intentionally refusing to follow the law, as detailed *ante*, and the statement in the notice of appeal suggesting the trial court tried to prevent plaintiff from receiving notice of the signed judgment in an effort to thwart appellate review of its decision, also made without any support in the record, constitute reportable misconduct.  We further note that many of the words and phrases in the notice of appeal have no place in a court filing.  We cannot understand why plaintiff's counsel thought it wise, much less persuasive, to include the words "disgraceful," "pseudohermaphroditic misconduct," or "reverse peristalsis" in the notice of appeal.

---

[9] We note rule 8.4.1 of the California Rules of Professional Conduct prohibits an attorney, in his or her representation of a client, from unlawfully harassing or unlawfully discriminating against persons on the basis of protected characteristics including gender. Plaintiff's notice of appeal was filed in April 2017, and thus before rule 8.4.1 became effective on November 1, 2018.  Had rule 8.4.1 been in effect at the time the notice of appeal was filed, Pavone's reference to the judicial officer's ruling as "succubustic" would have constituted a violation of that rule as well as misconduct under section 6068 of the Business and Professions Code.

DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.

Pursuant to canon 3D(2) of the California Code of Judicial Ethics, we hereby report Attorney Benjamin Pavone, counsel for plaintiff and appellant Fernando Martinez, to the State Bar of California for his misconduct as described in part V of this opinion's Discussion.  The clerk of this court is directed to send copies of this opinion, the notice of appeal filed in this court on April 14, 2017, plaintiff's appellate opening brief, and plaintiff's appellate reply brief to the State Bar of California.  The clerk is further directed to send a copy of this opinion to Attorney Benjamin Pavone, State Bar No. 181826, at his address listed by the State Bar.

FYBEL, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

23

# EXHIBIT 23

# Review Department of the State Bar Court for the State of California

<table>
<tr><td>

**BENJAMIN PAVONE, ESQ.,**

       **PETITIONER,**

**STATE BAR COURT,**

       **RESPONDENT,**

**STATE BAR OF CALIFORNIA,**

       **REAL PARTY IN INTEREST.**

</td><td>

**REVIEW DEPT. NO. _____**

**STATE BAR TRIAL COURT
CASE NO.: SBC-20-O-30496-CV**

**FILED
12/9/2020
STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES**

</td></tr>
</table>

**ON REVIEW FROM THE STATE BAR COURT
HON. CYNTHIA VALENZUELA, JUDGE PRESIDING**

## PETITION FOR INTERLOCUTORY REVIEW OF DENIAL OF MOTION TO DISMISS

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMER 181826**
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR PETITIONER

## <u>TABLE OF CONTENTS</u>

INTRODUCTION...................................................................................... 6

JURISDICTION ........................................................................................ 6

FACTUAL AND PROCEDURAL BACKGROUND.............................. 6

I.  THE TRIAL COURT'S DENIAL OF THE MOTION TO DISMISS
    WAS ERROR AS A MATTER OF LAW.  ALL CHARGES ARE WELL
    WITHIN PETITIONER'S CONSTITUTIONAL RIGHTS.  THIS REALITY
    RELEGATES THIS CASE TO A SLAPP ACTION AND THE ONGOING
    FEDERAL TORT OF SUCCESSFUL RETALIATORY
    INDUCEMENT TO PROSECUTE.  IT MUST BE DISMISSED................................. 11

    A.  Analysis of Count 1's Succubus Citation.  ..................................... 11

    B.  Count 2's 'Thwarting Review' Charge
        Must be Dismissed as a Matter of Law. ........................................... 14

    C.  The First Amendment Forecloses Ethics
        Charges for Counts 3 and 4. ............................................................ 16

CONCLUSION ......................................................................................... 19

# TABLE OF AUTHORITIES

## *Cases*

*Baumgartner v. United States*
(1944) 322 U.S. 665 ..................................................................................... 11

*Chavez v. Los Angeles*
(2007) 47 Cal.4th 970 ..................................................................................... 18

*Garrison v. Louisiana*
(1964) 379 U.S. 64 ........................................................................... 12, 15, 17

*Greenbelt v. Bresler*
(1970) 398 U.S. 6 ............................................................................... 12

*Hartman v. Moore*
(2006) 547 U.S. 250 ....................................................................... 6, 10, 14

*Hustler Magazine v. Falwell*
(1988) 485 U.S. 46 ......................................................................... 9, 11, 12

*In re Anderson*
(1997) 3 Cal. State Bar Ct. Rptr. 775
1997 Calif. Op. Lexis 5 ............................................................................. 9

*In re Arabia*
(S.D.Bankr. 2013) Case No. 12-15663-CL11 ................................................. 9

*In re Murchison*
(2016) 245 Cal.App.4th 847 .................................................................. 10

*In the Matter of Tady*
(Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 121 ................................... 13-14

*In re Snyder*
(1985) 472 U.S. 634 ....................................................................................12

*Iowa v. Weaver*
(2008) 750 N.W.2d 71 ..................................................................................17

*Knievel v. ESPN*
(9th Cir. 2004) 393 F.3d 1068 ......................................................................11

*Levinsky's v. Wal-Mart*
(1st Cir. 1997) 127 F.3d 122 ........................................................................11

*Ling v. P.F. Chang's*
(2016) 245 Cal.App.4th 1242 .......................................................................18

*Marcone v. Penthouse*
    (3d Cir. 1985) 754 F.2d 1072 ........................................................... 10

*Martinez v. O'Hara*
    (2019) 32 Cal.App.5th 853 ................................................... 8, 10, 13

*Martinez v. O'Hara*
    Case No. G054840 (Cal. Fourth District, February 28, 2019) ...................................... 8

*Milkovich v. Lorain*
    (1990) 497 U.S. 1 ........................................................................ 12

*Mullis v. U.S. Bankruptcy Court*
    (9th Cir. 1987) 828 F.2d 1385 ...................................................... 10, 14

*National Ass'n of Letter Carriers v. Austin*
    (1974) 418 U.S. 264 ................................................................. 11, 12

*New York Times v. Sullivan*
    (1964) 376 U.S. 254 ................................................. 9, 11, 15, 17, 19

*Nieves v. Bartlett*
    (2019) – U.S. –, 139 S.Ct. 1715
    2019 U.S. Lexis 3557 ................................................................. 6, 10

*Nygard v. Uusi-Kerttula*
    (2008) 159 Cal.App.4th 1027 ..................................................... 12, 16

*Pate v. Township of Galway-Cavendish*
    (Ont.App.2013) 117 O.R. (3d) 481 ................................................... 10

*People v. Douglas*
    (1966) 246 Cal.App.2d 594 .......................................................... 19

*People v. Valli*
    (1987) 187 Cal.App.4th 786 ......................................................... 19

*Philadelphia Newspapers v. Hepps*
    (1986) 475 U.S. 767 .......................................................... 12, 15, 17

*Rankin v. Howard*
    (9th Cir. 1980) 633 F.2d 844 ...................................................... 10, 14

*Stump v. Sparkman*
    (1978) 435 U.S. 349 ............................................................... 10, 14

*Standing Committee v. Yagman*
    (C.D. Cal. 1994) 856 F.Supp. 1384 ................................................. 16

*Standing Committee v. Yagman*
(9th Cir. 1995) 55 F.3d 1430 ........................................................................... passim

## *Statutes & Other Authority*

Business & Professions Code

section 6068(c). ....................................................................................14

California Rules Court

Rule 8.104(a) .........................................................................................15

Code Civil Procedure

section 86 ...............................................................................................18

section 425.16 ........................................................................................ 6

Code Judicial Conduct

Canon 3B(2) ......................................................................................... 10

Canon 3D(2) .................................................................................. 10, 14

Davis, *Arbitrary Justice: The Power of the American Prosecutor*
(Oxford Univ. Press 2007) .................................................................. 19

Government Code

section 12965(b) .................................................................................. 18

Langer, "*Rethinking Plea Bargaining: The Practice and Reform
of Prosecutorial Adjudication in American Criminal
Procedure*," (2006) 33 Am.J. Crim.L. 223 ....................................... 19

Restatement (Second) of Torts (1977), § 566 .......................................12

## INTRODUCTION

The consequences for filing a SLAPP suit – one that seeks to impose punishment for the exercise of constitutional rights – under California law are swift, harsh and indiscriminate. While the most common blowback occurs in the civil context under California's anti-SLAPP statute (CCP § 425.16), the prohibition against SLAPP suits finds its way into this State Bar ethics case through the doorway of prohibited retaliatory actions under the progeny of the U.S. Supreme Court's decision in *Hartman v. Moore*.[1]

Here, in seeking to retaliate against a male attorney during the height of the "metoo" movement for calling a female trial court's ruling succubistic, Orange County Appellate Justice Richard Fybel unleashed the full panoply of punitive measures at his disposal: denying all compensation on a fee motion, singling counsel out in a published opinion, catalyzing a national internet shaming exercise, and instigating this ethics prosecution.

However, Fybel apparently did not appreciate that counsel's commentary, while tactically inadvisable, fell squarely within Petitioner's constitutional rights. Consequently, this action by definition constitutes the federal tort of "successful retaliatory inducement to prosecute," is illegal, potentially subjects Fybel to a civil suit, and must be dismissed.

## JURISDICTION

Pursuant to State Bar Rules of Procedure, Rule 5.150, this Court has interlocutory jurisdiction to review an adverse, otherwise-dispositive ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

Undersigned counsel is a 25th-year Cornell/UCLA-trained California litigation attorney, with a background in civil, appellate and constitutional law practice and an otherwise unblemished professional record.[2]

---

[1]   *Hartman v. Moore* (2006) 547 U.S. 250, 256, 262; *Nieves v. Bartlett* (2019) – U.S. –, 139 S.Ct. 1715, 2019 U.S. Lexis 3557, *9-10 (Case No. 17-1174, March 28, 2019).

[2]   1 R 165-166 (Citations to the record are to two volumes, in the usual format, [volume] R [page].)

In 2012, counsel accepted a wrongful termination/sexual misconduct/false advertising plaintiff contingency case, in which an impoverished 19-young-old job seeker, Martinez, was used and abused by a wealthy sexagenarian employer, O'Hara.[3]

During discovery in 2013, the then-sitting trial judge, Hon. Gregory Munoz, sanctioned counsel, by failing to appreciate that counsel took a discovery motion off-calendar for a legitimate reason: counsel had gotten the relief he sought by other means.[4]

At the hearing on that motion, it became apparent that Judge Munoz was committing judicial misconduct – abdication of his official duties – because he had no knowledge of the motion's merits.[5]  He incomprehensibly admonished counsel for not reading an inaccessible, private chambers memorandum and referred counsel to an empty tentative ruling, among other confused actions.[6]  Counsel subsequently litigated a 170.6 bias challenge, and not long after the appellate writ, Munoz retired from the bench.[7]

The case later went to trial, with a mixed bag of outcomes: Martinez recovered $8K in sexual harassment damages; O'Hara capitulated to take down his fraudulent employment recruiting website; O'Hara paid a couple thousand in outstanding wages, but he, O'Hara, escaped Martinez's fraud claim and any major financial imposition.[8]

The earlier discovery dispute with Judge Munoz had long since passed, but the scars from being improperly sanctioned came back to the surface when opposing counsel, Grant Teeple, later accused undersigned counsel, Pavone, of not paying the sanction award in question.[9]

During a hearing on Martinez's motion for attorney's fees after trial, undersigned counsel fumed on the record that the sanction award had not only been promptly paid but that it should have never been entered in the first place.[10]

---

[3]   1 R 21-24.
[4]   1 R 25-26.
[5]   1 R 26-29.
[6]   1 R 26-29.
[7]   1 R 17.
[8]   1 R 30-31.
[9]   1 R 41.
[10]   1 R 64-65.

The judge hearing the fee motion, Commission Carmen Luege, subsequently ruled against Martinez on every issue and denied all compensation – in fact, did not even cover Martinez's costs.[11]  The reasons, analysis, merits and logic of this ruling are at the heart of this dispute and were perceived by undersigned counsel at the time as payback for counsel's criticism of Judge Munoz's competence at the fee hearing.[12]

In response to Commissioner Luege's ruling, Martinez filed a notice of appeal and in relevant part counsel called her ruling a succubistic adoption of the defense position.[13]  Counsel challenged the ruling in later appellate briefs in part by arguing that she was engaged in judicial advocacy.[14]

On appeal, Justice Richard Fybel sitting in the Fourth District, Division Three, affirmed the fee award in an unpublished opinion,[15] with an almost equal number of untenable legal positions,[16] but the California Supreme Court denied review after *en banc* consideration of the matter.[17]

In Justice Fybel's disposition, he published part of the opinion by declaring that counsel committed gender misconduct based on the succubistic comment in the notice of appeal[18] and for accusing Commissioner Luege of intellectual dishonesty in the *Martinez* appellate briefs.[19]

Justice Fybel's published opinion ripped through the internet blogosphere ultimately causing counsel to be nationally lambasted as a misogynist and

---

[11]  1 R 32-33.
[12]  *See* 1 R 77.
[13]  1 R 8.
[14]  1 R 11-12; 56.
[15]  *Martinez v. O'Hara*, Case No. G054840 (Cal. Fourth District, February 28, 2019).
[16]  *See* 1 R 92-93.
[17]  *Martinez v. O'Hara*, Case No. G054840 (Cal. Supreme Court, June 12, 2019).
[18]  *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 857.
[19]  *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 858.

homophobe[20] – even though counsel has championed dozens of women in cases over the years[21] and the *Martinez* case involved counsel's representation of a gay man.[22]

In August 2020, the State Bar dutifully carried out Justice Fybel's bidding by charging Petitioner with four counts of violating Business & Professions Code section 6068(b).[23]

This consisted of one count for the succubus remark, one count for alleging that Judge Luege attempted to thwart review by not serving the judgment, and two counts (containing a total of 31 individual statements) from the *Martinez* appellate briefs alleging intellectual dishonesty in the fee ruling.[24]

As a legal matter, all four counts fall within Petitioner's constitutional rights. Count one is clearly untenable in light of *Hustler*[25] and *Yagman.*[26] Count two does not even qualify as a prohibited moral-turpitude accusation,[27] much less survive the most rudimentary application of *New York Times v Sullivan* recklessness standards.[28]

And as to counts three and four (containing the 31 statements), they also fall with the parameters of *Yagman*, whose offending attorney directly called a judge dishonest and whose far-more-direct accusation was nevertheless insufficient because intellectual dishonesty accusations constitute permissible opinion.[29]

---

20  1 R 301-342.

21  *See, e.g., In re Arabia* (S.D.Bankr. 2013) Case No. 12-15663-CL11, Dkt. 108. [aggressively intervening in bankruptcy action to protect wife of debtor against oppressive bank tactics].

22  1 R 23.

23  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1434, 1441.

24  2 R 358.

25  2 R 416-428; *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 48

26  2 R 416-428; *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1437-1440; *see also In re Anderson* (1997) 3 Cal. State Bar Ct. Rptr. 775, 1997 Calif. Op. Lexis 5, *16 ["criticism by an attorney which amounts to an attack on the honesty, motivation, integrity, or competence of a judge who has the responsibility to administer the law may still be disciplinable under certain circumstances" [but those circumstances are limited by *Yagman* and may, according to *Anderson*, require impact on the administration of justice, also a fatal problem here].]

27  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1436-1439.

28  *New York Times v. Sullivan* (1964) 376 U.S. 254, 279-280.

29  2 R 358; *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440.

Consequently, the more reputational damage the State Bar inflicts with a prosecution founded on Justice Fybel's illegal decision to instigate an ethics prosecution based on counsel's exercise of constitutionally-protected speech,[30] the larger the damage claim becomes in a subsequent 1983 civil suit under *Hartman*.[31] For present purposes, the State Bar may not legally or ethically prosecute an action that constitutes an ongoing federal SLAPP tort.

---

[30]    *Nieves v. Bartlett* (2019) – U.S. –, 139 S.Ct. 1715, 2019 U.S. Lexis 3557, *9-10 (Case No. 17-1174, March 28, 2019) ["As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech"]; *Hartman v. Moore* (2006) 547 U.S. 250, 256, 262 ["Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right … the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out"].

Appellate Justice Fybel enjoyed no fundamental legal right to initiate a state bar prosecution because he was offended (per Canon 3B(2)), had no legal right to accuse counsel of a gender offense that *he knew* did not exist at the time of the subject remark (*Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 858, fn. 9) – not that it violated that rule anyway – and Canon 3D(2) did not give Fybel the right, nor saddle him with the obligation, to refer constitutionally-protected speech for an ethics prosecution. (*See* 2 R 383-391; *see In re Murchison* (2016) 245 Cal.App.4th 847, 852.)  The elements of retaliatory prosecution are satisfied, but a jury would have to decide whether instituting ethics prosecution for non-crimes is something within his regular duties for purposes of a judicial immunity defense. (*Rankin v. Howard* (9th Cir. 1980) 633 F.2d 844, 848-49; *Mullis v. U.S. Bankruptcy Court* (9th Cir. 1987) 828 F.2d 1385, 1389; *Stump v. Sparkman* (1978) 435 U.S. 349, 357 n. 7.)

[31]    *See, e.g., Pate v. Township of Galway-Cavendish* (Ont.App.2013) 117 O.R. (3d) 481, ¶ 240 [awarding $25,000 for wrongful discharge and $450,000 in punitive damages against government official that enlisted criminal authorities to charge plaintiff with a crime to distract from township's wrongful termination of him]; *Marcone v. Penthouse* (3d Cir. 1985) 754 F.2d 1072, 1077 [awarding 30,000 in actual damages and $537,000 in punitive damages for magazine that falsely connected an attorney to criminal marijuana trafficking].

## I.

**THE TRIAL COURT'S DENIAL OF THE MOTION TO DISMISS WAS ERROR AS A MATTER OF LAW. ALL CHARGES ARE WELL WITHIN PETITIONER'S CONSTITUTIONAL RIGHTS. THIS REALITY RELEGATES THIS CASE TO A SLAPP ACTION AND THE ONGOING FEDERAL TORT OF SUCCESSFUL RETALIATORY INDUCEMENT TO PROSECUTE. IT MUST BE DISMISSED.**

### A. Analysis of Count 1's Succubus Citation.

In the State Bar's Count One, Petitioner was cited for the including the following statement in a notice of appeal:

> The ruling's succubustic adoption of the defense position, and resulting validation of the defendant's pseudohermaphroditic misconduct, prompt one to entertain reverse peristalsis unto its four corners.[32]

One of the prerogatives of American citizenship is the right to criticize public figures: "such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to vehement, caustic, and sometimes unpleasantly sharp attacks."[33] Criticism is protected by the First Amendment if it cannot reasonably be interpreted as stating "actual facts" about the target.[34]

The NDC cites Petitioner for a violation of B&P 6068(b) by the decision essentially to call a civil trial court ruling succubistic.[35] There at least five dispositive constitutional defects with this charge:

(1) the language employed describes a ruling and not the judge and cannot, consistent with due process, be rewritten to suit the Bar's more convenient

---

[32]  1 R 8.

[33]  *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 51, *citing Baumgartner v. United States* (1944) 322 U.S. 665, 673-674 *and New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

[34]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1436-1437, *citing Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50; *National Ass'n of Letter Carriers v. Austin* (1974) 418 U.S. 264, 284; *Knievel v. ESPN* (9th Cir. 2004) 393 F.3d 1068, 1074 [calling Evil Knievel flanked by two women a "pimp" was not a literal assertion, but a jocular and perhaps even complimentary one]; *Levinsky's v. Wal-Mart* (1st Cir. 1997) 127 F.3d 122, 128 ["exaggeration and non-literal commentary have become an integral part of social discourse"].

[35]  2 R 358.

narrative of it being an *ad hominem* criticism.[36] There is no State Bar offense under B&P 6068 called "disrespecting a ruling."

(2) even if rewritten, the statement is textbook "rhetorical hyperbole," as it could not more perfectly exemplify a "lusty and imaginative expression"[37] protected by the First Amendment[38] and cannot be taken as an actual, factual *real* accusation about the judge in question[39];

(3) even if rewritten, it is at worst an opinion, in that it cannot be proven true or false[40];

(4) the criticism of the ruling as "disgraceful"[41] is also an opinion[42] and one in which the facts for that opinion were liberally disclosed (in the appellate briefing)[43]; and

---

[36]  *Compare Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440 [lawyer directly calling the judge "ignorant," "ill-tempered," a "buffoon," a "right-wing fanatic," a "bully" and "one of the "worst judges in the United States"]; *National Ass'n of Letter Carriers v. Austin* (1974) 418 U.S. 264, 284 (calling someone a "traitor" not a representation of fact); *Greenbelt v. Bresler* (1970) 398 U.S. 6, 14 [use of word "blackmail" not enough].  Once a charging party starts rewriting the language employed, there is virtually unlimited opportunity for abuse.

[37]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438-1440, *citing Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50; *National Ass'n of Letter Carriers v. Austin* (1974) 418 U.S. 264, 286; *Nygard v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1049 [working conditions described as "slaved … without a break" among other things, reversed].

[38]  *See In re Snyder* (1985) 472 U.S. 634, 637 [where a lawyer felt "appalled," "extremely disgusted" at a court's decision and verbalized his perception of the "extreme gymnastics even to receive the puny amounts which the federal courts authorize for [appointed] work" (remarks roughly comparable to the ones at bar), the ethics charge died on the vine.]

[39]  *See Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438.  Even more direct – and factual – insults, such as *Austin* (calling someone a "traitor") or *Greenbelt* (accusing one of "blackmail") apparently would not be sufficiently factual to survive First Amendment scrutiny. (*Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438-1440, *citing National Ass'n of Letter Carriers v. Austin* (1974) 418 U.S. 264, 284; *Greenbelt v. Bresler* (1970) 398 U.S. 6, 14.)

[40]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Milkovich v. Lorain* (1990) 497 U.S. 1, 19; *Lewis v. Time* (9th Cir. 1983) 710 F.2d 549, 555; Restatement (Second) of Torts (1977), § 566 (statement of opinion actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion")

[41]  1 R 8, 2 R 359.

[42]  *See Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438-1440; *Garrison v. Louisiana* (1964) 379 U.S. 64, 74 *and Philadelphia Newspapers v. Hepps* (1986) 475 U.S. 767, 776-777.

[43]  1 R 32-60, 74-80.

(5) the idea that the succubus comment "manifests gender bias" utterly fails the factual specificity requirements of *Yagman*.[44]

The State Bar's entire position in the court below in response to these fatal problems was that "respondent both demonized and sexualized the female judicial officer, thus manifesting gender bias."[45]

However, this observation cannot overcome even one of the above constitutional barriers, much less all of them. 'Demonizing' a judge literally fails every filter:

Respondent did not call the judge a demon, counsel called the ruling succubistic. Judges are not demons – it is not factual.

The lusty comment is surely textbook rhetorical hyperbole, and at worst, it would be an unprovable opinion.

Finally, 'manifesting gender bias' is not remotely sufficient relative to the standards of the federal case law that require a specific, factual (moral) accusation.[46]

'Sexualizing' a judge fares no better, for the same reasons: the manner of allegedly sexualizing her was not direct. A succubus is a fictional creature, so the remark is not factual. It's obviously hyperbole, and at worst, an unprovable opinion. And even if all that failed, a judge's 'sexualization' does not imply that she actually committed a specific moral offense, nor was one actually suggested here in the real world.

The lower court did not analyze the governing issues.[47] It tersely held that the complaint was sufficiently pled, without addressing the controlling federal analysis or in fact providing any reasoning at all.[48]

Its one citation, to *In re Tady*,[49] stands for the usual proposition that, like traditional motions to dismiss, the allegations of the charging document in a State Bar

---

[44] See *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 858, fn. 9; 2 R 359, 420-428, 447, 463-464, 510-511.

[45] 2 R 490.

[46] *See Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438.

[47] 2 R 534-535.

[48] 2 R 534-535.

[49] *In the Matter of Tady* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 121, 124.

13

action must be accepted as true and a complaint can only be dismissed if accepting those allegations, the charging document does not state an offense as a matter of law.[50]

That said, while accepting the facts alleged as true – that counsel called a trial court ruling succubistic – charging this as an ethics offense sits within the inner bullseye of Petitioner's federal constitutional rights.  The charge must be dismissed as a matter of law.[51]  It is unethical for a prosecutor to continue pursuing a charge that it knows is a tort.[52]

Because the succubus remark was unquestionably within counsel's First Amendment rights, much like an anti-SLAPP motion, all punishment is foreclosed and penalties potentially apply to the party, here Justice Fybel, that inflicted the action putatively criminalizing such speech in the wake of *Hartman*.[53]

### B.  Count 2's 'Thwarting Review' Charge Must be Dismissed as a Matter of Law.

Count Two alleges a B&P 6068(b) violation based on this language:

> Plaintiff never actually received a copy of a signed judgment, though a stipulated judgment was prepared for the commission court's signature, as it apparently cynically attempted to suppress notice of the judgment in order to thwart review.[54]

A similar set of fatal constitutional obstacles surround this charge, as the State Bar's citation for arguing that Commissioner Luege's failure to serve the judgment in

---

[50]  *In the Matter of Tady* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 121, 124.

[51]  Indeed, the State Bar is simply exposing Justice Fybel to increased damages by perpetuating this count, if a federal court determines that his action of reporting counsel for the exercise of constitutional rights was not protected by judicial immunity.  It's a close call, since unlike his published *Martinez* opinion, there was no obligation for Justice Fybel to file this complaint under 3D(2); that issue should probably be resolved by a jury.*Rankin v. Howard* (9th Cir. 1980) 633 F.2d 844, 848-49; *Mullis v. U.S. Bankruptcy Court* (9th Cir. 1987) 828 F.2d 1385, 1389; *Stump v. Sparkman* (1978) 435 U.S. 349, 357 n. 7.)

[52]  Business & Professions Code, § 6068(c).

[53]  *Hartman v. Moore* (2006) 547 U.S. 250, 256, 262.

[54]  2 R 359-360, 428.

question was *apparently* intended to thwart appellate review.[55]  The way a situation

*appeared* to Petitioner by definition cannot be a false assertion of fact.[56]

In addition:

(1)  The factual part – that the signed judgment was not served – is true and absolutely protected.[57]

(2)  the "apparently" part is an opinion based on facts that are disclosed[58] – that the judgment was not served;

(3)  It is true – the judgment wasn't served.  But even if counsel were proven wrong, counsel had a reasonable basis to believe that, as it was not received, and thus the charge fails under *New York Times v. Sullivan*[59];

(4)  "cynically attempted" to suppress notice is hyperbole or opinion, not factual, not provable and thus protected;[60]

(5)  Even if all of this language were completely factual, and objectively and provably untrue, attempting to "thwart review" is not a specific moral crime.  In fact, it is just the opposite – thwarting review by not serving a judgment is legally permissible as it merely extends the time to appeal.[61]  By definition a legal action by a judge cannot be immoral.

---

55   2 R 360, 429.

56   Justice Fybel's interjection of ethics charges, formalized in Count 2, reflects a truly disturbing abuse of power.  In legal actions across this country, thousands if not millions of times a day, litigators formulate a factual theory about a situation.  It's their working theory.  Because they do not know the ultimate merits, they insert the word "apparently" to insulate them from accusations of misrepresentation. With the inclusion of that word, by definition, this is how the situation appeared to the lawyer at the time of the statement.  It is necessarily a true statement.  Yet here we are.  If the Bar, following Fybel's lead, validates that the word "apparently" no longer protects attorneys from advancing their working theory of the case, it will set an extraordinarily dangerous precedent and chill vigorous advocacy.

57   *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Garrison v. Louisiana* (1964) 379 U.S. 64, 74 *and Philadelphia Newspapers v. Hepps* (1986) 475 U.S. 767, 776-777.

58   *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440.

59   *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438 ["Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken"].

60   *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438.

61   Cal. Rules Court, Rule 8.104(a).

The Bar's position on this point was limited to suggesting that the statement was false.[62]  As above, the use of the word "apparently" forecloses this, as well as the obstacles above: the statement has to be wildly, factually false and the Bar cannot get there given that the judgment was not served – the accurate factual basis upon which the subject statement was made.

The trial court did not address the issue.[63]

For these reasons, Count 2 abjectly fails to state a viable cause of action, and given once again that such punishment is a SLAPP violation instituted at the behest of Justice Fybel, this case must be dismissed.

### C. The First Amendment Forecloses Ethics Charges for Counts 3 and 4.

The remaining two charges relate to legal arguments in the *Martinez* opening brief and reply brief, respectively.[64]  Both counts consist essentially of a series of points about the accuracy of the trial court's ruling, while at times making the observation that since the rulings deviated (from Respondent's perception) so substantially from normative legal adjudication, the Court must have, or did, intentionally violate the law in order to rule against Martinez (for other, political, reasons detailed therein).[65]

This dynamic was characterized by Respondent in a legalistic-sounding term as "judicial advocacy."[66] *Yagman* called it being "overly result oriented."[67]

Robust debate regarding judicial performance is essential to a vital judiciary.[68]  If an attorney, after reasonable inquiry, has concerns about a judicial officer's fitness for service, he is permitted *and in fact encouraged* to express them openly.[69]  Protecting even harshly critical opinions of those at the center of disputes provides assurance that public debate will not suffer for lack of "imaginative expression."[70]

---

[62]  2 R 490.
[63]  1 R 534.
[64]  2 R 360-364, 430-431.
[65]  1 R 32-46, 74-81; 2 R 360-364.
[66]  1 R 16, 32, 61, 65.
[67]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441.
[68]  *Standing Committee v. Yagman* (C.D. Cal. 1994) 856 F.Supp. 1384, 1395.
[69]  *Standing Committee v. Yagman* (C.D. Cal. 1994) 856 F.Supp. 1384, 1395.
[70]  *Nygard v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1049.

In these two counts, the State Bar is basically accusing Petitioner of accusing Commissioner Luege of intellectual dishonesty. *Yagman* found such criticism to be permissible, noting that it was a common reaction by frustrated lawyers.[71]  It has been described by other courts as "hidden bias" or acting on an "unstated premise."[72]  *Yagman* went on to conclude that since this characterization of a ruling, intellectual dishonesty, cannot be objectively proven true or false, such criticism constitutes opinion and is therefore not actionable.[73]

Notably, the Ninth Circuit interpreted Attorney Yagman's insult to be one about Judge Keller himself – that Keller was generally an intellectually dishonest person.  Here, the criticism is only directed at Commissioner Luege's fee ruling, another "one off" from criticism found to be permissible.  Thus, this entire set of legal arguments fails *Yagman* scrutiny.

Even if not, as the above authorities establish, calling a ruling intellectually dishonest is certainly an opinion: if it is *(i)* right,[74] or it is *(ii)* wrong but the reasons for it are disclosed,[75] or it is *(iii)* wrong on the facts but not recklessly wrong,[76] it is protected.

The State Bar has never attempted to argue that Petitioner's criticisms of the underlying *Martinez* fee ruling were unfair or inaccurate.  If they are legitimate, and especially if none of them are invalid in any serious way, the State Bar will never overcome *New York Times* in terms of counsel's inference that the *Martinez* trial court's extraordinary departure from normative adjudication was driven by an abandonment of strict adherence to the law in favor of vindicating her colleague.

---

[71]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441 and fn. 19.

[72]  *Iowa v. Weaver* (2008) 750 N.W.2d 71, 90.

[73]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441 and fn. 19.

[74]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Garrison v. Louisiana* (1964) 379 U.S. 64, 74 *and Philadelphia Newspapers v. Hepps* (1986) 475 U.S. 767, 776-777.

[75]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440

[76]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438 ["Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken"]; *New York Times v. Sullivan* (1964) 376 U.S. 254, 279-280.

17

The *Martinez* trial court, the OC appellate court and now the Bar have all basically defaulted when it comes to debating the specific criticisms of the fee ruling in issue:

(1) Martinez' fee request did not legitimately fall under the *Chavez* "grossly inflated" exception because the $133K request was simply not an unusual or excessive number for a four-year case to run the length of the superior court system, a figure that was dramatically lower less than the ***$870K*** fee request that the *Chavez* "grossly inflated" construct is founded on.[77]

(2) The case did not qualify for treatment under *Chavez's* you-should-have-filed-in-limited-civil criticism because that was ***impermissible*** given Martinez's right to pursue injunctive causes of action.[78]

(3) that a case that is successful on a limited basis (here, resulting in termination of a fraudulent enterprise, a small but full recovery on a wage claim, and a small recovery on a FEHA claim) cannot accurately be classified as litigation that is "spectacularly unsuccessful," and in addition, this is a construct that only applies to FEHA claims (as opposed to Labor Code wage claims), where fees can be denied under FEHA 12965(b)'s discretion per *Chavez*.[79]

(4) that the trial court's accusations that counsel invented or exaggerated 15-hour and 25-hour billing entries, and therefore must have inflated the rest of the bill, was arrestingly inaccurate, as effort for the two controverted entries was supported by detailed demurrer opposition filings and easily supported the hours claimed.[80]

(5) that the trial court's finding under *Ling* that wait-time penalties are not wages was plainly inaccurate given the language of Labor Code section 203, an error the appellate court capitulated to.[81]

(6) that the trial court's finding that Martinez was not the prevailing party because O'Hara capitulated to pay the outstanding wage

---

[77] 1 R 101-103; *see Chavez v. Los Angeles* (2007) 47 Cal.4th 970, 975.

[78] 1 R 101-103, *citing* Code Civ. Proc., § 86, subds. (a)(7), (a)(8).

[79] 1 R 103, *citing* Gov. Code, § 12965(b) and *Chavez*.

[80] 1 R 80, 101-103 ["In summary, if the Court actually drills down to the legal work underlying the allegedly unreliable billing entries that form the basis of the trial court's and O'Hara's larger accusation that the billing was inflated [record citations], their theory falls apart."]

[81] 1 R 103, citing *Ling v. P.F. Chang's* (2016) 245 Cal.App.4th 1242.

balance at trial is inaccurate, as also capitulated to by the appellate court.[82]

There is no possibility that the charge here would survive these obstacles. Despite months of litigation, there is nothing in the record to say the above criticisms are inaccurate. It was counsel's constitutionally-protected inference that Luege's reason for so much inaccuracy in the fee ruling was intellectual dishonesty. Even if that is wrong, and there is no objective way to make that determination, the reasons for this opinion are disclosed in the appellate briefs. And none of this commentary would survive *New York Times* recklessness standards based on the facts – the Bar does not and cannot contest a single fact above.

Indeed, State Bar OCTC has a second ethics problem with respect to Counts 3 and 4: overcharging. The act of including 31 separate accusations, each theoretically sufficient to establish the charge, is a textbook example of overcharging a case – of prosecutorial abuse of discretion. This tactic has been the subject of considerable academic criticism and can warrant a court electing to dismiss or scale back the charging document.[83]

All 31 accusations allege intellectual dishonesty; they are within Petitioner's constitutional rights. The State Bar is egregiously invested in carrying out Justice Fybel's SLAPP exercise. This action should be terminated as a matter of damage control.

## CONCLUSION

Like a lot of undertakings that have a colorable moral basis – punishing an attorney for calling a female judge's ruling succubistic may have felt like the right thing to do – the intrusion of such endeavors into the domain of federal constitutional (free speech) rights always takes precedence in the law.

In the modern age, the filing of a SLAPP action is attended by summary and unforgiving consequences.

---

[82]  1 R 103.

[83]  *People v. Valli* (1987) 187 Cal.App.4th 786, 806, citing *People v. Douglas* (1966) 246 Cal.App.2d 594, 599; Langer, "*Rethinking Plea Bargaining: The Practice and Reform of Prosecutorial Adjudication in American Criminal Procedure*," (2006) 33 Am.J. Crim.L. 223, 286; Davis, *Arbitrary Justice: The Power of the American Prosecutor* (Oxford Univ. Press 2007) p. 31 [detailing advantages when prosecutors overcharge].)

This is undoubtedly because moral perceptions about the propriety of certain speech varies widely in our factionalized society, with an almost vicious competition between various groups to control the cultural narrative.  To permit the free exchange of ideas, courts and legislatures have created rules that bind us by one constraint – the freedoms inherent in the US Constitution and especially the First Amendment – and have provided for civil and other penalties on those who overreach by trying to punish unpopular but nevertheless constitutionally-protected speech.

As this is one such instance, this SLAPP action must be dismissed.


Respectfully:


Date: December 8, 2020                    PAVONE & FONNER, LLP


                                          Benjamin Pavone, Esq.

                                          Attorneys for Petitioner

# EXHIBIT 24

# Review Department of the State Bar Court for the State of California

| | |
|---|---|
| **BENJAMIN PAVONE, ESQ.,**<br><br>    **PETITIONER,**<br><br>**STATE BAR COURT,**<br><br>    **RESPONDENT,**<br><br>**STATE BAR OF CALIFORNIA,**<br><br>    **REAL PARTY IN INTEREST.** | **STATE BAR TRIAL COURT<br>CASE NO.: SBC-20-O-30496-CV**<br><br>**FILED** M2<br><br>February 2, 2021<br><br>**STATE BAR COURT<br>CLERK'S OFFICE<br>LOS ANGELES** |

**ON REVIEW FROM THE STATE BAR COURT<br>HON. CYNTHIA VALENZUELA, JUDGE PRESIDING**

## AMENDED REPLY BRIEF ON PETITION FOR INTERLOCUTORY REVIEW OF MOTION TO DISMISS

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.<br>STATE BAR NUMER 181826**<br>600 WEST BROADWAY, STE. 700<br>SAN DIEGO, CALIFORNIA 92101<br>TELEPHONE: 619 224 8885<br>FACSIMILE: 619 224 8886<br>EMAIL: bpavone@cox.net

ATTORNEYS FOR PETITIONER

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 5

I.  THE CASE SHOULD BE DISMISSED AS THE LANGUAGE
    EMPLOYED EITHER IS NOT AN ATTACK ON THE JUDGE'S
    HONESTY OR INTEGRITY OR IT QUALIFIES AS RHETORICAL
    HYPERBOLE AND IS CONSTITUTIONALLY PROTECTED. .................. 5

    A.  Definition and Etiology of the Term Succubus .................................... 5

    B.  The Meaning of the Phrase a "Ruling's Succubistic Adoption of the
        Defense Position" is Limited to the Reasonable Interpretations of a
        Ruling that can be Logically Modified by the Word Succubistic. ........ 5

    C.  Assuming the Word Were Intended to Imply or Refer to the
        Judge as a Succubus, this is still not an Actionable Wrong. .............. 7

        1.  Demonizing a Judge ................................................................. 7

        2.  Sexualizing a Judge ................................................................. 7

        3.  Derivative Gender Insults ........................................................ 8

    D.  The Moral Case for the Criticism in Question ................................... 9

    E.  Analysis of Count One's Succubus Citation. .................................... 12

        1.  Rewriting of the Language – Due Process Violation ................ 12

        2.  Rhetorical Hyperbole .............................................................. 12

        3.  Unprovable to be True or False ............................................... 14

        4.  Disgraceful ............................................................................. 14

        5.  "Manifesting Gender Bias" ..................................................... 14

        6.  "Embarrass", "Harass," "No Value," Etc. .............................. 15

    F.  Analysis of Count Two – Thwarting Appellate Review. ................... 16

    G.  Counts Three and Four – Arguments in the
        *Martinez* Appellate Briefs ............................................................... 18

II. THERE HAS BEEN NO IMPACT ON THE ADMINISTRATION
    OF JUSTICE.  THERE CAN BE NO 6068(b) VIOLATION FOR
    THIS AND OTHER REASONS ........................................................... 19

CONCLUSION ............................................................................................... 21

2

# TABLE OF AUTHORITIES

## *Cases*

*Garrison v. Louisiana*
(1964) 379 U.S. 64 ..........................................................................17

*Greenberg v. Haggerty*
(E.D. Pa 2020) Case No. 2:20-cv-03822-CFK........................................15, 20

*Hartman v. Moore*
(2006) 547 U.S. 250.........................................................................22

*Hustler Magazine v. Falwell*
(1988) 485 U.S. 46..................................................................... 13-14

*Lewis v. Time*
(9th Cir. 1983) 710 F.2d 549 ..............................................................19

*Milkovich v. Lorain*
(1990) 497 U.S. 1...........................................................................19

*New York Times v. Sullivan*
(1964) 376 U.S. 254.........................................................................19

*Nieves v. Bartlett*
(2019) – U.S. –, 139 S.Ct. 1715, 2019 U.S. Lexis 3557
Case No. 17-1174, March 28, 2019..........................................................22

*Philadelphia Newspapers v. Hepps*
(1986) 475 U.S. 767.........................................................................19

*Renwick v. News & Observer*
(N.C. App. 1983) 63 N.C.App. 200...........................................................13

*Standing Committee v. Yagman*
(9th Cir. 1995) 55 F.3d 1430 .......................................................... 12, 15-19

*United States v. Wunsch*
(9th Cir. 1996) 84 F.3d 1110 ............................................................ 19-20

## *Statutes & Other Authority*

Business & Professions Code

Section 6068(b) ....................................................................passim

Section 6068(f) ...............................................................7, 14, 19

California Rules of Professional Responsibility

Rule 8.4.1 ................................................................................................ 20-22

Rule 8.4.1(f)(3) ............................................................................................... 21

Oz, Frank

(1988) "*Dirty Rotten Scoundrels*," Orion Pictures ....................................... 21

Restatement (Second) of Torts

(1977) § 566 ..................................................................................................... 19

## INTRODUCTION

Seldom has one word triggered so much legal fodder.  The myriad trajectories of legal argument and interpretation of language surrounding it require a considerable effort to organize and then analyze through a quiver of legal principles.

Fundamentally, the State Bar violates interpretative rules of language, and for this reason, its position is untenable.  But Petitioner will attempt to address all of the State Bar's concerns, legally tenable or not, with the hope of bringing some peace to this situation.  The sentence, read fairly and in context, is not truly the gender attack that the Bar ascribes to it and was morally warranted in light of the OC trial court's own false accusations.

## I.

## THE CASE SHOULD BE DISMISSED AS THE LANGUAGE EMPLOYED EITHER IS NOT AN ATTACK ON THE JUDGE'S HONESTY OR INTEGRITY OR IT QUALIFIES AS RHETORICAL HYPERBOLE AND IS CONSTITUTIONALLY PROTECTED.

### A.  Definition and Etiology of the Term Succubus

The State Bar defines the noun "succubus" as per the *Martinez* appellate opinion, to mean a "demon assuming female form which has sexual intercourse with men in their sleep."  While this is a common definition, per the companion request for judicial notice, Petitioner asks the Court to recognize that the meaning, origin, implications and definitions go considerable beyond this one image, and can be both positive or negative.[1]

### B.  The Meaning of the Phrase a "Ruling's Succubistic Adoption of the Defense Position" is Limited to the Reasonable Interpretations of a Ruling that can be Logically Modified by the Word Succubistic.

A succubus is a noun.   When used as an adjective, in which a judicial ruling was characterized as succubistic, it is not a fair or accurate tactic to simply overlook this change of grammar roles and act as if the phrase is still a noun and refers to the ruling's author.  Petitioner understands that temptation.  Counsel addresses the legal permutations of that construct below.  But as far as legal accuracy goes in a court of law, it is

---

[1]    State Bar's Brief ("SBR"), p. 2.  In its more positive light, and more modern interpretations, a succubus is "often depicted as a beautiful seductress or enchantress, rather than as demonic or frightening." RJN, Ex. 5.

irresponsible to simply jump from an adjective to a noun by declining to do the real work of assembling a set of reasonable meanings when a noun is employed as an adjective.

To the State Bar, a promiscuous ruling means the judge is promiscuous.  A sanitary ruling means the judge is hygenic.  An incestuous ruling means the judge is sleeping with a sibling.  And a succubistic ruling means the judge is a succubus.

Respectfully, this is exegetical nonsense.  The word "succubus" possesses attributes that can be logically applied to a judicial ruling.  As the language itself states, the ruling was an adoption of the defense position, so it would be reasonable to infer that the adjective succubistic adds the thought that the adoption was so close, it was as if the two positions were interlocked, fornicating, or inseparable.  This is consistent with the way the term promiscuous is handled.

A second reasonable interpretation of a succubistic adoption of the defense position is that the adoption is additionally wrongful, evil or taboo.

A third layer of reasonable interpretation is to infer a gender component, by inferring that a judicial ruling's adoption of a defense position was in the context of a female judge's ruling and a male lawyer's defense position, perhaps even to the point where the ruling entreated the defense position.

Because a logical interpretation of the adjective succubistic permits several real and fair qualifiers to the phrase "adoption of the defense position," it is not fair or accurate to simply ignore this reality and act as if a word used as an adjective has jumped out of its sentence and stands alone as a noun.

None of the above interpretations are controversial from a 6068(b) point of view.  If a lawyer describes a ruling as an adoption of the defense position, whether it be an extricable one, a wrongful/evil/taboo one, or implies certain gender identities of the actors, or all of the above, none of this breaches the rules that prohibit an attack on the judge's personal integrity or honesty under 6068(b).

The sentence in question might have been received as scathing criticism, although at least part of it should be humorous to some people, but it was in fact written as a criticism *of the ruling*.

6

### C. Assuming the Word Were Intended to Imply or Refer to the Judge as a Succubus, this is still not an Actionable Wrong.

Petitioner believes that the above linguistic limitations end the viability of Count One. However, because both the *Martinez* appellate court and the State Bar advocate for the phrase being treated as a noun, and that the noun described the OC trial judge, Petitioner offers an analysis under this disputed assumption.

#### 1. Demonizing a Judge

To the extent that calling a trial judge a succubus implies that she is "demonic," this characterization is simply not, realistically, a factual criticism. Without being a real attack, such a description clearly falls into the rhetorical hyperbole doctrine.

#### 2. Sexualizing a Judge

To the extent that calling a trial judge a succubus sexualizes her, this is too vague a comment to be actionable as a 6068(b) violation. It goes without saying that everyone, especially women and especially women in the law, are entitled to be treated based on the intellectual merit of what they have to say rather than on their appearance, physical characteristics, etcetera.

In a formerly viable 6068(f) action, such sexualization might be considered offensive, if the judge was in fact offended. For example, in the less florid example of calling a woman lawyer, or a female judge, say, "hot," a judge may or may not be offended. She might be offended by any description of her physical appearance. But some judges may receive it simply for the complement that it is and not be offended.

Here, even as a sexualization of a judge, there can be no objective validation that it *necessarily* constitutes a 6068(f) violation. Persons unaccustomed to, or putatively retired from, being viewed as sexually vibrant, might be offended – but at least some might quietly celebrate such a depiction.

Either way, for purposes of the more difficult burden of proving that a judge was *disrespected* within the meaning of 6068(b), this must relate to an attack on the judge's honesty or integrity. To whatever degree a comment might or might not putatively sexualize a judge, and to what degree such sexualization might offend or not offend that

given jurist, it cannot reasonably be interpreted as a reflection of the court's judicial integrity.

### 3. Derivative Gender Insults

The State Bar infers that when counsel literally called a judicial ruling a succubistic adoption of the defense position, the criticism was not actually directed at the ruling. Its position is counterfactual. Instead, the Bar treats it as an assault on the judge's personal sexual identity. To the Bar, counsel labeled the OC trial judge "overly aggressive," "predatory," a "hyperaggressive female demon attempting to engage in carnal intercourse with men" (a "deeply misogynistic image"), and engaging the "insidious tactic of attacking the judicial officer's competence based upon harmful and derogatory stereotypes."[2]

Even treating the subject adjective into a direct reference to the judge, this is not a reasonable interpretation. There is no modern *stereotype* about mythical, demonic women seducing sleeping men.[3] The folklore of the subject term can be taken only as seriously as any historical fable.[4]

Regardless, the intended meaning can be objectively ascertained. The subsequent briefs lay out counsel's criticisms in appellate-caliber detail. There are no gender references in the later briefs; no nefarious appeals to gender stereotypes in order to win the case by the underhanded tactics envisioned by the Bar; no continuation of some idea to sexualize the trial judge, demonize her, paint her as predatory, or invoke stereotypes about "hyperaggressive females."[5]

Petitioner's actual criticism as clarified in the briefs is a logical continuation of the statement in the notice of appeal, one consistently directed at the accuracy of the ruling. After the notice, which essentially communicated that the ruling was arrestingly illegal, the briefs corroborate and continue a detailed chronicle of the ruling's numerous, particular legal, factual and evidentiary infirmities.

---

[2]    SBR, p. 11.
[3]    *See* RJN, Ex. 5.
[4]    *See* RJN, Ex. 5.
[5]    Petitioner's Appendix, 1 R 16-19, 36-40.

Consequently, the *Martinez* briefs do not support the Bar's hypothesis that counsel actually harbored any of its encyclopedic gender-related grievances with the OC trial judge. All of counsel's expressions of those grievances throughout the appellate process coalesce around the same basic complaint, to wit, that the ruling was infirm because it was profoundly inaccurate in a litany of particulars – not because somehow the judge's gender warranted any particular consideration.

For purposes here, it is not a tenable inference for the State Bar to deduce from the language in question that its descriptions or alleged stereotypes were *actually* being invoked, respectfully.

### D.  The Moral Case for the Criticism in Question

The sentence in question was written as an attack on the judge's ruling. An examination of the circumstances shows that there was moral cause for this. In other words, if the parties are to litigate the meaning of the term "respect," and how much respect was "due,"[6] that is a two-way conversation.

Petitioner simply does not believe that Commissioner Luege believes her ruling was an honest installment of completely accurate legal analysis. No one can rationally conclude that across dozens of issues in a larger ruling, every single legal issue was correctly adjudicated uniformly against one party. The OC trial court is an experienced lawyer and judge; for her to deny fees on the basis that counsel should have filed the case, for example, in limited civil is to betray the litigant's obligation to file any claim with an injunctive cause of action in superior court.

As far as counsel can discern, the Court's ruling was another way of communicating the message that counsel should not have filed any injunctive cause of action at all; that counsel's effort to dismantle O'Hara's website was too minor an endeavor to litigate.

---

[6]  Bus. & Prof. Code, § 6068(b) does not simply say that lawyers must treat courts with respect, no matter how courts behave. The language does not state: "lawyers shall treat courts with respect." It is actually phrased in a passive, relative fashion that at a minimum permits the inference that an attorney should show the judge as much respect as the court has shown him: "*to maintain the respect <u>due</u> to the courts of justice and judicial officers.*"

Apart from the fact that a judge does not have a legal right to dictate which causes of action a lawyer files, was such an effort objectively too insignificant?

It certainly was not insignificant as measured against the standards the State Bar seeks to enforce in this case. O'Hara's website was indisputably fraudulent; it contained dozens of over-the-top representations about the quality of the opportunity being offered. It was the blueprint for a national effort.[7]  As a tool to induce the labor of young, attractive people, since it was interlaced with pictures of them (including plenty of pretty young women), O'Hara proposed to defraud hundreds or thousands of them.[8]

O'Hara is gay.  Martinez is gay.  As a solicitation from one much-older gay man to a very young one, it is objectionable as an installment of fraud.  It should be even more objectionable to women if it were a 60-year-old straight man building a national website to lure 19-year-old girls into a financial and sexual trap with fraudulent promises of lucrative employment opportunity.

Considering the recent #metoo movement, with the Weinstein case being the poster child for that protest, can the State Bar honestly dispute that such efforts are unwarranted according to its contemporary gender values, given the real harm inflicted from these types of invitations?  And if the State Bar disagrees philosophically with the Commissioner on this point – and disagrees with the Fourth District Court of Appeal, which affirmed her decision on the same logic – to not only reject counsel's effort but to repeatedly insult it as an exercise in overlitigation and overbilling, is it not fair for counsel to have responsively lambasted the ruling, not only for its multitudinous legal errors but tone deaf treatment of our society's most vulnerable members?[9]

Consider also that the OC trial court implied that counsel had not only spent too much time on such a cause but that certain time entries were *invented*.[10]  The court claimed that it had conducted a complete review of the entire file.[11]  If it did so, it should

---

[7]    1 R 20-23.
[8]    1 R 40, fn. 3.
[9]    *See* RJN, Exs. 1 and 2.
[10]   RJN, Ex. 1, p. 2.
[11]   RJN, Ex. 1, p. 2.

have seen the extensive legal work undergirding the two challenged billing entries.[12] But it still held that they were manufactured, a hurtful attack on counsel's industry.[13]

Thus, the OC Court drew first blood by its libelous accusation/projection that counsel was an over-biller, or worse, engaged in outright billing fraud; counsel fired back with the fact that her inaccurate ruling may as well have been written by the defense. Counsel views this as a morally fair exchange of criticisms, particularly if the State Bar might not be as enthusiastic for the courts to target plaintiff lawyers for such vitriol when they are just trying to do their part to eliminate fraudulent sexual vehicles from the market, ones that might act as predatory lubricant for the mistreatment of young women.

At a minimum, the State Bar cannot seriously maintain that the instant, comparably expensive exercise – one litigated almost exclusively to teach counsel a lesson about the utilization of a single adjective – is somehow completely warranted, on the one hand, and yet on the other, that it was entirely unwarranted to remove a website full of predatory lies, that resulted in an actual verdict of sexual misconduct, and that was initially founded as the blueprint framework for a national marketing effort.[14]

If the Bar concedes that such an effort was warranted in light of contemporary gender values, then it should process the OC trial court's election to single counsel out for criticism as misguided and at least understand counsel's unique objection to its errors.

For this Court's purposes, the Count One hyperbolic expression of what is underneath a morally justified criticism was no more disrespectful than counsel had been treated by the court and thus did not fail the "*due* respect" language of 6068(b).

---

[12]  1 R 78-81. If the judiciary believes there should be a cap on the recoverable attorney's fees in relation to the amount recovered, it should ask the legislature to amend California law to state the particular percentage ceiling for each kind of case. This way, plaintiff lawyers can know exactly what limitations they face and what cases can be realistically accepted. It is unfair for the judiciary to instead issue pretextual, indefensible rulings that fault plaintiffs' lawyers for "overbilling" in relation to smaller cases, ones where intransigent defendants refuse to pay, they then ratchet up the transaction cost, and then blame the plaintiff. This dynamic is nothing more than a method for courts to subvert the will of the people, who declined to impose such caps, and it thereby effectively allows the rich to steal from the poor in small installments.

[13]  RJN, Ex. 1, p. 2.

[14]  1 R 20-22, 44-45.

### E. Analysis of Count One's Succubus Citation.

Petitioner offered five dispositive reasons why the statement in question fell within the First Amendment and was therefore not actionable. The State Bar offers no serious argument to quarrel with these reasons; its position is founded on misinterpreting the language.

#### 1. Rewriting of the Language – Due Process Violation

As discussed above, the State Bar adopts Justice Fybel's rewriting of the criticism from what it is, to something it is not: from "the ruling's succubistic adoption of the defense position," to "a succubus has adopted the defense position." These two phrases have different meanings. It is, or must be, an elemental violation of due process to be charged with the offense of saying something the defendant clearly did not.[15]

#### 2. Rhetorical Hyperbole

The subject comment is textbook rhetorical hyperbole, which was recognized in *Yagman* as a component of attorney free speech that supersedes state regulations.[16] The State Bar's theory in response is that if a comment manifests gender bias even though it qualifies as rhetorical hyperbole, it is removed from constitutional protection.[17] The State Bar cites no authority for creating this unprecedented exception to bedrock First Amendment jurisprudence; it effectively proposes to overrule the Ninth Circuit in *Yagman*.

Furthermore, even if the State Bar could overrule a federal court interpreting a federal issue, the underlying principles of the rhetorical hyperbole doctrine do not support the notion of creating an exception for alleged gender bias within this exception, in the first instance.[18] The State Bar does not deal with the underlying reason rhetorical hyperbole is protected under the US Constitution. It exists because the message being

---

[15]   Pet., pp. 11-12.

[16]   Pet., p. 12 and citations therein.

[17]   SBR, p. 11.

[18]   The State Bar cites the *Martinez* opinion for the idea that alleged gender bias somehow creates an exception to this axiom of First Amendment law. Because the *Martinez* opinion never considered this issue, nor found any such thing, this argument is legally misleading within the meaning of B&P 6068(c).

advanced is intended as fiction; the critic is not intending to slander the target with a real attack on her character.

Fictional criticism is not actionable, because *real* consequences must flow from *real* attacks. Thinking courts, and the US Supreme Court, simply do not validate ethereal, mythical, or fictional criticisms, ones devoid of an underlying, *actual* critical message. There is no point to prosecuting such fictional criticisms because the target was never in danger of losing real standing.

Applied here, even if counsel had directly called Commissioner Luege a succubus (or even if this Court were to accept the State Bar's position that the term intended to "refer" to the Commissioner as one), no one could actually or reasonably think she is one. Apart from the appellate court's decision to misread the term as a literal religious attack, the fact is that succubi *are* mythical creatures. The word cannot "reasonably be interpreted as stating actual facts" about the Commissioner, particularly by an atheist.[19] No one is going to be calling for the Commissioner's removal from office because of her feared binary conversion to an aphrodiasical winged, tailed temptress of the night.

Even interpreted this way, the word in question is so plainly caricaturesque, so obviously an "artificially eloquent exaggeration for effect, not to be taken literally,"[20] it cannot ultimately be received as anything but at least partly in jest. Indeed, much of the language in the remainder of the comment is as sardonic as it is hyperbolic; there is a demonstrably devilish sense of humor driving it.[21]

---

[19]  *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50.

[20]  *Renwick v. News & Observer* (N.C. App. 1983) 63 N.C.App. 200, 219.

[21]  Apart from the fact that some people can see the humor in referencing a Dungeons-and-Dragon cartoonish-type monster as a way to describe a court's seamless adoption of a defense lawyer's position – certainly plaintiff lawyers would get that joke – humans do not "entertain" whether they will vomit. Reverse peristalsis is an involuntary reflex. The very idea of internally debating with oneself, "should I vomit on this ruling because it reads like the defense wrote it?", to anyone that has a developed sense of humor, obviously contains a comedic element.

In addition, the use of the term "unto" was intended to invoke the comedic farce of the British, in the genre of the Benny Hill Show, because only a proper Britainite would formally announce he intends to vomit *unto* a piece of paper. One can almost see John

Ultimately, this case is little more than a judicial version of *Hustler*.  A pious victim class calls for the head of a perceived, Cuckoo's-Nest blasphemer after a "lusty and imaginative" quip rattles their usual expectation of unchallenged authority.  The Supreme Court dispenses with such exchanges as First Amendment banter.

Without establishing that there is a *real* defamatory-level accusation in which the critic truly means to untruthfully tear down a judge's honesty or integrity, there can be no plausible, enforceable infraction.

In short, even interpreting the language to entertain the Bar's interpretation about gender stereotypes, the rhetorical hyperbole doctrine applies.  There are no exceptions to this exception.

### 3.  Unprovable to be True or False

Apart from the above problems, all of which are fatal, the State Bar fails to address Petitioner's argument that the Count One offense constitutes unprovable opinion; that even if counsel had called the OC trial judge a succubus, no one could prove this true or false. The Bar only mentions this concept as to counts two through four.  Of course, the very notion of even *trying* to prove whether a judge is a mythical creature is absurd and must by definition constitute a protected opinion.

### 4.  Disgraceful

The State Bar concedes that Count One cannot survive on the basis that counsel called the ruling disgraceful.[22]

### 5.  "Manifesting Gender Bias"

In the opening brief, Petitioner took issue with the lack of specificity inherent in the term "manifesting gender bias."[23]  At least one other court has deactivated this phrase

---

Cleese in a dress using a Julia Child voice reading the ruling and declaring that he will now engage in reverse peristalsis *unto* it.  The point is that counsel can be fairly accused of being a linguistic provocateur, and maybe before it was invalidated, this might have raised 6068(f) issues.  But counsel cannot be fairly accused of being a misogynist.  It's just not true.  Such an approach takes one statement, and this whole case, beyond rational parameters.

[22]    SBR, p. 16.

[23]    Pet., p. 13, *citing Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438.

as a viable foundation to interfere with constitutional free speech rights.[24]  And again, if one actually studies the message that was being communicated, the criticism is not that Petitioner has a problem with female judges or actually harbors gender bias toward her or any woman, it is that counsel responded to a judicial officer's controversial decision to write a judicial opinion as if one side was 100% correct, "judicial advocacy."

Regardless, the State Bar proposes to label an experienced litigator as a misogynistic Neanderthal, one openly trying to win a case by appealing to gender stereotypes.  The far more nuanced language in reality expresses a point that has almost nothing to do with gender.

### 6.  "Embarrass", "Harass," "No Value," Etc.

The Bar also suggests that the notice-of-appeal statement in question should be punished because its only purpose was to harass the OC trial judge, to embarrass her, and that as a gender-based criticism, it had no expressive value.[25]  For all the same reasons previously discussed, the notice-of-appeal comment was basically a declaration of war in a protracted appellate battle to emphasize the importance of judicial accuracy, both of which presuppose independent judicial analysis[26]; the importance of maintaining the discipline of accuracy in the face of unpopular or disfavored litigants[27]; and the critical importance of legal accuracy in general if our system is to continue to be one based on the rule of law, instead of authorizing resort to the unmanageable personal proclivities of people entrusted with power.[28]

Petitioner started that message in the notice of appeal and continued it up to the California Supreme Court, by ultimately levying a detailed academic challenge to the

---

[24]  *Greenberg v. Haggerty* (E.D. Pa 2020) Case No. 2:20-cv-03822-CFK, Dkt. 20; RJN, Ex. 6.
[25]  SBR, pp. 14, 16.
[26]  1 R 7-8, 16-19, 48.
[27]  1 R 19, 30.
[28]  1 R 59-61.

harmless error doctrine,[29] which is another feature of adjudication that has drawn criticism for similar reasons.[30]

Accordingly, the message initiated by the notice of appeal was not to harass or embarrass the OC trial judge, but over the course of the next three years in appellate court, to emphasize that uniformly ruling in favor of one side represents an intellectually illegitimate form of adjudication.[31]

This is no small concern.  Much of the public believes that judges do "whatever they want," in other words, believes that the law is little more than the liquid medium by which judges carry out their personal or political preferences.

### F.  Analysis of Count Two – Thwarting Appellate Review.

Petitioner argued in the opening papers that count two, in which counsel wondered whether the OC trial court attempted to thwart appellate review, could not constitute a 6068(b) violation because it failed multiple constitutional barriers.[32]

Once again, the State Bar rewrites the sentence to a definitive, declaratory pronouncement that it was an unambiguously asserted fact that the trial court attempted to thwart appellate review.

In reality, the sentence is modified by the term "apparently," in other words, how the situation appeared to Petitioner.  By definition, how a situation appeared to the author cannot be false; and why that situation appeared as it did to Petitioner is based on undisputed facts: that the court did not serve the signed judgment and so it appeared to Petitioner as if the Commissioner tried to run out the appellate clock.

---

[29]  *See* 1 R 104-120.

[30]  *See* 1 R 120-122 and citations therein.

[31]  Like everywhere else in life, <u>respect is earned</u>.  If opinions make sense, are researched adequately, both sides' positions are documented fairly, and the ruling makes a judgment call between competing legal principles, respect will follow.  Adherence will follow.  Appellate litigation will be minimized.  On the other hand, if rulings essentially cut-and-paste one side's position, then criticism is likely to follow.

[32]  *See* Pet., p. 14.

This does not stop the State Bar from advocating that counsel "falsely represent[ed] in his notice of appeal and appellate briefs to the court of appeal that Commissioner Carmen Luege intentionally failed to serve a judgment."[33]

The State Bar's solution to this analytical disconnect is to chain cite cautionary principles about false accusation and respecting judges.[34]  However, a statement that is by definition true is constitutionally protected.[35]

The State Bar similarly decline to grapple with the reality that even if counsel had stated definitively that the 'thwarting review' criticism was a concrete fact, it cannot logically be a criticism of the judge's honesty, integrity or adherence to the law, because such thwarting is legally permissible.[36]

As against the State Bar's observation that counsel accused Judge Luege of intentionally failing to follow the law by not serving the judgment, a judge can intentionally, maliciously, nefariously and purposefully not serve it.  This is still permitted by the Code of Civil Procedure.  To complain that a judge is doing something that is legal necessarily precludes the conclusion that the complaint alleges intentional deviation from the law or an ethical transgression.

The Bar downshifts to the lesser included idea that the 'thwarting review' statement represents "conjecture without factual substantiation, which is sufficient to establish that the statements were false and at a minimum made with a reckless disregard of the truth."[37]  But once again, this characterization depends on removing the linchpin qualifier "apparently."  There is no room in this word for anything but how the situation subjectively appeared to the author.

---

[33]   The Bar provides no cite for any such grievance to be based on the *Martinez* appellate briefs.  Counsel is unaware of one.  The word "thwart" does not appear in either brief.  Regardless, Petitioner was not charged with any Count Two statements based on them; the charged offense is solely related to the statement in the notice of appeal. (2 R 359.)

[34]   SBR, pp. 16-18.

[35]   SBR, pp. 17-18; see *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Garrison v. Louisiana* (1964) 379 U.S. 64, 74 *and Philadelphia Newspapers v. Hepps* (1986) 475 U.S. 767, 776-777.

[36]   SBR, p. 17.

[37]   SBR, p. 19.

This is of course the reason why the word "apparently" is universally utilized by attorneys: to protect them from mistaken perceptions, to permit them to safely advance their operative theories, and to insulate them from claims of inaccuracy or defamation for those theories that later don't pan out, as should be the outcome here.

The Court must reject the Bar's dubious invitation for it to rewrite the sentence in question to one that conveniently conveys a level of factual certainty that the actual language disclaimed.

### G. Counts Three and Four – Arguments in the *Martinez* Appellate Briefs

In the opening brief, counsel argued that the *Martinez* briefs legitimately alleged major deviation from normative adjudication,[38] counsel provided detail to support that decisional disparity,[39] and the State Bar, both in the lower court and in this Court, refuse to touch this body of argument.

The State Bar instead defaults to generalized, antiquated case law that accusations of intellectual dishonesty are categorically impermissible.[40]  This is not the law after *Yagman*.[41]

> Fact: The OC trial judge ruled against counsel on every single issue.

> Fact: it is almost statistically impossible that a judge *not engaged* in intellectual dishonesty would have occasion to rule against one party on every single issue in a case with numerous issues; and

> Fact: some of the issues were so basic that it is hard to believe that a sitting judge would accidentally make such a mistake.[42]

---

[38]    Pet, p. 16.

[39]    Pet, p. 18; *see* RJN, Ex. 2.

[40]    SBR, pp. 18-19.

[41]    *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441 *and* fn. 19.

[42]    *See* Petition, p. 18, for example, chastising counsel for not filing the case in limited civil when that was impermissible given B&P 17200/17500 injunctive causes of action.  If the trial court was proposing to tell counsel which causes of action he was permitted to include, that was beyond its judicial authority.

Coupled with the Bar's default as to Petitioner's criticisms, these indisputable facts foreclose counsel's intellectual-dishonesty accusation from being considered so inaccurate that it would fail *New York Times*[43] recklessness standards.

As the record stands, the Bar declines to debate the numerous defects in the Commissioner's fee ruling.[44]  The unchallenged arguments in the *Martinez* appellate briefs, including the intellectual-dishonesty arguments, are necessarily true enough – and their factual basis is elaborately detailed and thereby fully disclosed[45] – to fall within First Amendment protection.

## II.
## THERE HAS BEEN NO IMPACT ON THE ADMINISTRATION OF JUSTICE. THERE CAN BE NO 6068(b) VIOLATION FOR THIS AND OTHER REASONS.

In the Court below, Petitioner argued that there was no impact on the administration of justice because the inconsequential remarks were made in a notice of appeal, outside the judge's presence.[46]  There is no information in this record to suggest that the OC trial court even saw the remark in real time, much less that it somehow affected anything during the case for purposes of impacting the administration of justice.

The State Bar takes up the issue by arguing that statements expressing gender bias interfere with the administration of justice.[47]  Its position, however, once again depends on its interpretation of the text as a comment about the judge's sexual character, rather than a flashy way to launch an attack on a judicial ruling.  On top of this, the Bar seems to misunderstand basic principles of causation inherent in the analysis.

Section 6068(b) and 6068(f) suffer from the same constitutional problem: vagueness.  A train can fit through the hole of the term "offensive" and a plane could navigate a path through the word "respect."  *Wunsch* invalidated 6068(f) for this reason;

---

[43]  *New York Times v. Sullivan* (1964) 376 U.S. 254, 279-280.

[44]  *See* RJN, Ex. 2.

[45]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Milkovich v. Lorain* (1990) 497 U.S. 1, 19; *Lewis v. Time* (9th Cir. 1983) 710 F.2d 549, 555; Restatement (Second) of Torts (1977), § 566 (statement of opinion actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion").

[46]  2 R 519.

[47]  SBR, p. 14.

there is no analytically-defensible logic for this Court to treat "respect" as somehow a more tangible standard than "offensive."[48]

The State Bar's attempt to interject "manifestations" (of gender bias) as a newly-enforceable basis to find a 6068(b)/respect violation is equally fraught with the constitutional difficulty of clear standards.[49]  Even if those standards perfectly defined gender bias, it is far less clear that "manifestations" of it are individually sufficient to constitute a 6068(b) violation.[50]  Manifestations are like symptoms.  Without proving the target actually harbors the underlying disease and infected the case with it, such events cannot logically impact the administration of justice.  This is opposed to, say, actual gender bias by a judge that drives the unjust disposition of a lawsuit for that reason.[51]

Finally, even if the notice-of-appeal statement were treated as manifesting gender bias, Petitioner did have an underlying purpose for the criticism in question.

As detailed above, the text in the notice of appeal was the formal declaration of war for an appellate legal battle about the importance of judicial accuracy, announced with linguistic flair commensurate with the undertaking and years of subsequent work.

The Bar's suggestion that legal documents should only convey that which is minimally necessary[52] betrays the very *raison d'être* of the First Amendment.  The Declaration of Independence could have been written in far less expressive language to achieve its objective of announcing U.S. succession from Great Britain; that purpose could have been accomplished in eight words.   The State Bar's preference that legal work should conform to the lowest-common-denominator of its necessity aims to exsanguinate our society with lobotomizing monotony.

---

[48]  *United States v. Wunsch* (9th Cir. 1996) 84 F.3d 1110, 1116-1117; *see* 2 R 431-438.
[49]  2 R 431-438.
[50]  *Greenberg v. Haggerty* (E.D. Pa 2020) Case No. 2:20-cv-03822-CFK, Dkt. 20 [RJN, Ex. 6].
[51]  *See, e.g.*, *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 249.
[52]  SBR, p. 10, fn. 29.

Even if 8.4.1 were incorporated into 6068(b), the notice of appeal's introductory proclamation falls within the right of attorneys to "engag[e] in *advocacy* as … permitted by these rules and the State Bar Act."[53]

## CONCLUSION

The State Bar's case is based on the fallacy of elemental language misinterpretation. Its position is infected with the perception of an impermissible gender message that it wants the case to stand for, but is simply not reflective of the truth of what was intended, the language employed, the limited range of rational interpretations as between adjectives and nouns, and the larger record of the events in question.

True, the subject proof was initiated with an attention-getting hyperbolic quip that invoked a mythical, sexual-sounding analogy, but counsel's expressive prose cannot convert a D&D characterization of a judicial ruling into an actual *ad hominem* attack on the author, without Ruprechting the rules of English interpretation.[54]

The State Bar extends a larger invitation for the Court to retroactively incorporate rule 8.4.1 into section 6068(b) as a solution to 8.4.1's current trajectory, which seems destined to be found unconstitutional. The Bar's invitation should be returned to sender because its attempt to indirectly convict Petitioner of 8.4.1 also suffers from the non-parenthetical problem that the rule's Title VII-discrimination-caliber elements cannot be satisfied by a single inconsequential burn, by a person neither holding nor withholding any benefits from the putative victim.

Petitioner can understand why an imprecise reading of the language at issue may result in hasty conclusions being drawn. In a more deliberative analysis, however, it should not be easy to convict a lawyer for offending a judge so seriously that she can be said to have been formally disrespected, based on a fictional reference. The comment was clearly within the rhetorical hyperbole doctrine, if not an inside-the-bullseye example of it.

---

[53]   Cal. Rules Prof. Resp., Rule 8.4.1(f)(3).

[54]   *See* Oz, Frank (1988) "*Dirty Rotten Scoundrels*," Orion Pictures [Ruprecht gets angry].

Counsel was also provoked by the court's own false accusations of moral turpitude in billing. The subject criticism was also made outside of the judge's presence. There is no indication she read it; she never filed a complaint about it – a different judge did, thereby raising issues about the transitive property of "due respect."

There is no plausible way the remark, buried in the relatively obscure and inert text of a notice of appeal, can be seen to have disrupted the OC proceedings. Without such a finding, it cannot have impacted the administration of justice, notwithstanding the Bar's preference that every perceived gender slight be automatically treated as such.

There is also something diabolical about a rule that criminalizes attorneys for questioning the motivation of judicial rulings written as if one side is 100% right and the other 100% wrong – especially when this is plainly not true – given that logic and statistics suggest that this style of adjudication is, if anything, the most singularly vulnerable in terms of the risk of intellectual dishonesty. If the judiciary cannot publicly explain why so many judges rule in this fashion, then maybe they should not do it.

The State Bar's decision to employ 6068(b) as a proxy for an otherwise untenable 8.4.1 gender bias prosecution should be viewed as counterfactual on this record. It is unnecessary as a matter of alleged gender-offender recalibration. It accompanies an inadvisable betrayal of *ex post facto* principles, while being pockmarked with a Covid-19-quantity of constitutional objections.

Finally, if the subject remarks are within constitutional rights, then technically this entire prosecution is the regulatory implementation of a federal anti-SLAPP tort.[55]

Respectfully:

Date: January 31, 2021                          PAVONE & FONNER, LLP

                                                Benjamin Pavone, Esq.

                                                Attorneys for Petitioner

---

[55]  *Hartman v. Moore* (2006) 547 U.S. 250, 256, 262; *Nieves v. Bartlett* (2019) – U.S. –, 139 S.Ct. 1715, 2019 U.S. Lexis 3557, *9-10 (Case No. 17-1174, March 28, 2019).

# EXHIBIT 25

# Review Department of the State Bar Court for the State of California

**BENJAMIN PAVONE, ESQ.,**

         **PETITIONER,**

**STATE BAR COURT,**

         **RESPONDENT,**

**STATE BAR OF CALIFORNIA,**

         **REAL PARTY IN INTEREST.**

**STATE BAR TRIAL COURT**
**CASE NO.: SBC-20-O-30496-CV**

# FILED *A2*

## February 2, 2021

**STATE BAR COURT**
**CLERK'S OFFICE**
**LOS ANGELES**

### ON REVIEW FROM THE STATE BAR COURT
### HON. CYNTHIA VALENZUELA, JUDGE PRESIDING

## AMENDED REQUEST FOR JUDICIAL NOTICE OF EXHIBITS IN SUPPORT OF REPLY BRIEF

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMER 181826**
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR PETITIONER

## **REQUEST FOR JUDICIAL NOTICE**

Pursuant to Evidence Code section 452, subdivision (d), Petitioner requests the Court to take judicial notice of the following exhibits:

**Exhibit 1**:  The OC trial court's fee ruling in the *Martinez* case.

**Exhibit 2**:  (To consider a marked-up version of that ruling as part of legal argument.)

**Exhibit 3**:  A subsequent complaint by the defense law firm in *Martinez* in which it sued its client, O'Hara for $250K after O'Hara only paid $50K in fees during the case.

**Exhibit 4**:  O'Hara's fourth bankruptcy filing in response to the defense firm's eventual judgment for $250K.

**Exhibit 5**:  Wikipedia etiology and definition of the word "succubus" under Evidence Code section 451(e) and 451(f).

**Exhibit 6**:  A copy of the *Greenberg* opinion.


Date: January 31, 2021                                     PAVONE & FONNER, LLP

                                                                        Benjamin Pavone, Esq.
                                                                        Attorneys for Petitioner

# INTERNAL
# EXHIBIT 1

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/30/2016               TIME: 11:15:00 AM          DEPT: C61

COMMISSIONER: Carmen Luege
CLERK: Ryan Castillo
REPORTER/ERM:
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2012-00614932-CU-FR-CXC**  CASE INIT.DATE: 11/28/2012
CASE TITLE: **Martinez vs. O'Hara**
CASE CATEGORY: Civil - Unlimited          CASE TYPE: Fraud

EVENT ID/DOCUMENT ID: 72490569
**EVENT TYPE**: Under Submission Ruling

**APPEARANCES**

There are no appearances by any party.

The Court, having taken the above-entitled matter under submission on 11/10/2016 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

Plaintiff seeks to recover over $160,000 in attorneys' fees based on his FEHA claim, pursuant to Government Code Section 12965(b), and his nonpayment of wages claim, pursuant to Labor Code Section 281.5. In addition, plaintiff seeks costs in the total sum of $15,966.94.

**Procedural History**

Plaintiff filed the complaint in this case on November 28, 2012. Plaintiff amended his complaint five times. In his fifth Amended Complaint, plaintiff, for the first time, sought class certification on his false advertising claim. The case was declared complex. Eventually, the court denied plaintiff's class certification request, at least in part, because plaintiff had not shown that there were multiple victims of the alleged false advertising. Plaintiff appealed the court's ruling, but the court of appeal affirmed the trial court's decision to deny class certification. At that point, the complex designation was removed from the case.

In March of 2016, the case finally proceeded to jury trial before this court. At that point there were two remaining causes of action, fraud and sexual harassment. After defendant testified that he did not rely on defendant's allegedly false representations, this court granted defendant's motion for non-suit on the fraud cause of action. The sexual harassment cause of action went to the jury and the jury awarded plaintiff damages in the sum of $8,080, $1,080 in economic damages and $7,000 in noneconomic

CASE TITLE: Martinez vs. O'Hara                                    CASE NO: **30-2012-00614932-CU-FR-CXC**

---

damages. Thereafter, this court denied plaintiff's request for injunctive relief.

## Court Denies Attorney's Fees Pursuant to Labor Code Section 281.5

Labor Code Section 281.5 provides that the prevailing party in "any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions" shall be awarded reasonable attorney's fees and cost. It is undisputed that long before this case came before this court for trial, defendant had paid plaintiff all his wages. Thus, the issue of wages was not before the court when the case proceeded to trial and plaintiff cannot be considered the prevailing party on the wages claim.

The only issue that remained related to the wages claim was a waiting time penalty claim in the sum of $1,300. Before the commencement of the trial, the parties represented that days earlier, defendant paid plaintiff an additional $1,300 to resolve the issue of waiting time penalties and thereby eliminate the issue from trial. Under Labor Code Section 203, waiting time penalties are not wages. *See Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal. App. 4th 1242, 1261. Accordingly, defendant's decision to pay the waiting time penalties does not make plaintiff a prevailing party pursuant to Section 281.5.

## Court Denies Attorney's Fees Based on the FEHA Claim

The award of attorney's fees in a FEHA is discretionary. Govt. Code Section 12965(b). Having spent time reviewing the complete record in this case, including the class certification portion of the litigation, the court finds that plaintiff over litigated this case. The factual similarities between the instant matter and the facts in the California Supreme Court decision *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, are striking. In *Chavez,* the plaintiff filed an action alleging several FEHA claims. Following a five-day trial, the jury awarded Chavez $1,500 in economic damages and $10,000 in noneconomic damages. Chavez then sought attorney's fees in excess of $400,000 which he subsequently amended to approximately $870,000. In *Chavez* the Supreme Court concluded that "in light of plaintiff's minimal success and grossly inflated attorney's fee request, the trial court did not abuse its discretion in denying attorney fees." *Id.* at 976. In reaching this decision, the court noted that Chavez's success on a single FEHA claim did not have "any broad public impact or resulted in significant benefit to anyone other than himself." *Id.* at 990.

Here, the jury awarded plaintiff Martinez $1,080 in economic damages and $7,000 in noneconomic damages. Plaintiff Martinez's request for attorney's fees is based on a calculation of approximately $414,407 in fees and plaintiff is asking the court to award more than one third of that sum. The court, however, finds the figure of $414,407 very unreliable. Plaintiff's counsel admitted during the hearing that he had not maintained contemporaneous billable hours and that he based the legal fee calculation on a reconstruction of the amount of hours plaintiff's counsel believes he spent working on the case. Although block billing is not invalid per se, its use may undercut the credibility of the fee application. *Christian Research Institute v. Alnor* (2008) 165 Cal. App. 4th 1325, 1329. In this particular case, the reconstructed time sheets plaintiff submitted show that on one specific day counsel billed 25 hours of work performed. On multiple days counsel billed in excess of 15 hours of work performed per day. These entries raise serious questions about the accuracy of counsel's alleged reconstruction of the time he spent working on this case. Taking into consideration the unreliability of the figures provided with the nominal damages the jury awarded, asking the court for more than $160,000 in legal fees, seems as excessive as the legal fees plaintiff requested in the *Chavez* case. *See also Serrano v. Unruh* (1982) 32 Cal.3d 621 ("a fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether"). Moreover, like in *Chavez,* this is not a claim that had a broad public impact or resulted in significant benefit to anyone other than plaintiff Martinez, further

---

CASE TITLE: Martinez vs. O'Hara                    CASE NO: **30-2012-00614932-CU-FR-CXC**

justifying the court's decision to deny plaintiff attorney's fees.

In addition, the court notes that plaintiff in this case was spectacularly unsuccessful. The court's records make clear that plaintiff engaged in fruitless litigation, with many adverse court rulings that underscored the weaknesses in plaintiff's case. Most of the litigation had nothing to do with the FEHA claim which probably explains why the evidence plaintiff presented at trial in support of the FEHA claim was so sparse. Most of the entries in counsel's time sheet have nothing to do with this one FEHA claim. A large portion of the entries relate to the false advertising claim and the unsuccessful efforts to obtain class certification.

The weakest evidence plaintiff presented at trial was on the issue of damages. The wrongful conduct at issue occurred over a matter of weeks, which made proving significant economic damages almost impossible. At trial, counsel asked the jury to return damages in excess of $500,000, yet failed to present evidence in support of such outlandish figure. Like in *Chavez*, plaintiff's counsel in this case should have determined long before trial that realistically the case was worth no more than $25,000 and should have pursued the case as a civil limited matter.

Following *Chavez,* the court denies plaintiff's request for attorney's fees.


### Plaintiff's Costs Requests Are also Unreasonably Inflated

<u>Filing and Motion Fees</u>

The court finds that plaintiff's memorandum of costs seeks to recover filing and motion costs which are not supported by the record. The court carefully reviewed plaintiff's documentation submitted to support plaintiff's claim of $5,633.63 in motion costs. The court found that plaintiff seeks recovery of a "filing fee –appeal" in the sum of $775 on 6/30/2013. The court has searched the records in this case and there is no payment receipt generated by the court to show that plaintiff paid $775 on 6/30/13. Plaintiff seeks recovery of a filing fee in the sum of $875 on 9/11/14. The court found a payment receipt that supports this amount, which shows $775 paid for the appeal and $100 for the transcript on appeal. From these entries, the court infers that plaintiff sought double recovery of the $775 appeal fee. Plaintiff also seeks recovery of $103 as a filing fee paid on 11/4/2013. The court's receipt shows that on 11/4/2013, plaintiff paid $90, not $103 as plaintiff claims. The court also notes that on 11/4/2013 plaintiff claims an additional fee in the sum of $103.91, paid to One Legal; thus plaintiff is double billing the $103 figure. For filing fees and motion fees, the court is disallowing the following charges: the $775 allegedly paid on 6/30/13 for which there is no court receipt on record; the $875 paid for the unsuccessful class action certification appeal; the $1009.95 complex fee; the $206.91 fees paid on 11/4/2013 which represent double billing $103 filing fee. The total figure for disallowed cost is $2,866.86. Thus, the court finds that only $2,766.77 is recoverable under this category.

<u>Jury Fees</u>

Based on court receipts, the jury fees paid to the court is a total of $898.28, not the $936.26 that plaintiff claims in the memorandum of costs.

<u>Service of Process</u>

CASE TITLE: Martinez vs. O'Hara                CASE NO: **30-2012-00614932-CU-FR-CXC**

---

Plaintiff claims $2,792.13 for service of process. On its face the figure appears excessive. Plaintiff did not produce any supporting documents to justify this figure. Given the fact that plaintiff's counsel has shown a tendency to overstate or inflate costs and attorney's fees, the court denies recovery of this sum in its entirety.

Other $3,155.09

Plaintiff seeks recovery of general travel expenses, hotel accommodations and parking fees. None of these items are recoverable costs and therefore the court denies recovery of these expenses.

For all the foregoing reasons, the court allows recovery of the following costs:

| | |
|---|---|
| Filing and motion fees | $2,766.77 |
| Jury fees | $898.28 |
| Deposition costs | $2,614.70 |
| Court ordered transcripts | $207.50 |
| Models, blowup, exhibits | $427.68 |
| Court reporter fees | $130 |
| **TOTAL COSTS:** | **$7,044.93** |

Accordingly, the court orders defendant to pay plaintiff costs in the sum of $7,044.93. For the reasons stated in this order, the court denies in its entirety plaintiff's request for attorney's fees.

Court orders Clerk to give notice.

---

# INTERNAL

# EXHIBIT 2

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/30/2016                TIME: 11:15:00 AM          DEPT:  C61

COMMISSIONER: Carmen Luege
CLERK:  Ryan Castillo
REPORTER/ERM:
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2012-00614932-CU-FR-CXC**  CASE INIT.DATE: 11/28/2012
CASE TITLE: **Martinez vs. O'Hara**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Fraud

EVENT ID/DOCUMENT ID: 72490569
**EVENT TYPE**: Under Submission Ruling

APPEARANCES

There are no appearances by any party.

The Court, having taken the above-entitled matter under submission on 11/10/2016 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

Plaintiff seeks to recover over $160,000 in attorneys' fees based on his FEHA claim, pursuant to Government Code Section 12965(b), and his nonpayment of wages claim, pursuant to Labor Code Section 281.5. In addition, plaintiff seeks costs in the total sum of $15,966.94.

**Procedural History**

Plaintiff filed the complaint in this case on November 28, 2012. Plaintiff amended his complaint five times. In his fifth Amended Complaint, plaintiff, for the first time, sought class certification on his false advertising claim. The case was declared complex. Eventually, the court denied plaintiff's class certification request, at least in part, because plaintiff had not shown that there were multiple victims of the alleged false advertising. Plaintiff appealed the court's ruling, but the court of appeal affirmed the trial court's decision to deny class certification. At that point, the complex designation was removed from the case.

In March of 2016, the case finally proceeded to jury trial before this court. At that point there were two remaining causes of action, fraud and sexual harassment. After defendant testified that he did not rely on defendant's allegedly false representations, this court granted defendant's motion for non-suit on the fraud cause of action. The sexual harassment cause of action went to the jury and the jury awarded plaintiff damages in the sum of $8,080, $1,080 in economic damages and $7,000 in noneconomic

DATE: 11/30/2016                        MINUTE ORDER                              Page 1
DEPT:  C61                                                                  Calendar No.

CASE TITLE: Martinez vs. O'Hara    CASE NO: **30-2012-00614932-CU-FR-CXC**

damages. Thereafter, this court denied plaintiff's request for injunctive relief.

## Court Denies Attorney's Fees Pursuant to Labor Code Section 281.5

Labor Code Section 281.5 provides that the prevailing party in "any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions" shall be awarded reasonable attorney's fees and cost. It is undisputed that long before this case came before this court for trial, defendant had paid plaintiff all his wages. Thus, the issue of wages was not before the court when the case proceeded to trial and plaintiff cannot be considered the prevailing party on the wages claim.

The only issue that remained related to the wages claim was a waiting time penalty claim in the sum of $1,300. Before the commencement of the trial, the parties represented that days earlier, defendant paid plaintiff an additional $1,300 to resolve the issue of waiting time penalties and thereby eliminate the issue from trial. Under Labor Code Section 203, waiting time penalties are not wages. *See Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal. App. 4th 1242, 1261. Accordingly, defendant's decision to pay the waiting time penalties does not make plaintiff a prevailing party pursuant to Section 281.5.

## Court Denies Attorney's Fees Based on the FEHA Claim

The award of attorney's fees in a FEHA is discretionary. Govt. Code Section 12965(b). Having spent time reviewing the complete record in this case, including the class certification portion of the litigation, the court finds that plaintiff over litigated this case. The factual similarities between the instant matter and the facts in the California Supreme Court decision *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, are striking. In *Chavez*, the plaintiff filed an action alleging several FEHA claims. Following a five-day trial, the jury awarded Chavez $1,500 in economic damages and $10,000 in noneconomic damages. Chavez then sought attorney's fees in excess of $400,000 which he subsequently amended to approximately $870,000. In *Chavez* the Supreme Court concluded that "in light of plaintiff's minimal success and grossly inflated attorney's fee request, the trial court did not abuse its discretion in denying attorney fees." *Id.* at 976. In reaching this decision, the court noted that Chavez's success on a single FEHA claim did not have "any broad public impact or resulted in significant benefit to anyone other than himself." *Id.* at 990.

Here, the jury awarded plaintiff Martinez $1,080 in economic damages and $7,000 in noneconomic damages. Plaintiff Martinez's request for attorney's fees is based on a calculation of approximately $414,407 in fees and plaintiff is asking the court to award more than one third of that sum. The court, however, finds the figure of $414,407 very unreliable. Plaintiff's counsel admitted during the hearing that he had not maintained contemporaneous billable hours and that he based the legal fee calculation on a reconstruction of the amount of hours plaintiff's counsel believes he spent working on the case. Although block billing is not invalid per se, its use may undercut the credibility of the fee application. *Christian Research Institute v. Alnor* (2008) 165 Cal. App. 4th 1325, 1329. In this particular case, the reconstructed time sheets plaintiff submitted show that on one specific day counsel billed 25 hours of work performed. On multiple days counsel billed in excess of 15 hours of work performed per day. These entries raise serious questions about the accuracy of counsel's alleged reconstruction of the time he spent working on this case. Taking into consideration the unreliability of the figures provided with the nominal damages the jury awarded, asking the court for more than $160,000 in legal fees, seems as excessive as the legal fees plaintiff requested in the *Chavez* case. *See also Serrano v. Unruh* (1982) 32 Cal.3d 621 ("a fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether"). Moreover, like in *Chavez*, this is not a claim that had a broad public impact or resulted in significant benefit to anyone other than plaintiff Martinez, further

---

CASE TITLE: Martinez vs. O'Hara                                    CASE NO: **30-2012-00614932-CU-FR-CXC**

justifying the court's decision to deny plaintiff attorney's fees.

In addition, the court notes that plaintiff in this case was spectacularly unsuccessful. The court's records make clear that plaintiff engaged in fruitless litigation, with many adverse court rulings that underscored the weaknesses in plaintiff's case. Most of the litigation had nothing to do with the FEHA claim which probably explains why the evidence plaintiff presented at trial in support of the FEHA claim was so sparse. Most of the entries in counsel's time sheet have nothing to do with this one FEHA claim. A large portion of the entries relate to the false advertising claim and the unsuccessful efforts to obtain class certification.

The weakest evidence plaintiff presented at trial was on the issue of damages. The wrongful conduct at issue occurred over a matter of weeks, which made proving significant economic damages almost impossible. At trial, counsel asked the jury to return damages in excess of $500,000, yet failed to present evidence in support of such outlandish figure. Like in *Chavez*, plaintiff's counsel in this case should have determined long before trial that realistically the case was worth no more than $25,000 and should have pursued the case as a civil limited matter.

Following *Chavez,* the court denies plaintiff's request for attorney's fees.


### Plaintiff's Costs Requests Are also Unreasonably Inflated

<u>Filing and Motion Fees</u>

The court finds that plaintiff's memorandum of costs seeks to recover filing and motion costs which are not supported by the record. The court carefully reviewed plaintiff's documentation submitted to support plaintiff's claim of $5,633.63 in motion costs. The court found that plaintiff seeks recovery of a "filing fee –appeal" in the sum of $775 on 6/30/2013. The court has searched the records in this case and there is no payment receipt generated by the court to show that plaintiff paid $775 on 6/30/13. Plaintiff seeks recovery of a filing fee in the sum of $875 on 9/11/14. The court found a payment receipt that supports this amount, which shows $775 paid for the appeal and $100 for the transcript on appeal. From these entries, the court infers that plaintiff sought double recovery of the $775 appeal fee. Plaintiff also seeks recovery of $103 as a filing fee paid on 11/4/2013. The court's receipt shows that on 11/4/2013, plaintiff paid $90, not $103 as plaintiff claims. The court also notes that on 11/4/2013 plaintiff claims an additional fee in the sum of $103.91, paid to One Legal; thus plaintiff is double billing the $103 figure. For filing fees and motion fees, the court is disallowing the following charges: the $775 allegedly paid on 6/30/13 for which there is no court receipt on record; the $875 paid for the unsuccessful class action certification appeal; the $1009.95 complex fee; the $206.91 fees paid on 11/4/2013 which represent double billing $103 filing fee. The total figure for disallowed cost is $2,866.86. Thus, the court finds that only $2,766.77 is recoverable under this category.

<u>Jury Fees</u>

Based on court receipts, the jury fees paid to the court is a total of $898.28, not the $936.26 that plaintiff claims in the memorandum of costs.

<u>Service of Process</u>

---

CASE TITLE: Martinez vs. O'Hara          CASE NO: **30-2012-00614932-CU-FR-CXC**

---

Plaintiff claims $2,792.13 for service of process. On its face the figure appears excessive. Plaintiff did not produce any supporting documents to justify this figure. Given the fact that plaintiff's counsel has shown a tendency to overstate or inflate costs and attorney's fees, the court denies recovery of this sum in its entirety.

Other $3,155.09

Plaintiff seeks recovery of general travel expenses, hotel accommodations and parking fees. None of these items are recoverable costs and therefore the court denies recovery of these expenses.

For all the foregoing reasons, the court allows recovery of the following costs:

| | |
|---|---|
| Filing and motion fees | $2,766.77 |
| Jury fees | $898.28 |
| Deposition costs | $2,614.70 |
| Court ordered transcripts | $207.50 |
| Models, blowup, exhibits | $427.68 |
| Court reporter fees | $130 |
| **TOTAL COSTS:** | **$7,044.93** |

Accordingly, the court orders defendant to pay plaintiff costs in the sum of $7,044.93. For the reasons stated in this order, the court denies in its entirety plaintiff's request for attorney's fees.

Court orders Clerk to give notice.

---

# INTERNAL

# EXHIBIT 3

ORIGINAL

1  | Grant G. Teeple, Esq.  SBN 144760
2  | Frederick M. Reich, Esq. SBN 157028
   | TEEPLE HALL, LLP
3  | 9255 Towne Centre Drive, Suite 500
   | San Diego, CA 92121
   | Telephone: (858) 622-7878
4  | Facsimile: (858) 622-0411

5  | Attorneys for Plaintiff TEEPLE HALL, LLP

FILED
CENTRAL DIVISION

2018 SEP 20  PM 3: 29

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

8  | **SUPERIOR COURT OF CALIFORNIA**

9  | **IN AND FOR THE COUNTY OF SAN DIEGO**

11 | TEEPLE HALL, LLP,                          ) Case No.  37-2018-00047552-CU-BC-CTL
   |                                            )
12 |            Plaintiff,                      ) **COMPLAINT BY TEEPLE HALL, LLP**
   |                                            ) **FOR:**
13 |     vs.                                    )
   |                                            ) **1. BREACH OF WRITTEN CONTRACT;**
14 | STEPHEN O'HARA, an individual;             ) **2. OPEN BOOKS; AND,**
   | CAREER SOLUTIONS AND                       ) **3. ACCOUNT STATED**
15 | CANDIDATE ACQUISITIONS; PACIFIC            )
   | VALLEY REALTY, INC.; and, DOES 1           ) **DEMAND FOR JURY TRIAL**
16 | through 10, inclusive,                     )
   |                                            )
17 |            Defendants.                     )
   |                                            )
18 |                                            )
   |                                            )
19 | _____)

20 |         **COMES NOW PLAINTIFF,** TEEPLE HALL, LLP ("Plaintiff"), and alleges causes of

21 | action against Defendants STEPHEN O'HARA, an individual, CAREER SOLUTIONS AND

22 | CANDIDATE ACQUISITIONS and PACIFIC VALLEY REALTY, INC. (collectively referred

23 | to as "Defendants"), as follows:

24 |                            **GENERAL ALLEGATIONS**

25 |         1.      Plaintiff TEEPLE HALL, LLP is, and at all times pertinent hereto, was a California

26 | Limited Liability Partnership doing business within the State of California, County of San Diego.

27 |

28 |

1

Teeple Hall, LLP v. O'Hara, et al.                                    Case No.
Complaint

1      2.     Plaintiff is informed and believes, and thereon alleges, that Defendant STEPHEN

2  O'HARA is, and at all times pertinent herein was, a natural person and competent adult whose

3  primary residence is within the County of Orange.

4      3.     Plaintiff is informed and believes, and thereon alleges, that Defendant CAREER

5  SOLUTIONS AND CANDIDATE ACQUISITIONS is a business organization form unknown.

6      4.     Plaintiff is informed and believes, and thereon alleges, that Defendant PACIFIC

7  VALLEY REALTY, INC. was and is, upon information and belief, a California corporation.

8      5.     Plaintiff is unaware of the true names or capacities of the Defendants sued under

9  the fictitious names DOES 1 through 10 but will seek leave of this Court to amend the complaint

10  and serve such fictitiously named Defendants once their names and capacities become known.

11      6.     Plaintiff is informed and believes, and thereon alleges, that DOES 1 through 5 are

12  the partners, agents, owners, shareholders, managers, or employees of PACIFIC VALLEY

13  REALTY, INC. at all relevant times.

14      7.     Plaintiff is informed and believes, and thereon alleges, that DOES 6 through 10

15  are the partners, agents, owners, shareholders, managers, or employees of CAREER

16  SOLUTIONS AND CANDIDATE ACQUISITIONS at all relevant times.

17      8.     Jurisdiction and venue are proper in the Superior Court for the County of San

18  Diego because the written agreements herein sued upon were entered into in the City of San

19  Diego.

20      9.     On or about May 23, 2018, Plaintiff gave written notice to Defendants STEPHEN

21  O'HARA, CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS and PACIFIC

22  VALLEY REALTY, INC. of their right to arbitrate the fee disputes alleged herein by the San

23  Diego County Bar Association, pursuant to California Business and Professions Code section

24  6201(a) and State Bar of California Rule 2.5 of the Rules of Procedure for Fee Arbitrations and

25  the Enforcement of Awards, by method of certified mail to their last addresses known to Plaintiff,

26  on May 23, 2018.  As of the date of filing of this Complaint, there has been no response from

27  Defendants to the notices of right to arbitration of the fee disputes which are alleged herein.

28  ///

*Teeple Hall, LLP*

Teeple Hall, LLP v. O'Hara, et al.                       Case No.
Complaint

## FIRST CAUSE OF ACTION

### The Retainer Agreement

### (Breach of Contract, Against All Defendants)

10.    Plaintiff repeats and realleges, and incorporates by reference, the allegations contained within Paragraphs 1 through 9, as though fully set forth herein.

11.    Plaintiff TEEPLE HALL, LLP and Defendants STEPHEN O'HARA, an individual, CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS and PACIFIC VALLEY REALTY, INC., entered into a written agreement entitled Fee Agreement for Legal Services ("Retainer Agreement") on or about December 7, 2012, pursuant to which Plaintiff agreed to provide legal services to Defendants as follows: (1) preparation of necessary documentation, (2) discovery and research of all pertinent information and case precedents, (3) investigation, (4) hiring consultants and experts, (5) representation and negotiation on Client's behalf, (6) other necessary pre-trial and trial preparation, (7) trying the civil litigation action entitled *Martinez v. O'Hara, et al.*, Orange County Superior Court, Case No. 30-2012-00614932-CU-FR-CJC, through to conclusion.   A true and correct copy of the Retainer Agreement is attached hereto, incorporated by reference, and marked as **Exhibit A** to the Complaint.

12.    Pursuant to the Retainer Agreement, between the dates of December 7, 2012 and September 12, 2017, Plaintiff provided legal services to Defendants.

13.    Plaintiff has performed all conditions required on its part to be performed pursuant to the terms and conditions of the Retainer Agreement entered into with Defendants.

14.    Defendant has breached the Retainer Agreement by failing to fully pay for the legal services provided to him by Plaintiff pursuant to the Retainer Agreement, despite written demands for payment.

15.    As a direct and proximate result of the breach of the Retainer Agreement by Defendant, Plaintiff has suffered damage in the sum of $247,175.59, plus ten percent (10%) interest thereon pursuant to Paragraph 8 of the Retainer Agreement.

/ / /

/ / /

3

Teeple Hall, LLP v. O'Hara, et al.                                                    Case No.
Complaint

1

## SECOND CAUSE OF ACTION

### The Retainer Agreement

### (Open Book Account, Against All Defendants)

16.    Plaintiff repeats and realleges, and incorporates by reference, the allegations contained within Paragraphs 1 through 15 as though fully set forth herein.

17.    Within the last five years, Defendants STEPHEN O'HARA, an individual, CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS and PACIFIC VALLEY REALTY, INC. became indebted to Plaintiff on an open book account for the principal sum of $247,175.59 for legal services rendered by Plaintiff pursuant to a written Retainer Agreement for Legal Services dated December 7, 2012 pursuant to which Plaintiff agreed to provide legal services to Defendants as follows: (1) preparation of necessary documentation, (2) discovery and research of all pertinent information and case precedents, (3) investigation, (4) hiring consultants and experts, (5) representation and negotiation on Client's behalf, (6) other necessary pre-trial and trial preparation, (7) trying the civil litigation action entitled *Martinez v. O'Hara, et al.*, Orange County Superior Court, Case No. 30-2012-00614932-CU-FR-CJC, through to conclusion. A true and correct copy of the Retainer Agreement is attached hereto, incorporated by reference, and marked as **Exhibit** A to the Complaint.

18.    The sum includes late charges on unpaid balances in the sum of ten percent (10%) per annum, pursuant to Paragraph 8 of the Retainer Agreement, and unreimbursed advanced costs.

19.    This action is based upon an open book account that was entered into after January 1, 1987, and as such, Plaintiff is entitled to an award of its reasonable attorney's fees according to Civil Code section 1717.5, in the event that it is deemed to be the prevailing party on this Cause of Action.

/ / /

/ / /

/ / /

/ / /

/ / /

*Teeple Hall, LLP*

4

Teeple Hall, LLP v. O'Hara, et al.                                   Case No.
Complaint

### THIRD CAUSE OF ACTION

#### The Retainer Agreement

#### (Account Stated, Against All Defendants)

20.    Plaintiff repeats and realleges, and incorporates by reference, the allegations contained within Paragraphs 1 through 19 of the Complaint hereinabove, as though fully set forth herein.

21.    Within the past five years, at the request of Defendants STEPHEN O'HARA, an individual, CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS and PACIFIC VALLEY REALTY, INC., Plaintiff provided legal services to Defendant in accordance with the Retainer Agreement dated December 7, 2012 for legal services pursuant to which Plaintiff agreed to provide legal services to Defendant as follows: (1) preparation of necessary documentation, (2) discovery and research of all pertinent information and case precedents, (3) investigation, (4) hiring consultants and experts, (5) representation and negotiation on Client's behalf, (6) other necessary pre-trial and trial preparation, (7) trying the civil litigation action entitled *Martinez v. O'Hara, et al.*, Orange County Superior Court, Case No. 30-2012-00614932-CU-FR-CJC, through to conclusion.  A true and correct copy of the Retainer Agreement is attached hereto, incorporated by reference, and marked as **Exhibit A** to the Complaint.

22.    Despite demand for payment, as of the date of filing of this Complaint, there was due to Plaintiff from Defendants STEPHEN O'HARA, an individual, CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS and PACIFIC VALLEY REALTY, INC., the sum of $247,175.59 for legal services rendered, including interest at the rate of ten percent (10%) per annum on unpaid balances and unreimbursed advanced costs, which Defendant agreed to pay to Plaintiff under the Retainer Agreements for legal services.

**WHEREFORE**, Plaintiff TEEPLE HALL, LLP prays for judgment, as follows:

On the First, Second, and Third Causes of Action Against Defendants STEPHEN O'HARA, an individual, CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS and PACIFIC VALLEY REALTY, INC.:

1.  For the principal sum of $247,175.59;

5

Teeple Hall, LLP v. O'Hara, et al.                                                    Case No.
Complaint

2. For late charges on the unpaid balance at the rate of ten percent (10%) from the present until paid, in an amount according to proof;

3. For attorney's fees pursuant to statute, Civil Code §1717.5;

4. For costs of suit incurred herein; and

5. For such other and further relief as the court may deem just and proper.

Dated: 9/20/18

TEEPLE HALL, LLP

By: _____
Grant G. Teeple, Esq.
Frederick M. Reich, Esq.
Attorneys for Plaintiff TEEPLE HALL, LLP

6

Teeple Hall, LLP v. O'Hara, et al.
Complaint

Case No.

1    ## DEMAND FOR TRIAL BY JURY

2    Plaintiff TEEPLE HALL, LLP hereby demands trial by Jury.

3

4    Dated: 9/20/2018                    TEEPLE HALL, LLP

5

6                                        By:

7                                        Grant G. Teeple, Esq.
                                         Frederick M. Reich, Esq.
8                                        Attorneys for Plaintiff TEEPLE HALL,
                                         LLP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

Teeple Hall, LLP v. O'Hara, et al.                          Case No.
Complaint

# Exhibit "A"

# Exhibit "A"

**TEEPLE HALL, LLP**
Attorneys at Law

9255 Towne Centre Drive
Suite 500
San Diego, CA 92121 USA

858.622.7878
858.622.0411 fax
www.teeplehall.com

December 7, 2012

**CONFIDENTIAL**

**VIA EMAIL ONLY**
steve@steveohara.com

Stephen Stratton O'Hara fka Stephen John O'Hara
30100 Town Center Drive
Laguna Niguel, CA  92667

Career Solutions and Candidate Acquisitions
c/o Stephen S. O'Hara

Pacific Valley Realty, Inc.
c/o Stephen S. O'Hara

Re:    **Fee Agreement for Legal Services**

Dear Mr. O'Hara:

This letter confirms your decision to engage Teeple Hall, LLP for the representation described below and sets forth the terms and conditions that will apply.  While Grant G. Teeple is your principal partner contact; Grant G. Teeple and Brook T. Barnes are your primary contact attorneys.  Subject to the supervisory role of the principal partner, part or all of the services to be rendered under this Agreement may be performed by one or more of Teeple Hall, LLP's legal personnel.

If at any time you have any questions about the Scope of Services as outlined in Paragraph 1 below, please raise those questions promptly with your principal partner contact.

---

**ATTORNEY-CLIENT LITIGATION HOURLY FEE AGREEMENT**

This Fee Agreement ("Agreement") is required by Business and Professions Code Section 6148 and is intended to fulfill the requirements of said Section.

**TEEPLE HALL, LLP** ("Attorney"), Stephen O'Hara, Career Solutions and Candidate Acquisitions, and Pacific Valley Realty, Inc. ("Clients") hereby agree that Attorney will provide legal services to Client pursuant to the terms set forth below.

1.    **SCOPE OF SERVICES.**  Clients are engaging Attorney to provide legal services in the following matter: Martinez v. O'Hara, et al., Orange County Superior Court, Case No. 30-

2012-00614932-CU-FR-CJC. Such services may include, but are not limited to, (1) preparation of necessary documentation, (2) discovery and research of all pertinent information and case precedents, (3) investigation, (4) hiring consultants and experts, (5) representation and negotiation on Client's behalf, (6) other necessary pre-trial and trial preparation, (7) trying the civil litigation action entitled Martinez v. O'Hara, et al., Orange County Superior Court, Case No. 30-2012-00614932-CU-FR-CJC, through to conclusion.

Attorney reserves the right to associate with other lawyers if, in Attorney's reasonable judgment, that becomes necessary. If Attorney associates with other lawyers, Client agrees that Attorney may share Client's fees with those lawyers. If Attorney shares the fees with other lawyers, it will not result in any increase in the amount of fees Client will pay Attorney unless Attorney has Client's prior written consent.

Client understands that Attorney is making no promises or guarantees concerning the outcome of Client's matter and that Attorney's ethics prevent Attorney from doing so. Nothing in this Agreement or in Attorney's oral statements shall be construed as such a promise or guarantee. Attorney's comments about the outcome of Client's matter are expressions of opinion only.

**2.    EXCLUDED SERVICES.** Specifically excluded services under this Agreement include, but are not limited to, (1) advice on tax questions or tax implications, except as set forth in Paragraph 1 above; (2) advice on securities questions or implications; (3) advice on probate matters; (4) advice on family law matters; and (5) advice on criminal matters. This Agreement does not cover representation on appeal or in execution proceedings after judgment, including collection of any Judgment Attorney obtains in connection with services rendered. Separate arrangements must be agreed to for those services.

If Client requests Attorney perform additional services related to, but not specifically included within the scope of services outlined in Paragraph 1 of this Agreement, such additional services will be provided on an hourly basis. If Client requests Attorney to provide any legal services on new matters, a separate written fee agreement between Attorney and Client will be required.

**3.    ATTORNEY'S AND CLIENT'S RESPECTIVE DUTIES.** Attorney will perform the legal services specifically included within Paragraph 1 of this Agreement. Attorney will keep Client informed of progress and developments and will respond promptly to Client's inquiries and communications.

Client agrees to be truthful with Attorney, to cooperate, to keep Attorney informed of any facts pertinent to Attorney's representation or developments which may come to Client's attention, to abide by this Agreement, to pay Attorney's invoices on time, and to keep Attorney advised of Client's address, telephone number and whereabouts. Client will assist Attorney in providing necessary information and documents and will appear when necessary at legal proceedings.

*O'Hara, Stephen*
*Civil Litigation Hourly Fee Agreement*
*December 07, 2012*
*Page 3 of 9*

4.    **ADVICE AND LEGAL OPINIONS**.  In the course of Attorney's representation of Client, Attorney will be asked to give advice on numerous matters.  Advice falls into two categories:  (1) advice based on the general knowledge of law and experience of the attorney involved; and (2) advice, referred to as a "Legal Opinion," expressed in a formal letter after conducting as much factual and legal research as Attorney feels necessary to assure Client the advice is based on a clear understanding of the facts and reflects the most recent applicable legal authority.  Except for advice in the form of a Legal Opinion, advice will not have the benefit of the legal and factual research that is employed in connection with giving a Legal Opinion.  Whenever Client seeks advice on a matter where the results of action to be taken may have a material consequence, Client should consider asking that the advice be in the form of a Legal Opinion.

5.    **FEE ARRANGEMENT AND BILLING PRACTICES**.  Client agrees to pay Attorney by the hour at Attorney's prevailing rates for all time spent on Client's matter by Attorney's legal personnel. Time is charged in minimum units of one-tenth (1/10th) of an hour. Current hourly rates are as follows:

| | |
|---|---|
| Partners/Senior Attorneys | $400.00/hour |
| Associate Attorneys | $300.00/hour |
| Paralegals/Legal Assistants | $125.00/hour |
| Administrative Support | $ 50.00/hour |



Attorney will charge for all activities undertaken in providing the legal services specifically included within Paragraph 1 of this Agreement including, but not limited to, preparation for and participation in meetings and conferences, including meetings with Client; court appearances; review and preparation of correspondence, including email correspondence, and legal documents; legal research; and time Attorney spends on telephone calls relating to Client's matter, including calls with Client, witnesses, opposing counsel, court personnel or any other parties related to the scope of services outlined in Paragraph 1 of this Agreement.  The legal personnel assigned to Client's matter may confer among themselves about the matter, as required and appropriate, and will charge Client for the time expended, as long as the work done is reasonably necessary.  Likewise, if more than one of the legal personnel attends a meeting, conference, court hearing or other proceeding, each will charge for the time spent.  Attorney will charge for waiting time in court and elsewhere and for travel time, both local and out of town.

The rates on this schedule are subject to change upon 30 days' written notice to Client. If Client declines to pay increased rates, Attorney will have the right to withdraw as Attorney for Client.

Client acknowledges that Attorney has made no promises about the total amount of Attorney's fees to be incurred by Client under this Agreement.

O'Hara, Stephen
Civil Litigation Hourly Fee Agreement
December 07, 2012
Page 4 of 9



6.    **INITIAL TRUST DEPOSIT.**  Client agrees to pay Attorney an initial deposit of $5,000.00 upon execution of this fee agreement to be billed against at the hourly rates identified in Paragraph 5.  Client's initial deposit, as well as any future deposits, will be held in a trust account for Client's behalf. Client authorizes Attorney to use that fund to pay the fees and other charges as they are incurred.  Once the initial deposit has been expended, Attorney may request additional trust deposits.  Should Attorney require additional trust deposits, Client agrees to pay all deposits within ten (10) days of Attorney's demand.  In the alternative, Attorney may elect to send a monthly invoice to Client with payment due upon receipt.  Client acknowledges that the initial deposit is not an estimate of total fees and costs.  Unless otherwise agreed to in writing, any unused deposit at the conclusion of Attorney's services will be refunded.  Interest earned on Client's funds held in trust is required by law to be paid to the State Bar of California for use in connection with programs mandated by the State of California.

7.    **COSTS AND OTHER CHARGES.**  Attorney will incur various costs and expenses in performing legal services under this Agreement.  Client agrees to pay for all costs, disbursements and expenses in addition to the hourly fees.  These costs and expenses commonly include, but are not limited to, attorney service charges, service of process charges, filing fees, court and deposition reporters' fees, research expenses, jury fees, notary fees, deposition costs, long distance telephone charges, messenger and other delivery fees, postage and express mail, photocopying and other reproduction costs, travel costs including parking, mileage, transportation, meals, hotel costs, investigation expenses, consultants' fees, expert witness, professional, mediator, arbitrator and/or special master fees and other similar items.  With regard to expert witnesses, consultants or investigators to be hired, Attorney will select such persons and Client will be informed of persons chosen and their charges.  Client agrees to pay such fees and charges.  Except for the items listed below, all costs and expenses will be charged at Attorney's cost.  Attorney reserves the right, in Attorney's sole and absolute discretion, to fund advanced costs relating to the Scope of Services as outlined in Paragraph 1 above, utilizing Attorney's third party credit facilities. All related third party, interest, fees and charges incurred by Attorney will be billed to Client at Attorney's cost.

| | |
|---|---|
| In-office photocopying/scanning (B&W): | $0.25/page |
| In-office photocopying/scanning (Color): | $0.50/page |
| Facsimile charges (B&W): | $0.25/page |
| Facsimile charges (Color): | $0.50/page |
| Mileage: | Prevailing Federal Reimbursement Rate |

With respect to any necessary out-of-town travel, Client agrees to pay transportation, meals, lodging and all other costs of any necessary out-of-town travel by Attorney's personnel. Client will also be charged the hourly rates for the time legal personnel spend traveling.

Additionally, Client understands that if the matter proceeds to court action or arbitration, Client may be required to pay fees and/or costs to other parties in the action.  Any such payment will be entirely the responsibility of Client.

*O'Hara, Stephen*
*Civil Litigation Hourly Fee Agreement*
*December 07, 2012*
*Page 5 of 9*

From time-to-time, Attorney may advance some of these costs on Client's behalf, but the majority of costs must be pre-paid by Client.

8.    **INVOICES AND PAYMENTS.** Attorney will send Client monthly invoices for fees and costs incurred and any outstanding balance due to Attorney. Invoices will be dated the day of or shortly prior to the mailing date. The invoices shall include the amount, rate, basis of calculation or other method of determination of the fees and costs, which costs will be clearly identified by item and amount. If no Attorney's fees or costs are incurred for a particular month, or if they are minimal, the invoice may be held and combined with a future invoice, unless Client requests an invoice.

Unless otherwise agreed to in writing, it is a condition of the Agreement that invoices are payable upon receipt. Damages incurred by Attorney when invoices are not paid as agreed are difficult to measure and, therefore, interest will be accrued on any unpaid balance at the highest legal rate or at the rate of ten percent (10%) per annum. Interest will begin to accrue after thirty (30) days on any unpaid balance.

All fees quoted herein are based upon Attorney's best rates possible. All costs invoiced are billed to the Client at Attorney's cost, with the exception of in-office photocopying and facsimile charges, which Attorney bills at an average expense per page determined by Attorney to most closely reflect Attorney's actual cost. As such, all invoice amounts assume payment to be made in cash or cash-equivalent methods, such as a business or personal check, a cashier's check or a bank draft. While other forms of payment are accepted, a convenience fee, not to exceed eight percent (8.00%) of Client's total payment, will be charged to Client on a future invoice.

Client confirms that all payments made to Attorney will be from good, clean funds and that the source of funds does not derive from any illegal activity.

9.    **DISPUTES.** Should Client have a dispute as to Attorney's fees or costs, the quality of Attorney's Services, the accuracy of Attorney's advice, or any other matter arising out of Attorney's representation, including claims for legal malpractice, pursuant to this Agreement that Attorney and Client cannot resolve voluntarily, Attorney and Client both agree that the dispute will be resolved through binding arbitration rather than litigation. With respect to arbitration of disputes, both Attorney and Client agree:

(i)    all disputes arising out of services performed by Attorney including, without limitation, disputes relating to charges for and the necessity of services or costs, and the quality of the services, including claims for legal malpractice, shall be resolved exclusively by binding arbitration pursuant to the provisions of Part III, Title 9 (Section 1280 *et seq.*) of the California Code of Civil Procedure ("CCP"); and

(ii)    the arbitrator shall be selected by agreement or, in the absence of agreement, shall be selected pursuant to, and the arbitration shall be governed by, the Commercial Arbitration Rules of the American Arbitration Association; and

(iii)    discovery will be permitted during arbitration as provided in Section 1283.05 of the CCP.

Notwithstanding the foregoing, upon a timely election by Client, arbitration of disputes relating to Attorney's fees shall be subject to arbitration pursuant to the provisions of Section 6200 *et seq.* of the California Business and Professions Code and related procedures established by the California State Bar Association.

By initialing below Client acknowledges, understands and agrees to resolve all disputes through binding arbitration and Client expressly waives Client's right to a trial by jury, trial by judge or appeal.

(Client Initial Here)

**10.     ORDER OR AGREEMENT FOR PAYMENT OF ATTORNEY'S FEES AND/OR COSTS BY A THIRD PARTY.** A court or other tribunal may order, or the parties to the dispute may agree, that a third party will pay some or all of Client's Attorney's fees, costs or both. Any such order or agreement will not affect Client's obligation to pay Attorney's fees and costs under this Agreement, nor will Attorney be obligated under this Agreement to enforce such an order or agreement. Any such amounts actually received by Attorney will be credited against Client's outstanding Attorney's fees and costs incurred.

**11.     SETTLEMENT.** Attorney will not settle Client's case without Client's express approval. Client will have the absolute right to accept or reject any settlement offer. Attorney will notify Client promptly of the terms of any settlement offer received by Attorney. Client will notify Attorney promptly of any payments received directly and will pay promptly to Attorney any amounts due from such payments, under the terms of this Agreement, including costs advanced by Attorney. If the debtor files bankruptcy after making any payments to Attorney on account of Client's claim, Client will hold Attorney harmless from any claim or demand for repayment or reimbursement made by the debtor or a trustee in bankruptcy under the Bankruptcy Code and will submit to the jurisdiction of the bankruptcy court for purposes of indemnification.

**12.     LIEN.** Client hereby grants Attorney a lien on any and all claims or causes of action that are the subject of the representation under this Agreement. The lien will be for any sums owing to Attorney at the conclusion of services performed. The lien will attach to any recovery Client may obtain, whether by arbitration award, judgment, settlement or otherwise. The effect of such a lien is that Attorney may be able to compel payment of fees and costs from any such funds recovered on behalf of Client even if Attorney has been discharged before the end of the case. Because a lien may affect Client's property rights, Client may seek the advice of an independent lawyer of Client's choice before agreeing to such a lien. By initialing this

O'Hara, Stephen
*Civil Litigation Hourly Fee Agreement*
December 07, 2012
Page 7 of 9

paragraph, Client represents and agrees that Client has had a reasonable opportunity to consult such an independent lawyer and—whether or not Client has chosen to consult such an independent lawyer—Client agrees that Attorney will have a lien as specified above.

(Client Initial Here)

13.    **DISCHARGE AND WITHDRAWAL.**  Client may discharge Attorney at any time, with or without cause, by giving notice to Attorney.  If Attorney is Client's Attorney of Record in any proceeding, Client will execute and return either a Substitution-of-Attorney form, or other applicable form, immediately upon receipt from Attorney.

Attorney is subject to the California Rules of Professional Conduct that provide the circumstances under which Attorney may unilaterally withdraw from representing Client. Attorney may withdraw with Client's consent or for good cause.  Good cause includes, but is not limited to, Client's breach of this Agreement; refusal to cooperate or to follow Attorney's advice on a material matter or any fact or circumstance that would render Attorney's continuing representation unlawful or unethical and result in a violation of the California Rules of Professional Conduct or the State Bar Act.  In matters pending before a court or other tribunal, approval of the court or tribunal may also be required.  Attorney will discuss with Client any situation that may lead to Attorney's withdrawal before Attorney withdraws.  In the event Attorney finds it necessary or desirable to withdraw from representing Client and the California Rules of Professional Conduct and the State Bar Act permit Attorney to do so, Client agrees to execute such documents, including a Substitution-of-Attorney form, as may be required. Attorney reserves the right to withdraw from any Agreement where such withdrawal is consistent with the California Rules of Professional Conduct.

When Attorney's services conclude, all unpaid charges will immediately become due and payable.  Client's discharge of Attorney's services will not affect Client's responsibility for payment of legal services rendered and costs incurred, including costs advanced by Attorney, before discharge *and* in connection with an orderly transition of Client's matter.  Client authorizes Attorney to use any funds in Client's trust account to pay any of Client's outstanding fees and costs.  This authorization shall survive even after Client has terminated Attorney's services.  After services conclude, Attorney will, upon Client's request, deliver Client's file and property in Attorney's possession unless subject to the lien provided in Paragraph 12 above.

14.    **RECORDS POLICY.**  Upon conclusion of the Client's matter set forth herein Attorney will, either upon Client's request or Attorney's decision, deliver Client's file and property in Attorney's possession, whether or not Client has paid for all services.  If Client does not request the file for this matter, Attorney will retain the *required* documents for a period of up to seven (7) years following the date of the last correspondence for this matter contained in the file.  If Client does not request delivery of the file for this matter before the end of the seven (7) year period, Attorney will have no further obligation to retain the file and may destroy it without further notice to Client.

*O'Hara, Stephen*
*Civil Litigation Hourly Fee Agreement*
*December 07, 2012*
*Page 8 of 9*

15.    **ERRORS AND OMISSIONS INSURANCE COVERAGE.**    Attorney maintains Errors and Omissions Insurance Coverage that apply to the services to be rendered within Paragraph 1 of this Agreement.

16.    **EFFECTIVE DATE.**    This Agreement will not take effect, and Attorney will have no obligation to provide legal services, until Client returns a signed copy of this Agreement and pays the initial trust deposit called for under Paragraph 6.  This Agreement will govern all legal services performed by Attorney on behalf of Client *commencing with the date Attorney first performed services.*  The date at the beginning of this Agreement is for reference only.    Even if this Agreement does not take effect, Client is obligated to pay Attorney the reasonable value of any services Attorney performed for Client.

17.    **ENTIRE AGREEMENT.**    This Agreement contains the entire agreement of the parties.  No other agreement, statement, or promise made on or before the effective date of this Agreement will be binding on the parties.

18.    **SEVERABILITY IN EVENT OF PARTIAL INVALIDITY.**    If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

19.    **MODIFICATION BY SUBSEQUENT AGREEMENT.**    This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them, or an oral agreement only to the extent that the parties carry it out.

If this Agreement accurately reflects the terms of our engagement, please initial, sign and return the original to us along with the initial trust deposit called for under Paragraph 6.  If you do not agree, please contact us immediately.  **If we do not hear from you promptly to the contrary and you continue to utilize our services, this Agreement will be binding upon both of us.** Please contact our office if you have any questions regarding this matter.

We appreciate the opportunity to be of service and look forward to working with you.

Very truly yours,

TEEPLE HALL, LLP

Grant G. Teeple
Partner

GGT/kc

*O'Hara, Stephen*
*Civil Litigation Hourly Fee Agreement*
*December 07, 2012*
*Page 9 of 9*

CLIENT HAS READ AND UNDERSTOOD THE FOREGOING TERMS AND AGREES TO THEM AS OF THE DATE ATTORNEY FIRST PROVIDED SERVICES. IF MORE THAN ONE CLIENT SIGNS BELOW, EACH AGREES TO BE LIABLE, JOINTLY AND SEVERALLY, FOR ALL OBLIGATIONS UNDER THIS AGREEMENT. CLIENT SHALL RECEIVE A FULLY EXECUTED DUPLICATE OF THIS AGREEMENT.

Dated: 12-7-12

By: _____
Stephen O'Hara

Address: 30100 Town Center Drive
Laguna Niguel, CA 92667

Phone: 949-466-9000
Fax: 949-334-3329
Email: steve@steveohara.com

Dated: 12-7-12

Career Solutions and Candidate Acquisitions

By: _____
Stephen O'Hara

Address: 30100 Town Center Drive
Laguna Niguel, CA 92667

Phone:
Fax:
Email: steve@steveohara.com

Dated: 12-7-12

Pacific Valley Realty, Inc.

By: _____
Stephen O'Hara

Address: 30100 Town Center Drive
Laguna Niguel, CA 92667

Phone:
Fax:
Email: steve@steveohara.com

# INTERNAL

# EXHIBIT 4

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)*

Chapter you are filing under:

☑ Chapter 7
☐ Chapter 11
☐ Chapter 12
☐ Chapter 13

☐ Check if this is an amended filing

## Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy

04/20

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

---

**Part 1: Identify Yourself**

| | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 1. | **Your full name** | | |
| | Write the name that is on your government-issued picture identification (for example, your driver's license or passport). | **Stephen**<br>First name | First name |
| | | **S**<br>Middle name | Middle name |
| | Bring your picture identification to your meeting with the trustee. | **O'Hara**<br>Last name and Suffix (Sr., Jr., II, III) | Last name and Suffix (Sr., Jr., II, III) |
| 2. | **All other names you have used in the last 8 years**<br><br>Include your married or maiden names. | | |
| 3. | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | **xxx-xx-8166** | |

Debtor 1   **Stephen S O'Hara**                                                          Case number *(if known)*

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **4. Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**<br><br>Include trade names and *doing business as* names | ■ I have not used any business name or EINs.<br><br>Business name(s)<br><br>EIN | □ I have not used any business name or EINs.<br><br>Business name(s)<br><br>EIN |
| **5. Where you live** | **3312 City Lights Drive**<br>**Aliso Viejo, CA 92656**<br>Number, Street, City, State & ZIP Code<br><br>**Orange**<br>County<br><br>**If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address.<br><br>**P.O. Box 7515**<br>**Newport Beach, CA 92658**<br>Number, P.O. Box, Street, City, State & ZIP Code | **If Debtor 2 lives at a different address:**<br><br>Number, Street, City, State & ZIP Code<br><br>County<br><br>**If Debtor 2's mailing address is different from yours, fill in here.** Note that the court will send any notices to this mailing address.<br><br>Number, P.O. Box, Street, City, State & ZIP Code |
| **6. Why you are choosing *this district* to file for bankruptcy** | *Check one:*<br><br>■ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>□ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) | *Check one:*<br><br>□ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>□ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) |

Debtor 1    **Stephen S O'Hara**                                                    Case number *(if known)* _____

| Part 2: | Tell the Court About Your Bankruptcy Case |
|---------|-------------------------------------------|

**7.** **The chapter of the Bankruptcy Code are you choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)).* Also, go to the top of page 1 and check the appropriate box.

- ■ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13

**8.** **How you will pay the fee**

- ■ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

- ☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

- ☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments. If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9.** **Have you filed for bankruptcy within the last 8 years?**

- ■ No.
- ☐ Yes.

| | | | | | |
|---|---|---|---|---|---|
| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |

**10.** **Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

- ■ No
- ☐ Yes.

| | | | | | |
|---|---|---|---|---|---|
| Debtor | _____ | | | Relationship to you | _____ |
| District | _____ | When | _____ | Case number, if known | _____ |
| Debtor | _____ | | | Relationship to you | _____ |
| District | _____ | When | _____ | Case number, if known | _____ |

**11.** **Do you rent your residence?**

- ☐ No.    Go to line 12.
- ■ Yes.   Has your landlord obtained an eviction judgment against you?

  - ■ No. Go to line 12.
  - ☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it with this bankruptcy petition.

Debtor 1    **Stephen S O'Hara** _____    Case number *(if known)* _____

---

| **Part 3:** | **Report About Any Businesses You Own as a Sole Proprietor** |
|---|---|

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

■ No.    Go to Part 4.

☐ Yes.    Name and location of business

_____
Name of business, if any

_____

_____
Number, Street, City, State & ZIP Code

*Check the appropriate box to describe your business:*

☐    Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐    Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐    Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐    Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐    None of the above

---

**13. Are you filing under Chapter 11 of the Bankruptcy Code, and are you a *small business debtor or a debtor as defined by 11 U.S.C. § 1182(1)*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor or a debtor choosing to proceed under Subchapter V so that it can set appropriate deadlines. If you indicate that you are a small business debtor or you are choosing to proceed under Subchapter V, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

■ No.    I am not filing under Chapter 11.

☐ No.    I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes.    I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.

☐ Yes.    I am filing under Chapter 11, I am a debtor according to the definition in § 1182(1) of the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

---

| **Part 4:** | **Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention** |
|---|---|

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

■ No.

☐ Yes.    What is the hazard?    _____

If immediate attention is needed, why is it needed?    _____

Where is the property?    _____

_____
Number, Street, City, State & Zip Code

---

Debtor 1    **Stephen S O'Hara**                                     Case number *(if known)* _____

| **Part 5:** | **Explain Your Efforts to Receive a Briefing About Credit Counseling** |

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

*You must check one:*

■ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy. If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the Internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the Internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1   **Stephen S O'Hara**                    Case number *(if known)*

---

| **Part 6:** | **Answer These Questions for Reporting Purposes** |
| --- | --- |

| | | |
| --- | --- | --- |
| **16. What kind of debts do you have?** | **16a.** | **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose." |
| | | ■ No. Go to line 16b. |
| | | ☐ Yes. Go to line 17. |
| | **16b.** | **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment. |
| | | ☐ No. Go to line 16c. |
| | | ■ Yes. Go to line 17. |
| | **16c.** | State the type of debts you owe that are not consumer debts or business debts |

---

| | | |
| --- | --- | --- |
| **17. Are you filing under Chapter 7?** | ☐ No. | I am not filing under Chapter 7. Go to line 18. |
| **Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?** | ■ Yes. | I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expense are paid that funds will be available to distribute to unsecured creditors? |
| | | ■ No |
| | | ☐ Yes |

---

| | | | |
| --- | --- | --- | --- |
| **18. How many Creditors do you estimate that you owe?** | ■ 1-49<br>☐ 50-99<br>☐ 100-199<br>☐ 200-999 | ☐ 1,000-5,000<br>☐ 5001-10,000<br>☐ 10,001-25,000 | ☐ 25,001-50,000<br>☐ 50,001-100,000<br>☐ More than100,000 |

---

| | | | |
| --- | --- | --- | --- |
| **19. How much do you estimate your assets to be worth?** | ☐ $0 - $50,000<br>■ $50,001 - $100,000<br>☐ $100,001 - $500,000<br>☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million<br>☐ $10,000,001 - $50 million<br>☐ $50,000,001 - $100 million<br>☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion<br>☐ $1,000,000,001 - $10 billion<br>☐ $10,000,000,001 - $50 billion<br>☐ More than $50 billion |

---

| | | | |
| --- | --- | --- | --- |
| **20. How much do you estimate your liabilities to be?** | ☐ $0 - $50,000<br>☐ $50,001 - $100,000<br>■ $100,001 - $500,000<br>☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million<br>☐ $10,000,001 - $50 million<br>☐ $50,000,001 - $100 million<br>☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion<br>☐ $1,000,000,001 - $10 billion<br>☐ $10,000,000,001 - $50 billion<br>☐ More than $50 billion |

---

| **Part 7:** | **Sign Below** |
| --- | --- |

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519 and 3571.

X _____

**Stephen S O'Hara**
Signature of Debtor 1

Signature of Debtor 2

Executed on   **May 14, 2020**            Executed on
          MM / DD / YYYY                                         MM / DD / YYYY

---

Debtor 1    **Stephen S O'Hara**                                                    Case number *(if known)*

---

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

|   |   |
|---|---|
| Signature of Attorney for Debtor | Date    **May 14, 2020** |
|   | MM / DD / YYYY |

**Jeffrey B. Smith 150095**
Printed name

**Curd, Galindo & Smith, LLP**
Firm name

**301 E. Ocean Blvd. Suite 1700**
**Long Beach, CA 90802**
Number, Street, City, State & ZIP Code

Contact phone    **562-624-1177**          Email address    **jsmith@cgsattys.com**

**150095 CA**
Bar number & State

---

Certificate Number: 00301-CAC-CC-033925571



00301-CAC-CC-033925571

# CERTIFICATE OF COUNSELING

I CERTIFY that on January 8, 2020, at 7:47 o'clock PM EST, STEPHEN S O'HARA received from InCharge Debt Solutions, an agency approved pursuant to 11 U.S.C. 111 to provide credit counseling in the Central District of California, an individual [or group] briefing that complied with the provisions of 11 U.S.C. 109(h) and 111.

A debt repayment plan was not prepared. If a debt repayment plan was prepared, a copy of the debt repayment plan is attached to this certificate.

This counseling session was conducted by internet.

Date:  January 8, 2020

By:    /s/Samantha Alicea

Name:  Samantha Alicea

Title:  Certified Bankruptcy Counselor

* Individuals who wish to file a bankruptcy case under title 11 of the United States Bankruptcy Code are required to file with the United States Bankruptcy Court a completed certificate of counseling from the nonprofit budget and credit counseling agency that provided the individual the counseling services and a copy of the debt repayment plan, if any, developed through the credit counseling agency. *See* 11 U.S.C. 109(h) and 521(b).

## STATEMENT OF RELATED CASES
## INFORMATION REQUIRED BY LBR 1015-2
## UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA

1.  A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, his or her current or former domestic partner, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of each such of prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**Chapter 7 filed 1/25/12, Case# 8:12-bk-10982-TA, discharged 5/14/12.**

**Chapter 7 filed 3/18/97, Case# 8:97-bk-13844-JR, discharged 7/14/97**

2.  (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

3.  (If petitioner is a corporation) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

4.  (If petitioner is an individual) A petition under the Bankruptcy Reform Act of 1978, including amendments thereof, has been filed by or against the debtor within the last 180 days: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at **Long Beach, CA**                     , California.

Date:          **May 14, 2020**

Stephen S O'Hara
Signature of Debtor 1

Signature of Debtor 2

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

October 2018                                Page 1                     **F 1015-2.1.STMT.RELATED.CASES**

| Fill in this information to identify your case: | | | |
|---|---|---|---|
| Debtor 1 | **Stephen S O'Hara** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number (if known) | | | |

☐ Check if this is an amended filing

## Official Form 106Sum

### Summary of Your Assets and Liabilities and Certain Statistical Information      12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.

**Part 1:    Summarize Your Assets**

| | | Your assets Value of what you own |
|---|---|---|
| 1. | **Schedule A/B: Property** (Official Form 106A/B) 1a. Copy line 55, Total real estate, from Schedule A/B.................................................... | $ 0.00 |
| | 1b. Copy line 62, Total personal property, from Schedule A/B.......................................... | $ 81,500.00 |
| | 1c. Copy line 63, Total of all property on Schedule A/B.................................................. | $ 81,500.00 |

**Part 2:    Summarize Your Liabilities**

| | | Your liabilities Amount you owe |
|---|---|---|
| 2. | *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D) 2a. Copy the total you listed in Column A, *Amount of claim,* at the bottom of the last page of Part 1 of *Schedule D...* | $ 32,000.00 |
| 3. | *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F) 3a. Copy the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F*............................... | $ 0.00 |
| | 3b. Copy the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F*........................... | $ 274,168.22 |
| | Your total liabilities | $ 306,168.22 |

**Part 3:    Summarize Your Income and Expenses**

| | | |
|---|---|---|
| 4. | *Schedule I: Your Income* (Official Form 106I) Copy your combined monthly income from line 12 of *Schedule I*................................................ | $ 6,300.00 |
| 5. | *Schedule J: Your Expenses* (Official Form 106J) Copy your monthly expenses from line 22c of *Schedule J*.......................................... | $ 6,280.00 |

**Part 4:    Answer These Questions for Administrative and Statistical Records**

6. **Are you filing for bankruptcy under Chapters 7, 11, or 13?**

   ☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

   ■ Yes

7. **What kind of debt do you have?**

   ☐ **Your debts are primarily consumer debts.** *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9g for statistical purposes. 28 U.S.C. § 159.

   ■ **Your debts are not primarily consumer debts.** You have nothing to report on this part of the form. *Check this box* and submit this form to the court with your other schedules.

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor 1    **Stephen S O'Hara**                                                    Case number *(if known)*

8.  From the *Statement of Your Current Monthly Income:* Copy your total current monthly income from Official Form
    122A-1 Line 11; **OR**, Form 122B Line 11; **OR**, Form 122C-1 Line 14.                                    $ _____

9.  Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:

| From Part 4 on *Schedule E/F*, copy the following: | Total claim | |
|---|---|---|
| 9a. Domestic support obligations (Copy line 6a.) | $ | 0.00 |
| 9b. Taxes and certain other debts you owe the government. (Copy line 6b.) | $ | 0.00 |
| 9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.) | $ | 0.00 |
| 9d. Student loans. (Copy line 6f.) | $ | 0.00 |
| 9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.) | $ | 0.00 |
| 9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.) | +$ | 0.00 |
| 9g. **Total.** Add lines 9a through 9f. | $ | 0.00 |

**Fill in this information to identify your case and this filing:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Stephen S O'Hara** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse, if filing) | First Name | Middle Name | Last Name |
| | | | |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| | | | |
| Case number | | | ☐ Check if this is an amended filing |

## Official Form 106A/B
# Schedule A/B: Property

12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:** Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

**1. Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

■ No. Go to Part 2.

☐ Yes. Where is the property?

**Part 2:** Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

**3. Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☐ No
■ Yes

| 3.1 | Make: **Mazda** | Who has an interest in the property? Check one | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* | |
|---|---|---|---|---|
| | Model: | ■ Debtor 1 only | | |
| | Year: **2020** | ☐ Debtor 2 only | **Current value of the entire property?** | **Current value of the portion you own?** |
| | Approximate mileage: **5,000** | ☐ Debtor 1 and Debtor 2 only | | |
| | Other information: | ☐ At least one of the debtors and another | | |
| | | | **$35,000.00** | **$35,000.00** |
| | | ☐ Check if this is community property (see instructions) | | |

**4. Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
*Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

■ No
☐ Yes

**5 Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here.............................................................................=>**  **$35,000.00**

**Part 3:** Describe Your Personal and Household Items

| Do you own or have any legal or equitable interest in any of the following items? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com

Debtor 1    **Stephen S O'Hara**                              Case number *(if known)*

**6. Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ■ Yes. Describe.....

| | |
|---|---|
| Furniture, Televisions, Appliances, Kitchenware, Linens, bedroom sets, and other miscellaneous household goods.  Debtor believes there are no individual items in this category that have an as is garage sale or "Craigs List" value in excess of $525.  However, debtor believes the REPLACEMENT value of these household goods, new, would be MUCH higher. | $5,000.00 |

**7. Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
   ☐ No
   ■ Yes. Describe.....

| | |
|---|---|
| Computer, printer, fax, phones, tablet, laptop and misc supplies | $5,000.00 |

**8. Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☐ No
   ■ Yes. Describe.....

| | |
|---|---|
| Books, pictures, CD's, DVD's, and other non-collector art. | $1,000.00 |

**9. Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ■ No
   ☐ Yes. Describe.....

**10. Firearms**
   *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
   ■ No
   ☐ Yes. Describe.....

**11. Clothes**
   *Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
   ☐ No
   ■ Yes. Describe.....

| | |
|---|---|
| Clothing for family of 2 | $1,000.00 |

**12. Jewelry**
   *Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
   ☐ No
   ■ Yes. Describe.....

| | |
|---|---|
| Non-filing spouse costume jewelry and wedding ring | $5,000.00 |

**13. Non-farm animals**
   *Examples:* Dogs, cats, birds, horses
   ■ No
   ☐ Yes. Describe.....

Debtor 1    Stephen S O'Hara                                                    Case number *(if known)* _____

14. **Any other personal and household items you did not already list, including any health aids you did not list**
- ■ No
- ☐ Yes. Give specific information.....

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached
for Part 3. Write that number here** ............................................................................

| | |
|---|---|
| | **$17,000.00** |

---

**Part 4:    Describe Your Financial Assets**

| Do you own or have any legal or equitable interest in any of the following? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

16. **Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
- ■ No
- ☐ Yes...............................................................................................................

17. **Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
- ☐ No
- ■ Yes........................                                  Institution name:

| | | | | |
|---|---|---|---|---|
| | 17.1. | Checking | **BofA Checking** | **$1,000.00** |
| | 17.2. | Checking | **BofA Joint Checking with Non-Filing Spouse** | **$500.00** |
| | 17.3. | Checking | **Wescom CU Joint Checking with Non-Filing Spouse** | **$300.00** |

18. **Bonds, mutual funds, or publicly traded stocks**
*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
- ☐ No
- ■ Yes.................                                      Institution or issuer name:

  **OCRE, Inc.**
  **Closely held company, Real Estate Broker. Run from home with**
  **adult daughter. Personal Service Corp.**
  **On petition date, OCRE has no transactions in Escrow and no**
  **active listings.**                                                                    **$0.00**

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
- ■ No
- ☐ Yes. Give specific information about them...................
  Name of entity:                                           % of ownership:

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
*Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
*Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
- ■ No
- ☐ Yes. Give specific information about them
  Issuer name:

21. **Retirement or pension accounts**
*Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
- ■ No

---

Official Form 106A/B                        Schedule A/B: Property                                          page 3
Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                                Best Case Bankruptcy

| Debtor 1 | Stephen S O'Hara | | Case number *(if known)* | |

☐ Yes. List each account separately.
Type of account:  Institution name:

**22. Security deposits and prepayments**
Your share of all unused deposits you have made so that you may continue service or use from a company
*Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
☐ No
■ Yes. .....................  Institution name or individual:

| | Rental | **Lease Deposit** | | **$700.00** |

**23. Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
■ No
☐ Yes.............  Issuer name and description.

**24. Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
■ No
☐ Yes............  Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

**25. Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
■ No
☐ Yes.  Give specific information about them...

**26. Patents, copyrights, trademarks, trade secrets, and other intellectual property**
*Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
■ No
☐ Yes.  Give specific information about them...

**27. Licenses, franchises, and other general intangibles**
*Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
■ No
☐ Yes.  Give specific information about them...

| **Money or property owed to you?** | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |

**28. Tax refunds owed to you**
■ No
☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

**29. Family support**
*Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
■ No
☐ Yes. Give specific information......

**30. Other amounts someone owes you**
*Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay, workers' compensation, Social Security benefits; unpaid loans you made to someone else
■ No
☐ Yes.  Give specific information..

**31. Interests in insurance policies**
*Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
☐ No
■ Yes. Name the insurance company of each policy and list its value.
Company name:  Beneficiary:  Surrender or refund value:

Debtor 1   Stephen S O'Hara                                                     Case number *(if known)*

| Term Policy with Mutual of Omaha. | | $0.00 |

32. **Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
■ No
☐ Yes. Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue
■ No
☐ Yes. Describe each claim.........

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
■ No
☐ Yes. Describe each claim.........

35. **Any financial assets you did not already list**
■ No
☐ Yes. Give specific information..

36. **Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached
for Part 4. Write that number here**..................................................................................................... | $2,500.00 |

**Part 5:**   Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

37. **Do you own or have any legal or equitable interest in any business-related property?**
■ No. Go to Part 6.
☐ Yes. Go to line 38.

**Part 6:**   Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.
If you own or have an interest in farmland, list it in Part 1.

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
■ No. Go to Part 7.
☐ Yes. Go to line 47.

**Part 7:**   Describe All Property You Own or Have an Interest in That You Did Not List Above

53. **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
☐ No
■ Yes. Give specific information.........

| Non-filing spouse has $27,000 remaining from a Personal Injury Settlement from prior to 2012. This asset was listed and exempted in 2012 bk filed by debtor and spouse. | $27,000.00 |

54. **Add the dollar value of all of your entries from Part 7. Write that number here** ...................................... | $27,000.00 |

Debtor 1    **Stephen S O'Hara**    Case number *(if known)*

| Part 8: | List the Totals of Each Part of this Form |
| --- | --- |

| | | |
| --- | --- | --- |
| 55. Part 1: Total real estate, line 2 ................................................................................................. | | $0.00 |
| 56. Part 2: Total vehicles, line 5 | $35,000.00 | |
| 57. Part 3: Total personal and household items, line 15 | $17,000.00 | |
| 58. Part 4: Total financial assets, line 36 | $2,500.00 | |
| 59. Part 5: Total business-related property, line 45 | $0.00 | |
| 60. Part 6: Total farm- and fishing-related property, line 52 | $0.00 | |
| 61. Part 7: Total other property not listed, line 54 + | $27,000.00 | |
| 62. **Total personal property.** Add lines 56 through 61... | **$81,500.00**    Copy personal property total | **$81,500.00** |
| 63. Total of all property on Schedule A/B. Add line 55 + line 62 | | **$81,500.00** |

**Fill in this information to identify your case:**

| Debtor 1 | Stephen S O'Hara | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the: CENTRAL DISTRICT OF CALIFORNIA

Case number
(if known) _____

☐ Check if this is an
amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt

4/19

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.

**Part 1:** Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   �■ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ☐ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | | Specific laws that allow exemption |
|---|---|---|---|---|
| **2020 Mazda 5,000 miles**<br>Line from *Schedule A/B*: **3.1** | $35,000.00 | ■ | $3,000.00 | C.C.P. § 703.140(b)(2) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |
| **Furniture, Televisions, Appliances, Kitchenware, Linens, bedroom sets, and other miscellaneous household goods.  Debtor believes there are no individual items in this category that have an as is garage sale or "Craigs List" value in excess of $525. Howeve**<br>Line from *Schedule A/B*: **6.1** | $5,000.00 | ■ | $5,000.00 | C.C.P. § 703.140(b)(3) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |
| **Computer, printer, fax, phones, tablet, laptop and misc supplies**<br>Line from *Schedule A/B*: **7.1** | $5,000.00 | ■ | $5,000.00 | C.C.P. § 703.140(b)(3) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |
| **Books, pictures, CD's, DVD's, and other non-collector art.**<br>Line from *Schedule A/B*: **8.1** | $1,000.00 | ■ | $1,000.00 | C.C.P. § 703.140(b)(3) |
| | | ☐ | 100% of fair market value, up to any applicable statutory limit | |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

| Debtor 1 | Stephen S O'Hara | Case number (if known) | |
|---|---|---|---|

| Brief description of the property and line on Schedule A/B that lists this property | Current value of the portion you own<br>Copy the value from Schedule A/B | Amount of the exemption you claim<br>Check only one box for each exemption. | Specific laws that allow exemption |
|---|---|---|---|
| **Clothing for family of 2**<br>Line from Schedule A/B: **11.1** | $1,000.00 | ■ $1,000.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(3) |
| **Non-filing spouse costume jewelry and wedding ring**<br>Line from Schedule A/B: **12.1** | $5,000.00 | ■ $1,750.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(4) |
| **Non-filing spouse costume jewelry and wedding ring**<br>Line from Schedule A/B: **12.1** | $5,000.00 | ■ $3,250.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Checking: BofA Checking**<br>Line from Schedule A/B: **17.1** | $1,000.00 | ■ $1,000.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Checking: BofA Joint Checking with Non-Filing Spouse**<br>Line from Schedule A/B: **17.2** | $500.00 | ■ $500.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Checking: Wescom CU Joint Checking with Non-Filing Spouse**<br>Line from Schedule A/B: **17.3** | $300.00 | ■ $300.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Rental: Lease Deposit**<br>Line from Schedule A/B: **22.1** | $700.00 | ■ $700.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Non-filing spouse has $27,000 remaining from a Personal Injury Settlement from prior to 2012. This asset was listed and exempted in 2012 bk filed by debtor and spouse.**<br>Line from Schedule A/B: **53.1** | $27,000.00 | ■ $25,075.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(5) |
| **Non-filing spouse has $27,000 remaining from a Personal Injury Settlement from prior to 2012. This asset was listed and exempted in 2012 bk filed by debtor and spouse.**<br>Line from Schedule A/B: **53.1** | $27,000.00 | ■ $1,925.00<br>□ 100% of fair market value, up to any applicable statutory limit | C.C.P. § 703.140(b)(11)(D) |

3. **Are you claiming a homestead exemption of more than $170,350?**
   (Subject to adjustment on 4/01/22 and every 3 years after that for cases filed on or after the date of adjustment.)

   ■ No

   □ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

       □ No

       □ Yes

**Fill in this information to identify your case:**

| Debtor 1 | Stephen S O'Hara | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the: CENTRAL DISTRICT OF CALIFORNIA

Case number (if known) _____

☐ Check if this is an amended filing

## Official Form 106D
# Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

1. Do any creditors have claims secured by your property?

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

☑ Yes. Fill in all of the information below.

### Part 1:  List All Secured Claims

| 2. List all secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name. | | Column A Amount of claim Do not deduct the value of collateral. | Column B Value of collateral that supports this claim | Column C Unsecured portion If any |
|---|---|---|---|---|
| **2.1  Mazda Capital Services** | Describe the property that secures the claim: | **$32,000.00** | **$35,000.00** | **$0.00** |
| Creditor's Name | 2020 Mazda 5,000 miles | | | |
| **POB 901076** **Fort Worth, TX 76101** | As of the date you file, the claim is: Check all that apply. | | | |
| Number, Street, City, State & Zip Code | ☐ Contingent | | | |
| | ☐ Unliquidated | | | |
| Who owes the debt? Check one. | ☐ Disputed | | | |
| | Nature of lien. Check all that apply. | | | |
| ☑ Debtor 1 only | ☐ An agreement you made (such as mortgage or secured car loan) | | | |
| ☐ Debtor 2 only | | | | |
| ☐ Debtor 1 and Debtor 2 only | ☐ Statutory lien (such as tax lien, mechanic's lien) | | | |
| ☐ At least one of the debtors and another | ☐ Judgment lien from a lawsuit | | | |
| ☐ Check if this claim relates to a community debt | ☐ Other (including a right to offset) _____ | | | |
| Date debt was incurred _____ | Last 4 digits of account number _____ | | | |

| Add the dollar value of your entries in Column A on this page. Write that number here: | **$32,000.00** |
|---|---|
| If this is the last page of your form, add the dollar value totals from all pages. Write that number here: | **$32,000.00** |

### Part 2:  List Others to Be Notified for a Debt That You Already Listed

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

| Fill in this information to identify your case: | | | |
|---|---|---|---|
| Debtor 1 | **Stephen S O'Hara** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |
| (If known) | | | |

☐ Check if this is an amended filing

## Official Form 106E/F
## Schedule E/F: Creditors Who Have Unsecured Claims    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY claims and Part 2 for creditors with NONPRIORITY claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Property (Official Form 106A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G). Do not include any creditors with partially secured claims that are listed in Schedule D: Creditors Who Have Claims Secured by Property. If more space is needed, copy the Part you need, fill it out, number the entries in the boxes on the left. Attach the Continuation Page to this page. If you have no information to report in a Part, do not file that Part. On the top of any additional pages, write your name and case number (if known).

### Part 1:    List All of Your PRIORITY Unsecured Claims

1. Do any creditors have priority unsecured claims against you?

   ☑ No. Go to Part 2.

   ☐ Yes.

### Part 2:    List All of Your NONPRIORITY Unsecured Claims

3. Do any creditors have nonpriority unsecured claims against you?

   ☐ No. You have nothing to report in this part. Submit this form to the court with your other schedules.

   ☑ Yes.

4. List all of your nonpriority unsecured claims in the alphabetical order of the creditor who holds each claim. If a creditor has more than one nonpriority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. Do not list claims already included in Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.If you have more than three nonpriority unsecured claims fill out the Continuation Page of Part 2.

| | | Total claim |
|---|---|---|
| | | |

| 4.1 | **Alvarado Smith**<br>Nonpriority Creditor's Name<br>**1 MacArthur Place Suite 200**<br>**Santa Ana, CA 92707**<br>Number Street City State Zip Code | Last 4 digits of account number ___ ___ ___ ___ | $26,992.63 |
|---|---|---|---|

When was the debt incurred? _____

As of the date you file, the claim is: Check all that apply

Who incurred the debt? Check one.

☑ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

☐ At least one of the debtors and another

☐ Check if this claim is for a community debt

Is the claim subject to offset?

☑ No

☐ Yes

☐ Contingent

☐ Unliquidated

☐ Disputed

Type of NONPRIORITY unsecured claim:

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

☐ Debts to pension or profit-sharing plans, and other similar debts

☑ Other. Specify **Legal Fees appeal of Martinez v. O'Hara matter. Business lawsuit resolved 2018.**

Debtor 1  Stephen S O'Hara

Case number (if known) _____

| 4.2 | **Teeple Hall, LLP** | Last 4 digits of account number _____ | **$247,175.59** |

Nonpriority Creditor's Name

9255 Towne Centre Drive Suite 500
San Diego, CA 92121

Number Street City State Zip Code

When was the debt incurred? _____

**Who incurred the debt?** Check one.

■ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

☐ At least one of the debtors and another

☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No

☐ Yes

**As of the date you file, the claim is:** Check all that apply

☐ Contingent

☐ Unliquidated

☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify **Legal fees incurred 2012-2017 to defend Martinez v. O'Hara business litigation matter. Default Judgment entered 11/21/19.**

---

**Part 3:** List Others to Be Notified About a Debt That You Already Listed

5. Use this page only if you have others to be notified about your bankruptcy, for a debt that you already listed in Parts 1 or 2. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the original creditor in Parts 1 or 2, then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Parts 1 or 2, list the additional creditors here. If you do not have additional persons to be notified for any debts in Parts 1 or 2, do not fill out or submit this page.

---

**Part 4:** Add the Amounts for Each Type of Unsecured Claim

6. Total the amounts of certain types of unsecured claims. This information is for statistical reporting purposes only. 28 U.S.C. §159. Add the amounts for each type of unsecured claim.

| | | | | | Total Claim |
|---|---|---|---|---|---|
| **Total claims from Part 1** | 6a. | Domestic support obligations | 6a. | $ | 0.00 |
| | 6b. | Taxes and certain other debts you owe the government | 6b. | $ | 0.00 |
| | 6c. | Claims for death or personal injury while you were intoxicated | 6c. | $ | 0.00 |
| | 6d. | Other. Add all other priority unsecured claims. Write that amount here. | 6d. | $ | 0.00 |
| | 6e. | Total Priority. Add lines 6a through 6d. | 6e. | $ | 0.00 |

| | | | | | Total Claim |
|---|---|---|---|---|---|
| **Total claims from Part 2** | 6f. | Student loans | 6f. | $ | 0.00 |
| | 6g. | Obligations arising out of a separation agreement or divorce that you did not report as priority claims | 6g. | $ | 0.00 |
| | 6h. | Debts to pension or profit-sharing plans, and other similar debts | 6h. | $ | 0.00 |
| | 6i. | Other. Add all other nonpriority unsecured claims. Write that amount here. | 6i. | $ | 274,168.22 |
| | 6j. | Total Nonpriority. Add lines 6f through 6i. | 6j. | $ | 274,168.22 |

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Stephen S O'Hara** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | | CENTRAL DISTRICT OF CALIFORNIA | |
| Case number (if known) | | | |

☐ Check if this is an amended filing

## Official Form 106G

## Schedule G: Executory Contracts and Unexpired Leases          12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the additional page, fill it out, number the entries, and attach it to this page. On the top of any additional pages, write your name and case number (if known).

1. **Do you have any executory contracts or unexpired leases?**
   ☐ No. Check this box and file this form with the court with your other schedules. You have nothing else to report on this form.
   ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B:Property* (Official Form 106 A/B).

2. **List separately each person or company with whom you have the contract or lease. Then state what each contract or lease is for (for example, rent, vehicle lease, cell phone).** See the instructions for this form in the instruction booklet for more examples of executory contracts and unexpired leases.

| Person or company with whom you have the contract or lease<br>Name, Number, Street, City, State and ZIP Code | State what the contract or lease is for |
|---|---|
| 2.1  **BMW**<br>**Box 83290**<br>**Chicago, IL 60691** | **2019 BMW 330i**<br>**$709/month** |

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Stephen S O'Hara** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |
| (if known) | | | |

☐ Check if this is an
amended filing

## Official Form 106H
## Schedule H: Your Codebtors                                          12/15

Codebtors are people or entities who are also liable for any debts you may have. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, and number the entries in the boxes on the left. Attach the Additional Page to this page. On the top of any Additional Pages, write your name and case number (if known). Answer every question.

**1. Do you have any codebtors?** (If you are filing a joint case, do not list either spouse as a codebtor.)

■ No
☐ Yes

**2. Within the last 8 years, have you lived in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, and Wisconsin.)

☐ No. Go to line 3.
■ Yes. Did your spouse, former spouse, or legal equivalent live with you at the time?

    ☐ No
    ■ Yes.

      In which community state or territory did you live?    **-NONE-**    . Fill in the name and current address of that person.

      _____
      Name of your spouse, former spouse, or legal equivalent
      Number, Street, City, State & Zip Code

**3. In Column 1, list all of your codebtors.** Do not include your spouse as a codebtor if your spouse is filing with you. List the person shown in line 2 again as a codebtor only if that person is a guarantor or cosigner. Make sure you have listed the creditor on Schedule D (Official Form 106D), Schedule E/F (Official Form 106E/F), or Schedule G (Official Form 106G). Use Schedule D, Schedule E/F, or Schedule G to fill out Column 2.

| Column 1: Your codebtor Name, Number, Street, City, State and ZIP Code | Column 2: The creditor to whom you owe the debt Check all schedules that apply: |
|---|---|
| **3.1** Name | ☐ Schedule D, line _____ <br> ☐ Schedule E/F, line _____ <br> ☐ Schedule G, line _____ |
| Number   Street <br> City          State      ZIP Code | |
| **3.2** Name | ☐ Schedule D, line _____ <br> ☐ Schedule E/F, line _____ <br> ☐ Schedule G, line _____ |
| Number   Street <br> City          State      ZIP Code | |

Fill in this information to identify your case:

| | |
|---|---|
| Debtor 1 | **Stephen S O'Hara** |
| Debtor 2<br>(Spouse, if filing) | |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number<br>(If known) | |

Check if this is:

☐ An amended filing

☐ A supplement showing postpetition chapter 13 income as of the following date:

_____
MM / DD/ YYYY

## Official Form 106I

## Schedule I: Your Income

12/15

Be as complete and accurate as possible. If two married people are filing together (Debtor 1 and Debtor 2), both are equally responsible for supplying correct information. If you are married and not filing jointly, and your spouse is living with you, include information about your spouse. If you are separated and your spouse is not filing with you, do not include information about your spouse. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:     Describe Employment**

1. **Fill in your employment information.**

   If you have more than one job, attach a separate page with information about additional employers.

   Include part-time, seasonal, or self-employed work.

   Occupation may include student or homemaker, if it applies.

| | | Debtor 1 | Debtor 2 or non-filing spouse |
|---|---|---|---|
| **Employment status** | | ■ Employed<br>☐ Not employed | ☐ Employed<br>☐ Not employed |
| Occupation | | **Broker** | |
| Employer's name | | | |
| Employer's address | | | |
| How long employed there? | | | |

**Part 2:     Give Details About Monthly Income**

**Estimate monthly income as of the date you file this form.** If you have nothing to report for any line, write $0 in the space. Include your non-filing spouse unless you are separated.

If you or your non-filing spouse have more than one employer, combine the information for all employers for that person on the lines below. If you need more space, attach a separate sheet to this form.

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 2. | List monthly gross wages, salary, and commissions (before all payroll deductions). If not paid monthly, calculate what the monthly wage would be. | 2. | $ 0.00 | $ N/A |
| 3. | Estimate and list monthly overtime pay. | 3. | +$ 0.00 | +$ N/A |
| 4. | Calculate gross income. Add line 2 + line 3. | 4. | $ 0.00 | $ N/A |

Debtor 1   **Stephen S O'Hara**            Case number *(if known)*

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| | Copy line 4 here | 4. | $ 0.00 | $ N/A |

5.   **List all payroll deductions:**

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 5a. | **Tax, Medicare, and Social Security deductions** | 5a. | $ 0.00 | $ N/A |
| 5b. | **Mandatory contributions for retirement plans** | 5b. | $ 0.00 | $ N/A |
| 5c. | **Voluntary contributions for retirement plans** | 5c. | $ 0.00 | $ N/A |
| 5d. | **Required repayments of retirement fund loans** | 5d. | $ 0.00 | $ N/A |
| 5e. | **Insurance** | 5e. | $ 0.00 | $ N/A |
| 5f. | **Domestic support obligations** | 5f. | $ 0.00 | $ N/A |
| 5g. | **Union dues** | 5g. | $ 0.00 | $ N/A |
| 5h. | **Other deductions.** Specify: | 5h.+ | $ 0.00 + | $ N/A |

6.   **Add the payroll deductions.** Add lines 5a+5b+5c+5d+5e+5f+5g+5h.    6.    $ 0.00    $ N/A

7.   **Calculate total monthly take-home pay.** Subtract line 6 from line 4.    7.    $ 0.00    $ N/A

8.   **List all other income regularly received:**

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 8a. | **Net income from rental property and from operating a business, profession, or farm** <br> Attach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income. | 8a. | $ 4,300.00 | $ N/A |
| 8b. | **Interest and dividends** | 8b. | $ 0.00 | $ N/A |
| 8c. | **Family support payments that you, a non-filing spouse, or a dependent regularly receive** <br> Include alimony, spousal support, child support, maintenance, divorce settlement, and property settlement. | 8c. | $ 0.00 | $ N/A |
| 8d. | **Unemployment compensation** | 8d. | $ 0.00 | $ N/A |
| 8e. | **Social Security** | 8e. | $ 2,000.00 | $ N/A |
| 8f. | **Other government assistance that you regularly receive** <br> Include cash assistance and the value (if known) of any non-cash assistance that you receive, such as food stamps (benefits under the Supplemental Nutrition Assistance Program) or housing subsidies. <br> Specify: | 8f. | $ 0.00 | $ N/A |
| 8g. | **Pension or retirement income** | 8g. | $ 0.00 | $ N/A |
| 8h. | **Other monthly income.** Specify: | 8h.+ | $ 0.00 + | $ N/A |

9.   **Add all other income.** Add lines 8a+8b+8c+8d+8e+8f+8g+8h.    9.    $ 6,300.00    $ N/A

10.   **Calculate monthly income.** Add line 7 + line 9.    10.    $ 6,300.00 + $ N/A = $ 6,300.00 <br> Add the entries in line 10 for Debtor 1 and Debtor 2 or non-filing spouse.

11.   **State all other regular contributions to the expenses that you list in *Schedule J*.** <br> Include contributions from an unmarried partner, members of your household, your dependents, your roommates, and other friends or relatives. <br> Do not include any amounts already included in lines 2-10 or amounts that are not available to pay expenses listed in *Schedule J*. <br> Specify:        11. +$ 0.00

12.   **Add the amount in the last column of line 10 to the amount in line 11.** The result is the combined monthly income. <br> Write that amount on the *Summary of Schedules* and *Statistical Summary of Certain Liabilities* and Related *Data*, if it applies      12.    $ 6,300.00 <br>              **Combined monthly income**

13.   **Do you expect an increase or decrease within the year after you file this form?**

☐ No.

■ Yes. Explain:    Debtor is recovering from a major heart attack in mid-2019. Income figures are estimates of commissions that might be earned in 2020 forward. Debtor is forced to reduce work load considerably due to health concerns.

Fill in this information to identify your case:

| | |
|---|---|
| Debtor 1 | **Stephen S O'Hara** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number (If known) | |

Check if this is:

☐ An amended filing

☐ A supplement showing postpetition chapter 13 expenses as of the following date:

_____
MM / DD / YYYY

## Official Form 106J
## Schedule J: Your Expenses

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1: Describe Your Household

1. **Is this a joint case?**

   ■ No. Go to line 2.

   ☐ Yes. **Does Debtor 2 live in a separate household?**

       ☐ No

       ☐ Yes. Debtor 2 must file Official Form 106J-2, *Expenses for Separate Household* of Debtor 2.

2. **Do you have dependents?** ■ No

| | | | Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
|---|---|---|---|---|---|
| Do not list Debtor 1 and Debtor 2. | ☐ Yes. | Fill out this information for each dependent.............. | | | |
| Do not state the dependents names. | | | | | ☐ No ☐ Yes |
| | | | | | ☐ No ☐ Yes |
| | | | | | ☐ No ☐ Yes |
| | | | | | ☐ No ☐ Yes |
| | | | | | ☐ No ☐ Yes |

3. **Do your expenses include expenses of people other than yourself and your dependents?**

   ■ No

   ☐ Yes

### Part 2: Estimate Your Ongoing Monthly Expenses

Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental *Schedule J*, check the box at the top of the form and fill in the applicable date.

Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on *Schedule I: Your Income* (Official Form 106I.)

**Your expenses**

4. **The rental or home ownership expenses for your residence.** Include first mortgage payments and any rent for the ground or lot.

   4. $ 3,100.00

   **If not included in line 4:**

   | | | | |
   |---|---|---|---|
   | 4a. | Real estate taxes | 4a. $ | 0.00 |
   | 4b. | Property, homeowner's, or renter's insurance | 4b. $ | 10.00 |
   | 4c. | Home maintenance, repair, and upkeep expenses | 4c. $ | 0.00 |
   | 4d. | Homeowner's association or condominium dues | 4d. $ | 0.00 |

5. **Additional mortgage payments for your residence,** such as home equity loans

   5. $ 0.00

Debtor 1  **Stephen S O'Hara**                                          Case number (if known)

| | | | |
|---|---|---|---|
| 6. | **Utilities:** | | |
| | 6a.  Electricity, heat, natural gas | 6a.  $ | 60.00 |
| | 6b.  Water, sewer, garbage collection | 6b.  $ | 50.00 |
| | 6c.  Telephone, cell phone, Internet, satellite, and cable services | 6c.  $ | 100.00 |
| | 6d.  Other. Specify: | 6d.  $ | 0.00 |
| 7. | **Food and housekeeping supplies** | 7.  $ | 400.00 |
| 8. | **Childcare and children's education costs** | 8.  $ | 0.00 |
| 9. | **Clothing, laundry, and dry cleaning** | 9.  $ | 30.00 |
| 10. | **Personal care products and services** | 10.  $ | 100.00 |
| 11. | **Medical and dental expenses** | 11.  $ | 100.00 |
| 12. | **Transportation.** Include gas, maintenance, bus or train fare. Do not include car payments. | 12.  $ | 300.00 |
| 13. | **Entertainment, clubs, recreation, newspapers, magazines, and books** | 13.  $ | 50.00 |
| 14. | **Charitable contributions and religious donations** | 14.  $ | 0.00 |
| 15. | **Insurance.** Do not include insurance deducted from your pay or included in lines 4 or 20. | | |
| | 15a.  Life insurance | 15a.  $ | 250.00 |
| | 15b.  Health insurance | 15b.  $ | 300.00 |
| | 15c.  Vehicle insurance | 15c.  $ | 175.00 |
| | 15d.  Other insurance. Specify: | 15d.  $ | 0.00 |
| 16. | **Taxes.** Do not include taxes deducted from your pay or included in lines 4 or 20. Specify: | 16.  $ | 0.00 |
| 17. | **Installment or lease payments:** | | |
| | 17a.  Car payments for Vehicle 1 | 17a.  $ | 720.00 |
| | 17b.  Car payments for Vehicle 2 | 17b.  $ | 535.00 |
| | 17c.  Other. Specify: | 17c.  $ | 0.00 |
| | 17d.  Other. Specify: | 17d.  $ | 0.00 |
| 18. | **Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5, *Schedule I, Your Income* (Official Form 106I).** | 18.  $ | 0.00 |
| 19. | **Other payments you make to support others who do not live with you.** Specify: | $ | 0.00 |
| 20. | **Other real property expenses not included in lines 4 or 5 of this form or on *Schedule I: Your Income.*** | | |
| | 20a.  Mortgages on other property | 20a.  $ | 0.00 |
| | 20b.  Real estate taxes | 20b.  $ | 0.00 |
| | 20c.  Property, homeowner's, or renter's insurance | 20c.  $ | 0.00 |
| | 20d.  Maintenance, repair, and upkeep expenses | 20d.  $ | 0.00 |
| | 20e.  Homeowner's association or condominium dues | 20e.  $ | 0.00 |
| 21. | **Other: Specify:** | 21.  +$ | 0.00 |

| | | | |
|---|---|---|---|
| 22. | **Calculate your monthly expenses** | | |
| | 22a.  Add lines 4 through 21. | $ | 6,280.00 |
| | 22b.  Copy line 22 (monthly expenses for Debtor 2), if any, from Official Form 106J-2 | $ | |
| | 22c.  Add line 22a and 22b.  The result is your monthly expenses. | $ | 6,280.00 |

| | | | |
|---|---|---|---|
| 23. | **Calculate your monthly net income.** | | |
| | 23a.  Copy line 12 *(your combined monthly income)* from Schedule I. | 23a.  $ | 6,300.00 |
| | 23b.  Copy your monthly expenses from line 22c above. | 23b.  -$ | 6,280.00 |
| | 23c.  Subtract your monthly expenses from your monthly income. The result is your *monthly net income.* | 23c.  $ | 20.00 |

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**
For example, do you expect to finish paying for your car loan within the year or do you expect your mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

■ No.
☐ Yes.  |  Explain here:

| Fill in this information to identify your case: |
| --- |

| Debtor 1 | Stephen S O'Hara | | |
| --- | --- | --- | --- |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |
| (if known) | | | |

☐ Check if this is an amended filing

## Official Form 106Dec
# Declaration About an Individual Debtor's Schedules

12/15

If two married people are filing together, both are equally responsible for supplying correct information.

You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Sign Below

Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?

■ No

☐ Yes. Name of person _____     Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119)

Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.

X _____     X _____
   Stephen S O'Hara                 Signature of Debtor 2
   Signature of Debtor 1

   Date   **May 14, 2020**            Date _____

Official Form 106Dec          **Declaration About an Individual Debtor's Schedules**

| Fill in this information to identify your case: | |
|---|---|

| Debtor 1 | **Stephen S O'Hara** | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |
| (If known) | | | |

☐ Check if this is an
   amended filing

## Official Form 107
## Statement of Financial Affairs for Individuals Filing for Bankruptcy           4/19

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:**   **Give Details About Your Marital Status and Where You Lived Before**

1.   **What is your current marital status?**

   ■ Married
   ☐ Not married

2.   **During the last 3 years, have you lived anywhere other than where you live now?**

   ■ No
   ☐ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1 Prior Address: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|

3.   **Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

   ☐ No
   ■ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

**Part 2**   **Explain the Sources of Your Income**

4.   **Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
   Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
   If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

   ☐ No
   ■ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income Check all that apply. | Gross income (before deductions and exclusions) | Sources of income Check all that apply. | Gross income (before deductions and exclusions) |
| From January 1 of current year until the date you filed for bankruptcy: | ☐ Wages, commissions, bonuses, tips | $0.00 | ☐ Wages, commissions, bonuses, tips | |
| | ■ Operating a business | | ☐ Operating a business | |

Debtor 1    Stephen S O'Hara _____    Case number (if known) _____

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income<br>Check all that apply. | Gross income<br>(before deductions and<br>exclusions) | Sources of income<br>Check all that apply. | Gross income<br>(before deductions<br>and exclusions) |
| For last calendar year:<br>(January 1 to December 31, 2019 ) | ☐ Wages, commissions,<br>bonuses, tips | $0.00 | ☐ Wages, commissions,<br>bonuses, tips | |
| | ■ Operating a business | | ☐ Operating a business | |
| For the calendar year before that:<br>(January 1 to December 31, 2018 ) | ☐ Wages, commissions,<br>bonuses, tips | $41,103.00 | ☐ Wages, commissions,<br>bonuses, tips | |
| | ■ Operating a business | | ☐ Operating a business | |

5.  **Did you receive any other income during this year or the two previous calendar years?**
    Include income regardless of whether that income is taxable. Examples of other income are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

    List each source and the gross income from each source separately. Do not include income that you listed in line 4.

    ☐  No
    ■  Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income<br>Describe below. | Gross income from<br>each source<br>(before deductions and<br>exclusions) | Sources of income<br>Describe below. | Gross income<br>(before deductions<br>and exclusions) |
| From January 1 of current year until<br>the date you filed for bankruptcy: | Social Security<br>Benefits | $2,000.00 | | |
| For last calendar year:<br>(January 1 to December 31, 2019 ) | Social Security<br>Benefits | $27,500.00 | | |
| For the calendar year before that:<br>(January 1 to December 31, 2018 ) | Social Security<br>Benefits | $27,132.00 | | |

---

**Part 3:    List Certain Payments You Made Before You Filed for Bankruptcy**

6.  **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

    ■  No.  **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** Consumer debts are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

    During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $6,825* or more?

    ■  No.    Go to line 7.

    ☐  Yes    List below each creditor to whom you paid a total of $6,825* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.
    * Subject to adjustment on 4/01/22 and every 3 years after that for cases filed on or after the date of adjustment.

    ☐  Yes.  **Debtor 1 or Debtor 2 or both have primarily consumer debts.**
    During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

    ☐  No.    Go to line 7.

    ☐  Yes    List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                                                                  Best Case Bankruptcy

Debtor 1    Stephen S O'Hara
           Case number *(if known)*

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|

7. **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
   *Insiders include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.*

   ■ No
   ☐ Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|

8. **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
   Include payments on debts guaranteed or cosigned by an insider.

   ■ No
   ☐ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment Include creditor's name |
|---|---|---|---|---|

**Part 4:    Identify Legal Actions, Repossessions, and Foreclosures**

9. **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
   List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

   ☐ No
   ■ Yes. Fill in the details.

| Case title Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| Teeple Hall v. O'Hara 37-2018-00047552-CU-BC-CTL | Collections | | ■ Pending ☐ On appeal ☐ Concluded |
| Martinez v. O'Hara | OCSC-Case# unknown | | ☐ Pending ☐ On appeal ■ Concluded **Resolved-Judgment for Debtor** |

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
    Check all that apply and fill in the details below.

    ■ No. Go to line 11.
    ☐ Yes. Fill in the information below.

| Creditor Name and Address | Describe the Property Explain what happened | Date | Value of the property |
|---|---|---|---|

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**
    ■ No
    ☐ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

Debtor 1  **Stephen S O'Hara**                                                        Case number *(if known)*

---

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

☑ No
☐ Yes

---

**Part 5:**  **List Certain Gifts and Contributions**

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

☑ No
☐ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person<br><br>Person to Whom You Gave the Gift and Address: | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|

14. **Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

☑ No
☐ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that total more than $600<br>Charity's Name<br>Address (Number, Street, City, State and ZIP Code) | Describe what you contributed | Dates you contributed | Value |
|---|---|---|---|

---

**Part 6:**  **List Certain Losses**

15. **Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?**

☑ No
☐ Yes. Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss<br>Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property*. | Date of your loss | Value of property lost |
|---|---|---|---|

---

**Part 7:**  **List Certain Payments or Transfers**

16. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**
Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

☐ No
☑ Yes. Fill in the details.

| Person Who Was Paid<br>Address<br>Email or website address<br>Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| Curd, Galindo & Smith, LLP<br>301 E. Ocean Blvd. Suite 1700<br>Long Beach, CA 90802 | Check | 1/15/2019 | $5,335.00 |

---

17. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

☑ No
☐ Yes. Fill in the details.

| Person Who Was Paid<br>Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

---

18. **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property**

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                                      Best Case Bankruptcy

Debtor 1    Stephen S O'Hara             Case number *(if known)*

---

transferred in the ordinary course of your business or financial affairs?
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

☐   No
■   Yes. Fill in the details.

| Person Who Received Transfer Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|
| Mazda Deaqler | Traded in a 2016 Ford Escape to purchase/don payment on Mazda | | 1/2020 |

19. **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices*.)

■   No
☐   Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

---

**Part 8:    List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units**

20. **Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.

■   No
☐   Yes. Fill in the details.

| Name of Financial Institution and Address (Number, Street, City, State and ZIP Code) | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

21. **Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?**

☐   No
■   Yes. Fill in the details.

| Name of Financial Institution Address (Number, Street, City, State and ZIP Code) | Who else had access to it? Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|
| Bank of America Ladera Ranch, CA | Debtor and wife | Family photos and important papers. | ☐ No<br>■ Yes |

22. **Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?**

■   No
☐   Yes. Fill in the details.

| Name of Storage Facility Address (Number, Street, City, State and ZIP Code) | Who else has or had access to it? Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

---

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com       Best Case Bankruptcy

Debtor 1    **Stephen S O'Hara**                                                                     Case number *(if known)*

---

| **Part 9:** | **Identify Property You Hold or Control for Someone Else** |
|---|---|

23. **Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone.**

   ■ No
   ☐ Yes. Fill in the details.

| Owner's Name <br> **Address** (Number, Street, City, State and ZIP Code) | Where is the property? <br> (Number, Street, City, State and ZIP Code) | Describe the property | Value |
|---|---|---|---|

| **Part 10:** | **Give Details About Environmental Information** |
|---|---|

For the purpose of Part 10, the following definitions apply:

■ *Environmental law* means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.

■ *Site* means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.

■ *Hazardous material* means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.

Report all notices, releases, and proceedings that you know about, regardless of when they occurred.

24. **Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**

   ■ No
   ☐ Yes. Fill in the details.

| Name of site <br> **Address** (Number, Street, City, State and ZIP Code) | Governmental unit <br> **Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

25. **Have you notified any governmental unit of any release of hazardous material?**

   ■ No
   ☐ Yes. Fill in the details.

| Name of site <br> **Address** (Number, Street, City, State and ZIP Code) | Governmental unit <br> **Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

26. **Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

   ■ No
   ☐ Yes. Fill in the details.

| Case Title <br> Case Number | Court or agency <br> Name <br> **Address** (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|

| **Part 11:** | **Give Details About Your Business or Connections to Any Business** |
|---|---|

27. **Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**

   ■ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

   ☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

   ☐ A partner in a partnership

   ☐ An officer, director, or managing executive of a corporation

   ☐ An owner of at least 5% of the voting or equity securities of a corporation

---

Debtor 1    **Stephen S O'Hara**                                    Case number (*if known*)

☐    No. None of the above applies. Go to Part 12.

■    Yes. Check all that apply above and fill in the details below for each business.

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br><br>Name of accountant or bookkeeper | Employer identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| OCRE, Inc | Real Estate Broker | EIN: |
|  | Troy Barnett, CPA<br>Barnett & Co.<br>30212 Tomas #200<br>Rancho Santa Margarita, CA<br>92688 | From-To   October 2012 to Present |

28.    **Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.**

■    No
☐    Yes. Fill in the details below.

| Name,<br>Address<br>(Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|
|  |  |

### Part 12:   Sign Below

I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

X _____
**Stephen S O'Hara**
Signature of Debtor 1

Signature of Debtor 2

Date    **May 14, 2020**                        Date    _____

Did you attach additional pages to *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* (Official Form 107)?
■ No
☐ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?
■ No
☐ Yes. Name of Person _____. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

| Fill in this information to identify your case: | | | |
|---|---|---|---|
| Debtor 1 | **Stephen S O'Hara** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | | |
| Case number | | | |
| (if known) | | | |

☐ Check if this is an
amended filing

## Official Form 108
## Statement of Intention for Individuals Filing Under Chapter 7   12/15

If you are an individual filing under chapter 7, you must fill out this form if:
■ creditors have claims secured by your property, or
■ you have leased personal property and the lease has not expired.

You must file this form with the court within 30 days after you file your bankruptcy petition or by the date set for the meeting of creditors, whichever is earlier, unless the court extends the time for cause. You must also send copies to the creditors and lessors you list on the form

If two married people are filing together in a joint case, both are equally responsible for supplying correct information. Both debtors must sign and date the form.

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known).

### Part 1:   List Your Creditors Who Have Secured Claims

1. For any creditors that you listed in Part 1 of Schedule D: Creditors Who Have Claims Secured by Property (Official Form 106D), fill in the information below.

| Identify the creditor and the property that is collateral | What do you intend to do with the property that secures a debt? | Did you claim the property as exempt on Schedule C? |
|---|---|---|
| Creditor's name: **Mazda Capital Services** <br><br> Description of property securing debt: **2020 Mazda 5,000 miles** | ☐ Surrender the property. <br> ☐ Retain the property and redeem it. <br> ☐ Retain the property and enter into a *Reaffirmation Agreement.* <br> ■ Retain the property and [explain]: **Retain and Pay Pursuant to Contract** | ☐ No <br><br> ■ Yes |

### Part 2:   List Your Unexpired Personal Property Leases

For any unexpired personal property lease that you listed in Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G), fill in the information below. Do not list real estate leases. Unexpired leases are leases that are still in effect; the lease period has not yet ended. You may assume an unexpired personal property lease if the trustee does not assume it. 11 U.S.C. § 365(p)(2).

| Describe your unexpired personal property leases | Will the lease be assumed? |
|---|---|
| Lessor's name: **BMW** | ☐ No <br><br> ■ Yes |
| Description of leased Property: **2019 BMW 330i** <br> **$709/month** | |

Debtor 1    **Stephen S O'Hara**                                    Case number (*if known*)

| Part 3: | Sign Below |

Under penalty of perjury, I declare that I have indicated my intention about any property of my estate that secures a debt and any personal property that is subject to an unexpired lease.

X _____              X _____
**Stephen S O'Hara**                                Signature of Debtor 2
Signature of Debtor 1

Date    **May 14, 2020** _____              Date _____

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com              Best Case Bankruptcy

# Notice Required by 11 U.S.C. § 342(b) for
# Individuals Filing for Bankruptcy (Form 2010)

**This notice is for you if:**

**You are an individual filing for bankruptcy,** and

**Your debts are primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

### The types of bankruptcy that are available to individuals

Individuals who meet the qualifications may file under one of four different chapters of Bankruptcy Code:

    Chapter 7 - Liquidation

    Chapter 11 - Reorganization

    Chapter 12 - Voluntary repayment plan
            for family farmers or
            fishermen

    Chapter 13 - Voluntary repayment plan
            for individuals with regular
            income

**You should have an attorney review your decision to file for bankruptcy and the choice of chapter.**

| Chapter 7: | | Liquidation |
|---|---|---|
| | $245 | filing fee |
| | $75 | administrative fee |
| + | $15 | trustee surcharge |
| | $335 | total fee |

Chapter 7 is for individuals who have financial difficulty preventing them from paying their debts and who are willing to allow their nonexempt property to be used to pay their creditors. The primary purpose of filing under chapter 7 is to have your debts discharged. The bankruptcy discharge relieves you after bankruptcy from having to pay many of your pre-bankruptcy debts. Exceptions exist for particular debts, and liens on property may still be enforced after discharge. For example, a creditor may have the right to foreclose a home mortgage or repossess an automobile.

However, if the court finds that you have committed certain kinds of improper conduct described in the Bankruptcy Code, the court may deny your discharge.

You should know that even if you file chapter 7 and you receive a discharge, some debts are not discharged under the law. Therefore, you may still be responsible to pay:

    most taxes;

    most student loans;

    domestic support and property settlement obligations;

most fines, penalties, forfeitures, and criminal restitution obligations; and

certain debts that are not listed in your bankruptcy papers.

You may also be required to pay debts arising from:

fraud or theft;

fraud or defalcation while acting in breach of fiduciary capacity;

intentional injuries that you inflicted; and

death or personal injury caused by operating a motor vehicle, vessel, or aircraft while intoxicated from alcohol or drugs.

If your debts are primarily consumer debts, the court can dismiss your chapter 7 case if it finds that you have enough income to repay creditors a certain amount. You must file *Chapter 7 Statement of Your Current Monthly Income* (Official Form 122A–1) if you are an individual filing for bankruptcy under chapter 7. This form will determine your current monthly income and compare whether your income is more than the median income that applies in your state.

If your income is not above the median for your state, you will not have to complete the other chapter 7 form, the *Chapter 7 Means Test Calculation* (Official Form 122A–2).

If your income is above the median for your state, you must file a second form —the *Chapter 7 Means Test Calculation* (Official Form 122A–2). The calculations on the form— sometimes called the *Means Test*—deduct from your income living expenses and payments on certain debts to determine any amount available to pay unsecured creditors. If

your income is more than the median income for your state of residence and family size, depending on the results of the *Means Test*, the U.S. trustee, bankruptcy administrator, or creditors can file a motion to dismiss your case under § 707(b) of the Bankruptcy Code. If a motion is filed, the court will decide if your case should be dismissed. To avoid dismissal, you may choose to proceed under another chapter of the Bankruptcy Code.

If you are an individual filing for chapter 7 bankruptcy, the trustee may sell your property to pay your debts, subject to your right to exempt the property or a portion of the proceeds from the sale of the property. The property, and the proceeds from property that your bankruptcy trustee sells or liquidates that you are entitled to, is called *exempt property*. Exemptions may enable you to keep your home, a car, clothing, and household items or to receive some of the proceeds if the property is sold.

Exemptions are not automatic. To exempt property, you must list it on *Schedule C: The Property You Claim as Exempt* (Official Form 106C). If you do not list the property, the trustee may sell it and pay all of the proceeds to your creditors.

## Chapter 11: Reorganization

|   | | |
|---|---|---|
|   | $1,167 | filing fee |
| + | $550 | administrative fee |
|   | $1,717 | total fee |

Chapter 11 is often used for reorganizing a business, but is also available to individuals. The provisions of chapter 11 are too complicated to summarize briefly.

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

**Read These Important Warnings**

Because bankruptcy can have serious long-term financial and legal consequences, including loss of your property, you should hire an attorney and carefully consider all of your options before you file. Only an attorney can give you legal advice about what can happen as a result of filing for bankruptcy and what your options are. If you do file for bankruptcy, an attorney can help you fill out the forms properly and protect you, your family, your home, and your possessions.

Although the law allows you to represent yourself in bankruptcy court, you should understand that many people find it difficult to represent themselves successfully. The rules are technical, and a mistake or inaction may harm you. If you file without an attorney, you are still responsible for knowing and following all of the legal requirements.

You should not file for bankruptcy if you are not eligible to file or if you do not intend to file the necessary documents.

Bankruptcy fraud is a serious crime; you could be fined and imprisoned if you commit fraud in your bankruptcy case. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Chapter 12: Repayment plan for family farmers or fishermen

|   | | |
|---|-------|--------------------|
|   | $200  | filing fee         |
| + | $75   | administrative fee |
|   | $275  | total fee          |

Similar to chapter 13, chapter 12 permits family farmers and fishermen to repay their debts over a period of time using future earnings and to discharge some debts that are not paid.

### Chapter 13: Repayment plan for individuals with regular income

|   | | |
|---|-------|--------------------|
|   | $235  | filing fee         |
| + | $75   | administrative fee |
|   | $310  | total fee          |

Chapter 13 is for individuals who have regular income and would like to pay all or part of their debts in installments over a period of time and to discharge some debts that are not paid. You are eligible for chapter 13 only if your debts are not more than certain dollar amounts set forth in 11 U.S.C. § 109.

Under chapter 13, you must file with the court a plan to repay your creditors all or part of the money that you owe them, usually using your future earnings. If the court approves your plan, the court will allow you to repay your debts, as adjusted by the plan, within 3 years or 5 years, depending on your income and other factors.

After you make all the payments under your plan, many of your debts are discharged. The debts that are not discharged and that you may still be responsible to pay include:

domestic support obligations,

most student loans,

certain taxes,

debts for fraud or theft,

debts for fraud or defalcation while acting in a fiduciary capacity,

most criminal fines and restitution obligations,

certain debts that are not listed in your bankruptcy papers,

certain debts for acts that caused death or personal injury, and

certain long-term secured debts.

**Warning: File Your Forms on Time**

Section 521(a)(1) of the Bankruptcy Code requires that
you promptly file detailed information about your
creditors, assets, liabilities, income, expenses and
general financial condition. The court may dismiss your
bankruptcy case if you do not file this information within
the deadlines set by the Bankruptcy Code, the
Bankruptcy Rules, and the local rules of the court.

For more information about the documents and
their deadlines, go to:
http://www.uscourts.gov/bkforms/bankruptcy_form
s.html#procedure.

**Bankruptcy crimes have serious consequences**

If you knowingly and fraudulently conceal assets
or make a false oath or statement under penalty
of perjury—either orally or in writing—in
connection with a bankruptcy case, you may be
fined, imprisoned, or both.

All information you supply in connection with a
bankruptcy case is subject to examination by the
Attorney General acting through the Office of the
U.S. Trustee, the Office of the U.S. Attorney, and
other offices and employees of the U.S.
Department of Justice.

**Make sure the court has your mailing address**

The bankruptcy court sends notices to the mailing
address you list on *Voluntary Petition for Individuals
Filing for Bankruptcy* (Official Form 101). To ensure
that you receive information about your case,
Bankruptcy Rule 4002 requires that you notify the court
of any changes in your address.

A married couple may file a bankruptcy case
together—called a *joint case*. If you file a joint case and
each spouse lists the same mailing address on the
bankruptcy petition, the bankruptcy court generally will
mail you and your spouse one copy of each notice,
unless you file a statement with the court asking that
each spouse receive separate copies.

**Understand which services you could receive from
credit counseling agencies**

The law generally requires that you receive a credit
counseling briefing from an approved credit counseling
agency. 11 U.S.C. § 109(h). If you are filing a joint
case, both spouses must receive the briefing. With
limited exceptions, you must receive it within the 180
days *before* you file your bankruptcy petition. This
briefing is usually conducted by telephone or on the
Internet.

In addition, after filing a bankruptcy case, you generally
must complete a financial management instructional
course before you can receive a discharge. If you are
filing a joint case, both spouses must complete the
course.

You can obtain the list of agencies approved to provide
both the briefing and the instructional course from:
http://justice.gov/ust/eo/hapcpa/ccde/cc_approved.html
.

In Alabama and North Carolina, go to:
http://www.uscourts.gov/FederalCourts/Bankruptcy/
BankruptcyResources/ApprovedCredit
AndDebtCounselors.aspx.

If you do not have access to a computer, the clerk of
the bankruptcy court may be able to help you obtain
the list.

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## Central District of California

In re  **Stephen S O'Hara**

_____  Case No. _____

Debtor(s)                    Chapter    **7**

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1. Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

   ■  **FLAT FEE**

   For legal services, I have agreed to accept _____  $          **5,000.00**

   Prior to the filing of this statement I have received _____  $          **5,000.00**

   Balance Due _____  $              **0.00**

   ☐  **RETAINER**

   For legal services, I have agreed to accept and received a retainer of _____  $  _____

   The undersigned shall bill against the retainer at an hourly rate of _____  $  _____
   [Or attach firm hourly rate schedule.] Debtor(s) have agreed to pay all Court approved
   fees and expenses exceeding the amount of the retainer.

2. The source of the compensation paid to me was:

   ■  Debtor      ☐  Other (specify):

3. The source of compensation to be paid to me is:

   ■  Debtor      ☐  Other (specify):

4. ■  I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

   ☐  I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

5. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
   b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
   c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
   d. [Other provisions as needed]
      **Negotiations with secured creditors to reduce to market value; exemption planning; preparation and filing of reaffirmation agreements and applications as needed; preparation and filing of motions pursuant to 11 USC 522(f)(2)(A) for avoidance of liens on household goods.**

6. By agreement with the debtor(s), the above-disclosed fee does not include the following service:
      **Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding.**

In re **Stephen S O'Hara**                                                Case No.

_____
Debtor(s)

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)
(Continuation Sheet)

| CERTIFICATION |
|---|
|  |

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

**May 14, 2020**
_____
*Date*

**Jeffrey B. Smith 150095**
*Signature of Attorney*
**Curd, Galindo & Smith, LLP**
**301 E. Ocean Blvd. Suite 1700**
**Long Beach, CA 90802**
**562-624-1177   Fax: 562-624-1178**
**jsmith@cgsattys.com**
*Name of law firm*

| Fill in this information to identify your case: | Check one box only as directed in this form and in Form 122A-1Supp: |
|---|---|

**Debtor 1**    Stephen S O'Hara

**Debtor 2**
(Spouse, if filing)

United States Bankruptcy Court for the:   Central District of California

**Case number**
(if known)

- ☑ 1. There is no presumption of abuse
- ☐ 2. The calculation to determine if a presumption of abuse applies will be made under *Chapter 7 Means Test Calculation* (Official Form 122A-2).
- ☐ 3. The Means Test does not apply now because of qualified military service but it could apply later.

☐ Check if this is an amended filing

## Official Form 122A - 1
## Chapter 7 Statement of Your Current Monthly Income
04/20

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for being accurate. If more space is needed, attach a separate sheet to this form. Include the line number to which the additional information applies. On the top of any additional pages, write your name and case number (if known). If you believe that you are exempted from a presumption of abuse because you do not have primarily consumer debts or because of qualifying military service, complete and file *Statement of Exemption from Presumption of Abuse Under § 707(b)(2)* (Official Form 122A-1Supp) with this form.

### Part 1:   Calculate Your Current Monthly Income

1. **What is your marital and filing status?** Check one only.

   ☐ **Not married.** Fill out Column A, lines 2-11.

   ☐ **Married and your spouse is filing with you.** Fill out both Columns A and B, lines 2-11.

   ☐ **Married and your spouse is NOT filing with you.** You and your spouse are:

       ☐ **Living in the same household and are not legally separated.** Fill out both Columns A and B, lines 2-11.

       ☐ **Living separately or are legally separated.** Fill out Column A, lines 2-11; do not fill out Column B. By checking this box, you declare under penalty of perjury that you and your spouse are legally separated under nonbankruptcy law that applies or that you and your spouse are living apart for reasons that do not include evading the Means Test requirements. 11 U.S.C § 707(b)(7)(B).

Fill in the average monthly income that you received from all sources, derived during the 6 full months before you file this bankruptcy case. 11 U.S.C. § 101(10A). For example, if you are filing on September 15, the 6-month period would be March 1 through August 31. If the amount of your monthly income varied during the 6 months, add the income for all 6 months and divide the total by 6. Fill in the result. Do not include any income amount more than once. For example, if both spouses own the same rental property, put the income from that property in one column only. If you have nothing to report for any line, write $0 in the space.

| | Column A<br>Debtor 1 | Column B<br>Debtor 2 or<br>non-filing spouse |
|---|---|---|
| 2. **Your gross wages, salary, tips, bonuses, overtime, and commissions** (before all payroll deductions). | $ | $ |
| 3. **Alimony and maintenance payments.** Do not include payments from a spouse if Column B is filled in. | $ | $ |
| 4. **All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support.** Include regular contributions from an unmarried partner, members of your household, your dependents, parents, and roommates. Include regular contributions from a spouse only if Column B is not filled in. Do not include payments you listed on line 3. | $ | $ |

5. **Net income from operating a business, profession, or farm**

| | Debtor 1 | | |
|---|---|---|---|
| Gross receipts (before all deductions) | $ | | |
| Ordinary and necessary operating expenses | -$ | | |
| Net monthly income from a business, profession, or farm $ | | Copy here -> $ | $ |

6. **Net income from rental and other real property**

| | Debtor 1 | | |
|---|---|---|---|
| Gross receipts (before all deductions) | $ | | |
| Ordinary and necessary operating expenses | -$ | | |
| Net monthly income from rental or other real property $ | | Copy here -> $ | $ |

| 7. **Interest, dividends, and royalties** | $ | $ |
|---|---|---|

Debtor 1  **Stephen S O'Hara** _____    Case number (*if known*) _____

| | | Column A Debtor 1 | Column B Debtor 2 or non-filing spouse |
|---|---|---|---|

**8. Unemployment compensation** | | $ _____ | $ _____

Do not enter the amount if you contend that the amount received was a benefit under the Social Security Act. Instead, list it here:

For you ........................................................... $ _____

For your spouse _____ $ _____

**9. Pension or retirement income.** Do not include any amount received that was a benefit under the Social Security Act. Also, except as stated in the next sentence, do not include any compensation, pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If you received any retired pay paid under chapter 61 of title 10, then include that pay only to the extent that it does not exceed the amount of retired pay to which you would otherwise be entitled if retired under any provision of title 10 other than chapter 61 of that title. | $ _____ | $ _____

**10. Income from all other sources not listed above.** Specify the source and amount. Do not include any benefits received under the Social Security Act; payments made under the Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID-19); payments received as a victim of a war crime, a crime against humanity, or international or domestic terrorism; or compensation pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If necessary, list other sources on a separate page and put the total below..

_____ | $ _____ | $ _____

_____ | $ _____ | $ _____

Total amounts from separate pages, if any. | + $ _____ | $ _____

**11. Calculate your total current monthly income.** Add lines 2 through 10 for each column. Then add the total for Column A to the total for Column B. | $ _____ | + $ _____ | = | $ _____

Total current monthly income

---

**Part 2:    Determine Whether the Means Test Applies to You**

**12. Calculate your current monthly income for the year.** Follow these steps:

12a. Copy your total current monthly income from line 11 ................. Copy line 11 here=> | $ _____

Multiply by 12 (the number of months in a year) | x 12

12b. The result is your annual income for this part of the form | 12b. | $ _____

**13. Calculate the median family income that applies to you.** Follow these steps:

Fill in the state in which you live. [ _____ ]

Fill in the number of people in your household. [ _____ ]

Fill in the median family income for your state and size of household. ............... | 13. | $ _____

To find a list of applicable median income amounts, go online using the link specified in the separate instructions for this form. This list may also be available at the bankruptcy clerk's office.

**14. How do the lines compare?**

14a.  ☐  Line 12b is less than or equal to line 13. On the top of page 1, check box 1, *There is no presumption of abuse.*
Go to Part 3. Do NOT fill out or file Official Form 122A-2.

14b.  ☐  Line 12b is more than line 13. On the top of page 1, check box 2, *The presumption of abuse is determined by Form 122A-2.*
Go to Part 3 and fill out Form 122A-2.

---

**Part 3:    Sign Below**

By signing here, I declare under penalty of perjury that the information on this statement and in any attachments is true and correct.

X _____
Stephen S O'Hara

Official Form 122A-1        **Chapter 7 Statement of Your Current Monthly Income**        page 2

Debtor 1  **Stephen S O'Hara**                                          Case number (*if known*)

Signature of Debtor 1

Date  **May 14, 2020**
      MM / DD  / YYYY

If you checked line 14a, do NOT fill out or file Form 122A-2.

If you checked line 14b, fill out Form 122A-2 and file it with this form.

Fill in this information to identify your case:

| | |
|---|---|
| Debtor 1 | **Stephen S O'Hara** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number (if known) | |

☐ Check if this is an amended filing

## Official Form 122A - 1Supp

## Statement of Exemption from Presumption of Abuse Under § 707(b)(2)     12/15

File this supplement together with *Chapter 7 Statement of Your Current Monthly Income* (Official Form 122A-1), if you believe that you are exempted from a presumption of abuse. Be as complete and accurate as possible. If two married people are filing together, and any of the exclusions in this statement applies to only one of you, the other person should complete a separate Form 122A-1 If you believe that this is required by 11 U.S.C. § 707(b)(2)(C).

### Part 1     Identify the Kind of Debts You Have

1. **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose." Make sure that your answer is consistent with the answer you gave at line 16 of the *Voluntary Petition for Individuals Filing for Bankruptcy* (Official Form 1).

   ■ No.   Go to Form 122A-1; on the top of page 1 of that form, check box 1, *There is no presumption of abuse,* and sign Part 3. Then submit this supplement with the signed Form 122A-1.

   ☐ Yes.  Go to Part 2.

### Part 2:     Determine Whether Military Service Provisions Apply to You

2. **Are you a disabled veteran** (as defined in 38 U.S.C. § 3741(1))?

   ☐ No.   Go to line 3.

   ☐ Yes.  Did you incur debts mostly while you were on active duty or while you were performing a homeland defense activity? 10 U.S.C. § 101(d)(1); 32 U.S.C. § 901(1).

       ☐ No.    Go to line 3.

       ☐ Yes.   Go to Form 122A-1: on the top of page 1 of that form, check box 1, *There is no presumption of abuse,* and sign Part 3. Then submit this supplement with the signed Form 122A-1.

3. **Are you or have you been a Reservist or member of the National Guard?**

   ☐ No.   Complete Form 122A-1. Do not submit this supplement.

   ☐ Yes.  Were you called to active duty or did you perform a homeland defense activity? 10 U.S.C. § 101(d)(1); 32 U.S.C. § 901(1).

       ☐ No.    Complete Form 122A-1. Do not submit this supplement.

       ☐ Yes.   Check any one of the following categories that applies:

           ☐  **I was called to active duty after September 11, 2001,** for at least 90 days and remain on active duty.

           ☐  **I was called to active duty after September 11, 2001,** for at least 90 days and was released from active duty on _____, which is fewer than 540 days before I file this bankruptcy case.

           ☐  **I am performing a homeland defense activity for at least 90 days.**

           ☐  **I performed a homeland defense activity for at least 90 days,** ending on _____, which is fewer than 540 days before I file this bankruptcy case.

   > If you checked one of the categories to the left, go to Form 122A-1. On the top of page 1 of Form 122A-1, check box 3, *The Means Test does not apply now,* and sign Part 3. Then submit this supplement with the signed Form 122A-1. You are not required to fill out the rest of Official Form 122A-1 during the exclusion period. The *exclusion period* means the time you are on active duty or are performing a homeland defense activity, and for 540 days afterward. 11 U.S.C. § 707(b)(2)(D)(ii).
   >
   > If your exclusion period ends before your case is closed, you may have to file an amended form later.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Jeffrey B. Smith 150095** **301 E. Ocean Blvd. Suite 1700** **Long Beach, CA 90802** **562-624-1177 Fax: 562-624-1178** California State Bar Number: **150095 CA** Jsmith@cgsattys.com | |

☐ *Debtor(s) appearing without an attorney*

■ *Attorney for Debtor*

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| In re: **Stephen S O'Hara** | CASE NO.: CHAPTER: **7** |
|---|---|
| Debtor(s). | **VERIFICATION OF MASTER MAILING LIST OF CREDITORS** **[LBR 1007-1(a)]** |

Pursuant to LBR 1007-1(a), the Debtor, or the Debtor's attorney if applicable, certifies under penalty of perjury that the master mailing list of creditors filed in this bankruptcy case, consisting of __1__ sheet(s) is complete, correct, and consistent with the Debtor's schedules and I/we assume all responsibility for errors and omissions.

Date: **May 14, 2020** _____

X _____
Signature of Debtor 1

Date: _____

_____
Signature of Debtor 2 (joint debtor) ) (If applicable)

Date: **May 14, 2020** _____

_____
Signature of Attorney for Debtor (if applicable)

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2015*                                          **F 1007-1.MAILING.LIST.VERIFICATION**

Stephen S O'Hara
P.O. Box 7515
Newport Beach, CA 92658


Jeffrey B. Smith
Curd, Galindo & Smith, LLP
301 E. Ocean Blvd. Suite 1700
Long Beach, CA 90802


Alvarado Smith
1 MacArthur Place Suite 200
Santa Ana, CA 92707


BMW
Box 83290
Chicago, IL 60691


Mazda Capital Services
POB 901076
Fort Worth, TX 76101


Teeple Hall, LLP
9255 Towne Centre Drive Suite 500
San Diego, CA 92121

# INTERNAL

# EXHIBIT 5

WIKIPEDIA

# Succubus

A succubus is a <u>demon</u> or supernatural entity in folklore, in female form, that appears in dreams to seduce men, usually through sexual activity. According to religious <u>traditions</u>, repeated sexual activity with a succubus can cause poor physical or mental <u>health</u>, even death.

In modern representations, a succubus is often depicted. as a <u>beautiful</u> seductress or enchantress, rather than as demonic or frightening.

The male counterpart to the succubus is the incubus.



A 16th-century sculpture representing a succubus, Cambridge

## Contents

Etymology:

In folklore

Ability to reproduce

Qarinah

Scientific explanations

In fiction

See also

References

## Etymology

The word is derived from <u>Late Latin</u> *succuba* "paramour"; from *suc.cubare* "to lie beneath" (*sub-* "under" and *cubare* "to lie"), W used to describe this female supernatural being's implied sexual position relative to the male sleeper's position. The word *succubus* originates from the late 14th century.[2]

## In folklore



*The Succubus,* an 1889 sculpture by Auguste <u>Rodin</u>

*As* depicted in the Jewish mystical work Zohar and the medieval rabbinical text Alphabet of Ben Sira, Lilith was Adam's first wife, who later became a <u>succubus</u>.[f1] She left <u>Adam</u> and refused to return to the Garden of Eden after she mated with the ar<u>chang</u>el Samael In Zoharistic <u>K</u>abbalah, there were four succubi who mated with the archangel Samael. There were four original queens of the demons: Lilith, Eisheth, Agrat bat Mahlat, and <u>Naamah</u>.iSI A succubus may take a form of a beautiful young girl but closer inspection may reveal deformities of her body, such as bird-like claws or <u>serpentine</u> tails.ill Folldore also describes the act of

sexuall enetratin a succubus as akin to entering a cavern of ice, and there are reports of succubi forcing men to perform cunnilins on their vulvas, which drip with urine and other fluids.lzl In later folklore, a succubus took the form of a siren.

Throughout history, priests and rabbis, including Hanina Ben Dosa and Abaye, tried to curb the power of succubi over humanSlfil However, not all succubi were malevolent. According to Walter Ma  in the satire *De Nugis Curialium* *(Trifles of Courtiers),* Po e S Ivester II (999-1003) was allegedly involved with a succubus named Meridiana, who helped him achieve his high rank in the Catholic Church. Before his death, he confessed of his sins and died repentant. [21

# Ability to reproduce

According to the Kabbalah and the school of Rashba, the original three queens of the demons,  at Bat Mahlat, Naamah, Eisheth Zenunim, and all their cohorts give birth to children, except Lilith.I!fil' According to other le ends, the children of Lllith are called Lilin.

According to the *Malleus Malejjcarum,* or "Witches' Hammer", written by Heinrich Kramer (Institoris) in 1486, succubi collect semen from men they seduce. Incubi, or male demons, then use the semen to impregnate human females,L¹l thus explaining how demons could apparently sire children despite the traditional belief that they were incapable  of reproduction. Children so begotten-cambions-were supposed to be those that were born deformed, or more susceptible to supernatural influences. L¹²1 While the book does not address why a human female impregnated with the semen of a human male would not produce regular human offspring, an explanation could be that the semen is altered before being transferred to the female host. However in some lore, the child is born deformed because the conception was unnatural.

King James in his dissertation titled Dremonologie refutes the possibility for angelic entities to reproduce and instead offered a suggestion that a devil would carry out two methods of impregnating women: the first, to steal the sperm out of a dead man and deliver it into a woman. If a demon could extract the semen quickly, the substance could not be instantly transported to a female host, causing it to go cold. This explains his view that succubi and incubi were the  same demonic entity only to be described differently based on the tormented sexes being conversed with. The second method was the idea that a dead body could be possessed by a devil, causing it to rise and have sexual relations with others. However, there is no mention of a female corpse being possessed to elicit sex from men.l!al

# Qarinah

In Arabian my:!holo , the *qarinah* ◯ is a spirit similar to the succubus, with origins possibly in ancient E tian reli ion or in the animistic beliefs of re-Islamic Arabia.llil A qarinah "sleeps with the person and has relations during sleep as is known by the dreams"J fil They are said to be invisible, but a person with "second si ht" can see them, often in the form of a cat, dog, or other household pet.  "In Omdurman it is a spirit which possesses. ... Only certain people are possessed and such people cannot marry or the qarina will harm them."l!fil To date, many African myths claim that men who have similar experience with such principality (succubus) in dreams (usually in form of a beautiful woman) find themselves exhausted as soon as they awaken; often claiming spiritual attack upon them. Local rituals/divination are often invoked in order to appeal the god for divine protection and intervention.

# Scientific  explanations

In the field of medicine, there is some belief that the stories relating to encounters with succubi bear resemblance to the contemporary phenomenon of people reporting alien abductions,[!zl which has been ascribed to the condition known as slee aral is. It is therefore suggested that historical accounts of people experiencing encounters with succubi may rather have been symptoms of sleep paralysis, with the hallucination of the said creatures coming from their contemporary culture. Furthermore, the experience of nocturnal emissions or "wet dreams" may explain the sexual aspect of the phenomenon.[ˡBl[¹1

# Infiction

Throughout history, succubi have been popular characters in music, literature, film, television, and more.

# See also

**Similar creatures in folklore**

- Al Basti
- Baobhan Sith
- Empusa
- Fox spirit
- Hisa-me
- Hone-onna
- Huldra
- Jorōgumo
- Lamia (Basque mythology)1
- Leanan sídhe
- Liderc
- Mare (folklore)

- Mavka
- Moura Encantada
- Sa_ona
- Sihuanaba
- Patasola
- Samodiva
- Trauco
- Tunda
- Xana
- Xtaba
- Siren

# References

1. "Succuba" htt ://dictiona .reference.com/browse/succuba . *dictiona .com*.
2. Ha er Douglas. "Succubus" htt //www.e monline.com/index. h ?term=succubus . *Online Etymology Dictionary*.
3. "The Sto Of Lilith" htt //ewishchristianlit.com/To ics/Lilith/al habet.html .jewishchristian lit.com. Retrieved 21 September 2016.
4. "Samael & Lilith" htt //istina.rin.ru/en /ufo/text/663.html }.istina.rin.ru. Retrieved 21 September 2016.
5. "Zohar: Cha ter XXXII" htt //www.sacred-texts.com/"ud/zdm/zdm041. htm}.
6. Davidson, Jane P. (2012). *Early modem supernatural : the dark side of European culture, 1400-1700.* Santa Barbara, Calif.: Praeger. p. 40. ISBN 9780313393433 .
7. Guiley, Rosemary Ellen (2008). *The encyclopedia of witches, witchcraft and wicca* (3rd ed.). New York: Facts On File. p. 95. ISBN 9781438126845 .
8. Geoffrey W. Dennis, The encyclopedia of Jewish myth, magic and mysticism. p. 126
9. Histo[Y of the Succubus (htt s://web.archive.org/web/20040717001332/htt //www.c odine.com/succ ubus/Histo .htm

10. Alan Humm. "Kabbala: Lilith, Queen of the Demons" (htt ://www.lilith alle .com/libra /lilith/Queen-o f-the-Demons.html). lilithgallery.com. Retrieved 21 September 2016.

11. Kramer, Heinrich and Sprenger, James (1486), Summers, Montague (translator – 1928), *The Malleus Maleficarum,* Part 2, Cha ter VIII {htt ://www.sacred-texts.com/ a /mm/mm02b08a.htm _, "Certain Remedies prescribed against those Dark and Horrid Harms with which Devils may Afflict Men," at sacred-texts.com (htt ://www.sacred-texts.coml

12. Lewis, James R., Oliver, Evelyn Dorothy, Sisung Kelle S. (Editor) (1996), *Angels A* to Z, Entry: Incubi and Succubi, pp. 218, 219, Visible Ink Press, ISBN 0-7876-0652-9

13. Warren, Brett (2016). *The Annotated Dtemonologie of King James. A Critical Edition. In Modem English.* pp. 79-83. ISBN 978-1-5329-6891-4 .

14. Zwemer, Samuel M. (1939). "5". *Studies in Po ular Islam: Collection of Pa ers dealin with the Su erstitions and Beliefs of the Common Peo le* (htt ://www.answerin -islam.or /Books/Zwemer/St udies/cha 5.htm . London: Sheldon Press.

15. Tremeame, A. J. N. *Ban of the Bari: Demons and Demon-Dancin in West and North Africa* htt s://a rchive.or /details/cu31924029887431 .

16. Trimin ham, J. S encer (1965). *Islam in the Sudan.* London: Frank Cass & Co. Ltd. p. 172.

17. Knight-Jadczyk, Laura; Henri Sy (2005). *The high strangeness* of *dimensions, densities, and the process of alien abduction.* Red Pill Press. p. 92. ISBN 9781897244111.

18. "Slee Paral sis" htt ://www.ske dic.com/slee aral sis.html .The Skeptics Dictionary.

19. "Phenomena of Awareness durin Slee Paral sis" htt ://www.trionica.com/as / henomena/index.h tm .Trionic Research Institute.

---

Retrieved from "https://en.wikipedia.org/w/index.Qhp?title=Succubus&oldid=978273034"

---

This page was last edited on 13 September 2020, at 23:05 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ZACHARY GREENBERG,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 20-3822** |
| | : | |
| **JAMES C. HAGGERTY,** *in his official* | : | |
| *capacity as Board Chair of The* | : | |
| *Disciplinary Board of the Supreme* | : | |
| *Court of Pennsylvania,* **et al.,** | : | |
| *Defendants.* | : | |

## MEMORANDUM

This case concerns the constitutionality of the amendments to Pennsylvania
Rule of Professional Conduct 8.4, which were approved by the Supreme Court of
Pennsylvania[1] and are set to take effect on December 8, 2020. The amendments
added paragraph (g) to Rule 8.4 along with two new comments, (3) and (4).
Plaintiff, Zachary Greenberg, Esquire, a Pennsylvania attorney who gives
presentations on a variety of controversial legal issues, brings this pre-enforcement
challenge alleging that these amendments violate the First Amendment because
they are unconstitutionally vague, overbroad, and consist of viewpoint-based and
content-based discrimination.

---

[1] Justice Mundy dissented.

Before the Court are Defendants' Motion to Dismiss Plaintiff's Complaint (ECF No. 15) and Plaintiff's Motion for Preliminary Injunction (ECF No. 16).

## A.    BACKGROUND

Plaintiff Zachary Greenberg graduated from law school in 2016 and was admitted to the Pennsylvania Bar in May 2019.  ECF No. 1 at ¶ 10, 11; ECF No. 21 at ¶¶ 2-4.[2]  Plaintiff currently works as a Program Officer at the Foundation for Individual Rights in Education.  ECF No. 1 at ¶ 13; ECF No. 21 at ¶ 6.  In this position, Plaintiff speaks and writes on a number of topics, including freedom of speech, freedom of association, due process, legal equality, and religious liberty. ECF No. 1 at ¶ 14; ECF No. 21 at ¶ 7.  Plaintiff is also a member of the First Amendment Lawyers Association, which regularly conducts continuing legal education ("CLE") events for its members.  ECF No. 1 at ¶ 15; ECF No. 21 at ¶¶ 8-9.   As a part of his association with the Foundation for Individual Rights in Education and the First Amendment Lawyers Association, Plaintiff speaks at a number of CLE and non-CLE events on a variety of controversial issues.  ECF No. 1 at ¶ 16-19; ECF No. 21 at ¶ 10.  Specifically, Plaintiff has written and spoken against banning hate speech on university campuses and university regulation of

---

[2] The facts included here were alleged in the Complaint (ECF No. 1) and also stipulated in the Stipulated List of Facts for Purposes of Preliminary Injunction Motion (ECF No. 21).  Although the Court considered all allegations in the Complaint for purposes of Defendants' Motion to Dismiss and all stipulated facts for purposes of Plaintiff's Motion for Preliminary Injunction, the Court found these facts pertinent to its analysis and conclusion.

hateful online expression as protected by the First Amendment.  ECF No. 1 at ¶¶ 19-20; ECF No. 21 at ¶¶ 14-15.

In 2016, the Disciplinary Board of the Supreme Court of Pennsylvania considered adopting a version of the American Bar Association Model Rule of Professional Conduct 8.4(g) in Pennsylvania. ECF No. 1 at ¶¶ 38-39; ECF No. 21 at ¶ 56.  After an iterative process of notice and comment between December 2016 and June 2020, the Supreme Court of Pennsylvania approved the recommendation of the Board[3] and ordered that Pennsylvania Rule of Professional Conduct ("Pa.R.P.C.") 8.4 be amended to include the new Rule 8.4(g) (the "Rule") along with two new comments, (3) and (4), (together, the "Amendments").  ECF No. 1 at ¶ 40; ECF No. 21 at ¶ 61.

The Amendments state:

> It is professional misconduct for a lawyer to:
> * * *
> (g) in the practice of law, by words or conduct, knowingly manifest bias or prejudice, or engage in harassment or discrimination, as those terms are defined in applicable federal, state or local statutes or ordinances, including but not limited to bias, prejudice, harassment or discrimination based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude advice or advocacy consistent with these Rules.

---

[3] Justice Mundy dissented.  ECF No. 1 at ¶ 40.

Comment:

* * *

[3] For the purposes of paragraph (g), conduct in the practice of law includes participation in activities that are required for a lawyer to practice law, including but not limited to continuing legal education seminars, bench bar conferences and bar association activities where legal education credits are offered.

[4] The substantive law of antidiscrimination and anti-harassment statutes and case law guide application of paragraph (g) and clarify the scope of the prohibited conduct.

ECF No. 1 at ¶ 40 (quoting Pa.R.P.C. 8.4); ECF No. 21 at ¶¶ 62-64 (quoting Pa.R.P.C. 8.4).

The Amendments take effect on December 8, 2020. ECF No. 1 at ¶ 41; ECF No. 21 at ¶ 61.

In terms of enforcement, the Office of Disciplinary Counsel ("ODC") is charged with investigating complaints against Pennsylvania-licensed attorneys for violation of the Pennsylvania Rules of Professional Conduct and, if necessary, charging and prosecuting attorneys under the Pennsylvania Rules of Disciplinary Enforcement.  ECF No. 1 at ¶ 45; ECF No. 21 at ¶ 32.  First, a complaint is submitted to the ODC alleging an attorney violated the Pennsylvania Rules of Professional Conduct.  ECF No. 1 at ¶¶ 46-47; ECF No. 21 at ¶ 36.  The ODC then conducts an investigation into the complaint and decides whether to issue a DB-7 letter.  ECF No. 1 at ¶¶ 51-52; ECF No. 21 at ¶¶ 36-38.  If the ODC issues a DB-7

letter, the attorney has thirty days to respond to that letter. *Id*. If, after

investigation and a DB-7 letter response, the ODC determines that a form of

discipline is appropriate, the ODC recommends either private discipline, public

reprimand, or the filing of a petition for discipline to the Board. ECF No. 1 at ¶¶

55-57; ECF No. 21 at ¶¶ 44-45. After further rounds of review and

recommendation, along with additional steps, the case may proceed to a hearing

before a hearing committee and de novo review by the Disciplinary Board and the

Supreme Court of Pennsylvania. ECF No. 1 at ¶¶ 54-59; ECF No. 21 at ¶¶ 46-50.[4]

Plaintiff filed a complaint in this Court alleging the Amendments consist of

content-based and viewpoint-based discrimination and are overbroad in violation

of the First Amendment (Count 1) and the Amendments are unconstitutionally

vague in violation of the Fourteenth Amendment (Count 2). ECF No. 1.[5]

Defendants filed a Motion to Dismiss (ECF No. 15), and Plaintiff filed a response

in opposition (ECF No. 25). Plaintiff filed a Motion for Preliminary Injunction

(ECF No. 16), and Defendants filed a response in opposition (ECF No. 24). The

---

[4] The Complaint (ECF No. 1) and the Stipulated List of Facts for Purposes of Preliminary Injunction Motion (ECF No. 21) contain different information regarding the process for a disciplinary action, but the discrepant facts are irrelevant to the Court's analysis of both Defendants' Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction.

[5] All Defendants are sued in their official capacities only. ECF No. 1 at 3. "State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them." *Hafer v. Melo*, 502 U.S. 21, 27 (1991). In this case, Defendants are members of either the Disciplinary Board of the Supreme Court of Pennsylvania or the Office of Disciplinary Counsel. ECF No. 1 at 3.

Court held oral argument on November 13, 2020, addressing both Defendants'

Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction. ECF No. 26.

## B. STANDARD OF REVIEW

Before the Court are Defendants' Motion to Dismiss the Complaint (ECF

No. 15) and Plaintiff's Motion for Preliminary Injunction (ECF No. 16).

### I. *Standard of Review for Motion to Dismiss*

When reviewing a motion to dismiss, the Court "accept[s] as true all

allegations in plaintiff's complaint as well as all reasonable inferences that can be

drawn from them, and [the court] construes them in a light most favorable to the

non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018)

(quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)).

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (quoting

*Twombly*, 550 U.S. at 557)). "The plausibility determination is 'a context-specific

task that requires the reviewing court to draw on its judicial experience and

common sense.'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

Finally, courts reviewing the sufficiency of a complaint must engage in a three-step process. First, the court "must 'take note of the elements [the] plaintiff must plead to state a claim.'" *Id.* at 787 (alterations in original) (quoting *Iqbal*, 556 U.S. at 675). "Second, [the court] should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Third, "'[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (alterations in original) (quoting *Iqbal*, 556 U.S. at 679).

## II. *Standard of Review for Preliminary Injunction*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the plaintiff is entitled to such relief.'" *Id.* (quoting *Winter*, 555 U.S. at 22).

In order to "obtain a preliminary injunction the moving party must show as a prerequisite (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)) (alteration in original).

The Third Circuit has held that the first two factors act as "gateway factors," and that a "court must first determine whether the movant has met these two gateway factors before considering the remaining two factors—balance of harms, and public interest." *Fulton v. City of Philadelphia*, 320 F. Supp. 3d 661, 675 (E.D. Pa. 2018), *aff'd*, 922 F.3d 140 (3d Cir. 2019) (citing *Reilly*, 858 F.3d at 180). However, "[b]ecause this action involves the alleged suppression of speech in violation of the First Amendment, we focus our attention on the first factor, i.e., whether [Plaintiff] is likely to succeed on the merits of his constitutional claim." *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")).

## C.    DISCUSSION

### I.    *Standing*

Defendants move to dismiss the Complaint contending that Plaintiff lacks standing to bring this pre-enforcement challenge to the Amendments.  ECF No. 15 at 10-16.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) [hereinafter *SBA List*] (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 158 (quoting *Lujan*, 504 U.S. at 560) (internal citations omitted).

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"  *Id.* (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 437 (2014)) (internal quotation marks omitted).  "The party invoking federal jurisdiction bears the burden of establishing standing."  *Id.* (quoting *Clapper*, 568 U.S. at 411) (internal quotation marks omitted).  "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the

manner and degree of evidence required at the successive stages of the litigation." *Id*. (quoting *Lujan*, 504 U.S. at 561) (alteration in original).

Here, the Court must determine if "the threatened enforcement of" the Amendments "creates an Article III injury." *Id*. "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id*. (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)) (additional citations omitted). The Supreme Court has "permitted preenforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Id*. "Specifically, [the Supreme Court] ha[s] held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id*. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Many circuit courts have found a plaintiff's allegation that the law has or will have a chilling effect on the plaintiff's speech is sufficient to satisfy the injury-in-fact requirement. The Third Circuit held that "an allegation that certain conduct has (or will have) a chilling effect on one's speech must claim a 'specific present objective harm or a threat of specific future harm.'" *Sherwin-Williams Co. v. Cty. of Delaware, Pennsylvania*, 968 F.3d 264, 269–70 (3d Cir. 2020) (quoting *Laird v.*

*Tatum*, 408 U.S. 1, 13–14 (1972)).  The Fifth Circuit "has repeatedly held, in the pre-enforcement context, that '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.'"  *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330-331 (5th Cir. Oct. 28, 2020), as revised (Oct. 30, 2020) (quoting *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)) (alteration in original) (additional citations omitted).  Similarly, the Ninth Circuit has held that "[a] chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself [is] too speculative to confer standing.'"  *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (quoting *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015)) (additional citations omitted).  The Seventh Circuit has held "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), as amended on denial of reh'g and reh'g en banc (Sept. 4, 2020) [hereinafter *Killeen*] (citations omitted).

In terms of Plaintiff's injury-in-fact, Plaintiff alleges in the Complaint that the "vast majority of topics" discussed at Plaintiff's speaking events "are considered biased, prejudiced, offensive, and hateful by some members of his

11

audience, and some members of society at large." ECF No. 1 at ¶ 61.[6] Plaintiff further alleges that "during his presentations," Plaintiff's "discussion of hateful speech protected by the First Amendment involves a detailed summation of the law in this area, which includes a walkthrough of prominent, precedential First Amendment cases addressing incendiary speech." *Id*. at ¶ 62.

Plaintiff alleges that "it would be nearly impossible to illustrate United States First Amendment jurisprudence, such as by accurately citing and quoting precedent First Amendment cases, without engaging in speech that at least some members of his audience will perceive as biased, prejudiced, offensive, and potentially hateful." *Id*. at ¶ 63. Plaintiff alleges that he believes that "every one of his speaking engagements on First Amendment issues carries the risk that an audience member will file a bar disciplinary complaint against him based on the content of his presentation under rule 8.4(g)." *Id*. at ¶ 64. Plaintiff alleges that he fears "his writings and speeches could be misconstrued by readers and listeners, and state officials within the Board or Office, as violating Rule 8.4(g)." *Id*. at ¶ 72. Plaintiff alleges that he does not want to be subjected to disciplinary sanctions by the ODC or the Disciplinary Board and that a disciplinary investigation would harm his "professional reputation, available job opportunities, and speaking

---

[6] As the Court is determining whether to grant or deny Defendants' Motion to Dismiss the Complaint for lack of standing, the Court considers those allegations related to standing in the Complaint (ECF No. 1).

opportunities." *Id*. at ¶ 69. Plaintiff alleges that he will be "forced to censor himself to steer clear of an ultimately unknown line so that his speech is not at risk of being incorrectly perceived as manifesting bias or prejudice." *Id*. at ¶ 75.

Defendants contend that Plaintiff lacks standing because Plaintiff's injury "depends on an 'indefinite risk of future harms inflicted by unknown third parties.'" ECF No. 15 at 11-12 (quoting *Reilly v. Ceridian Corp*., 664 F.3d 38, 42 (3d Cir. 2011)) (citing *Clapper*, 568 U.S. at 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.")). Defendants contend that Plaintiff speculates an audience member will be offended by his presentation, then further speculates that that audience member will file a disciplinary complaint against Plaintiff, and then finally speculates that the ODC will not dismiss the complaint as frivolous but will require Plaintiff to file an official response and thereafter move to bring charges. *Id*. at 12.

Defendants further contend that Plaintiff lacks standing because there is no credible threat of enforcement. *Id*. First, Defendants note that there is no history of past enforcement, as the Amendments have not yet gone into effect, and Plaintiff failed to point to any attorneys anywhere who were charged with violating a similar provision. *Id*. at 13.

13

Next, Defendants note that the ODC has not "issued warning letters, opinions, or provided any other reason to believe that Plaintiff would be charged with violating the Amendments based on the conduct he wants to engage in." *Id*. Finally, Defendants contend that even if the ODC received a complaint, it is speculative whether Plaintiff would ever be notified, and further speculative whether Plaintiff would be required to respond or be charged with a violation. *Id*. at 14. Defendants reiterate that even if an audience member is offended by Plaintiff's presentation and makes a complaint to the ODC, "complainants do not institute disciplinary charges against an attorney: only ODC has that power – and only after approval by a Disciplinary Board hearing committee member." *Id*.

Finally, Defendants contend that the conduct in which Plaintiff wants to engage, providing a detailed summation of the law regarding hateful speech, is not proscribed by the plain language of the Amendments. *Id*. at 15. As the Amendments require that the Plaintiff *knowingly* manifest bias or prejudice or *knowingly* engage in discrimination or harassment, Defendants contend that it "strains credulity" to believe that citing and quoting cases could lead to disciplinary action. *Id*. Furthermore, if Plaintiff intends to advocate that certain cases were wrongly decided or advance a different interpretation of the law, Defendants note that Rule 8.4(g) provides a safe harbor for advocacy and advice. *Id*.

14

Plaintiff responds that the Amendments arguably proscribe Plaintiff's alleged speech and that there is a credible threat of enforcement. ECF No. 25 at 11. Plaintiff also contends that the Amendments would create an "*objectively reasonable* chill to [Plaintiff's] protected speech." *Id*. at 12.

First, Plaintiff contends that he plans to continue speaking at CLE events on controversial and polarizing issues such as hate speech, regulation on college campuses or online, due process requirements for students accused of sexual misconduct, and campaign finance restrictions on monetary political contributions. *Id*. Plaintiff notes that his presentations include summarizing and using language from a number of cases that has in the past offended, and will continue to offend, audience members. *Id*. at 12. Plaintiff notes that Rule 8.4(g) proscribes words or conduct manifesting bias or prejudice at CLE seminars and that the Complaint contains many examples of people labeling speakers as biased and prejudiced "for taking policy positions, for discussing statistics or academic theories, for espousing legal views, or mentioning certain epithets as part of an academic discussion." *Id*.

Plaintiff further contends that although Rule 8.4(g) requires the manifestation of bias or prejudice to be "knowing[]," the ultimate decision of whether to file and bring a disciplinary action against Plaintiff "turn[s] on the reaction of the listener and judgment of those who administer the Rule." *Id*. at 13.

Therefore, Plaintiff contends his lack of intention to manifest bias or prejudice does not undercut his standing to challenge Rule 8.4(g). *Id.*

Additionally, although Rule 8.4(g) "does not preclude advice or advocacy consistent with these Rules," Plaintiff contends that "'advocacy' in this context refers to the only sort of advocacy contemplated by rules of professional conduct: the zealous advocacy in support of a client's interest." *Id.* (citing Pa.R.P.C. Preamble ("As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system); Pa.R.P.C. 1.3, cmt. 1 ("A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf")). Therefore, Plaintiff contends that "[a]cademic advocacy" at CLE events is not covered within the advocacy or advice safe harbor. *Id.* at 14.

Furthermore, Plaintiff contends that his intention to mention epithets, slurs, and demeaning nicknames during his presentations and in the question-and-answer portion of his presentation is arguably proscribed under Rule 8.4(g). *Id.* Although Rule 8.4(g) does not provide examples of "manifestations of bias or prejudice," Plaintiff notes that the language of Rule 8.4(g) regarding "manifest[ing] bias or prejudice" was borrowed from Rule 2.3 of the Pennsylvania Code of Judicial Conduct. *Id.* Comment 2 to Rule 2.3 of the Pennsylvania Code of Judicial Conduct states that examples of manifestations of bias and prejudice "include but

are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics." *Id*. (quoting Pa.C.J.C. Rule 2.3, cmt. 2).  Plaintiff reiterates that he alleged in the Complaint that he mentions slurs, epithets, and demeaning nicknames during his presentations. *Id*.  Plaintiff contends that he also exchanges ideas with audience members about the importance of affording Due Process and First Amendment rights to people who do and say "odious" things. *Id*.  Plaintiff is concerned that people might construe his theories as manifesting bias or prejudice against those protected classes, akin to "suggestions of connections between race, ethnicity, or nationality and crime." *Id*. (quoting Pa.C.J.C. Rule 2.3).

Next, Plaintiff contends that there is a credible threat of enforcement. *Id*. Although Defendants point out that no one has filed a disciplinary complaint against Plaintiff based on his past presentations, Plaintiff retorts that such a showing is not required for standing and Rule 8.4(g) is not yet in effect. *Id*. "When dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id*. (quoting *ACLU v. Reno*, 31 F.

Supp. 2d 473, 479 (E.D. Pa. 1999), eventually rev'd on other grounds sub. nom. *Ashcroft v. ACLU*, 535 U.S. 564 (2002)).

Plaintiff further contends that no Defendants have "declare[d] or present[d] other evidence that they would find this type of 8.4(g) complaint to be frivolous, let alone disavow[ed] their authority to take any enforcement steps in response to such complaints." *Id*. at 18 (collecting cases). Even if Defendants were to submit such evidence, Plaintiff maintains that the Complaint contains numerous examples of individuals who have imputed bias and bigotry to speakers advancing legal views or mentioning incendiary words, which shows that a disciplinary complaint for this reason would not be considered "frivolous." *Id*.

The Court finds that Plaintiff has standing to bring this pre-enforcement challenge to the Amendments. First, the Court finds Plaintiff's allegation that his speech will be chilled by the Amendments shows a "threat of specific future harm." *Sherwin-Williams*, 968 F.3d at 269–70 (quoting *Laird*, 408 U.S. at 13–14); *see also Speech First*, 979 F.3d 319, 330-331. Plaintiff's alleged fear of a disciplinary complaint and investigation is objectively reasonable based on Plaintiff's allegation that the "vast majority of topics" discussed at Plaintiff's speaking events "are considered biased, prejudiced, offensive, and hateful by some members of his audience, and some members of society at large." ECF No. 1 at ¶ 61.

Furthermore, Plaintiff alleged specific examples of individuals filing disciplinary and Title IX complaints against speakers who were presenting on similar topics as those discussed by Plaintiff, which he alleges will "force[ him] to censor himself to steer clear of an ultimately unknown line so that his speech is not at risk of being incorrectly perceived as manifesting bias or prejudice." ECF No. 1 at ¶ 75. Therefore, in addition to showing that the "chilling effect on his speech . . . is objectively reasonable," Plaintiff has shown that he will "self-censor[] as a result." *Killeen*, 968 F.3d at 638.

The Court concludes that Plaintiff's alleged chilling effect constitutes an injury in fact that is concrete, particularized, and imminent. *SBA List*, 573 U.S. at 158. Plaintiff's allegations of future injury suffice because Plaintiff has shown that "the threatened injury is 'certainly impending,'" and that "there is a 'substantial risk' that the harm will occur.'" *Id*. (quoting *Clapper*, 568 U.S. at 437) (internal citations omitted).

Plaintiff has further shown that he has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 157–58 (quoting *Babbitt*, 442 U.S. at 298). First, neither party challenges that the speech in which Plaintiff intends to engage is affected with a constitutional interest. *See generally* ECF No. 15; ECF No. 25 at 11.

19

Second, Plaintiff has also clearly shown a likelihood that the activity in which he intends to engage is "arguably proscribed" by the Amendments. *Speech First, Inc*., 979 F.3d at 332. Plaintiff has alleged that he intends to mention epithets, slurs, and demeaning nicknames as part of his presentation on First Amendment and Due Process rights. ECF No. 1 at ¶¶ 62-63. Rule 8.4(g) explicitly states that it is attorney misconduct to, "by **words** or conduct, knowingly manifest bias or prejudice." Pa.R.P.C. 8.4(g) (emphasis added). Both parties agree that the language used in Rule 8.4(g) mirrors Pennsylvania Code of Judicial Conduct Rule 2.3, which provides, in Comment 2, that "manifestations of bias include . . . epithets; slurs; demeaning nicknames; negative stereotyping . . . ." Plaintiff has shown that by repeating slurs or epithets, or by engaging in discussion with his audience members about the constitutional rights of those who do and say offensive things, he will need to repeat slurs, epithets, and demeaning nicknames. This is arguably proscribed by Rule 8.4(g).

Defendants contend that because Rule 8.4(g) requires an attorney to "*knowingly* manifest bias or prejudice," it "strains credulity" to believe that citing and quoting cases could lead to disciplinary action. ECF No. 15 at 15 (emphasis added). However, since the Court has found that repeating slurs or epithets is arguably proscribed by the statute based on the plain language, whether Plaintiff "knowingly" repeated slurs or epithets is immaterial.

Defendants further contend that, "to the extent that Plaintiff intends to advocate that certain cases were wrongly decided or advanced a different interpretation of relevant law," Rule 8.4(g)'s "clear safe harbor for advocacy" would protect Plaintiff. *Id*. at 16. However, the "advice or advocacy" safe harbor was plainly intended to protect those giving advice or advocacy in the context of representing a client, and not in the context of Plaintiff's intended activity. Therefore, Plaintiff has shown that his intended conduct is arguably proscribed by the Amendments.

Third, Plaintiff has shown that there exists a credible threat of prosecution. Defendants' contention that Plaintiff's injury "depends on an 'indefinite risk of future harms inflicted by unknown third parties'" is not persuasive. *Id*. at 11-12 (quoting *Ceridian*, 664 F.3d at 42) (additional citations omitted). Plaintiff alleged specific examples of individuals filing disciplinary and Title IX complaints against speakers who were presenting on similar topics as those discussed by Plaintiff. ECF No. 1 at ¶¶ 73, 74. Not every complaint filed with the ODC results in a letter to the accused attorney, nor every letter to the accused attorney results in any formal sanction. However, Plaintiff has demonstrated that there is a substantial risk that the Amendments will result in Plaintiff being subjected to a disciplinary complaint or investigation.

Ultimately, the Court is swayed by the chilling effect that the Amendments will have on Plaintiff, and other Pennsylvania attorneys, if they go into effect. Rule 8.4(g)'s language, "by words . . . manifest bias or prejudice," are a palpable presence in the Amendments and will hang over Pennsylvania attorneys like the sword of Damocles. This language will continuously threaten the speaker to self-censor and constantly mind what the speaker says and how the speaker says it or the full apparatus and resources of the Commonwealth may be engaged to come swooping in to conduct an investigation. Defendants dismiss these concerns with a paternal pat on the head and suggest that the genesis of the disciplinary process is benign and mostly dismissive. Defendants further argue that, under the language of Rule 8.4(g) targeting "words," even if a complaint develops past the initial disciplinary complaint stage, actual discipline will not occur given the conduct targeted, good intentions of the Rule and those trusted arbiters that will sit in judgment and apply it as such. But Defendants do not guarantee that, nor did they remove the language specifically targeting attorneys' "words." Defendants effectively ask Plaintiff to trust them not to regulate and discipline his offensive speech even though they have given themselves the authority to do so. So, despite asking Plaintiff to trust them, there remains the constant threat that the Rule will be engaged as the plain language of it says it will be engaged.

It can hardly be doubted there will be those offended by the speech, or the written materials accompanying the speech, that manifests bias or prejudice who will, quite reasonably, insist that the Disciplinary Board perform its sworn duty and apply Rule 8.4(g) in just the way the clear language of the Rule permits.  Even if the disciplinary process does not end in some form of discipline, the threat of a disruptive, intrusive, and expensive investigation and investigatory hearing into the Plaintiff's words, speeches, notes, written materials, videos, mannerisms, and practice of law would cause Plaintiff and any attorney to be fearful of what he or she says and how he or she will say it in any forum, private or public, that directly or tangentially touches upon the practice of law, including at speaking engagements given during CLEs, bench-bar conferences, or indeed at any of the social gatherings forming around these activities. The government, as a result, de facto regulates speech by threat, thereby chilling speech.  Defendants' attempt to sidestep a direct constitutional challenge by claiming no final discipline will ever be rendered under Rule 8.4(g) fails.  The clear threat to Plaintiff's First Amendment rights and the chilling effect that results is the harm that gives Plaintiff standing.  Defendant's Motion to Dismiss the Complaint for lack of standing is denied.

## II. *First Amendment Violation*

In their Motion to Dismiss, Defendants contend that Plaintiff's claim that the Amendments constitute either content-based or viewpoint-based discrimination fails to state a claim because the Amendments regulate conduct, not speech.  ECF No. 15 at 30.  Even if the Amendments regulate speech, Defendants contend, the Amendments are narrowly tailored to achieve Pennsylvania's compelling interest in regulating the practice of law and ensuring that the judicial system is free from discriminatory and harassing conduct.  *Id.*

Defendants further contend that the Amendments are not viewpoint-based since they were not enacted based on particular views but rather to prohibit discrimination and harassment.  *Id.* at 30 (citing *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018)).  Furthermore, Defendants note that the Amendments apply to all attorneys.  *Id.* (citing *Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008)).

Finally, Defendants contend that the Supreme Court has held that states have a "compelling interest" in regulating professions, and that "broad power" is "especially great" in "regulating lawyers[.]"  *Id.* (quoting *In re Primus*, 436 U.S. 412, 422 (1978)) (additional citations omitted).  Defendants further contend that states have a substantial interest both in "protect[ing] the integrity and fairness of a State's judicial system," *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1031

(1991), and in preventing attorneys from engaging in conduct that "is universally regarded as deplorable and beneath common decency," *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (internal citations omitted).  ECF No. 15 at 31.

Plaintiff, on the other hand, contends that Rule 8.4(g)'s prohibition on using words to "manifest bias or prejudice, or engage in harassment or discrimination" is unconstitutional viewpoint discrimination.  ECF No. 25 at 19.  Plaintiff contends that the Amendments allow for "tolerant, benign, and respectful speech" while disallowing "biased, prejudiced, discriminatory, critical, and derogatory speech." *Id*.  Plaintiff highlights *Matal v. Tam*, where the Supreme Court found that a federal statute prohibiting the registration of trademarks that may "disparage or bring into contempt or disrepute" any "persons, living or dead" was a viewpoint-based restriction.  *Id*. (citing *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017)).  The Court stated that this "law thus reflects the Government's disapproval of a subset of messages it finds offensive, the essence of viewpoint discrimination." *Matal*, 137 S. Ct. at 1750.

Plaintiff further disputes that Rule 8.4(g) regulates discriminatory and harassing *conduct* and not speech, since the plain language of Rule 8.4(g) restricts "words" in addition to "conduct" and "manifest[ing] bias or prejudice" in addition to "engag[ing] in harassment or discrimination."  ECF No. 25 at 20.  Plaintiff notes that Rule 8.4(g) mirrors Rule 2.3 of the Pennsylvania Judicial Code of

Conduct, which states that "[e]xamples of manifestations of bias and prejudice include . . . epithets; slurs; demeaning nicknames," and this further underscores that Rule 8.4(g) prohibits the expression of certain words alone, apart from any conduct. *Id*.

Plaintiff further disputes Defendants' claim that because 8.4(g) applies to all attorneys it cannot be viewpoint discrimination. *Id*. at 21. Plaintiff contends that this is not the test for viewpoint discrimination and that the Supreme Court rejected the same argument. *Id*. Plaintiff contends that if the Court finds that the Amendments consist of viewpoint bias, that "end[s] the matter." *Id*. (quoting *Iancu v. Brunetti*, 204 L. Ed. 2d 714 (2019)).

Plaintiff further contends that even though Rule 8.4(g) is a regulation of "professional speech," it is still unconstitutional viewpoint-based discrimination under the Supreme Court's ruling in *Nat'l Inst. of Family & Life Advocates v. Becerra*. *Id*. at 22 (citing *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018) [hereinafter *NIFLA*]). Plaintiff contends that Rule 8.4(g) does not fit within either of the two areas that the Court in *NIFLA* recognized justified regulation of professional speech. *Id*. Plaintiff contends that Rule 8.4(g) is not a law that "require[s] professionals to disclose factual, noncontroversial information in their 'commercial speech,'" nor does it merely "regulate professional

conduct, . . . [that] incidentally involves speech." *Id*. (quoting *NIFLA*, 138 S. Ct. at 2372).

Plaintiff further contends that the Court in *Gentile* and *Sawyer* recognized that when an attorney's speech occurs as part of pending litigation or a client representation, it is "more censurable" because it can "obstruct the administration of justice." *Id*. at 23 (quoting *In re Sawyer*, 360 U.S. 622, 636 (1959)) (citing *Gentile*, 501 U.S. at 1074 ("[O]ur opinions… indicate that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press.")). Rule 8.4(g), however, contains no similar limitation, as it applies to any words or conduct uttered "in the practice of law," which includes participating in events where CLE credits are issued. *Id*. (quoting Pa.R.P.C. 8.4(g)).

### 1. Attorney Speech and Professional Speech

The Court recognizes that Pennsylvania has an interest in licensing attorneys and the administration of justice. However, contrary to Defendants' contention, speech by an attorney or by a professional is only subject to greater regulation than speech by others in certain circumstances, none of which are present here. The Supreme Court in *Gentile v. State Bar of Nevada* found that, "in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has

is extremely circumscribed." 501 U.S. at 1071. Furthermore, "[e]ven outside the courtroom . . . lawyers in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be." *Id*. (citing *In re Sawyer*, 360 U.S. 622 (1959)). The Supreme Court has "expressly contemplated that the speech of *those participating before the courts* could be limited." *Id*. at 1072. Additionally, in the commercial context, the Supreme Court's "decisions dealing with a lawyer's right under the First Amendment to solicit business and advertise . . . have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other business." *Id*. at 1073 (collecting cases).

In contrast, Rule 8.4(g) does not limit its prohibition of "words . . . [that] manifest bias or prejudice" to the legal process, since it also prohibits these words or conduct "during activities that are required for a lawyer to practice law," including seminars or activities where legal education credits are offered. Pa.R.P.C. 8.4(g). Rule 8.4(g) does not seek to limit attorneys' speech only when that attorney is in court, nor when that attorney has a pending case, nor even when that attorney seeks to solicit business and advertise. Rule 8.4(g) much more broadly prohibits attorneys' speech.

This Court also finds that Rule 8.4(g) does not cover "professional speech" that is entitled to less protection. The Supreme Court "has not recognized 'professional speech' as a separate category of speech." *NIFLA*, 138 S. Ct. at 2371

(finding petitioners were likely to succeed on merits of claim that act requiring clinics that primarily serve pregnant women to provide certain notices violated the First Amendment).  "Speech is not unprotected merely because it is uttered by 'professionals.'" *Id.* at 2371-2372.

However, the Supreme Court "has afforded less protection for professional speech in two circumstances." *Id.* at 2372.  "First, [Supreme Court] precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* (collecting cases). "Second, under [Supreme Court] precedents, States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* (collecting cases).

Rule 8.4(g) does not fall into either of these categories.  First, Rule 8.4(g) does not relate specifically to commercial speech, nor does it require that professionals "disclose factual, noncontroversial information."  *Id*.

Second, Rule 8.4(g) does not regulate professional conduct that incidentally involves speech.  The plain language of Rule 8.4(g) explicitly prohibits "words" that manifest bias or prejudice.  Furthermore, a comment included in a May 2018 proposal of Rule 8.4(g) "explains and illustrates" that Rule 8.4(g) was intended to regulate speech.  Pa.R.P.C., Preamble and Scope ("The Comment accompanying

29

each Rule explains and illustrates the meaning and purpose of the Rule.")  This comment stated, "[e]xamples of manifestations of bias or prejudice include but are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics."[7]  48 Pa.B. 2936.  This proposed comment reveals that the drafters of Rule 8.4(g) intended to explicitly restrict offensive words in prohibiting an attorney from "manifest[ing] bias or prejudice."

Although the final version of Rule 8.4(g) does not include this comment, the fatal language, "by words . . . manifest bias or prejudice," remains.  Removing this candid comment about the intent of the Rule does not also remove the intent of those words.  That this language, "by words . . . manifest bias or prejudice," remained in the final version of Rule 8.4(g) illustrates the Rule's broad and chilling implications.  If the drafters wished to reform the Rule, they could have easily removed the offending language from the Rule as well the proposed comment.  Removing the comment alone did not rid Rule 4.8(g) of its language specifically targeting speech.

---

[7] This exact language also appears in Comment 2 to Rule 2.3 of Pennsylvania Code of Judicial Conduct.  Pa.C.J.C. Rule 2.3.  Both parties agree Pennsylvania Code of Judicial Conduct Rule 2.3 mirrors Pennsylvania Rule of Professional Conduct Rule 8.4(g). *See* ECF No. 15 at 28; ECF No. 25 at 7.

Despite this, Defendants tell us to look away from the clearly drafted language of the Rule and focus rather on the conduct component.  Plaintiff agrees that if we were looking at conduct, the government has a right to regulate conduct of its licensed attorneys.  *See* ECF No. 25 at 21.  Defendants try to deflect our attention away from the clear speech regulation in the Rule because they themselves had to know in drafting the Rule they were venturing into the narrowest of channels that permit government to regulate speech.  They merge "words" into "conduct" by blithely arguing that the shoal that confronts us is a mere illusion to be ignored and is simply nothing but part of the deep, blue channel.  Yet, when the reality of the shoal hits the ship, it will not be the government left ensnared and churning in the sand, it will be the individual attorney and the attorney's practice embedded in an inquisition regarding the manifestation of bias and prejudice, and an exploration of the attorney's character and previously expressed viewpoints, to determine if such manifestation was "knowing."

Defendants cite *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, to support their contention that Rule 8.4(g) is intended to prohibit "conduct carried out by words," and not speech.  Transcript of Oral Argument at 25; ECF No. 15 at 17 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006)).  In *Rumsfeld*, the Supreme Court held that speech was incidental to the challenged law's requirement that law schools afford equal access to military

31

recruiters. 547 U.S. at 62. The challenged law denied federal funding to an

institution of higher education that prohibited the military from recruiting on its

campus. *Id*. at 47. The plaintiffs brought suit, seeking to deny the military from

recruiting on their campuses because of "disagreement with the Government's

policy on homosexuals in the military," and arguing that the law violated law

schools' freedom of speech. *Id*. at 51, 60. The Supreme Court held that the law

did not regulate speech, nor did the expressive nature of the conduct regulated

bring it under the First Amendment's protection. *Id*. at 65. The Court held, "it has

never been deemed an abridgment of freedom of speech or press to make a course

of conduct illegal merely because the conduct was in part initiated, evidenced, or

carried out by means of language, either spoken, written, or printed." *Id*. at 62

(quoting *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949)).

     The Supreme Court's holding in *Rumsfeld* is inapplicable to the case before

this Court. Whereas the challenged law in *Rumsfeld* required the plaintiffs to

provide equal campus access to military recruiters, a law that clearly regulates

conduct, the Amendments explicitly limit what Pennsylvania attorneys may say in

the practice of law. Rule 8.4(g)'s prohibition against using "words" to "manifest

bias or prejudice" does not regulate conduct "carried out by means of language."

*Rumsfeld*, 547 U.S. at 62. It simply regulates speech. Even if the Rule was

*intended* to prohibit "harassment and discrimination . . . carried out by words,"

Transcript of Oral Argument at 25, Rule 8.4(g) plainly prohibits "words . . . manifest[ing] bias or prejudice," which regulates a much broader category of speech than supposedly intended.

"Outside of the two contexts discussed above—disclosures under [attorney advertising] and professional conduct—[the Supreme] Court's precedents have long protected the First Amendment rights of professionals." *NIFLA*, 138 S. Ct. at 2374. "The dangers associated with content-based regulations of speech are also present in the context of professional speech." *Id*. "As with other kinds of speech, regulating the content of professionals' speech 'pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information.'" *Id*. (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). "States cannot choose the protection that speech receives under the First Amendment [by imposing a licensing requirement], as that would give them a powerful tool to impose 'invidious discrimination of disfavored subjects.'" *Id*. (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423-424  (1993)) (additional citations omitted).  Defendants may not impinge upon Pennsylvania attorneys' First Amendment rights simply because Rule 8.4(g) regulates speech by professionals.

Furthermore, in *In re Primus*, quoted by Defendants to establish that states have "broad power" to regulate attorneys, the Court ultimately concluded that the

state's application of the disciplinary rules violated the First and Fourteenth

Amendments, showing the limits to that "broad" regulation power. 436 U.S. 412,

438 (1978). In *In re Primus*, a lawyer informed a prospective client via letter that

free legal assistance was available from a nonprofit organization with which this

lawyer worked. *Id*. at 414. Based on this activity, the state disciplinary board

charged the lawyer with soliciting a client in violation of the disciplinary rules and

administered a private reprimand. *Id*. at 421. The state supreme court then

adopted the board's findings and increased the sanction to a public reprimand. *Id*.

The Supreme Court found that the "State's special interest in regulating members

whose profession it licenses, and who serve as officers of its courts, amply justifies

the application of *narrowly drawn* rules to proscribe solicitation that in fact is

misleading, overbearing, or involves other features of deception or improper

influence." *Id*. at 438 (emphasis added). Even though the state had argued that the

regulatory program was aimed at preventing undue influence "and other evils that

are thought to inhere generally in solicitation by lawyers of prospective clients,"

the Court found that "that '[b]road prophylactic rules in the area of free expression

are suspect,' and that '[p]recision of regulation must be the touchstone in an area

so closely touching our most precious freedoms.'" *Id*. at 432 (quoting *Button*, 371

U.S., at 438). "Because of the danger of censorship through selective enforcement

of broad prohibitions, and '[b]ecause First Amendment freedoms need breathing

space to survive, government may regulate in [this] area only with narrow specificity.'" *Id*. at 432-433 (quoting *Button*, 371 U.S., at 433) (alteration in original). This case does not, therefore, ultimately support Defendants' conclusion nor indicate that Defendants have broad power in this context to regulate attorneys' words.

Rule 8.4(g) does not regulate the specific types of attorney speech or professional speech that the Supreme Court has identified as warranting a deferential review. The speech that Rule 8.4(g) regulates is entitled to the full protection of the First Amendment.

### 2. Viewpoint-Based Discrimination

The Court finds that the Amendments, Rule 8.4(g) and Comments 3 and 4, are viewpoint-based discrimination in violation of the First Amendment.

"[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 193 (3d Cir. 2008) (quoting *Turner Broadcasting*, 512 U.S. at 643) (alteration in original). Content-based restrictions "are subject to the 'most exacting scrutiny,' . . . because they 'pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public

debate through coercion rather than persuasion.'" *Id.* (quoting *Turner Broadcasting*, 512 U.S. at 641-642).

Viewpoint discrimination is "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). "Viewpoint discrimination is thus an egregious form of content discrimination." *Id.* (quoting *Rosenberger*, 515 U.S. at 829). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (quoting *Rosenberger*, 515 U.S. at 829).

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "[T]hat is viewpoint discrimination: Giving offense is a viewpoint." *Matal*, 137 S. Ct. at 1763. The Supreme Court has "said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Id.* (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)) (additional citations omitted).

In *Matal v. Tam*, the Supreme Court considered the constitutionality of "a provision of federal law prohibiting the registration of trademarks that may 'disparage . . . or bring . . . into contemp[t] or disrepute' any 'persons, living or dead.'" 137 S. Ct. at 1751. The Court concluded that the provision violated the Free Speech Clause of the First Amendment because "[s]peech may not be banned on the ground that it expresses ideas that offend." *Id*. The Court noted that when the government creates a limited public forum for private speech "some content- and speaker-based restrictions may be allowed," but, "even in such cases . . . 'viewpoint discrimination' is forbidden." *Id*. (citing *Rosenberger*, 515 U.S. at 830-831). The Court clarified that the term "viewpoint" discrimination is to be used in a broad sense and, even if the provision at issue "evenhandedly prohibits disparagement of all group," it is still viewpoint discrimination because "[g]iving offense is a viewpoint." *Id*. at 1763.

In a concurring opinion, Justice Kennedy stated that "[t]he First Amendment guards against laws 'targeted at specific subject matter,' [a] form of speech suppression known as content based discrimination." *Id*. at 1765-1766 (Kennedy, J., concurring) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015)). "This category includes a subtype of laws that go further, aimed at the suppression of 'particular views . . . on a subject.'" *Id*. (Kennedy, J., concurring) (quoting *Rosenberger*, 515 U.S. at 829) (alteration in original). "A law found to

discriminate based on viewpoint is an 'egregious form of content discrimination,' which is 'presumptively unconstitutional.'" *Id.* (Kennedy, J., concurring) (quoting *Rosenberger*, 515 U.S. at 829–830).

"At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id.* at 1766 (Kennedy, J., concurring) (citation omitted).  Justice Kennedy further stated that even though the provision at issue applied in "equal measure to any trademark that demeans or offends," it was not viewpoint neutral: "To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so." *Id.* at 1766 (Kennedy, J., concurring) (citation omitted).

Similarly, Rule 8.4(g) states that it is professional misconduct for a lawyer, "in the practice of law, by **words** or conduct, to knowingly **manifest bias** or **prejudice** . . . . " Pa.R.P.C. 8.4(g) (emphasis added).  While Rule 8.4(g) restricts Pennsylvania attorneys' ability to express bias or prejudice "based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status," it allows Pennsylvania attorneys to express tolerance or respect based on these same statuses. *Id.* Defendants have "singled out a subset of message," those words that manifest bias

38

or prejudice, "for disfavor based on the views expressed." *Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring) (citation omitted).

As in *Matal*, Defendants seek to remove certain ideas or perspectives from the broader debate by prohibiting *words* that manifest bias or prejudice. The American Civil Liberties Union defines censorship as "the suppression of words, images, or ideas that are 'offensive,' [which] happens whenever some people succeed in imposing their personal political or moral values on others." *What is censorship?*, ACLU, https://www.aclu.org/other/what-censorship (last visited December 7, 2020). This is exactly what Defendants attempt to do with Rule 8.4(g). Although Defendants contend that Rule 8.4(g) "was enacted to address discrimination, equal access to justice, [and] the fairness of the judicial system," the plain language of Rule 8.4(g) does not reflect this intention. Transcript of Oral Argument at 3. Rule 8.4(g) explicitly prohibits words manifesting bias or prejudice, i.e., "offensive" words. In short, Defendants seek to impose their personal moral values on others by censoring all opposing viewpoints.

"A law found to discriminate based on viewpoint is an 'egregious form of content discrimination,' which is 'presumptively unconstitutional.'" *Id*. at 1766 (Kennedy, J., concurring) (quoting *Rosenberger*, 515 U.S. at 829-830). Therefore,

"[t]he Court's finding of viewpoint bias end[s] the matter." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).[8]

The irony cannot be missed that attorneys, those who are most educated and encouraged to engage in dialogues about our freedoms, are the very ones here who are forced to limit their words to those that do not "manifest bias or prejudice." Pa.R.P.C. 8.4(g). This Rule represents the government restricting speech outside of the courtroom, outside of the context of a pending case, and even outside the much broader playing field of "administration of justice." Even if Plaintiff makes a good faith attempt to restrict and self-censor, the Rule leaves Plaintiff with no guidance as to what is in bounds, and what is out, other than to advise Plaintiff to scour every nook and cranny of each ordinance, rule, and law in the Nation. Furthermore, the influence and insight of the May 2018 comments on this self-

---

[8] Even if the Court were to weigh the competing interests involved, Rule 8.4(g) would not pass either strict scrutiny or intermediate scrutiny. "To survive strict scrutiny analysis, a statute must: (1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest." *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008). The compelling interest provided by Defendants is "ensuring that those who engage in the practice of law do not knowingly discriminate or harass someone so that the legal profession 'functions for all participants,' ensures justice and fairness, and maintains the public's confidence in the judicial system." ECF No. 15 at 22-23. However, as addressed at length in this Memorandum, by also prohibiting "words . . . [that] manifest bias or prejudice," the Amendments are neither narrowly tailored nor the least restrictive means of advancing that interest. Pa.R.P.C. 8.4(g). In the same way, the Amendments would not survive intermediate scrutiny as they are not "narrowly tailored to serve a significant governmental interest." *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2356 (2020) (Sotomayor, J., concurring) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

censorship will loom large as guidance as to the intent of the Rule.  *See supra* p. 29.

There is no doubt that the government is acting with beneficent intentions. However, in doing so, the government has created a rule that promotes a government-favored, viewpoint monologue and creates a pathway for its handpicked arbiters to determine, without any concrete standards, who and what offends.  This leaves the door wide open for them to determine what is bias and prejudice based on whether the viewpoint expressed is socially and politically acceptable and within the bounds of permissible cultural parlance.  Yet the government cannot set its standard by legislating diplomatic speech because although it embarks upon a friendly, favorable tide, this tide sweeps us all along with the admonished, minority viewpoint into the massive currents of suppression and repression.  Our limited constitutional Government was designed to protect the individual's right to speak freely, including those individuals expressing words or ideas we abhor.

Therefore, the Court holds that the Amendments, Rule 8.4(g) and Comments 3 and 4, consist of unconstitutional viewpoint discrimination in violation of the First Amendment.  Because the Court finds that Plaintiff has standing and that the

Amendments constitute unconstitutional viewpoint discrimination, Defendants'

Motion to Dismiss is denied.[9]

As for Plaintiff's Motion for a Preliminary Injunction, for the foregoing

reasons, the Court finds Plaintiff has shown that the likelihood of success on the

merits of his constitutional claim is "significantly better than negligible." *Reilly*,

858 F.3d at 179.

Second, "[t]he loss of First Amendment freedoms, for even minimal periods

of time, unquestionably constitutes irreparable injury." *Stilp*, 613 F.3d at 409

(citing *Elrod*, 427 U.S. at 373). Plaintiff alleged that he will be chilled in the

exercise of his First Amendment rights at CLE presentations and other speaking

events if the Amendments go into effect as planned on December 8, 2020. ECF

No. 16-1 at 28 (citing ECF No. 1 at ¶ 60). As the Court has found the

Amendments constitute unconstitutional viewpoint discrimination and Plaintiff has

alleged a chilling effect that is objectively reasonable in light of the plain language

in Rule 8.4(g), Plaintiff has shown he is more likely than not to suffer irreparable

harm in the absence of preliminary relief. Plaintiff has thus met the threshold for

---

[9] The Court also denies Defendant's Motion to Dismiss as to Count II, alleging unconstitutional vagueness.

the "first two 'most critical' factors" in determining whether to grant a preliminary injunction. *Reilly*, 858 F.3d at 179.

As the Court has found that the Amendments violate the First Amendment, the last two factors, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest, also favor preliminary relief. On balance, and because Plaintiff has satisfied the first two factors, the factors favor granting the preliminary injunction.[10]  Therefore, the Court grants Plaintiff's Motion for Preliminary Injunction.

### D.    CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motion to Dismiss and grants Plaintiff's Motion for Preliminary Injunction.

An appropriate order will follow.

**BY THE COURT:**

**DATE:   December 7, 2020**

**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**

---

[10] The parties agree that there should be no bond.  Transcript of Oral Argument at 50-51; ECF No. 21 at ¶ 50 ("The Defendants bear no risk of financial loss if they are wrongfully enjoined in this case.")

43

# EXHIBIT 26

# Review Department of the State Bar Court for the State of California

**BENJAMIN PAVONE, ESQ.,**

       **PETITIONER,**

**STATE BAR COURT,**

       **RESPONDENT,**

**STATE BAR OF CALIFORNIA,**

       **REAL PARTY IN INTEREST.**

**STATE BAR TRIAL COURT
CASE NO.: SBC-20-O-30496-CV**

**FILED** M2

February 3, 2021

**STATE BAR COURT**

**CLERK'S OFFICE**

**LOS ANGELES**

## ON REVIEW FROM THE STATE BAR COURT
### HON. CYNTHIA VALENZUELA, JUDGE PRESIDING

## SECOND MOTION FOR JUDICIAL NOTICE OF EXHIBITS IN SUPPORT OF REPLY BRIEF

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMER 181826**
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR PETITIONER

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Evidence Code section 452, subdivision (d), Petitioner requests the Court to take judicial notice of the following exhibit 7 and a marked-up copy included as Exhibit 8.  Exhibit 7 was admitted into evidence at the *Martinez v. O'Hara* trial in 2016, as Plaintiff's Trial Exhibit 275.  Therefore, this exhibit is part of the records of the courts of this state.

Exhibit 7 depicts the CSCA website as pulled down on November 11, 2012.  This website is one of the underlying fundamental reasons that your undersigned counsel, on behalf of Martinez, spearheaded the legal effort to shut it down, as a vehicle to trap and sexually exploit young men and women.

Within the website, O'Hara, who was 61 years old at the time, included numerous photos of young women and young men, all of which I interpreted as his view of the desired kinds of targets for his fraudulent enterprise and surreptitious sexual agenda.

Exhibit 7 is the full exhibit.  Exhibit 8 is Exhibit 7 redacted, by showing just the pages with relevant photos and a page showing a photo of O'Hara himself.  In total, the 47-page website contains some 34 pictures of attractive young men and women.

This evidence is relevant to Petitioner's contention on appeal, as stated in the reply brief at pages 9-10, that this entire problem started with an Orange County Commissioner treating such an effort as too insignificant to warrant litigation, and correspondingly, to justify any payment of attorney's fees for shutting O'Hara's website down.

Petitioner submits to this Court that history has borne out his position over the Commissioner's, given the recent #metoo movement.  Such elevated seriousness, and appreciation for the problems created by these sorts of exercises, validate the elimination of predatory vehicles like O'Hara's website at the earliest possible opportunity.

Date: February 3, 2021                    PAVONE & FONNER, LLP

                                          Benjamin Pavone, Esq.

                                          Attorneys for Petitioner

# EXHIBIT 7



       Apply Now  |  Find Us

**YOUR CAREER.** **LETS GET IT STARTED.**

**CSCA® is one of the best places to launch your career. If you share our 'DNA' we know you will like what everyone is talking about.**



Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment at : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



     Apply Now  |  Find Us

Our Company

Home

Our Company

Our History

Where We're Going

In The News

Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### From the Desk of our Founder and CEO



**Thank you for visiting CSCA®. You are about to discover a Talent Acquisition Company that offers you a career like no other.**

At CSCA®, all talents apply. We're people who love technology and people who love people. We're also business people, musicians, photographers, mountain climbers, students, and artists whose interests can't be defined by a job description. Whether you're analytical or creative, tech savvy or insightful, there's a place in our Brokerages to share your talents while you learn, develop, and inspire.

I encourage you to tell us about yourself. Join us. Show your passion and expertise as you connect customers with our services and help integrate our services into their lives. Be a part of our team and change the way our customers work, play, create, and live. Our network of fine Brokerages sell a lot more than houses, they sell Lifestyles!

I challenge you to be part of something amazing. CSCA® hand selects the very best Brokerages across the nation (Independent and Franchised) on the basis that they have met our stringent standards, embrace our culture and are looking to the future. In fact, the elite Brokerages who are members of our network are not only the most innovative real estate Brokerages in the world; they represent the best brands and are among the fastest growing. On behalf of our Brokerages, CSCA® is always looking for smart, engaging, supportive, and dynamic people who have a passion for people and serving them as you would want to be served yourself.

We join our Brokerages in sharing the common goal of exceeding the expectations of our customers. That's where YOU come in. We can't do it without the right talent. Consumers can go anywhere for their Financial Services needs; in this case real estate and take their chances or they can enjoy the experience with one of our team members and buy and sell with confidence. That's the CSCA® difference.

Successfully and Warmly,



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                          Client Access   Terms of Use   Privacy Policy

**2**



      Apply Now  |  Find Us

## Our History

### Home
### Our Company
- Our History
- Where We're Going
- In The News
- Awards & Recognition
### Our Culture
### Opportunities
### Benefits
### Job Prep
### Guarantee

### Find Us

**'Under All is the Land'.** This is the preamble to the REALTORS® Code of Practice. Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry.

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



Apply Now
|
Find Us

**'Under All is the Land'.** **This is the preamble to the REALTORS® Code of Practice. Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.**

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy

their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry.

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that rewards them financially with the lifestyle they imagine for themselves.

We know that it's hard to find the right company. And, frankly, we know that it's hard for these same companies to find qualified Talent. That's where CSCA® comes in.

CSCA® serves the finest real estate Brokerages brands in the nation who are seeking career oriented College Graduates and recent Military Veterans. We filter the best Talent for our Brokerages and we offer the best Brokerages to our Talent. It's really that simple.



     Apply Now  |   Find Us

Where We're Going

- Home
- **Our Company**
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

Find Us

## LOOKING FOR SUCCESS? IT STARTS WITH CSCA®

It's what we know best. Our focus is finding the best Candidates for our Brokerages. We work with the Best-of-the-Best; the leader's in the real estate industry, we can take your career just about anywhere. We've put innovative ideas and thinking into the hands of our professionals, and the results have been outstanding.

**CSCA®** is an acronym for **Career Solutions Candidate Acquisition.** We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry.

While you may be completing college, coming home from the military, or have had a college background, but may be interested in using your knowledge and experience to take your career to the next level, you might want to SUBMIT YOUR APPLICATION NOW as most of our Brokerages are hiring now.



## BILLIONS OF REASONS TO JOIN US

About $64 Billion is paid each year to real estate professionals across the nation. As a multibillion-dollar industry, we can offer you more than a chance to succeed. This is where you can thrive. The sky really is the limit. Our environment's energetic, our people are motivated and our career paths can take you where you want to GO. No matter **where you apply,** get ready for something big.

The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara. Nearly all of our team members started in this program. You will learn the Brokerage business from the inside out – taking care of customers, developing marketing plans and working with an energetic team of professionals. You'll see just how much influence you can have on the future of our Brokerage's and



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**6**

## LOOKING FOR SUCCESS? IT STARTS WITH CSCA®

**It's what we know best. Our focus is finding the best Candidates for our Brokerage Network. We work with the Best-of-the-Best; the leader's in the real estate industry, we can take your career just about anywhere. We've put innovative ideas and thinking into the hands of our professionals.          And          the          results          have          been          outstanding.**

**CSCA® is an acronym for Career Solutions Candidate Acquisition. We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry.**

**While you may be completing college, coming home from the military, or have had a college background, but may be interested in using your knowledge and experience to take your career to the next level, you might want to SUBMIT YOUR APPLICATION NOW as most of our Brokerages are hiring now.**

## BILLIONS OF REASONS TO JOIN US

About $64 Billion is paid each year to real estate professionals across the nation. As a multibillion-dollar industry, we can offer you more than a chance to succeed. This is where you can thrive. The sky really is the limit. Our environment's energetic, our people are motivated and our career paths can take you where you want to **GO**. No matter where you apply, get ready for something big.

The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara. Nearly all of our team members started in this program. You will learn the Brokerage business from the inside out – taking care of customers, developing marketing plans and working with an energetic team of professionals. You'll see just how much influence you can have on the future of our Brokerage's and in your own career. As you progress through the program, you'll see many more career options open to you.

## INTERNSHIPS

Want to start way out in front? Try our Internship Program. As a current university Business and/or Communication Major, you'll learn how to run a million dollar business by working with a team that's actually running one. You'll also gain truly marketable skills that will prepare you for a successful career after graduation.

## IT'S ABOUT YOU AND THE CUSTOMER

**The biggest ideas are often the simplest. We focus the resources of CSCA® on the satisfaction of Consumer Experience with our Brokerages and the success of its Team Members – including management. The rest will take care of itself. Our innovative commitment has held true, and as a result, our Brokerages continue to be recognized for their world-class customer service and the way we advance our professionals.**

## LEADING THE WAY.

As a company, the goal of CSCA® was never to be the biggest – only the best. However, because our people offer the best customer experience, we've done some growing. We serve the best real estate Brokerage brands in the world. And there's no plan to slow down.

## STARTING IN NEIGHBORHOODS.

Since our founding, we've helped our Brokerages market to both their communities and local neighborhoods. In fact, that's what we are about; marketing the best of Talent to the best people in the world, our Brokerages and the customers in the communities they serve. We expanded this local service to other markets, and we continue to build on this base of business – real estate expertise conveniently located right where customers live and work.

## MORE THAN JUST REAL ESTATE.

Our exclusive Brokerages continue to find success in other business areas as well. These revenue streams give them the opportunity to diversify their businesses and, in turn, offer you more career opportunities.

## TECHNOLOGY MAKES US GO.

How committed are we to technology? Every year, our Brokerages invest in their technology infrastructure so they remain on the leading edge. This technology is put in your hands so you can make the customer's experience the absolute best it can be.



      Apply Now  |  Find Us

In The News

**Home**

**Our Company**

Our History

Where We're Going

In The News

Awards & Recognition

**Our Culture**

**Opportunities**

**Benefits**

**Job Prep**

**Guarantee**

**Find Us**

### WE MAKE NEWS.

**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

### Announcing the 2012 Class of '30 Under 30'

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

### Need a Role Model? Meet Ours!



**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old.**

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**9**

## WE MAKE NEWS.

**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

## Announcing the 2012 Class of '30 Under 30'

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

## Need a Role Model? Meet Ours!



**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old**.

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".

Kendra is a judge for the Real Estate Apprentice Foundation - a grant program helping 5,000 newly licensed real estate agents every year to succeed in real estate.

Kendra hosts "My House is Worth What?" on HGTV and a regular real estate contributor on Cavuto on Business.

If you are considering Applying with CSCA® you might want to VIEW WHAT KENDRA HAS TO SAY about her journey after her College Years.

## Want to hear MORE FROM KENDRA?

Author Carolyn Castleberry and entrepreneur Kendra Todd talk about "Kingdom Entrepreneurs" and how to become one. Carolyn is an accomplished author and TV News Anchor.



      Apply Now  |   Find Us

Awards & Recognition

Home

Our Company

Our History

Where We're Going

In The News

Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### Make it yours …

A LITTLE RECOGNITION **GOES A LONG WAY.** A lot of recognition goes even further. Our Brokerages and their Team have received recognition and accolades for every aspect of real estate business. Whether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                    Client Access    Terms of Use    Privacy Policy

**12**



       Apply Now   |   Find Us

Interview Preparation

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

   Interview Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

## YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access     Terms of Use     Privacy Policy

**13**

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

## The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

## INSIDERS TIP

**Want a few 'insider' tips?**

1. Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers. (Please Click on Link.)

2. If You APPLY to CSCA® TODAY, you can get on the ground floor of the next great market; YES, it's already begun! Not only can you be a part of history, but, this knowledge can give your career a real power boost!

This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in economics and really understand the back story to the nation's current financial quagmire (without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special: **Money, Power and Wall Street: Part One, Two, Three and Four.** This link will take you to Part One and you should find Part's Two, Three and Four on the same page.

## The Markets

Read a few articles each week.
Understand what's going on in the real estate.
Stay up-to-date with financial news.
Know about FHA & VA, FANNIE MAE and FREDIE MAC.
Know about the financial crisis: what happened and why? It is the easiest way to demonstrate interest in our specific market.
Choose one or two areas of the market that you can discuss with specific knowledge and enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and economics.



     Apply Now   |   Find Us

Opportunities

**Home**

**Our Company**

**Our Culture**

**Opportunities**

   Training Program

   What You'll Learn

   Career Path

   Rewarding Success

   Day In The Life

   Internships

   Seasoned Professional

**Benefits**

**Job Prep**

**Guarantee**

**Find Us**

INTEREST IN ANY OF THESE PROFESSIONS? **WE ARE LOOKING FOR YOU!**

Management  Advertising  Marketing  Communications  Public Relations  Stock  Brokerage  Insurance  Financial Advisors  Real Estate  Appraisal  Recruiting & Staffing  Retail  Banking  Consumer Loan  Mortgage  Retail  Business Development  Career  Consumer  Credit  School  Counselor  Customer Service  Commercial and Residential Real Estate  Events  Manager  Telemarketing  Paralegals  Sales  Direct  Marketing  Teacher  Trainer  Coaching  Relocation  Real Estate Sales Management

**CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.**

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

**What can you earn?** Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

**It's time to GO.**

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.

   Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**16**

**INTEREST IN ANY OF THESE PROFESSIONS?** WE ARE LOOKING FOR YOU!

Management Advertising Marketing Communications Public Relations Stock Brokerage Insurance Financial Advisors Real Estate Appraisal Recruiting & Staffing Retail Banking Consumer Loan Mortgage Retail Business Development Career Consumer Credit School Counselor Customer Service Commercial and Residential Real Estate Events Manager Telemarketing Paralegals Sales Direct Marketing Teacher Trainer Coaching Relocation Real Estate Sales Management

CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

**What can you earn?** Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

## It's time to GO.

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.

## Right out of school or military?

Take your first step to success. You'll quickly learn that we hired you to eventually run your own business. And you'll have the opportunity to work with people as motivated and driven as you. You'll bring your degree to the table, and we'll help you make crucial business decisions in no time.

## Have some experience already?

We promote based on performance, not seniority. So if you're looking to move quickly, our Restart Training Program is for you. We'll take your existing knowledge and your drive to succeed, and supplement it with tools and training that will help you climb to the top.

### Where leaders learn to lead.

We start with orientation and classroom training. Once you are selected by one of our local Brokerage Offices, your hands-on training begins. You'll work with and learn from capable mentors who were once in your shoes. Does it work? Absolutely. Nearly all of our managers and corporate executives started out as Trainees -- including our Chairman and CEO.

### EXECUTIVE SEARCH and OTHER OPPORTUNITIES:

Like most businesses, CSCA® and its Brokerages have other positions that need filled from time to time that are not directly sales related.



     Apply Now  |  Find Us

FAQs

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

   Interview Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

### Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

### When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply **email us.**

### Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please **apply here**.

### Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

### What happens during the interview process?

If we meet you at in a job fair or campus environment, your first-round interview may take place on campus and/or at



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                    Client Access  Terms of Use   Privacy Policy

### Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

### When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply email us.

### Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please apply here

### Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

### What happens during the interview process?

If we meet you at in a job fair or campus environment, your first-round interview may take place on campus and/or at the job fair. Depending on the position, second and final rounds will take place are always held at the Brokerage with which we place you.

### Is career mobility an option with a CSCA® Brokerage?

Yes, the breadth and scope of the CSCA® Brokerage Network geographic presence enables our team to experience a wide array of career mobility based on their interests and evolving business needs.

### Do you accept applications from disabled persons?

We welcome applications from people with disabilities and are fully committed to supporting individuals through the recruitment process.

While driving and mobility are necessary functions, there are many other situations which would not present any challenge. Feel free to discuss your situation with us. If you believe you can do it, we want to believe in you.

## Do you accept applications for military veterans?

We welcome applications for military veterans. In fact, some of our best team members are former military folks. We invite you to visit our **Military Page** on this website.

## Do I need to be licensed before I submit my application?

Absolutely NOT! If you are placed with one of our Brokerages, helping you get your licensed is part of 'what we do'.

## Do you accept applications from currently licensed real estate professionals.

Yes, we welcome currently licensed real estate professionals, however, we have a special interview process for these situations. Please let us know when you submit your application that you are SEASONED.

To be clear, while CSCA® Brokerage member's represent all the major national and regional companies as well as local Independents, our hiring qualifications are very different. Generally, we are looking for a person that is not the 'typical' real estate agent. We are looking for real professionals, not people who simply write the word professional on their resume.

## Are you hiring interns now?

Absolutely. Interns play an integral role in the success of our Brokerages. We generally hire during your summer vacation – but our Brokers can always make exceptions. Some of our Brokerages, however, do hire interns all year long. **Apply now** to learn more.

## Are internships paid?

Yes. Sometimes. It depends on what your goals are. Interns may also be eligible for incentives and rewards. Talk to our CSCA® Talent Acquisition Manager for more details.

## What are the requirements for internship?

You should be currently enrolled in college. The ideal person should be interested in a management and sales environment and should have strong multi-tasking skills.

## What hours do interns work?

Hours for interns vary from location to location. Summer interns



    Apply Now  |  Find Us

What You'll Learn

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

## WHERE GO-GETTERS COME AND GET IT.

As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.

### Customer Service

**"How can I help you?"**

Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to **GO**.

### Marketing

**"Let's spread the word."**

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

### Financials



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                Client Access    Terms of Use    Privacy Policy

**22**

# WHERE GO-GETTERS COME AND GET IT.

**As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.**

## Customer Service

### "How can I help you?"

**Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to GO.**

## Marketing

### "Let's spread the word."

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

## Financials

### Keeping us in the green."

This is the "running a business" part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### "Everything has its place."

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management

techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.

## Financials

### Keeping us in the green."

This is the "running a business" part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### "Everything has its place."

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.



      Apply Now  |  Find Us

Career Path

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

Find Us

### There's only one way to GO. Anywhere.

There are many opportunities in real estate. We give you the flexibility to find your passion. And, then, follow that path. Where virtually everyone begins is as a trainee, where you GO is really up to you. Real estate has many faces. Residential, Commercial, Property Management, Business Opportunities, Mortgage Financing and the list goes on and on.

It's like changing careers without changing companies. It all depends on how far you want to GO.





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**25**



      Apply Now  |  Find Us

Rewarding Success

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

GREAT PERFORMANCE = **GREAT REWARDS**

As part of our team, you'll be compensated based on your performance. By making your Brokerage fun, and working well with your team, you'll be able to directly influence all areas of your success. You can build on our entrepreneurial model and earn an income that has no ceiling. It's only limited by your innovation, desire and skills. How much can you earn? If you perform, that's up to you.

### Managers

All team members, receive a percentage of the profits generated by their own success. As a manager, you'll earn a highly competitive income that is dependent upon the success of the business you're running. If your business does better, so do you. If you have a true entrepreneurial spirit, there's no limit to what you can earn. How high can you **GO?**





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



       Apply Now  |  Find Us

Internships

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

### There's Only One Internship Program Like This.

That's because there's only one CSCA®. Every year we turn internships into real, substantial career-building tools. And no, you won't spend your time fetching cups of coffee or making coffee. You'll learn what it takes to run a successful business because that's what you'll help do.

Along the way, you'll also participate in contests and competitions with other interns, building relationships, honing your entrepreneurial skills and gaining experience. You'll take on the same challenges as our first and second year full-time professionals. Even better, at the end of your internship, you'll make a presentation to your management team covering the business topics you learned throughout the program. **Want to GO?**



### You Put The GO In GO-Getter.

As part of our Internship Program, you must be ambitious, creative, personable, resourceful, fun loving and hard working. As you'd imagine, everyone else in the program is just as motivated as you. If you're ready, the business training you'll receive will put your skills, your attitude and your resume way out in front.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



      Apply Now  |   Find Us

Seasoned Professional

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

Find Us

### There's More Than One Way To Join One Of Our Fine Brokerages Through CSCA®.



Perhaps you are a seasoned real estate professional. By all means, YES! We'd enjoy talking to you about your career. In fact, we have many folks who 'informally' learned a lot about real estate, but their business hit a plateau. This is common. Once they have sold their family and friends, they have exhausted their Sphere-of-Influence (SOI).

You'll learn how our Proprietary System will help you increase your sphere, thereby increasing your opportunities for new business. In fact, doubling or tripling the business you are doing now can be easy if you follow our Sphere-of-Influence Building System™. Taking your business to the next level is exactly what our System is about.

We also hire for numerous positions (Sales Management, Relocation, etc.) that are integral to helping us better serve our customers.

### And, more

We also hire for a variety of administrative positions including full and part-time opportunities. Simply send us your resume and let us know how we can help you. There is always something moving in real estate.

NOTE: The CSCA® Guarantee applies to entry level opportunities only. Be sure to ask your CSCA® Talent Acquisition Director for more information.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates

CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



     Apply Now  |  Find Us

Benefits

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

---

- Find Us

## WE COVER TODAY AND TOMORROW

Our Brokerages offer you a career-home where you can build your future. And this means more than just a career. Through our various Associations, we offer many benefits packages designed to give you peace of mind today and is flexible enough to grow with you. Just think of it as your foundation for building something truly impressive. As you'd expect, our benefits help you **GO** much farther.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**29**



       Apply Now  |   Find Us

Job Prep

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

   Interview Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

Job Prep: **Who We Are Looking For**

CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few.

Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like.

### What CSCA® Looks for in Candidates

The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well.

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**30**

Job Prep: **Who We Are Looking For**

CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few.

Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like.

## What CSCA® Looks for in Candidates

The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well.

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.

   - Career-related employment
   - Internships
   - Co-op experience
   - Leadership in organizations
   - Student organization membership



     Apply Now  |   Find Us

Interview Preparation

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

   Interview Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

### YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**



GO
▶▶▶

Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**32**

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

### The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

### INSIDERS TIP

**Want a few 'insider' tips?**

1. Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers. (Please Click on Link.)


2. If You APPLY to CSCA® TODAY, you can get on the ground floor of the next great market; YES, it's already begun! Not only can you be a part of history, but, this knowledge can give your career a real power boost!

**This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in economics and really understand the back story to the nation's current financial quagmire (without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special: Money, Power and Wall Street: Part One, Two, Three and Four. This link will take you to Part One and you should find Part's Two, Three and Four on the same page.**

## The Markets

**Read a few articles each week.**
**Understand what's going on in the real estate.**
**Stay up-to-date with financial news.**
**Know about FHA & VA, FANNIE MAE and FREDIE MAC.**
**Know about the financial crisis: what happened and why? It is the easiest way to demonstrate interest in our specific market.**
**Choose one or two areas of the market that you can discuss with specific knowledge and enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and economics.**



      Apply Now  |   Find Us

## Recruitment Process

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

   Interview Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

### Attend Our On-Campus Events

Please check with your career services center and student-run organizations for a listing of dates when CSCA® representatives will be at your school. If you're interested in a career with us, please join us for our presentations and other recruiting events held on campus. Take some time to talk with us, and we'll explain the different career opportunities available at a CSCA® Brokerage and share personal observations of the Brokerage, such as why we enjoy working here.

### Apply Online

Complete our **online application.** If you qualify for consideration, we'll contact you to arrange an interview to discuss available opportunities. We ask that all interested candidates complete our online application in addition to applying through your school's system if we have posted a job at your campus.

### Interview With Us

We generally have at least two rounds of interviews. First and final rounds can be conducted by phone, on campus or in our offices.

### If We Don't Visit Your School

Unfortunately, CSCA® representatives can't visit every school. If our on-campus interviews aren't offered on your campus, you should learn as much as you can about our goals in advance by reading our website and then complete our **online application.** for consideration.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**35**



      Apply Now  |   Find Us

FAQs

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

   Interview Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

### Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

### When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply **email us**.

### Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please **apply here**.

### Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

### What happens during the interview process?

If we meet you at in a job fair or campus environment, your first-round interview may take place on campus and/or at



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

**36**

 Guarantee

      Apply Now  |  Find Us

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### 'If CSCA® doesn't help you find a job, we'll help pay your bills.'™

We're so confident that (if you have the right skill-set to launch your career with one of our entry level positions, be willing to relocate and we have a brokerage in your market) CSCA® will guarantee that you will find employment with one of our Brokerages within six months of graduation, or, we'll help pay your bills for the next six months. Simple as that. Ask our Talent Acquisition Manager for more details. A written agreement is required.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**37**



     Apply Now  |  Find Us

Apply now

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### Are you on the GO?

With 90% of the U.S. population located within 15 miles of one of our Brokerages, there's a CSCA® Career Consultant waiting to talk to you.

If you have been surfing our site, you have already learned about some of the opportunities at one of our Brokerages. In just a minute, you'll be able to apply for a position online.

Our Brokerages have built a thriving business based on offering exceptional service to their customers and a dynamic and rewarding work environment to their employees.

Interested in a career with one of our fine Brokerages? You'll only need to SUBMIT ONE Application based on where you live and/or plan to work. Applying to more than one position or to multiple locations will slow the process down. Our Career Counselors will work with you to find the position and location that is a perfect fit for your skill set. Thank you for allowing us to respond to your application in a timely fashion!

Thank you for letting CSCA® help you plan your career path!

### OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):

SELECT APPROPRIATE FIELD
(Select Up to Five Choices)



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                         Client Access    Terms of Use    Privacy Policy

**38**

## OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):
SELECT APPROPRIATE FIELD
(Select Up to Five Choices)

- ☐ Advertising
- ☐ Appraisal
- ☐ Banking
- ☐ Business Administration
- ☐ Commercial Real Estate
- ☐ Communications
- ☐ Consumer Loan
- ☐ Credit
- ☐ Customer Service
- ☐ Counselor(Career,Credit,School)
- ☐ Development
- ☐ Direct Marketing
- ☐ Events Manager
- ☐ Finance
- ☐ Financial Advisors
- ☐ Insurance
- ☐ Marketing
- ☐ Market Research
- ☐ Marketing & Research
- ☐ Mortgage
- ☐ Paralegals
- ☐ Public Relations
- ☐ Real Estate
- ☐ Retail
- ☐ Retail & Consumer
- ☐ Recruiting & Staffing
- ☐ Sales
- ☐ Stock Broker

- ☐ Stock Brokerage
- ☐ Teacher
- ☐ Trader
- ☐ Trainer
- ☐ Telemarketing
- ☐ Other (Please Describe)

Are You Applying For:

- ☐ Full-Time
- ☐ Intern with Full Time Expectancy
- ☐ Part-Time
- ☐ Other (Please Describe)

Tell Us About Your School / Work History:

- ☐ Business
- ☐ College Graduate
- ☐ Great People Skills
- ☐ Intuitive
- ☐ Marketing
- ☐ Military Veteran
- ☐ Niche Relationships
- ☐ Public Relations
- ☐ Sales
- ☐ Some College
- ☐ Student
- ☐ Other (Please Describe)

**Just for The Fun of It, Tell Us Your Yes's and No's**

Have You enjoyed and Watched NBC's THE APPRENTICE®?
☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched ABC's SHARK TANK®?
☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

**Tell Us About Your School / Work History:**

☐ Business

☐ College Graduate

☐ Great People Skills

☐ Intuitive

☐ Marketing

☐ Military Veteran

☐ Niche Relationships

☐ Public Relations

☐ Sales

☐ Some College

☐ Student

☐ Other (Please Describe)

**Just for The Fun of It, Tell Us Your Yes's and No's**

Have You enjoyed and Watched NBC's THE APPRENTICE®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched ABC's SHARK TANK®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

Like many professions (nursing, teaching, contracting, plumbing, law, medical, real estate, stock-brokerage, insurance, etc.), the career for which you are applying requires state licensing, malpractice / Errors and Omissions (E&O) insurance and joining one or more professional associations.

The fees and costs associated with licensing and membership are usually paid by you directly to the state licensing agencies and/or other third parties. **YOU WILL NEVER BE ASKED TO PAY ANY FEES OR COSTS TO CSCA®.**

Exact fees will be discussed with you upon determination of WHICH sector of the Financial Services Industry (banking, insurance, stock-brokerage and/or real estate) for which you will be recommended as well as the state in which you will be working.

With this in mind and setting aside questions about a specific fee, do you understand (conceptually) that many higher level careers require you to obtain a license and ongoing continuing education to maintain your license?

☐ Yes ☐ No

**The Career You Are Applying For Requires State Licensing and a Background Check. Is there anything in your past that might cause you a challenge that would compromise your ability to be licensed or pass a background check?**

☐ Yes ☐ No

100 Words Limitation



Education Qualification

---

College Attended

Type Your Re:

Highest Degree Attended

Type Your Re:

Graduate Year

Choose Graduation Year ▼

Available Start Date

Type Your Re:

500 Words Limitation

**How would your friends describe you?** (Self-Starter, Needs Motivation, Detail Oriented, People Person, team player, etc.):



500 Words Limitation

If you could change anything about yourself, what would it be?



500 Words Limitation

What do you consider your strengths and weaknesses?



500 Words Limitation

Tell us about a time when you accomplished something that others didn't' think you could do.



500 Words Limitation

When YOU are working with a salesperson (from any industry), what do you think are the most important characteristics the salesperson should have?



500 Words Limitation

Was there ever a time when you had to meet people you didn't know and had to ask them for something or sell them something or present an idea? Describe the situation and what was the outcome?

What other career industries have you considered or have an interest in?



500 Words Limitation

Do you know anyone in the Real Estate / Mortgage Sectors of the Financial Services Industry? Are they successful? Assuming the income potential met your expectations and you had appropriate training, what, if any, are your feelings towards becoming an 'Account Executive / Sales Professional' as a career choice?



500 Words Limitation

If the income potentials are appropriate, but you had to 'arrange your personal time, would you be willing to work evenings and weekends if needed or, are you more comfortable with "9-5"? Explain why.

What 'MATTERS' to you? What are you looking for in a company? What are you looking for in life?

> Type Your Response Here…

Work Information

---

If You Have Worked, Tell Us About It:

☐ Yes

☐ No Student Only. I've Never Worked.

If you have prior work experience, describe what the job(s) was/were and what you liked the LEAST and MOST about the job(s).

500 Words Limitation

> Type Your Response Here…

Years of Combined Work History

> Type Your Re:

Current Employer

> Type Your Re:

Current Title

> Type Your Re:

Current Salary

> Type Your Re:

Would You Consider Relocating

☐ Yes  ☐ No

1500 Words Limitation

Work History/Experience (List Current and Past Employers while student or after along with the Tasks and Duties involved with your Job.)

> Type Your Response Here…

500 Words Limitation

Combined Duties of All Listed Work History

Resume Questions

---

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

> Type Your Response Here…

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

> Type Your Response Here…

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?

> Type Your Response Here…

From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One

> $------to $------

Year Two

> $------to $------

Year Five

> $------to $------

☐

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.

Resume Questions

---

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

> Type Your Response Here…

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

> Type Your Response Here…

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?



From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One



Year Two

Year Five

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.



     Apply Now  |  Find Us

Find Us

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

- Find Us

**CSCA®**
Career Solutions and Candidate Acquisition
4533 MacArthur Blvd., Suite 100
Newport Beach, CA 92660-2059
USA Toll Free: 1-866-254-7600
Local: 949-644-7600
www.csca.com
CONTACT US





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**47**

# EXHIBIT 8



     Apply Now  |  Find Us

**YOUR CAREER. LETS GET IT STARTED.**

**CSCA® is one of the best places to launch your career. If you share our 'DNA' we know you will like what everyone is talking about.**



Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

1



      Apply Now  |  Find Us

Our Company

- Home
- **Our Company**
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

Find Us

**From the Desk of our Founder and CEO**



**Thank you for visiting CSCA®. You are about to discover a Talent Acquisition Company that offers you a career like no other.**

At CSCA®, all talents apply. We're people who love technology and people who love people. We're also business people, musicians, photographers, mountain climbers, students, and artists whose interests can't be defined by a job description. Whether you're analytical or creative, tech savvy or insightful, there's a place in our Brokerages to share your talents while you learn, develop, and inspire.

I encourage you to tell us about yourself. Join us. Show your passion and expertise as you connect customers with our services and help integrate our services into their lives. Be a part of our team and change the way our customers work, play, create, and live. Our network of fine Brokerages sell a lot more than houses, they sell Lifestyles!

I challenge you to be part of something amazing. CSCA® hand selects the very best Brokerages across the nation (Independent and Franchised) on the basis that they have met our stringent standards, embrace our culture and are looking to the future. In fact, the elite Brokerages who are members of our network are not only the most innovative real estate Brokerages in the world; they represent the best brands and are among the fastest growing. On behalf of our Brokerages, CSCA® is always looking for smart, engaging, supportive, and dynamic people who have a passion for people and serving them as you would want to be served yourself.

We join our Brokerages in sharing the common goal of exceeding the expectations of our customers. That's where YOU come in. We can't do it without the right talent. Consumers can go anywhere for their Financial Services needs; in this case real estate and take their chances or they can enjoy the experience with one of our team members and buy and sell with confidence. That's the CSCA® difference.

Successfully and Warmly,



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**2**



     Apply Now   |   Find Us

Awards & Recognition

Home

Our Company

   Our History

   Where We're Going

   In The News

   Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

## Make it yours …

A LITTLE RECOGNITION **GOES A LONG WAY.** **A lot of recognition goes even further. Our Brokerages and their Team have received recognition and accolades for every aspect of real estate business. Whether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation.**





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**12**



      Apply Now   |   Find Us

Career Path

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

## There's only one way to GO. Anywhere.

There are many opportunities in real estate. We give you the flexibility to find your passion. And, then, follow that path. Where virtually everyone begins is as a trainee, where you GO is really up to you. Real estate has many faces. Residential, Commercial, Property Management, Business Opportunities, Mortgage Financing and the list goes on and on.

It's like changing careers without changing companies. It all depends on how far you want to GO.





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**25**



      Apply Now  |   Find Us

Rewarding Success

Home

Our Company

Our Culture

Opportunities

    Training Program

    What You'll Learn

    Career Path

    Rewarding Success

    Day In The Life

    Internships

    Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

GREAT PERFORMANCE = **GREAT REWARDS**

As part of our team, you'll be compensated based on your performance. By making your Brokerage fun, and working well with your team, you'll be able to directly influence all areas of your success. You can build on our entrepreneurial model and earn an income that has no ceiling. It's only limited by your innovation, desire and skills. How much can you earn? If you perform, that's up to you.

### Managers

All team members, receive a percentage of the profits generated by their own success. As a manager, you'll earn a highly competitive income that is dependent upon the success of the business you're running. If your business does better, so do you. If you have a true entrepreneurial spirit, there's no limit to what you can earn. How high can you **GO?**





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



      Apply Now  |  Find Us

Internships

Home

Our Company

Our Culture

Opportunities

   Training Program

   What You'll Learn

   Career Path

   Rewarding Success

   Day In The Life

   Internships

   Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's Only One Internship Program Like This.

That's because there's only one CSCA®. Every year we turn internships into real, substantial career-building tools. And no, you won't spend your time fetching cups of coffee or making coffee. You'll learn what it takes to run a successful business because that's what you'll help do.



Along the way, you'll also participate in contests and competitions with other interns, building relationships, honing your entrepreneurial skills and gaining experience. You'll take on the same challenges as our first and second year full-time professionals. Even better, at the end of your internship, you'll make a presentation to your management team covering the business topics you learned throughout the program. **Want to GO?**

### You Put The GO In GO-Getter.

As part of our Internship Program, you must be ambitious, creative, personable, resourceful, fun loving and hard working. As you'd imagine, everyone else in the program is just as motivated as you. If you're ready, the business training you'll receive will put your skills, your attitude and your resume way out in front.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



       Apply Now  |   Find Us

Seasoned Professional

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

Find Us

### There's More Than One Way To Join One Of Our Fine Brokerages Through CSCA®.

Perhaps you are a seasoned real estate professional. By all means, YES! We'd enjoy talking to you about your career. In fact, we have many folks who 'informally' learned a lot about real estate, but their business hit a plateau. This is common. Once they have sold their family and friends, they have exhausted their Sphere-of-Influence (SOI).

You'll learn how our Proprietary System will help you increase your sphere, thereby increasing your opportunities for new business. In fact, doubling or tripling the business you are doing now can be easy if you follow our Sphere-of-Influence Building System™. Taking your business to the next level is exactly what our System is about.

We also hire for numerous positions (Sales Management, Relocation, etc.) that are integral to helping us better serve our customers.

### And, more

We also hire for a variety of administrative positions including full and part-time opportunities. Simply send us your resume and let us know how we can help you. There is always something moving in real estate.

NOTE: The CSCA® Guarantee applies to entry level opportunities only. Be sure to ask your CSCA® Talent Acquisition Director for more information.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**28**



      Apply Now  |   Find Us

Benefits

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

## WE COVER TODAY AND TOMORROW

Our Brokerages offer you a career-home where you can build your future. And this means more than just a career. Through our various Associations, we offer many benefits packages designed to give you peace of mind today and is flexible enough to grow with you. Just think of it as your foundation for building something truly impressive. As you'd expect, our benefits help you **GO** much farther.





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use    Privacy Policy

**29**



Guarantee

      Apply Now  |  Find Us

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### 'If CSCA® doesn't help you find a job, we'll help pay your bills.'™

We're so confident that (if you have the right skill-set to launch your career with one of our entry level positions, be willing to relocate and we have a brokerage in your market) CSCA® will guarantee that you will find employment with one of our Brokerages within six months of graduation, or, we'll help pay your bills for the next six months. Simple as that. Ask our Talent Acquisition Manager for more details. A written agreement is required.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

**37**



      Apply Now  |  Find Us

Apply now

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### Are you on the GO?

With 90% of the U.S. population located within 15 miles of one of our Brokerages, there's a CSCA® Career Consultant waiting to talk to you.

If you have been surfing our site, you have already learned about some of the opportunities at one of our Brokerages. In just a minute, you'll be able to apply for a position online.

Our Brokerages have built a thriving business based on offering exceptional service to their customers and a dynamic and rewarding work environment to their employees.

 

Interested in a career with one of our fine Brokerages? You'll only need to SUBMIT ONE Application based on where you live and/or plan to work. Applying to more than one position or to multiple locations will slow the process down. Our Career Counselors will work with you to find the position and location that is a perfect fit for your skill set. Thank you for allowing us to respond to your application in a timely fashion!

Thank you for letting CSCA® help you plan your career path!

### OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):

SELECT APPROPRIATE FIELD
(Select Up to Five Choices)



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.          Client Access   Terms of Use   Privacy Policy



     Apply Now   |   Find Us

Find Us

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

**CSCA®**
Career Solutions and Candidate Acquisition
4533 MacArthur Blvd., Suite 100
Newport Beach, CA 92660-2059
USA Toll Free: 1-866-254-7600
Local: 949-644-7600
www.csca.com
CONTACT US





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**47**

# EXHIBIT 27

# EXHIBIT 28

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE:  619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**04/25/2013** at 09:36:00 PM
Clerk of the Superior Court
By e Clerk, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# ORANGE COUNTY SUPERIOR COURT

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>              PLAINTIFF,<br>v.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS;<br><br>PROFESSIONAL REALTY COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.;<br><br>and DOES 2-10,<br><br>              DEFENDANTS. | **CASE NO.:** 30-2012-614932-CU-FR-CJC<br><br>**JUDGE:** Hon. Gregory Munoz<br><br>**PLAINTIFF FERNANDO MARTINEZ'S OPPOSITION TO DEMURRER, OPPOSITION TO DISMISS THE CASE WITH PREJUDICE, AND REQUEST TO FILE THE PROPOSED SECOND AMENDED COMPLAINT**<br><br>**Date**: May 9, 2013<br>**Time**: 2:00 pm<br>**Dept**: C-13 |

BENJAMIN PAVONE, ESQ.

## **INTRODUCTION**

Mr. O'Hara has now filed three demurrers in this case offering dozens of picayune criticisms.  As Hon. Joel Pressman, a San Diego judge, lamented not so long ago: "demurrers are disfavored, because they're fairly useless."

Indeed.  Demurrers are little more than a great way for defense counsel to generate dozens if not hundreds of billable hours charging a legally unsophisticated client to accomplish exactly nothing.   Under state law, a plaintiff has a liberal right to amend his complaint unless no possible case can be stated and the relentless nitpicking of a complaint by a defendant, as is occurring here, will be fixed by the plaintiff and his complaint on file will be improved.  This is arguably contrary to the defendant's actual interest.   Thus, instead of allowing a complaint that puts the defendant on notice of the claims and allows the parties to move the case in discovery thereafter, extensive demurrer practice usually results in a more advanced, lengthy and complex complaint that accounts for all the defense's never-ending objections, is exhaustively supported and cited, and usually asks for more and greater relief than the original complaint.  That is the case here.

Of course, justice is not driven by the beauty of complaints.  Hence, judges like Mr. Pressman become demoralized with law firms that practice the way Teeple Hall does, as extensive objections to the complaint rarely serve any actual purpose under the law and end up being a galactic waste of the Plaintiff's time and little more than a transfer of wealth from the defendant to defense counsel.

As it stands, Plaintiff has not had a _single_ opportunity to amend the complaint without limitation, and without facing some sort of effort to block it by the defense: the First Amended Complaint is challenged as beyond the permissible scope of the Court's February 21, 2013 ruling, with the defense accusing counsel of contempt and other procedural sins.  So Plaintiff prepared a Second Amended Complaint attempting to account for the multitudinous defense criticisms.  Defendants refused to allow it.  Plaintiff set up an ex parte motion seeking leave to amend, but then sought

BENJAMIN PAVONE, ESQ.

to file it directly under section 472 by relying on language in Rutter: "Because CCP § 472 applies to 'any pleading,' where a demurrer has been sustained with leave to amend and plaintiff files an amended complaint, that pleading presumably can also be amended once 'of course' (without leave of court) before defendants answers or demurs.' (Weil & Brown, <u>Civil Procedure Before Trial</u> (2006), Chapter 6, §6:603 – § 6:607, pp. 6-153 – 6-154 ["Rutter Guide"].)

Nevertheless, upon the attempted filing, defendants filed another comprehensive challenge blocking it and court staff nevertheless bounced it. Consequently, Plaintiff Martinez is required to file opposition to, and the Court is apparently requested to rule on, a demurrer that is pursued solely to satisfy the defense's desire to make an entirely unreasonable request: to dismiss a case *with prejudice* where Plaintiff has not been afforded *even one opportunity* to file an amended complaint without restriction.

## I.

## THE DEFENSE DEMURRER SHOUD BE OVERRULED IN ITS ENTIRETY AS MOOT, GIVEN THE SECOND AMENDED COMPLAINT.

### A.    The Court Should Allow the Second Amended Complaint, which Moots the Debate about the Various Criticisms Leveled by the Defense in Regard to the Fraud Cause of Action, the Addition of the Injunctive Causes of Action and the Alter Ego Request.

At any time, before or after the trial starts, the court may allow a party to amend a pleading in the furtherance of justice. (Code Civ. Proc., § 473, subd. (a)(1), § 576; see also *Stanton* v. *Cox* (1989) 207 Cal.App.3d 1557, 1563.) Courts are liberal in allowing amendments. (*California Gasoline* v. *Regal Petroleum* (1958) 50 Cal.2d 844, 851.) Courts allow amended pleadings under Code of Civil Procedure, section 473, subdivision (a) where a plaintiff seeks to allege a new cause of action based on the same general set of facts. (*Glaser* v. *Meyers* (1982) 137 Cal.App.3d 770, 776-777 ["even an amendment which gives rise to a separate cause of action is permitted if

recovery is being sought on the same general set of facts, and if the amendment is not prejudicial to the party against whom it is offered."]; *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 564-565; *Kirby v. Seeno* (1992) 11 Cal.App.4th 1059, 1069 [denial of leave only plausible where no amendment can cure the defect].)

Plaintiff has changed part of the theory of recovery, evolving from a labor claim to include a false advertising argument, but the gravamen originates from the same basic misconduct: Mr. O'Hara lured Mr. Martinez under a complex advertising rule into a putative business relationship, and then used his sophistication advantage over Martinez to obtain sex from him. Instead of pleading the case only as fraud, Plaintiff has studied the luring device, the CSCA website, and has sought to stop Mr. O'Hara responsible for releasing dozens of false, public statements into the economy.

The First Amended Complaint is based on the same general set of facts as the original complaint. The Second Amended Complaint, included herewith, is very similar to the First Amended Complaint, by accounting for a few more criticisms and correcting a few citations.

Plaintiff understood the Court's ruling of February 21, 2013 to give him blanket authority to amend the complaint, as no restriction was expressly stated therein. However, a review of case authorities indicates that an unspecified grant of leave to amend in response to a demurrer-type challenge, as was the case with that ruling, does not give the Plaintiff carte blanche to amend. Rather, the amended complaint must be within the scope of the Court's ruling. (*Harris* v. *Wachovi* (2010) 185 Cal.App.4th 1018, 1022-23.) Nevertheless, Plaintiff could have arguably utilized his one "free" amendment to justify filing an amended complaint without restriction. (Weil & Brown, Civil Procedure Before Trial (2006), Chapter 6, §6:603 – § 6:607, pp. 6-153 – 6-154 ["Rutter Guide"].) Either way, the point of this litigation, it would seem, is to get the case to where the pleadings are settled, and the Second Amended Complaint should be the last of these amendment exercises. If the Court allows the Second Amended Complaint, the defense's criticism about the permissible

BENJAMIN PAYONE, ESQ.

scope of amendment as to the First Amended Complaint, including its protest that Martinez improperly added causes of action and alter ego findings, is all moot.

**B.    The Fraud Cause of Action Is Overwhelmingly Pled.**

Plaintiff fails to see what more could possibly be alleged in relation to the fraud cause of action.  (See FAC/SAC, ¶¶ 1-70 [reciting detailed factual background of circumstances constituting fraudulent conduct]; ¶ 72 [specifying exact nature of who claim is directed against]; ¶¶ 73-81 and Exhibit A [laying out extensive itemization of detailed, and mostly, written allegedly false statements including basis for finding liability of allegedly speculative statements]; FAC/SAC ¶ 82 [alleging/summarizing falsity of claims]; FAC/SAC ¶ 83[summarizing O'Hara's knowledge and intent]; ¶¶ 84-85 [addressing reasonable reliance issues]; FAC/SAC ¶¶ 86-98 [extensively detailed damage theory, based on "benefit-of-the-bargain" theory allowable in the Fourth District, as opposed to out-of-pocket rule]; FAC/SAC ¶ 100 [explaining basis for punitive damages].)  Put simply, O'Hara defrauded Martinez by luring him with false promises of real estate riches and access to the accoutrements of a real estate empire, when in reality, O'Hara is a garden variety real estate agent using a complex false promise system as a way to obtain youthful sexual partners.  That is fraud.

**C.    The Fraud Cause of Action Against the Entity Defendants is Viable.**

The defense contends Martinez cannot allege fraud against the entity defendants.  (Demurrer, p. 4.)   As to CSCA, O'Hara was acting as its direct representative when he made the statements that form the majority of the fraud cause of action.  (See FAC, Exhibit A; SAC, Exhibit A [same exhibit].)   CSCA does not appear to itself be a different entity than PRCI.  CSCA is apparently an unincorporated trade name being used by O'Hara; depending on the details of its ownership, it is either property of O'Hara personally or property of PRCI.  If it is PRCI's property, PRCI is the entity liable for the fraud of its representatives.[1]

---

[1] In its footnote (4), the defense purports to create an inconsistency in Plaintiff's pleading about CSCA.  There is no inconsistency.  There is an uncertainty as to what

BENJAMIN PAVONE, ESQ.

Plaintiff has filled out sufficient allegations in the Second Amended Complaint. (SAC, ¶ 72.)

### D. The False Advertising Claim Is Viable in the Second Amended Complaint.

The defense criticizes the First Amended Complaint for failing to allege how Martinez lost money, that he did not purchase a product as a consumer, and that O'Hara does not have standing as a general member of the public. (Demurrer, p. 10.)

Plaintiff has added allegations about lost money in the Second Amended Complaint to satisfy defendants, Martinez was a consumer of O'Hara's employment placement services, and he was directly harmed as a person who fell for the false advertisements by coming to work for O'Hara and succumbing to the inferior employment offered. (SAC, ¶¶ 104, 210; Bus. & Prof. Code, § 17500 [including services within remedial purview]; *Hoover v. Groger* (1936) 12 Cal.App.2d 417, 420.)   As to the defense claim that Martinez admits he was not a consumer, Martinez was obviously a consumer at the time he read O'Hara's advertisement for employment placement services.

Defendants claim that CSCA's statements are mere puffery.  The statements make claims that are verifiable by resort to facts. (See, e.g., FAC/SAC, ¶ 124 [is there an annual class of 30]; ¶ 131 [does CSCA have verifiable standards]; ¶¶ 136 [does CSCA have established practices]; ¶ 138 [does CSCA have a track record of placing college graduates and military]; ¶ 140 [does CSCA actually represent companies who are looking to hire]; ¶ 143 [is CSCA actually affiliated with the finest real estate Brokerage brands in the nation]; ¶ 145 [does CSCA work with the leaders of the real

the exact relationship between CSCA and PRCI is; it appears that PRCI was recently formed, but its formation was before the relationship between Martinez and O'Hara occurred and has now appeared, after the suit, on CSCA's website.  Thus, as many corporate confidence men do, O'Hara is probably keeping his options open in terms of who owns what among his entities depending on how the lawsuit goes.

BENJAMIN PAVONE, ESQ.

estate industry]; ¶ 149 [are CSCA brokerages actually hiring]; ¶ 155 [does CSCA's brokerages launch thousands of successful careers].)  Based on discovery to date, the entire CSCA placement organization appears to be an illusion – a giant bubble of baloney unsupported by anything remotely close to that which is represented on the website.

### E.    The Unfair Business Practices Claim

Defendants contend the UCL claim rises and falls with the False Advertising cause, but only cite authority to establish that the "unlawful" prong of a 17200 claim requires a predicate legal violation.  (Demurrer, p. 12.)   The language of the statute is written in the disjunctive and therefore allows liability for any unlawful, or unfair, or fraudulent, business practice. (*Podolsky* v. *First Healthcare* (1996) 50 Cal.App.4th 632, 647.)  The independent unfairness prong of the UCA is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. (*Ibid*.)  Thus, even if the Court finds a defect with the False Advertising cause of action, the Court may still ultimately determine that Mr. O'Hara's practice of making false employment placement promises on the internet is unfair or fraudulent, and can thereby be enjoined. (FAC ¶¶ 217-218; SAC ¶¶ 217-218.)

### F.    The Sexual Harassment Citation Has Been Amended.

The Second Amended Complaint corrects a citation to the statutory basis for a sexual harassment claim in an employment context.  (SAC, p. 34.)   The citation and procedure for requesting attorney's fees on a penalty claim has also been tweaked. (SAC, ¶ 241; SAC p. 41, ¶ 6.)

### G.    Alter Ego Findings Are Permissible.

The defense contends that Martinez's request for alter ego findings is impermissible.  As explained in the Opposition to Motion to Strike, a request for such findings is not a cause of action in the traditional sense, nonetheless it is routinely pled in order to put the defense on notice that such relief is sought. (*Mesler v. Bragg* (985) 39 Cal. 3d 290, 297-298.)  As for the defense claim that Martinez clearly

BENJAMIN PAVONE, ESQ.

misunderstands the doctrine, the opposite is true.  (Compare *Sonora Diamond* v. *Sonora High* (2000) 83 Cal.App.4th 523, 538 [traditional piercing] with *Postal Press* v. *Kaswa* (2008) 162 Cal.App.4th 1510, 1518 [reverse piercing].)  Already there has been a suspicious corporate layer added to the present iteration of the CSCA website, which raises concerns that reverse piercing will be necessary. (SAC ¶ 5.)

## **CONCLUSION**

"O'er lawyers' fingers, who straight dream on fees," said Shakespeare in Romeo and Juliet.  In a motion where the defense does not seriously contend that the existing complaint is so devoid of any possible merit that no amendment could conceivably rectify it, one wonders what purpose related to the law is actually being served by these extensive, seriatim pleading challenges.

Regardless, Plaintiff filed a detailed complaint.   At the Court's request, he made numerous corrections to make it more concise.  If counsel read a broader grant of amendment than the law allowed, technically Martinez had the right to file an unlimited amendment.  Either way, upon each defense challenge, Plaintiff made more corrections, and still more corrections.  The complaint, now in its Second Amended edition, should be in an acceptable state even for the pickiest of defense counsel.  Thus, the Court should allow it to be filed, overrule the defense motions, and thereby signal that it is time to move the case forward on the merits.

Date: April 25, 2013

LAW OFFICES OF
BENJAMIN PAVONE, PC


\s\Benjamin Pavone, Esq.
Benjamin Pavone, Esq.
Attorney for Plaintiff
Fernando Martinez

BENJAMIN PAVONE, ESQ.

---

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA 92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| FERNANDO MARTINEZ, | CASE NO. 30-2012-614932 |
| v. | **PROOF OF SERVICE** |
| STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA; | |

I am a resident of the San Diego County. I am over the age of eighteen years and not a party to the within entitled action. My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108. On April 25, 2013, I served the following:

     *      Opposition to Demurrer; Opposition to Motion to Strike; Pavone Declaration; Proposed Second Amended Complaint

Brook Barnes, Esq.
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, California 92121
(Attorney for Defendants)                           (Via Electronic Service)

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 25th day of April, 2013 that the foregoing is true and correct.



---

# EXHIBIT 29

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE:  619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**04/25/2013** at 09:36:00 PM
Clerk of the Superior Court
By e Clerk, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# ORANGE COUNTY SUPERIOR COURT

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>            PLAINTIFF,<br>v.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS;<br><br>PROFESSIONAL REALTY COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.;<br><br>and DOES 2-10,<br><br>            DEFENDANTS. | **CASE NO.:** 30-2012-614932-CU-FR-CJC<br><br>**JUDGE:** Hon. Gregory Munoz<br><br>**PLAINTIFF FERNANDO MARTINEZ'S OPPOSITION TO MOTION TO STRIKE, OPPOSITION TO DISMISS THE CASE WITH PREJUDICE, AND REQUEST TO FILE THE PROPOSED SECOND AMENDED COMPLAINT**<br><br>**Date**: May 9, 2013<br>**Time**: 2:00 pm<br>**Dept**: C-13 |

BENJAMIN PAVONE, ESQ.

---

MARTINZ v. O'HARA – CASE NO. 30-2012-614932
MARTINEZ'S OPPOSITION TO MOTION TO STRIKE

1

# **PROCEDURAL HISTORY**

Plaintiff Fernando Martinez filed suit on November 28, 2012 alleging employment-related causes of action in a detailed complaint.  Mr. O'Hara filed a demurrer and motion to strike on or about January 16, 2013, which set the matter for ruling on February 21, 2013. [1]  In his motion to strike, Mr. O'Hara sought to eliminate various language from the complaint, sometimes seeking to have a whole paragraph eliminated, at other times asking the Court to strike portions of a particular paragraph.

The Court issued a written tentative ruling in anticipation of its February 21, 2013 ruling.  Its language: "After consideration of all papers filed in this case, defendants' Motion to Strike portions of the Complaint is granted in its entirety. Plaintiff is granted 15-days leave to amend. The Complaint does not conform with CCP §425.10(a)(1). It does not state facts constituting the cause of action, in ordinary and *concise* language. Therefore, it is subject to being stricken under CCP §436(b) as not being drawn in conformity with the laws of this State. Further, the inclusion of improper evidentiary facts, which may support plaintiff's theory of the case, but are unnecessary to state any cause of action, render the Complaint subject to being stricken under CCP §436(a).   In light of the ruling on the Motion to Strike and the granting of leave to amend, the Court declines to rule on the Demurrer as unnecessary."  At the appearance on the motion, the Court afforded Plaintiff (30) days leave to amend.

Meanwhile, other activity relating to the case affected the claims being brought.  For example, in between the original complaint and the ruling on the demurrer, Mr. O'Hara capitulated to part of Martinez's cause of action for non-payment of wages in the labor board forum.   O'Hara altered the website that invited Fernando to apply for work in the first place.  As part of that alteration, he announced

---

[1] Unless otherwise specified, references to Mr. O'Hara should be read to include all defendants.

BENJAMIN PAYONE, ESQ.

that a new entity, Professional Realty Council, Inc., a California corporation, was involved in the website.

In order for the lawsuit to reflect the current reality between the parties, Plaintiff updated the complaint: he formalized his concerns about the website and representations that lured Mr. Martinez into the problematic employment relationship with Mr. O'Hara, given a payment he scaled back the labor code cause of action to a mere penalty claim, he combined the wrongful termination and sexual harassment causes of action into one claim, he filed a Doe Amendment with respect to the corporate entity, and he made a genuine effort to remove the argumentative and editorial commentary in the original complaint.   The Court's language states: "In light of the ruling on the Motion to Strike and the granting of leave to amend, the Court declines to rule on the Demurrer as unnecessary."   There is no specific limitation on Plaintiff's right to amend in this language.  The First Amended Complaint was a better, clearer, and more concise complaint.  This is what the Court wanted.

Mr. O'Hara interprets the Court's ruling to have restricted Martinez to removing the language it challenged and to otherwise leave the original complaint as it was.  This was not practical or sensible.  As a practical matter, Martinez was required as an ethical matter to update the labor cause of action or else he would be tendering allegations in a pleading that were not true.  As a legal matter, he had the right to name PRCI as a Doe Defendant regardless of the Court's order.  As a matter of common sense in terms of advancing the litigation, it is easier for a party to fix a problematic complaint in one writing, rather than edit out the challenged language, file that, and then immediately file a motion to amend that complaint.  Arguably, Plaintiff had the right to use his one "free" amendment as provided in Code of Civil Procedure section 472 in conjunction with the Court's order to file an amendment without limitation. "Because CCP § 472 applies to 'any pleading,' where a demurrer has been sustained with leave to amend and plaintiff files an amended complaint, that

BENJAMIN PAYONE, ESQ.

pleading presumably can also be amended once 'of course' (without leave of court) before defendants answers or demurs.' (Weil & Brown, <u>Civil Procedure Before Trial</u> (2006), Chapter 6, §6:603 – § 6:607, pp. 6-153 – 6-154 ["Rutter Guide"].)

If Plaintiff misunderstood the Court, or the Court's language restricted Plaintiff from doing anything but removing the challenged language, then Plaintiff asks the Court to expand its grant of leave to allow for the more comprehensive filing in the proposed Second Amended Complaint, as a matter of the efficient administration of justice. (*Tarakjian* v. *Krone* (1987) 196 Cal.App.3d 1243, 1245 [trial court has the power to amend an order nunc pro tunc].)

As it stands, Plaintiff has not had a <u>*single*</u> opportunity to amend the complaint without limitation, and without facing some sort of effort to block it by the defense: the First Amended Complaint is challenged as beyond the permissible scope of the Court's February 21, 2013 ruling, with the defense accusing counsel of contempt and other alleged procedural felonies. In response, Plaintiff prepared a Second Amended Complaint attempting to account for the numerous defense concerns. Defendants refused to allow it. Plaintiff set up an ex parte for leave but then sought to file it directly utilizing section 472. Court staff bounced it and the defense attacked it. Consequently, Plaintiff Martinez is required to file opposition to, and the Court is apparently requested to rule on, challenged language in a version of a complaint that is out of date, solely to satisfy the defense's desire to make an entirely unreasonable request: to dismiss a case *with prejudice* where Plaintiff has not been afforded *even one opportunity* to file an amended complaint without restriction.

BENJAMIN PAVONE, ESQ.

# I.

## THE DEFENSE MOTION PROPOSES TO STRIKE CERTAIN LANGUAGE THAT IS EITHER OUT OF DATE OR IS NOT OBJECTIONABLE.    THE DEFENSE'S INSISTENCE IN ASKING THE COURT TO DISMISS THE CASE WITH PREJUDICE IS AN UNREASONABLE, LEGALLY IMPLAUSIBLE REQUEST.

The defense challenges various provisions in the First Amended Complaint. Plaintiff Martinez will itemize his response to these criticisms, but for purposes of deciding this motion with the least amount of effort, the Court should grant Plaintiff the right to file the Second Amended Complaint (without limitation) and declare the entire defense exercise challenge to the First Amended Complaint to be **moot**.

An alternate approach is for the Court to rule on the challenges to the First Amended Complaint and then either allow the Second Amended Complaint as it stands or direct it to be amended to account for any outstanding criticisms.

The list of defense challenges to the First Amended Complaint and the present state of the relevant allegations are as follows:

**Defense Challenge No. 1**

1.   All paragraphs in Plaintiff's Second Cause of action (FAC ¶¶ 101-211).

**Martinez's Response No. 1**

This is the cause of action for False Advertising.  It is challenged for lack of permission to include after the Court's February 21 order granting leave to amend, for asking for civil penalties, for not alleging that Martinez lost money or property, and for not reflecting a purchase of a consumer product. (Motion to Strike, p. 3.)  There has been no significant challenge to the language itself.   In the proposed Second Amended Complaint, Plaintiff includes this cause of action and has agreed that civil penalties are limited to actions brought in the name of the People, has alleged how Martinez lost money or property, and has maintained that a false advertisement for services is also actionable.  At present, it is an injunctive cause of action only.  (SAC ¶¶ 104, 210, 211.)

1   **Defense Challenge No. 2**

2      2.  All paragraphs in Plaintiff's Third Cause of action (FAC ¶¶ 212-219).

3   **Martinez's Response No. 2**

4      This is the cause of action for Unfair Business Practices.  It is challenged for

5 lack of permission to include after the Court's February 21 order granting leave to

6 amend and for rising and falling with the False Advertising cause of action, which the

7 defense contends should fail. (Motion to Strike, p. 3.)  As a legal matter, an unfair

8 business practices cause is broader than a false advertising claim and would survive

9 even if the advertising cause does not.  (See Bus. & Prof. Code, § 17200 [allowing

10 relief for any unfair business practice].)  It has always been an injunctive cause of

11 action only.  (SAC, p. 41 [Prayer No. 3].)

12   **Defense Challenge No. 3**

13      3.  All paragraphs in Plaintiff's Sixth Cause of action (FAC ¶¶ 212-219).

14   **Martinez's Response No. 3**

15      This is the request for alter ego findings.  It is challenged for lack of permission

16 to include after the Court's February 21 order granting leave to amend, for not being

17 properly before the Court, and because "Plaintiff clearly misunderstands the purpose

18 of the alter ego doctrine." (Motion to Strike, p. 3; Demurrer, p. 14.)  A request for

19 such findings is not a cause of action in the traditional sense, nonetheless it is

20 routinely pled in order to put the defense on notice that such relief is sought. (See

21 *Tomaselli* v. *Transamerica* (1994) 25 Cal.App.4th 1269, 1284-1285.)  As for the

22 defense claim that Martinez "clearly misunderstands" the doctrine, it is "clearly" the

23 defense lawyers that do not understand the various ways the corporate form can be

24 misused by confidence men like their client, which results in requests to both pierce

25 the corporate veil when the individual commits misconduct using a corporate entity

26 ("traditional" piercing, see *Sonora Diamond* v. *Sonora High* (2000)  83 Cal.App.4th

27 523, 538), but just as commonly, to hold a corporation liable for an individual's debt,

28 because the individual commits misconduct and a judgment is entered against him

BENJAMIN PAVONE, ESQ.

personally, and as a result, he attempts to shift, hide or transfer assets to the entity. (See, e.g., *Postal Press* v. *Kaswa* (2008) 162 Cal.App.4th 1510, 1518; *Taylor v. Newton* (1953) 117 Cal.App.2d 752; *McLoughlin v. Bloom* (1962) 206 Cal.App.2d 848, 852-853.)  Already there has been a suspicious corporate layer added to the present iteration of the CSCA website, which is what prompted Martinez to name Professional Realty Council, Inc., as a Doe defendant. (SAC, ¶ 5.)

**Defense Challenge No. 4**

4.  O'Hara has a daughter, Lauren Ashley O'Hara. She works with him under the Pacific Valley Realty broker license as a real estate salesperson." (FAC, 3:7-8)

**Martinez's Response No. 4**

This language is challenged as not being permitted given the Court's order to strike and is thought to be improper because it identifies O'Hara's daughter, who is assertedly unconnected to the case. (Motion to Strike, p. 4.)  In the proposed Second Amended Complaint, the language presently reads: "O'Hara has an employee, Lauren Ashley O'Hara.   She appears to work with him under the Pacific Valley Realty broker license as a real estate salesperson."  (SAC, ¶ 9.)  PVRI wrote a check for Martinez's wages and the daughter is undoubtedly a central witness in the case.  As such, this uncontroversial language should be allowed as part of the Second Amended Complaint.

**Defense Challenge No. 5**

5.  that "Stephen O'Hara is married to Deborah Irwin O'Hara."

**Martinez's Response No. 5**

This language is challenged as not being permitted given the Court's order to strike and is thought to be improper because it identifies O'Hara's wife, who is also allegedly unconnected to the case. (Motion to Strike, p. 4.)  The language in the Second Amended Complaint presently reads: "Stephen O'Hara is married to Deborah Irwin O'Hara, who is a witness in the case, relating to Mr. O'Hara's sexual interest, preferences and motivations."  (SAC, ¶ 10.)  Given the issues in the case, the

BENJAMIN PAYONE, ESQ.

language is not objectionable or controversial as amended and should be allowed as part of the Second Amended Complaint.

**Defense Challenge No. 6**

6. "O'Hara rents a three bedroom condo where he lives with his wife Deborah Irwin O'Hara." (FAC, 5:16-17).

**Martinez's Response No. 6**

This language is challenged as not being permitted given the Court's order to strike and is thought to be improper because where Mr. O'Hara lives and what type of place he lives in is immaterial. (Motion to Strike, p. 4.) The language in the proposed amendment reads: "O'Hara rents a three bedroom condo where he lives with his wife Deborah Irwin O'Hara, and where some of the incidents in question took place." Mr. O'Hara's housing is relevant given the stature Mr. O'Hara presented himself as (e.g., "Billion Dollar Agent"), the details of the sexual encounters at the condo, and which may include his wife's knowledge about them as it reflects on Mr. O'Hara's true motivations in luring young men into his life under questionable circumstances.

**Defense Challenge No. 7**

7. "O'Hara made a concerted effort to get Fernando to quit his job at McDonald's which was the job that covered Fernando's basic living necessities, and included some assistance to his low income family. On information and belief, O'Hara pushed this idea to make Fernando financially dependent on him and thereby more vulnerable to O'Hara's sexual agenda." (FAC, 6:14-19).

**Martinez's Response No. 7**

This language is challenged as not being permitted given the Court's order to strike and is thought to be improper because "this statement has no support in the factual allegations of Plaintiff's verified complaint." (Motion to Strike, pp. 4-5.) As to the running defense theme that a challenged statement was stricken by the Court, the Court generally struck the entire complaint without addressing the propriety of any specific allegation. Surely it could not have intended to permanently strike each

BENJAMIN PAVONE, ESQ.

1    and every statement in the complaint, as that would amount to eliminating it

2    altogether.    Consequently, Plaintiff has re-asserted some previously-challenged

3    allegations, sanitized them where appropriate, and proposes to defend them

4    individually.

5        The statement at issue is proper.  It is relevant to establish the predatory

6    conduct of Mr. O'Hara which is relevant and proper for Martinez to establish fraud

7    and to obtain punitive damages.  As to the defense claim that the statement is without

8    factual support, *the original verified complaint on file exactly stated this allegation*.

9    (Complaint, ¶ 69.)  In terms of the pointless nitpicking discussed in the corresponding

10    demurrer, this is such an example.

11    **Defense Challenge No. 8**

12        Paragraph (8)'s language acknowledging the possibility of "extreme exposure"

13    if Martinez discussed O'Hara's conduct indicates that O'Hara knew he had committed

14    wrongdoing and evidences Martinez's right to punitive damage within the meaning of

15    Civil Code section 3294(c)." (FAC, 8:19-22).

16    **Martinez's Response No. 8**

17        This language is challenged as not being permitted given the Court's order to

18    strike and is alleged to be improper because it contains legal conclusions unsupported

19    by the facts, is immaterial and irrelevant. (Motion to Strike, p. 5.)  The statement

20    details factual evidence directly providing sufficient grounds to file suit, to support

21    fraud, and to obtain punitive damages.  This statement amounts to a confession of

22    egregious wrongdoing.  The defense objection here is frivolous.

23    **Defense Challenge No. 9**

24        9.    "Paragraph (9) purports to be the formal waiver of Fernando's claims.

25    Fernando did not sign the document, there is no 1542 language, and the false

26    recitations of the document would subject it to being set aside." (FAC, 8:26-28)

27

28

BENJAMIN PAYONE, ESQ.

**Martinez's Response No. 9**

This language is challenged as being improper because it contains unsupported and immaterial legal contentions, and is irrelevant and immaterial to Plaintiff's claims. (Motion to Strike, p. 5.)   The language in the proposed Second Amended Complaint reads: "Paragraph (9) purports to be the formal waiver of Fernando's claims. Fernando did not sign the document and there is no 1542 language, a requirement in California to effectuate a valid waiver of unknown claims."  (SAC, ¶ 65.)  O'Hara's attempt to have Martinez sign an illegal waiver of his rights speaks to his desire to oppress him and is relevant to punitive damages.  The circumstances and illegality of O'Hara's proposed waiver agreement are also relevant and proper in supporting Martinez's cause of action for sexual harassment resulting in wrongful discharge.

**Defense Challenge No. 10**

10.   "At the time, O'Hara was himself only making $72K/year according to his 201 bankruptcy schedules, and he had just finished causing serious financial harm to number of his friends and business associates with his borrowing power over them and later Chapter 7 discharge of their debts." (FAC, 11:12-15)

**Martinez's Response No. 10**

This language is challenged as not being permitted given the Court's order to strike, is challenged as being improper because it contains unsupported and immaterial legal contentions, and as irrelevant and immaterial to Plaintiff's claims. (Motion to Strike, p. 6.)   The objection is frivolous.  O'Hara was holding himself out to Martinez as a real estate guru, a "visionary," a "Billion Dollar Agent," and someone that could teach Martinez to make millions in real estate.  (See Original Verified Complaint, ¶¶ 18-29, 60-63.)  The subject allegation directly deflates that illusion in support of Martinez's cause of action for fraud.   O'Hara's "secret" to making money was not some sort of legitimate real estate genius, but straight up fraud: he was actually broke and the money he made in the past (4) years was by

BENJAMIN PAYONE, ESQ.

enticing his friends to invest in bogus or bad real estate ventures and pocketing some or all of the cash.

**Defense Challenge No. 11**

11.     "Pursuant to 11 U.S.C. § 523, plaintiff seeks declaratory findings that O'Hare committed fraud, within the meaning of the non-dischargeability provisions of sections 523(a)(2), (a)(4) and/or (a)(6)." (FAC, 14:18-20).

**Martinez's Response No. 11**

This language is challenged as not being permitted given the Court's order to strike, as being improper because there is no declaratory relief cause of action, and there is no jurisdiction for such a request.  (Motion to Strike, p. 6.)   In the proposed Second Amended Complaint, the language currently reads: "Pursuant to 11 U.S.C. § 523, Martinez seeks a sufficiently-specific formal finding that O'Hara committed fraud, such that the debt will qualify as non-dischargeable without repeating the litigation in bankruptcy court, within the meaning of section 523(a)(2), (a)(4) and/or 523(a)(6)." (SAC, ¶ 99.)   As phrased, Martinez believes that a fraud cause of action entitles him to a judgment of fraud, and if the record justifies it, may be written in such a way as to have the intended "scope and effect" to avert duplicative litigation in bankruptcy court. (See *Estate of Careaga* (1964) 61 Cal.2d 471, 475; *Los Angeles v. Stan* (1955) 136 Cal.App.2d 89, 94.)

**Defense Challenge No. 12**

12.     "O'Hara has made a practice of issuing inflated financial claims, not only to Fernando Martinez through the CSCA website vehicle, but to friends and longtime associates. To his friends and associates, he collected approximately $4M in unsecured personal loans from 2008-2011.  He never paid this money back. Reportedly he lived glamorously in this period, and then discharged the debts in his 2012 bankruptcy.  In the process, he caused serious financial harm to number of people, including but not limited to, Midge Garrison ($75,000), Tiffany Trujillo ($35,000), and Patricia Mikkelson ($350,000). He also reaped devastation to one of

BENJAMIN PAYONE, ESQ.

his (formerly) closest friends, Brenda Ranney, who lost her pension and live savings ($750,000 as claimed by O'Hara), and which resulted in her becoming homeless." (FAC, p. 9:16-25)

**Martinez's Response No. 12**

This language is challenged: "Plaintiffs inclusion of non-parties' alleged harms is both improper and irrelevant because none of the aforementioned people are indispensable [sic] parties even if every word Plaintiff alleged is true." (Motion to Strike, p. 7.)   The objection is unmeritorious.  O'Hara was holding himself out to Martinez as a real estate guru, someone that could teach Martinez to make millions in real estate.  (See Verified Complaint, ¶¶ 18-29, 60-63.)  The subject allegation deflates that illusion in support of Martinez's cause of action for fraud and as relevant to punitive damages in relation to fraud.   O'Hara's apparent "secret" to real estate riches is stealing from people that trusted him with their money, a Ponzi scheme in the words of several investors.  That is a relevant fact to plead in a fraud case.

**Defense Challenge No. 13**

13.     "Ms. Ranney presently lives in her car." (FAC, p. 9:26).

**Martinez's Response No. 13**

"Plaintiffs inclusion of this allegation should be struck as irrelevant and improper." (Motion to Strike, p. 7.)  The information is relevant to punitive damages. (Civ. Code, § 3294(c)(1)  ["'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff *or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others*."].)

**Defense Challenge No. 14**

14.     "As evidence that Stephen did make the promises that Fernando would make millions within a few years, in a September 19, 2012 email to Fernando, Stephen recounts how he connected with a song: 'I connect to this song because my family thought I was nuts. They wanted me to have a boring $35K year job working

BENJAMIN PAYONE, ESQ.

9-5. To this day, they think that the $1.5 to $2 Million I made per year I made in the real estate industry `is not a REAL job.'" (FAC, p. 9:26)

**Martinez's Response No. 14**

The defense challenges the allegation on the basis that it is irrelevant and improper because O'Hara's interpretation of a song has no bearing on Plaintiff's claims. (Motion to Strike, p. 7.)

In the proposed Second Amended Complaint, Plaintiff has amended paragraph (78) to read: "Stephen made the promises that Fernando would make millions within a few years, in a September 19, 2012 email to Fernando, because he took the trouble to recount how he connected with a song: 'I connect to this song because my family thought I was nuts. They wanted me to have a boring $35K year job working 9-5. To this day, they think that the $1.5 to $2 Million I made per year in the real estate industry 'is not a REAL job.' Thus, Stephen claims the right to teach people how to make millions in real estate by virtue of this claim." (SAC, ¶ 78.)

O'Hara's connection to the song is merely context to his claim that he consistently made $1.5-2M/year, a statement that is provably false and that directly supports Martinez's cause of action for fraud.

**Defense Challenge No. 15**

15. "Based on the facts alleged herein, CSCA is a "front," a supposed talent agency, but is actually a vehicle by which Mr. O'Hara induces a pipeline of young men to explore and satisfy his sexual appetite. On this basis, every advertising statement detailed herein is untrue and/or misleading." (FAC, p. 9:12).

**Martinez's Response No. 15**

The defense challenges this allegation on the basis that, "It is clear that this statement is improper and meant to harass Defendant through pleadings. It is also immaterial and irrelevant to any of Plaintiff's claims." (Motion to Strike, p. 8.)

In the proposed Second Amended Complaint, Plaintiff has amended paragraph (110) to read: "Based on the facts alleged herein, and discovery conducted to date

BENJAMIN PAYONE, ESQ.

which does not corroborate the size or complexity of the CSCA organization as claimed, Plaintiff believes, and thereon asserts, that CSCA is a 'front,' a supposed elite talent agency with 10-50 employees, but is actually a vehicle by which Mr. O'Hara alone induces a pipeline of young men to explore and potentially satisfy his sexual appetite.  On this basis, every advertising statement detailed herein is untrue and/or misleading because this underlying motivation and reality is not announced." (SAC, ¶ 110.)

It is unclear to plaintiff what 'harassment through pleadings' is -- a procedural tort? -- but the allegation is directly relevant to Martinez's cause of action for fraud, as leading Martinez to CSCA under false pretenses.  It is also relevant to Martinez's false advertising claim, and it is a relevant to Martinez's unfair business practices cause of action.

**Defense Challenge No. 16**

16.    "A place that requires sexual submission to the organization's president is not one of the best places to launch a career." (FAC, p. 17:10-11.)

**Martinez's Response No. 16**

The defense challenges this statement as improper and intended to "harass Defendant through pleadings." (Motion to Strike, p. 8.)  CSCA publicly proclaims it is one of the best places to launch one's career. (FAC, ¶ 90.)  Plaintiff does not consider it controversial to allege that an entity whose president and founder fraternizes with the applicants is not a good place to launch a career, given the many problems with such entanglements, not the least of which is that the entity is inevitably going to get sued for sexual harassment.

**Defense Challenge No. 17**

17.    "Because of the fragility of sexual relationships, and their tendency to often end quickly as was the case here, CSCA was not one of the best places Martinez could have attempted to launch his career."

BENJAMIN PAYONE, ESQ.

1   **Martinez's Response No. 17**

2       "This statement is improper and meant to harass Defendant through pleadings.

3   It is also immaterial and irrelevant to any of Plaintiff's claims." (Motion to Strike, p.

4   8.)   The allegations is offered to provide support for the idea that O'Hara's CSCA

5   recruiting vehicle was not one of the best places to launch a career, because

6   fraternization between the organization's leaders and the applicants promotes

7   instability in the applicant's relationship, and as was predictable, Martinez's

8   aspiration to learn the real estate business ended quickly – as soon as he ended the

9   romantic relationship.

10  **Defense Challenge No. 18**

11      18.   "For Fernando Martinez, as evidenced in discovery, 'the sky is the limit'

12  meant working for Stephen O'Hara as a sexual apprentice for $1,500/mo." (FAC, p.

13  21:14-15)

14  **Martinez's Response No. 18**

15      "This statement is improper and meant to harass Defendant through pleadings.

16  It is also immaterial and irrelevant to any of Plaintiff's claims." (Motion to Strike, p.

17  8.)   The statement is relevant to contrast O'Hara's advertising claim with the reality

18  as he practiced it.

19  **Defense Challenge No. 19**

20      19.   "Pursuant to Business & Professions Code section 17500, plaintiff seeks

21  civil fines in the amount of $2,500 per false statement, for a total fine of at least

22  $160,000. "

23  **Martinez's Response No. 19**

24      Plaintiff has withdrawn a damage claim for the false advertising cause of

25  action.

26  **Defense Challenge No. 20**

27      20.   ". . .attorney's fees [...] based on the fee shifting provisions permitted

28  under the private attorney general doctrine in Code of Civil Procedure, section

BENJAMIN PAYONE, ESQ.

---

MARTINZ v. O'HARA – CASE NO. 30-2012-614932
MARTINEZ'S OPPOSITION TO MOTION TO STRIKE
15

1021.5, the fee shifting provisions of Civil Code section 52(b)(3) for sexual harassment and resulting wrongful termination, and Labor Code section 218.5 for the outstanding penalty. . . (FAC, pgs.35-36:27-2)

**Martinez's Response No. 20**

Martinez has updated the specific code citations in the proposed Second Amended Complaint. (SAC, ¶ 241; SAC p. 38.)

**CONCLUSION**

For the foregoing reasons, the challenged language in the First Amended Complaint was either appropriate or an objectionable aspect of it was sanitized and corrected in the Second Amended Complaint, which is requested to be allowed.

The motion to strike should be denied.  The suggestion of a dismissal with prejudice should be summarily rejected and the case should be advanced on the merits.

Date: April 25, 2013                              LAW OFFICES OF
                                                  BENJAMIN PAVONE, PC


                                                  \s\Benjamin Pavone, Esq.
                                                  Benjamin Pavone, Esq.
                                                  Attorney for Plaintiff
                                                  Fernando Martinez

BENJAMIN PAVONE, ESQ.

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| FERNANDO MARTINEZ, | CASE NO. 30-2012-614932 |
| v. | **PROOF OF SERVICE** |
| STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA; | |

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108.  On April 25, 2013, I served the following:

    \*       Opposition to Demurrer; Opposition to Motion to Strike; Pavone Declaration; Proposed Second Amended Complaint

Brook Barnes, Esq.
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, California 92121
(Attorney for Defendants)          (Via Electronic Service)

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 25th day of April, 2013 that the foregoing is true and correct.



---

MARTINZ v. O'HARA – CASE NO. 30-2012-614932
PROOF OF SERVICE

# EXHIBIT 30

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

## BENJAMIN PAVONE, ESQ.

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**04/25/2013** at 09:36:00 PM
Clerk of the Superior Court
By e Clerk,Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# ORANGE COUNTY

FERNANDO MARTINEZ,

          PLAINTIFF,

v.

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA;

CAREER SOLUTIONS AND
CANDIDATE ACQUISITIONS;

PROFESSIONAL REALTY
COUNCIL, INC;

PACIFIC VALLEY REALTY, INC.;

and DOES 2-10,

          DEFENDANTS.

**CASE NO.:** 30-2012-614932-CU-FR-CJC

**JUDGE:** Hon. Gregory Munoz

**DECLARATION OF BENJAMIN PAVONE IN OPPOSTION TO DEFENSE MOTION TO STRIKE AND DEMURRER**

**Date**: May 9, 2013
**Time**: 2:00 pm
**Dept**: C-13

BENJAMIN PAVONE, ESQ.

1    I, Benjamin Pavone, am an attorney licensed to practice in all state and federal

2    courts located in California, as well as various district and federal appellate courts

3    around the country.  If called to testify, I could and would testify competently to the

4    following:

5    1.    Attached hereto as Exhibit A is Martinez's Proposed Second Amended

6    Complaint.

7    2.    Attached hereto as Exhibit B is an excerpt of a statement on the record

8    made by Hon. Joel Pressman in commenting about the utility of demurrer practice.

9

10    I hereby declare under penalty of perjury under the laws of the State of

11    California that, to the best of my knowledge, the foregoing is true and correct.

12

13    Date:  April 25, 2013                                    \s\Benjamin Pavone

# EXHIBIT A

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF ORANGE

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>               PLAINTIFF,<br>v.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS;<br><br>PROFESSIONAL REALTY COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.;<br><br>and DOES 2-10,<br><br>            DEFENDANTS. | CASE NO.  30-2012-614932<br><br>**SECOND AMENDED COMPLAINT**<br><br>**I.  FRAUD**<br>    **(Civil Code § 1710)**<br><br>**II.  FALSE ADVERTISING**<br>    **(Bus. & Prof. Code § 17500)**<br><br>**III.  UNFAIR BUSINESS  PRACTICES**<br>    **(Bus. & Prof. Code § 17200)**<br><br>**IV.  LABOR CODE VIOLATION**<br>    **(Lab. Code §§ 203/2699.3)**<br><br>**V.  SEXUAL HARASSMENT**<br>    **(Gov't Code § 12940(j)(1))**<br><br>**VI.  REQUEST FOR ALTER<br>     EGO FINDINGS** |

BENJAMIN PAVONE, ESQ.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................2

PARTIES...............................................................................................................2

FACTUAL ALLEGATIONS ..................................................................................3

    O'Hara Background ...........................................................................................3

    Facts Relating to Martinez-O'Hara Relationship ..............................................4

    Facts Regarding the Parties' Separation Agreement (Unconsummated) ...............7

    Factual Allegations Relating to Punitive Damages .................................................8

I.    CAUSE OF ACTION FOR FRAUD ..................................................................11

    (Civil Code § 1710)

    Damages for Fraud Cause of Action.....................................................................15

II.    CAUSE OF ACTION FOR FALSE ADVERTISING ........................................18

    (Business & Professions Code § 17500)

III.  CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES.........................32

    (Business & Professions Code § 17200)

IV.  CAUSE OF ACTION FOR LABOR CODE VIOLATION .................................34

    (Labor Code § 203.5)

V.    CAUSE OF ACTION FOR SEXUAL HARASSMENT ....................................38

    (California Civil Code § 51.9)

VI. REQUEST FOR ALTER EGO FINDINGS........................................................40

**INTRODUCTION**

1.      This is a consumer case in which plaintiff seeks to remedy fraud and false advertising, interlaced with sexual misconduct, by an Orange County real estate agent named Stephen O'Hara.

2.      Plaintiff filed an original complaint in this dispute, which was challenged by defendants and subjected to a motion to strike on February 21, 2013. Plaintiff filed a First Amended Complaint in response to the strike order, which defendants again challenged, this time as not being within the permissible scope of the Court's order granting leave to amend, among other things.  Rather than quarrel over the scope of the order or be subjected to the inconvenience of complying with the cumbersome provisions of Rule 3.1324 on a motion to formally amend, Plaintiff invokes his right to amend the Complaint once as a matter of course pursuant to Code of Civil Procedure, section 472. (Weil & Brown, Civil Procedure Before Trial (2006), Chapter 6, §6:603 – § 6:607, p. 6-153 – 6-154 ["Rutter Guide"].)

**PARTIES**

3.      Plaintiff Fernando Martinez is a resident of the Escondido area, outside of San Diego.

4.      Defendant Stephen O'Hara is a resident of Laguna Niguel and is believed to presently reside at 38 Toulon in Orange County, 92677.

5.      Defendant CSCA is an entity of unknown organizational form, and appears to be merely a trade name for defendant Professional Realty Council, Inc. (PRCI), a California corporation, formally associated with the same contact information.  PRCI's principal address is 4533 MacArthur Blvd., Suite 100, in Newport Beach, California.  CSCA, though operating presently under the corporate entity, claims to have been operating since 2006, while PRCI was only formed in 2012.

BENJAMIN PAVONE, ESQ.

6.      Defendant Pacific Valley Realty, Inc. (PVRI) is a California corporation whose listed business address is P.O. Box 7515, Newport Beach, California, with a registered agent for service, O'Hara, listed at 26012 Marguerite Parkway H200, Mission Viejo, California 92692.

6a.     The true names and capacities, whether individual, corporate, associate or otherwise, of defendants named as Does 2 through 10, inclusive, are unknown to plaintiff who therefore sues such defendants by fictitious names.  Plaintiff will seek leave of this Court to amend this Complaint with the true names and capacities of the Doe defendants when the true names and capacities become known to plaintiff. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously-named defendants is responsible in some manner for the claims, obligations, and damages sued upon herein.

6b.     Plaintiff is informed and believes, and thereon alleges that at all relevant times, unless specifically otherwise alleged, each of the defendants was the agent, servant and employee of each of the remaining defendants and was at all times relevant, acting within the course and scope of their authority as agent, servant, and/or employee and with the permission and consent of each of the remaining defendants.

## FACTUAL ALLEGATIONS

### O'Hara Background

7.      Stephen John O'Hara was born in September, 1951 in the Orange County area of Florida.  Today he is approximately 61 years old.

8.      O'Hara changed his name from Stephen John O'Hara to Stephen Stratton O'Hara.

9.      O'Hara has an employee, Lauren Ashley O'Hara.   She appears to work with him under the Pacific Valley Realty broker license as a real estate salesperson.

10.     Stephen O'Hara is married to Deborah Irwin O'Hara, who is a witness in the case, relating to Mr. O'Hara's sexual interest, preferences and motivations.

BENJAMIN PAYONE, ESQ.

11.    O'Hara became registered with the National Association of Realtors, License 2055012, in May, 1989.

12.    On or about April 22, 1988, O'Hara obtained his California real estate license.

13.    On or about November 9, 1990, he obtained his California real estate broker license, number 988103.

14.    He became a certified residential specialist with the National Association of Realtors, License 550126, in March, 1991.

15.    In 1993, he worked as a Century 21 real estate broker.

16.    In 1996, Stephen started a website named OrangeCountyRealEstate.com, which he continues to operate at present.

17.    In May, 2006, he claims to have founded CSCA ("Career Solutions and Candidate Acquisitions"), a website to assist people to seek professional advancement in the real estate field.

### Facts Relating to Martinez-O'Hara Relationship

18.    Fernando Martinez is a 21-year-old, clean-cut young man, and oriented toward the same sex.

19.    Martinez lives in an apartment in Escondido and is from the San Diego area.

20.    He has a high school education.

21.    In approximately September, 2010, Martinez applied to work at McDonald's and obtained a job working (35) hours per week for roughly $8/hr.

22.    Martinez worked at McDonald's for approximately (18) months.

23.    While working at McDonald's, Fernando uploaded a resume to Monster.com, an employment website.

24.    On August 10, 2012, he received a response to his resume post from Stephen O'Hara, who purported to represent CSCA, a "Talent Acquisition firm."

BENJAMIN PAYONE, ESQ.

25.     On August 10, 2012, in an email authored by O'Hara to Martinez, O'Hara represented that CSCA was retained by a large company (over 35 offices and over 3,000 employees) in Southern California.

26.     On August 10, 2012, O'Hara represented that the large company CSCA represented was seeking recent Business & Communication majors for intern and full time careers.

27.     On August 10, 2012, O'Hara represented that CSCA's fees were paid by the large company seeking employees.

28.     On August 10, 2012, O'Hara represented "[a]s an [sic] Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more.   After your third year, you will have the ability to earn an income of $250K or more pear year – so we are very serious about 'who' [sic] we select."

29.     On or about August 12, 2012, based on Mr. O'Hara's request for him to apply online, Martinez completed CSCA's online application.

30.     After he applied, he called the CSCA number on its website, which directed him to O'Hara's phone.

31.     Martinez reached O'Hara, who indicated he would provide Martinez assessment tests and instructed him what to look for in the tests.

32.     After Martinez submitted the completed tests, O'Hara called stating that he (Martinez) had impressed O'Hara so much by the results of the tests that he wanted to explain them in person.

33.     On September 9, 2012, O'Hara commented to Martinez in an email, "[y]ou have the 'it' factor they [persons in the modeling business] would be looking for.  In fact, my contact simply said 'wow' when I showed him your picture.  (And his 'wow' wasn't sleazy or sexual as he is straight, married and very successful.)"

BENJAMIN PAYONE, ESQ.

34.    Martinez suggested they meet at Starbucks, but O'Hara changed the location and instead they met at O'Hara's home, presently at 38 Toulon, Laguna Niguel, 92677, on or about September 9, 2012.

35.    O'Hara rents a three bedroom condo where he lives with his wife Deborah Irwin O'Hara, and where some of the incidents in question took place.

36.    At the Toulon condo, O'Hara and Martinez spent approximately (9) hours discussing many topics, mostly business, and how Martinez performed on his "intake assessment" test.

37.    O'Hara described the remarkable possibilities that were within Martinez's reach if he (O'Hara) were able to professionally guide Martinez within the real estate industry.

38.    O'Hara told Martinez he had the ability to make millions.

39.    O'Hara indicated that he wanted Fernando to take over his business and gave his word that in a few years Fernando would be making millions.

40.    O'Hara directed Martinez to return to the Toulon condo the next day.

41.    Martinez was worried and uneasy but agreed to return based on the belief that O'Hara could in fact teach him how to make millions in real estate.

42.    In a September 19, 2012 email to Fernando, O'Hara made a statement, not reprinted verbatim here, which amounted to a request for sexual gratification by O'Hara toward plaintiff.

43.    On September 21, 2012, O'Hara sent Martinez a link with the subject header entitled "where real men want to go."  The link was to a celebrity cruise ship website.  Mr. O'Hara wanted Fernando to accompany him on a gay cruise.

44.    Fernando's supposed job role continued to change.  First he was supposed to be handled by "First Team" but as O'Hara became familiar with Fernando (and allegedly his assessment scores), Stephen said he wanted to keep Fernando for himself.   O'Hara suggested he become Stephen's partner.

BENJAMIN PAYONE, ESQ.

45.    O'Hara told Fernando that once he got his real estate license and started selling houses, his income would be around 6-figures.

46.    O'Hara made a concerted effort to get Fernando to quit his job at McDonald's, which was the job that covered Fernando's basic living necessities, and included some assistance to his low income family.

47.    On information and belief, O'Hara pushed this idea to make Fernando financially dependent on him and thereby more vulnerable to O'Hara's sexual agenda.  (See Original Verified Complaint, ¶¶ 66-67.)

48.    In a similar fashion, O'Hara pushed for Fernando to live with him or move to Orange County, as distancing himself from his sister was allegedly better for Fernando's career.

49.    O'Hara insisted that if Fernando allowed O'Hara to take him under his wing, he would undoubtedly make millions and that such opportunities do not often happen.

50.    Through September-October, 2012, O'Hara and Martinez spent time together, which included (8) sexual encounters, 50 telephone calls, and a few trips, such as to Rodeo Drive, Abbey Food & Bar, through Mulholland Drive, Griffith Observatory and to a sex shop called Chi Chi Larue's, where O'Hara purchased sexually-suggestive undergarments for Fernando.

### Facts Regarding The Parties'
### Separation Agreement (Unconsummated)

51.    Fernando initially complied with O'Hara's sexual demands in the September-October period, but soon elected to decline O'Hara's advances and desire for a romantic partnership.

52.    After that, O'Hara constructively terminated Fernando and requested Fernando to sign a release agreement liberating O'Hara from any legal responsibility for his conduct.

BENJAMIN PAYONE, ESQ.

53. The document contains (10) paragraphs.   It proposes in paragraph (2) to have Fernando agree that "it was my personal decision to not work at McDonald's," even though O'Hara was lobbying for Fernando to quit.

54. In paragraph (3), O'Hara proposed for Martinez to sign away his right to be considered an employee for tax purposes, even though Fernando knew nothing about real estate and would be taking sole, exclusive and complete direction from O'Hara.

55. In paragraph (4), O'Hara acknowledged that he owed Fernando $750 for the period from October 1 through October 15 (O'Hara paid him $1,750 for the month of September), which was when Fernando (supposedly) "resigned."

56. Fernando did not resign.  He was constructively terminated for not participating in a quid pro quo sexual relationship and/or succumbing to the sexually compliant work environment O'Hara desired of Martinez.

57. In paragraph (5) of the release agreement, during a trip to Los Angeles, O'Hara gave Fernando $100 in cash, a gift.  O'Hara suggested he had the right to deduct the $100 from the $750 in wages owed.

58. Based on other deductions O'Hara decided to enforce, O'Hara proposed that he actually owed Fernando just $100.

59. In paragraph (6), O'Hara suggested that he could deduct the entrance fee for Fernando's admission to the convention for the California Association of Realtors and "many other items."

60. In paragraph (6), O'Hara proposed that Fernando sign a statement acknowledging that "[i]t is a fact that Stephen O'Hara took a personal interest in my success."

61. In paragraph (7), O'Hara offered Martinez $525 as "liquidated damages for anything that might arise as a result of my relationship with Stephen."

BENJAMIN PAYONE, ESQ.

## Factual Allegations Relating to Punitive Damages

62.    In paragraph (8) of O'Hara's proposed release agreement, O'Hara desired a broad non-disclosure agreement: "I will not discuss in ANY form of communication with ANY third-party ANY and ALL proprietary, business, personal and/or confidential information for which I gained access to during my tenure with Stephen O'Hara and his group of companies.  [¶]  I understand that any discussion of same could cause irreparable damage to the parties and that *violation of this paragraph would cause extreme exposure to various legal claims for the parties*.  I understand fully that this Paragraph Eight will, therefore, be prosecuted to the fullest extent of the law should it be violated." (Emphasis added.)

63.    Paragraph (8)'s language acknowledging the possibility of "extreme exposure" if Martinez discussed O'Hara's conduct reveals that O'Hara knew he had committed wrongdoing and evidences Martinez's right to punitive damages within the meaning of Civil Code section 3294(c).

64.    Paragraph (8) concludes with language traditionally associated with a criminal violation, to the effect that any breach of the non-disclosure agreement will be "prosecuted to the fullest extent of the law," a threat.

65.    Paragraph (9) purports to be the formal waiver of Fernando's claims. Fernando did not sign the document and there is no 1542 language, a requirement in California to effectuate a valid waiver of unknown claims.

66.    The proposed release agreement was an attempt by Mr. O'Hara to whitewash his conduct and contributes to plaintiff's case for punitive damages under Civil Code section 3294(c)(2) ("despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights"), in addition to punitive damages under section 3294(c)(3) plaintiff seeks for O'Hara's fraudulent representations relating to the proffered employment opportunity.

BENJAMIN PAVONE, ESQ.

67.     O'Hara's release agreement came with an introductory note, "I think the following is more than fair when you consider all the facts.  I hope after you digest the following, you will agree and be very happy."  Fernando did not think it was fair and retained a lawyer in response.

68.     On O'Hara's Orange County website, he observes that "real estate agents don't usually get the job based[d] upon their technique or track record.  It's rather sad, actually."  This is evidence that O'Hara acknowledges a level of guilt about his own conduct, because Martinez did not get a job with O'Hara based on his technique or track record, but because of O'Hara's sexual interest in him.

69.     O'Hara has made a practice of issuing inflated financial claims as a real estate professional, not only to Fernando Martinez through the CSCA website vehicle, but to friends and long-time associates.  To his friends and associates, he collected approximately $4M in unsecured personal loans from 2008-2011.  He never paid this money back.  Reportedly he lived glamorously in this period, and then discharged the debts in his 2012 bankruptcy.  In the process, he caused serious financial harm to a number of people, including but not limited to, Midge Garrison ($75,000), Tiffany Trujillo ($35,000), and Patricia Mikkelson ($350,000).  He also reaped devastation to one of his (formerly) closest friends, Brenda Ranney, who lost her pension and live savings ($750,000 as claimed by O'Hara), and which resulted in her becoming homeless and living out of her car.

70.     Pursuant to Evidence Code section 1101 relating to other misconduct, and as relevant to the issue of punitive damages under Civil Code section 3294(c), Plaintiff announces this information, makes demand for discovery of O'Hara's net worth, and reserves his right to a bifurcated punitive damage hearing to set a reasonable figure with respect to such damages.

BENJAMIN PAYONE, ESQ.

# I.

## CAUSE OF ACTION FOR FRAUD

### (Civil Code § 1710)

71.     Plaintiff incorporates the allegations of paragraph 1-70 as if fully set forth into this cause of action.

72.     This cause of action is brought against defendants O'Hara, CSCA, Professional Realty Council, Inc. and Pacific Valley Realty, Inc.   It is alleged against O'Hara because, among other things, he personally made statements in the CSCA Monster Response Ad attached as Exhibit A.  At the time, O'Hara was purportedly making those representations as an agent for defendant CSCA, subjecting it to fraud liability on a *respondent superior* basis.  CSCA is possibly owned by, and certainly affiliated with, Professional Realty Council, Inc., as the latter now appears on the CSCA website in some sort of proprietary capacity.  Pacific Valley Realty is potentially liable because PVRI is the one who paid Martinez: in other words, if it is determined that Martinez was defrauded by virtue of a false employment offer, the inferior employer may be PVRI.  It is therefore also involved, as a co-conspirator, aider/abettor, possible vicarious liability, alter ego, etc.  Discovery is continuing.

73.     Mr. O'Hara made a series of representations to Fernando Martinez, including but not limited to, promises of a job as an intern, a $35-65K year salary once Fernando obtained his salesperson license with a national real estate company, a $55K-$125K salary as a second year with that company, he promised a quarter million dollar salary after his third year, and gave his word that Fernando would make millions in a matter of a few years.

74.     A number of these representations were in writing, memorialized in an August 10, 2012 email in response to Martinez's Monster resume post, which is included hereto as Exhibit A.

BENJAMIN PAYONE, ESQ.

75.     As documented herein as Exhibit A, these statements indicated that Martinez could make a professional salary (from $35-65K in year 1, to $55-125K/year 2, to $250K+/year 3), and that there were millions of dollars to be earned if Fernando agreed to work under Stephen O'Hara's tutelage.   These statements were either false, were based on no track record of tuturing persons to these income levels in that short of a period, or O'Hara had no reasonable basis for asserting them as O'Hara himself was bankrupt, his recent history of making money was by misappropriating it from others, and he has apparently never himself made "millions" of dollars in a given year.

76.     The representations stated in the August 10, 2012 email were authored by O'Hara, were made by him in the context of representing CSCA, the latter of which is the property of Professional Realty Council, Inc.  Thus, all three defendants are responsible for the representations in the August 10, 2012 email.  As Martinez believes and contends the CSCA website was set up to induce job applicants under false pretenses (given the exceptional amount of apparent fraud on the website itself), all three entities should be deemed to have acted with knowledge and intent of Mr. O'Hara's statements.  Put another way, the CSCA/PRCI entity is liable because its entire fraudulent presentation is consistent with Mr. O'Hara's personal agenda.

77.     In terms of Stephen's representations that Fernando would make millions in a few years, it appears these representations were made orally by O'Hara, acting as a real estate tutor in the context of Fernando's "internship" with Pacific Valley Realty, Inc.  As such, responsibility for these representations befalls to O'Hara personally and Pacific Valley.

78.     Stephen made the promises that Fernando would make millions within a few years, in a September 19, 2012 email to Fernando, because he took the trouble to recount how he connected with a song: "I connect to this song because my family thought I was nuts.  They wanted me to have a boring $35K year job working 9-5.

BENJAMIN PAYONE, ESQ.

To this day, they think that the $1.5 to $2 Million I made per year in the real estate industry 'is not a REAL job.' "   Thus, Stephen claims the right to teach people how to make millions in real estate by virtue of this claim.

79.    Thus, Stephen was representing to Fernando that he consistently made $1.5-$2M per year in the real estate business and was promising to teach Fernando how to similarly earn such an income.

80.    At the time, O'Hara was himself only making $72K/year according to his 2012 bankruptcy schedules, and he had just finished causing serious financial harm to a number of his friends and business associates with his borrowing power over them and later Chapter 7 discharge of their debts.

81.    The specific statements include, but are not limited to, Mr. O'Hara's August 10, 2012 written response to Fernando's resume on Monster.com, a copy of which is included here as Exhibit A:

(a)    "I saw your RESUME on Monster® and have an interest in you."

(b)    "I represent CSCA® a Talent Acquisition firm specializing in the real estate sector of the Financial Services Industry**."**

(c)    "Experience is NOT necessary, we'll be focusing on your skills and ability to be trained."

(d)    "We have been retained by a large company (over 35 offices and over 3,000 employees) in Southern California who is seeking recent Business & Communications Majors for Intern and Full Time careers."

(e)    "Our fees are paid by the employer (not you) and they are hiring 'now'."

(f)    "As an [sic] Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more."

BENJAMIN PAVONE, ESQ.

(g)    "After your third year, you will have the ability to earn an income of $250K or more per year -- so we are very serious about 'who' [sic] we select."

(h)    "Based upon your Monster Resume, we feel you might be a fit for the company we represent.  Let me invite you to visit www.CSCA.com. The site will give you all sorts of information as to the individual talent we are seeking."

82.    These statements were false and/or misleading: O'Hara's interest in Fernando was not professional, the talent acquisition firm appears to be a hollow shell, experience is not necessary because O'Hara is not really looking for a real estate employee, the large company either does not exist or O'Hara does not have the connections to it he claims, the large company was not hiring on the terms and conditions O'Hara claimed, O'Hara/CSCA was not hired, it was not getting paid, the claimed income was speculative at best and came with sexual strings, and O'Hara was only a "fit" for the company because O'Hara had a romantic interest in him.

83.    O'Hara knew the statements were false or made them with reckless disregard for their truth, given O'Hara's own sworn, financial circumstances, the fact that CSCA did not actually represent a national real estate firm, the fact that the entire website appears to be an illusion, and because O'Hara had an unstated sexual agenda, which was a precondition of his continued interest in Fernando.  O'Hara intended to defraud Martinez because he lured him into a sexual relationship by making him promises about potential employment, promises that were not true, were not as they were presented, were based on an illusion of a website, and were exaggerated, speculative and/or patently invented.

84.    Martinez reasonably relied on O'Hara's promises because he started working for him.   O'Hara adeptly held himself out as being a real estate mogul and claimed to have consistently made millions of dollars, at a time when he was recently bankrupt and had survived in the previous years by stealing from his friends.

BENJAMIN PAVONE, ESQ.

85.     Martinez's reliance on O'Hara's representations was a substantial factor in causing Fernando harm, in that Fernando capitulated to a sexual relationship, he accepted the lower (non-national, prestigious) employment as a personal intern, and he was never paid, and never even got close, to securing any sort of employment commensurate with the representations in the Monster Ad or on the CSCA website.

## Damages for Fraud Cause of Action

86.     At the time of the representations, Mr. O'Hara and CSCA were offering an employment placement service for Martinez -- an agency relationship and thus a fiduciary relationship -- for purposes of securing him the position with the large company CSCA purported to represent.

87.     In the August 10, 2012 post, Mr. O'Hara referred Martinez to CSCA for more information about what CSCA was offering.

88.     On CSCA's website, it purports to be a "Talent Acquisition Company" – a talent agency – which is a fiduciary relationship.

89.     By definition, a person who is "acquired" by another is represented by the acquiring party, here CSCA.

90.     On CSCA's website, it claims to be "one of the best places to launch your career," which reflects that CSCA acts in a cooperative relationship with the employee/talent, thus creating an agency relationship and thus a fiduciary relationship (as opposed to engaging employees at arms-length, e.g., employer-employee transaction).

91.     On CSCA's website, it states, "[w]e know that it's hard to find the right company.  And, frankly, we know that it's hard for these same companies to find qualified Talent.  That's where CSCA® comes in."

92.     Based on this statement, CSCA acts as a middleman between the employee and the employer, which creates a fiduciary relationship for it as to both the employee and the employer.

BENJAMIN PAYONE, ESQ.

93.    CSCA's website states: "we filter the best Talent for our Brokerages and we offer the best Brokerages to our Talent.  It's really that simple."

94.    CSCA reported on its site: "… we can take your career just about anywhere."

95.    Based on these statements, and numerous others on CSCA's site, it proposes to offer a service in which it nurtures the employee, through its "Professional Training Program" (which educates the employee on how to take care of customers, to help him or her develop marketing plans and "work with an energetic team of professionals"), through a "culture that breeds your success," and through its top-notch standing in the industry (the "Best-of-the-Best"), all of which point to a fiduciary relationship between Martinez and O'Hara/CSCA/PRCI.

96.    In addition, Martinez was in a fiduciary relationship with O'Hara when he engaged him romantically, albeit briefly.

97.    In the Fourth District, when a fiduciary commits fraud or in cases of promissory fraud, both equally applicable here, the rule of damages may be selected by the trial court to allow the defrauded party to recover "benefit of the bargain" damages.  (*Cupps* v. *Mendelson* (2010) (unpublished, D052869), citing *Metz* v. *Soares* (2006) 142 Cal.App.4th 1250, 1255 and *Strebel* v. *Brenlar* (2006) 135 Cal.App.4th 740, 749 ["[u]nder Civil Code section 3333, a court has discretion and flexibility to instruct a jury on an award that will appropriately compensate the plaintiff for the detriment caused by the defendant's tortious conduct.  Under the particular circumstances here, the trial court did not abuse its discretion in determining that Cupps was entitled to the benefit of the bargain to ensure he was fully compensated for Mendelson's wrongful conduct."]; *Glendale Savings* v. *Marina View* (1977) 66 Cal.App.3d 101, 145-146.)

98.    As such, plaintiff seeks damages in terms of what was promised to him under a benefit-of-the-bargain damage theory: a job with a national real estate firm

BENJAMIN PAYONE, ESQ.

that pays $35-65K in the first year, $55K-$125K in the second year, and $250K+ in the third year, complete with all the bells and whistles associated with the claims on the website: professional training, membership in a "team of energetic professionals," etc.)  O'Hara's promise that Martinez would make millions under his tutelage is also incorporated into this calculus.  The amortized value of such a job/career is itself worth approximately $250K, and as such, plaintiff seeks $250K in fraud damages for this cause of action, plus punitive damages.

99.    Pursuant to 11 U.S.C. § 523, Martinez seeks a sufficiently-specific formal finding that O'Hara committed fraud, such that the debt will qualify as non-dischargeable without repeating the litigation in bankruptcy court, within the meaning of section 523(a)(2), (a)(4) and/or 523(a)(6).

100.    Plaintiff seeks punitive damages within the meaning of Civil Code section 3294(c) in that defendants' conduct was oppressive, fraudulent and/or malicious because the representations emanating from CSCA were seriously misleading, painted a false picture of the employment opportunity that was actually being offered, contained an improper element of obligatory sexual reciprocation within it, and upon discharge, displayed a level of callous disregard for the young McDonald's employee's financial situation, by proposing Martinez not only sign off on a false document but essentially waive all his rights, solely in order to get his last paycheck, a fundamental right under California law.

BENJAMIN PAVONE, ESQ.

## II.

## CAUSE OF ACTION FOR FALSE ADVERTISING

### (Business & Professions Code § 17500)

101.   Plaintiff incorporates the allegations of paragraph 1-100 as if fully set forth into this cause of action.

102.   This cause of action is alleged against defendants O'Hara, CSCA, and Professional Realty Council, Inc.

103.   Plaintiff was contacted by Mr. O'Hara, representing CSCA, which may now be property of Professional Realty Council, Inc., as reflected by the email in Exhibit A.

104.   In Exhibit A, O'Hara referred Martinez, a potential consumer of employment placement services, to CSCA's website, at www.csca.com, which made a series of public advertising representations.

105.   Generally speaking, the CSCA website, as of a December 10, 2012 capture included herewith as Exhibit B, purports to be an elite and cutting-edge career placement service and proposes to guide the career of aspiring young professionals toward a rewarding and lucrative lifestyle, but mostly contains an innumerable stream of meaningless business catchphrases.

106.   The website contains a number of young professionals shown to be celebrating, engaged in outdoor activity, living the "good life" (fine wine, nice clothing, attractive people), and engaging in successful, lucrative and rewarding business activity.

107.   None of the people shown are in any way actually connected to CSCA.

108.   CSCA purports to be a large organization with many employees: it identifies Mr. O'Hara as the manager and founder; it claims to have "corporate executives," "managers," "career counselors," a "talent acquisition manager," a "talent acquisition director," an "executive search team," an annual "class of 30"

BENJAMIN PAYONE, ESQ.

graduates, six separate orientation and training programs, a formal promotion system, a trademarked "Sphere-of-Influence Building System," a claim it hires for numerous and varied positions besides real estate agents ("Sales Management, Relocation and a "variety of administrative positions"), a classroom where orientation and training is provided, a recruiting reach that allows it to visit college campuses around the nation, and a national geographic presence of its graduates.

109.    CSCA claims that its broker members represent all of the major national and regional real estate companies.

110.    Based on the facts alleged herein, and discovery conducted to date which does not corroborate the size or complexity of the CSCA organization as claimed, Plaintiff believes, and thereon asserts, that CSCA is a "front," a supposed elite talent agency with 10-50 employees, but is actually a vehicle by which Mr. O'Hara alone induces a pipeline of young men to explore and potentially satisfy his sexual appetite. On this basis, every advertising statement detailed herein is untrue and/or misleading because this underlying motivation and reality is not announced.

111.    Based on the facts alleged herein, Mr. O'Hara, CSCA and Professional Realty Council, Inc., know that they are engaged in a false advertising scheme, that the statements made on CSCA's website (as partly recited herein) are untrue and/or misleading, and that they are attempting to induce young persons to get involved with CSCA by submitting their career ambitions to it under the false belief that it is a large, established, top-tier, connected, national, and recognized organization.

112.    Ultimately, the job seeker is solicited for sexual purposes or the grandiose claims on CSCA's website sit in contrast to what is actually a small 1-3 person operation.

113.    When plaintiff counsel called CSCA's office in an effort to settle the case before a filing, Mr. O'Hara personally picked up the phone.

BENJAMIN PAVONE, ESQ.

114.   If not solicited for sex, the job opportunity, if any, offered to the young person is not possessed of all the amazing qualities described in the website, because CSCA is not nearly the complex, prestigious, sizeable, national, top-tier placement agency it poses as.

115.   The bulk of CSCA's representations are made on the internet, at www.csca.com.

116.   The representations reflected in paragraphs117-203 are either untrue or can be demonstrated to be misleading for other reasons as well, as discussed below. Plaintiff has identified and discussed the first (36) false advertising claims, and then refers to Exhibit B, which highlights a total of (28) additional false claims for a total of (64) claims.

117.   <u>False Advertising Statement #1</u>: "CSCA® is one of best places to launch your career."

118.   A place that requires sexual submission to the organization's president is not one of the best places to launch a career.

119.   Because of the fragility of sexual relationships, and their tendency to often end quickly as was the case here, CSCA was not one of the best places Martinez could have attempted to launch his career.

120.   CSCA is not a national, prestigious, recognized, awarded, large or complex organization and thus cannot under be described under any definition of the word "best" as one of the best places to launch a career, given true, serious and established career and employment placement organizations, such as ones from major colleges and universities.

121.   <u>False Advertising Statement #2</u>: "If you share our 'DNA', we know you will like what everyone is talking about."

122.   Even in the colloquial sense (as opposed to the literal sense), everyone is not talking about CSCA.  There is no evidence that CSCA has been in the news or is

BENJAMIN PAYONE, ESQ.

the subject of any public discussion.  It has no known public presence other than the website itself.  Based on information and discovery to date, it does not represent any large companies seeking to hire, as claimed to Martinez in Exhibit A.

123.   In its section entitled, "In the News," which suggests that CSCA has been the subject of public interest, the actual text reveals that it has not been in the news for anything.

124.   In its section entitled, "In the News," it purports to announce the "2012 Class of '30 Under 30'" and then discusses Kendra Todd, the apparent winner of NBC's "The Apprentice" during Season 3.   The page implies that Ms. Todd was in CSCA's "class of '30 under 30'."

125.   However, a careful reading of the website text reveals that Kendra is merely its "role model," CSCA does not actually state that she enrolled in any CSCA "class" (nor graduated from it), nor does CSCA appear to have any actual connection, relationship or affiliation to Ms. Todd (or to Donald Trump, pictured with her).

126.   Thus, CSCA is using the name and likeness of celebrities Todd and Trump as part of its advertising materials (perhaps in violation of Civil Code section 3344), by giving the impression that it enrolled and graduated Kendra Todd from CSCA's class of 30 persons (under 30 years old), without having any actual connection to her, without having an annual graduating class of 30 or at all, or having a training program that contains a class of enrollees.

127.   <u>False Advertising Statement #3</u>: "You are about to discover a Talent Acquisition company that offers you a career like no other."

128.   At best, CSCA is offering a rather traditional career, as a real estate agent.

129.   <u>False Advertising Statement #4</u>: "We're also business people, musicians, photographers, mountain climbers, students and artists whose interests can't be defined by a job description."

BENJAMIN PAYONE, ESQ.

130.   There is no evidence that CSCA consists of anyone but Mr. O'Hara individually or that he regularly, or has ever, "acquired" any of the aforementioned types of people or a large number of people, as suggested.

131.   False Advertising Statement #5: "CSCA$^®$ hand selects the very best Brokerages across the nation (Independent and Franchised") on the basis that they have met our stringent standards, embrace our culture and are looking to the future."

132.   CSCA does not hand select the very best brokerages across the nation, as there is no indication that CSCA is a national entity or has any ability to access or determine the best "brokerages," (which it defines as, some sort of real estate professional "representing a variety of real estate companies that serve as an intermediary for buyers and sellers").

133.   There is no evidence that anyone at, affiliated with, or who allegedly graduated from, CSCA has connections to the best "brokerages" in the nation, much less the right to select among them.

134.   CSCA does not distinguish between independent and franchised brokerage and has refused to disclose the existence of any actual relationship with any real estate firm, independent, franchised, national or otherwise.

135.   There is no indication, as particularly exemplified by the Martinez case, that CSCA employs "stringent standards," or has any documented standards.

136.   False Advertising Statement #6: "Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices.  Like CSCA$^®$ itself, our Brokerages are very progressive.  We take what we do seriously and we are consumer driven."

137.   There is no evidence, as suggested, that CSCA has a web of brokerage relationships and that it has instilled a consistent progressive marketing policy across them.

138.   False Advertising Statement #7: "College Graduates and Military Veterans are finding it hard to find employment that fulfills [sic] their dreams.

BENJAMIN PAYONE, ESQ.

CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that rewards them financially with the lifestyle they imagine for themselves."

139.    This statement is doubtfully at all true, for reasons previously stated.

140.    <u>False Advertising Statement #8</u>: "We know it's hard to find the right company.  And frankly, we know that it's hard for these same companies to find qualified Talent.  That's where CSCA® comes in."

141.    CSCA has no known history of successfully acting as the middleman between individuals and companies and has refused to disclose any information about its actual performance.

142.    CSCA does not specialize or focus in seeking college graduates or military veterans, Martinez was neither of those, and CSCA has no track record of matching college graduates with like-minded real estate firms with a similar "culture."

143.    <u>False Advertising Statement #9</u>: "CSCA® serves the finest real estate Brokerages brands in the nation who are seeking career oriented College Graduates and recent Military Veterans."

144.    CSCA has no established business relationship with "the finest real estate Brokerages brands in the nation" who are seeking a particular type of employee.

145.    <u>False Advertising Statement #10</u>: "We work with the Best-of-the-Best, the leader's [sic] in the real estate industry…"

146.    There is no indication that CSCA has any connection to the top, national real estate firms in the United States or that it regularly places employees with top national real estate firms with lucrative employment offers like the one suggested to Martinez in Exhibit A.

BENJAMIN PAYONE, ESQ.

147.   <u>False Advertising Statement #11</u>: "We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry."

148.   There is no evidence that CSCA specializes in any particular trade, nor that it has a track record of connecting persons with a specific skill set to the real estate sector.

149.   <u>False Advertising Statement #12</u>: "…most of our Brokerages are hiring now."

150.   There is no indication that CSCA is connected to a number of brokerages, nor that they are hiring, nor that they were willing to hire persons like Mr. Martinez.

151.   Mr. Martinez was never offered nor introduced to any real estate brokerage, nor one willing to hire him.

152.   <u>False Advertising Statement #13</u>: "The sky really is the limit.  Our environment's energetic, our people are motivated and our career paths take you where you want to go."

153.   There is no evidence that there is an "environment," as CSCA is not a real company and does not have "people."  CSCA acknowledges that not a single person is an actual witness to any of the activity between O'Hara and Martinez.

154.   For Fernando Martinez, as evidenced by his experience with O'Hara, "the sky is the limit" meant working for Stephen O'Hara as a sexual apprentice for $1,500/mo.

155.   <u>False Advertising Statement #14</u>: "The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara.  Nearly all of our team members started in this program."

156.   There is no basis to infer that CSCA has the ability to place an employee into a brokerage training program, that it has done so in thousands of cases, or that

BENJAMIN PAYONE, ESQ.

there are "team members."  The training program given to Fernando largely consisted of emails from Stephen in which he slowly explained some aspects of the real estate business, along with providing a number of Joel Osteen prayer messages.

157.   False Advertising Statement #15: "[a]s you progress through the program, you'll see many more career options open to you."

158.   There is no evidence to date that any other career options became open to Fernando Martinez, much less "many more" options.

159.   False Advertising Statement #16:"Want to start way out in front?  Try out Internship Program.  As a current university Business and Communication Major, you'll learn how to run a million dollar business by working with a team that's actually running one."  The O'Hara "team" is not running one.

160.   False Advertising Statement #17: "We focus the resources of CSCA® on the satisfaction of Consumer Experience with our Brokerages and the success of its Team Members – including management."

161.   CSCA does not have "team members" and does not have separate management.  It appears to be all one man, O'Hara, posing as a much larger organization.

162.   CSCA is not working with a team that is running a million dollar business, as the O'Hara real estate business was bankrupt at the time of this statement.

163.   False Advertising Statement #18: "As a company, the goal of CSCA® was never to be the biggest – only the best."

164.   The suggestion falsely implies that CSCA is of at least a significant size, more than a couple of people.

165.   False Advertising Statement #19: "However, because our people offer the best customer experience, we've done some growing.  We serve the best real estate Brokerage brands in the world."

BENJAMIN PAYONE, ESQ.

1    166.    None of this appears to have any truth to it.

2    167.    False Advertising Statement #20: "In fact, that's what we are about;

3    marketing the best of Talent to the best people in the world, our Brokerages and the

4    customers in the communities they serve."

5    168.    There is no indication, particularly given the example of Mr. Martinez,

6    that CSCA attracts top-tier aspiring young real estate professionals, like Ms. Todd,

7    nor connects such persons to "the best people in the world."

8    169.    The statement suggests that CSCA is a sizeable entity, just not as large

9    as some entities constituting the largest of companies.  It has no basis in size to

10    compare itself to large companies.

11    170.    False Advertising Statement #21: "We make news."

12    171.    There is no known information to suggest CSCA has been in the news,

13    or the center of any public discussion.

14    172.    As discussed in earlier paragraphs, CSCA's "in the news" section

15    reveals that CSCA is not in the news and is misappropriating the newsworthiness of

16    celebrities it has no connection to.

17    173.    False Advertising Statement #22: "Announcing the 2012 Class of '30

18    Under 30.'  Success in real estate takes many paths.  These young practitioners are

19    helping to redefine the business as they shape careers showcasing their intelligence,

20    drive and innovative spirit."

21    174.    The CSCA website does not actually announce a class of 30 graduates

22    from CSCA's training school.  It mentions one person, Kendra Todd, who is

23    suggested to be a graduate of CSCA.  She is not.

24    175.    False Advertising Statement #23:"Need a Role Model?  Meet Ours!"

25    176.    Pictured below this statement is a photograph of Donald Trump with

26    Kendra Todd.  There is no evidence that Donald Trump or Kendra Todd is connected

27    to CSCA in any way.

28

BENJAMIN PAVONE, ESQ.

177.   <u>False Advertising Statement #24</u>: "awards and recognition … [w]hether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation."

178.   There is no evidence that any of this is real.  A large number of detailed and specific discovery requests about CSCA's operations were met with a virtual across-the-board refusal to tender any substantive corroboration for any of the claims on the website.

179.   There is no indication or evidence that CSCA is a national organization or that awards are being won around the nation.

180.   <u>False Advertising Statement #25</u>: "What can you earn?  Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year."

181.   There is no evidence that CSCA has a "typical" track record of placing first and second years at these income levels, or that CSCA has actually mentored anyone at all into a lucrative real estate career.

182.   <u>False Advertising Statement #26</u>: "Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately."

183.   There is no evidence there is a real management training program.

184.   <u>False Advertising Statement #27</u>: "We promote based on performance, not seniority.  So if you're looking to move quickly, our Restart Training Program is for you."

BENJAMIN PAVONE, ESQ.

185.   There is no evidence to indicate that CSCA actually has numerous, functioning "programs": on the website, it claims to have six different training programs: an orientation program, "Internship Program," "Training Program," "Professional Training Program," "Management Training Program," and the instant "Restart Training Program."

186.   <u>False Advertising Statement #28</u>: "We start with orientation and classroom training."

187.   CSCA does not have any classrooms, nor a real orientation program. Mr. Martinez's "classroom training" included driving around with Mr. O'Hara to Macy's and Chi-Chi Larue lingerie shop.

188.   False Advertising Statement #29: "We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent."

189.   There is no evidence that CSCA places persons nationally, or at all.

190.   False Advertising Statement #30: "Because we pride ourselves in screening the very best job applicants, we are very selective as to which Brokerages with whom we choose to work."

191.   There is no proof that CSCA obtains, has access to, qualifies or interviews the very best job applicants or has any brokerages from which to select from.

192.   False Advertising Statement #31: "we will only represent one brokerage in each market."

193.   CSCA does not break down a national business by markets.

194.   False Advertising Statement #32: "You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA$^{®}$."

195.   There is no evidence this statement has any truth to it, whatsoever.

BENJAMIN PAVONE, ESQ.

196.   <u>False Advertising Statement #33</u>: "[Q:] When will CSCA® be visiting my campus?  [A:]  Please check with your school's career services office for a calendar of events or simply email us."

197.   Given that the internet reaches all persons attending any college in the United States and CSCA's conversation assuming that any given applicant might reasonably be able to check with their college career office to verify that CSCA will visit its campus, plaintiff does not believe, and thereby disputes, that CSCA maintains a presence, or has the ability, to conduct interviews at any given college in the nation.

198.   <u>False Advertising Statement #34</u>: "[Q:] Should I apply on CSCA's website or my school's career website?  [A:]  If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings."

199.   This statement attempts to paint a false picture that CSCA has a specific required protocol for college applicants, and a national recruiting presence.

200.   <u>False Advertising Statement #35</u>: "Can I apply to more than one position?  Yes, but keep in mind you will be required to explain your interests in and demonstrate your understanding of each of the positions that you have applied to."

201.   The statement suggests that this is a legitimate question, as if CSCA has multiple job openings available at a given student's college admissions office anywhere in the nation, all of which is untrue.

202.   <u>False Advertising Statement #36</u>: "We encourage you to explore our program descriptions by asking questions during your interview."

203.   The response falsely suggests that CSCA conducts interviews on college campuses on a national scale.

204.   There are several dozen more statements that are untrue and/or misleading and that CSCA knows to be untrue and/or misleading, and that are intended to induce young persons seeking employment to contact CSCA, so it can in

BENJAMIN PAYONE, ESQ.

some way capitalize on them with its grandiose promises, inducements and stated top-tier professional standing.

205.   In total, there are at least (64) false claims of advertising, with similar implausible claims that CSCA is a nationally-functioning, omnipresent, multiple program, structured-training system educational entity, seeking only the most highly qualified individuals, connecting them to top-tier real estate professionals, and nurturing them to lucrative million dollar careers.

206.   Plaintiff has identified and discussed (36) false statements individually within this cause of action and has highlighted the text and utilized red arrow pointers to identify at least (64) false claims in total, documented throughout Exhibit B, which are incorporated herein by reference.

207.   Plaintiff was actually deceived by these representations.

208.   Plaintiff reasonably relied on the claims by CSCA, as they were presented to him in writing, existed formally on a website, and were backed by a person that appeared to be a successful real estate broker.

209.   Plaintiff was damaged by his futile pursuit of employment with the CSCA entity, which ended within a couple of months, in that it was a pretext for O'Hara to begin a personal relationship with him, not the top-tier, uber-professional, nationally-recognized, multi-layered complex educational organization portrayed on the website.  Plaintiff was also injured by the fact that he was lured into a sexual relationship with O'Hara in pursuing the lucrative, established and attractive corporate employment dangled by O'Hara and CSCA in Exhibit A and on CSCA's website.

210.   Plaintiff lost money or property as a result of the false allegations because he had to travel to Mr. O'Hara and incurred some out-of-pocket expenses in the course of working for O'Hara.  On information and belief, Mr. O'Hara may collect part of the real estate commission fee, if in fact he has lured .

BENJAMIN PAYONE, ESQ.

211.   Pursuant to Business & Professions Code section 17535, plaintiff seeks injunctive relief.

BENJAMIN PAVONE, ESQ.

# III.

## CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES
### (Business & Professions Code § 17200)

212.   Plaintiff incorporates the allegations of paragraph 1-211 as if fully set forth into this cause of action.

213.   This cause of action is alleged against defendants O'Hara, CSCA, and Professional Realty Council, Inc.

214.   Defendants are involved in the practice of soliciting young people to submit themselves to them, under the guise of inviting them to apply for lucrative employment by a nationally-recognized, top-tier, selective, complex corporate organization.

215.   The invitation is false, because CSCA is not the entity it purports to be: it does not have a legitimate multi-tiered educational advancement system, connection to a national network of the top real estate companies, a national presence on college campuses, a track record of financial performance consistent with its representations, or the host of other features it purports to describe on its website (formal orientation, multiple training programs, various separate employment positions within the company, annual 30-person enrollee or graduating classes, formal classroom, etc.)

216.   Many of the statements on CSCA's website are untrue and/or misleading. Therefore defendants are engaged in a practice of presenting a public image that is essentially false, in violation of section 17500, and therefore unlawful within the meaning of section 17200.

217.   The false statements documented herein, including the statements made to Martinez in the Exhibit A response to his resume posting, which align with CSCA's statements on its website, are also unfair within the meaning of section 17200.

BENJAMIN PAYONE, ESQ.

218.   The statements described herein are also fraudulent within the meaning of section 17200, as they are untrue and/or misleading and are likely to deceive members of the public, particularly younger members of the public like Martinez, who do not have sufficient world and life experience to "see through" the illusion of CSCA's website, may be blinded to the illusion by the need for gainful employment and are thus more susceptible and vulnerable to claims of this nature.

219.   Pursuant to section 17203, in addition to the relief requested under section 17500, plaintiff requests an injunction shutting down the CSCA website and barring O'Hara from putting up another employee placement service, either through himself or any entity he controls, during the permissible duration of a permanent injunction.

BENJAMIN PAVONE, ESQ.

## IV.

## CAUSE OF ACTION FOR LABOR CODE VIOLATION
### (Labor Code §§ 203.5, 2699.3)

220.    Plaintiff incorporates the allegations of paragraph 1-70 as if fully set forth into this cause of action.

221.    This cause of action is alleged against defendants O'Hara and Pacific Valley Realty, Inc.

222.    Plaintiff was employed by O'Hara and Pacific Valley Realty, Inc. in that Martinez was effectively a personal employee of O'Hara while Pacific Valley wrote the check reflecting his compensation dated September 27, 2012, in the amount of $1,000, check 8544, drawn on a Bank of America account in its name.

223.    Plaintiff was constructively discharged from defendants' employment on or about mid-October, as reflected by an October 24, 2012 email in which O'Hara offered Martinez a release agreement to wind up their affairs.

224.    On November 16, 2012, plaintiff counsel contacted Mr. O'Hara by email prior to filing suit to discuss resolution of the dispute prior to a formal filing. Counsel provided Mr. O'Hara a copy of the draft complaint.  No response was received.

225.    On November 20, 2012, plaintiff counsel followed up by calling Mr. O'Hara directly at CSCA's telephone number, a call Mr. O'Hara personally answered.  Counsel advised O'Hara there was a potential lawsuit being filed and resent the email of November 16, 2013.

226.    On November 27, 2012, having not received a response, counsel sent a final email stating that the lawsuit would be filed if an immediate response to discuss resolution was not forthcoming.  No response was returned.

227.    On November 28, 2012, counsel filed suit on behalf of Martinez, which included a cause of action under the Labor Code.

228.   In response to the Labor Code cause of action, Mr. O'Hara's initial position, consistent with O'Hara's proposed release agreement submitted directly to Martinez on October 24, 2012, was that Fernando was an independent contractor.

229.   On December 31, 2012, Martinez filed a claim with the California Department of Labor Standards Enforcement.

230.   On January 10, 2013, the Labor Board set a hearing for February 25, 2013 for a hearing on the matter in San Diego.

231.   On January 18, 2013, the law firm of Teeple Hall, LLP wrote a check from its trust account for $975 payable to Fernando Martinez.

232.   On January 23, 2013, the Labor Board wrote back to Martinez, "[t]he enclosed check is payment we received from your former employer in settlement of your wage claim. Our records indicate that is for: … [a]n amount the employer concedes to be due you. If the amount is not acceptable as settlement of your claim, please send us in writing, within (10) days, further evidence and facts in support of your complaint and we will continue our investigation of the matter." The Notice was signed by Mark Meeker, Deputy Labor Commissioner.

233.   Martinez did not consider the amount tendered acceptable as settlement of the claim and submitted a detailed response on February 2, 2013 seeking additional penalties and fines based on the failure to timely remit Mr. Martinez's wages under Labor Code section 203 and for intentionally misclassifying him as an independent contractor in the proposed release agreement, pursuant to Labor Code section 226.8.

234.   In a February 14, 2013 submission, Martinez requested a continuance of the February 25, 2013 hearing date to allow him to conduct discovery in order to prove up his case for penalties for misclassifying him as an independent contractor.

235.   In a February 19, 2013 response, the Labor Board denied the continuance request without explanation.  In response to that, on the same day February 19, 2013, Martinez responded, "[c]onsidering the detail in my office's

BENJAMIN PAVONE, ESQ.

motion to continue, and your unsubstantiated and frankly terse denial of the request, I am going to have to insist on a decision that provides a reason and a supporting legal analysis."

236.    Having gotten no response, on February 20, 2013, Martinez followed up: "We are not ready to appear for this conference.  We have made formal, detailed legal requests that require more investigation of the defendants in order to be ready to appear for this, to take responsible and supportable positions, and accordingly, we will not be rushed into appearing for this matter.  We do not intend to appear."

237.    Martinez did not hear from the Labor Board again and has assumed it has closed its file.  Martinez will re-file his Labor Board claim when he has an adequate opportunity to investigate all of his claims, not just for the Labor Code 203 waiting time penalties, but for misclassification by O'Hara of him as an independent contractor (and potentially other persons), for purposes of the imposition of penalties under Labor Code section 226.8.  Martinez will not be forced to appear before he has time to investigate, as a ruling on the issues in question would be premature and would subject him potentially to adverse findings based on inadequate and incomplete information, and that are therefore not consistent with the truth of the situation.

238.    In the meantime, Labor Code section 203 provides in relevant part that, "if an employer willfully fails to pay … any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

239.    Because no payment was made within (30) days from the time of Martinez's discharge in October, his wages continued as a penalty against O'Hara and PVRI for (30) days.  Martinez's additional wages for (30) days equated to $1,500, plus the original $750 owed from the period of October 1-October 15, 2012.

BENJAMIN PAVONE, ESQ.

240.    Offsetting the trust payment from Teeple Hall of $975, Martinez is still owed $1,275 in outstanding wages.

241.    Martinez tendered an administrative claim to the Labor and Workforce Development Agency on April 24, 2013 pursuant to Labor Code section 2699.3(a)(1). Accordingly, plaintiff requests judgment in the amount of $1,275 in outstanding Labor Code penalties, along with recovery of attorney's fees pursuant to Labor Code section 218.5, 1194 or other Labor Code section authorizing the recovery of attorney's fees for such violation.

BENJAMIN PAVONE, ESQ.

# V.

## CAUSE OF ACTION FOR SEXUAL HARASSMENT
### (California Government Code § 12940(j)(1))

242.   Plaintiff incorporates the allegations of paragraph 1-241 as if fully set forth into this cause of action.

243.   This cause of action is alleged against defendants O'Hara, CSCA, PCRI and Pacific Valley Realty, Inc.  Plaintiff has exhausted all necessary administrative remedies.

244.   Fernando applied for a job and provided services pursuant to an employment contract with Mr. O'Hara and/or one of these entities that paid him $1,500/month as a real estate intern.   In that there was a sexual relationship and a lot of personal interaction, Martinez was arguably a personal employee intern to Mr. O'Hara; on the other hand, the employment was solicited through Mr. O'Hara's website, CSCA, a claimed employment placement agency (now perhaps owned by Professional Realty Council, Inc).  On the other hand to that, at least one of the wage checks issued to Martinez was tendered by Pacific Valley Real Estate, Inc. Therefore, because of the overlap, Martinez alleges an employment relationship against all (4) defendants.

245.   Although there was initial reciprocation, O'Hara's sexual conduct was ultimately unacceptable, unwanted and severe.  Martinez was unable to easily end the relationship with defendants.

246.   O'Hara made unwanted sexual advances to Martinez and engaged in other verbal and physical conduct of a sexual nature.

247.   Job benefits, and continued employment, were conditioned by words or conduct on Fernando's compliance with O'Hara's sexual agenda.

248.   An employment decision to terminate Martinez was made because of Martinez's refusal to continue the sexual relationship.

BENJAMIN PAYONE, ESQ.

249.    At the time of O'Hara's conduct, he was Martinez's boss.

250.    Martinez was harmed in a number of ways including unwanted sexual attention, undesired sexual compliance, the loss of his wages, the loss of his job, and the disappointment of O'Hara's broken promises, which provided Fernando the hope and prospect of a professional career and financial security.

251.    O'Hara's conduct was a direct factor in causing Martinez's harm. [CACI 2520]

# VI.

## REQUEST FOR ALTER EGO FINDINGS

252.   Plaintiff incorporates the allegations of paragraph 1-251 as if fully set forth into this request for findings.

253.   To the extent a judgment against any of the entities is not collectible, pursuant to *Sonora Diamond* v. *Sonora High* (2000)  83 Cal.App.4th 523, 538, plaintiff seeks alter ego findings that the following alter ego relationships exist:

        (a)    that PVRI is the alter ego of O'Hara;

        (b)    that CSCA is the alter ego of O'Hara;

        (c)    that PRCI is the alter ego of O'Hara;

        (d)    that PRCI is the alter ego of CSCA;

        (e)    that PVRI is the alter ego of PRCI;

        (f)    that CSCA is the alter ego PVRI;

254.   If a judgment is entered against any of these entities and is not collectible, plaintiff will prove, and hereby alleges, that there is such a unity of interest that the separate personalities of the corporations no longer exist; and that an inequitable result will follow if the corporate separateness is respected.

255.   In the event O'Hara, who is effectively in control of all of these entities, shifts, moves or hides assets away from himself to avoid payment of a judgment against himself personally, plaintiff requests findings to extinguish any distinction between himself and the entity holding his assets under *Taylor v. Newton* (1953) 117 Cal.App.2d 752 and *McLoughlin v. Bloom* (1962) 206 Cal.App.2d 848, 852-853.

BENJAMIN PAVONE, ESQ.

*Wherefore*, plaintiff requests damages as follows:

(1)     fraud damages in the amount of at least $250,000;

(2)     punitive damages in relation to the fraud cause of action in the amount of at least $250,000, given the volume of fraud in connection with Mr. O'Hara's online presentation (and noting the financial destruction he is heaping on his friends and associates given his recent bankruptcy discharge), and for any of the other causes of action that permit punitive damages given a large volume of intentional, and often, fraudulent misconduct detailed herein;

(3)     an injunction taking down the CSCA website and barring O'Hara, and any entity he controls, from putting up another employment placement for the duration of the permanent restraining order period, within the broad, preventative language of Business & Professions Code section 17203;

(4)     payment of $1,250 in outstanding labor code penalties;

(5)     general damages of at least $50,000 for sexual harassment (a reduced figure given the initially consensual nature of it) and wrongful termination based on O'Hara's decision to lure Martinez into a sexual relationship using an employment opportunity, constructively discharging him when the latter declined to continue the sexual relationship, along with an equal punitive award, of at least $50,000, for that obscenely one-sided proposed release agreement circulated by O'Hara on October 24, 2013;

(6)     attorney's fees for time expended from the inception to the conclusion of the litigation, but noted here as approximately (230) hours to date, at counsel's current hourly rate of $395/hr, for a current fee request as of April 17, 2013 of $90,850, and continuing to accrue as the litigation progresses, based on the fee shifting provisions permitted under the private attorney general doctrine in Code of Civil Procedure, section 1021.5 , the fee shifting provisions of Civil Government

BENJAMIN PAVONE, ESQ.

Code section 12965(b) for sexual harassment and resulting wrongful termination, and Labor Code sections 203, 218.5, 1194, 2699.3, or other Labor Code sections, for the outstanding penalty and recovery of attorney's fees.  Thus, plaintiff makes a total tentative overall request as of this writing (and thus excluding accruing interest, costs and attorney's fees) of at least $642,100 (subject to revision, amendment or reconsideration, according to the evidence at trial), which is consistent with Mr. O'Hara's own assessment of his wrongdoing in characterizing it as "extreme exposure to various legal claims for the parties," in seeking for Martinez to agree to an unconscionable release agreement covering up his wrongdoing.

(7)    interest on all counts, pursuant to section 3287, et seq.;

(8)    costs, to be fixed after trial by memorandum; and

(9)    such other relief as the court deems just and proper.


Date: April 25, 2013                          LAW OFFICES OF
                                              BENJAMIN PAVONE, PC

                                              \s\Benjamin Pavone, Esq.
                                              Attorney for Plaintiff
                                              Fernando Martinez

BENJAMIN PAVONE, ESQ.

# EXHIBIT A

**I Found You On Monster**

From: **Stephen O'Hara via Monster** (letters@route.monster.com)
Sent: Fri 8/10/12 12:03 PM  To:
infinateS@hotmail.com
Hi Fernando:

I saw your RESUME on MonsterB and have an interest in you. I represent CSCA® a Talent Acquisition firm specializing in the real estate sector of the **Financial Services Industry.** (Experience is NOT necessary, we'll be focusing on your skills and ability to be trained)

We have been retained by a large company (over 35 offices and over 3,000 employees) in Southern California who is seeking recent Business & Communications Majors for Intern and Full Time careers. Our fees are paid by the employer (not you) and they are hiring 'now'.

As an Full Time Intern or Full Time Associate, you should be able to earn between $35K and $65K in your first year and after your first year, you should comfortably be able to earn between $55K and $125K or more. After your third year, you will have the ability to earn an income of $250K or more per year- so we are very serious about 'who' we select.

Based upon your Monster Resume, we feel you might be a fit for the company we represent. Let me invite you to visit **www.CSCA.com**. The site will give you all sorts of information as to the individual talent we are seeking.

After reviewing our site, there is an APPLY NOW button (upper right comer) on the Site which will lead you to our Online Application page. Once we receive your application, we will pre-screen it and if we feel you have the skill set and personality to succeed with our client, we will invite you to move onto the next step which will be the last step before a face-to-face Interview is scheduled.

If you need to Email me, please take note of my private Email: **steve@csca.com**. In

the meantime, know that we wish you the very best in your Career Search.

Warmly,

CAREER SOLUTIONS & CANDIDATE ACQUISITION

Stephen O'Hara

Executive Search Team

Letter Value: 5B87ED-1451CEE

# EXHIBIT B



f  t  in    Apply Now  |  Find Us

**YOUR CAREER. LETS GET IT STARTED.**    1



**CSCA® is one of the best places to launch your career. If you share our 'DNA' we know you will like what everyone is talking about.**    2

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us







Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment at : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



    Apply Now  |  Find Us

Our Company

| | |
|---|---|
| Home | **From the Desk of our Founder and CEO** |
| Our Company | |
| Our History | |
| Where We're Going | |
| In The News | |
| Awards & Recognition | |
| Our Culture | |
| Opportunities | |
| Benefits | |
| Job Prep | |
| Guarantee | |
| | |
| Find Us | |

3

Thank you for visiting CSCA®. You are about to discover a Talent Acquisition Company that offers you a career like no other.

At CSCA®, all talents apply. We're people who love technology and people who love people. We're also business people, musicians, photographers, mountain climbers, students, and artists whose interests can't be defined by a job description. Whether you're analytical or creative, tech savvy or insightful, there's a place in our Brokerages to share your talents while you learn, develop, and inspire.

4

I encourage you to tell us about yourself. Join us. Show your passion and expertise as you connect customers with our services and help integrate our services into their lives. Be a part of our team and change the way our customers work, play, create, and live. Our network of fine Brokerages a lot more than houses, they sell Lifestyles!

5

I challenge you to be part of something amazing. CSCA® hand selects the very best Brokerages across the nation (Independent and Franchised) on the basis that they have met our stringent standards, embrace our culture and are looking to the future. In fact, the elite Brokerages who are members of our network are not only the most innovative real estate Brokerages in the world; they represent the best brands and are among the fastest growing. On behalf of our Brokerages, CSCA® is always looking for smart, engaging, supportive, and dynamic people who have a passion for people and serving them as you would want to be served yourself.

We join our Brokerages in sharing the common goal of exceeding the expectations of our customers. That's where YOU come in. We can't do it without the right talent. Consumers can go anywhere for their Financial Services needs; in this case real estate and take their chances or they can enjoy the experience with one of our team members and buy and sell with confidence. That's the CSCA® difference.

Successfully and Warmly,

Stephen O'Hara



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



     Apply Now  |   Find Us

## Our History

**'Under All is the Land'.** This is the preamble to the REALTORS® Code of Practice. Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.

Home
Our Company
  Our History
  Where We're Going
  In The News
  Awards & Recognition
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry.

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



Apply Now
|
Find Us

**'Under All is the Land'.** **This is the preamble to the REALTORS® Code of Practice. Most of the worlds wealth is tied to real estate. And, there is a lot of money that can be made in the real estate sector of the Financial Services industry – if you are licensed, trained and with the right company.**

Clearly, our Brokerages don't embrace the typical 'Old School' real estate practices. Like CSCA® itself, our Brokerages are very progressive. We take what we do seriously and we are consumer driven.

Yes, like the stock market, real estate has its ups and downs. The difference? When a publicly held company closes its doors, your stock is worthless. But, when the real estate market goes down, the 'dirt' doesn't go anywhere…just hang on and it will come back. You can't lose with real estate. Like a stock broker, real estate professionals get paid whether property owners make or lose money on their home. As a business, real estate is full of money making opportunities.

While just about everyone has to have a roof over their heads, those in the IGeneration (Gen X, Y and Millennials) historically create the most demand. Those in the IGeneration are now ready to buy

their first home, and, as their income and personal needs grow, this same group will most likely buy a number of homes before they retire – which, with some planning, should be about the same time you do! In other words, CSCA® and its Brokerages believe in 'Customers for Life'!

To be a successful real estate professional, you need to be educated, tech savvy and speak the language of those who are buying homes today and tomorrow…the IGeneration. You need a skill set that incorporates many of the characteristics associated with a Communication and/or Business related Degree and certain learned skills in the military. That's why we want to talk to you.

Our founder, Stephen O'Hara realized that some of the finest real estate Brokerages in America have a huge need to Identify College Graduates and Military Veterans; Talent who speak the language of today's dominate consumer: The IGeneration. **You might be just who we are looking for.** We want to give you an opportunity to participate in this multi-billion dollar industry. 7

College Graduates and Military Veterans are finding it hard to find employment that fulfils their dreams. CSCA® offers a career path to help College Graduates find a company whose culture matters to them and affords them a career path that rewards them financially with the lifestyle they imagine for themselves.

8

We know that it's hard to find the right company. And, frankly, we know that it's hard for these same companies to find qualified Talent. That's where CSCA® comes in.

CSCA® serves the finest real estate Brokerages brands in the nation who are seeking career oriented College Graduates and recent Military Veterans. We filter the best Talent for our Brokerages and we offer the best Brokerages to our Talent. It's really that simple.

9



     Apply Now   |   Find Us

Where We're Going

- Home
- Our Company
  - Our History
  - Where We're Going
  - In The News
  - Awards & Recognition
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

- Find Us

## LOOKING FOR SUCCESS? IT STARTS WITH CSCA®

It's what we know best. Our focus is finding the best Candidates for our Brokerages. We work with the Best-of-the-Best; the leader's in the real estate industry, we can take your career just about anywhere. We've put innovative ideas and thinking into the hands of our professionals. And the results have been outstanding.

CSCA® is an acronym for Career Solutions Candidate Acquisition. We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry.

While you may be completing college, coming home from the military, or have had a college background, but may be interested in using your knowledge and experience to take your career to the next level, you might want to SUBMIT YOUR APPLICATION NOW as most of our Brokerages are hiring now.



## BILLIONS OF REASONS TO JOIN US

About $64 Billion is paid each year to real estate professionals across the nation. As a multibillion-dollar industry, we can offer you more than a chance to succeed. This is where you can thrive. The sky really is the limit. Our environment's energetic, our people are motivated and our career paths can take you where you want to GO. No matter where you apply, get ready for something big.

The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara. Nearly all of our team members started in this program. You will learn the Brokerage business from the inside out – taking care of customers, developing marketing plans and working with an energetic team of professionals. You'll see just how much influence you can have on the future of our Brokerage's and



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

## LOOKING FOR SUCCESS? IT STARTS WITH CSCA®

**It's what we know best. Our focus is finding the best Candidates for our Brokerage Network. We work with the Best-of-the-Best; the leader's in the real estate industry, we can take your career just about anywhere. We've put innovative ideas and thinking into the hands of our professionals.        And        the        results        have        been        outstanding.**

**CSCA®** is an acronym for **C**areer **S**olutions **C**andidate **A**cquisition. **We specialize in connecting a specific 'skill set' to the real estate sector of the Financial Services industry.**

**While you may be completing college, coming home from the military, or have had a college background, but may be interested in using your knowledge and experience to take your career to the next level, you might want to SUBMIT YOUR APPLICATION NOW as most of our Brokerages are hiring now.**

## BILLIONS OF REASONS TO JOIN US

About $64 Billion is paid each year to real estate professionals across the nation. As a multibillion-dollar industry, we can offer you more than a chance to succeed. This is where you can thrive. The sky really is the limit. Our environment's energetic, our people are motivated and our career paths can take you where you want to **GO**. No matter where you apply, get ready for something big.

The Training Program used by our Brokerages is where thousands of successful careers are launched – including that of our Founder, Stephen O'Hara. Nearly all of our team members started in this program. You will learn the Brokerage business from the inside out – taking care of customers, developing marketing plans and working with an energetic team of professionals. You'll see just how much influence you can have on the future of our Brokerage's and in your own career. As you progress through the program, you'll see many more career options open to you.

15

## INTERNSHIPS

16

Want to start way out in front? Try our Internship Program. As a current university Business and/or Communication Major, you'll learn how to run a million dollar business by working with a team that's actually running one. You'll also gain truly marketable skills that will prepare you for a successful career after graduation.

## IT'S ABOUT YOU AND THE CUSTOMER



The biggest ideas are often the simplest. ==We focus the resources of CSCA® on the satisfaction of Consumer Experience with our Brokerages and the success of its Team Members – including management.== The rest will take care of itself. Our innovative commitment has held true, and as a result, our Brokerages continue to be recognized for their world-class customer service and the way we advance our professionals.

## LEADING THE WAY.

==As a company, the goal of CSCA® was never to be the biggest – only the best.== However, because our people offer the best customer experience, we've done some growing. ==We serve the best real estate Brokerage brands in the world.== And there's no plan to slow down.

## STARTING IN NEIGHBORHOODS.

Since our founding, we've helped our Brokerages market to both their communities and local neighborhoods. ==In fact, that's what we are about; marketing the best of Talent to the best people in the world, our Brokerages and the customers in the communities they serve.== We expanded this local service to other markets, and we continue to build on this base of business – real estate expertise conveniently located right where customers live and work.

## MORE THAN JUST REAL ESTATE.

Our exclusive Brokerages continue to find success in other business areas as well. These revenue streams give them the opportunity to diversify their businesses and, in turn, offer you more career opportunities.

### TECHNOLOGY MAKES US GO.

How committed are we to technology? Every year, our Brokerages invest in their technology infrastructure so they remain on the leading edge. This technology is put in your hands so you can make the customer's experience the absolute best it can be.



f  t  in    Apply Now  |  Find Us

In The News

| Home |
| Our Company |
|    Our History |
|    Where We're Going |
|    In The News |
|    Awards & Recognition |
| Our Culture |
| Opportunities |
| Benefits |
| Job Prep |
| Guarantee |
| Find Us |

21

22

**WE MAKE NEWS.**

**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

**Announcing the 2012 Class of '30 Under 30'**

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

23

**Need a Role Model? Meet Ours!**

**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old.**

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".



GO ▶▶▶

Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

## WE MAKE NEWS.

**It comes with the territory.** After all, we are one of the best places to launch your career; our Brokerages put the consumer first.

## Announcing the 2012 Class of '30 Under 30'

Success in real estate takes many paths. These young practitioners are helping to redefine the business as they shape careers showcasing their intelligence, drive, and innovative spirit.

## Need a Role Model? Meet Ours!



**Kendra Todd** (born 1978) was hired by Donald Trump on national television at the conclusion of Season 3 of NBC's "The Apprentice" live at New York University on May 19, 2005. She was the first female candidate, and the youngest, to be hired on the US Apprentice.

Prior to becoming a Season 3 candidate she was a successful real estate broker from Boynton Beach, Florida. At the time the show was recorded and produced, **Kendra was 26 years old**.

Prior to becoming a real estate broker she had obtained her Bachelor's Degree in Linguistics from the University of Florida, founded a highly-respected lifestyle magazine based on South Florida, and used her media expertise as a founder of My House Real Estate, Inc., a firm specializing in property acquisitions.

Kendra has recently authored a book, Risk and Grow Rich. She also recently appeared in an infomercial for Billy Blanks' new Tae-Bo exercise program, "Billy's Bootcamp: Elite".

Kendra is a judge for the Real Estate Apprentice Foundation - a grant program helping 5,000 newly licensed real estate agents every year to succeed in real estate.

Kendra hosts "My House is Worth What?" on HGTV and a regular real estate contributor on Cavuto on Business.

If you are considering Applying with CSCA® you might want to VIEW WHAT KENDRA HAS TO SAY about her journey after her College Years.

## Want to hear MORE FROM KENDRA?

Author Carolyn Castleberry and entrepreneur Kendra Todd talk about "Kingdom Entrepreneurs" and how to become one. Carolyn is an accomplished author and TV News Anchor.



   Apply Now  |  Find Us

24

**Awards & Recognition**

Home

Our Company

  Our History

  Where We're Going

  In The News

  Awards & Recognition

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

### Make it yours …

A LITTLE RECOGNITION **GOES A LONG WAY.** A lot of recognition goes even further. Our Brokerages and their Team have received recognition and accolades for every aspect of real estate business. **Whether it's for our exceptional Professional Training Program, our commitment to the environment or our innovative use of technology, we're earning awards and honors from around the nation.**

24





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



      Apply Now  |  Find Us

Interview Preparation

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
   Interview Preparations
   Recruitment Process
   FAQs
Guarantee

Find Us

### YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"

For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

## The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

## INSIDERS TIP

**Want a few 'insider' tips?**

1. [Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers](). (Please Click on Link.)

2. If You [APPLY]() to CSCA® TODAY, you can get on the ground floor of the next great market; YES, it's already begun! Not only can you be a part of history, but, this knowledge can give your career a real power boost!

**This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in economics and really understand the back story to the nation's current financial quagmire (without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special: Money, Power and Wall Street: Part One, Two, Three and Four. This link will take you to Part One and you should find Part's Two, Three and Four on the same page.**

## The Markets

**Read a few articles each week.**
**Understand what's going on in the real estate.**
**Stay up-to-date with financial news.**
**Know about FHA & VA, FANNIE MAE and FREDIE MAC.**
**Know about the financial crisis: what happened and why? It is the easiest way to demonstrate interest in our specific market.**
**Choose one or two areas of the market that you can discuss with specific knowledge and enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and economics.**



      Apply Now  |   Find Us

Opportunities

Home
Our Company
Our Culture
Opportunities
    Training Program
    What You'll Learn
    Career Path
    Rewarding Success
    Day In The Life
    Internships
    Seasoned Professional
Benefits
Job Prep
Guarantee

Find Us

INTEREST IN ANY OF THESE PROFESSIONS? **WE ARE LOOKING FOR YOU!**

Management  Advertising  Marketing  Communications  Public Relations  Stock  Brokerage  Insurance  Financial Advisors  Real Estate  Appraisal  Recruiting & Staffing  Retail  Banking  Consumer Loan  Mortgage  Retail  Business Development  Career  Consumer  Credit  School  Counselor  Customer Service  Commercial and Residential Real Estate  Events  Manager  Telemarketing  Paralegals  Sales  Direct  Marketing  Teacher  Trainer  Coaching  Relocation  Real Estate Sales Management

### CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

**What can you earn?** Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

25    26

### It's time to GO.

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

**INTEREST IN ANY OF THESE PROFESSIONS?** WE ARE LOOKING FOR YOU!

Management Advertising Marketing Communications Public Relations Stock Brokerage Insurance Financial Advisors Real Estate Appraisal Recruiting & Staffing Retail Banking Consumer Loan Mortgage Retail Business Development Career Consumer Credit School Counselor Customer Service Commercial and Residential Real Estate Events Manager Telemarketing Paralegals Sales Direct Marketing Teacher Trainer Coaching Relocation Real Estate Sales Management

CSCA® Specializes In The Financial Services Industry – With An Emphasis On The Real Estate Sector.

Just about everyone needs a roof over their head. You don't have to look far…perhaps outside your front door. In fact, about 5 Million Homes are sold each year. Each time real estate is bought and sold, a lot of people are making money. Each year, about $64 Billion is paid to real estate professionals for their expertise. If you are a getting ready to graduate, already a College Graduate or coming home from Military Service, our job is to help you get your share of that $64 Billion – if you have an interest in the Financial Services industry.

**What can you earn?** Typically, about six months after our Brokerage helps you become licensed (unless you are already licensed), on the sale of homes around $225,000.00, you can expect to earn between $45,000.00 and $65,000 in your first year (more in communities with higher real estate values) and you can double that in your second year. Real estate can be a very fast, financially rewarding journey if you are willing to work hard.

## It's time to GO.

Whether you're right out of school, the military or looking for something more out of your current career, our Brokerage's Management Training Program is designed to put you in a position to succeed immediately. You'll learn how to run a million-dollar business, maximize profits and motivate a team of professionals, while having fun along the way.

## Right out of school or military?

Take your first step to success. You'll quickly learn that we hired you to eventually run your own business. And you'll have the opportunity to work with people as motivated and driven as you. You'll bring your degree to the table, and we'll help you make crucial business decisions in no time.

## Have some experience already?

**27**

We promote based on performance, not seniority. So if you're looking to move quickly, our Restart Training Program is for you. We'll take your existing knowledge and your drive to succeed, and supplement it with tools and training that will help you climb to the top.

### Where leaders learn to lead.

**28**

We start with orientation and classroom training. Once you are selected by one of our local Brokerage Offices, your hands-on training begins. You'll work with and learn from capable mentors who were once in your shoes. Does it work? Absolutely. Nearly all of our managers and corporate executives started out as Trainees -- including our Chairman and CEO.

### EXECUTIVE SEARCH and OTHER OPPORTUNITIES:

Like most businesses, CSCA® and its Brokerages have other positions that need filled from time to time that are not directly sales related.



    Apply Now  |  Find Us

FAQs

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
   Interview Preparations
   Recruitment Process
   FAQs
Guarantee

Find Us

### Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

### When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply email us.

### Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings.

If the CSCA® job postings are not listed on your school's career website, please apply here

### Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

### What happens during the interview process?

If we meet you at in a job fair or campus environment, your first-round interview may take place on campus and/or at



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access  Terms of Use  Privacy Policy

### Is CSCA® a real estate company?

No, CSCA® is not a real estate company. CSCA® is a specialized Talent Acquisition Company. We work with selected real estate brokerages across the nation – every brand you can think of – to place new talent. Because we pride ourselves in screening the very best job candidates, we are very selective as to which Brokerages with whom we choose to work.

In fact, we will only represent ONE BROKERAGE in each market. You might say we place the best talent with the best real estate brokerages in the nation that mirror the values and culture of CSCA®.

### When will CSCA® be visiting my campus?

Please check with your school's career services office for a calendar of events or simply email us.

### Should I apply on CSCA's website or my school's career website?

If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings. If the CSCA® job postings are not listed on your school's career website, please apply here

### Can I apply to more than one position?

Yes, but keep in mind you will be required to explain your interests in and demonstrate an understanding of each of the positions that you have applied to. We encourage you to explore our program descriptions by asking questions during your interview Your interviewer is the best person to help you determine which areas you are most interested in and best suited to.

### What happens during the interview process?

37

If we meet you at in a job fair or campus environment, your first-round interview may take place on campus and/or at the job fair. Depending on the position, second and final rounds will take place are always held at the Brokerage with which we place you.

38

### Is career mobility an option with a CSCA® Brokerage?

Yes, the breadth and scope of the CSCA® Brokerage Network geographic presence enables our team to experience a wide array of career mobility based on their interests and evolving business needs.

39

### Do you accept applications from disabled persons?

We welcome applications from people with disabilities and are fully committed to supporting individuals through the recruitment process.

While driving and mobility are necessary functions, there are many other situations which would not present any challenge. Feel free to discuss your situation with us. If you believe you can do it, we want to believe in you.

## Do you accept applications for military veterans? 

We welcome applications for military veterans. In fact, some of our best team members are former military folks. We invite you to visit our **Military Page** on this website.

## Do I need to be licensed before I submit my application?

Absolutely NOT! If you are placed with one of our Brokerages, helping you get your licensed is part of 'what we do'.

## Do you accept applications from currently licensed real estate professionals.

Yes, we welcome currently licensed real estate professionals, however, we have a special interview process for these situations. Please let us know when you submit your application that you are SEASONED.

To be clear, while CSCA® Brokerage member's represent all the major national and regional companies as well as local Independents, our hiring qualifications are very different. Generally, we are looking for a person that is not the 'typical' real estate agent. We are looking for real professionals, not people who simply write the word professional on their resume.

## Are you hiring interns now? 

Absolutely. Interns play an integral role in the success of our Brokerages. We generally hire during your summer vacation – but our Brokers can always make exceptions. Some of our Brokerages, however, do hire interns all year long. **Apply now** to learn more.

## Are internships paid? 

Yes. Sometimes. It depends on what your goals are. Interns may also be eligible for incentives and rewards. Talk to our CSCA® Talent Acquisition Manager for more details.

## What are the requirements for internship?

You should be currently enrolled in college. The ideal person should be interested in a management and sales environment and should have strong multi-tasking skills.

## What hours do interns work?

Hours for interns vary from location to location. Summer interns



      Apply Now  |    Find Us

What You'll Learn

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

Find Us

## WHERE GO-GETTERS COME AND GET IT.

As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.

### Customer Service

**"How can I help you?"**

43

Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to **GO**.

### Marketing

**"Let's spread the word."**

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

### Financials



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

# WHERE GO-GETTERS COME AND GET IT.

As part of our Training Program, you'll learn every day. You'll build skills in every area of business from Profit and Loss statements to working with customers. You'll learn how to network, manage time and make your CSCA® Brokerage experience even more successful. Here's just a glimpse at what's ahead.

## Customer Service

### "How can I help you?"

Helping our Brokerage's serve their community is the cornerstone of CSCA®. As a Professional Trainee, you'll learn how to communicate with and influence all types of customers, vendors and co-workers. Out of everything you learn, this is the one skill you'll use every minute of every hour of every day. Our training covers everything from proper sales techniques to problem solving. Once you've completed the program, you'll be able to handle any situation. You'll be ready to GO.

## Marketing

### "Let's spread the word."

Getting the word out about our Brokerage is a big part of what you'll do. Real estate is a very social business. In fact, it's common to hear one of our Candidates come back to us and say they can't believe they get paid for being social.

We'll show you how to build a marketing strategy that helps you reach out to local businesses and your community. This will help you build solid business-to-business sales skills as well as relationships with everyone from local businesspeople, to your neighbors across the street.

## Financials

### Keeping us in the green."



This is the "running a business" part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### "Everything has its place."

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management

techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.

## Financials

### Keeping us in the green."

This is the "running a business" part of the Professional Training Program. After all, profits are what make a business successful. We'll start with basic accounting and finance principles, progress to more advanced topics and eventually put you in charge of the profit and loss statement for your real estate business. From day one, your compensation comes from the profits you generate. The better you perform, the better our Brokerage performs, and the more you earn.

## Logistics

### "Everything has its place."

Things can get pretty hectic at a real estate Brokerage. It's always exciting and there are customers and employees buzzing around all day. You'll learn everything from creative time-management techniques to innovative organizational tools. It will all help you keep your real estate business running smoothly – and prepare you for wherever your career takes you.



    Apply Now  |  Find Us

Career Path

- Home
- Our Company
- Our Culture
- Opportunities
  - Training Program
  - What You'll Learn
  - Career Path
  - Rewarding Success
  - Day In The Life
  - Internships
  - Seasoned Professional
- Benefits
- Job Prep
- Guarantee

- Find Us

## There's only one way to GO. Anywhere.

There are many opportunities in real estate. We give you the flexibility to find your passion. And, then, follow that path. Where virtually everyone begins is as a trainee, where you GO is really up to you. Real estate has many faces. Residential, Commercial, Property Management, Business Opportunities, Mortgage Financing and the list goes on and on.

It's like changing careers without changing companies. It all depends on how far you want to GO.





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy



       Apply Now  |   Find Us

### Rewarding Success

45

**GREAT PERFORMANCE = GREAT REWARDS**

Home

Our Company

Our Culture

Opportunities

    Training Program

    What You'll Learn

    Career Path

    Rewarding Success

    Day In The Life

    Internships

    Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

As part of our team, you'll be compensated based on your performance. By making your Brokerage fun, and working well with your team, you'll be able to directly influence all areas of your success. You can build on our entrepreneurial model and earn an income that has no ceiling. It's only limited by your innovation, desire and skills. How much can you earn? If you perform, that's up to you.

**Managers**    ← 46

All team members, receive a percentage of the profits generated by their own success. As a manager, you'll earn a highly competitive income that is dependent upon the success of the business you're running. If your business does better, so do you. If you have a true entrepreneurial spirit, there's no limit to what you can earn. How high can you **GO?**





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



      Apply Now  |  Find Us



Home

Our Company

Our Culture

Opportunities

    Training Program

    What You'll Learn

    Career Path

    Rewarding Success

    Day In The Life

    Internships

    Seasoned Professional

Benefits

Job Prep

Guarantee

Find Us

### There's Only One Internship Program Like This.    47

That's because there's only one CSCA®. Every year we turn internships into real, substantial career-building tools. And no, you won't spend your time fetching cups of coffee or making coffee. You'll learn what it takes to run a successful business because that's what you'll help do.

48

Along the way, you'll also participate in contests and competitions with other interns, building relationships, honing your entrepreneurial skills and gaining experience. You'll take on the same challenges as our first and second year full-time professionals. Even better, at the end of your internship, you'll make a presentation to your management team covering the business topics you learned throughout the program. Want to GO?    49

### You Put The GO In GO-Getter.

As part of our Internship Program, you must be ambitious, creative, personable, resourceful, fun loving and hard working. As you'd imagine, everyone else in the program is just as motivated as you. If you're ready, the business training you'll receive will put your skills, your attitude and your resume way out in front.    50



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



     Apply Now   |   Find Us

Seasoned Professional

Home
Our Company
Our Culture
Opportunities
   Training Program
   What You'll Learn
   Career Path
   Rewarding Success
   Day In The Life
   Internships
   Seasoned Professional
Benefits
Job Prep
Guarantee

Find Us

### There's More Than One Way To Join One Of Our Fine Brokerages Through CSCA®.

Perhaps you are a seasoned real estate professional. By all means, YES! We'd enjoy talking to you about your career. In fact, we have many folks who 'informally' learned a lot about real estate, but their business hit a plateau. This is common. Once they have sold their family and friends, they have exhausted their Sphere-of-Influence (SOI).

You'll learn how our Proprietary System will help you increase your sphere, thereby increasing your opportunities for new business. In fact, doubling or tripling the business you are doing now can be easy if you follow our Sphere-of-Influence Building System™. Taking your business to the next level is exactly what our System is about.

We also hire for numerous positions (Sales Management, Relocation, etc.) that are integral to helping us better serve our customers.

### And, more

We also hire for a variety of administrative positions including full and part-time opportunities. Simply send us your resume and let us know how we can help you. There is always something moving in real estate.

NOTE: The CSCA® Guarantee applies to entry level opportunities only. Be sure to ask your CSCA® Talent Acquisition Director for more information.



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



    Apply Now  |  Find Us

Benefits

## Home
## Our Company
## Our Culture
## Opportunities
## Benefits
## Job Prep
## Guarantee

## Find Us

### WE COVER TODAY AND TOMORROW

Our Brokerages offer you a career-home where you can build your future. And this means more than just a career. Through our various Associations, we offer many benefits packages designed to give you peace of mind today and is flexible enough to grow with you. Just think of it as your foundation for building something truly impressive. As you'd expect, our benefits help you GO much farther.

55





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



       Apply Now  |   Find Us

Job Prep

| | |
|---|---|
| Home | Job Prep: **Who We Are Looking For** |
| Our Company | CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few. |
| Our Culture | |
| Opportunities | |
| Benefits | Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like. |
| Job Prep | |
| Interview Preparations | |
| Recruitment Process | |
| FAQs | **What CSCA® Looks for in Candidates** |
| Guarantee | |
| | The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well. |
| Find Us | |

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.



Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.                    Client Access   Terms of Use   Privacy Policy

Job Prep: **Who We Are Looking For**

CSCA® seeks career focused students, graduates, military veterans and people who are considering industries such as Advertising, Marketing, communications, Public Relations, Finance, Stock Brokerage, Insurance, Financial Advisors, Real Estate, Appraisal, Recruiting & Staffing and Retail to name only a few.

Within these industries, you would be considering functions such as Banking, Consumer Loan, Credit, Mortgage, Retail & Consumer, Business Administration, Communications, Development, Counselor (Career, Credit, School), Customer Service, Finance, Stock Broker, Trader, Finance, Commercial Real Estate, Marketing, Events Manager, Marketing & Research, Telemarketing, Paralegals, Sales, Advertising, Customer Service, Direct Marketing, Market Research, Public Relations, Retail, Teacher, Trainer and the like.

## What CSCA® Looks for in Candidates

The following is a list of a few of the characteristics CSCA® is looking for in a Candidate. Certainly, not all of these are required, but any combination of at least half of these 'skill sets' afford a candidate for a career the real estate sector of the financial services industry well.

1. Academic preparation
2. An Entrepreneurial Spirit
3. An ability to study for and pass any and all necessary licensing requirements
4. Communication skills (including public speaking and presentations)
5. Common Business Related Computer & Internet Skills
6. Leadership and Teamwork
7. Interpersonal skills and Personal accountability
8. Shift thinking and creating new knowledge that can be used by the organization; requires "strategic" or "breakthrough" thinking - another way of saying higher levels of complex, critical thinking
9. Ability to adapt to changing systems - flexibility to handle multiple tasks. Demonstrated commitment to learning
10. Participation in co-curricular activities that would enhance a career in real estate.

   - o  Career-related employment
   - o  Internships
   - o  Co-op experience
   - o  Leadership in organizations
   - o  Student organization membership



     Apply Now  |   Find Us

Interview Preparation

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

   Interview Preparations

   Recruitment Process

   FAQs

Guarantee

Find Us

### YOU AND YOUR STORY

- Before your interview, think about the impression you want to make with the interviewer(s).
- Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.
- Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.
- Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.
- Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

### Know your interests

- If you are drawn to a quantitative role, demonstrate your quantitative capabilities.
- If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.
- Be awake, enthusiastic, ready and energized.
- Be concise and compelling.
- Be genuine and stay true to yourself.
- PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**



GO
▶▶▶

Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

## YOU AND YOUR STORY

Before the interview, think about the impression you want to make with the interviewer(s).

Know your resume inside-out - always maintain eye contact with your interviewer and never look down at your resume during the interview.

Understand what professionals at your level in the industry do. Read resources. Ask questions of our team members during the recruiting season.

Use examples from past experiences to demonstrate why you would be the ideal candidate for the role for which you are applying. Highlight people to people, sales and marketing experiences, and your familiarity with the financial services industry.

Be a quick thinker and demonstrate mathematical and analytical skills proficiencies.

## Know your interests

If you are drawn to a quantitative role, demonstrate your quantitative capabilities.

If you are drawn to real estate, have an understanding of the basics and share with us what you know during the interview.

Be awake, enthusiastic, ready and energized.

Be concise and compelling.

Be genuine and stay true to yourself.

PRACTICE! Sit down with a friend and run through mock interviews. Get comfortable speaking about yourself. Remember, we don't know unless you share it with us!

**Prior to your interview, think of approximately five solid questions to ask the interviewer that are relevant to the real estate sector of the financial services business. Avoid generic questions such as, "What is the culture like at a CSCA® Brokerage?"**

**For example, after you tell us about yourself, you might ask, "Where do you feel like my skill-set could be used in your organization."**

## The Business

Have an understanding about the potential of being part of the real estate business.

Have a sense of the mortgage and lending environment.

Know the REALTOR® Code of Ethics and Standards of Practice as well as the principles and values of the National Association of REALTORS®. Spend some time on www.realtor.org

Have an understanding of our company, CSCA® (which you will find on this website).

**All the information needed for above can be found on www.realtor.org, Google, WSJ.com, NYTimes.com, CNBC, Bloomberg, Bloomberg TV, etc. You'll find that real estate is one of the most commonly reported topics; as a market, it impacts just about everyone.**

## INSIDERS TIP

**Want a few 'insider' tips?**

1. [Biggest Interview Mistake Is 'Inappropriate Attire,' According To Hiring Managers](). (Please Click on Link.)

2. If You [APPLY]() to CSCA® TODAY, you can get on the ground floor of the next great market; YES, it's already begun! Not only can you be a part of history, but, this knowledge can give your career a real power boost!

**This is NOT required by any means, however, if you want to 'fast track' a 'mini MBA in economics and really understand the back story to the nation's current financial quagmire (without the politics), we HIGHLY recommend you watch the PBS FRONTLINE Special: Money, Power and Wall Street: Part One, Two, Three and Four. This link will take you to Part One and you should find Part's Two, Three and Four on the same page.**

## The Markets

**Read a few articles each week.**
**Understand what's going on in the real estate.**
**Stay up-to-date with financial news.**
**Know about FHA & VA, FANNIE MAE and FREDIE MAC.**
**Know about the financial crisis: what happened and why? It is the easiest way to demonstrate interest in our specific market.**
**Choose one or two areas of the market that you can discuss with specific knowledge and enthusiasm. No one expects a candidate to be on top of all areas of markets, finance and economics.**



f  t  in    Apply Now  |  Find Us

## Recruitment Process

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
   Interview Preparations
   Recruitment Process
   FAQs
Guarantee

Find Us

**Attend Our On-Campus Events**

[56]

Please check with your career services center and student-run organizations for a listing of dates when CSCA® representatives will be at your school. If you're interested in a career with us, please join us for our presentations and other recruiting events held on campus. Take some time to talk with us, and we'll explain the different career opportunities available at a CSCA® Brokerage and share personal observations of the Brokerage, such as why we enjoy working here.

**Apply Online**

[57]

Complete our online application. If you qualify for consideration, we'll contact you to arrange an interview to discuss available opportunities. We ask that all interested candidates complete our online application in addition to applying through your school's system if we have posted a job at your campus.

**Interview With Us**

We generally have at least two rounds of interviews. First and final rounds can be conducted by phone, on campus or in our offices.

**If We Don't Visit Your School**

[59]

Unfortunately, CSCA® representatives can't visit every school. If our on-campus interviews aren't offered on your campus, you should learn as much as you can about our goals in advance by reading our website and then complete our online application. for consideration.

[58]



Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy







Apply Now  |  Find Us

Guarantee

60

Home
Our Company
Our Culture
Opportunities
Benefits
Job Prep
Guarantee

Find Us

**'If CSCA® doesn't help you find a job, we'll help pay your bills.'™**

We're so confident that (if you have the right skill-set to launch your career with one of our entry level positions, be willing to relocate and we have a brokerage in your market) CSCA® will guarantee that you will find employment with one of our Brokerages within six months of graduation, or, we'll help pay your bills for the next six months. Simple as that. Ask our Talent Acquisition Manager for more details. A written agreement is required.

61





Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy



      Apply Now  |  Find Us

Apply now

- Home
- Our Company
- Our Culture
- Opportunities
- Benefits
- Job Prep
- Guarantee

Find Us

**Are you on the GO?**     62

With 90% of the U.S. population located within 15 miles of one of our Brokerages, there's a CSCA® Career Consultant waiting to talk to you.

If you have been surfing our site, you have already learned about some of the opportunities at one of our Brokerages. In just a minute, you'll be able to apply for a position online.

Our Brokerages have built a thriving business based on offering exceptional service to their customers and a dynamic and rewarding work environment to their employees.

Interested in a career with one of our fine Brokerages? You'll only need to SUBMIT ONE Application based on where you live and/or plan to work. Applying to more than one position or to multiple locations will slow the process down. Our Career Counselors will work with you to find the position and location that is a perfect fit for your skill set. Thank you for allowing us to respond to your application in a timely fashion!

63     Thank you for letting CSCA® help you plan your career path!

### OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):



SELECT APPROPRIATE FIELD
(Select Up to Five Choices)


Who Are You?
Support For Veterans
Why CSCA?
Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access   Terms of Use   Privacy Policy

# OK, Let's Get Started! What Are Your Career Interests?

Out of the positions shown below, please choose your **TOP FIVE** preferences – not the ones that sound good, but the ones that describe the job(s) that suit your specific career interests; the ones that get your heart pounding!

What are your career interest(s):
SELECT APPROPRIATE FIELD
(Select Up to Five Choices)

- [ ] Advertising
- [ ] Appraisal
- [ ] Banking
- [ ] Business Administration
- [ ] Commercial Real Estate
- [ ] Communications
- [ ] Consumer Loan
- [ ] Credit
- [ ] Customer Service
- [ ] Counselor(Career,Credit,School)
- [ ] Development
- [ ] Direct Marketing
- [ ] Events Manager
- [ ] Finance
- [ ] Financial Advisors
- [ ] Insurance
- [ ] Marketing
- [ ] Market Research
- [ ] Marketing & Research
- [ ] Mortgage
- [ ] Paralegals
- [ ] Public Relations
- [ ] Real Estate
- [ ] Retail
- [ ] Retail & Consumer
- [ ] Recruiting & Staffing
- [ ] Sales
- [ ] Stock Broker

☐ Stock Brokerage

☐ Teacher

☐ Trader

☐ Trainer

☐ Telemarketing

☐ Other (Please Describe)

Are You Applying For:

☐ Full-Time

☐ Intern with Full Time Expectancy

☐ Part-Time

☐ Other (Please Describe)

Tell Us About Your School / Work History:

☐ Business

☐ College Graduate

☐ Great People Skills

☐ Intuitive

☐ Marketing

☐ Military Veteran

☐ Niche Relationships

☐ Public Relations

☐ Sales

☐ Some College

☐ Student

☐ Other (Please Describe)


Just for The Fun of It, Tell Us Your Yes's and No's


Have You enjoyed and Watched NBC's THE APPRENTICE®?

☐ Yes ☐ No ☐ Never Heard of It


Have You enjoyed and watched ABC's SHARK TANK®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

Tell Us About Your School / Work History:

☐ Business

☐ College Graduate

☐ Great People Skills

☐ Intuitive

☐ Marketing

☐ Military Veteran

☐ Niche Relationships

☐ Public Relations

☐ Sales

☐ Some College

☐ Student

☐ Other (Please Describe)

Just for The Fun of It, Tell Us Your Yes's and No's

Have You enjoyed and Watched NBC's THE APPRENTICE®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched ABC's SHARK TANK®?

☐ Yes ☐ No ☐ Never Heard of It

Have You enjoyed and watched/read Suze Orman®?

☐ Yes ☐ No ☐ Never Heard of Her

Have You enjoyed and read any of Robert Kiyosaki's (Rich Dad/Poor Dad®) Books?

☐ Yes ☐ No ☐ Never Heard of Him

Like many professions (nursing, teaching, contracting, plumbing, law, medical, real estate, stock-brokerage, insurance, etc.), the career for which you are applying requires state licensing, malpractice / Errors and Omissions (E&O) insurance and joining one or more professional associations.

The fees and costs associated with licensing and membership are usually paid by you directly to the state licensing agencies and/or other third parties. **YOU WILL NEVER BE ASKED TO PAY ANY FEES OR COSTS TO CSCA®.** 64

==Exact fees will be discussed with you upon determination of WHICH sector of the Financial Services Industry (banking, insurance, stock-brokerage and/or real estate) for which you will be recommended as well as the state in which you will be working.==

With this in mind and setting aside questions about a specific fee, do you understand (conceptually) that many higher level careers require you to obtain a license and ongoing continuing education to maintain your license?

☐ Yes ☐ No

**The Career You Are Applying For Requires State Licensing and a Background Check. Is there anything in your past that might cause you a challenge that would compromise your ability to be licensed or pass a background check?**

☐ Yes ☐ No

100 Words Limitation

If Yes, Please explain..

Education Qualification

College Attended

Type Your Re:

Highest Degree Attended

Type Your Re:

Graduate Year

Choose Graduation Year ▼

Available Start Date

Type Your Re:

500 Words Limitation

**How would your friends describe you?** (Self-Starter, Needs Motivation, Detail Oriented, People Person, team player, etc.):

Type Your Response Here...

500 Words Limitation

If you could change anything about yourself, what would it be?



500 Words Limitation

What do you consider your strengths and weaknesses?



500 Words Limitation

Tell us about a time when you accomplished something that others didn't' think you could do.



500 Words Limitation

When YOU are working with a salesperson (from any industry), what do you think are the most important characteristics the salesperson should have?



500 Words Limitation

Was there ever a time when you had to meet people you didn't know and had to ask them for something or sell them something or present an idea? Describe the situation and what was the outcome?

What other career industries have you considered or have an interest in?



500 Words Limitation

Do you know anyone in the Real Estate / Mortgage Sectors of the Financial Services Industry? Are they successful? Assuming the income potential met your expectations and you had appropriate training, what, if any, are your feelings towards becoming an 'Account Executive / Sales Professional' as a career choice?



500 Words Limitation

If the income potentials are appropriate, but you had to 'arrange your personal time, would you be willing to work evenings and weekends if needed or, are you more comfortable with "9-5"? Explain why.

What 'MATTERS' to you? What are you looking for in a company? What are you looking for in life?



Work Information

---

If You Have Worked, Tell Us About It:

☐ Yes

☐ No Student Only. I've Never Worked.

If you have prior work experience, describe what the job(s) was/were and what you liked the LEAST and MOST about the job(s).

500 Words Limitation

> Type Your Response Here…

Years of Combined Work History

> Type Your Re:

Current Employer

> Type Your Re:

Current Title

> Type Your Re:

Current Salary

> Type Your Re:

Would You Consider Relocating

☐ Yes ☐ No

1500 Words Limitation

Work History/Experience (List Current and Past Employers while student or after along with the Tasks and Duties involved with your Job.)

> Type Your Response Here…

500 Words Limitation

Combined Duties of All Listed Work History

Resume Questions

---

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

Type Your Response Here…

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

Type Your Response Here…

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?

Type Your Response Here…

From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One

$------to $------

Year Two

$------to $------

Year Five

$------to $------

☐

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.

Resume Questions

---

500 Words Limitation

What are you NATURAL (non-academic) Skill Sets

Type Your Response Here…

500 Words Limitation

Summary of Qualifications (include skills and knowledge of technology)

Type Your Response Here…

500 Words Limitation

Tell Us About Your Goals (personal and business). Where do you see yourself in five years and ten years from now?



From the time you begin your career, what is your income RANGE expectancy (based upon your needs, lifestyle and goals) your first, second and in fifth year?

Year One



Year Two

$------to $------

Year Five

$------to $------

☐

By checking this Box I am Authorizing CSCA® and its Authorized Representatives to share my personal information as I have given chosen to provide CSCA® with potential employers or others who may eventually may be instrumental in helping us help you.



     Apply Now  |  Find Us

Find Us

Home

Our Company

Our Culture

Opportunities

Benefits

Job Prep

Guarantee

Find Us

**CSCA®**
Career Solutions and Candidate Acquisition
4533 MacArthur Blvd., Suite 100
Newport Beach, CA 92660-2059
USA Toll Free: 1-866-254-7600
Local: 949-644-7600
www.csca.com
CONTACT US





Who Are You?

Support For Veterans

Why CSCA?

Job Availability Updates



CSCA® seeks and values people of all backgrounds; every employee, customer and business partner is important. We are proud to be an equal opportunity employer. Income expectations quoted herein are for illustration only; your actual experience may be less or more.

If you have any difficulty using our online system or you need an accommodation due to a disability, you may use this alternative email address to contact us about your interest in employment : CONTACT US.

© 2006 -2012 CSCA®. ALL RIGHTS RESERVED.

Client Access    Terms of Use    Privacy Policy

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| FERNANDO MARTINEZ, | CASE NO. 30-2012-614932 |
| v. | **PROOF OF SERVICE** |
| STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA; | |

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108.  On April 25, 2013, I served the following:

    *    Opposition to Demurrer; Opposition to Motion to Strike; Pavone Declaration;
         Proposed Second Amended Complaint

Brook Barnes, Esq.
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, California 92121
(Attorney for Defendants)                              (Via Electronic Service)

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 25th day of April, 2013 that the foregoing is true and correct.



---

MARTINZ v. O'HARA – CASE NO. 30-2012-614932
PROOF OF SERVICE

# EXHIBIT B

1    think that that happened first.

2            And -- but looking at it, I can understand why

3    the Court doesn't want to get demurred to death by us

4    and wants to move to have us respond to the complaint.

5    That's what it seems to say.

6            And I guess my concern or the thing I'd like

7    to point out to the Court is that the -- we pointed out

8    what we think is a fatal defect in their first

9    complaint, which is that the party that filed the action

10   does not have standing under the law in this state or

11   under the deed of trust.  And I just want to make sure

12   that we're clear that that same fatal defect still

13   exists in the current complaint.  They have not named a

14   party.

15           THE COURT:  It may.  It may not.  This is not

16   without -- this is without prejudice to your raising it

17   in a summary judgment motion, judgment on the pleadings,

18   or at any time during trial.

19           [          ]  Okay.  Then that's -- again,

20   that's why I didn't know exactly where to go with --

21           THE COURT:  That's why demurrers are

22   disfavored, because they're fairly useless.

23           [          ]  Okay.  I understand.  And -- and

24   I understand that we can do something on summary

25   judgment.

26           I guess my second concern is that it feels,

27   from this side, that there's sort of a race to try and

28   get to a judicial foreclosure, at least on the part of

# EXHIBIT 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

## BENJAMIN PAVONE, ESQ.

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/10/2013** at 10:55:00 AM
Clerk of the Superior Court
By Giovanni Galon, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# ORANGE COUNTY

FERNANDO MARTINEZ,

                PLAINTIFF,

v.

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA;

CAREER SOLUTIONS AND
CANDIDATE ACQUISITIONS;

O'HARA FAMILY TRUST;

OCRE, INC.;

PROFESSIONAL REALTY
COUNCIL, INC;

PACIFIC VALLEY REALTY, INC.;

and DOES 4-10,

                DEFENDANTS.

**CASE NO.:** 30-2012-614932-CU-FR-CJC

**JUDGE:** Hon. Gregory Munoz

**PLAINTIFF FERNANDO
MARTINEZ'S POINTS AND
AUTHORITIES IN OPPOSITION TO
DEFENSE DEMURRER**

**DATE**: July 25, 2013
**TIME**: 2:00 pm
**DEPT**: C-13

BENJAMIN PAVONE, ESQ.

1

# **TABLE OF CONTENTS**

2

3     I.     MARTINEZ HAS PLED A CAUSE OF
            ACTION FOR FRAUD.................................................    1

4

5           A.     CSCA/PRCI Is Liable Because Its Leader
                   Made the Statements. ........................................    1

6

7           B.     Pacific Valley's Leader Committed Fraud
                   Acting as the Entity. ........................................    2

8

9           C.     Martinez Alleged the Claims Were False. ....................    3

10

11          D.     Martinez Is Entitled to Seek Damages Based
                   on the Promise Made. ........................................    7

12

13          E.     The Law Does Not Require Proof of Martinez's
                   Former Income. ..............................................    8

14

15          F.     Martinez Adequately Pled Reasonable Reliance..........    8

16    II.    THE FALSE ADVERTISING CLAIM IS
            SUFFICIENTLY PLED. .................................................    9

17

18    III.   THE UNFAIR BUSINESS PRACTICES CLAIM
            IS VIABLE. ...........................................................    12

19

20    IV.    MARTINEZ'S PURSUIT OF LABOR CODE SECTION 203
            WAIT TIME PENALTIES AND FEES IS VALID AND

21          HAS BEEN PROPERLY EXHAUSTED. .................................    14

22

23    V.     MARTINEZ'S SEXUAL HARASSMENT CLAIM
            IS VALID. .............................................................    15

24

25    VI.    ALTER EGO DECISIONS ARE PREMATURE. ........................    16

26

27

28

BENJAMIN PAYONE, ESQ.

1

## **TABLE OF AUTHORITIES**

2 <u>Cases</u>

3

4
*Agosta* v. *Astor*
      (2004) 120 Cal.App.4th 596...........................................................    8

5

6
*American* v. *Pacific*
      (1936) 17 Cal.App.2d 225...............................................................    2, 3

7

8
*Archbishop v. Superior Court*
      (1971) 15 Cal.App.3d 405, 406.......................................................    3

9

10
*Berryman* v. *Merit Property*
      (2007) 152 Cal.App.4th 1544...................................................... ..    12

11

12
*Bily v. Arthur Young*
      (1992) 3 Cal.4th 370......................................................................    6

13

14
*Cascade* v. *Banks*
      (10th Cir. 1990) 896 F.2d 1557.....................................................    16

15

16
*Cel-Tech* v. *Los Angeles Cellular*
      (1999) 20 Cal.4th 163....................................................................    12

17

18
*Cruz* v. *HomeBase*
      (2000) 83 Cal.App.4th 160.............................................................    2

19

20
*Daugherty v. American Honda*
      (2006) 144 Cal.App.4th 824..........................................................    12, 13

21

22
*Diamond Multimedia v. Superior Court*
      (1999) 19 Cal.4th 1036.................................................................    7, 8

23

24
*Dore* v. *Arnold Worldwide*
      (2006) 39 Cal.4th 384...................................................................    8, 9

25

26
*Ferrero Litigation*
      (S.D.Cal.2011) 794 F.Supp.2d 1107.............................................    11

27

28

BENJAMIN PAYONE, ESQ.

---

*Grynberg* v. *Citation Oil*
    (S.D. 1997) 1997 SD 121 [573 N.W.2d 493] ............................... 7

*Hauter* v. *Zogarts*
    (1975) 14 Cal.3d 104 .................................................................... 11

*Helmer* v. *Bingham Isuzu*
    (2005) 129 Cal.App.4th 1121 ....................................................... 8, 9

*Hoover v. Groger*
    (1936) 12 Cal.App.2d 417.............................................................. 9

*Kesmodel* v. *Rand*
    (2004) 119 Cal.App.4th 1128......................................................... 2

*Kwikset* v. *Benson*
    (2011) 51 Cal.4th 310.................................................................... 10, 11

*Las Palmas* v. *Las Palmas*
    (1991) 235 Cal.App.3d 1220.......................................................... 3

*Lazar* v. *Rykoff*
    (1996) 12 Cal.4th 631.................................................................... 4, 7, 9

*McClellan v. Northridge*
    (2001) 89 Cal.App.4th 746............................................................. 3. 16

*Mercer* v. *Elliott*
    (1962) 208 Cal.App.2d 275............................................................ 5

*Neu-Visions* v. *Soren*
    (2000) 86 Cal.App.4th 303............................................................. 5, 6

*Newcal Industries* v. *Ikon*
    (9th Cir. 2008) 513 F.3d 1038........................................................ 11

*Pacesetter Homes* v. *Brodkin*
    (1970) 5 Cal.App.3d 206................................................................ 6

*Pizza Hut* v. *Papa John's*
    (5th Cir. 2000) 227 F.3d 489.......................................................... 11

*Podolsky* v. *First Healthcare*
    (1996) 50 Cal.App.4th 632............................................................ 12

*Police* v. *Suders*
    (2004) 542 U.S. 129.................................................................... 15

*Postal Press v. Kaswa*
    (2008) 162 Cal.App.4th 1510....................................................... 16

*Presidio* v. *Warner Bros.*
    (5th Cir. 1986) 784 F.2d 674........................................................ 11

*Robinson Helicopter* v. *Dana*
    (2004) 34 Cal.4th 979, 990-993.................................................. 2, 7, 9

*Rochlis v. Walt Disney*
    (1993) 19 Cal.App.4th 201........................................................... 8

*Slivinsky* v. *Watkins*
    (1990) 221 Cal.App.3d 799.......................................................... 8, 9

*Sonora Diamond* v. *Sonora High*
    (2000) 83 Cal.App.4th 523........................................................... 2

*Talbot v. Fresno-Pacific*
    (1960) 181 Cal.App.2d 425.......................................................... 3

*Taylor v. Newton*
    (1953) 117 Cal.App.2d 752.......................................................... 3, 16

*Toscano v. Greene*
    (2004) 124 Cal.App.4th 685......................................................... 8

*Vendors v. Oakland*
    (1962) 210 Cal.App.2d 825.......................................................... 3

BENJAMIN PAVONE, ESQ.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Warshauer* v. *Bauer Construction*
    (1960) 179 Cal.App.2d 44.......................................................... 2

*Weeks* v. *Baker & McKenzie*
    (1998) 63 Cal.App.4th 11284..................................................... 2

*Wenban v. Hewlett*
    (1924) 193 Cal. 675.................................................................... 3

Statutes & Other Authority

Bus. & Prof. Code
    section 17200.............................................................................. 11
    section 17500.............................................................................. 10
Labor Code
    section 203................................................................................. 14
    section 2699.3............................................................................ 14, 15
    section 2699.5............................................................................ 14
Proposition 64.................................................................................... 10, 11

BENJAMIN PAVONE, ESQ.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BENJAMIN PAVONE, ESQ.

# I.

**MARTINEZ HAS PLED A CAUSE OF ACTION FOR FRAUD.**

Defendants lodge arguments to challenge each element and each defendant in relation to Martinez's fraud cause of action. (MP, pp. 2-7; see AC4, ¶¶ 71-101.)[1]

## A.    CSCA/PRCI Is Liable Because Its Leader Made the Statements.

Defendants contend that none of the entity defendants can be liable for fraud, because Martinez failed to adequately allege who committed it. (MP, pp. 3-4.) However, the defense minimizes, and in doing so mischaracterizes, the breadth and scope of the allegations of the Fourth Amended Complaint.  Defendants claim that Martinez "only alleges two theories on which the entity defendants Entity Defendants could theoretically be held liable. First, Plaintiff alleged Defendant O'Hara made representations in an email while he was representing CSCA, and that CSCA is the property of the property of Professional Realty Council, Inc. ... No other allegations of fraud relate to the Entity Defendants."  (MP, p. 3:7-13, citing AC4, ¶¶ 72-77 and Exhibit A to AC4.)

This summarization represents an understatement of the breadth of the Fourth Amended Complaint as against CSCA/PVRI.  Paragraph (72) captures the fact that when O'Hara made the representations in the email, he made them as an officer, director or manager. (AC4, ¶ 72.)  Paragraph (76) clarifies that CSCA is unincorporated and therefore merely PRCI's property, thus for liability purposes, they are the same entity. (AC4, ¶ 76.)  Paragraph (5) also confirms that "CSCA ... appears to be merely a trade name for defendant Professional Realty Council, Inc." (AC4, ¶ 5.)

Defendants attempt to eliminate PRCI because "defendants are unaware of any legal theory that makes a corporation liable for the actions of an agent of a subsidiary

---

[1] "MP" refers to the moving points and authorities in support of the demurrer. References to the supporting Declaration of Benjamin Pavone are shortened to "Pavone, ¶ __.")  "AC4" refers to the Fourth Amended Complaint.  References to "defendants" or to "O'Hara" shall refer to all defendants unless otherwise stated.

company." (MP, p. 3:18.)  Yet, Martinez did not allege CSCA was a subsidiary of PRCI.   CSCA is not a corporate subsidiary of PRCI and O'Hara is not the subsidiary's agent.  The CSCA/PRCI entity is liable because its corporate leadership made the fraudulent statements, which make them by definition attributable to the corporation itself. (*Cruz* v. *HomeBase* (2000) 83 Cal.App.4th 160, 167-168; AC4, ¶ 72.)

## B. Pacific Valley's Leader Committed Fraud Acting as the Entity.

Pacific Valley Realty is liable for fraud because PVRI, acting through its one and only leader (Mr. O'Hara acting as founder, CEO, CFO, Treasurer, and sole stockholder, according to his deposition testimony (Pavone, ¶ 11)), made fraudulent representations directly to Martinez as the embodiment of the corporation itself. (AC4,  ¶¶ 77-78.)   PVRI is the one who paid Martinez. (AC4, ¶ 222.)  If it is determined that Martinez was defrauded by virtue of a false employment offer and other promises (e.g., AC4, ¶¶ 73, 78-79), separate and apart from the Exhibit A statements by O'Hara/CSCA/PVRI, the false offer was made by an officer, director or managing agent of PVRI, O'Hara. (AC4, ¶ 72.)   PVRI is therefore liable on a direct fraud theory,[2] or is at a minimum responsible as a co-conspirator or aider/abettor,[3] on a vicarious liability basis,[4] or an alter ego theory. [5]

_____

[2] *Cruz* v. *HomeBase*, *supra*, 83 Cal.App.4th 160, 167-168; *American* v. *Pacific* (1936) 17 Cal.App.2d 225, 235-236; *Warshauer* v. *Bauer Construction* (1960) 179 Cal.App.2d 44, 50; *Robinson Helicopter* v. *Dana* (2004) 34 Cal.4th 979, 990-993.

[3] *Kesmodel* v. *Rand* (2004) 119 Cal.App.4th 1128, 1141 [discussing co-conspirator and aider/abettor liability].

[4] *Weeks* v. *Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1148-1149 [discussing principles of respondeat superior liability for intentional misconduct of corporate agents].

[5] *Sonora Diamond* v. *Sonora High* (2000)  83 Cal.App.4th 523, 538.  Notably, Defendants contend that since Martinez alleged O'Hara had a personal agenda, there is no room for him to have been manipulating his own corporation to commit fraud to

BENJAMIN PAVONE, ESQ.

BENJAMIN PAVONE, ESQ.

The reality is that all of the subject activity is little more than one man shuffling around various corporate shells, and engaging in the prototypical manipulation of the corporate privilege by shifting assets to the least targeted entity, which generally results in all defendants being considered alter egos and all eventually becoming liable.[6] (Pavone, ¶ 8 [Depo. S. O'Hara, pp. 115:15-118:13]; *Las Palmas* v. *Las Palmas* (1991) 235 Cal.App.3d 1220, 1249; *Wenban v. Hewlett* (1924) 193 Cal. 675, 696; *Taylor v. Newton* (1953) 117 Cal.App.2d 752, 754-756; *McClellan v. Northridge* (2001) 89 Cal.App.4th 746, 752-753; *Archbishop v. Superior Court* (1971) 15 Cal.App.3d 405, 406, 411 *Vendors v. Oakland* (1962) 210 Cal.App.2d 825, 838-839; *Talbot v. Fresno-Pacific* (1960) 181 Cal.App.2d 425, 432.)

### C.    Martinez Alleged the Claims Were False.

Mr. O'Hara contends that Martinez failed to plead how any of the representations were false, in that he "only states that the statements are false because Mr. O'Hara allegedly only made $72,000 a year." (MP, p. 4:18.)   Once again, this summary reflects a misrepresentation of the breadth of the Fourth Amended Complaint.  First, when it comes to the element of falsity, the only requirement is that a plaintiff plead that the representation is in fact false – there is no requirement that a

---

serve that agenda. (MP, p. 4:3-17),  Yet, as managing agent/officer/director, O'Hara had the power to direct the corporation to commit its misdeeds to serve any agenda he wanted –  in other words, a corporation's conduct is not less fraudulent because its underlying purpose is to satisfy one of its officer's personal appetites. "If the officer is in fact acting for the corporation in the transaction, even though he may have an opposing personal interest, it is his duty, notwithstanding his interest, to communicate to his company any facts in his possession material to the transaction. In such case the law will presume in favor of third persons that he made such communication; and it is immaterial that he took some personal benefit from the fraud." (*American* v. *Pacific*, *supra*, 17 Cal.App.2d 225, 235-236.)

[6] At Mr. O'Hara's has filed bankruptcy three times and he claims his first one, in 1986, cost creditors $43 million in losses. (Pavone, ¶ 2.)  Recently, he closed down PVRI in favor of using a new entity, OCRE, Inc., and he declined to incorporate CSCA in favor of connecting it to PRCI. (Pavone, ¶ 8 [Depo. S. O'Hara, pp. 115:15-118:13].)

plaintiff explain the exact ways, reasons or motives behind the claim's falsity.  (*Lazar* v. *Rykoff* (1996) 12 Cal.4th 631, 638-639.)

Moreover, Martinez nevertheless explained in detail why the statements were false and/or misleading: "O'Hara's interest in Fernando was not professional, the talent acquisition firm appears to be a hollow shell, experience is not necessary because O'Hara is not really looking for a real estate employee, the large company either does not exist or O'Hara does not have the connections to it he claims, the large company was not hiring on the terms and conditions O'Hara claimed, O'Hara/CSCA was not hired, it was not getting paid, the claimed income was speculative at best and came with sexual strings, and [Martinez] was only a 'fit' for the company because O'Hara had a romantic interest in him."  (AC4, ¶ 82.)

"O'Hara knew the statements were false or made them with reckless disregard for their truth, given O'Hara's own sworn, financial circumstances, the fact that CSCA did not actually represent a national real estate firm, the fact that the entire website appears to be an illusion, and because O'Hara had an unstated sexual agenda, which was a precondition of his continued interest in Fernando.  O'Hara intended to defraud Martinez because he lured him into a sexual relationship by making him promises about potential employment, promises that were not true, were not as they were presented, were based on an illusion of a website, and were exaggerated, speculative and/or patently invented." (AC4, ¶ 83.)

Defendants seize on two of O'Hara's compensation representations, but these two statements represent only a small fraction of the numerous fraudulent statements made to Martinez, either in the email or on the website.  (AC4, ¶¶ 45, 49, 75, 77-79, 81; see also AC4, ¶¶ 117, 121, 127, 129, 131, 136, 140, 143, 145, 147, 149, 152, 155, 157, 159, 160, 163, 165, 167, 170, 173, 175, 177, 180, 182, 184, 186, 190, 192, 194, 196, 198, 200, 202.) [7]  Defendants nonetheless contend the two compensation

---

[7] See, AC4:
¶ 124 [is there an annual class of 30?  No.  Pavone, ¶ 6(b)]
¶ 127 [is a real estate agent career "a career like no other"?   Not really];

BENJAMIN PAVONE, ESQ.

representations are merely opinions on the basis that they were conditioned on Martinez getting a real estate license, and even then, were still phrased in speculative terms. (MP, p. 5:20-6:19.)   The line between opinion and fact is not a distinct one. (*Neu-Visions* v. *Soren* (2000) 86 Cal.App.4th 303, 307, citing *Mercer* v. *Elliott* (1962) 208 Cal.App.2d 275, 280.)  If the opinion is rendered under circumstances such that it may be regarded as amounting to a positive affirmation of fact, it will be treated as a representation of fact for purposes of a deceit action." (*Ibid*.)   Under

---

¶ 131 [has CSCA hand selected brokerages that have passed "stringent standards"? No, Pavone ¶ 5(d) (they are in Mr. O'Hara's head)];

¶ 138 [has CSCA provided a career path to any college graduates or military?  No, Pavone, ¶ 5(a)-5(c)];

¶ 140 [does CSCA actually represent companies who are looking to hire?  No, Pavone, ¶¶ 5(a)-5(c), 6(f)];

¶ 146 [is CSCA actually connected to the top, national real estate firms and is placing persons without experience in those firms?  No, Pavone ¶ 7(a)(10)];

¶ 149 [are most of CSCA's brokers "hiring now"?  No.  Pavone, ¶¶ 6(f), 7(a)(12)];

¶ 157 [has CSCA opened up a variety of career options?  No, Pavone, ¶¶ 7(a)(47), 7(a)(50)];

¶ 159 [does CSCA have an internship program teaching persons how to run a million dollar business?  No, Pavone, ¶ 5(a)];

¶ 160 [does CSCA have "management"?  Only O'Hara.  Pavone ¶ 6(a)];

¶ 163 [can CSCA consider itself to be in the league of the biggest?  No, Pavone ¶ 6(a)];

¶ 165 [has CSCA done "some growing?"  No, Pavone ¶ 7(a)(19) (when companies refer to "growth," they usually mean in terms of employees size or net profits; Mr. O'Hara's idea of growth is that he shared his CSCA marketing idea with another person)];

¶¶ 170-176 [Is CSCA in the news because of its affiliation with Kendra Todd and Donald Trump?  No, Pavone, ¶¶ 7(a)(21)-7(a)(23)];

¶ 177, 184-185 [does CSCA have a series of professional programs?  No, the programs are given by the putative real estate company, if they exist at all. Pavone, ¶ 6(c), 7(a)(10)];

¶ 180 [does CSCA have a track record of persons who earned $45-65K in their first year and double that their second?  No, Pavone, ¶¶ 5(a)-5(c)];

¶¶ 196-203 [is there national recruiting reach on college campuses?  No, Pavone, ¶ 7(a)(33); see also ¶¶ 186-188, 202-206.

BENJAMIN PAVONE, ESQ.

certain circumstances, expressions of professional opinion are treated as representations of fact. When a statement, although in the form of an opinion, is not a casual expression of belief but a deliberate affirmation of the matters stated, it may be regarded as a positive assertion of fact. (*Ibid*.)   When a defendant holds himself out as possessing superior knowledge or special expertise regarding the subject matter and a plaintiff is situated such that he may reasonably rely on such supposed expertise, the defendant's representation may be treated as one of material fact. (*Neu-Visions*, *supra*, 86 Cal.App.4th 303, 307, citing *Bily v. Arthur Young* (1992) 3 Cal.4th 370, 408.)

There can be little debate that Mr. O'Hara held himself out as a real estate guru.  (AC4, ¶¶ 11-17, 37, 39, 41, 49.)   Furthermore, O'Hara provided specific annual compensation figures. (AC4, ¶ 28, 73-75.)  When a defendant makes representations that contain an element of factual prediction, he must have a reasonable basis for believing the prediction to be achievable. (*Pacesetter Homes* v. *Brodkin* (1970) 5 Cal.App.3d 206, 211 [actionable predictions include ones where the opinion is expressed in a manner implying a factual basis which does not exist]; see also Civ. Code, § 1710 [deceit is "the assertion, as a fact, of that which is not true, *by one who has no reasonable ground* for believing it to be true"].)  Here, Mr. O'Hara and CSCA have no track record of employees achieving the kind of high-income figures described to Martinez. (AC4, ¶¶ 73-75; Pavone, ¶ 5(a), Exhibit A, p. 172:16-22.)   Indeed, Mr. O'Hara could not cite a single person that had successfully come through the CSCA program at all, much less one that earned $55-125K after his first year of licensing or $250K after his third year. (Pavone, ¶ 5(a), Exhibit A, p. 172:16-22.)   Consequently, as to the financial compensation figures, the complaint pleads a viable claim for fraud because, even though it was conditioned on Martinez obtaining a real estate license, even if he had gotten it, O'Hara had no "factual basis," "reasonable grounds" or track record with CSCA for placing entry level real estate salespeople like Fernando – particularly in a slow real estate market of 2012 – into

BENJAMIN PAVONE, ESQ.

1    jobs where they would actually make over $100K within one year of licensing, and

2    $250K or more just two years later. (See AC4, ¶¶ 73-75, 78-79, 81(f), 81(g).)

3        **D.    Martinez Is Entitled to Seek Damages Based on the Promise Made.**

4        The defense contends that courts generally apply an "out-of-pocket" measure

5    of damages in fraud cases, as opposed to the benefit-of-the-bargain rule, because this

6    is more consistent with the logic and purpose of tort actions. (MP, 6:20-7:21; contrast

7    AC4, ¶ 97 [alleging right to benefit rule].)   According to the complaint, O'Hara

8    promised Martinez that he would be making over a hundred thousand dollars a year

9    within a couple of years, under the given assumption that Martinez got his real estate

10   license, and assured him that he would be making millions within a few years. (AC4,

11   ¶¶ 39, 73, 77-78.)   However, the California Supreme Court announced in its 2004

12   *Robinson Helicopter v. Dana* decision: "In pursuing a valid fraud action, a plaintiff

13   advances the public interest in punishing intentional misrepresentations and in

14   deterring such misrepresentations in the future.  Because of the extra measure of

15   blameworthiness inhering in fraud, and because in fraud cases we are not concerned

16   about the need for predictability about the cost of contractual relationships, fraud

17   plaintiffs may recover 'out-of-pocket' damages *in addition to* benefit-of-the-bargain

18   damages." (*Robinson Helicopter v. Dana* (2004) 34 Cal.4th 979, 997, citing *Lazar v.*

19   *Superior Court, supra,* 12 Cal.4th 631, 646 [emphasis added].)  Thus, the Supreme

20   Court resolved the conflicting damage rules as between the appellate courts in fraud

21   cases in favor of authorizing both remedies because "California has a legitimate and

22   compelling interest in preserving a business climate free of fraud and deceptive

23   practices." (*Robinson*, *supra*, at 992, citing *Diamond Multimedia v. Superior Court*

24   (1999) 19 Cal.4th 1036, 1064.)  Thus, a contract is not a license allowing one party to

25   cheat or defraud the other. (*Robinson*, *supra*, at 992, citing *Grynberg v. Citation Oil*

26   (S.D. 1997) 1997 SD 121 [573 N.W.2d 493, 501].)  Allowing a plaintiff's claim for

27   affirmative misrepresentation discourages such practices in the future while

28   encouraging a "business climate free of fraud and deceptive practices." (*Robinson*,

BENJAMIN PAYONE, ESQ.

*supra*, 34 Cal.4th 979, 992, quoting *Diamond Multimedia, supra,* at p. 1064.) Consequently, the law allows Martinez to seek that which was promised: a $35K/year first year, a roughly $75K second year, and a $250K third year, subject to reasonable limitations to account for speculative damages. (*Helmer* v. *Bingham Isuzu* (2005) 129 Cal.App.4th 1121, 1129-1130, citing *Toscano v. Greene* (2004) 124 Cal.App.4th 685, 693-696.)

### E.    The Law Does Not Require Proof of Martinez's Former Income.

The defense alleges that in a fraud case, a claim for lost income must be based on a contract claim, because damages outside the contract are limited to income from the former employment.  (MP, p. 6:25-7:9.)   However, the law only precludes speculative lost income. (*Helmer*, *supra*, at 1129-1130.)  To require Martinez to prove that he would have made X amount of dollars but for the fraudulent inducement is to defeat the benefit-of-the-bargain rule Martinez is entitled to invoke under *Robinson*.  Admittedly, the out-of-pocket rule as expressed in cases like *Helmer* and *Rochlis v. Walt Disney* (1993) 19 Cal.App.4th 201, 215-216 suggest a plaintiff must corroborate damages under an out-of-pocket theory, but this does not preclude a fraud victim from enforcing compensation figures as represented under the benefit rule, otherwise its deterrent purpose would be eviscerated. (*Agosta* v. *Astor* (2004) 120 Cal.App.4th 596, 606 ["Fraudulent inducement causing damages unrelated to the employee's discharge is an actionable tort regardless of whether he or she is 'at-will.' Certainly the objectives of punishing intentional misconduct and deterring future fraud are not dependent on the nature of employment."]

### F.    Martinez Adequately Pled Reasonable Reliance

The defense contends that the element of justifiable reliance cannot be satisfied because Martinez's employment was at-will, and as such, he cannot prove damages because those damages could have been interrupted by the employer's discretionary decision to terminate. (MP, p. 7:22-8:4, citing *Slivinsky* v. *Watkins* (1990) 221 Cal.App.3d 799, 806-807 and *Dore* v. *Arnold Worldwide* (2006) 39 Cal.4th 384,

BENJAMIN PAYONE, ESQ.

391.)    Unlike *Slivinsky* and *Dore*, the representations at issue here were not the kind of employment promises that did exist and could be given, but could just as easily be taken away by a fickle employer's change of heart.  Rather, the argument here is that CSCA had no track record to make the kind of compensation claims it did; viz., the represented employment did not exist in the first place. (AC4, ¶¶ 142, 148, 181, 215.) Under these circumstances, once again under *Robinson*, the law allows an aggrieved plaintiff to hold the defendant to answer for what the latter fraudulently promised, not what the plaintiff lost based on alternate scenarios, or as argued by the defense here, what he might have only temporarily enjoyed. (*Robinson Helicopter v. Dana*, *supra*, 34 Cal.4th 979, 997, citing *Lazar v. Superior Court, supra,* 12 Cal.4th 631, 646.)

## II.

## THE FALSE ADVERTISING CLAIM IS SUFFICIENTLY PLED.

The defense contends that the false advertising claim must be dismissed because Martinez does not have standing: he does not allege that he lost money or property, he did not purchase a product or service as a consumer, and that he is nothing more than a general member of the public. (MP, pp. 8:16-9:20.)

As a threshold matter, Martinez did in fact plead that he is a consumer, that he lost money, and that he lost it during his pursuit of CSCA's employment placement services. (AC4, ¶¶ 104, 210; see *Hoover v. Groger* (1936) 12 Cal.App.2d 417, 420.) The defense's insistence that Martinez was not a consumer is puzzling: he clearly was a consumer of CSCA's employment placement services (AC4, ¶ 104), he completed CSCA's "intake assessment" test (AC4, ¶ 36), he travelled at his own expense to Mr. O'Hara's personal meeting locations (AC4, ¶ 210) and as the evidence has come to develop, 25% of Martinez's check was going to be withheld as compensation to CSCA. (AC4, ¶¶ 208-210; Pavone, ¶ 4; Exhibit B, ¶ 7.)[8]    Furthermore, Martinez

[8] The CSCA website targets gullible consumers – young people in dire need of employment – and who lack a basic level of sophistication to eliminate CSCA as a legitimate employment path, thus Martinez cannot be held to have been more careful in believing O'Hara's exaggerated claims.  (*Freeman* v. *Time* (9th Cir. 1998) 68 F.3d

BENJAMIN PAVONE, ESQ.

1   ultimately gave up his job at McDonald's trying to satisfy Mr. O'Hara's employment

2   demands. (AC4, ¶¶ 21-23, 46-47.)  Once the employment situation with O'Hara

3   soured, Martinez was completely destitute. (See AC4, ¶¶ 51-60.)

4       Defendants argue that only plaintiffs who have been deceived into spending

5   money to purchase a product have standing.  (MP, p. 8:21, citing *Kwikset* v. *Benson*

6   (2011) 51 Cal.4th 310, 317.)   The defense reads the law too narrowly.  The code

7   specifically includes services within its statutory ambit. (See Bus. & Prof. Code, §

8   17500 [broadly prohibiting untrue statements about services offered, professional or

9   otherwise].  As explained by the Supreme Court, "Proposition 64 should be read in

10  light of its apparent purposes, i.e., to eliminate standing for those who have not

11  engaged in any business dealings with would-be defendants and thereby strip such

12  unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for

13  actual victims of deception and other acts of unfair competition the ability to sue and

14  enjoin such practices." (*Kwikset* v. *Benson*, *supra*, 51 Cal.4th 310, 317.)

15      Martinez clearly falls on the side of claimants engaged in actual business

16  dealings with CSCA, as he found himself deeply entangled in Mr. O'Hara's web of

17  false advertising and then quickly trapped into a sexual relationship with him. (AC4,

18  ¶ 209.)   Standing should not be an obstacle, particularly since a gullible Martinez

19  bought into the promises that CSCA offered in its email and on its website by

20  participating in its intake screening and accepting the inferior employment offered.

21  (AC4, ¶¶ 36, 105-109, 244.)  Martinez clearly did not get what was promised: a top

22  career launching pad with a national real estate firm, extensive professional training,

23  and exposure to the leaders of the titans of the real estate business.  (See AC4, ¶¶

24  214-217; see generally AC4, Exhibit B.)   What he got instead was an inferior

25  placement with a bankrupt, listing-less O'Hara, inferior compensation, not with a

26  nationally prestigious real estate company but with O'Hara's one-man shell of an

27

28  285, 289; see AC4, ¶¶ 114, 218 [memorializing targeting of vulnerable youth by
    CSCA].)

BENJAMIN PAYONE, ESQ.

organization, and compliance to a sexual agenda with the boss as a prerequisite to the real estate training he would provide. (AC4, ¶¶ 110-114, 244-248.)  Given these facts, the defense's position that Martinez falls on the Prop 64 "generic consumer" side of the line as a person with no actual business dealings with the target entity is manifestly untenable.

Defendants claim that CSCA's statements are mere puffery.  (MP, p. 9:21-25, citing *Ferrero Litigation* (S.D.Cal.2011) 794 F.Supp.2d 1107, 1115.)   When praise is in general terms, without specific content or reference to facts, buyers are expected to understand that they are not entitled to rely literally upon the words: such statements are puffery, or opinion. (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 111.)  If the descriptive term at issue is unquantifiable, it qualifies as opinion. (*Pizza Hut* v. *Papa John's* (5th Cir. 2000) 227 F.3d 489, 499.)  In contrast, a statement of fact is one that can be adjudged true or false with empirical verification. (*Presidio* v. *Warner Bros*. (5th Cir. 1986) 784 F.2d 674, 679; *Newcal Industries* v. *Ikon* (9th Cir. 2008) 513 F.3d 1038, 1053.).

Numerous of the identified statements are factual and make claims that are verifiable by resort to empirical inquiry.[9]   Based on discovery to date, the entire CSCA placement organization appears to be an illusion – a giant balloon of fiction supported by only the thread from O'Hara's hand to the figurative CSCA balloon itself, a thread which is itself based on a single connection to one person at a real estate company, Chris Pollinger at First Team Real Estate, a mid-level salesman, who either rents a foreclosed house with roommates or still lives with his mother. (See AC4, ¶ 44; See Pavone, ¶¶ 4-7)

### III.

### THE UNFAIR BUSINESS PRACTICES CLAIM IS VIABLE.

Defendants contend that a 17200 claim requires a predicate legal violation and that since the False Advertising claim predicate fails, so must the 17200 cause of

[9] See footnote 7.

BENJAMIN PAVONE, ESQ.

1    action. (MP, p. 10:11-22, citing *Berryman* v. *Merit Property* (2007) 152 Cal.App.4th

2    1544, 1554.)  *Berryman* explains the opposite: the language of the statute is written in

3    the disjunctive and therefore a predicate legal violation is only required under the

4    unlawful prong. (*Id.*, at pp. 1554-1557; see also *Cel-Tech* v. *Los Angeles Cellular*

5    (1999) 20 Cal.4th 163, 180.)   As discussed above, Martinez has standing to assert the

6    F/A cause of action, and it is therefore viable, since he did engage CSCA's placement

7    services. (AC4, ¶¶ 18-52.)

8         But even if the F/A claim were not viable, a UCL claim may exist based on an

9    unfair or fraudulent business practice, for which no predicate is required. (*Podolsky* v.

10   *First Healthcare* (1996) 50 Cal.App.4th 632, 647.)   The UCL addresses practices

11   that are unfair or deceptive even if they are not violative of a specific law. (*Cel-Tech*,

12   *supra,* 20 Cal.4th 163, 180.)  The separate unfairness and fraudulent prongs of the

13   UCL are intentionally broad, thus allowing courts maximum discretion to prohibit

14   new schemes to defraud. (*Podolsky, supra,* at p. 647.)  O'Hara's practice of making

15   false employment placement promises on the internet is still an unfair and fraudulent

16   practice toward consumers. (AC4, ¶¶ 217-218.)

17        In particular, under the unfair prong, "[a]n act or practice is unfair if the

18   consumer injury is substantial, is not outweighed by any countervailing benefits to

19   consumers or to competition, and is not an injury the consumers themselves could

20   reasonably have avoided." (*Daugherty v. American Honda* (2006) 144 Cal.App.4th

21   824, 839.)  Here, there is not only pleading detail to show that there is consumer

22   injury in the form of an entirely false or highly misleading employment placement

23   website (see AC4, ¶¶ 101-211), but the evidence demonstrates that Mr. O'Hara

24   emailed 20,000 of these false advertisements to every client of Monster.com.

25   (Pavone, ¶ 3, Exhibit A, pp. 48:25-49:11.)   There is no benefit to consumers in being

26   targeted for an advertising campaign containing numerous false, misleading or

27   grossly exaggerated employment enticements. (AC4, ¶¶ 101-211; *Daugherty, supra,*

28   144 Cal.App.4th 824, 839.)

BENJAMIN PAVONE, ESQ.

1  With respect to the fraudulent prong of a UCL claim, unlike common law

2  fraud, a section 17200 violation can be shown even without allegations of actual

3  deception, reasonable reliance and damage; historically, the term fraudulent, as used

4  in the UCL, has required only a showing that members of the public are likely to be

5  deceived. (*Daugherty v. American Honda, supra,* 144 Cal.App.4th at p. 838.)

6  Martinez has catalogued (64) false claims that provide a wide-ranging basis for a

7  finding that CSCA is deceiving members of the public by virtue of its exaggerated

8  presentation on the internet, which include untruths about its size and organizational

9  sophistication (AC4, ¶¶ 108-110, 156, 159, 160-165, 173-174, 185-186), its invented

10  presentation of associated people and connections (AC4, ¶¶ 130, 153, 165, 170-176,

11  188-191), its compensation capabilities for new professionals (AC4, ¶¶ 180-181),[10]

12  its track record of placing people (AC4, ¶¶ 138-142 ), its national recruiting reach

13  (AC4, ¶¶ 196-203), its claimed growth (AC4, ¶¶ 160-161), its self-described high

14  public profile (AC4, ¶¶ 170-171), its list of non-existent awards (AC4, ¶¶ 178-179),

15  its elite status (AC4, ¶¶ 131-133, 146), its access to immediately available jobs (AC4,

16  ¶¶ 149-151, 157-158)[11] and the uniqueness of its career opportunities (AC4, ¶¶ 127-

17  128).  (See generally AC4, ¶¶ 205-206 and Exhibit B.)  Martinez pled all requisite

18  elements of this prong in detail.  (AC4, ¶¶ 206-210.)   As such, Martinez's UCL cause

19  of action should survive regardless of the Court's decision on the false advertising

20  claim.

21

22

23  [10] The evidence is that CSCA never actually shepherded a person through its system

24  to meet any of its compensation claims, as the entire project was still in an "R&D

25  stage." (Pavone, ¶ 5(b) [Depo. S. O'Hara, pp. 268:18-269:7 [Exhibit A]; see also fn. 8.)

26

27  [11] The CSCA email claims that experience is not necessary and that most brokers are

28  hiring "interns" now (AC4, ¶¶ 81(3), 149-150 and Exhibit A), but the reality is that

Fernando Martinez was not recommended for an interview with First Team without a

real estate license. (Pavone, ¶ 6(f).)

BENJAMIN PAVONE, ESQ.

# IV.

## MARTINEZ'S PURSUIT OF LABOR CODE SECTION 203 WAIT TIME PENALTIES AND FEES IS VALID AND HAS BEEN PROPERLY EXHAUSTED.

The defense argues that Martinez's labor claim fails because it tendered a check to settle all claims, Martinez cashed the check, and that he elected to not appear at the hearing, which amounts to a forfeiture of the claim. (MP, p. 10:23-11:16.)

First, the Labor Board specifically informed Martinez: "**PLEASE CASH THE CHECK AS IT WILL NOT JEOPARDIZE ANY BALANCE OF YOUR CLAIM IN ANY WAY.**" (Pavone, ¶ 9, and Exhibit C [capitalized and bold in original].)  Martinez cashed the check and thereafter formally pursued the balance of his claim, per DLSE's express permission. (AC4, ¶¶ 233-234.)

Second, subsequent correspondence from the Labor Board makes clear that it denied his administrative claim, not based on the dispute over the missed hearing date (see AC4, ¶¶ 235-237), but based on the complexity of the case and the necessity for discovery, which the Labor Board procedure was not designed to accommodate. (Pavone, ¶ 9, and Exhibit D, ¶ 3.)  Therefore, Martinez has exhausted his administrative rights and cannot be deemed to have forfeited his claim by seeking a hearing only after he had time to appropriately conduct discovery.  (AC4, ¶¶ 234-236.)

In terms of the defense challenge to the merits of Martinez's labor claim, he simply seeks recovery of the $1,250 waiting time penalties owed to him and attorney's fees for having to force it by court process.  (AC4, ¶ 233-241; AC4, p. 43 [Prayer, ¶¶ 4, 6].)  Labor Code section 2699.5 permits the recovery of attorney's fees for violations based on wait time penalties under section 203. (Lab. Code, § 2699.5 [citing 203 as one of its recoverable provisions]; § 2699.3(g)(1) [authorizing recovery of attorney's fees for such enforcement actions].)[12]   The defense's complaint that the

_____

[12] Martinez completed his LWDA administrative compliance by letter dated June 18, 2013. (Pavone, ¶ 9 and Exhibit E; see also AC4, ¶ 241.)

BENJAMIN PAVONE, ESQ.

lawsuit overlapped with the administrative compliance is foreclosed by section 2699.3(a)(2)(C): "Notwithstanding any other provision of law, a plaintiff may as a matter of right amend an existing complaint to add a cause of action arising under this part at any time within 60 days of the time periods specified in this part." Martinez Fourth Amended Complaint added the PAGA compliance in a timely fashion. (AC4, ¶ 241 and Prayer, pp. 43-44, ¶ (6).) Therefore, this claim should stand.

V.

## MARTINEZ'S SEXUAL HARASSMENT CLAIM IS VALID.

The defense contends that Martinez did not properly exhaust his administrative remedies against PCRI or PVRI. Mr. O'Hara has testified that Martinez was his personal employee, despite improperly paying him from PVRI's corporate account. (Pavone, ¶ 10 [Depo. S. O'Hara, pp. 175:9-21 [Exhibit A]; AC4, ¶ 222.) Thus, Martinez will abandon the sexual harassment charge against PVRI and PCRI.

The defense further contends that Martinez did not sufficiently plead that his working conditions were so intolerable that a reasonable person in his position would have felt compelled to resign. (MP, p. 14:24-15:3, citing *Police* v. *Suders* (2004) 542 U.S. 129, 140-141.) However, Martinez pled that O'Hara requested sexual gratification from him (AC4, ¶ 42), suggested they go on a gay cruise together (AC4, ¶ 43), was removed from the supposed First Team placement track because Stephen wanted to keep Fernando "for himself," and wanted him to become his romantic partner. (AC4, ¶ 45.) O'Hara caused Fernando to quit his job at McDonald's so as to make him dependent on Stephen's will for survival (AC4, ¶ 47), and as a result Fernando capitulated to having sex with O'Hara in order to maintain his employment (AC4, ¶ 50), and soon thereafter could not tolerate the sexual compliance requirement. (AC4, ¶ 56.) The complaint alleges O'Hara's sexual conduct unacceptable, unwanted and severe. (AC4, ¶ 245.) The suggestion that these facts and allegations do not amount to conditions that are sufficiently intolerable as to warrant resignation is unmeritorious.

BENJAMIN PAVONE, ESQ.

# VI.

## ALTER EGO DECISIONS ARE PREMATURE.

The defense contends that Martinez cannot allege a case of "outside reverse piercing" based on *Postal Press v. Kaswa* (2008) 162 Cal.App.4th 1510, 1518. *Kaswa* surveyed the case law on the issue and concluded that holding a corporation liable for the acts of a shareholder by an "outside" third party is unacceptable, because innocent shareholders or creditors of the company may be prejudiced. *Kaswa*, *supra*, at 1520, citing *Cascade* v. *Banks* (10th Cir. 1990) 896 F.2d 1557, 1576-1577. *Kaswa* recognizes that the right case might justify outside reverse piercing, but concluded that the facts of its case did not justify it. (*Id.*, at p. 1524.) *Taylor v. Newton* (1953) 117 Cal.App.2d 752, 753-756 resulted in corporate liability based on an individual judgment and *McClellan v. Northridge* (2001) 89 Cal.App.4th 746, 749-750 resulted in liability against a new corporation based on a specific business when a judgment against the old corporation housing that business was entered, and the corporations were changed out merely to avoid the judgment.

At the pleading stage, the Court should not make decisions about which entities to hold responsible on an alter ego theory, as a number of variables could moot the need for such a decision, and any decision should be based on a full evidentiary record. The defense has been given adequate notice that the possibility that alter ego findings may be necessary, and will be pursued.

For all of the following reasons, the defense's latest demurrer and motion to strike should be denied.

Date: July 10, 2013

LAW OFFICES OF
BENJAMIN PAVONE, PC


\s\Benjamin Pavone, Esq.


Benjamin Pavone, Esq.
Attorney for Plaintiff
Fernando Martinez

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| FERNANDO MARTINEZ, | CASE NO. 30-2012-614932 |
| v. | **PROOF OF SERVICE** |
| STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA | |

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108.  On July 10, 2013, I served the following:

*       Opposition to Defense Demurrer
        Declaration of Benjamin Pavone in Support of Opposition to Demurrer w/Exhibits A-E

*       Opposition to Motion to Strike
        Declaration of Benjamin Pavone in Support of Opposition to Strike w/Exhibits A-D

Barnes/Garrison/Teeple
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121                              (Electronic Service)

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 10th day of July, 2013 that the foregoing is true and correct.



BENJAMIN PAVONE, ESQ.

# EXHIBIT 32

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

## BENJAMIN PAVONE, ESQ.

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**07/10/2013** at 10:55:00 AM
Clerk of the Superior Court
By Giovanni Galon, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# ORANGE COUNTY

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>    PLAINTIFF,<br><br>v.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS;<br><br>O'HARA FAMILY TRUST;<br><br>OCRE, INC.;<br><br>PROFESSIONAL REALTY COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.;<br><br>and DOES 4-10,<br><br>    DEFENDANTS. | **CASE NO.:** 30-2012-614932-CU-FR-CJC<br><br>**JUDGE:** Hon. Gregory Munoz<br><br>**PLAINTIFF'S POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO STRIKE**<br><br>**DATE**: July 25, 2013<br>**TIME**: 2:00 pm<br>**DEPT**: C-13 |

BENJAMIN PAVONE, ESQ.

BENJAMIN PAYONE, ESQ.

## OPPOSITION TO MOTION TO STRIKE

The defense tenders a number of criticisms of Plaintiff's Fourth Amended Complaint.[1]

### A. Administrative Employment Claim

In the Fourth Amended Complaint ("AC4"), Martinez detailed the procedural history by which O'Hara failed to compensate him properly under California employment law: to wit, that Martinez was entitled to $750 for his one outstanding wage check, and pursuant to Labor Code section 203, was also entitled to 30-days worth of wait time penalties for a total principal liability of $2,250. (AC4, ¶¶ 220-241.)   As O'Hara had paid $975 to the Labor Board for Martinez, the net liability owed to Martinez is $1,275. (AC4, ¶ 240.)

Pursuant to paragraph (241), as a matter of precaution, Martinez filed and served an administrative grievance on the LWDA on April 25, 2013, copied by certified mail to the defense, and received a generic denial on June 18, 2013. (Dec. B. Pavone, ¶ 1-3 and Exhibits A-C.)   Similarly, the Labor Board denied Martinez's administrative claim in that forum on May 21, 2013. (Dec. B. Pavone, ¶ 4 and Exhibit D.)

Mr. O'Hara contends that plaintiff cannot collect penalties under Labor Code section 203 and under section 2699.   Plaintiff's Labor Code claim is simple: he is entitled to (30) days of waiting time penalties under section 203, which are an extension of his wages, and he is further entitled to recovery his attorney's fees to enforce the right to collect wages under section 218.5, 1194 or other Labor Code section. (See *Armenta* v. *Osmose* (2005) 135 Cal.App.4th 314, 325-326.)   It is not necessary for Martinez to cite the exact legal basis for every request he makes at the pleading stage: as the Court has previously ruled, the complaint should contain a statement in ordinary and concise language containing Martinez's right to relief.

---

[1] References to the "defense" or to Mr. O'Hara shall collectively refer to defendants Stephen O'Hara, Pacific Valley Real Estate, Inc., Career Solutions and Candidate Acquisitions, and Professional Realty Council, Inc.

(Code Civ. Proc., § 425.10.)  Therefore, the Court should not engage the defense's desire to nitpick about the statutory basis for Martinez's request for fees in relation to his wait time complaint under the Labor Code.

Nonetheless, the defense insists that attorney's fees are not recoverable to enforce section 203 penalties, because section 218.5 only applies to wages.  The defense cites *Montecino* v. *Spherion* (C.D.Cal. 2006) 427 F.Supp.2d 965, 968, *Tomlinson v. Indymac Bank* (C.D.Cal. 2005) 359 F.Supp.2d 891, 895, and *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1401-1402, all of which clearly establish that section 203 payments may not be recovered as restitution under a UCL cause of action.  For purposes of that analysis, these cases make clear that section 203 payments are considered penalties, but it is not clear whether the same characterization will apply for purposes of recovering attorney's fees under 218.5, based on a section 203 violation.  None of the defense's cited cases address the issue in this fashion.  To disallow the recovery of attorney's fees to a party enforcing a section 203 violation would defeat the protective purposes of the statutory scheme, which includes the goal of discouraging delay in the prompt payment of all outstanding obligations due. (See *Cortez* v. *Purolator Air* (2000) 23 Cal.4th 163, 177; *Phillips* v. *Gemini* (1998) 63 Cal.App.4th 56, 74; *Pineda*, *supra*, at p. 1400.)    In any event, it appears that Labor Code section 2699.5 permits the recovery of attorney's fees for violations based on wait time penalties under section 203. (Lab. Code, § 2699.5 [citing 203 as one of its recoverable provisions]; § 2699.3(g)(1) [authorizing recovery of attorney's fees for such enforcement actions].)

In a related contention, O'Hara contends that Martinez forfeited or abandoned his right to pursue judicial relief because the Labor Commissioner denied him a continuance of his administrative hearing. (Opp., pp. 6-7.)  In a May 21, 2013 letter, the Labor Board clarified that the hearing procedure should not be considered a forfeiture of any rights: "the dispute is lengthy, complicated, and in some respects ambiguous.  As a consequence, resolution of the parties' dispute will require

BENJAMIN PAVONE, ESQ.

discovery and also application of various complex legal doctrines pertinent to the issues that have been raised.  The administrative process afforded by the Labor Commissioner is not designed for the invocation of discovery procedures and is not well suited to the adjudication of intricate disputes of this type." (Dec. B. Pavone, ¶ 4 and Exhibit D.)  The defense claim of forfeiture and abandonment does not square with the Labor Board's acknowledgment that formal litigation was necessary for Martinez to obtain relief, given the complexity of the issues raised.

With respect to Martinez's citation to Code of Civil Procedure section 1021.5, O'Hara misunderstands the intended application of this provision.  Martinez does not contend that section 1021.5 provides him a right to recover attorney's fees for his Labor Code cause of action.  Rather, Martinez is pursuing injunctive relief to, among other things, shut down the CSCA website, which mass blasts false advertisements to every person posting a resume on Monster.com. (See Dec. B. Pavone in Opposition to Demurrer, ¶ 3, Exhibit A, pp. 48:25-49:11 [O'Hara deposition testimony ["So I forced down 20,000 -- a blast of like 20-some thousand of a generic letter" (the Exhibit A letter to the Complaint)].)   If Martinez successfully obtains injunctive relief to stop this practice, or otherwise interrupts CSCA's false advertising in general, he is entitled to argue he has provided a public service as a private attorney general and is allowed to recover his attorney's fees for the effort.  (*Inyo* v. *Los Angeles* (1978) 78 Cal.App.3d 82, 86-88; *Otto* v. *Los Angeles* (2003) 106 Cal.App.4th 328, 332-335.)

Date: July 10, 2013                              LAW OFFICES OF
                                                 BENJAMIN PAVONE, PC

                                                 \s\Benjamin Pavone, Esq.

                                                 Benjamin Pavone, Esq.
                                                 Attorney for Plaintiff
                                                 Fernando Martinez

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA 92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

FERNANDO MARTINEZ,

v.

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA

CASE NO. 30-2012-614932

**PROOF OF SERVICE**

I am a resident of the San Diego County. I am over the age of eighteen years and not a party to the within entitled action. My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108. On July 10, 2013, I served the following:

    \*     Opposition to Defense Demurrer
         Declaration of Benjamin Pavone in Support of Opposition to Demurrer w/Exhibits A-E

    \*     Opposition to Motion to Strike
         Declaration of Benjamin Pavone in Support of Opposition to Strike w/Exhibits A-D

Barnes/Garrison/Teeple
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121             (Electronic Service)

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 10th day of July, 2013 that the foregoing is true and correct.



_____
MARTINZ v. O'HARA – CASE NO. 30-2012-614932
PROOF OF SERVICE

# EXHIBIT 33

1

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

2

**BENJAMIN PAVONE, ESQ.**

3

4

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA 92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

5

6

7

ATTORNEYS FOR FERNANDO MARTINEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/10/2013** at 10:55:00 AM
Clerk of the Superior Court
By Giovanni Galon, Deputy Clerk

8

9

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

10

## ORANGE COUNTY

11

12

13

FERNANDO MARTINEZ,

14

                    PLAINTIFF,

15

v.

16

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA;

17

18

CAREER SOLUTIONS AND
CANDIDATE ACQUISITIONS;

19

20

O'HARA FAMILY TRUST;

21

OCRE, INC.;

22

23

PROFESSIONAL REALTY
COUNCIL, INC;

24

25

PACIFIC VALLEY REALTY, INC.;

26

and DOES 4-10,

27

                    DEFENDANTS.

28

**CASE NO.:** 30-2012-614932-CU-FR-CJC

**JUDGE:** Hon. Gregory Munoz

**DECLARATION OF BENJAMIN PAVONE IN OPPOSITION TO DEFENSE DEMURRER**

**DATE**: July 25, 2013
**TIME**: 2:00 pm
**DEPT**: C-13

BENJAMIN PAVONE, ESQ.

I, Benjamin Pavone, am an attorney licensed to practice in all state and federal courts located in California, as well as various district and federal appellate courts in other states.  If called to testify, I could and would testify competently to the following:

1.    Attached hereto as Exhibit A is true and correct of Mr. O'Hara's deposition in the following particulars, to address various issues about the causes of action in the Fourth Amended Complaint.

2.    Mr. O'Hara claimed that he had $43M in creditor claims in his 1986 bankruptcy and he scheduled $4M worth of debt in his 2012 bankruptcy, his third one, as explained at pages 19-20 and 24 of his deposition, attached hereto.

3.    In Mr. O'Hara's deposition, he explained that the email sent to Fernando Martinez (as reflected by Exhibit A in the Fourth Amended Complaint) was not a personal missive, but a mass emailing consisting of 20,000 or more emails:

.... What would happen is we worked boards like Monster board and those kind of things just as massive. When we first do our first hit, if you want to call it that, the first broadcast, we'll call it a broadcast, the level of membership that I have with, like, Monster allows me to -- like, if you have an application on Monster's board, I have the type of membership that I can actually communicate directly to you.  So I forced down 20,000 -- a blast of like 20-some thousand of a generic letter. It is a generic letter. But it is disclosed in the generic letter that -- that it is being electronically done at that point."

(Depo. S. O'Hara, pp. 48:25-49:11. )

4.    In Mr. O'Hara's deposition, we discussed a contract he purportedly entered into with Chris Pollinger of First Team Real Estate, wherein he would market for leads for new real estate agents and collect 25% of the new hire's compensation.  (See Exhibit B, ¶ 7.)

BENJAMIN PAVONE, ESQ.

5.    <u>Fraud Cause of Action</u>:

5(a).    When asked whether CSCA had nurtured anyone through its process to become a First Team member, Mr. O'Hara responded thusly:

Q:    Okay. Are you aware of anyone that came through that became an intern with First Team?

A:    You've asked that question before. I don't remember. I don't -- I never had anything -- I had no -- what would you call it? I didn't have enough of an emotional connection to know anybody. It was a matter of flipping information.  (Depo. S. O'Hara, pp. 172:16-22.)

5(b).    Similarly, in another colloquy:

Q:    About six months after our brokerage helps you become licensed, unless you are already licensed, on the sale of homes around 225,000, you can expect to earn between 45,000 and 65,000 in your first year, more communities with higher real estate values, and can double  that in your second year.  Okay. My question is, do you have any documented instances of persons that CSCA has taken through its system and to have then gone on to earn between 45- and 65,000 in their first year?

A:    My first answer, once again, is that we were in an R&D stage. A year hasn't even started yet with anybody. The most anybody would have been anywhere is maybe for a couple of months and they're not even out of their training and licensing yet. So the answer to your question is no.

(Depo. S. O'Hara, pp. 268:18-269:7 [Exhibit A].)

5(c).    A similar exchange:

Q:    Okay. And can I infer that you would give me a similar answer for the second year? In other words, the statement is you can double that in your second year, which would be, according to the numbers, 90,000 to 130,000, that you don't have any documented instances of that because you're still in the R&D phase?

BENJAMIN PAVONE, ESQ.

A:     Well, I actually amended what I said. CSCA does not -- I'm not sure when you say do I have. I have as far as industry standards go. But, no, with CSCA, no, it hasn't gotten to that point yet. It is in the R&D stage.

(Depo. S. O'Hara, pp. 269:22-270:6 [Exhibit A].)

5(d).    An exchange relating to CSCA's "stringent" standards:

Q     Okay. Now, whose standards are those? Meaning where does that come from?

A     Well, it begins with me. And then it begins with what I and the -- without getting into detail on the model of how PRC is set up and PRC sets those standards, but currently, since I am 90 percent PRC, I set those standards.

Q     Okay. Are those standards written?

A     Not formally probably at this point. It will be when we launch it.

(Depo. S. O'Hara, pp. 250:21-251:5 [Exhibit A].)

6.     Paragraph (81) makes clear that the listed statements are not the exclusive or total universe of fraudulent misrepresentations: "The specific statements include, *but are not limited to*, Mr. O'Hara's August 10, 2012 written response to Fernando's resume on Monster.com... .   Additional statements that form Martinez's fraud cause of action include:

6(a).    CSCA purports to be a large organization with many employees: it identifies Mr. O'Hara as the manager and founder; it claims to have "corporate executives," "managers," "career counselors," a "talent acquisition manager," a "talent acquisition director," and an "executive search team."  (AC4, ¶ 108 and Exhibit B.)

6(a)(1).    Is the organization this complex?

BENJAMIN PAVONE, ESQ.

BENJAMIN PAVONE, ESQ.

1      6(a)(2).      No, it consists of Mr. O'Hara and his niece in Florida, Ali Merre.
2                    (Exhibit A, Depo. S. O'Hara, pp. 279:9-15, 132:14-23.)

3      6(a)(3).      Mr. O'Hara is the only corporate executive. (Depo. S. O'Hara, p.
4                    71:14-17 [Exhibit A].)

5      6(a)(4).      Ali Merre, the niece, is the only CSCA career counselor.  (Exhibit
6                    A, p. 285:13-21.)

7      6(a)(5).      Mr. O'Hara and Ms. Merre make up the executive search team.
8                    (Depo. S. O'Hara, p. 304:2-15 [Exhibit A].)

9      6(a)(6).      Ali Merre is the talent acquisition coordinator.  The talent
10                   acquisition director belongs to the brokerage.  (Exhibit A, p.
11                   279:9-15.)

12     6(b).         CSCA purports to have an annual "class of 30" graduates and a
13                   classroom where orientation and training is provided. (AC4, ¶
14                   108.)

15     6(b)(1).       Is there an annual "class of 30 under 30" ?    No:

16                   Q:    And you have told me that that's -- well, first, I guess we
17                         should establish this between us. CSCA doesn't actually
18                         have its own class of 30 under 30?

19                   A:    Not at all.  ...

20
21                   Q:    Okay.  And neither Donald Trump nor Kendra Todd have
                           any relationship with CSCA?
22
23                   A:    Not at all.   (Exhibit A, p. 266:2-8.)

24     6(c).         CSCA purports to have six separate orientation and training
25                   programs (AC4, ¶ 108.)

26     6(c)(1).      Orientation Training Program
27                   Q:    All right.  You have an orientation program?
28

1           A:     Our brokerages do, yes.

2          (Depo. S. O'Hara, pp. 274:7-10.)

3    6(c)(2).     Classroom Training Program

4           Q:     Okay. And classroom training is a part of -- where does that

5                   come from?

6

7           A:     Our brokerages. In this case, First Team.

          (Depo. S. O'Hara, pp. 274:10-12.)

8    6(c)(3)      Professional Training Program

9

10          Q     Okay. The training program used by our brokerages is

11                 worth thousands of successful careers that are launched. Do

                 you have any paperwork that corroborates the idea that

12                 thousands of successful careers have been launched from

13                 the training program?

14          A     Of course, I don't have that type of paperwork. However,

15                 Century 21 has had probably 3- or 400,000 agents over the

16                 years. RE/MAX has had many. Coldwell Banker.  And

                 basically because I own those franchises, I have been

17                 exposed to all of those programs, along with independent

18                 industry gurus that I have their programs.

19          (Depo. S. O'Hara, pp. 258:16-259:1.)

20    6(c)(4).     Restart Training Program

21           Q:     My question is this restart training program is a program

22                 from CSCA; correct?

23           A:     Well, that our brokerages would offer to the people.

24        (Depo. S. O'Hara, pp. 271:7-10.)

25

26    6(c)(5).     Internship Program

27           Q:     Okay. Let's see, let's try 16 here. Try our internship

28                 program.

BENJAMIN PAVONE, ESQ.

1

2      A    Uh-huh.

3      Q    Okay. Now, can you tell me a little bit about that?

4

5      A    Well, what would you like to know about it?

6      Q    How many people have passed through it?

7

8      A    Nobody has applied for it.

9      Q    Okay.

10

11      (Depo. S. O'Hara, pp. 260:9-17.)

6(d). Omitted.

6(e). CSCA claims to have a recruiting reach that allows it to visit college campuses around the nation, and a national geographic presence of its graduates. (AC4, ¶ 108.)  See paragraph 7(a)(33).

6(f). CSCA represented in the email that no experience was necessary, that interns could earn $35K/year and that the employer is "hiring now." (AC4, Exhibit A.)  However, the reality is different:

Q:    Well, to your understanding of the job with First Team, I understand that they prefer a person to be licensed, but is there an intern position that's -- that involves, you know, compensation as an employee while the person is getting licensed?

A:    Everybody is different. Everybody has a different program. But in this case here if you get a license -- if you have the license, it is more apt to have programs where there is some sort of a minimal this or that or something. But a lot of times it is for free too.  I mean, I have had -- over the years I have had many people that are willing -- you know, that they work for free just to learn the business and then kind of go from there with it.

BENJAMIN PAVONE, ESQ.

(Depo. S. O'Hara, p. 173:1-16, Exhibit A.)

6(f)(1).    The following additional testimony also speaks to CSCA's 'hiring now' claim:

Q    Okay. So you offered him employment as a personal assistant; is that fair?

A    Well, that was after much going back and forth. That was with two weeks going back and forth, how can we make this work, because I want you in 2013 to be part of my operations. So we spent two weeks trying to figure out how I could get money to him. And those conversations also included me processing how can I do it without -- I mean, I didn't want any new employees. I didn't have any need for him to be an employee or anything else. And the only thing that I could have used a little bit of help with was my real estate side. *There was nothing for him to do with CSCA yet.* [¶] And also, I might add, the real estate industry begins to die around mid-October, late October, and so November, December, January are our lowest points of the year. So I took this young boy along for -- when I had no reason -- I had nothing -- he was the one that wanted the money.

(Depo. S. O'Hara, pp. 175:9-176:1 [Exhibit A, emphasis added].)

6(f)(2).    The following additional testimony is relevant to CSCA's claim that it is hiring now.

Q:    The downfall he had with that option is while CSCA doesn't charge anything for its services, our fees are all paid by our client. And our client is not Fernando, our client would be the First Team. So our fees are paid by them. I began to tell him that I can get you over there right away, but it is going to be about a six-month process, because you've got to get -- your license is going to take about three months and then they have got a three-month training program. And there will be costs associated with that. In other words, First

BENJAMIN PAVONE, ESQ.

1    Team charges to put you through licensing school and

2    things like that.

3    (Depo. S. O'Hara, pp.167:25-168:10 [Exhibit A].)

7.    <u>False Advertising Cause of Action – Evidentiary In</u>sight:

7(a)(2).    <u>Advertising Claim #2</u> – "If you share our 'DNA', we know you

will like what everyone is talking about."  (See 7(a)(23), below.)

7(a)(10).    <u>Advertising Statement #10</u>: "We work with the Best-of-the-Best,

the leader's [sic] in the real estate industry…"  (AC4, ¶ 145; see

also AC4, ¶ 146 ["There is no indication that CSCA has any

connection to the top, national real estate firms in the United

States or that it regularly places employees with top national real

estate firms with lucrative employment offers like the one

suggested to Martinez in Exhibit A."

Q    You were filling out the different options –

A:    Oh, yeah, his options. So that was one option to just do
exactly what he showed up for. And if you want to be in
real estate, this is what it is going to take to do it.  And by
the way, a lot of the conversation probably did -- I would
say a lot of that first third and almost all of the second third
in the conversation did apply to business. He wanted to
know what it took to be a realtor and, you know, the DNA
for all of that.

Q    Uh-huh.

A    So -- anyhow, that was Option 1.  Option 2 was, I would
have proudly had him to be part of the PRC project, the
CSCA project, as you know it, but with PRC, because I had
the East Coast covered with Ali, but I would have loved to
have somebody on the West Coast in 2013. So I thought he
could be kind of morphed into that. Then -- those were

BENJAMIN PAVONE, ESQ.

basically his two.  At that seating -- I mean, on that Saturday, those were the two choices. And floated out there was -- *but none of this is really open yet. It's not going to be open until 2013.* And I said, that leaves the only option is to kind of be my assistant or something like that if we can even find a place for you. So those were his options.

(Depo. S. O'Hara, pp.168:13-169:11 [Exhibit A, emphasis added].)

7(a)(12).        Advertising Claim #12 - "…most of our Brokerages are hiring now."  (AC4, ¶ 149-151.)  See also paragraph 81(e) ["Our fees are paid by the employer (not you) and they are hiring 'now'."

Evidence:

Q:    The downfall he had with that option is while CSCA doesn't charge anything for its services, our fees are all paid by our client. And our client is not Fernando, our client would be the First Team. So our fees are paid by them. I began to tell him that I can get you over there right away, but it is going to be about a six-month process, because you've got to get -- your license is going to take about three months and then they have got a three-month training program. And there will be costs associated with that. In other words, First Team charges to put you through licensing school and things like that.

(Depo. S. O'Hara, pp.167:25-168:10 [Exhibit A].)

7(a)(16)        Advertising Statement #16: "Want to start way out in front? Try out our Internship Program. As a current university Business and Communication Major, you'll learn how to run a million dollar business by working with a team that's actually running one." (AC4, ¶ 159)

BENJAMIN PAVONE, ESQ.

BENJAMIN PAVONE, ESQ.

1

Evidence: Internship Program

2
3

Q:    Okay. Let's see, let's try 16 here. Try our internship program.

4
5

A    Uh-huh.

6
7

Q    Okay. Now, can you tell me a little bit about that?

8

A    Well, what would you like to know about it?

9
10

Q    How many people have passed through it?

11

A    Nobody has applied for it.

12

Q    Okay.

13
14

(Depo. S. O'Hara, pp. 260:9-17.)

15

7(a)(19).    Advertising Claim #19 - 165. "However, because our people offer

16
17

the best customer experience, we've done some growing. We

serve the best real estate Brokerage brands in the world."

18

Evidence

19
20

Q:    All right. So the corporation has done some growing, is that

an accurate understanding of that phrase?

21
22

A    More specifically, CSCA. And what we're doing is filing

out of the off the shelf, sitting dormant for a year and a half,

23

and we've begun to do something. We signed up First

24

Team. We're beginning to make progress.

25

(Depo. S. O'Hara, p. 264:4-9.)

26

7(a)(21).    Advertising Claim #21 – "We make news!

27

7(a)(22).    Advertising Claim #22 – "Announcing the 2012 Class of '30

28

Under 30.'

7(a)(23).    Advertising Claim #23 – "Need a Role Model?  Meet Ours!"
Advertising claims 2, 21-23 relate to CSCA's citation and picture of Donald Trump and Kendra Todd, the latter being a well-known real estate celebrity and Todd being semi-famous for winning in Trump's show "The Apprentice."  They are both pictured on CSCA's website in discussing the above representations in the context of CSCA's claim that its graduate, Todd, is a newsmaker.  CSCA's use of Trump's/Todd's name and likeness is alleged to create an association with CSCA.  (See AC4, ¶¶ 121-126, 170-176.)

The evidence is as follows:

Q:    Okay. And neither Donald Trump nor Kendra Todd have any relationship with CSCA?

A:    Not at all.  (Depo S. O'Hara, Exhibit A, p. 266:2-8.)

7(a)(30).    Advertising Claim #30  - "Because we pride ourselves in screening the very best job applicants, we are very selective as to which Brokerages with whom we choose to work."  (AC4, ¶ 190.)

Evidence:

Q:  ... we are very selective as to which brokerages with whom we choose to work. Again, this is a reference to First Team?

A:    Well, it is a reference to anybody that's going to be a part of our party has to meet a certain criteria.

Q:    What would those criteria be?

A:    Again, that is in formulation.

(Depo. S. O'Hara, p. 274:25-275:6.)

BENJAMIN PAVONE, ESQ.

7(a)(33).    Advertising Statement #33:

[Q:] When will CSCA® be visiting my campus?

[A:]  Please check with your school's career services office for a calendar of events or simply email us.  (AC4, ¶ 196.)

Evidence:

Q    Has CSCA been to any campuses?

A:    Well, not yet. That's when we come out of the nationally -- now 2014, it's 2013. But we do – the person, though, that actually does the visit is not CSCA. It is going to be -- it's the person that does the hiring at the brokerage.  So like in this case, if there was such an event, let's say, UCI or something like that, that would be a representative of First Team that would host that.

Q    Okay. So CSCA will not actually be visiting any campuses?

A    No. No. No.

(Depo. S. O'Hara, p. 276:4-15.)

Q:    Okay. What happens during the interview process?  We meet you at a job fair or campus environment. Again, this is not actually -- this has not actually happened; right?

A:    No. No.  The -- the -- the -- the thing is in place, so when we do start that part of it, it would be the local person from XYZ Realty in Atlanta that would attend to this. We're not going to pay for personnel to be at campuses everywhere.

(Depo. S. O'Hara, p. 277:22-278:5; see also p. 284:7-17.)

BENJAMIN PAVONE, ESQ.

7(a)(34).    Advertising Statement #34:

[Q:]    Should I apply on CSCA's website or my school's career website?

[A:]    If the CSCA® job postings are listed on your school's career website as well as our own, please apply to both postings."

(AC4, ¶¶ 198-199 ["This statement attempts to paint a false picture that CSCA has a specific required protocol for college applicants, and a national recruiting presence.)

Evidence:

Q    And then 34, should I apply on CSCA's website or my school career's website? Please apply to both postings. Has CSCA posted anything on any school career website?

A    Not yet. No. That's why we say if CSCA does have something posted on their website, that's fine, but apply here. In other words, the answer to your question is no.

(Depo. S. O'Hara, p. 276:16-22.)

7(a)(41).    Advertising Statement #41: "To be clear, while CSCA® Brokerage member's represent all the major national and regional companies as well as local Independents, our hiring qualifications are very different." (AC4, Exhibit B, #41.)

Evidence

Q:    So you're saying -- correct me if I'm wrong -- that CSCA brokerage members represent all of the major national and regional companies; is that true?

A    Uh-huh.

Q    And can you explain how that's true? I am not really following what that means.

BENJAMIN PAVONE, ESQ.

1    A    Maybe a better way to word is we will do business with all

2    brands. We're not just with Century 21 or just with

3    Prudential or not just with an independent.

4    (Depo. S. O'Hara, p. 278:14-22.)

5    7(a)(45).    Advertising Claim #45: ... with your team, you'll be able to

6    directly influence all areas of your success. You can build on our

7    entrepreneurial model and earn an income that has no ceiling.

8    (AC4, Exhibit B, #45.)

9    Evidence:

10    Q:    Do you have any instances in which someone that's gone through

11    the program has earned an income that's particularly –

12    A:    That statement was made more out of my professional experience

13    over all the years. I mean, I have recruited people my whole life,

14    so I know what they can make and what they can do.

15    (Depo. S. O'Hara, p. 280:16-22.)

16    7(a)(47).    Advertising Claim #47: "That's because there's only one CSCA®.

17    Every year we turn internships into real, substantial career-

18    building tools."

19    (AC4, Exhibit B, #47.)

20    Evidence:

21    Q:    Okay. 47, every year we turn internships into real substantial

22    career-building tools.

23    A:    Uh-huh.

24    Q:    Right?

25    A:    Uh-huh.

26    Q:    Okay. So do you have any documented instances of having turned

27    a person who is engaged in internship into a career?

28    A:    Not yet.  Not until we get out of our R&D stage.

1          (Depo. S. O'Hara, p. 281:3-11.)

2    7(a)(50).    Advertising Claim #50: "As you'd imagine, everyone else in the

3                program is just as motivated as you."

4                (AC4, Exhibit B, #50.)

5                Evidence:

6                Q    Okay. 48 -- let's go to 50. As you would  imagine, everyone

7                     else in the program is just as motivated as you. Have you

8                     had a program with more than one person?

9                A    Well, yeah. Anybody that has been moved over and gotten

10                    in the brokerage, they're very excited about what they're

11                    doing, the ones that have done it. There's probably been a

12                    few that have failed. I don't know, because I don't follow

13                    that side of it. But certainly at the time they get into it

14                    they're very excited.

15                Q    So who would have the records of, you know, the internship

16                    program?

17                A    Again, we are in an R&D stage. We are not keeping those

18                    type of records at this time.

19                (Depo. S. O'Hara, p. 281:12-25.)

20    7(a)(52).    Advertising Claim #52: "CSCA .... claims to hire for numerous

21                and varied positions besides real estate agents ("Sales

22                Management, Relocation and a "variety of administrative

23                positions"). (AC4, ¶ 108.)

24                Evidence:

25                Q    Okay. Number 52. We also have numerous -- or we also

26                hire for numerous positions, sales management, relocation, et

27                cetera.  Okay. Now, who is doing the hiring there?

28                A    I only do that. I don't let anybody else do that. That's me.

BENJAMIN PAVONE, ESQ.

1       Q       Okay. Now, when you -- who is the employer,
2       though? Is that CSCA?
3       A       No.  First Team is.
4       (Depo. S. O'Hara, p. 282:7-15.)
5   7(a)(62).    Advertising Claim #62: "With 90% of the U.S. population located
6       within 15 miles of one of our Brokerages, there's a CSCA®
7       Career Consultant waiting to talk to you."  (AC4, Exhibit B, #62.)
8       Evidence:
9       Q       Okay. 62, 90 percent of the population located within 15
10              miles of one of our brokerages there's a CSCA career
11              consultant. Can you tell me what that means?
12      A       It is a broad statement. But basically what we're talking
13              about is that we have -- and again, as this is formally
14              launched and we're in business, we serve the whole country
15              is the bottom line.
16      (Depo. S. O'Hara, p. 284:23-285:6.)
17  7(a)(63).    Advertising Claim #63: "With 90% of the U.S. population located
18      within 15 miles of one of our Brokerages, there's a CSCA®
19      Career Consultant waiting to talk to you."  (AC4, Exhibit B, #62.)
20      Evidence:
21  8.      In terms of the entity shuffling Mr. O'Hara has undertaken, he testified:
22      A       Pacific Valley Realty is no longer in business Pacific Valley
23              Realty, Incorporated is no longer in business.
24      Q       Okay.
25      A       Bank accounts closed, everything.
26      Q       Okay.
27      A       It's gone. And neither is any of the others. The only two operations
28              are OCRE, Inc. dba Pacific Valley Realty and I think another dba.

BENJAMIN PAVONE, ESQ.

BENJAMIN PAVONE, ESQ.

1    And then PRC has the dba of CSCA and all that.  ...  I wanted to

2    get the corporations that had leases and all of that kind of stuff, all

3    of the baggage from before, I just decided it was better just to start

4    clean, because the direction I wanted to go was

5    OrangeCountyRealEstate.com. And so I wanted to create a new

6    corporation for that, which is what I did.

7    Q    Okay. Did Pacific Valley Real Estate have a lot of creditors? It

8    was under water, I take it?

9    A    I don't remember.  ....  Past employees or past agents, past -- just

10    the past four years of a very bad real estate market and I wanted to

11    start clean with it ...  I just wanted a clean company because it was

12    so convoluted with all of the old stuff.

13    (Depo. S. O'Hara, pp. 115:15-118:13 [Exhibit A].)

14    9.    In terms of Martinez's administrative claim, he was informed by letter

15    on January 23, 2010 that there was a check for him.  The relevant

16    language stated: "PLEASE CASH THE CHECK AS IT WILL NOT

17    JEOPARDIZE ANY BALANCE OF YOUR CLAIM IN ANY WAY."

18    A true and correct copy of the letter is included herewith as Exhibit C,

19    and a true and correct copy of a subsequent letter closing the

20    administrative case for complexity and the need for discovery is attached

21    as Exhibit D.   I received our administrative denial from the LWDA on

22    June 18, 2013, a copy of which is included hereto as Exhibit E.

23    10.    On the issue of whether Martinez was an employee of CSCA, PVRI, or

24    Mr. O'Hara himself, the following testimony is instructive:

25    Q    Okay. So you offered him employment as a personal assistant; is

26    that fair?

27    A    Well, that was after much going back and forth. That was with

28    two weeks going back and forth, how can we make this work,

1    because I want you in 2013 to be part of my operations. So we

2    spent two weeks trying to figure out how I could get money to

3    him. And those conversations also included me processing how

4    can I do it without -- I mean, I didn't want any new employees. I

5    didn't have any need for him to be an employee or anything else.

6    And the only thing that I could have used a little bit of help with

7    was my real estate side. There was nothing for him to do with

8    CSCA yet. [¶] And also, I might add, the real estate industry

9    begins to die around mid-October, late October, and so November,

10    December, January are our lowest points of the year. So I took this

11    young boy along for -- when I had no reason -- I had nothing -- he

12    was the one that wanted the money.

13    (Depo. S. O'Hara, pp. 175:9-176:1 [Exhibit A].)

14    11.    In terms of ownership and control, Mr. O'Hara testified that he is sole

15    stockholder of all corporations.

16    Q:    In terms of the -- was stock issued in any of the corporations? I

17    guess we can start with Credentialed Learning Institute. Was there

18    stock issued with –

19    A:    We can go fast with all of them. All of them are in my name.

20    Q:    All of them are 100 percent you?

21    A:    Yes.

22    Q:    Okay. So that would include, just for the record, CLI, PVRI, PRCI

23    --correct me -- stop me if I am wrong.

24    A:    Uh-huh.

25    (Depo. S. O'Hara, pp. 114:2-11 [Exhibit A].)

26    11(a).    Mr. O'Hara also attested to being "everything" in terms of

27    CSCA's corporate leadership. (Depo. S. O'Hara, pp. 297:12-

28    298:2, 69:20-23 [Exhibit A].)

BENJAMIN PAVONE, ESQ.

11(b).     Mr. O'Hara attested "any time I form a corporation, I wear all the hats." (Depo. S. O'Hara, p. 71:14-17 [Exhibit A].)

I hereby declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: July 10, 2013                                        \s\Benjamin Pavone

BENJAMIN PAVONE, ESQ.

**EXHIBIT A**

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  ORANGE COUNTY SUPERIOR COURT

3

4    _____

                                      )

5    FERNANDO MARTINEZ,               )

                                      )

6             Plaintiff,              )

                                      )

7    vs.                              )   CASE NO. 30-2012-614932-

                                      )           CU-FR-CJC

8    STEPHEN STRATTON O'HARA fka      )

     STEPHEN JOHN O'HARA;             )

9    CAREER SOLUTIONS AND             )

     CANDIDATE ACQUISITIONS;          )

10   PROFESSIONAL REALTY COUNCIL,     )

     INC.; PACIFIC VALLEY REALTY,     )

11   INC.; and DOES 2-10,             )

                                      )

12            Defendants.             )

     _____)

13

14

15

16      VIDEOTAPED DEPOSITION OF STEPHEN STRATTON O'HARA

17                  San Diego, California

18                Monday, June 24, 2013

19                     Volume I

20

21

22   Reported by:

     MONICA M.

     CLINE

23   RPR, CSR No. 8933

24   Job No. 1689811

25   PAGES 1 - 311

Sarnoff, A VERITEXT COMPANY
877-955-3855

| | | |
|---|---|---|
| 1 | Q    Trade related?  I'm sorry, what do you mean by | 09:11:26AM |
| 2 | that? | 09:11:28AM |
| 3 | A    I'm in the real estate business, so I go to | 09:11:28AM |
| 4 | continuing education.  I have certain classes that I had to | 09:11:30AM |
| 5 | take to get my broker's license -- | 09:11:33AM |
| 6 | Q    Right.  Right. | 09:11:35AM |
| 7 | A    -- et cetera, et cetera, et cetera. | 09:11:35AM |
| 8 | Q    Okay.  I just wanted to make sure the trade was | 09:11:36AM |
| 9 | real estate. | 09:11:38AM |
| 10 | Okay.  Now, let's see.  You mentioned here, | 09:11:40AM |
| 11 | Bates 390, that -- and I was able to highlight this one for | 09:11:51AM |
| 12 | you -- that you have a business background in law, | 09:11:55AM |
| 13 | accounting and marketing. | 09:11:57AM |
| 14 | A    That's what I took classes in. | 09:11:59AM |
| 15 | Q    Okay.  So where did you take law classes or | 09:12:01AM |
| 16 | whatever this refers to?  Where did that occur? | 09:12:06AM |
| 17 | A    I don't remember the schools, but, I mean, I have | 09:12:09AM |
| 18 | been licensed since '76.  So pretty much anything that was | 09:12:11AM |
| 19 | offered in real estate that revolved around law and | 09:12:15AM |
| 20 | accounting, I did quite a bit of that. | 09:12:20AM |
| 21 | Q    Okay.  Turning you to 392.  Okay.  Do you see the | 09:12:22AM |
| 22 | statement on -- sorry.  Lost it.  Hopefully you can see | 09:12:53AM |
| 23 | this.  On the second paragraph -- I'll try and bring this | 09:13:05AM |
| 24 | up a little bit better for you -- "On January 28th I was on | 09:13:07AM |
| 25 | my first cell phone with my CPA" -- do you see that | 09:13:12AM |

Page 19

```
 1   paragraph?                                        09:13:15AM

 2   A     Uh-huh.                                     09:13:15AM

 3   Q     Again, this is at Bates 392.                09:13:16AM

 4         You're apparently on a phone call and you're   09:13:19AM

 5   explaining why -- or your CPA is explaining to you why   09:13:22AM

 6   you're going to go through a multimillion-dollar   09:13:25AM

 7   bankruptcy.                                       09:13:27AM

 8         Do you see that?                            09:13:28AM

 9   A     Uh-huh.                                     09:13:28AM

10   Q     Now, did you go through -- did you actually file   09:13:29AM

11   that bankruptcy?                                  09:13:30AM

12   A     Yes.                                        09:13:31AM

13   Q     Okay.  So you filed a bankruptcy in 1986?   09:13:31AM

14   A     Yeah.                                       09:13:34AM

15   Q     Okay.  Where did you file that bankruptcy?  09:13:35AM

16   A     In Orlando, Florida.                        09:13:40AM

17   Q     Okay.                                       09:13:42AM

18   A     Actually, the actual bankruptcy was filed in   09:13:43AM

19   Florida.  I don't remember if it was in Orlando or Tampa.   09:13:46AM

20   Q     Okay.  And -- at various times you have given   09:13:49AM

21   numbers attached to your bankruptcies, like, for example,   09:13:57AM

22   one you said was 43 million and, say, your last one, the   09:14:00AM

23   one in 2012, is roughly 4 million.                09:14:04AM

24         Do you know how much -- or can you recall how much   09:14:07AM

25   that bankruptcy in 1986 was?                      09:14:10AM

                                                       Page 20
```

| | | |
|---|---|---|
| 1 | And just so, you know, we all have the same | 09:18:08AM |
| 2 | understanding of it, Bates 393 now, here's the mention of | 09:18:11AM |
| 3 | your 43 million bankruptcy.  And again, that's a reference | 09:18:15AM |
| 4 | to the 1986 -- the one with the certified cars? | 09:18:18AM |
| 5 | A    Yes. | 09:18:21AM |
| 6 | Q    Okay.  Great. | 09:18:21AM |
| 7 | Now, you had a second bankruptcy -- you have had | 09:18:22AM |
| 8 | three bankruptcies in total? | 09:18:26AM |
| 9 | A    Two or three, yeah.  But of recent, the two. | 09:18:29AM |
| 10 | Q    Okay.  I have a 1997 bankruptcy.  Is that -- do | 09:18:33AM |
| 11 | you -- can you corroborate that? | 09:18:38AM |
| 12 | A    '97, that made sense, because that -- I'm trying | 09:18:42AM |
| 13 | to think what that tied to.  That one was in -- the answer | 09:18:47AM |
| 14 | to your question is yes, but I don't remember.  It was tied | 09:18:56AM |
| 15 | to a bunch of leases, I remember that.  It was a | 09:18:59AM |
| 16 | business-related thing. | 09:19:04AM |
| 17 | Q    Were you -- did you -- was the -- strike all of | 09:19:05AM |
| 18 | that. | 09:19:10AM |
| 19 | Do you remember what chapter it was filed under? | 09:19:11AM |
| 20 | A    Everything is Chapter 7. | 09:19:13AM |
| 21 | Q    Okay. | 09:19:15AM |
| 22 | A    Yeah.  And what I do remember from it is -- it was | 09:19:16AM |
| 23 | during the -- I don't know if you lived here then, but | 09:19:18AM |
| 24 | Orange County was going through a bankruptcy. | 09:19:20AM |
| 25 | Q    I remember. | 09:19:23AM |

Page 24

```
 1      A    Plus or minus.  I just -- I don't really remember,   09:48:36AM

 2   because you have to understand where we were at is in an     09:48:40AM

 3   R&D stage.  We were very fluid in that if something didn't   09:48:46AM

 4   work this hour, we could spin on a dime and change it to     09:48:49AM

 5   something else so that it would work the next hour.          09:48:52AM

 6          And, you know, again, without taking your time and    09:48:56AM

 7   everybody else's, we would do one thing and then analyze     09:48:59AM

 8   the heck out of it for a month.  And so that's where we      09:49:04AM

 9   were at with this.                                           09:49:07AM

10          So to give you some little example, for instance,     09:49:08AM

11   because our passion is to get basically that 25 to 40 age    09:49:13AM

12   group, that would be the target.  We learned that maybe the  09:49:19AM

13   candidates -- where their heads were at, maybe 25 was too     09:49:31AM

14   young, maybe we needed to go to 26.  And I am making this     09:49:35AM

15   up to get a point across.                                    09:49:40AM

16      Q    Okay.                                                09:49:41AM

17      A    Because we really don't know where the point was     09:49:42AM

18   that would be the tilt point.  Some kids are mature at 22,   09:49:44AM

19   others are 50 and they're not mature.                        09:49:48AM

20      Q    All right.  I understand.                            09:49:51AM

21          So I take it that there's -- well, how did CSCA       09:49:53AM

22   transmit the leads?  In other words, was this, you know, on  09:49:59AM

23   a single referral sheet or a -- you know.                    09:50:01AM

24      A    That's a fair question.                              09:50:04AM

25          What would happen is we worked boards like Monster    09:50:06AM
```

Page 48

| | | |
|---|---|---|
| 1 | board and those kind of things just as massive.  When we | 09:50:11AM |
| 2 | first do our first hit, if you want to call it that, the | 09:50:14AM |
| 3 | first broadcast, we'll call it a broadcast, the level of | 09:50:20AM |
| 4 | membership that I have with, like, Monster allows me to -- | 09:50:24AM |
| 5 | like, if you have an application on Monster's board, I have | 09:50:27AM |
| 6 | the type of membership that I can actually communicate | 09:50:31AM |
| 7 | directly to you. | 09:50:35AM |
| 8 | So I forced down 20,000 -- a blast of like 20-some | 09:50:36AM |
| 9 | thousand of a generic letter.  It is a generic letter.  But | 09:50:43AM |
| 10 | it is disclosed in the generic letter that -- that it is | 09:50:46AM |
| 11 | being electronically done at that point.  No human is | 09:50:51AM |
| 12 | touching it.  It is disclosed in this letter that we've | 09:50:54AM |
| 13 | done an electronic word search.  And in the Monster posting | 09:50:57AM |
| 14 | you have, there's certain key words that we like.  That | 09:51:02AM |
| 15 | might have been marketing.  It could have been sales.  It | 09:51:06AM |
| 16 | could have -- because we're looking -- we're targeting -- | 09:51:08AM |
| 17 | well, if they're in college, we're targeting, like, a | 09:51:11AM |
| 18 | business or communications major.  If they're in the | 09:51:15AM |
| 19 | military, we're looking for certain things.  You know, if | 09:51:19AM |
| 20 | they have no schooling, we're looking for something totally | 09:51:21AM |
| 21 | different. | 09:51:24AM |
| 22 | So basically -- I am so sorry, my mind -- when I | 09:51:25AM |
| 23 | said the last thing I got off -- the question I'm answering | 09:51:33AM |
| 24 | is what?  Could you please ask that again? | 09:51:35AM |
| 25 | Q    Sure.  It was the manner in which leads were | 09:51:37AM |

Page 49

```
 1              MR. PAVONE:  Can we leave a space in the        10:13:38AM

 2    deposition to fill in some contact information for        10:13:39AM

 3    Mr. Chapman?                                              10:13:42AM

 4              MR. BARNES:  That's fine.                       10:13:44AM

 5              (Information Requested: _____       10:13:46AM

 6    _____) 10:13:46AM

 7    BY MR. PAVONE:                                            10:13:46AM

 8       Q    Okay.  Now, just to trace CSCA's history a little 10:13:46AM

 9    bit, you said that CSCA -- I think some of your paperwork 10:13:51AM

10    said that it was founded in 2006.                         10:13:54AM

11              Does that ring a bell for you?                  10:13:56AM

12       A    That's about right.                               10:14:04AM

13       Q    Right.                                            10:14:06AM

14              And I'll -- just to refresh your recollection   10:14:07AM

15    here --                                                   10:14:09AM

16       A    And to be clear here, when you're saying CSCA, the 10:14:11AM

17    concept of delivering better agents to consumers that would 10:14:14AM

18    have -- that thought, that gestation, would have started  10:14:19AM

19    then, yes.                                                10:14:23AM

20       Q    Okay.  Okay.  So looking at Bates 17, this is part 10:14:24AM

21    of, I think, that LinkedIn resume, you have Founder and CEO 10:14:29AM

22    of CSCA and -- is that accurate?                          10:14:37AM

23       A    Yes.                                              10:14:39AM

24       Q    All right.  But what was -- when you say CEO, I   10:14:40AM

25    guess at the time there wasn't really a company formed, was 10:14:44AM
```

                                                        Page 69

| | | |
|---|---|---|
| 1 | Q    "Yeah" is okay. | 10:15:39AM |
| 2 | Now, does CLI have -- do you have corporate | 10:15:43AM |
| 3 | records for CLI? | 10:15:46AM |
| 4 | A    Not anymore, no. | 10:15:48AM |
| 5 | Q    Okay.  What happened?  You tossed everything with | 10:15:50AM |
| 6 | respect to CLI? | 10:15:53AM |
| 7 | A    When I filed a bankruptcy I got rid of everything, | 10:15:53AM 8 |
| | uh-huh. | 10:15:56AM |
| 9 | Q    Okay.  Do you know when CLI was formed? | 10:15:57AM |
| 10 | A    No.  I'm going to guess -- I really don't know.  I | 10:16:05AM |
| 11 | don't remember.  It would have been in the mid-2000s | 10:16:10AM |
| 12 | probably, maybe 2003 or '4, something like that. | 10:16:12AM |
| 13 | Q    Fair enough. | 10:16:16AM |
| 14 | Was this, again, one of these companies that you | 10:16:18AM |
| 15 | form and you're wearing all hats? | 10:16:20AM |
| 16 | A    Any time I form a corporation, I wear all the | 10:16:24AM |
| 17 | hats. | 10:16:26AM |
| 18 | Q    Okay.  Was there anyone else you can name that | 10:16:27AM |
| 19 | was maybe not one of the hats -- and I use the term, you | 10:16:31AM |
| 20 | know, figuratively, of course -- | 10:16:34AM |
| 21 | A    Yeah. | 10:16:35AM |
| 22 | Q    -- that was regularly involved in the business? | 10:16:37AM |
| 23 | A    Not that was an employee, no.  CLI was for -- it | 10:16:40AM |
| 24 | was for a specific use.  I do speaking and things like that | 10:16:44AM |
| 25 | and creating that kind of stuff -- well, the name | 10:16:49AM |

Page 71

| | | | |
|---|---|---|---|
| 1 | Q | Uh-huh.  Okay.  Let's see. | 11:14:30AM |
| 2 | | In terms of the -- was stock issued in any of the | 11:14:41AM |
| 3 | | corporations?  I guess we can start with Credentialed | 11:14:46AM |
| 4 | | Learning Institute.  Was there stock issued with -- | 11:14:50AM |
| 5 | A | We can go fast with all of them.  All of them are | 11:14:52AM |
| 6 | | in my name. | 11:14:54AM |
| 7 | Q | All of them are 100 percent you? | 11:14:56AM |
| 8 | A | Yes. | 11:14:57AM |
| 9 | Q | Okay.  So that would include, just for the record, | 11:14:57AM |
| 10 | | CLI, PVRI, PRCI -- correct me -- stop me if I am wrong. | 11:14:59AM |
| 11 | A | Uh-huh. | 11:15:06AM |
| 12 | Q | Okay.  So it is all the same? | 11:15:06AM |
| 13 | | Is PVRI still actively doing business? | 11:15:13AM |
| 14 | A | No. | 11:15:16AM |
| 15 | Q | When did you stop business operations for PVRI? | 11:15:17AM |
| 16 | A | Winding it down through 2012 with the -- all the | 11:15:23AM |
| 17 | | new launch for real estate and the new CSCA stuff is all | 11:15:27AM |
| 18 | | for 2013. | 11:15:31AM |
| 19 | Q | Right. | 11:15:33AM |
| 20 | | So have you shut down your real estate practice? | 11:15:35AM |
| 21 | A | That's not the question you asked me. | 11:15:40AM |
| 22 | Q | Understood. | 11:15:42AM |
| 23 | A | No.  My real estate practice is very much in | 11:15:43AM |
| 24 | | operation. | 11:15:46AM |
| 25 | Q | Okay.  What corporation is it under? | 11:15:46AM |

Page 114

```
 1         A    Orange County -- well, it's              11:15:49AM

 2   OrangeCountyRealEstate.com, but that's under OCRE, comma,   11:15:50AM

 3   Inc.                                                11:15:57AM

 4         Q    OC- --                                   11:15:57AM

 5         A    OCRE, comma, Inc.                        11:15:59AM

 6         Q    Comma, Inc.  Okay.                       11:16:00AM

 7              Have you filed and incorporated that?    11:16:01AM

 8         A    Yes.                                     11:16:02AM

 9         Q    Okay.  So PVRI is out of business?       11:16:04AM

10         A    I apologize.  My hesitation is I am not used to   11:16:08AM

11   using those initials.  And I never put the "I" in it.   11:16:12AM

12         Q    Okay.                                    11:16:15AM

13         A    Pacific Valley Realty is no longer in business.   11:16:16AM

14   Pacific Valley Realty, Incorporated is no longer in   11:16:18AM

15   business.                                           11:16:21AM

16         Q    Okay.                                    11:16:22AM

17         A    Bank accounts closed, everything.        11:16:23AM

18         Q    Okay.                                    11:16:24AM

19         A    It's gone.  And neither is any of the others.  The   11:16:25AM

20   only two operations are OCRE, Inc. dba Pacific Valley   11:16:27AM

21   Realty and I think another dba.  And then PRC has the dba   11:16:32AM

22   of CSCA and all that.                               11:16:38AM

23         Q    Uh-huh.                                  11:16:42AM

24              Is there any difference -- I mean, other than the   11:16:43AM

25   name has changed, is there any difference between your real   11:16:43AM
```

Page 115

```
 1    estate practice, whether it was under PVR or now, I guess    11:16:47AM

 2    it is, under OCRE?                                           11:16:50AM

 3        A    Yeah, there's a lot of difference.  You need to be 11:16:53AM

 4    more specific with your question.                            11:16:56AM

 5        Q    Fair enough.                                        11:16:57AM

 6             I mean, both essentially are the corporate vehicle  11:16:58AM

 7    by which you practice, you know, your trade as a real        11:17:04AM

 8    estate broker.  Other than that?                             11:17:09AM

 9        A    Yes and no.  The categorical answer on both of      11:17:11AM

10    them is it became so -- I think I mentioned to you earlier   11:17:16AM

11    that there were predecessor corporations to -- not           11:17:22AM

12    predecessor corporations -- predecessor names.  The          11:17:25AM

13    corporations might have began as one, two, three and then a  11:17:28AM

14    few years later I used it for four, five, six.               11:17:32AM

15             And then I decided, yeah, that can go into bubble   11:17:35AM

16    gum.  And these are all for examples.  I wasn't really in    11:17:38AM

17    bubble gum.  But for different purposes.                     11:17:41AM

18             So I -- because the 2013 version, which is a        11:17:44AM

19    totally different version of PRC, that was going to be       11:17:49AM

20    launched January 2013, now it won't be launched until 2014, 11:17:55AM

21    I just wanted a clean company because it was so convoluted   11:18:00AM

22    with all of the old stuff.  And so we -- I created a new     11:18:04AM

23    clean company for it, because it is going to involve new     11:18:09AM

24    people, new everything.  I'm the only common denominator     11:18:12AM

25    with it.                                                     11:18:15AM
```

Page 116

```
 1              On the real estate company it is kind of the same  11:18:17AM

 2    story.  It started -- it was used for different things.   11:18:20AM

 3    And then finally -- my, gosh, Century 21 had passed the one  11:18:22AM

 4    time my personal stuff, and it was just time to start anew,  11:18:26AM

 5    because I wanted to go into the electronics side of it.  So  11:18:31AM

 6    I wanted to get the corporations that had leases and all of  11:18:35AM

 7    that kind of stuff, all of the baggage from before, I just   11:18:39AM

 8    decided it was better just to start clean, because the       11:18:42AM

 9    direction I wanted to go was OrangeCountyRealEstate.com.      11:18:45AM

10    And so I wanted to create a new corporation for that, which  11:18:48AM

11    is what I did.                                               11:18:51AM

12        Q    Okay.  Did Pacific Valley Real Estate have a lot    11:18:53AM

13    of creditors?  It was under water, I take it?               11:18:58AM

14              MR. BARNES:  Objection.  Assumes facts not in      11:19:00AM

15    evidence.                                                    11:19:02AM

16              You may answer.                                    11:19:02AM

17              THE WITNESS:  I don't remember.                    11:19:03AM

18    BY MR. PAVONE:                                               11:19:04AM

19        Q    Okay.  One thing I got from your answer -- you      11:19:04AM

20    said a lot, so forgive me if I didn't process all of it      11:19:08AM

21    perfectly.                                                   11:19:13AM

22              Well, one thing I inferred was that Pacific Valley 11:19:14AM

23    had, I don't know, a number of debts and you wanted to just  11:19:17AM

24    start a clean corporation to --                             11:19:22AM

25              MR. BARNES:  Give me a chance.                    11:19:26AM
```

Page 117

| | | |
|---|---|---|
| 1 | THE WITNESS:  Go ahead. | 11:19:27AM |
| 2 | MR. BARNES:  Wait until he's finished.  Objection. | 11:19:28AM |
| 3 | Misstates prior testimony. | 11:19:31AM |
| 4 | You may answer. | 11:19:31AM |
| 5 | THE WITNESS:  No, I think that's a gross | 11:19:32AM |
| 6 | miscalculation of it. | 11:19:34AM |
| 7 | BY MR. PAVONE: | 11:19:36AM |
| 8 | Q    All right.  Well, what was -- what was so | 11:19:36AM |
| 9 | necessary about starting a new corporation if it wasn't | 11:19:41AM |
| 10 | for, you know, concern about creditors? | 11:19:44AM |
| 11 | A    Past employees or past agents, past -- just the | 11:19:49AM |
| 12 | past four years of a very bad real estate market and I | 11:19:53AM |
| 13 | wanted to start clean with it. | 11:19:56AM |
| 14 | Q    When you say start clean, what's not clean about | 11:19:58AM |
| 15 | the way -- when you say employees -- | 11:20:02AM |
| 16 | A    New people -- new people, new -- get rid of all of | 11:20:04AM |
| 17 | the old people, get new people, change the way we were | 11:20:07AM |
| 18 | marketing.  Instead of a traditional office with desks and | 11:20:10AM |
| 19 | things that you walk into, go more virtual and more into | 11:20:13AM |
| 20 | the OrangeCountyRealEstate.com era. | 11:20:18AM |
| 21 | Q    You said that the starting of OCRE was not going | 11:20:21AM |
| 22 | to start until 2014? | 11:20:27AM |
| 23 | A    '13.  Well -- | 11:20:30AM |
| 24 | Q    Go ahead. | 11:20:32AM |
| 25 | A    Okay.  OCRE I have to keep that going.  OCRE, Inc. | 11:20:33AM |

Page 118

| | | |
|---|---|---|
| 1 | feeling of somebody dropped the ball and he didn't get the | 11:38:36AM |
| 2 | attention he was supposed to get, I did put a rush on this. | 11:38:39AM |
| 3 | So what normally would have taken about a week took about | 11:38:42AM |
| 4 | three days -- probably two to three days. | 11:38:45AM |
| 5 | Q    Okay. | 11:38:47AM |
| 6 | A    So then Florida would have sent me this along with | 11:38:48AM |
| 7 | the assessment test.  And I get it in my hands.  So that's | 11:38:51AM |
| 8 | where we are right there. | 11:38:53AM |
| 9 | Q    When you say Florida, who in Florida are you | 11:38:55AM |
| 10 | dealing with?  Is that Ali Merre? | 11:38:58AM |
| 11 | A    Right. | 11:39:02AM |
| 12 | Q    Does she maintain an office there? | 11:39:02AM |
| 13 | A    In her home. | 11:39:04AM |
| 14 | Q    Okay.  And I also notice there was no contact | 11:39:10AM |
| 15 | information in the written discovery.  Is there some | 11:39:12AM |
| 16 | contact information for her? | 11:39:16AM |
| 17 | A    Well, through the office. | 11:39:17AM |
| 18 | Q    Through CSCA? | 11:39:22AM |
| 19 | A    Through CSCA, yeah. | 11:39:24AM |
| 20 | Q    Right. | 11:39:26AM |
| 21 | But -- well, will you agree to -- I don't know -- | 11:39:26AM |
| 22 | to make her available or something if I -- | 11:39:30AM |
| 23 | A    She's my niece.  You may not want to talk to her. | 11:39:32AM |
| 24 | I don't know.  But she's got a big call center background | 11:39:36AM |
| 25 | and stuff like that, so she's perfect for this job. | 11:39:40AM |

Page 132

```
 1   was by the time he left on the first night, instead of when   01:20:38PM

 2   we greeted -- we greeted with a handshake, and when he left   01:20:43PM

 3   he hugged me goodbye.                                         01:20:47PM

 4       Q    Okay.  So --                                        01:20:49PM

 5       A    But I wouldn't call that sexual, because I'm a      01:20:50PM

 6   hugger.  I hug people all the time.  So I didn't interpret    01:20:53PM

 7   it as sexual at that time.                                   01:20:56PM

 8       Q    Right.  Okay.                                       01:20:58PM

 9            And, I guess, to interrupt that thought, when --    01:21:00PM

10   what was the plan for him?  I mean, you had a couple of      01:21:06PM

11   different placement ideas?                                   01:21:08PM

12       A    Uh-huh.                                             01:21:10PM

13       Q    Okay.  Could you fill those out?                    01:21:10PM

14       A    Well, with a backdrop of his assessments just      01:21:13PM

15   being off the top, he really had his choice of anything     01:21:18PM

16   that he wanted to do.  And I had two viable ways of going    01:21:22PM

17   and a third possibility.                                     01:21:30PM

18            The first was, of course, what did he apply for in  01:21:34PM

19   the first place, which was to -- he contacted the talent     01:21:38PM

20   acquisition company, CSCA, to be placed for a job.  So if    01:21:41PM

21   he fit the criteria, I had an option to flip him to a        01:21:47PM

22   broker that we had a contract with, like a First Team.  And  01:21:51PM

23   he could go over there and that would have been one of his   01:21:55PM

24   options.                                                     01:21:58PM

25            The downfall he had with that option is while CSCA  01:21:58PM
```

```
 1   doesn't charge anything for its services, our fees are all    01:22:02PM

 2   paid by our client.  And our client is not Fernando, our      01:22:06PM

 3   client would be the First Team.  So our fees are paid by       01:22:08PM

 4   them.  I began to tell him that I can get you over there       01:22:12PM

 5   right away, but it is going to be about a six-month            01:22:20PM

 6   process, because you've got to get -- your license is going    01:22:23PM

 7   to take about three months and then they have got a           01:22:26PM

 8   three-month training program.  And there will be costs        01:22:28PM

 9   associated with that.  In other words, First Team charges      01:22:33PM

10   to put you through licensing school and things like that.      01:22:37PM

11           So -- what was I answering?  I'm sorry, the           01:22:43PM

12   question -- what were you asking me again?                    01:22:45PM

13       Q    You were filling out the different options --        01:22:49PM

14       A    Oh, yeah, his options.  So that was one option to    01:22:51PM

15   just do exactly what he showed up for.  And if you want to     01:22:53PM

16   be in real estate, this is what it is going to take to do      01:22:57PM

17   it.                                                           01:23:00PM

18           And by the way, a lot of the conversation probably   01:23:00PM

19   did -- I would say a lot of that first third and almost all   01:23:03PM

20   of the second third in the conversation did apply to          01:23:07PM

21   business.  He wanted to know what it took to be a realtor      01:23:11PM

22   and, you know, the DNA for all of that.                       01:23:14PM

23       Q    Uh-huh.                                             01:23:18PM

24       A    So -- anyhow, that was Option 1.                     01:23:18PM

25           Option 2 was, I would have proudly had him to be      01:23:21PM
```

Page 168

1    part of the PRC project, the CSCA project, as you know it,    01:23:25PM

2    but with PRC, because I had the East Coast covered with    01:23:30PM

3    Ali, but I would have loved to have somebody on the West    01:23:35PM

4    Coast in 2013.  So I thought he could be kind of morphed    01:23:41PM

5    into that.  Then -- those were basically his two.    01:23:45PM

6                At that seating -- I mean, on that Saturday, those    01:23:50PM

7    were the two choices.  And floated out there was -- but    01:23:53PM

8    none of this is really open yet.  It's not going to be open    01:23:57PM

9    until 2013.  And I said, that leaves the only option is to    01:24:00PM

10    kind of be my assistant or something like that if we can    01:24:04PM

11    even find a place for you.  So those were his options.    01:24:07PM

12        Q    Okay.  At the time that Fernando was considering    01:24:12PM

13    these options or you were discussing them with him, had you    01:24:18PM

14    ever sent anyone to First Team?    01:24:22PM

15        A    Oh, yeah.    01:24:26PM

16        Q    Can you estimate how many referrals you had made    01:24:27PM

17    to First Team by that time?    01:24:31PM

18        A    No.    01:24:33PM

19        Q    Less than 50?    01:24:34PM

20        A    I'll go along with that number, yeah.    01:24:35PM

21        Q    Less than 50?    01:24:37PM

22        A    Uh-huh.    01:24:38PM

23        Q    Okay.  And those are transmitted by that package    01:24:38PM

24    method we talked about -- you discussed earlier in the --    01:24:43PM

25        A    Well, again, it grew.  I mean, it began with, hey,    01:24:46PM

Page 169

```
 1        A    I mean, there's a corporate central thing that      01:27:14PM

 2   owns everything, but --                                       01:27:16PM

 3        Q    All right.  Well, on that kind of business model     01:27:17PM

 4   was there a particular job available for a particular real     01:27:21PM

 5   estate office?                                                 01:27:25PM

 6        A    If you're licensed.  If you're licensed.  In his     01:27:25PM

 7   case he was unlicensed, which was the point of contention.     01:27:29PM

 8        Q    Right.                                               01:27:32PM

 9        A    So he would have gone to their central office and    01:27:34PM

10   first gone through licensing this and then they place him      01:27:36PM

11   wherever.  I mean, I am not part -- I am not involved with     01:27:40PM

12   that part of it.                                               01:27:43PM

13        Q    Uh-huh.                                              01:27:44PM

14        A    They have all of that centralized to their          01:27:44PM

15   training and licensing schools.  It's all centralized.        01:27:46PM

16        Q    Okay.  Are you aware of anyone that came through    01:27:49PM

17   CSCA that became an intern with First Team?                   01:27:53PM

18        A    You've asked that question before.  I don't        01:28:00PM

19   remember.  I don't -- I never had anything -- I had no --     01:28:02PM

20   what would you call it?  I didn't have enough of an           01:28:06PM

21   emotional connection to know anybody.  It was a matter of     01:28:10PM

22   flipping information.  And a lot of it went directly from      01:28:13PM

23   Florida to First Team.  I didn't deal with those people.      01:28:16PM

24   My -- 80 percent of my involvement with everything was        01:28:19PM

25   creation of it all.                                           01:28:23PM
```

                                                        Page 172

1     Q    Okay.   Well, to your understanding of the job with   01:28:25PM

2  First Team, I understand that they prefer a person to be   01:28:32PM

3  licensed, but is there an intern position that's -- that   01:28:36PM

4  involves, you know, compensation as an employee while the   01:28:41PM

5  person is getting licensed?   01:28:44PM

6          MR. BARNES:   Objection.   Calls for speculation.   01:28:46PM

7          You may answer.   01:28:47PM

8          THE WITNESS:   Everybody is different.   Everybody   01:28:48PM

9  has a different program.   But in this case here if you get   01:28:49PM

10  a license -- if you have the license, it is more apt to   01:28:54PM

11  have programs where there is some sort of a minimal this or   01:28:59PM

12  that or something.   But a lot of times it is for free too.   01:29:04PM

13          I mean, I have had -- over the years I have had   01:29:07PM

14  many people that are willing -- you know, that they work   01:29:10PM

15  for free just to learn the business and then kind of go   01:29:14PM

16  from there with it.   01:29:17PM

17  BY MR. PAVONE:   01:29:19PM

18     Q    And once again, did you have a particular broker   01:29:19PM

19  in mind in the First Team hierarchy that you were going to   01:29:23PM

20  refer Fernando to or was it just generally to First Team's,   01:29:27PM

21  you know, corporate center or whatever?   01:29:31PM

22     A    Again, there is not -- I don't have a relationship   01:29:34PM

23  with their 60 offices or 30 offices.   My relationship is   01:29:36PM

24  with their corporate hiring center.   That's what I deal   01:29:40PM

25  with.   01:29:43PM

Page 173

```
 1    understanding you correctly, that he ended up working for      01:31:22PM

 2    you personally is because the CSCA project wasn't going to     01:31:25PM

 3    start punitively until 2013.  First Team required a lot        01:31:31PM

 4    of -- let's call it administrative workup, for lack of a       01:31:36PM

 5    better term.                                                   01:31:40PM

 6         A    No.  I think a better word is a license.  Yeah.      01:31:40PM

 7         Q    It required a license --                            01:31:43PM

 8         A    Which he didn't have the money to get.              01:31:45PM

 9         Q    Okay.  So you offered him employment as a personal  01:31:47PM

10    assistant; is that fair?                                      01:31:55PM

11         A    Well, that was after much going back and forth.     01:31:59PM

12    That was with two weeks going back and forth, how can we      01:32:01PM

13    make this work, because I want you in 2013 to be part of my   01:32:04PM

14    operations.  So we spent two weeks trying to figure out how   01:32:08PM

15    I could get money to him.  And those conversations also       01:32:12PM

16    included me processing how can I do it without -- I mean, I   01:32:14PM

17    didn't want any new employees.  I didn't have any need for    01:32:19PM

18    him to be an employee or anything else.  And the only thing   01:32:22PM

19    that I could have used a little bit of help with was my       01:32:26PM

20    real estate side.                                             01:32:30PM

21              There was nothing for him to do with CSCA yet.      01:32:31PM

22    And also, I might add, the real estate industry begins to     01:32:34PM

23    die around mid-October, late October, and so November,        01:32:38PM

24    December, January are our lowest points of the year.  So I    01:32:42PM

25    took this young boy along for -- when I had no reason -- I     01:32:45PM
```

Page 175

```
 1    had nothing -- he was the one that wanted the money.     01:32:52PM

 2    Q    Uh-huh.  Uh-huh.  All right.                         01:32:55PM

 3         So that two-week period that you mentioned, would    01:33:01PM

 4    that be the two weeks from like September 15th to September 01:33:04PM

 5    30th?  Can we ballpark that there?  Or what would be the -- 01:33:08PM

 6    A    Yeah, I think that's fair.                           01:33:11PM

 7    Q    Okay.                                                01:33:13PM

 8    A    Yes, I think that's fair.                            01:33:13PM

 9    Q    So that would be the first -- out of the total of    01:33:16PM

10    one month of employment, that would be the first half of   01:33:18PM

11    it?                                                       01:33:21PM

12    A    Actually, no.  Excuse me.  You said between the      01:33:22PM

13    middle of September and the first of October?             01:33:25PM

14    Q    Right.                                               01:33:27PM

15    A    No.  It would be from the first of September to      01:33:27PM

16    the middle of September.  I didn't pay him any money until 01:33:29PM

17    I knew what the deal was going to be.  Unless you asked the 01:33:32PM

18    question differently, I may have misheard you.            01:33:36PM

19    Q    I thought -- well, I thought September 1st -- I      01:33:40PM

20    thought you didn't even really meet until September 9.    01:33:43PM

21    A    We met -- whenever our first meeting -- I'm not      01:33:47PM

22    sure when that was, but all the -- but it would be --     01:33:51PM

23         May I ask you to read back his question?  Because    01:33:54PM

24    I don't remember the question.  It would be before he was 01:33:57PM

25    paid money, though.                                       01:34:00PM
```

Page 176

| | | |
|---|---|---|
| 1 | Q    Okay.  All right.  So you're saying you hand | 03:13:37PM |
| 2 | select the very best brokerages across the nation; right? | 03:13:39PM |
| 3 | A    Uh-huh. | 03:13:43PM |
| 4 | Q    Had you -- which ones had you hand selected at the | 03:13:44PM |
| 5 | time? | 03:13:49PM |
| 6 | A    Only First Team at this point, because we're in an | 03:13:49PM |
| 7 | R&D stage. | 03:13:52PM |
| 8 | Q    Okay.  And was there something about First Team | 03:13:54PM |
| 9 | that made it the very best in the nation? | 03:13:57PM |
| 10 | A    Yeah, they're Number 7 nationwide out of probably | 03:14:01PM |
| 11 | close to 500,000 brokerages.  They're Number 7. | 03:14:04PM |
| 12 | Q    What is that based on?  Sales or size or what? | 03:14:07PM |
| 13 | A    Industry placement.  We have a ranking system | 03:14:11PM |
| 14 | within the industry. | 03:14:15PM |
| 15 | Q    Is there a name for who does those rankings? | 03:14:18PM |
| 16 | A    I'm sure.  I don't remember who it is right now. | 03:14:22PM |
| 17 | Q    Okay.  Now, you say "We hand select these | 03:14:26PM |
| 18 | brokerages on the basis they have met our stringent | 03:14:33PM |
| 19 | standards." | 03:14:37PM |
| 20 | A    Uh-huh. | 03:14:37PM |
| 21 | Q    Okay.  Now, whose standards are those?  Meaning | 03:14:38PM |
| 22 | where does that come from? | 03:14:41PM |
| 23 | A    Well, it begins with me.  And then it begins with | 03:14:44PM |
| 24 | what I and the -- without getting into detail on the model | 03:14:46PM |
| 25 | of how PRC is set up and PRC sets those standards, but | 03:14:52PM |

Page 250

```
 1    currently, since I am 90 percent PRC, I set those     03:14:57PM
 2    standards.                                            03:15:01PM
 3        Q    Okay.  Are those standards written?          03:15:01PM
 4        A    Not formally probably at this point.  It will be  03:15:08PM
 5    when we launch it.  They've changed so much, I have used  03:15:10PM
 6    the word -- I have used delete over too many times it has  03:15:15PM
 7    to be -- we keep updating it.                          03:15:19PM
 8        Q    You keep updating it?                         03:15:21PM
 9        A    Yeah, we update everything.  Again, as I said,  03:15:23PM
10    because we're in an R&D stage, we do one thing, then we  03:15:25PM
11    take a week and analyze it.  We see what we're doing.  We  03:15:29PM
12    see what works and what doesn't work.  So everything is  03:15:33PM
13    being updated.  So it was all in a very fluid state.   03:15:36PM
14        Q    Okay.  Turning to the next sentence, "In fact, the  03:15:40PM
15    elite brokerages are members of our network."         03:15:42PM
16             What network is that?  I mean, who is included in  03:15:45PM
17    that network?  Maybe that's a better way to put it.   03:15:52PM
18        A    As we assign brokerages to become the -- well,  03:15:54PM
19    CSCA only works with one brokerage in each community.  03:15:58PM
20    Maybe that is what you're looking for.  So therefore, as  03:16:01PM
21    brokerages affiliate with us, they would become -- and by  03:16:06PM
22    the way, a brokerage doesn't apply to us.  We actually  03:16:12PM
23    invite them to join us.  It will be what the business model  03:16:15PM
24    is with it.                                            03:16:19PM
25        Q    Right.                                        03:16:20PM
```

Page 251

```
 1    that.                                              03:25:32PM

 2         Q    Okay.  So PRC possesses this information that  03:25:33PM

 3    would, let's say, underlie --                      03:25:36PM

 4         A    Kind of in a draft form, because, again, we use  03:25:39PM

 5    it, we throw it away and we try something else.  But, yeah,  03:25:42PM

 6    that's always been going on as part of everything else that  03:25:46PM

 7    we do.                                             03:25:49PM

 8              I'm not sure if I mentioned to you, but we -- this  03:25:50PM

 9    thing here, as a result of all of this, what has come out  03:25:54PM

10    is we now have -- we're delivering a ready-to-go agent.  So  03:25:57PM

11    instead of First Team now putting them through -- for  03:26:02PM

12    instance, if I met Fernando today, the program would be  03:26:06PM

13    very -- a little bit different in that we would put him  03:26:08PM

14    through the school and everything and deliver him to First  03:26:11PM

15    Team ready to go.                                  03:26:14PM

16         Q    Okay.  The training program used by our brokerages  03:26:17PM

17    is worth thousands of successful careers that are launched.  03:26:23PM

18              Do you have any paperwork that corroborates the  03:26:26PM

19    idea that thousands of successful careers have been  03:26:31PM

20    launched from the training program?                03:26:34PM

21         A    Of course, I don't have that type of paperwork.  03:26:35PM

22    However, Century 21 has had probably 3- or 400,000 agents  03:26:38PM

23    over the years.  RE/MAX has had many.  Coldwell Banker.  03:26:44PM

24    And basically because I own those franchises, I have been  03:26:47PM

25    exposed to all of those programs, along with independent  03:26:51PM
```

                                                    Page 258

```
 1    industry gurus that I have their programs.  And basically    03:26:56PM

 2    we took a lot of -- what a lot of those people had and        03:27:01PM

 3    updated it to the I generation.  And that's where all of      03:27:05PM

 4    this came from.                                               03:27:10PM

 5            So, in other words, everything that we do is just     03:27:11PM

 6    taken from the best of the best from everybody else.          03:27:13PM

 7    Q     Okay.  Also, the pictures below it, where did you       03:27:17PM

 8    obtain those pictures?                                        03:27:20PM

 9    A     They're stock photos.                                   03:27:21PM

10    Q     Stock photos, what do you -- my question is where       03:27:25PM

11    did you get them?                                             03:27:31PM

12    A     I have no earthly idea.  I mean, the website            03:27:34PM

13    people give me photos to choose from.  I tell them what I'm   03:27:37PM

14    looking for, and then they send me some to select.  So I      03:27:41PM

15    don't know what they call it, stock photo bucket or           03:27:45PM

16    something like that.  There's different ones.  I don't        03:27:49PM

17    know.                                                         03:27:51PM

18    Q     Okay.  Who is the website people?                       03:27:51PM

19    A     It's a company in India that did this one.              03:27:55PM

20    Q     I'm sorry?                                              03:27:58PM

21    A     It's a company in India that did this one.              03:27:59PM

22    Q     India?                                                  03:28:01PM

23    A     Uh-huh.                                                 03:28:02PM

24    Q     Does it have -- do you have a webmaster or website      03:28:03PM

25    designer?                                                     03:28:09PM
```

Page 259

```
 1        A    Not on me, no.  His name is Prontop, I know that.  03:28:09PM

 2   You're talking about quite a long time ago with this.      03:28:16PM

 3        Q    We're talking about a year ago.                   03:28:18PM

 4        A    Yeah.                                             03:28:20PM

 5        Q    Not that long ago.                                03:28:22PM

 6        A    But I don't deal with the person on an hourly     03:28:23PM

 7   basis anymore.  Like this ship has sailed.  Now all we do   03:28:26PM

 8   is update it and stuff.                                     03:28:30PM

 9        Q    Okay.  Let's see, let's try 16 here.  Try our     03:28:32PM

10   internship program.                                        03:28:44PM

11        A    Uh-huh.                                           03:28:46PM

12        Q    Okay.  Now, can you tell me a little bit about    03:28:47PM

13   that?                                                       03:28:49PM

14        A    Well, what would you like to know about it?       03:28:52PM

15        Q    How many people have passed through it?           03:28:55PM

16        A    Nobody has applied for it.                        03:28:58PM

17        Q    Okay.                                             03:29:01PM

18        A    It requires written -- I don't know if you have it 03:29:02PM

19   on here or if you have the site, but on the site on the    03:29:05PM

20   left-hand side it says "Guarantee."                        03:29:09PM

21        Q    Uh-huh.                                           03:29:10PM

22        A    And if you read that, it says that would have to  03:29:10PM

23   be in writing.  And then the same thing here.  And the     03:29:12PM

24   reason for that, Ben, is because every brokerage is        03:29:17PM

25   different.  Each is independently owned and operated.  Some 03:29:21PM
```

Page 260

```
 1    corporate -- corporation is a we.  I don't usually say "I"
03:33:55PM

 2    when I talk about the corporation.  So I usually talk about   03:33:59PM

 3    it as either an it or a we.                                    03:34:01PM

 4        Q    All right.  So the corporation has done some          03:34:04PM

 5    growing, is that an accurate understanding of that phrase?     03:34:06PM

 6        A    More specifically, CSCA.  And what we're doing is     03:34:09PM

 7    filing out of the off the shelf, sitting dormant for a year    03:34:13PM

 8    and a half, and we've begun to do something.  We signed up     03:34:18PM

 9    First Team.  We're beginning to make progress.                 03:34:21PM

10        Q    Uh-huh.  Okay.  Turning you to 22.  All right.        03:34:23PM

11    Let's go to 21.  We make news.                                 03:34:35PM

12             Okay.  Has CSCA been in the news?                     03:34:40PM

13        A    No, not yet.  We have a place in the articles on      03:34:44PM

14    us there.  These are other articles on two other things, I     03:34:47PM

15    believe.  That's the title of this page, though.  As we get    03:34:50PM

16    news to present on PRC directly, it would appear on this       03:34:55PM

17    page.                                                          03:34:59PM

18        Q    Okay.  Announcing -- 22, announcing the 2012 class    03:35:01PM

19    of 30 under 30.                                                03:35:06PM

20        A    That's NAR.  National Association of Realtors does    03:35:07PM

21    that every year.  That's an article that supports what         03:35:10PM

22    we're doing.  And the one below that, Kendra, that is a --     03:35:12PM

23    she's not with us, but she is an example of a 26-year-old      03:35:19PM

24    that went on to win the apprentice and was a very good         03:35:23PM

25    agent.  The whole purpose of this page to let somebody in      03:35:27PM
```

Page 264

| | | | |
|---|---|---|---|
| 1 | A | Uh-huh. | 03:41:00PM |
| 2 | Q | And you have told me that that's -- well, first, I | 03:41:01PM |
| 3 | | guess we should establish this between us.  CSCA doesn't | 03:41:04PM |
| 4 | | actually have its own class of 30 under 30? | 03:41:09PM |
| 5 | A | Not at all. | 03:41:12PM |
| 6 | Q | Okay.  And neither Donald Trump nor Kendra Todd | 03:41:13PM |
| 7 | | have any relationship with CSCA? | 03:41:16PM |
| 8 | A | Not at all. | 03:41:17PM |
| 9 | Q | What you're referring to is -- | 03:41:20PM |
| 10 | A | Potential.  In other words, if you have nothing | 03:41:23PM |
| 11 | | and you're just starting, here's people that are in your | 03:41:26PM |
| 12 | | age group that made it, so can you. | 03:41:28PM |
| 13 | Q | Okay. | 03:41:31PM |
| 14 | A | That's the message. | 03:41:31PM |
| 15 | Q | All right.  But you referred me to the fact that | 03:41:32PM |
| 16 | | this announcing language is actually a link that refers to | 03:41:35PM |
| 17 | | NAR's class of 30 under 30; right? | 03:41:41PM |
| 18 | A | Correct. | 03:41:45PM |
| 19 | Q | And NAR is a professional organization for | 03:41:46PM |
| 20 | | realtors? | 03:41:49PM |
| 21 | A | Correct. | 03:41:50PM |
| 22 | Q | Right? | 03:41:50PM |
| 23 | | And NAR has no business relationship with CSCA; | 03:41:51PM |
| 24 | | correct? | 03:41:55PM |
| 25 | A | No. | 03:41:55PM |

Page 266

```
 1    is the consumer facing side.  That's why there's two      03:43:24PM

 2    differences there.                                         03:43:27PM

 3         Q    Okay.  I'll turn you to 25.  I know that's kind of 03:43:28PM

 4    small for you.  I have seem to have lost -- hold on.       03:43:43PM

 5         A    I can read it.                                   03:43:46PM

 6         Q    Oh, you can read it?                             03:43:47PM

 7         A    Are you talking about where it says what cases   03:43:48PM

 8    are -- what can you earn, I guess it is?                   03:43:50PM

 9         Q    Yeah.                                            03:43:54PM

10         A    Okay.  Uh-huh.                                   03:43:55PM

11         Q    What can you earn, just to read the language, in 03:43:55PM

12    typically about six months after a brokerage helps you     03:43:58PM

13    become licensed, unless you are already licensed --        03:44:01PM

14              THE REPORTER:  Could you -- because I don't have  03:44:10PM

15    the document --                                            03:44:10PM

16              MR. PAVONE:  I'm sorry.  Sure.                    03:44:10PM

17    BY MR. PAVONE:                                             03:44:10PM

18         Q    About six months after our brokerage helps you   03:44:10PM

19    become licensed, unless you are already licensed, on the   03:44:13PM

20    sale of homes around 225,000, you can expect to earn       03:44:16PM

21    between 45,000 and 65,000 in your first year, more         03:44:21PM

22    communities with higher real estate values, and can double 03:44:28PM

23    that in your second year.                                  03:44:31PM

24              Okay.  My question is, do you have any documented 03:44:32PM

25    instances of persons that CSCA has taken through its system 03:44:38PM
```

Page 268

1    and to have then gone on to earn between 45- and 65,000 in    03:44:44PM

2    their first year?    03:44:49PM

3         A    My first answer, once again, is that we were in an    03:44:52PM

4    R&D stage.  A year hasn't even started yet with anybody.    03:44:56PM

5    The most anybody would have been anywhere is maybe for a    03:45:01PM

6    couple of months and they're not even out of their training    03:45:04PM

7    and licensing yet.  So the answer to your question is no.    03:45:07PM

8         Q    All right.    03:45:11PM

9              MR. BARNES:  Ben, sorry, I can't see on the    03:45:15PM

10    screen.  What's the Bates range?    03:45:17PM

11              MR. PAVONE:  Sure.  I'm sorry.    03:45:19PM

12              MR. BARNES:  Is it Statement 26?    03:45:22PM

13              MR. PAVONE:  That's where Stephen 25 is.  But I'll    03:45:22PM

14    throw in the entire lot of it.    03:45:26PM

15              MR. BARNES:  Okay.    03:45:28PM

16    BY MR. PAVONE:    03:45:34PM

17         Q    Okay.  Looking at Statement 26 --    03:45:34PM

18         A    And by the way, these numbers all came from that    03:45:37PM

19    example.  In other words, we just took the average price of    03:45:39PM

20    a home in America and did this math and came up with an    03:45:42PM

21    example.    03:45:46PM

22         Q    Okay.  And can I infer that you would give me a    03:45:46PM

23    similar answer for the second year?  In other words, the    03:45:50PM

24    statement is you can double that in your second year, which    03:45:54PM

25    would be, according to the numbers, 90,000 to 130,000, that    03:45:57PM

Page 269

```
 1    you don't have any documented instances of that because    03:46:02PM

 2    you're still in the R&D phase?                             03:46:04PM

 3        A    Well, I actually amended what I said.  CSCA does  03:46:07PM

 4    not -- I'm not sure when you say do I have.  I have as far 03:46:10PM

 5    as industry standards go.  But, no, with CSCA, no, it     03:46:14PM

 6    hasn't gotten to that point yet.  It is in the R&D stage. 03:46:17PM

 7        Q    Okay.  And, let's see, 26 refers to a brokerage --03:46:23PM

 8    a brokerage's management training program.                03:46:30PM

 9        A    Uh-huh.                                          03:46:33PM

10        Q    Is that, again, First Team's?                    03:46:33PM

11        A    Well, it's -- any brokerage has their own thing  03:46:36PM

12    and First Team has their own thing.                       03:46:40PM

13        Q    Okay.                                            03:46:42PM

14        A    And -- so an example, you had asked earlier about 03:46:42PM

15    what our criteria is, you know, for a brokerage to sign on. 03:46:45PM

16    This will be an example where it would come through.  We  03:46:48PM

17    want to know what their training is, and are they training 03:46:52PM

18    old school, new school, what are they doing.  And all of  03:46:55PM

19    that would be kind of a decision made on a per-case basis 03:46:59PM

20    on what that brokerage fell into, what category.          03:47:02PM

21        Q    Uh-huh.                                          03:47:06PM

22             27, our restart training program.  Is that one of 03:47:07PM

23    CSCA's/PRCI's?                                            03:47:16PM

24        A    Well, the training program is not.  However, what 03:47:21PM

25    this is is to let experienced agents know that if they want 03:47:23PM
```

Page 270

```
 1    to -- okay.  During the recession we lost an awful lot of        03:47:28PM

 2    agents.  Probably -- I don't even know how many.  Probably       03:47:33PM

 3    a third or half of the agents.  So we wanted to be sure to       03:47:36PM

 4    put out there that we also represent people that are             03:47:41PM

 5    licensed, experienced agents.  So that's what this is            03:47:44PM

 6    about.                                                           03:47:47PM

 7        Q    My question is this restart training program is a       03:47:49PM

 8    program from CSCA; correct?                                      03:47:53PM

 9        A    Well, that our brokerages would offer to the           03:47:55PM

10    people.  But we want our brokerages to be able to take an       03:47:58PM

11    existing -- in other words, we don't want our brokerages        03:48:01PM

12    just to take newbies.  We want them to take experienced,        03:48:03PM

13    newbies, and other people.  So in this case here, we're         03:48:07PM

14    talking about people that have experience.                      03:48:11PM

15        Q    I understand the philosophy in which you               03:48:14PM

16    reference.  What I'm asking is whose program is it.  You        03:48:16PM

17    say "our," so the reader --                                      03:48:19PM

18        A    It would be our brokerage.                             03:48:21PM

19        Q    Okay.  Your brokerage, not CSCA's; correct?            03:48:22PM

20        A    Yeah.  And honestly, if you read the site from        03:48:26PM

21    word one, like on my opening letter, I'm referring to          03:48:29PM

22    things interchangeably who we are and who the brokerages       03:48:32PM

23    are.  I spell all of that out on our company part of the       03:48:36PM

24    website.  Which if you put that in, that will make this all   03:48:39PM

25    have context.                                                   03:48:43PM
```

Page 271

| | | | |
|---|---|---|---|
| 1 | Q | Okay. | 03:52:11PM |
| 2 | A | Would you like to clean it up for her, because I | 03:52:12PM |
| 3 | | don't know what to tell her. | 03:52:16PM |
| 4 | Q | No. You captured enough of it. | 03:52:17PM |
| 5 | | Let's see. Now, we start with orientation and | 03:52:20PM |
| 6 | | classroom training, 28. Let's go back to the Bates | 03:52:23PM |
| 7 | | numbers. | 03:52:28PM |
| 8 | | All right. You have an orientation program? | 03:52:47PM |
| 9 | A | Our brokerages do, yes. | 03:52:56PM |
| 10 | Q | Okay. And classroom training is a part of -- | 03:52:58PM |
| 11 | | where does that come from? | 03:53:02PM |
| 12 | A | Our brokerages. In this case, First Team. | 03:53:04PM |
| 13 | Q | So First Team has classrooms? | 03:53:09PM |
| 14 | A | Uh-huh. Major. | 03:53:13PM |
| 15 | Q | Okay. Where are those located? | 03:53:15PM |
| 16 | A | At their corporate offices in Irvine. | 03:53:16PM |
| 17 | Q | So the "Frequently Asked Questions" is kind of the | 03:53:36PM |
| 18 | | same as it was on your current page, just if you want, we | 03:53:38PM |
| 19 | | can agree to that -- | 03:53:44PM |
| 20 | A | Yeah, it's the same. I didn't change that. But | 03:53:46PM |
| 21 | | what's changed is the current letter from me, the opening | 03:53:49PM |
| 22 | | letter. If you go to the website, my opening letter is | 03:53:53PM |
| 23 | | very different from the one that you have here. Not very, | 03:53:55PM |
| 24 | | but enough different. | 03:54:00PM |
| 25 | Q | Okay. So anyways, CSCA 29 statement, we are very | 03:54:01PM |

Page 274

```
 1    selective as to which brokerages with whom we choose to        03:54:16PM

 2    work.  Again, this is a reference to First Team?               03:54:19PM

 3        A    Well, it is a reference to anybody that's going to    03:54:24PM

 4    be a part of our party has to meet a certain criteria.         03:54:26PM

 5        Q    What would those criteria be?                         03:54:30PM

 6        A    Again, that is in formulation.  However, the          03:54:32PM

 7    criteria would be their standing.  In other words, we're       03:54:35PM

 8    not looking for somebody that just opened their doors,         03:54:38PM

 9    we're looking for established firms.  It might help you if     03:54:41PM

10    you understand that the whole thing with CSCA is to address    03:54:45PM

11    the aging asset problem of existing brokerages.  So aging      03:54:49PM

12    asset, if you recall this morning I mentioned the average      03:54:54PM

13    age of a realtor is 57 years old.  So in order for that to     03:54:57PM

14    be, these are all brokerages that are 20, 25, 30, 40 years     03:55:01PM

15    old.  And where they're at in their journey is they better     03:55:07PM

16    do something or else they'll find themselves closed up         03:55:12PM

17    because all of their assets are dying.  Their agents are,      03:55:15PM

18    you know, retiring, expiring, or whatever.  They're doing      03:55:18PM

19    nothing to backfill that.                                      03:55:21PM

20        Q    Okay.                                                 03:55:22PM

21        A    So that's our whole -- the reason you see this        03:55:22PM

22    whole thing weighted at 80 percent under 40 is because         03:55:26PM

23    we're trying to fix that problem that these brokerages         03:55:30PM

24    have.                                                          03:55:34PM

25        Q    Number 33, when will CSCA be visiting my campus?      03:55:35PM
```

Page 275

```
 1    Please check with your school's career services office for   03:55:42PM
 2    calendar events or simply e-mail us.                         03:55:46PM
 3        A    Uh-huh.                                             03:55:48PM
 4        Q    Has CSCA been to any campuses?                      03:55:49PM
 5        A    Well, not yet.  That's when we come out of the      03:55:52PM
 6    nationally -- now 2014, it's 2013.  But we do -- the         03:55:55PM
 7    person, though, that actually does the visit is not CSCA.    03:56:01PM
 8    It is going to be -- it's the person that does the hiring    03:56:04PM
 9    at the brokerage.                                            03:56:07PM
10            So like in this case, if there was such an event,    03:56:08PM
11    let's say, UCI or something like that, that would be a       03:56:11PM
12    representative of First Team that would host that.           03:56:15PM
13        Q    Okay.  So CSCA will not actually be visiting any    03:56:18PM
14    campuses?                                                    03:56:22PM
15        A    No.  No.  No.                                       03:56:23PM
16        Q    And then 34, should I apply on CSCA's website or    03:56:28PM
17    my school career's website?  Please apply to both postings.  03:56:31PM
18            Has CSCA posted anything on any school career        03:56:39PM
19    website?                                                     03:56:42PM
20        A    Not yet.  No.  That's why we say if CSCA does have  03:56:42PM
21    something posted on their website, that's fine, but apply    03:56:45PM
22    here.  In other words, the answer to your question is no.    03:56:49PM
23        Q    Okay.  Apply to more than one position, 35.         03:56:53PM
24        A    Uh-huh.                                             03:57:04PM
25        Q    Well, it's your 35.                                 03:57:06PM
```

Page 276

```
 1              What different positions are you referring to       03:57:08PM
 2     there?                                                       03:57:10PM
 3       A    We're not talking about different positions.         03:57:10PM
 4     We're talking about different places.  We don't want        03:57:12PM
 5     applicants coming in -- if you're in a lone area like       03:57:16PM
 6     Wyoming, the odds are we're going to have one brokerage in  03:57:19PM
 7     Cheyenne, this would not be an issue.  But in Southern      03:57:23PM
 8     California -- well, we've got so many other -- of one       03:57:29PM
 9     brand, let's just -- for our conversation purposes, let's   03:57:32PM
10     say that we had several different brokerages.  We don't     03:57:35PM
11     want them applying to all of these different places.  We    03:57:38PM
12     want them to run through us and then we will place them,    03:57:42PM
13     because it gets confusing.                                  03:57:45PM
14              Specially the ones that apply from out of town.    03:57:47PM
15     Like, you know, they're in school in Oklahoma and they're   03:57:50PM
16     not sure yet if they're going to live with their mother in  03:57:52PM
17     Florida or their father in California and they apply        03:57:54PM
18     everywhere and it just confuses our system.                 03:57:57PM
19       Q    Okay.  37, what happens --                          03:58:00PM
20       A    Can you roll it up?  I can't see --                 03:58:07PM
21       Q    I apologize.                                        03:58:09PM
22              Okay.  What happens during the interview process?  03:58:17PM
23     We meet you at a job fair or campus environment.           03:58:20PM
24              Again, this is not actually -- this has not       03:58:22PM
25     actually happened; right?                                   03:58:24PM
```

Page 277

```
 1        A    No.  No.   The -- the -- the -- the thing is in      03:58:26PM

 2   place, so when we do start that part of it, it would be the   03:58:29PM

 3   local person from XYZ Realty in Atlanta that would attend     03:58:34PM

 4   this.   We're not going to pay for personnel to be at         03:58:39PM

 5   campuses everywhere.                                          03:58:43PM

 6        Q    Uh-huh.  Got it.                                    03:58:45PM

 7        A    And it would only be the brokerage in the town of   03:58:45PM

 8   where that campus was.                                        03:58:47PM

 9        Q    Right.                                              03:58:49PM

10             Let's see -- 41.  To be clear, while CSCA           03:59:01PM

11   brokerage members represent all of the major national and    03:59:05PM

12   regional companies as well as local independents, hiring     03:59:08PM

13   qualifications are very different.                            03:59:14PM

14             So you're saying -- correct me if I'm wrong --      03:59:15PM

15   that CSCA brokerage members represent all of the major       03:59:19PM

16   national and regional companies; is that true?               03:59:22PM

17        A    Uh-huh.                                             03:59:25PM

18        Q    And can you explain how that's true?  I am not      03:59:25PM

19   really following what that means.                            03:59:28PM

20        A    Maybe a better way to word is we will do business   03:59:30PM

21   with all brands.  We're not just with Century 21 or not      03:59:33PM

22   just with Prudential or not just with an independent.        03:59:36PM

23        Q    Uh-huh.  Okay.                                     03:59:40PM

24             42, interns may also be eligible for incentives    03:59:49PM

25   and awards.  Talk to CSCA talent acquisition manager.        03:59:55PM
```

Page 278

```
 1        A     Okay.  And that would be the person -- that's what    03:59:59PM

 2   the person is called in the brokerage.  That is our              04:00:00PM

 3   counterpart.  That's who we work with.  So it depends on         04:00:04PM

 4   the local brokerage.  If that brokerage has -- they're          04:00:07PM

 5   offering something, it could be anything from free to a          04:00:12PM

 6   paid or it could even be paid with a team within the            04:00:14PM

 7   brokerage.  It's just in my -- it's an item to ask about        04:00:18PM

 8   that.                                                            04:00:23PM

 9        Q     Okay.  So does CSCA, yes or no, have a talent        04:00:23PM

10   acquisition manager?                                             04:00:29PM

11        A     The talent acquisition manager belongs to the       04:00:33PM

12   brokerage.  We have a talent acquisition coordinator.  That    04:00:36PM

13   would be Ali.                                                    04:00:39PM

14        Q     Okay.  So coordinator, and that's Ali Merre?         04:00:40PM

15        A     Uh-huh.  Merre.                                       04:00:46PM

16        Q     Merre.  My apologies.                                04:00:51PM

17              Referring to 43, what's a professional trainee?      04:01:09PM

18        A     This is the agent.  In other words, once they're    04:01:19PM

19   licensed they become a professional.  And they're a            04:01:21PM

20   trainee.  So this would be like --                              04:01:25PM

21        Q     So licensed trainee, same thing?                     04:01:27PM

22        A     No.  A trainee means -- I'm identifying the new     04:01:31PM

23   person that's started.  So, for instance, if you had            04:01:35PM

24   just -- if you had just applied into CSCA and you're going      04:01:38PM

25   to be working for one of the brokerages that are one of our     04:01:48PM
```

Page 279

```
 1    authorized brokerages as a professional trainee, you'll     04:01:51PM

 2    learn how to communicate and influence all -- with all      04:01:54PM

 3    types of customers.                                          04:01:56PM

 4          What that means is that we're taking you who have     04:01:58PM

 5    never dealt with the public before and we're teaching you   04:02:01PM

 6    how to integrate yourself into the local market and become  04:02:04PM

 7    a business person.  So we set the framework of that.  In    04:02:07PM

 8    other words, when that gets actually put into motion, we    04:02:10PM

 9    have a basic guideline.  And then each of the brokerages    04:02:13PM

10    has their own fingerprint for what they do.                 04:02:16PM

11         Q    Okay.  45 --                                      04:02:19PM

12         A    It's great we're reviewing my site.              04:02:27PM

13         Q    You can build on our entrepreneurial model and    04:02:31PM

14    earn an income that has no ceiling.                         04:02:34PM

15         A    Uh-huh.                                           04:02:36PM

16         Q    Do you have any instances in which someone that's 04:02:37PM

17    gone through the program has earned an income that's        04:02:41PM

18    particularly --                                             04:02:44PM

19         A    That statement was made more out of my            04:02:45PM

20    professional experience over all the years.  I mean, I have 04:02:47PM

21    recruited people my whole life, so I know what they can     04:02:51PM

22    make and what they can do.                                  04:02:54PM

23         Q    Uh-huh.                                           04:02:57PM

24         A    And -- so that's -- yeah, if you do what we tell  04:02:58PM

25    you to do, you can earn this, this, this.  And once you get 04:03:00PM
```

Page 280

```
 1    it all nailed down, if you have got the magic skills, the    04:03:03PM

 2    sky is the limit.                                            04:03:08PM

 3         Q    Okay.   47, every year we turn internships into    04:03:12PM

 4    real substantial career-building tools.                      04:03:15PM

 5         A    Uh-huh.                                            04:03:18PM

 6         Q    Right?                                             04:03:19PM

 7         A    Uh-huh.                                            04:03:19PM

 8         Q    Okay.   So do you have any documented instances of 04:03:20PM

 9    having turned a person who is engaged in internship into a   04:03:29PM

10    career?                                                      04:03:33PM

11         A    Not yet.   Not until we get out of our R&D stage.  04:03:35PM

12         Q    Okay.   48 -- let's go to 50.   As you would       04:03:39PM

13    imagine, everyone else in the program is just as motivated   04:03:53PM

14    as you.                                                      04:03:57PM

15              Have you had a program with more than one person?  04:03:58PM

16         A    Well, yeah.   Anybody that has been moved over and 04:04:08PM

17    gotten in the brokerage, they're very excited about what     04:04:14PM

18    they're doing, the ones that have done it.   There's         04:04:17PM

19    probably been a few that have failed.   I don't know,        04:04:19PM

20    because I don't follow that side of it.   But certainly at   04:04:21PM

21    the time they get into it they're very excited.              04:04:24PM

22         Q    So who would have the records of, you know, the    04:04:27PM

23    internship program?                                          04:04:32PM

24         A    Again, we are in an R&D stage.   We are not keeping 04:04:36PM

25    those type of records at this time.                          04:04:40PM
```

                                                          Page 281

```
 1      Q    Okay.                                          04:04:42PM

 2           THE VIDEOGRAPHER:  Sorry, but --               04:04:46PM

 3           MR. PAVONE:  Yeah.  Sure.  Let's stop for a second 04:04:47PM

 4    so we can change the video.                           04:04:49PM

 5           (Recess.)                                      04:10:45PM

 6    BY MR. PAVONE:                                        04:10:45PM

 7      Q    Okay.  Number 52.  We also have numerous -- or we 04:10:45PM

 8    also hire for numerous positions, sales management,   04:11:00PM

 9    relocation, et cetera.                                04:11:03PM

10           Okay.  Now, who is doing the hiring there?     04:11:04PM

11    A    I only do that.      I don't let anybody else do that. 04:11:07PM

12    That's me.                                            04:11:09PM

13      Q    Okay.  Now, when you -- who is the employer,   04:11:11PM

14    though?  Is that CSCA?                                04:11:14PM

15      A    No.  First Team is.  CSCA is a talent acquisition 04:11:16PM

16    company.  It is a headhunter.                         04:11:19PM

17      Q    Okay.  So First Team would have a regular W-2  04:11:21PM

18    employee position for sales management, something like 04:11:29PM

19    that?                                                 04:11:33PM

20      A    Yes.                                           04:11:33PM

21      Q    All right.  And the same with relocation?     04:11:34PM

22      A    Yep.  Yes.                                     04:11:37PM

23      Q    Okay.  And then we also hire for a variety of  04:11:41PM

24    administrative positions, that's also with First Team? 04:11:44PM

25      A    Yes.  It may be easier if I just make a        04:11:47PM
```

                                                    Page 282

```
 1          A     Again, I have answered that the talent acquisition    04:13:17PM

 2    director is the person at First Team.                             04:13:19PM

 3          Q     Okay.                                                 04:13:22PM

 4          A     That's their -- that would have been called their     04:13:22PM

 5    own recruiter.  What they used to call recruiter, we've           04:13:25PM

 6    given that a new name.                                            04:13:29PM

 7          Q     Okay.  56, and not to cover the same ground, but       04:13:31PM

 8    please check with your career services center and                 04:14:09PM

 9    student-run organizations for a listing of dates when CSCA        04:14:12PM

10    representatives will be at your school.                           04:14:16PM

11          Again, I think your position is -- correct me if I          04:14:17PM

12    am wrong -- that CSCA won't be adding schools.  That's            04:14:21PM

13    something that's happening in the future and that would be        04:14:24PM

14    done by the brokerage representative anyway; is that              04:14:26PM

15    accurate?                                                         04:14:30PM

16          A     It would happen not in the future after               04:14:31PM

17    operations, but once we formally operate, yes.                   04:14:35PM

18          Q     Okay.  Number 60, if CSCA doesn't help you find a     04:14:38PM

19    job, we'll help pay your bills.                                   04:14:57PM

20          Do you have any instances in which CSCA has                 04:14:59PM

21    actually paid anybody's bills?                                    04:15:02PM

22          A     No.  Nobody has ever applied for it.                  04:15:04PM

23          Q     Okay.  62, 90 percent of the population located        04:15:14PM

24    within 15 miles of one of our brokerages there's a CSCA          04:15:22PM

25    career consultant.                                                04:15:26PM
```

Page 284

```
 1              Can you tell me what that means?               04:15:30PM
 2       A     It is a broad statement.  But basically what we're 04:15:32PM
 3   talking about is that we have -- and again, as this is   04:15:36PM
 4   formally launched and we're in business, we serve the whole 04:15:42PM
 5   country is the bottom line.  In other words, this is not 04:15:46PM
 6   something where they're going to have to relocate.       04:15:49PM
 7              That was the point of this thing here is that most 04:15:51PM
 8   people who are in college or that part of their life,    04:15:54PM
 9   they're used to being recruited.  Most recruiters have got 04:15:58PM
10   something, but they have to go somewhere for it.  Like, you 04:16:04PM
11   know, they went to college in Missouri, but they have got 04:16:06PM
12   to come to L.A. to have an interview.                    04:16:09PM
13              So what we're saying is that's not what we're  04:16:12PM
14   about.  We've actually -- our brokerages are going to be 04:16:14PM
15   located pretty much close to everybody.                  04:16:17PM
16       Q     Okay.  Are any of these -- so these CSCA career 04:16:19PM
17   consultants, are they employees of CSCA?                 04:16:27PM
18       A     That would be CSCA, right.  Uh-huh.            04:16:31PM
19       Q     All right.  So do you have any career          04:16:35PM
20   consultant --                                            04:16:41PM
21       A     Ali.  Ali is the one that's doing it right now. 04:16:42PM
22       Q     Okay.  So you have one career consultant and   04:16:45PM
23   that's Ms. -- how did you pronounce --                   04:16:47PM
24       A     Merre.  I think you don't have the accent mark 04:16:50PM
25   after the E.                                             04:16:53PM
```

Page 285

```
 1              So the times that I was with a national brand      04:32:28PM
 2    there would be managers.  And when I was independent, I did  04:32:31PM
 3    have some people, but that was like 10 years ago, 15 years   04:32:35PM
 4    ago.                                                         04:32:39PM
 5         Q    All right.                                         04:32:40PM
 6         A    But in the case of what I would be talking to as   04:32:40PM
 7    far as a potential employee, you know, somebody -- you       04:32:43PM
 8    know, if this were found like on CSCA, those same people     04:32:47PM
 9    would appear in the brokerage environment.                   04:32:51PM
10         Q    Okay.  Can you see the highlighted text there?     04:33:29PM
11         A    Uh-huh.                                            04:33:32PM
12         Q    So -- okay.  On behalf of CEO, that's you; right?  04:33:32PM
13         A    Uh-huh.                                            04:33:36PM
14         Q    Okay.  Now, who are our partners?                  04:33:37PM
15         A    Again, now or at the time this was written, or     04:33:41PM
16    what is your question?  I mean, it's just a statement.  It   04:33:44PM
17    is a marketing statement.  We welcome them.  We want to      04:33:46PM
18    serve people, et cetera.  There were times when there would  04:33:50PM
19    have been managers.  There would be team members.  At this   04:33:53PM
20    particular point in the whole program, because everything    04:33:57PM
21    has been put on hold since you started this stuff --         04:34:00PM
22         Q    Well, this was made on December 10th, 2012.        04:34:03PM
23         A    Uh-huh.                                            04:34:07PM
24         Q    Okay?  So at the time who was -- who were the      04:34:07PM
25    partners?                                                    04:34:10PM
```

Page 297

Sarnoff, A VERITEXT COMPANY
877-955-3855

| 1 | A    I believe I was everything.    Once you got in the | 04:34:11PM |
| 2 | picture, I took over everything. | 04:34:13PM |
| 3 | Q    Okay.  My question is, at the time that this was | 04:34:15PM |
| 4 | written before there was litigation, who were the partners? | 04:34:17PM |
| 5 | A    With Orange County Real Estate? | 04:34:22PM |
| 6 | Q    Uh-huh. | 04:34:24PM |
| 7 | A    You're going over a long period of time.  I had | 04:34:26PM |
| 8 | other agents.  You can check with DRE on that.  I don't | 04:34:30PM |
| 9 | know off the top of my head.  DRE would list everybody | 04:34:35PM |
| 10 | that's been associated with me. | 04:34:39PM |
| 11 | Q    Okay.  Who are the managers, if you can name any? | 04:34:40PM |
| 12 | A    I can't right now.  I don't remember. | 04:34:45PM |
| 13 | Q    All right.  And can you name any team members? | 04:34:47PM |
| 14 | Team members are like agents -- | 04:34:51PM |
| 15 | A    Agents, yeah. | 04:34:54PM |
| 16 | Q    I got the team members part. | 04:34:55PM |
| 17 | A    You have to go to DRE for that.  I don't remember. | 04:34:57PM |
| 18 | It is not something that I stay on top of. | 04:35:00PM |
| 19 | Q    Do you remember we talked about your bankruptcy | 04:36:01PM |
| 20 | schedules and the various personal debts, you know, to | 04:36:05PM |
| 21 | Mikkelsen, Garrison and so forth?  Do you still have -- you | 04:36:09PM |
| 22 | said that you threw everything away.  And I'm sure that's | 04:36:12PM |
| 23 | true.  But I just want to confirm that you threw away all | 04:36:15PM |
| 24 | of the underlying promissory notes. | 04:36:19PM |
| 25 | A    I'm assuming if I threw everything away, I threw | 04:36:23PM |

Page 298

| | | |
|---|---|---|
| 1 | discrimination.  But I suppose that's a fair question. | 04:44:30PM |
| 2 | Okay.  Taking you to 33.  This is CSCA Number 33. | 04:44:51PM |
| 3 | All right.  Just confirming that the executive search team | 04:45:11PM |
| 4 | is referenced in -- | 04:45:15PM |
| 5 | A    What line are you looking at? | 04:45:18PM |
| 6 | Q    I'm sorry.  6 and 7.  This was a request for every | 04:45:20PM |
| 7 | person on the executive search team. | 04:45:24PM |
| 8 | A    Okay.  Could you raise the thing up so I can see | 04:45:27PM |
| 9 | what's before it? | 04:45:29PM |
| 10 | Q    Of course.  It will be Line 20. | 04:45:30PM |
| 11 | A    On Line 20.  Okay.  Uh-huh. | 04:45:36PM |
| 12 | Q    Right? | 04:45:40PM |
| 13 | A    Okay. | 04:45:40PM |
| 14 | Q    Okay.  So that's you and Ms. Merre? | 04:45:41PM |
| 15 | A    That is correct. | 04:45:48PM |
| 16 | Q    All right. | 04:45:49PM |
| 17 | A    And that would have been the team had Fernando, | 04:45:49PM |
| 18 | you know, continued, that's -- he would have been doing | 04:45:53PM |
| 19 | some of that work too. | 04:45:56PM |
| 20 | Q    Okay. | 04:45:57PM |
| 21 | A    And he wouldn't have needed a real estate license | 04:46:02PM |
| 22 | on that one. | 04:46:04PM |
| 23 | Q    Do you have any other active -- well, have you | 04:46:30PM |
| 24 | incorporated any other companies, let's say, in 2012, 2013, | 04:46:33PM |
| 25 | besides what is currently the status of OCRE/PRCI? | 04:46:39PM |

Page 304

```
 1    moment.                                                04:52:10PM

 2            (Recess.)                                       04:53:36PM

 3            MR. PAVONE:  I have some good news for you, sir. 04:53:36PM

 4    You are finished.                                      04:53:38PM

 5            MR. BARNES:  Stip?                              04:53:39PM

 6            MR. PAVONE:  Yeah, we'll do a stipulation.      04:53:40PM

 7            Why don't we agree to relieve the court reporter 04:53:41PM

 8    of her duties under the code with the agreement that an 04:53:44PM

 9    original transcript will be prepared by the court reporter 04:53:47PM

10    and sent to Mr. Barnes's office.  He'll have 30 days from 04:53:50PM

11    the time of receipt to forward it to his client for    04:53:55PM

12    signature, review.  And any changes will be returned to 04:53:58PM

13    plaintiff's counsel within that 30-day period.  If the 04:54:02PM

14    original transcript is not available, lost or stolen, a 04:54:06PM

15    certified copy can be used in lieu of the original.    04:54:12PM

16            In terms of the exhibits, what we've agreed to do 04:54:14PM

17    is I will redact the body of Bates data, Bates-stamped 04:54:16PM

18    data, that I referenced today and just simply turn over an 04:54:26PM

19    electronic copy to Mr. Barnes.  And then we'll just both 04:54:31PM

20    have it.  And we can reference it as part of the       04:54:34PM

21    deposition.  I am not going to turn that over or have it 04:54:36PM

22    printed to be included with the deposition.  We'll just 04:54:39PM

23    have it.  That way we both will be able to know what we're 04:54:41PM

24    talking about.                                         04:54:45PM

25            With that, we'll relieve the court reporter and 04:54:46PM
```

Page 308

```
 1    conclude the deposition.                          04:54:52PM

 2           MR. BARNES:  So stipulated.                04:54:53PM

 3              (TIME NOTED:  4:54 P.M.)                 04:54:54PM

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 309

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby certify:

5          That the foregoing proceedings were taken before

6    me at the time and place herein set forth; that any

7    witnesses in the foregoing proceedings, prior to

8    testifying, were placed under oath; that a verbatim record

9    of the proceedings was made by me using machine shorthand

10   which was thereafter transcribed under my direction;

11   further, that the foregoing is an accurate transcription

12   thereof.

13          I further certify that I am neither financially

14   interested in the action nor a relative or employee of any

15   attorney of any of the parties.

16          IN WITNESS WHEREOF, I have this date subscribed

17   my name.

18

19   Dated:  7/5/13

20

21

22          _____

                MONICA M. CLINE

23              RPR, CSR NO. 8933

24

25

                                        Page 311

# EXHIBIT B

# CAREER SOLUTIONS & CANDIDATE ACQUISTION
### 4533 MacArthur Blvd., Suite 100
### Newport Bea.ch, CA 92660-2059

May 8, 2012

Chris Pollinger
Vice President Sales & Operational Support
First Team Real Estate
108 Pacifica, STE 300
Irvine, CA 92618

### RE: LETTER OF UNDERSTANDING

Dear Mr. Pollinger:

on behalf of CSCA® (Career Solutions & Candidate Acquisition) we'd like to thank you for being part of what we feel will position selected Brokerages across the nation for a new era in professionalism for the real estate Industry.

We respect your due diligence and your need for a 'test drive'. We have reviewed our services and fees in detail with you. You have asked our Board to work with you for a test period and finalize a long term relationship with First Team® at a later date. Iam please to inform you that it would be our pleasure to work with First Team® in this way. For this reason, this letter will serve as a 'place holder' until a long term agreement is reached.

With the aforementioned in mind, if the following points are mutually acceptable, these terms and conditions will represent our understanding. At the conclusion of this letter, you will be asked to Acknowledge you Acceptance of said Terms and Conditions.

1. During this test period, CSCA® will not offer its programs to any real estate brokerage in Southern California which shall be defined herein to include the counties of orange, Los Angeles, Riverside, San Bernardino and San Diego.

2. Upon the execution of a Long Term Agreement, First Team® shall have the first right to acquire the CSCA® System exclusively for the Southern California region as defined in paragraph one above.

3. The scope of the CSCA® System includes a proprietary system for recruiting and retaining real estate professionals and fixed salary employees.  It is agreed that First Team® will not disclose any of the proprietary features of the CSCA® System.

4. It is understood that the fees agreed to herein are solely for the test period, after which a permanent fee structure will be agreed upon.

5. CSCA® shall deliver 500 candidates for new and/or existing agent hires.  Each lead will cost $30 per lead for a total of $15,000.00.

6. The $15,000.00 quoted in paragraph five above shall be paid as follows: $7500.00 due at signing.  These funds will be used for initial set up and training.

   The remaining balance due of $7500.00 shall be paid upon the first of 100 lead appointments are set as follows:  After a total of 50 appointments are set, $2500 shall be due.  Once a total of 75 appointments are set and additional $2500 shall be due and upon a total of 100 appointments are set, the balance of $2500.00 shall be due.

7. For salaried positions, First Team® will pay CSCA® 25% of the new hire's proposed first year compensation at hire.

s. It is understood that CSCA® will offer First Team® qualified leads and that it will be at First Teams® discretion to hire and/or terminate any hire.

If the following meets with your understanding, please so acknowledge below.  We are excited about working with a Brand such as First Team®.   Know that our loyalty and energy will be 150% into and on this project.  We are very proud to be associated with First Team® Real Estate.

Warmly,
CSCA®



Stephen O'Hara
CEO

Acknowledged  and Accepted By:



May a, 2012

Chris Pollinger, VP Sales & Operational Support

# EXHIBIT C



State of California
*Director of correspondence ta:*
LABOR COMMISSIONER, TATE *OF* CALIFORNIA
Department or Industrial Re,alions
L>ivisioo of Labor Standards Enforcement
7575 Metropolitan Dr.,Ste. 210
an Diego CA  92108
Tel:  (619) 220-5451   Fas:  (619)767-2020

January 23, 2013

Fernando Martinez                                    In Reply, refor to:
345 West EI Norte Parkway, Apt 23 J                  **10 - 80451 MM**
Escondido, CA 92026

RE: Fernando Martinez              v.        Stephen O'Hara

The enclosed check is payment we received from your former employer in settlement of your wage claim.
Our records indicate that it is for:

D  Full payment of your claim.

D  Full payment pursuant to the Settlement Agreement.

D  Partial payment pursuant to the Settlement Agreement

D  *An* amount the employer concedes is due you with a restrictive endorsement indicating lhat by endorsing the dleck you have agreed it will be payment in full.

     I1'l'IPORTANT NOTE: If the restrictive endorsement appears on your check cross out the endorsement, sign your narne and add, "Accepted pursuant to Labor Code Sections 206, 206.5 and Civil Code Section 1526 ' PLEASE CASH THE CHECK AS IT WILL NOT JEOPARDIZE AW BALANCE OF YOUR CLAIM JN ANY WAY.

D  See attached correspondence received from your former employer. Jf you disagree wifuany statement or any points raised in the letter, please answer in writing. lfwe don't hear from you within ten (10) days, we must assnme you do not wish to pursue your claim and your file will be closed.

I:8J  An amount the employer concedes to be due you. IfU'eamount is not acceptable as settlement of your claim, please send us in writing, wi thin ten (10) days, rurther evidence and facts in support of your complaint and we will continue our investigation of the matter. **RLEASE CASH THE CHECK AS IT WILL NOT JEOPARDIZE ANY BALANCE OF YOUR CLAIM IN ANY \VAY.**

D  Other:

Sincerely,

*Mark Meeker*

Mark Meeker         Deputy Labor Commissioner
619-767-2009

DLSE 17 (Rev. 3/11)

# EXHIBIT D

Department of Industrial Relations
**DIVISION OF LABOR STANDARDS ENFORCEMENT**
**7575 Metropolitan Dr., Ste. 210**
**San Diego CA 92108**
**Tel: (619) 220-5451    Fax: (619) 767-2020**

**May 21, 2013**

Benjamin Pavone, Esq.                         Reply to: 10 - 80451       MM
**7676 Hazard Center Drive, 5th Floor**
**San Diego, CA 92107**

RE: Fernando Martinez **v.** Stephen O'Hara, an individual

      Under California law, the Labor Commissioner is authorized to investigate complaints for wages, penalties, and other demands for compensation properly before the Commissioner. Pursuant to that authority, the Labor Commissioner has discretion to decline to proceed with any case that is determined to be inappropriate for processing by the agency.

      We wish to advise you that this office has completed its threshold review of the materials and information provided in connection with the above-referenced case. It is the policy of the Labor Commissioner to not assert jurisdiction over a matter that is pending in court. The complaint you filed in Orange County Superior Court (Case# 30-2012-00614932-CU-FR-CJC) in Section IV, lines 144-149 alleges the same causes of action that you filed with this office.

      In addition, the dispute is lengthy, complicated, and in some respects ambiguous. As a consequence, resolution of the parties' dispute will require discovery and also application of various complex legal doctrines pertinent to the issues that have been raised. The administrative process afforded by the Labor Commissioner is not designed for the invocation of discovery procedures and is not well suited to the adjudication of intricate disputes of this type.

      Regarding the imposition of penalties pursuant to Labor Code Section 226.8, the procedure for filing under this statute can be found under Labor Code Section 2699 and cannot be claimed in the individual wage process. If your client was not properly classified as an employee you may wish to file a Bureau of Field Enforcement complaint which I have included with this letter.

      Accordingly, in this matter, the Labor Commissioner exercises the Commissioner's discretion to decline jurisdiction over this case. The parties remain free to pursue resolution of their dispute in a court of law or other appropriate forum that may be available to them. The file in this case is closed.

Sincerely,

-/ L

uilar
Senior Deputy Labor Commissioner

cc: Brook T. Barnes, Esq.

# EXHIBIT E



STATE OF CALIFORNIA
# Labor & Workforce Development Agency

GOVERNOR Edmund G. Brown Jr. • SECRETARY Marty Morgenstern

Agricultural Labor Relations Board • California Unemployment Insurance Appeals Board
California Workforce Investment Board • Department of Industrial Relations
Economic Strategy Panel • Employment Development Department • Employment Training Panel

June 18, 2013                                    **CERTIFIED MAIL**

Law Offices of Benjamin Pavone, PC
7676 Hazard Center Drive, 5th Floor
San Diego, CA 92108

RE: Employer:      Career Solutions & Candidate Acquisitions; et al.
RE: Employee(s): Fernando Martinez
RE: LWDA No:    12975

This is to inform you that the Labor and Workforce Development Agency
(LWDA) received your notice of alleged Labor Code violations pursuant to
Labor Code Section 2699, postmarked April 25, 2013, and after review, does
not intend to investigate the allegations.

As a reminder to you, the provisions of Labor Code Section 2699(i) provides
that "...civil penalties recovered by aggrieved employees shall be distributed
as follows: 75 percent to the LWDA for enforcement of labor laws and
education of employers and employees about their rights and responsibilities
under this code." Labor Code Section 2699(1) specifies "[T]he superior court
shall review and approve any penalties sought as part of a proposed
settlement agreement pursuant to this part."

Consequently, you must advise us of the results of the litigation, and forward
a copy of the court judgment or the court-approved settlement agreement.
Please be certain to reference the above LWDA assigned Case Number in
any future correspondence.

Sincerely,

Mark Woo-Sam
General Counsel

Cc:    Career Solutions & Candidate Acquisitions; et al.

# EXHIBIT 34

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR FERNANDO MARTINEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/10/2013** at 10:55:00 AM
Clerk of the Superior Court
By Giovanni Galon, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# ORANGE COUNTY

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>                    PLAINTIFF,<br><br>v.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS;<br><br>O'HARA FAMILY TRUST;<br><br>OCRE, INC.;<br><br>PROFESSIONAL REALTY COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.;<br><br>and DOES 4-10,<br><br>                    DEFENDANTS. | **CASE NO.:** 30-2012-614932-CU-FR-CJC<br><br>**JUDGE:** Hon. Gregory Munoz<br><br>**DECLARATION OF BENJAMIN PAVONE IN SUPPORT OF OPPOSITION BRIEF TO DEFENSE MOTION TO STRIKE**<br><br>**DATE**: July 25, 2013<br>**TIME**: 2:00 pm<br>**DEPT**: C-13 |

BENJAMIN PAVONE, ESQ.

---

MARTINZ v. O'HARA – CASE NO. 30-2012-614932
PAVONE DECLARATION IN SUPPORT OF MARTINEZ'S OPPOSITION TO MOTION TO STRIKE
1

I, Benjamin Pavone, am an attorney licensed to practice in all state and federal courts located in California, as well as various district and federal appellate courts in other states.  If called to testify, I could and would testify competently to the following:

1.      Attached hereto as Exhibit A is a true and correct copy of April 24, 2013 complaint filed with the California Labor & Workforce Development Agency.  I sent it by certified mail, and copied it to Mr. Barnes by certified mail.)

2.      Attached hereto as Exhibit B are a true and correct copy of the certified mail slips sent to LWDA and to defendants, through their attorney at the time, Brook Barnes.

3.      Attached hereto as Exhibit C is a true and correct copy of June 18, 2013 response from the California Labor & Workforce Development Agency.

4.      Attached hereto as Exhibit D is a true and correct copy of May 21, 2013 letter from the Department of Labor Standards Enforcement.

I hereby declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: July 10, 2013                                        \s\Benjamin Pavone

BENJAMIN PAVONE, ESQ.

# EXHIBIT A

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

ATTORNEY FOR FERNANDO MARTINEZ

# BEFORE THE LABOR AND WORKFORCE DEVELEPEMENT AGENCY

# STATE OF CALIFORNIA

| | |
|---|---|
| FERNANDO MARTINEZ,<br><br>            Petitioner,<br><br>v.<br><br>STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA;<br><br>CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS;<br><br>PROFESSIONAL REALTY COUNCIL, INC;<br><br>PACIFIC VALLEY REALTY, INC.;<br><br>            Respondents. | LWDA NO. _____<br><br>**LABOR BOARD NO. 10-80451-MM**<br><br>**ORANGE COUNTY NO.:** 30-2012-614932<br><br>**NOTICE OF VIOLATIONS**<br><br>(Labor Code § 2699.3(a)(1))<br><br>**Date:** Not Set<br>**Time:** Not Set<br>**Place**: Not Set |

BENJAMIN PAVONE, ESQ.

**DECLARATION OF BENJAMIN PAVONE
IN SUPPORT OF FERNANDO MARTINEZ COMPLAINT
TO LABOR AND WORKFORCE AGENCY**

I, Benjamin Pavone, am an attorney licensed to practice in all state and federal courts located in California, and if called to testify, could and would testify competently to the following:

1.      I am the attorney for Fernando Martinez.  This notice is submitted pursuant to Labor Code section 2699.3, subdivision (a)(1).

2.      On or about October 24, 2012, Mr. O'Hara attempted to have Fernando Martinez sign a release agreement.  As relevant here, it contained language in paragraph (3): "I had agreed to accept $1500 per month (as an Independent Contractor).  I understand that I will be responsible for any taxes due the Federal Government or the State of California."  A true and correct copy of that email is attached hereto as Exhibit A.

3.      As alleged in a Verified Complaint on file in Orange County, Martinez explained: "In paragraph (3), O'Hara proposes Martinez to sign away his right to be considered an employee for tax purposes, even though it is clear that Fernando knew nothing about real estate and would be taking sole, exclusive and complete direction from O'Hara."  A true and correct copy of that complaint, previously lodged with the Labor Board and excerpted here in the relevant pages, is attached hereto as Exhibit B.

4.      In a letter from Mr. O'Hara's attorneys dated December 19, 2012, they claim that Martinez "parted ways with Mr. O'Hara without any expectation of employment compensation or benefits."   A true and correct copy of that letter, excerpted here in the relevant portion, is attached hereto as Exhibit C.

5.      On January 23, 2013, Mr. O'Hara promptly reversed that position by tendering a check for $975 to the Department of Labor for Martinez's benefit, a tacit admission that Mr. Martinez was in fact an employee in at least some capacity.  A true and correct copy of the check is attached hereto as Exhibit D.

6.    In a court pleading dated February 13, 2013, Mr. O'Hara's attorneys state: "Plaintiff brought his wrongful termination claim against Defendant O'Hara, who was not his employer, but rather a supervisor.  (Opposition, p. 6:8-11 (citing Complaint, Ex. A, ¶ 1) [acknowledging that Defendant O'Hara was speaking on behalf of CSCA].)"  From this position, it appears Mr. O'Hara is now admitting that Mr. Martinez was employed by the CSCA entity and that O'Hara was the "supervisor" in that entity.[1]  A true and correct copy of the excerpted pleading is included as Exhibit E.

7.    Thus, regardless of whether Martinez was employed by O'Hara, CSCA or Pacific Valley Real Estate (or all three), within the span of four months, O'Hara has contradicted himself: at first, he tried to get Fernando to admit he was an independent contractor, then he denied in a letter that Fernando was owed any employee compensation, then he turned around and paid him the outstanding employee compensation, and now he has admitted, at a minimum, that he was in fact an employee of CSCA all along.

8.    A labor agency should issue a fine of $5,000-$15,000 under Labor Code section 226.8(a) for O'Hara's attempt to intentionally misclassifying Martinez as an independent contractor

9.    Martinez is probably considered an employee of Mr. O'Hara and Pacific Valley Realty, Inc. as well, in that Martinez was in reality a personal employee of O'Hara given Exhibit F, while Pacific Valley wrote the check covering Martinez's

---

[1]  Even this latter view, that Martinez was an employee of CSCA, is troubled.  It appears Fernando was in reality a personal employee of O'Hara.  In an email dated September 19, 2012, O'Hara, from his personal email address (not his CSCA email), writes: "Fernando, remember I played that song that reminded me of you and your mom?  I wanted to give you a bit more so in a special moment you can play it and really suck the energy out of the overall song and performance."  A true and correct copy of that email is attached hereto as Exhibit F.

BENJAMIN PAYONE, ESQ.

compensation dated September 27, 2012, in the amount of $1,000, check 8544, drawn on a Bank of America account in its name. (A true and correct copy of that check is included as Exhibit G.)

10.    Martinez was allegedly discharged from defendants' employment on or about mid-October, as reflected by an October 24, 2012 email in which O'Hara offered Martinez a release agreement to wind up their affairs. (Exhibit A.)

11.    On November 16, 2012, plaintiff counsel contacted Mr. O'Hara by email prior to filing suit to discuss resolution of the dispute prior to a formal filing. Counsel provided Mr. O'Hara a copy of the draft complaint. No response was received.

12.    In response to the Labor Code cause of action in the Orange County complaint, Mr. O'Hara's initial position, consistent with O'Hara's proposed release agreement submitted directly to Martinez on October 24, 2012 (Exhibit A), was that Fernando was an independent contractor.

13.    On December 31, 2012, Martinez filed a claim with the California Department of Labor Standards Enforcement.

14.    On January 10, 2013, the Labor Board set a hearing for February 25, 2013 for a hearing on the matter in San Diego.

15.    On January 18, 2013, the law firm of Teeple Hall, LLP wrote a check from its trust account for $975 payable to Fernando Martinez.

16.    On January 23, 2013, the Labor Board wrote back to Martinez, **"[t]he enclosed check is payment we received from your former employer in settlement of your wage claim. Our records indicate that is for: … [a]n amount the employer concedes to be due you. If the amount is not acceptable as settlement of your claim, please send us in writing, within (10) days, further evidence and facts in support of your complaint and we will continue our investigation of the matter."**

17.    Martinez did not consider the amount tendered acceptable as settlement of the claim and submitted a detailed response on February 2, 2013 seeking additional

BENJAMIN PAYONE, ESQ.

penalties and fines based on the failure to timely remit Mr. Martinez's wages under Labor Code section 203 and for intentionally misclassifying him as an independent contractor in the proposed release agreement, pursuant to Labor Code section 226.8.

18. Labor Code section 203 provides in relevant part that, "if an employer willfully fails to pay … any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

19. Because no payment of Martinez's outstanding wages was made within (30) days from the time of Martinez's discharge in or about the middle of October, his wages continued as a penalty against O'Hara and PVRI for (30) days. Martinez's additional wages for (30) days equated to $1,500, plus the original $750 owed from the period of October 1-October 15, 2012.

20. Offsetting the trust payment from Teeple Hall of $975, Martinez is still owed $1,275 in outstanding wages.

21. Accordingly, plaintiff requests payment in the amount of $1,275 in outstanding Labor Code penalties, along with recovery of attorney's fees pursuant to Labor Code section 2699.3, along with any other penalty provisions available through the LWDA authority, such as misclassification penalties.

I hereby declare under penalty of perjury under the laws of the State of California that, to the best of my knowledge about the Martinez-O'Hara case and in reviewing and studying the available evidence that I possess about the case at present, the foregoing recitation is true and correct.

LAW OFFICES OF
BENJAMIN PAVONE, PC

Date: April 24, 2013

\s\Benjamin Pavone
Benjamin Pavone, Esq.
Attorney for Fernando Martinez

BENJAMIN PAVONE, ESQ.

# EXHIBIT A

### IT'S FINALLY HERE! ARE YOU READY FOR THE BEST EXPO YET?

The biggest real estate event of the year is finally upon us! CALIFORNIA REALTOR® EXPO 2012 starts on Tuesday, Oct. 2, with PRE EXPO at the Anaheim Convention Center, and continues through Thursday, Oct. 4. This is an event that you simply can't afford to miss. The free professional development and abundant networking opportunities which EXPO offers will give you a competitive edge in the market and show you how to increase your bottom line.

**Drive Out for the Day!**

Come to EXPO for:

- Social media training
- Sales tips
- Technology tools and trends
- Understanding the economic landscape
- Financing insight for clients
- Fresh market data
- Short sales, REO, and foreclosure knowledge
- Tons of free prize giveaways
- And more!

To see a complete schedule of PRE EXPO and EXPO sessions, and an exhibitor list, visit expo.car.org.

**CALIFORNIA REALTOR® EXPO 2012 is FREE for C.A.R. members**, but you must register to gain access to nearly 200 vendors in the exhibit hall and 50 free educational sessions. **Register today** by visiting **http://expo.car.org/**, or register onsite in Hall A at the Anaheim Convention Center.

See you in Anaheim!

This message was sent to **steve@steveohara.com**. Visit your **subscription management page** to modify your email communication preferences or update your personal profile. To stop receiving this email in the future, **click to remove** yourself from this list.



---

# www.linkedin.com/pub/fernando-martinez/57/689/4b7

| | |
|---|---|
| From: | **Stephen O'Hara** (steve@steveohara.com) |
| Sent: | Sun 9/30/12 2:25 PM |
| To: | 'infinates@hotmail.com' (infinates@hotmail.com) |

## Your Resignation Settlement

| | |
|---|---|
| From: | **Stephen O'Hara** (steve@steveohara.com) |
| Sent: | Wed 10/24/12 12:45 PM |
| To: | 'infinates@hotmail.com' (infinates@hotmail.com); Fernando Martinez (contactfernandomartinez@gmail.com) |

**Hi Fernando!**

**I hope you are well.  In order to Deposit your final check for the services you rendered as an Intern, I will need you to REPLY to this Email and APPROVE IT AS WRITTEN.**

**Once I receive your REPLY, I will instruct Accounting to release monies due you per this Agreement as per this Agreement within five (5) business days after I receive the following back from you.**

**I think the following is more than fair when you consider all the facts.  I hope after you digest the following, you will agree and be very happy.**

**Needless to say, you represent a great loss to me.  I wish you the very best and will miss you.**

**If you need to talk with me to clarify anything, feel free to text me and I'll call you back ASAP.**

**Many Thanks, Fernando.**

**Stephen**

# AGREEMENT

I, Fernando Martinez hereby agree and stipulate to the following:

1. On or About August or September 2012, I applied to CSCA® for a job that was offered to me in the real estate business.  I was additionally offered a job to work at a Corporate level with Stephen O'Hara with the future intent of being employed Full Time on or about January 2, 2013.  I understand that I needed to get my real estate license in order to receive money for performing the Acts of a Real Estate Licensee.

2. I was going to work for McDonald's between September 2012 and December 31, 2012.  However, it was my personal decision to NOT work at McDonald's and use this time to a) get my real estate license and b) work part time 'while I learn' as a paid Intern, for Stephen O'Hara and his Group of Companies.

3. I had agreed to accept $1500 per month (as an Independent Contractor). I understand that I will be responsible for any taxes due the Federal Government or the State of California.

4. At the time I resigned, I was owed $750.00 representing the period from Oct. 1 to Oct 15, 2012.

5. During the first few weeks I worked, I had asked for and received in total about $300.00 that I authorized to be taken out of my future check. I had also needed more money, therefore, Stephen O'Hara actually *overpaid* me $250.00 on my prior check and told me that he would NOT deduct the $300 until a future check. Additionally, on Oct 13, 2012 during a trip to Los Angeles, Stephen gave me an cash advance of $100.00.

With the above in mind, all total, I have received $650.00 over and above that which I was told I would be paid. Based upon this paragraph alone, Stephen O'Hara actually owes me $100.00.

6. It is a fact that Stephen O'Hara took a personal interest in my success. As a result, Stephen purchased many other items for me including admission to the CAR Convention and other items. It is my understanding that Stephen has NOT charged me back or asked for any repayment for these expenses.

7. While I am probably NOT owed any money, Stephen O'Hara has offered me $525.00 in Liquidated Damages for anything that might arise as a result of my relationship with Stephen and, more importantly, to help me get re-started.

8. I understand that by accepting this $525.00 I agree that I will not discuss in *ANY* form of communication with ANY third-party ANY and ALL proprietary, business, personal and / or confidential information for which I gained access to during my tenure with Stephen O'Hara and his Group of Companies.

I understand that any discussion of same could cause irreparable damage to the parties and that violation of this paragraph eight would cause extreme exposure to various legal claims for the parties. I understand fully that this Paragraph Eight will, therefore, be prosecuted to the fullest extent of the law should it be violated.

9. By accepting $525.00 as Liquidated Damages and Payment in Full, I hereby waive any past, present or future claim for damages, business or personal and hereby FULLY RELEASE Stephen O'Hara and his Group of Companies from any and all claims and/or liability prior to, during and after my resignation of my Internship with Stephen O'Hara.

10.        In accepting these Terms and Conditions as Final Settlement, I represent that I am of sober mind and have considered all facts relating to this matter and therefore have given this

matter my full consideration and fully agree to the Terms and Conditions as stated herein.

I will also remove my involvement with CSCA® or Stephen O'Hara from ALL Social Media Sites and return all BUSINESS materials (in my possession) that belong to Stephen O'Hara or any of his Group of Companies.

I will permanently delete any and all emails between me and Stephen O'Hara and/or his Group of Companies that involve business matters.

Sincerely,

Fernando Martinez

345 W El Norte' Pkwy

Escondido, CA 92026

(Electronic Signature:  REPLY and state that you accept the following as written, then email back to me.)

**Happy Birthday. You don't know how much I miss you. Take care and Enjoy your Special Day. All I think is, "This is supposed to be ME and YOU in Las Vegas! Best Always! Stephen**

| | |
|---|---|
| From: | **Stephen O'Hara** (steve@steveohara.com) |
| Sent: | Sat 11/03/12 1:18 AM |
| To: | 'infinates@hotmail.com' (infinates@hotmail.com) |

# EXHIBIT B

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

<table>
<tr>
<td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Stephen Stratton O'Hara fka Stephen John O'Hara; Career Solutions and Candidate Acquisitions; Pacific Valley Realty, Inc.; and Does 1-10

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Fernando Martinez

</td>
<td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**11/28/2012** at 09:31:52 AM

Clerk of the Superior Court
By Natasha Dorfman, Deputy Clerk

</td>
</tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es)*  Orange County Superior Court<br><br>700 Civic Center Drive, Santa Ana, CA 92701 | CASE NUMBER:<br>*(Número del Caso):*  30-2012-00614932-CU-FR-CJC |

Judge Gregory Munoz

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Law Offices of Benjamin Pavone, 7676 Hazard Center Dr., 5th Floor, San Diego, CA 92108, (619) 224-8885

| DATE: 11/28/2012<br>*(Fecha)* | ALAN CARLSON, Clerk of the Court | Clerk, by<br>*(Secretario)* Natosha | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

Natasha Dorfman

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation)              ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

THE LAW OFFICES OF
BENJAMIN PAVONE

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE
5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619.224.8885
FACSIMILE:  619.224.8886
EMAIL: bpavone@cox.net

<u>ATTORNEYS FOR FERNANDO MARTINEZ</u>

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**11/28/2012** at 09:31:52 AM
Clerk of the Superior Court
By Natasha Dorfman,Deputy Clerk

# Superior Court of the State of California

# County of Orange

|  |  |
|---|---|
| FERNANDO MARTINEZ,<br><br>                    plaintiff,<br><br>v.<br><br>STEPHEN STRATTON O'HARA fka<br>STEPHEN JOHN O'HARA;<br>CAREER SOLUTIONS AND<br>CANDIDATE ACQUISITIONS;<br>PACIFIC VALLEY REALTY, INC.;<br>and Does 1-10,<br><br>                    defendants. | CASE NO. 30-2012-00614932-CU-FR-CJC<br><br>**VERIFIED COMPLAINT FOR**:<br><br>**I.   RAPE**<br><br>**II.  SEXUAL HARASSMENT**<br><br>**III. FRAUD**<br><br>**IV. LABOR CODE VIOLATION**<br><br>**V.  WRONGFUL TERMINATION**<br><br>Judge Gregory Munoz |

68.     In a similar fashion, O'Hara pushed for Fernando to live with him or move to Orange County, as distancing himself from his sister was allegedly better for his career.

69.     O'Hara insisted that if Fernando allowed O'Hara to take him under his wing, he would undoubtedly make millions and that such opportunities do not often happen.

70.     Through September-October, 2012, O'Hara and Martinez spent time together, which included (8) sexual encounters, 50 telephone calls, and a few trips, such as to Rodeo Drive, Abbey Food & Bar, through Mulholland Drive, Griffith Observatory and to a sex shop called Chi Chi Larue's, where O'Hara purchased sexually-suggestive undergarments for Fernando.

### The Sleazy Release Agreement

71.     Fernando initially complied with O'Hara's sexual demands, but the guilt, lack of interest and emotional pain of succumbing to this arrangement eventually caused Fernando to rebuff O'Hara's sexual advances and desire for a romantic partnership.

72.     After that – in other words, after Fernando declined to be O'Hara's prostitute -- O'Hara terminated Fernando and requested Fernando to sign a release agreement liberating O'Hara from any legal responsibility for his conduct.

73.     The document contains (10) paragraphs.   It purports to rewrite history in paragraph (2) by having Fernando agree that "it was my personal decision to not work at McDonald's," even though O'Hara was lobbying for Fernando to quit and thereby become financially beholden to him.

74.     In paragraph (3), O'Hara proposes Martinez to sign away his right to be considered an employee for tax purposes, even though it is clear that Fernando knew

nothing about real estate and would be taking sole, exclusive and complete direction from O'Hara.

75.     In paragraph (4), O'Hara acknowledges that he owes Fernando $750 for the period from October 1 through October 15 (O'Hara paid him $1,750 for the month of September), which was when Fernando "resigned." Fernando did not resign. He was constructively terminated for not participating in a quid pro quo sexual relationship and/or succumbing to the sexually hostile work environment O'Hara desired.

76.     In paragraph (5), during a trip to Los Angeles, O'Hara allegedly gave Fernando $100 in cash. One would think that O'Hara would not include this as part of Fernando's employment compensation considering that the trip to Los Angeles included a visit to an underwear shop, but he proposed to deduct the $100 from the $750 in wages owed.

77.     Based on other deductions O'Hara decided to enforce, O'Hara proposed that he actually owed Fernando just $100, equivalent to $12.50 for each sexual act.

78.     In paragraph (6), O'Hara actually suggested that he could have deducted the entrance fee for Fernando's admission to the convention for the California Association of Realtors they attended, $100 or so, and "many other items" (the Chi Chi Larue underwear?), from the wages owed to Fernando. Thus, O'Hara's flaw is not just the inappropriate mixture of his sexual appetite with his business, but a form of petty austerity that is utterly unacceptable under the circumstances.

79.     In paragraph (6), O'Hara proposes that Fernando sign a statement acknowledging that "[i]t is a fact that Stephen O'Hara took a personal interest in my success." That statement is only true if the word "personal" is replaced with the word "sexual."

(9)    such other relief as the court deems just and proper.

Date: November 28, 2012

LAW OFFICES OF
BENJAMIN PAVONE

Benjamin Pavone, Esq.

Attorney for Plaintiff
Fernando Martinez

## VERIFICATION

1

2      I, Fernando Martinez, am the plaintiff in this proceeding. I have read the foregoing

3  "Verified Complaint" and know the contents thereof. The same is true of my knowledge,

4  except those matters which are therein alleged on information and belief, and, as to those

5  matters, I believe them to be true.

6      I declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct.

8      Executed on November 27, 2012, in San Diego County, California.

9

10

11                                                                 Fernando Martinez

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

Letter to Mr. Ben Pavone, Esq.
December 19, 2012
Page 3 of 3

In reality, it appears that your client welcomed all sexual advances and <mark>amicably parted ways with Mr. O'Hara without any expectation of employment compensation or benefits.</mark>  The

Ultimately, your verified complaint will be subject to a motion to strike and possibly multiple demurrers—leaving your client with scant facts to withstand a summary judgment motion after his deposition.  Our office will assuredly serve you a § 998 offer with our responsive pleadings. This predicament opens your client up to malicious prosecution as his verified complaint is in direct contradiction to the text messages he sent Mr. O'Hara, and the evidence of this case.

Please respond to this offer by Tuesday December 28, 2012.  Should you have any questions regarding the foregoing, please do not hesitate to contact the undersigned directly.

Sincerely,

TEEPLE HALL, LLP

Brook T. Barnes, Esq.
BTB/uc

# EXHIBIT D



Security features. Details on back.

**TEEPLE HALL, LLP**
ATTORNEYS AT LAW
CLIENT TRUST ACCOUNT
9255 TOWNE CENTRE DR., SUITE 500
SAN DIEGO, CA 92121
(858) 622-7878

Wells Fargo Bank, N.A.
16-24-1220

1/18/2013

PAY TO THE
ORDER OF: Fernando Martinez                          $ **975.00

Nine Hundred Seventy-Five and 00/100******************************************************************************** DOLLARS

Labor Commissioner, State of California
c/o Deputy Mark Meeker
7575 Metropolitan Drive, Suite 210
San Diego, CA 92108
USA

MEMO   Wages to Fernando Martinez

AUTHORIZED SIGNATURE

⑈012257⑈ ⑆122000247⑆ 9179664934⑈

TEEPLE HALL, LLP - CLIENT TRUST ACCOUNT

Fernando Martinez

1/18/2013

122257

975.00

Wages to Fernando Martinez

# EXHIBIT E

Grant G. Teeple, Esq. SBN 144760
Gregory M. Garrison, Esq. SBN 165215
Brook T. Barnes, Esq. SBN 276667
TEEPLE HALL, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121
Telephone: (858) 622-7878
Facsimile: (858) 622-0411

Attorneys for Defendants STEPHEN O'HARA, CAREER SOLUTIONS AND CANDIDATE
ACQUISITIONS, and PACIFIC VALLEY REALTY, INC.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| FERNANDO MARTINEZ, | Case No. 30-2012-00614932-CU-FR-CJC |
| Plaintiff, | **DEFENDANTS STEPHEN STRATTON O'HARA, CAREER SOLUTIONS AND CANDIDATE AQCUISITIONS, AND PACIFIC VALLEY REALTY, INC.'S REPLY IN SUPPORT OF DEMURRER TO PLAINTIFF'S VERFIED COMPLAINT** |
| vs. | |
| STEPHEN STRATTON O'HARA fka STEPHEN JOHN O'HARA; CAREER SOLUTIONS AND CANDIDATE ACQUISITIONS; PACIFIC VALLEY REALTY, INC.; and Does 1-10, | |
| Defendants. | Date: February 21, 2013 |
| | Time: 2:00 pm |
| | Dept: C-13 |
| | Judge: Hon. Gregory Munoz |

///
///
///
///
///
///
///
///
///
///
///

i

Martinez v. O'Hara, et al.                                    Case No: 30-2012-00614932-CU-FR-CJC
Defendants' Reply Brief in Support of Demurrer to Verified Complaint

Teeple Hall, LLP

1    Defendants do not know which Defendants employed Plaintiff, which Defendants terminated Plaintiff,
2    or how Plaintiff was damaged or injured.  Additionally, Defendants cannot even ascertain whether
3    Plaintiff is bringing a common law claim for wrongful termination or a statutory claim.  Without any
4    clarity whatsoever as to what Plaintiff is alleging, his claim for wrongful termination must fail for
5    uncertainty.  *See Khoury v. Maly's of Calif., Inc.* (1993) 14 Cal.App.4th 612, 616 (holding that when a
6    defendant cannot reasonably respond, or when a defendant cannot determine what issues must be
7    admitted or denied, a cause of action fails for uncertainty).

8        *2.  Plaintiff Has Not Sufficiently Alleged a Cause of Action for Wrongful Termination*

9        As this Court is aware, to bring a common law cause of action for wrongful termination, or a
10   *Tameny* claim, a plaintiff must establish the following elements:

11       a. An employer-employee relationship existed;
         b. The termination of the plaintiff's employment was a violation of public policy;
12       c. The termination of employment was the legal cause of the plaintiff's damages; and
         d. The *nature* and *extent* of the plaintiff's damages. *See Holmes v. General Dynamics Corp.*
13       (1993) 17 Cal.App.4th 1418, 1437 at fn. 8.

14       In properly pleading a *Tameny* action, a Plaintiff may plead actual discharge, a constructive
15   discharge, or an adverse employment action.  *See Tameny v. Atlantic Richfield Co.* (1980) 27
16   Cal.App.3d 167, 178; *Garcia v. Rockwell Int'l Corp.* (1986) 187 Cal.App.3d 1556, 1562.  Additionally,
17   a *Tameny* action *may not* be brought against supervisors.  *Khajavi v. Feather River Anesthesia Med.*
18   *Group* (2000) 84 Cal.App.4th 32, 53; *Miklosy v. Regents of Univ. of Calif.* (2008) 44 Cal.App.4th 876,
19   901 (both holding that, as a matter of law, only an employer can be liable for the tort of wrongful
20   discharge in violation of public policy).  Finally, it is essential that a plaintiff allege that there was a
21   specific public policy that was violated through the plaintiff's termination.  *Tameny v. Atlantic*
22   *Richfield Co., supra,* 27 Cal.3d at 169; *Stevenson v. Sup. Ct.* (1997) 16 Cal.App.4th 880, 894.  The
23   public policy *must* be based on a statutory or constitutional provision.  *Green v. Ralee Eng. Co.* (1998)
24   19 Cal.App.4th 66, 79.

25       In the present case, Plaintiff has not alleged whether he was actually discharged, constructively
26   discharged, or suffered an adverse employment action.  Furthermore, Plaintiff brought his wrongful
27   termination claim against Defendant O'Hara, who was not his employer, but rather a supervisor.

28

Teeple Hall, LLP

8

1  (Opposition, p. 6:8-11 (citing Complaint, Ex. A, ¶ 1) (acknowledging that Defendant O'Hara was

2  speaking *on behalf* of CSCA)).  Alternatively, if Plaintiff believes that Defendant O'Hara was his

3  employer, Plaintiff should be required to plead this allegation. Additionally, Plaintiff completely failed

4  to allege what specific statute or constitutional provision Defendants allegedly violated in order to

5  satisfy the violation of public policy requirement. Finally, Plaintiff failed to allege either the nature or

6  the extent of his damages. As such, Plaintiff patently failed to sufficiently allege a cause of action for

7  common law wrongful termination.

8      *3.   This Court Lacks Jurisdiction to Hear a Statutory Cause of Action for Wrongful*

9          *Termination Based Upon Sexual Harassment*

10     As explained above, Plaintiff *must* exhaust his administrative remedies *prior* to bringing a cause

11  of action based upon a Title VII or a FEHA violation. Furthermore, Plaintiff must specifically *plead*

12  that the administrative exhaustion requirement has been satisfied. In the present case, this Court lacks

13  jurisdiction to hear a statutory cause of action for wrongful termination based upon sexual harassment

14  because Plaintiff failed to plead his exhaustion of administrative remedies *and* because Plaintiff in fact

15  *did not* satisfy the administrative exhaustion requirement *prior* to filing his Verified Complaint. As

16  such, Plaintiff's cause of action for wrongful termination must be dismissed.

17  **III.   CONCLUSION**

18     For all of the above reasons, this Court should sustain Defendants' Demurrer to Plaintiff's

19  Second, Third, and Fifth Causes of Action.

20  Dated: February 13, 2013                    TEEPLE HALL, LLP

21

22                          By:

23                              Grant G. Teeple, Esq.
                               Gregory M. Garrison, Esq.

24                              Brook T. Barnes, Esq.
                               Attorneys for Defendants,

25                              STEPHEN O'HARA, CAREER SOLUTIONS
                               AND CANDIDATE ACQUISITIONS, and

26                              PACIFIC VALLEY REALTY, INC.

27

28

Teeple Hall, LLP

9

Martinez v. O'Hara, et al.                                    Case No: 30-2012-00614932-CU-FR-CJC
Defendants' Reply Brief in Support of Demurrer to Verified Complaint

# EXHIBIT F

doing the wrong thing.  You hold the fork in the wrong hand.  You drive your cars on the wrong side of the road.  And now, sir, you seem to have thrown the wrong bitch out the window'.

**#2**

**THE ABSOLUTE BEST POLITICAL AD THIS YEAR!!!** http://www.youtube.com/watch?v=fZgQhnNRSuw

---

## Something Specail For You... (Let me know if you connet to this one.)

From:  **Stephen O'Hara** (steve@steveohara.com)
Sent:   Wed 9/19/12 9:09 PM
To:      'infinates@hotmail.com' (infinates@hotmail.com)

> **Fernando, remember I played that song that reminded me so much of you and your mom? I wanted to give you a bit more so in a special moment you can play it and really SUCK the energy out of the overall song and performance.**

Due to your age, I'm not sure if you know 'who' Liza Minnelli is, but she is the daughter of Judy Garland as in "Dorothy in The Wizard of Oz".  Frankly, if you do NOT know, they should REVOKE your 'G-Card'!!!

This is from a Broadway show called Gypsy.   It's based upon a true story.  I actually would highly recommend you renting the movie version with a young Natalie Wood playing the role of Gypsy.

Why do I feel you will relate?  It's the story of 'Mama Rose' who is a single mom raising her kids against all odds and WITHOUT her family's support.  They all think "Momma" is nuts.  The truth is Mamma is a survivor.  In this song, her daughter June has an opportunity to be a Broadway star and Mamma is trying to borrow $88 (about $1000 in today's money) from her dad who wants her to just settle down and live a boring life.

**While I've never (and won't be) a 'single mom' in many other ways, I connect to this song because my family thought I was nuts.  They wanted me to have a boring $35K year job working 9-5.  To this day, they think that the $1.5 to $2 Million I made per year in the real estate industry 'is not a REAL job'.**

Have I had to enjoy the $1.50 Hot Dog and Coke at COSTCO on my way up the ladder?  Yes, my dear, I have done all it takes to do to get where I got as I was born with nothing.

But, like Momma Rose, I did what I had to do and I made it the 'the Broadway of Real Estate'.

I watch this several times each week to remember where I came from.  Now sit back and read the words while you enjoy: "Some People":

http://www.youtube.com/watch?v=-oGRNoGZk-k

## LYRRICS WHILE YOU WATCH:

Some people can get a thrill, knitting sweaters and sitting still
That's OK for some people don't know they're alive
Some people can thrive and bloom, living life in a living room
That's perfect for some people of one hundred and five
But I, at least gotta try

When I think of all the sights that I gotta see
And all the places I gotta play, All the things that I gotta be at
Come on papa, what'd ya say?

Some people can be content, playin' bingo and payin' rent
That's livin' for some people, for some hum-drum people, too be
But some people, ain't me

I had a dream, a wonderful dream, papa
All about June in the Orpheum circuit
Give me a chance, I know I can work it, Uhh, what a dream
And it was just as real as could be, papa
Well just listen to me, there I was in Mr Orpheum's office  (a big Broadway Producer)
And he was sayin' to me, Rose!
Get yourself some new orchestrations, new routines and red velvet curtains
Get a feathered hat for the baby, photographed in front of the theater
Get an agent and in jig time, you'll be being booked in the big time

Oh what a dream, a wonderful dream, papa
And all that I need is eighty-eight bucks, Papa, that's it
That's what he said papa, only eighty-eight bucks, papa

It's uh, yeah, but it's only eighty-eight bucks
It's not like I'm askin' for a second mortgage on this place
What do ya gettin' so crick, why you gettin' crazy, it's eighty-eight lousy bucks
What do you mean I ain't gettin' eighty-eight cents out of you
Well, I'll get it, and I'll get my kids, out, now

Goodbye, to blueberry pies, good ridance to all the socials I had to go to
All the lodges that I had to play, all the shriners  (a men only club like Rotary)  I said hell

## Speak Vision (I Hope Your Week is Going Well. Busy Day Today for Me. Working 'One Armed is a bit Tough! Enjoy Your Day! Best! Stephen)

From: **Stephen O'Hara** (steve@steveohara.com)

# EXHIBIT G



**Bank of America** 

# Online Banking

## Transaction Details

|  |  |
|---|---|
| **Check number:** | 00000008544 |
| **Posting date:** | 09/27/2012 |
| **Amount:** | -1,000.00 |
| **Type:** | Check |
| **Description:** | Check Image |

DEF - 000048

THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886

ATTORNEYS FOR FERNANDO MARTINEZ

**BEFORE THE LABOR AND WORKFORCE DEVELEPEMENT AGENCY**

**STATE OF CALIFORNIA**

FERNANDO MARTINEZ,

v.

STEPHEN STRATTON O'HARA fka
STEPHEN JOHN O'HARA, et al.

OC CASE NO. 30-2012-614932

**PROOF OF SERVICE**

I am a resident of the San Diego County.  I am over the age of eighteen years and not a party to the within entitled action.  My business address is 7676 Hazard Center Dr., 5th Floor, San Diego, California 92108.  On April 24, 2013, I served the following:

        \*        Notice of Violation

California Labor & Workforce Development Agency
800 Capitol Mall, MIC-55
Sacramento, California 95814           (Via Certified Mail)

To: Stephen O'Hara, CSCA/PRCI, PVRI
c/o Brook Barnes, Esq.
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121
(Attorneys for Respondents)          (Via Certified Mail and Courtesy Copy by Email)

I declare under the laws of the State of California in the County of San Diego under penalty of perjury on this 24th day of April, 2013 that the foregoing is true and correct.



MARTINZ v. O'HARA – CASE NO. 30-2012-614932
PROOF OF SERVICE

BENJAMIN PAVONE, ESQ.

# EXHIBIT B

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X   EMPLOYMENT DEVELOPMENT
    800 Capitol
    ☐ Agent
    ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

California Labor & Workforce Development Agency
800 Capitol Mall, MIC-55
Sacramento, California 95814

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)   7010 1060 0001 7296 3375

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X   Brown
    ☐ Agent
    ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

Mr. Stephen O'Hara, CSCA/PROPVRI
c/o Mr. Brook Barnes, Esq.
Teeple Hall, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)   7010 1060 0001 7296 3382

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

# EXHIBIT C



**STATE OF CALIFORNIA**
# Labor & Workforce Development Agency

GOVERNOR Edmund G. Brown Jr. • SECRETARY Marty Morgenstern

Agricultural Labor Relations Board • California Unemployment Insurance Appeals Board
California Workforce Investment Board • Department of Industrial Relations
Economic Strategy Panel • Employment Development Department • Employment Training Panel

June 18, 2013                                          **CERTIFIED MAIL**

Law Offices of Benjamin Pavone, PC
7676 Hazard Center Drive, 5th Floor
San Diego, CA  92108

RE: Employer:     Career Solutions & Candidate Acquisitions; et al.
RE: Employee(s): Fernando Martinez
RE: LWDA  No:    12975

This is to inform you that the Labor and Workforce Development Agency
(LWDA) received your notice of alleged Labor Code violations pursuant to
Labor Code Section 2699, postmarked April 25, 2013, and after review, does
not intend to investigate the allegations.

As a reminder to you, the provisions of Labor Code Section 2699(i) provides
that "…civil penalties recovered by aggrieved employees shall be distributed
as follows: 75 percent to the LWDA for enforcement of labor laws and
education of employers and employees about their rights and responsibilities
under this code." Labor Code Section 2699(l) specifies "[T]he superior court
shall review and approve any penalties sought as part of a proposed
settlement agreement pursuant to this part."

Consequently, you must advise us of the results of the litigation, and forward
a copy of the court judgment or the court-approved settlement agreement.
Please be certain to reference the above LWDA assigned Case Number in
any future correspondence.

Sincerely,

Mark Woo-Sam
General Counsel

Cc:   Career Solutions & Candidate Acquisitions; et al.

800 Capitol Mall, Suite 5000 • Sacramento, California 95814 • TEL (916) 653-9900 • FAX (916) 653-6913 • www.labor.ca.gov

# EXHIBIT D

State of California                                                    EDMUND G. BROWN JR., GOVERNOR
Department of Industrial Relations
DIVISION OF LABOR STANDARDS ENFORCEMENT
7575 Metropolitan Dr., Ste. 210
San Diego  CA  92108
Tel: (619) 220-5451    Fax: (619) 767-2020

May 21, 2013

Benjamin Pavone, Esq.                        **Reply to: 10 - 80451    MM**
7676 Hazard Center Drive, 5th Floor
San Diego, CA 92107

RE:  Fernando Martinez **v.** Stephen O'Hara, an individual

     Under California law, the Labor Commissioner is authorized to investigate complaints for wages, penalties, and other demands for compensation properly before the Commissioner.  Pursuant to that authority, the Labor Commissioner has discretion to decline to proceed with any case that is determined to be inappropriate for processing by the agency.

     We wish to advise you that this office has completed its threshold review of the materials and information provided in connection with the above-referenced case.  It is the policy of the Labor Commissioner to not assert jurisdiction over a matter that is pending in court.  The complaint you filed in Orange County Superior Court (Case# 30-2012-00614932-CU-FR-CJC) in Section IV, lines 144-149 alleges the same causes of action that you filed with this office.

     In addition, the dispute is lengthy, complicated, and in some respects ambiguous.  As a consequence, resolution of the parties' dispute will require discovery and also application of various complex legal doctrines pertinent to the issues that have been raised.  The administrative process afforded by the Labor Commissioner is not designed for the invocation of discovery procedures and is not well suited to the adjudication of intricate disputes of this type.

     Regarding the imposition of penalties pursuant to Labor Code Section 226.8, the procedure for filing under this statute can be found under Labor Code Section 2699 and cannot be claimed in the individual wage process.  If your client was not properly classified as an employee you may wish to file a Bureau of Field Enforcement complaint which I have included with this letter.

     Accordingly, in this matter, the Labor Commissioner exercises the Commissioner's discretion to decline jurisdiction over this case.  The parties remain free to pursue resolution of their dispute in a court of law or other appropriate forum that may be available to them.  The file in this case is closed.

Sincerely,

Linda Aguilar
Senior Deputy Labor Commissioner

cc: Brook T. Barnes, Esq.

# EXHIBIT 35

**The New York Times**

OPINION

# How Hillary Clinton Met Satan

**By Susan Faludi**

Oct. 29, 2016

It was my third day at the Republican National Convention in 1996, and my notebook overflowed with a one-note theme: "You do know that Hillary Clinton is funding the whole radical feminist agenda?" "She had Vince Foster killed." "She's behind many more murders than that." "It's well-established that Hillary Clinton belonged to a satanic cult, still does." The consensus among Pat Buchanan's supporters seemed ardent and universal, though the object of this obloquy wasn't even on the opposing ticket.

One of the mysteries of 2016 is the degree to which Hillary Clinton is reviled. Not just rationally opposed but viscerally and instinctively hated. None of the stated reasons for the animus seem to satisfy. Yes, she's careful and cagey, and her use of a private email server, which the F.B.I. flung back into the news on Friday, was a big mistake. But no, she's not more dishonest than other politicians, and compared with her opponent, she's George Washington. Her policies, even where bold, are hardly on the subversive fringe.

Yet she's cast not just as a political combatant but as a demon who, in the imaginings of Republicans like Paul D. Ryan, the speaker of the House, and Representative Trent Franks, would create an America "where passion — the very stuff of life — is extinguished" (the former) and where fetuses would be destroyed "limb from limb" (the latter).

Donald J. Trump and his supporters posit their antipathy as a reaction to Mrs. Clinton's accumulated record over "30 years in power." It's important to recall that she was deranging Republicans on Day 1. Understanding her demonization requires admitting her full significance in our political history, for she is not simply a pioneering woman fighting an Ur-misogyny. Mrs. Clinton faces a two-headed Cerberus, an artificial conjoining that occurred in the early 1990s, of wounded Republican invincibility and wounded male prerogative. Our current political crisis won't be resolved until those forces are separated and the Cerberus slain.

Few current observers seem to recall the wrath that greeted Bill Clinton's ascension. To the left, "Clintonism" implies accommodation and calculation. But to the right in 1992, it meant usurpation. Reaganism held almost religious significance, and its reign was supposed to be transformative and permanent. For the One True Way to be restored, Clintonism had to be delegitimized.

Case 2:21-cv-01778-FMO-PD   Document 1   Filed 02/25/21   Page 1055 of 1093   Page ID #:1055

That delegitimization ushered in the politics of party restoration at whatever cost, governance and country be damned. This led first to an attempted legislative coup in 1998 and then to a judicial coup in 2000. And to all the more recent outrages of birtherism, government shutdowns, delayed Supreme Court confirmations and, ultimately, the rise of a would-be autocrat as a party nominee.

But political restoration was only one head of the Cerberus. The other — wounded male prerogative — was personal and sexual. The 1990s produced a generation of men who felt (and still feel) left behind by a society redefining power and success in terms of ornament and celebrity and demoting the value of industry and brawn, while simultaneously challenging men's value as family providers. Though women weren't the source of men's pain, the antagonist conjured up by aggrieved men I talked with in those years had a feminine face, and very often that face was Hillary's.

A startling aspect of the rage that greeted Bill Clinton was how much of it was aimed at the women he entrusted — or tried to entrust — with power. When I was investigating one of the early skirmishes of the Clinton years, the burning of the Branch Davidian compound in Waco, Tex., which right-wingers attributed to Clinton's F.B.I., I was treated to the fervent rants of "Patriot" men, aimed not at Mr. Clinton but at what I came to think of as the Three Witches of Waco: Attorney General Janet Reno ("Reno's master is Satan," a Third Continental Congress militiaman told me), the gun-control advocate Sarah Brady and, most of all, Hillary Clinton. Her anti-male conspiracies were legion: redirecting their tax dollars to bankroll women's rights around the globe ("She gave away a million dollars to each first lady she visited in Africa to get educated"), using their Social Security to "pay for abortion," and "calling the shots at the White House."

Republican ideological absolutism, nourished by masculine insecurity, created an amalgam corrosive to pragmatic politics. For Hillary Clinton, it's meant being demonized for traits that have little to do with her character. Not only by right-wing politicians, who found the Hillary-with-horns specter a convenient recruitment tool, but by the culture at large. Even the supposedly liberal mainstream media still seek out any bit of evidence that can be chiseled to fit that prefab 1990s narrative — and if she denies the caricature, she's called a liar. Her famous "hiddenness" is, at heart, her refusal to cop to the crime of purloined male authority. A Spy magazine story in 1995 made that theft succinct: a cover image of a grinning Hillary, her skirt billowing up as in the old Marilyn Monroe photo, to reveal male briefs bulging with a penis. Across her legs ran the headline: "Hillary's Big Secret."

The G.O.P.'s gender grudge feeds on its own defeat. As the culture moves further away from the conservative ideal — as women gain freedoms, minorities assert rights, same-sex marriage proves commonplace — the monster's howls grow louder. But the howls say nothing new. This election is the decisive battle in a Thirty Years' War.

"We're going to fight this if it takes a hundred years," one of the Patriots I met in Waco advised me. "Our republic's on its knees. Our throat is about to be slit." And then: "Radical feminism gave the government all this power." Flash forward to October of 2016, as Trump supporters, egged on by their candidate, talk openly about getting their guns to "take out" the "radical feminist" candidate who has declared "open war against men."

The left needs to acknowledge what the right has long known: that it's a fiction to think we can move on beyond the brawl of the 1990s without settling it — and settling it requires helping Mrs. Clinton triumph once and for all against the calumnies that were created to define her. It would be a mistake to think that Mrs. Clinton, the imperfect politician, is not the right standard-bearer for this fight. She was nominated to her role not last July at the Democratic National Convention in Philadelphia, but in 1992, when her husband destroyed the myth of Republican invincibility and Hillary Clinton was anointed the feminine face of evil.

Susan Faludi is the author of "Backlash: The Undeclared War Against American Women" and, most recently, "In the Darkroom."

A version of this article appears in print on , Section SR, Page 5 of the New York edition with the headline: How Hillary Clinton Met Satan

# EXHIBIT 36

WIKIPEDIA

# Succubus

A succubus is a demon or supernatural entity in folklore, in female form, that appears in dreams to seduce men, usually through sexual activity. According to religious traditions, repeated sexual activity with a succubus can cause poor physical or mental health, even death.

In modern representations, a succubus is often depicted. as a beautiful seductress or enchantress, rather than as demonic or frightening.

The male counterpart to the succubus is the incubus.



A 16th-century sculpture representing a succubus, Cambridge

## Contents

Etymology:

In folklore

Ability to reproduce

Qarinah

Scientific explanations

In fiction

See also

References

## Etymology

The word is derived from Late Latin *succuba* "paramour"; from *suc.cubare* "to lie beneath" (*sub-* "under" and *cubare* "to lie"),W used to describe this female supernatural being's implied sexual position relative to the male sleeper's position. The word *succubus* originates from the late 14th century.[2]

## In folklore

*As* depicted in the Jewish mystical work Zohar and the medieval rabbinical text Alphabet of Ben Sira, Lilith was Adam's first wife, who later became a succubus.[if] She left Adam and refused to return to the Garden of Eden after she mated with the archangel Samael In Zoharistic Kabbalah, there were four succubi who mated with the archangel Samael. There were four original queens of the demons: Lilith, Eisheth, Agrat bat Mahlat, and Naamah.[SI A succubus may take a form of a beautiful young girl but closer inspection may reveal deformities of her body, such as bird-like claws or serpentine tails.[l] Folklore also describes the act of



*The Succubus,* an 1889 sculpture by Auguste Rodin

sexuall enetratin a succubus as akin to entering a cavern of ice, and there are reports of succubi forcing men to perform cunnilins on their vulvas, which drip with urine and other fluids.lzl In later folklore, a succubus took the form of a siren.

Throughout history, priests and rabbis, including Hanina Ben Dosa and Abaye, tried to curb the power of succubi over humanSlfil However, not all succubi were malevolent. According to Walter Ma in the satire *De Nugis Curialium (Trifles of Courtiers),* Po e S Ivester II (999-l003) was allegedly involved with a succubus named Meridiana, who helped him achieve his high rank in the Catholic Church. Before his death, he confessed of his sins and died repentant.[21

# Ability to reproduce

According to the Kabbalah and the school of Rashba, the original three queens of the demons, at Bat Mahlat, Naamah, Eisheth Zenunim, and all their cohorts give birth to children, except Lilith.I!fil' According to other le ends, the children of Lllith are called Lilin.

According to the *Malleus Malejjcarum,* or "Witches' Hammer", written by Heinrich Kramer (Institoris) in l486, succubi collect semen from men they seduce. Incubi, or male demons, then use the semen to impregnate human females,L¹l thus explaining how demons could apparently sire children despite the traditional belief that they were incapable of reproduction. Children so begotten-cambions-were supposed to be those that were born deformed, or more susceptible to supernatural influences.L¹²1 While the book does not address why a human female impregnated with the semen of a human male would not produce regular human offspring, an explanation could be that the semen is altered before being transferred to the female host. However in some lore, the child is born deformed because the conception was unnatural.

King James in his dissertation titled Dremonologie refutes the possibility for angelic entities to reproduce and instead offered a suggestion that a devil would carry out two methods of impregnating women: the first, to steal the sperm out of a dead man and deliver it into a woman. If a demon could extract the semen quickly, the substance could not be instantly transported to a female host, causing it to go cold. This explains his view that succubi and incubi were the same demonic entity only to be described differently based on the tormented sexes being conversed with. The second method was the idea that a dead body could be possessed by a devil, causing it to rise and have sexual relations with others. However, there is no mention of a female corpse being possessed to elicit sex from men.l!al

# Qarinah

In Arabian my:!holo , the *qarinah* ◯ is a spirit similar to the succubus, with origins possibly in ancient E tian reli ion or in the animistic beliefs of re-Islamic Arabia.llil A qarinah "sleeps with the person and has relations during sleep as is known by the dreams"J fil They are said to be invisible, but a person with "second si ht" can see them, often in the form of a cat, dog, or other household pet. "In Omdurman it is a spirit which possesses. ... Only certain people are possessed and such people cannot marry or the qarina will harm them."l!filTo date, many African myths claim that men who have similar experience with such principality (succubus) in dreams (usually in form of a beautiful woman) find themselves exhausted as soon as they awaken; often claiming spiritual attack upon them. Local rituals/divination are often invoked in order to appeal the god for divine protection and intervention.

# Scientific explanations

In the field of medicine, there is some belief that the stories relating to encounters with succubi bear resemblance to the contemporary phenomenon of people reporting alien abductions,[!zl which has been ascribed to the condition known as slee aral is. It is therefore suggested that historical accounts of people experiencing encounters with succubi may rather have been symptoms of sleep paralysis, with the hallucination of the said creatures coming from their contemporary culture. Furthermore, the experience of nocturnal <u>emissions</u> or "wet dreams" may explain the sexual aspect of the <u>phenomenon</u>.[¹Bl[¹1

# Infiction

Throughout history, succubi have been popular characters in music, literature, film, television, and more.

# See also

### Similar creatures in folklore

- <u>Al B</u>asti
- <u>Baobhan Sith</u>

  <u>Empusa</u>

  <u>Fox spirit</u>
- Hisa-me
- Hone-onna
- Huldra

  <u>Jorōgumo</u>

  <u>Lamia (Basque myt</u>holog}1

  <u>Leanan sídhe</u>
- Liderc
- <u>M</u>are (folklore)

- Mavka
- <u>Moura Encantada</u>
- <u>Sa_ona</u>
- Sihuanaba
- Patasola
- Samodiva
- Trauco
- Tunda
- Xana
- Xtaba
- Siren

# References

1. "Succuba" htt ://dictiona .reference.com/browse/succuba . *dictiona .com*.
2. Ha er Douglas. "<u>Succubus" htt ://www.e monline.com/index. h ?term=succubus</u> . *Online Etymology Dictionary*.
3. "<u>The Sto Of Lilith" htt ://"ewishchristianlit.com/To ics/Lilith/al habet.html</u> .jewishchristian lit.com. Retrieved 21 September 2016.
4. "Samael & Lilith" htt ://istina.rin.ru/en /ufo/text/663.html } .istina.rin.ru. Retrieved 21 September 2016.
5. "<u>Zohar: Cha ter XXXII" htt ://www.sacred-texts.com/"ud/zdm/zdm041. htm}</u>
6. Davidson, Jane P. (2012). *Early modem supernatural : the dark side of European culture, 1400-1700.* Santa Barbara, Calif.: Praeger. p. 40. ISBN 9780313393433 .
7. Guiley, Rosemary Ellen (2008). *The encyclopedia of witches, witchcraft and wicca* (3rd ed.). New York: Facts On File. p. 95. ISBN 9781438126845 .
8. Geoffrey W. Dennis, The encyclopedia of Jewish myth, magic and mysticism. p. 126
9. Histo[Y of the Succubus (htt s://web.archive.org/web/20040717001332/htt //www.c odine.com/succ ubus/Histo .htm

10. Alan Humm. "Kabbala: Lilith, Queen of the Demons" (htt ://www.lilith alle .com/libra /lilith/Queen-o
f-the-Demons.html). lilithgallery.com. Retrieved 21 September 2016.

11. Kramer, Heinrich and Sprenger, James (1486), Summers, Montague (translator – 1928), *The
Malleus Maleficarum,* Part2, Cha ter VIII {htt ://www.sacred-texts.com/ a /mm/mm02b08a. htm _,
"Certain Remedies prescribed against those Dark and Horrid Harms with which Devils may Afflict
Men," at sacred-texts.com (htt ://www.sacred-texts.coml

12. Lewis, James R., Oliver, Evelyn Dorothy, Sisung Kelle S. (Editor) (1996), *Angels A* to Z, Entry: Incubi
and Succubi, pp. 218, 219, Visible Ink Press, ISBN 0-7876-0652-9

13. Warren, Brett (2016). *The Annotated DtBmonologie of King James. A Critical Edition. In Modem
English.* pp. 79-83. ISBN 978-1-5329-6891-4 .

14. Zwemer, Samuel M.(1939). "5". *Studies in Po ular Islam: Collection of Pa ers dealin with the
Su erstitions and Beliefs of the Common Peo le* htt ://www.answerin -islam.or /Books/Zwemer/St
udies/cha 5.htm . London: Sheldon Press.

15. Tremeame, A. J. N. *Ban of the Bari: Demons and Demon-Dancin in West and North Africa* htt s://a
rchive.or /details/cu31924029887431 .

16. Trimin ham, J. S encer (1965). *Islam in the Sudan.* London: Frank Cass & Co. Ltd. p. 172.

17. Knight-Jadczyk, Laura; Henri Sy (2005). *The high strangeness* of *dimensions, densities, and the
process of alien abduction.* Red Pill Press. p. 92. ISBN 9781897244111.

18. "Slee Paral sis" htt ://www.ske dic.com/slee aral sis.html .The Skeptics Dictionary.

19. "Phenomena of Awareness durin Slee Paral sis" htt ://www.trionica.com/as / henomena/index.h
tm .Trionic Research Institute.

---

Retrieved from "https://en.wikipedia.org/w/index.Qhp?title=Succubus&oldid=978273034"

---

This page was last edited on 13 September 2020, at 23:05 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site,
you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a
non-profit organization.

# EXHIBIT 37

1  STATE BAR OF CALIFORNIA
   OFFICE OF CHIEF TRIAL COUNSEL
2  MELANIE J. LAWRENCE, No. 230102
   INTERIM CHIEF TRIAL COUNSEL
3  CHRISTOPHER G. JAGARD, No. 191147
   ASSISTANT CHIEF TRIAL COUNSEL
4  RACHEL S. GRUNBERG, No. 197080
   ACTING SUPERVISING ATTORNEY
5  KIMBERLY G. ANDERSON, No. 150359
   SENIOR TRIAL COUNSEL
6  845 South Figueroa Street
   Los Angeles, California 90017-2515
7  Telephone: (213) 765-1083

**FILED**

**JAN 14 2021**

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

8

9                    STATE BAR COURT

10                   REVIEW DEPARTMENT

11

12  In the Matter of:                    )  Case No.  SBC-20-O-30496
                                         )
13  BENJAMIN LAURENCE PAVONE,            )  **THE STATE BAR'S RESPONSE TO**
    State Bar No. 181826,                )  **RESPONDENT'S PETITION FOR**
14                                       )  **INTERLOCUTORY REVIEW OF**
                                         )  **HEARING JUDGE'S ORDER DENYING**
15                                       )  **RESPONDENT'S MOTION TO DISMISS**
                                         )
16  An Attorney of the State Bar.        )  **(FILED CONCURRENTLY WITH THE**
                                         )  **STATE BAR'S SUPPLEMENTAL**
17                                       )  **APPENDIX AND REQUEST FOR**
                                         )  **JUDICIAL NOTICE; DECLARATION OF**
18                                       )  **KIMBERLY G. ANDERSON)**
                                         )
19                                       )
    _____)  (OCTC-19-O-12069)
20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 1

II.   FACTUAL BACKGROUND ......................................................................... 1

III.  PROCEDURAL BACKGROUND ................................................................. 3

IV.   RESPONDENT'S REQUEST FOR DISMISSAL IS UNWARRANTED ........................ 5

V.    THE HEARING JUDGE DID NOT ABUSE HER DISCRETION OR COMMIT LEGAL ERROR ........................................................................... 6

VI.   RESPONDENT SEEKS DISMISSAL OF THE CASE BEFORE A FULL HEARING WHERE HE AND OTHER WITNESSES ARE SUBJECTED TO CROSS-EXAMINATION AND CREDIBILITY ASSESSMENTS ............................................ 7

VII.  THE FOUR CHARGES IN THE NDC STATE DISCIPLINABLE OFFENSES AND RESPONDENT'S STATEMENTS ABOUT COMMISSIONER LUEGE ARE NOT PROTECTED BY THE FIRST AMENDMENT ................................................. 8

      A.   Count One – Gender Bias ............................................................ 10

      B.   Counts Two through Four – Impugning the Integrity of a Judicial Officer ........... 16

VIII. CONCLUSION ........................................................................................ 20

THE STATE BAR'S RESPONSE TO RESPONDENT'S PETITION FOR INTERLOCUTORY REVIEW OF HEARING JUDGE'S ORDER DENYING RESPONDENT'S MOTION TO DISMISS; Case No. SBC-20-O-30496

1

## TABLE OF AUTHORITIES

2

### CASES

3

**California Supreme Court Cases**

4

*Andrews v. ALRB* (1981) 28 Cal.3d 781 ........................................................... 19

5

*Anderson* and *Ramirez v. State Bar* (1980) 28 Cal.3d 402 ........................................ 12

6

*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970 .............................................. 2

7

*Fishbaugh v. Fishbaugh* (1940) 15 Cal.2d 445 .................................................... 19

8

*Hogan v. State Bar* (1951) 36 Cal.2d 807 .......................................................... 18

9

*Hume v. Superior Court* (1941) 17 Cal.2d 506 ..................................................... 18

*In re Buckley* (1973) 10 Cal.3d 237 ............................................................... 18

10

*In re Kelley* (1990) 52 Cal.3d 487 ................................................................. 8

11

*In re Philbrook* (1985) 105 Cal. 471 ............................................................... 9

12

*In the Matter of Ramirez* (1980) 28 Cal.3d 402 ........................................... 9, 17, 18, 19

13

*Maltaman v. State Bar* (1987) 43 Cal.3d 924 ....................................................... 3

14

*McEwen v. Occidental Life Insurance Co.* (1916) 172 Cal. 6 ....................................... 19

15

*People v. Guerra* (2006) 37 Cal.4th 1067 ......................................................... 19

*Sabella v. S. Pac. Co.* (1969) 70 Cal.2d 311 ...................................................... 3

16

*Snyder v. State Bar* (1976) 18 Cal.3d 286 ......................................................... 18

17

18

**State Bar Court Cases**

19

*In the Matter of Anderson* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 775 .......... 5, 12, 17, 18

20

*In the Matter of Lais* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 112 ....................... 3

21

*In the Matter of McCarthy* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 364 ................... 7

22

*In the Matter of Regan* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 844 ..................... 19

23

*In the Matter of Respondent B* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 424 .............. 8

*In the Matter of Tady* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 121 ...................... 7

24

25

26

27

28

**California Court of Appeal**

*Dietrich v. Litten Industries* (1970) 12 Cal.App.3d 704 ................................................ 19

*Hanson v. Superior Court* (2001) 91 Cal.App.4th 75 .................................................... 18

*In re Grossman* (1972) 24 Cal.App.3d 624 .................................................................. 18

*In re Koven* (2005) 134 Cal.App.4th 262 ..................................................................... 18

*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507 ......................................... 3

*In re White* (2004) 121 Cal.App.4th 1453 .................................................................... 18

*Lasalle v. Vogel* (2019) 36 Cal.App.5th 127 ................................................................. 3

*Mackie v. Dyer* (1957) 154 Cal.App.2d 395 ................................................................ 19

*Martinez v. O'Hara* (2019) 32 Cal.App.5th 853 ........................... 1, 2, 3, 7, 10, 11, 13

*McCann v. Municipal Court* (1990) 221 Cal.App.3d 527 ............................................ 18

*People v. Chong* (1999) 76 Cal.App.4th 232 ............................................................... 18

*Ryan v. Welte* (1948) 87 Cal.App.2d 888 .................................................................... 19

**United States District Courts**

*Badlam v. Reynolds Metals Co.* (N.D.N.Y. 1999) 46 F.Supp.2d 187 ........................... 15

**United States Court of Appeals**

*Burns v. McGregor Electronic Indus., Inc.* (8th Cir. 1953) 989 F.2d 959 ..................... 15

*In re Paige* (2018 3rd Cir.) 738 Fed.Appx. 85 ....................................................... 14, 16

*Ransmeier v. Mariani* (2nd Cir. 2013) 718 F.3d 64 ..................................................... 15

*Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman* (9th Cir. 1995) 55 F.3d 1430 ........................................................ 4, 15, 16, 17

*United States Dist. Ct. v. Sandlin* (9th Cir. 1993) 12 F.3d 861 ............................... 9, 12

*United States v. Cooper* (1st Cir. 1989) 872 F.2d 1 ...................................................... 9

*United States v. Wunsch* (9th Cir. 1996) 84 F.3d 1110 .......................................... 15, 16

**United States Supreme Court**

*Bates v. State Bar of Arizona* (1977) 433 U.S. 350 ....................................................... 9

*Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030 .............................................. 9, 10

*Hustler v. Fallwell* (1988) 485 U.S. 46 ................................................................... 11, 15

*In re Sawyer* (1959) 360 U.S. 622 ................................................................................ 9

iii

*United States v. Young* (1985) 470 U.S. 1 ........................................................................ 9

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489 ......................... 8

**Out of State Cases**

*Crawford County Bar Association v. Nicholson* (Ohio 1993) 613 N.E.2d 1025 ........................ 14

*Cruz-Aponte v. Caribbean Petroleum Corp.* (U.S.D.C. Puerto Rico 2015) 123 F.Supp.3d 276 .. 14

*Disciplinary Counsel v. Mills* (Ohio 2001) 755 N.E.2d 336 ........................................ 14

*Florida Bar v. Wasserman* (Fla. 1996) 67 So.2d 103 .............................................. 14

*Galbreath v. Board of Professional Responsibility of Supreme Court of Tennessee* (Tenn. 2003) 121 S.W.3d 660 .............................................................................. 15

*Greivance Adm'r v. Fieger* (Mich. 2006) 719 N.W.2d 123 ........................................ 15

*In re Davidson* (La. 2012) 99 So.3d 18 .......................................................... 14

*In re Greenburg* (La. 2009) 9 So.3d 802 ......................................................... 14

*In re Hinds* (N.J. 1982) 449 A.2d 483 ............................................................. 9

*In re Spivey* (1997) 345 N.C. 404 ................................................................ 14

*In re Williams* (Minn. 1987) 414 N.W.2d 394 .................................................... 14

*In the Matter of Blume* (2019) 309 Kan. 1313 ................................................... 15

*In the Matter of Paulsrude* (Minn. 1976) 248 N.W.2d 747 ........................................ 14

*Lumumba v. State* (Miss. 2003) 868 So.2nd. 1018 ................................................ 15

*Matter of Friedland* (Ind. 1978) 376 N.E.2d 1126 ............................................... 14

*Matter of Member of Bar Hurley* (Del. 2018) 183 A.3d 703 ....................................... 14

*Matter of Schiff* (N.Y. App. Div. 1993)190 A.D.2d. 293 ......................................... 14

*Mullaney v. Aude* (Md. 1999) 730 A.2d 759 ................................................. 14, 15

*Peters v. Pine Meadows Ranch Home Ass'n* (Utah 2007) 151 P.3d 962 .............................. 18

*Principe v. Assay Partners* (N.Y. 1992) 586 N.Y.S.2d 182 .................................. 14, 15, 16

*Spencer v. Dixon* (W.D. Louisiana 1969) 290 Fed. Supp. 531 ....................................... 9

*State ex rel. Counsel for Discipline of Nebraska Supreme Court v. Beach* (Neb. 2006) 722 N.W.2d 30 ................................................................................... 15

*Statewide Greivance Committee v. Presnick* (Conn. 1989) 559 A.2d 220 ........................... 14

iv

**STATUTES**

**Business and Professions Code**

Section 6068, subdivision (b) ................................................. 1, 3, 4, 5, 6, 8, 10, 12, 13, 15, 17, 19

Section 6068, subdivision (f) ........................................................................... 15

**California Government Code**

Section 12965, subdivision (b) ........................................................................... 2

**California Code of Civil Procedure**

Section 218.5 ........................................................................................... 2

Section 904.1 ......................................................................................... 10

Section 1033, subdivision (a) ........................................................................ 2

**Business and Professions Code**

Section 6068, subdivision (b) ........................................................................... 8

**California Evidence Code**

Section 451(a) ......................................................................................... 7

**RULES**

**Rules of Procedure of the State Bar of California**

Rule 5.124(C) ...................................................................................... 7, 8

Rule 5.150(K) ......................................................................................... 6

**Out of State Rules**

Kansas Rule 4.4(a) .................................................................................. 15

**TREATISES**

**California Constitution**

Article III, Section 3.5 ............................................................................... 8

1  **I.    INTRODUCTION**

2        Pursuant to this Court's December 23 and 30, 2020 orders[1], the State Bar of California

3  (State Bar) files this response and opposition to respondent's petition for interlocutory review,

4  wherein he seeks review of the hearing judge's November 25, 2020 order, denying his motion to

5  dismiss this case.

6        This case is not about the respondent's free speech rights; nor is it about his right to be a

7  zealous advocate, to criticize a judicial officer, or to challenge her ruling, as respondent would

8  have this Court believe.  This case is about how respondent, while acting as an officer of the

9  court, and while representing a party in pending litigation, engaged in acts of gender bias against

10 a female judge and falsely impugned her honesty and integrity and failed to show the required

11 respect due the court as required by the rules regulating the profession, in willful violation of

12 Business and Professions Code section 6068, subdivision (b).  Respondent's manifestations of

13 gender bias and false impugning of a judicial officer's integrity compromises the necessary

14 public trust that the judicial system will produce fair and just results.

15 **II.   FACTUAL BACKGROUND**

16       Respondent represented the plaintiff in a civil case entitled *Martinez v. O'Hara*, in which

17 plaintiff alleged employment-related claims against the defendants, including claims for unpaid

18 wages, fraud, sexual harassment, and claims seeking an injunction for unfair advertising and

19 unfair business practices.  The wage claim was resolved before trial, and the remaining claims

20 went to trial in 2016.  The trial court (Commissioner Carmen Luege) granted the defendants'

21 motion for nonsuit and dismissed the fraud claim.  The jury returned a modest verdict on the

22 sexual harassment claim in favor of respondent's client in the amount of $8,080.  And, following

23 ///

24 ///

25

26

27 [1] On December 30, 2020, this Court granted the State Bar's motion to extend the time to file a
response to this petition until January 14, 2021.  (State Bar's Supplemental Appendix, Exh. 1.)

28                                          1

1   a bench trial of plaintiff's remaining claims seeking injunctive relief, the court found in favor of

2   defendants.[2]

3        After trial, respondent filed a motion for an order awarding prevailing party attorney fees

4   and costs pursuant to Government Code section 12965, subdivision (b), and Labor Code section

5   218.5 requesting attorney fees in the amount of $133,887 for litigating the case plus $12,747 for

6   fees incurred in bring the motion itself, for a total fee award of $146,634.  The trial court denied

7   respondent's motion for fees in its entirety.[3]  It is respondent's conduct in appealing the trial

8   court's order denying his motion for attorney fees that forms the basis for this disciplinary case,

9   which was referred to the State Bar by the Court of Appeal of California, Fourth Appellate

10  District, Division Three.[4]

11       In its opinion filed on February 28, 2019, the appellate court affirmed the trial court's

12  denial of respondent's motion for attorney fees finding that the trial court properly exercised its

13  discretion under Code of Civil Procedure section 1033, subdivision (a), and followed the legal

14  principles set forth in *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970.[5]

15       The appellate court also partially certified a portion of its opinion for publication where it

16  concluded that respondent committed professional misconduct and reported him to the State Bar.

17  The court published this portion of its opinion for two reasons.  First, it found that the respondent

18  manifested gender bias in the notice of appeal that he signed and filed by referring to the ruling

19  of the female judicial officer as "succubustic."  The court stated: "A 'succubus' is defined as a

20  demon assuming female form which has sexual intercourse with men in their sleep.  We publish

21  this portion of the opinion to make the point that gender bias by an attorney appearing before us

22

23  [2] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 854-855.  (Respondent's Appendix, 2 R 497-
    501.  The State Bar adopts the same abbreviation system used by respondent in his petition when
24  citing to documents in the Respondent's Appendix.)

25  [3] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855.  (Respondent's Appendix, 2 R 497-501.)

26  [4] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853.  (Respondent's Appendix, 2 R 497-501.)

27  [5] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855.  (Respondent's Appendix, 2 R 497-501.)

28                                         2

1   will not be tolerated, period."[6]  The court also reported respondent to the State Bar because of a

2   statement respondent made in the notice of appeal suggesting that the trial court attempted to

3   thwart service of the signed judgment on the plaintiff in an effort to evade appellate review and

4   because of statements he made in his appellate briefs accusing the judicial officer who ruled on

5   his motion for attorney fees of *intentionally* refusing to follow the law.  The court found that

6   these serious accusations were baseless and unsupported by any evidence.[7]

7 **III.  PROCEDURAL BACKGROUND**

8       On August 11, 2020, the State Bar initiated this disciplinary proceeding by filing a Notice

9   of Disciplinary Charges (NDC) alleging four counts of misconduct against respondent.  Each

10   count alleges that respondent failed to maintain respect due to courts and judicial officers, in

11   willful violation of Business and Professions Code section 6068, subdivision (b), based on

12   statements made by respondent in the notice of appeal and appellate briefs that he filed in the

13   *Martinez* case.[8]  With respect to the notice of appeal that respondent filed, the State Bar alleges

14

15 [6] *Martinez v. OHara* (2019) 32 Cal.App.5th 853, 855.  (Respondent's Appendix, 2 R 497-501.)
It is not uncalled for, for a civil court to castigate disrespectful conduct by attorneys who appear
16 before them.  (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1537 ["[A]ll counsel,
regardless of practice, regardless of age—that zealous advocacy does not equate with 'attack
17 dog' or 'scorched earth'; nor does it mean lack of civility. [Citations]. Zeal and vigor in the
representation of clients are commendable. So are civility, courtesy, and cooperation.  They are
18 not mutually exclusive."]; *Sabella v. S. Pac. Co.* (1969) 70 Cal.2d 311, 326 (dis. opn. of Traynor,
J.) ["the courtroom is a forum for the presentation of evidence and rational argument, not a stage
19 for over mellow drama.  The responsibility of a lawyer is to raise issues, not scenes, and to
reason about them in nontheatrical terms.  Invective, with all its theatrics, has no place in the
20 language of the law."]; (*Lasalle v. Vogel* (2019) 36 Cal.App.5th 127, 141 ["[L]awyers who know
how to think but have not learned how to behave are a menace and a liability ... to the
21 administration of justice.... [¶] ... [T]he necessity for civility is relevant to lawyers because they
are the living exemplars – and thus teachers – every day in every case and in every court and
22 their worst conduct will be emulated perhaps more readily than their best."].)

23 [7] *Martinez v. OHara* (2019) 32 Cal.App.5th 853, 855.  (Respondent's Appendix, 2 R 497-501.)
The State Bar Court gives a strong presumption of validity to the superior court's findings if
24 supported by substantial evidence.  (*Maltaman v. State Bar* (1987) 43 Cal.3d 924, 947.) And the
State Bar Court may rely on a court of appeal opinion to which an attorney was a party as a
25 conclusive legal determination of civil matters "which bear a strong similarity, if not identity, to
the charged disciplinary conduct."  (*In the Matter of Lais* (Review Dept. 2000) 4 Cal. State Bar
26 Ct. Rptr. 112, 117.)

27 [8] Respondent's Appendix, 2 R 357-366.

28                     3

1  in counts one and two of the NDC that respondent failed to maintain respect due to the courts

2  and judicial officers by making a statement that manifested gender bias and by making a false

3  statement of fact, or opinion implying or based on a false assertion of fact,[9] impugning the

4  honesty, motivation, integrity, or competence of the trial court judicial officer by suggesting that

5  the trial court attempted to thwart service of the judgment on plaintiff in an effort to evade

6  appellate review.  With respect to the appellate briefs that respondent filed, the State Bar alleges

7  in counts three and four of the NDC that respondent further failed to maintain respect due to the

8  courts and judicial officers by making false statements of fact, or opinions implying or based on

9  false assertions of fact, impugning the honesty, motivation, integrity, or competence of the trial

10  court judicial officer by accusing a judicial officer of *intentionally* refusing to follow the law due

11  to bias against plaintiff and/or his counsel (respondent).  The NDC sets forth, in full, the various

12  statements made by respondent in the notice of appeal and appellate briefs that form the basis for

13  the alleged violations of Business and Professions Code section 6068, subdivision (b).

14         On September 18, 2020, respondent filed a motion to dismiss the NDC and a request for

15  judicial notice.[10]  On October 5, 2020, the State Bar opposed the motion to dismiss and requested

16  judicial notice of the Court of Appeal's opinion, which was partially certified for publication.[11]

17  On October 6, 2020, respondent filed his reply in support of his motion to dismiss.[12]

18         On November 25, 2020, the hearing judge issued her order granting both parties' requests

19  for judicial notice, and denying respondent's motion to dismiss.  In denying the motion to

20  dismiss, the hearing judge correctly concluded, in pertinent part, "[t]he charges are sufficiently

21  pled and Business and Professions Code section 6068, subdivision (b), is not unconstitutional.

22

23  [9] Statements of opinion are punishable as well, if they "imply a false assertion of fact."  (See
    *Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*
24  (9th Cir. 1995) 55 F.3d 1430, 1437-1438.)

25  [10] Respondent's Appendix, 2 R 367-458; 2 R 460-466.

26  [11] Respondent's Appendix, 2 R 467-502.

27  [12] Respondent's Appendix, 2 R 508-522.

28  _____4_____

1  (See *In the Matter of Anderson* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 775.)"  The

2  hearing judge also correctly disregarded all factual matters outside of the ambit of the NDC,

3  since the purpose of the motion to dismiss is to test the sufficiency of the notice, not to contest

4  the charges.[13]

5         On December 9, 2020, respondent filed this petition for interlocutory review.

6         On December 10, 2020, the hearing judge abated the case based upon respondent's

7  motion to stay the proceedings pending this Court's ruling on respondent's two petitions for

8  interlocutory review.  The State Bar did not oppose the motion for stay or abatement of this case

9  pending the outcome of this petition.[14]

10        On December 23, 2020, this Court ordered the State Bar to respond to the respondent's

11  petition for interlocutory review.[15]

12        On December 28, 2020, the State Bar filed a motion for extension of time, which this

13  Court granted on December 30, 2020, and ordered the State Bar to file its response to

14  respondent's petition for interlocutory review on or before January 14, 2021.[16]

15  **IV.    RESPONDENT'S REQUEST FOR DISMISSAL IS UNWARRANTED**

16        Respondent requests that this Court dismiss the NDC in its entirety.  He argues that all

17  four counts fail to state a disciplinary offense in light of his expansive free speech rights.  He

18  also argues that Business and Professions Code section 6068, subdivision (b), is unconstitutional,

19  and therefore unenforceable, because it is overbroad and vague.  Respondent is wrong and his

20

21  _____

    [13] Respondent's Appendix, 2 R 533-536.  In his petition, respondent goes into a lot of
22  background about his dealings with a different judicial officer, and his speculation that those
    dealings impacted Commissioner Luege's rulings.  These matters are not relevant to the instant
23  petition and the underlying motion to dismiss the NDC based upon the sufficiency of the
    pleading.  To the extent this information is relevant to the case, this information will need to be
24  developed in the record during a full trial on the merits, along with other factual issues, as
    discussed below.
25
    [14] State Bar's Supplemental Appendix, Exh. 2.
26
    [15] State Bar's Supplemental Appendix, Exh. 3.
27
    [16] State Bar's Supplemental Appendix, Exh. 1.
28                                                    5

1  arguments must fail.  As set forth below, Business and Professions Code section 6068,

2  subdivision (b), is not unconstitutional and each of the four counts of the NDC properly alleges a

3  disciplinary offense that respondent failed to maintain respect due to courts and judicial officers.

4        While respondent tries to characterize his statements in his notice of appeal and his

5  appellate briefs as fair criticism of the judge protected by the First Amendment, his statements

6  are not protected speech.  An attorney's speech may lawfully be restricted to maintain respect

7  due to the courts.  The courts and the State Bar have a strong interest in prohibiting gender bias

8  and false statements that impugn the integrity of judicial officers and the courts.  Moreover, an

9  attorney has a duty to be respectful.  While an attorney can criticize a judicial officer, he must

10 not engage in gender bias or falsely impugn the judge's honesty.  These restrictions serve the

11 interest of maintaining public confidence in the justice system, preventing illegal bias and

12 ensuring a fair proceeding for all parties that is based on the evidence and the law.  Respondent

13 was not precluded from appealing the judge's order and criticizing the judge, but he did not stop

14 there.  He inappropriately went further with derogatory and degrading language and manifests

15 gender bias.  The Appellate Court's findings are entitled to great weight but this court.

16       The respondent also seeks dismissal of these proceedings even though the record has not

17 been fully developed, and the hearing judge has not yet had the opportunity to hear the testimony

18 of the witnesses, subject to cross-examination, and to determine their veracity and credibility.

19 As discussed below, there are mixed questions of law and fact that need to be addressed by the

20 hearing judge, the witnesses and their testimony will need to be evaluated, and the hearing judge

21 may be called upon to make credibility assessments.

22       For these reasons, the State Bar asks this Court to deny respondent's petition.

23 **V.    THE HEARING JUDGE DID NOT ABUSE HER DISCRETION OR COMMIT
         LEGAL ERROR**

24

25       Rule 5.150(K) of the Rules of Procedure of the State Bar of California[17] provides that the

26 _____

27 [17] All further references to rules are to the Rules of Procedure of the State Bar unless otherwise
    indicated.

28                                         6

1    standard of review on interlocutory review is abuse of discretion or error of law unless otherwise

2    specified.  As is discussed below, the hearing judge did not abuse her discretion or commit any

3    legal error.

4    **VI.    RESPONDENT SEEKS DISMISSAL OF THE CASE BEFORE A FULL
         HEARING WHERE HE AND OTHER WITNESSES ARE SUBJECTED TO**

5    **CROSS-EXAMINATION AND CREDIBILITY ASSESSMENTS**

6           Rule 5.124(C) provides in pertinent part that a disciplinary proceeding may be dismissed

7    without prejudice "if the initial pleading does not state a disciplinable offense or give sufficient

8    notice of the charges."  In evaluating a contention that a notice of disciplinary charges is

9    defective because it fails to state a disciplinary offense, this Court is required to treat the

10   allegations of the notice as true but may draw its own conclusions regarding the legal import of

11   those facts.  (*In the Matter of McCarthy* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 364, 376,

12   citing *In the Matter of Tady* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 121, 124. "'Both at

13   hearing and on review, the court considering a motion to dismiss should disregard all factual

14   matters outside the ambit of the notice . . . , since *the purpose of the motion is to test the*

15   *sufficiency of the notice, not to contest the charges.*  [Emphasis in original.]  [Citation.]

16   However, judicially noticeable facts outside the scope of the notice are an exception to this rule

17   and are cognizable. [Citations.]'" (*Ibid.*)  For example, the hearing judge properly took judicial

18   notice of the Fourth District Court of Appeal's partially published opinion in *Martinez v.*

19   *O'Hara.*[18]

20          In his pleadings, respondent delves largely into factual matters which are beyond the

21   court's consideration on a motion to dismiss and should be dealt with by the trial judge where a

22   full record of the facts and circumstances surrounding this case can be developed, which will

23   include cross-examination of live witnesses and credibility determinations by the hearing

24   judge.[19]

25   _____

26   [18] Respondent's Appendix, 2 R 533-536; Cal. Evid. Code § 451(a).

27   [19] Even if this Court were to agree with respondent's assertions that one or more counts fail to
     state a disciplinable offense, or to give adequate notice of the charges, the Court must allow the

28                                                    7

1  VII.    **THE FOUR CHARGES IN THE NDC STATE DISCIPLINABLE OFFENSES AND RESPONDENT'S STATEMENTS ABOUT COMMISSIONER LUEGE ARE NOT PROTECTED BY THE FIRST AMENDMENT**

3     Respondent attacks the NDC by claiming that all of his statements are protected by the

4  First Amendment, and that Business and Professions Code section 6068, subdivision (b), is

5  unconstitutional due to overbreadth and vagueness.

6     All four counts of the NDC allege that respondent violated Business and Professions

7  Code section 6068, subdivision (b).  Section 6068, subdivision (b), provides that it is the duty of

8  an attorney "[t]o maintain the respect due to the courts of justice and judicial officers."

9     As a threshold matter, this Court may not declare a statute unconstitutional.  The Review

10  Department of the State Bar Court has properly held that it cannot declare a statute

11  unconstitutional in proceedings in which discipline may be implemented without California

12  Supreme Court action, as the State Bar Court's authority is limited to interpreting existing law.

13  At best, as a sui generis arm of the Supreme Court, if the Court recommends a suspension or

14  disbarment, it may also recommend that a statute be declared unconstitutional by the California

15  Supreme Court.[20]

16     Further, respondent's assertion that section 6068, subdivision (b), is unconstitutional

17  because it is overbroad and vague due to the broad range of criticisms that may cause a judge to

18  feel "disrespected" must fail.  "It is well established that 'one to whose conduct a statute clearly

19  applies may not successfully challenge it for vagueness.'  [Citation.]"[21]

20     Similar arguments that enforcement of section 6068, subdivision (b), violates free speech

21

22  ─────────────────────

23  State Bar at least one opportunity to amend the pleading within 20 days after an order of dismissal is served.  (Rule 5.124(C).)

24  [20] See *In the Matter of Respondent B* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 424, 433, fn.
25  11; see also Cal. Const. Art. III, § 3.5 (an administrative agency, including an administrative agency created by the Constitution, has no power to declare a statute unconstitutional).

26  [21] *In re Kelley* (1990) 52 Cal.3d 487, 497; see also *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 495 ["[a] plaintiff who engages in some conduct that is clearly
27  proscribed cannot complain of the vagueness of the law as applied to the conduct of others."].)

28

8

rights under the First Amendment have been previously addressed and rejected by the California Supreme Court.[22]  It is well established that once an attorney is admitted to the bar, although he does not surrender his freedom of expression, he must temper his criticism in accordance with professional standards.[23]  Obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech.[24]

Moreover, the United States Supreme Court has held that "[i]t is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech" an attorney has is extremely circumscribed.  An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal.  [Citations.]  Even outside the courtroom, a majority of the [Supreme] Court observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be."[25]

The United States Supreme Court has further made clear that speech otherwise entitled to full constitutional protection may nonetheless be sanctioned if it obstructs or prejudices the administration of justice.[26]  Further, false, misleading, or deceptive statements are not constitutionally protected.[27]

---

[22] See *Ramirez v. State Bar* (1980) 28 Cal.3d 402, 411.

[23] *United States Dist. Ct. v. Sandlin* (9th Cir. 1993) 12 F.3d 861, 866; *United States v. Cooper* (1st Cir. 1989) 872 F.2d 1; *In re Hinds* (N.J. 1982) 449 A.2d 483, 489; *Spencer v. Dixon* (W.D. Louisiana 1969) 290 Fed. Supp. 531, 537; *In re Philbrook* (1985) 105 Cal. 471, 477-478; see also *Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030 [finding "the speech of those participating before the courts could be limited" and "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for the regulation of the press" and other strangers to litigation]; *In re Sawyer* (1959) 360 U.S. 622, 646-647 (Stewart, J., concurring) [rejecting any "intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct" and stating that "obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech"]; *United States v. Young* (1985) 470 U.S. 1, 9-10.)

[24] *In re Sawyer* (1959) 360 U.S. 622, 646-647[Stewart, concurring].

[25] *Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030, 1071.

[26] *Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030, 1074-1075.

[27] *Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 383.

9

1    In *Gentile v. State Bar of Nevada, supra*, 501 U.S. 1030, 1075, the United States Supreme

2    Court held that attorneys involved in pending cases may be punished even for out-of-court

3    statements if they pose merely a "substantial likelihood" of materially prejudicing the

4    administration of justice.  In so doing, the Court noted that attorneys participating in pending

5    cases have "special access to information" about the case, and as a result, their statements pose a

6    heightened threat to the administration of justice "since [they] are likely to be received as

7    especially authoritative."[28]

8        **A.    Count One – Gender Bias**

9    Count one of the NDC alleges that respondent filed a Notice of Appeal in the case

10   entitled *Martinez v. O'Hara*, in which respondent failed to maintain the respect due to the courts

11   of justice and judicial officers by making the following statement regarding the ruling of

12   Commissioner Carmen Luege, a female judicial officer, which statement manifested gender bias,

13   in willful violation of Business and Professions Code section 6068, subdivision (b):

14       Pursuant to Code of Civil Procedure section 904.1 et seq., Plaintiff Fernando
         Martinez hereby appeals from the lower court's disgraceful order dated November
15       30, 2016, as incorporated into a reported judgment dated February 21, 2017, and as
         such, technically appeals from that judgment.  The ruling's succubustic adoption of
16       the    defense    position,    and    resulting    validation    of    the    defendant's
         pseudohermaphroditic misconduct, prompt one to entertain reverse peristalsis unto
17       its four corners.[29]

18   Respondent argues that count one should be dismissed for five reasons.[30]

19   First, respondent argues that he did not refer to the judge as "succubustic," but only to her

20   ruling; therefore, his statements do not constitute disrespect to the judge.  But a "succubus" is

21

22   ───────────────

     [28] *Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030, 1074.
23
     [29] Respondent's Appendix, 2 R 450-458.  The respondent's offensive statements were not even
24   necessary to the notice of appeal, as a notice of appeal need only refer to the orders appealed.

25   [30] The State Bar addresses this count separately from counts two through four because it is based
     upon an allegation that respondent's statement involved gender bias, and not on the allegation
26   that the statements were false.  There are other ways to violate Business and Professions Code
     section 6068, subdivision (b) that do not involve making false statements of fact about a judicial
27   officer, which must be analyzed differently.

28                                         10
     ───────────────────────────────────────────────────────────────
     THE STATE BAR'S RESPONSE TO RESPONDENT'S PETITION FOR INTERLOCUTORY REVIEW OF
     HEARING JUDGE'S ORDER DENYING RESPONDENT'S MOTION TO DISMISS; Case No. SBC-20-O-30496

1  defined as a demon assuming a female form which has sexual intercourse with men in their

2  sleep, and respondent made the statement in the context of a female judicial officer.[31]  By doing

3  so, respondent sexualized and engaged in gender bias against Commissioner Luege.  The import

4  of his message was not just that her decision was wrong; instead, respondent inappropriately

5  went further and ascribed derogatory language that indicated the decision was based upon an

6  overly aggressive, predatory, and incompetent female jurist.  By using the epithet, as applied to a

7  female judge, respondent perpetuated disparaging and denigrating stereotypes about women.

8         In his second and third arguments, respondent claims that even if the statement were

9  interpreted as referring to the judge as a "succubus," such statement is "rhetorical hyperbole"

10  protected by the First Amendment and is not capable of being proven to be true or false.  But, as

11  found by the Fourth District Court of Appeal, the statement evidences gender bias, and is

12  prohibited in the context of court proceedings in reference to a judicial officer.  Statements of

13  gender bias, racial epithets and other forms of bias have no place in court proceedings.  Whether

14  the statement involves gender bias, and a lack of respect for the court and its judicial officers,

15  does not turn on the case law involving false statements of fact about a judicial officer as

16  discussed below, with respect to counts two through four.  Using gender bias or racial epithets to

17  attack a judge or their ruling, lacks respect and denigrates the legal system because, rather than

18  attacking the court's ruling on the merits, the party uses the insidious tactic of attacking the

19  judicial officer's competence based upon harmful and derogatory stereotypes.  In this case, the

20  respondent called Commissioner Luege's ruling "succubustic," which conjures up a sexualized

21  image of a hyperaggressive female demon attempting to engage in carnal intercourse with men

22  —a deeply misogynistic image.  Respondent's reliance upon cases like *Hustler v. Fallwell*

23  (1988) 485 U.S. 46 do not help him here, because his statements were made while he was acting

24  as an attorney in court proceedings and pleadings, where the state has a strong interest in limiting

25  attorney's speech.  These limitations on respondent's speech did not prevent him from criticizing

26

27

[31] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853.  (Respondent's Appendix, 2 R 497-501.)

28

the judge or her rulings, but it is vital to the integrity of our adversary legal system and our system of justice that an attorney maintain respect for the court and the court's rulings even where the attorney chooses to challenge those rulings.

As discussed above, it is well established that once an attorney is admitted to the bar, although he does not surrender his freedom of expression, he must temper his criticism in accordance with professional standards. (*United States Dist. Ct. v. Sandlin* (9th Cir. 1993) 12 F.3d 861, 866; see also *Gentile v. State Bar of Nevada* (1991) 501 U.S. 1030, [finding "the speech of those participating before the courts could be limited" and "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for the regulation of the press" and other strangers to litigation].)

In *In the Matter of Anderson* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 775, 782, the Review Department of the State Bar Court recognized that "attorneys occupy a special status and perform an essential function in the administration of justice. Because attorneys are officers of the court with a special responsibility to protect the administration of justice, courts have recognized the need for the imposition of reasonable speech restrictions upon them." The Review Department stated:

> A restriction on free speech can survive judicial scrutiny under the First Amendment only if two fundamental conditions are satisfied. First, the limitation must further an important or substantial governmental interest unrelated to the suppression of expression. Second, the restriction must be no greater than is necessary or essential to the protection of the particular governmental interest involved. [Citations.]

(*In the Matter of Anderson, supra,* at p. 782.)

Although *Anderson* and *Ramirez v. State Bar* (1980) 28 Cal.3d 402, both of which are discussed more fully below, dealt with allegations that an attorney failed to maintain respect due to the courts of justice and judicial officers in violation of Business and Professions Code section 6068, subdivision (b), in the context of making statements impugning the integrity of the courts, under the test articulated in *Anderson*, section 6068, subdivision (b), also passes constitutional muster when applied to allegations that an attorney failed to maintain respect due to the courts

12

1   and judicial officers by making statements that manifest gender bias in a matter pending before

2   the court as is alleged in Count One of the NDC filed against respondent.  In this situation, the

3   first prong of the test is satisfied in that there are important and strong governmental interests in

4   preserving the administration of justice free of prejudice and harm caused by gender bias and

5   preserving public confidence in the legal system.  The second prong of the test also is satisfied in

6   that prohibiting statements made by an attorney in a matter pending in court that manifest gender

7   bias imposes a limited restriction that is no greater than is necessary or essential to the protection

8   of the governmental interests involved.  The restriction does not prohibit attorneys from

9   criticizing courts or judicial officers or their rulings.  The restriction simply prohibits attorneys

10  from doing so in a manner that manifests gender bias and thereby demonstrates a lack of respect

11  for the courts and judicial officers.  Making statements that manifest gender bias is akin to

12  creating a hostile work environment.  If such statements would not be permitted in a work

13  environment, there is no reason why such statements should be permitted by attorneys in matters

14  pending before a court.  This is especially true because, like false statements that impugn the

15  integrity of a court, statements that manifest gender bias have no advocacy value and no

16  constitutional value and therefore are not worthy of constitutional protection.  Statements made

17  by attorneys in matters pending before a court that manifest gender bias are particularly harmful

18  in that they interfere with the administration of justice and undermine public confidence in the

19  legal system.

20         As stated by the Fourth District Court of Appeal in its published opinion, a "succubus" is

21  defined as a demon assuming female form which has sexual intercourse with men in their

22  sleep.[32]  By referring to the female judicial officer's ruling as "succubustic," respondent both

23  demonized and sexualized the female judicial officer, thus manifesting gender bias and

24  demonstrating lack of respect for the court in violation of section 6068, subdivision (b).  As set

25  forth above, application of section 6068, subdivision (b), to statements made by attorneys in

26

27  _____
    [32] *Martinez v. O'Hara, supra*, 32 Cal.App.5th at 855. (Respondent's Appendix, 2 R 497-501.)

28                                              13

1  matters pending before the court that manifest gender bias does not unconstitutionally infringe

2  on free speech rights pursuant to the two-part test set forth in *Anderson*.

3      Attorneys have been sanctioned or received discipline for similar misconduct in a number

4  of other jurisdictions because gender bias and other forms of discrimination serve little or no

5  purpose other than to embarrass or harass the recipient of the statements, and such statements

6  made in court interferes with the administration of justice, and with public confidence in the

7  legal system and the administration of justice.[33]

8  _____

9  [33] While other jurisdictions have sanctioned or prosecuted attorneys under their own rules and statutes the following cases are examples of similar misconduct. (See e.g., *See Cruz-Aponte v. Caribbean Petroleum Corp.* (U.S.D.C. Puerto Rico 2015) 123 F.Supp.3d 276 [male attorney sanctioned and required to complete continuing education course on professionalism and professional conduct after commenting to female attorney during deposition, that "[y]ou're not getting menopause, I hope."]; *Matter of Member of Bar Hurley* (Del. 2018) 183 A.3d 703 [male lawyer's inappropriate sexual emails to female opposing counsel, and religious statements to male opposing counsel warranted public reprimand]; *Matter of Schiff* (N.Y. App. Div. 1993)190 A.D.2d. 293 [attorney's vulgar, obscene and sexist epithets toward female opposing counsel's anatomy and gender were inexcusable, intolerable and adversely reflected on attorney's fitness to practice law]; *Mullaney v. Aude* (Md. 1999) 730 A.2d 759 [male attorney sanctioned for sexist remark to female deponent and addressing female attorney as "babe," during deposition]; *Principe v. Assay Partners* (N.Y. 1992) 586 N.Y.S.2d 182, 184–88, 191 [male attorney sanctioned for calling female attorney "little lady," "little mouse," and "little girl" repeatedly during deposition]; *In re Davidson* (La. 2012) 99 So.3d 18 [defense attorney's statement to a police witness prior to testimony "[H]ave you ever been raped?...well get ready because today will be your first time" violated Louisiana Rule of Professional Conduct]; *Statewide Greivance Committee v. Presnick* (Conn. 1989) 559 A.2d 220 [shouting and screaming in courthouse conference room that child protection workers were "Nazis" and "child molesters"]; *Florida Bar v. Wasserman* (Fla. 1996) 67 So.2d 103 [yelling, angry outburst in court and swearing at judicial assistant not protected by constitutional right to free speech]; *In re Greenburg* (La. 2009) 9 So.3d 802 [attorney reprimanded for exchanging vulgarities with opposing attorney in open court, while opposing attorney suspended for the same conduct in addition to assaulting counsel]; *Matter of Friedland* (Ind. 1978) 376 N.E.2d 1126 [rude comments to juvenile court judge, including "Judge, you're the biggest fool I've ever seen."]; *In re Spivey* (1997) 345 N.C. 404 [removal of DA for repeated use of word "nigger," which was found not to be protected by First Amendment]; *In re Paige* (2018 3rd Cir.) 738 Fed.Appx. 85 [court castigated attorneys appearing pro se who made statements in notice of appeal and briefs ascribing and adopting lewd and derogatory terminology and identifiers for themselves, such as "faggots" and "cunts," and calling court and the members of the bar a "cesspool of bigots"]; *In re Williams* (Minn. 1987) 414 N.W.2d 394 [public reprimand where attorney, inter alia, provoked opposing counsel, referred to opposing counsel with racial epithet, and intimidated witnesses]; *In the Matter of Paulsrude* (Minn. 1976) 248 N.W.2d 747 [attorney, inter alia, called judge a "horse's ass" and referred to court as "kangaroo court" after hearing adjourned]; *Crawford County Bar Association v. Nicholson* (Ohio 1993) 613 N.E.2d 1025 [inappropriate and disrespectful language, giving the judge "the finger," and sexual innuendo toward court officials]; *Disciplinary Counsel v. Mills* (Ohio 2001) 755 N.E.2d 336 [attorney reprimanded for tirade against magistrate and opposing counsel, including "this is bullshit" and "this is the second time you've done this crap to me"]; *Galbreath v. Board of Professional Responsibility of Supreme Court of Tennessee* (Tenn. 2003)

14

1    Where an attorney engages in discriminatory behavior, it not only reflects a lack of

2    professionalism, but also tarnishes the image of the entire legal profession and disparages our

3    system of justice. (*Principe v. Assay Partners, supra*, 586 N.Y.S.2d at pp. 184-188, 191;

4    *Mullaney, supra*, 126 Md. App. at p. 654.)

5    Respondent argues that a finding that his statements evidence gender bias and violate

6    section 6068, subdivision (b) is precluded based upon *Hustler v. Fallwell* (1988) 485 U.S. 46 and

7    *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430.  As discussed above, *Hustler* and

8    the newspaper-related cases do not help respondent here, because respondent's statements were

9    made while he was acting as an attorney in court proceedings and pleadings, where the state has

10   a strong interest in limiting attorney's speech.  *Yagman* does not help respondent either because

11   the attorney in *Yagman* did not engage in impermissible gender bias.[34]  Gender bias is prejudicial

12

13   121 S.W.3d 660 [attorney suspended, inter alia, for calling judge "honey"]; *Ransmeier v.
     Mariani* (2nd Cir. 2013) 718 F.3d 64, 68-71 [attorney sanctioned for making disparaging

14   comments about judge, including anti-Semitic comments]; *Greivance Adm'r v. Fieger* (Mich.
     2006) 719 N.W.2d 123, 135-138 [attorney reprimanded for remarking on radio program about

15   appellate judges, inter alia, that "Hey Michael Talbot, and Bandstra, and Markey, I declare war
     on you.  You declare it on me, I declare it on you.  Kiss my ass, too," and "[w]hen another

16   person involved in the broadcast used the word 'innuendo,' Mr. Fieger stated, 'I know the only
     thing that's in their endo should be a large, you know, plunger about the size of, you know, my

17   fist.'"]; *Lumumba v. State* (Miss. 2003) 868 So.2nd. 1018 [contempt conviction upheld for
     disrespectful statements to judge and calling court officials "henchmen"]; *State ex rel. Counsel*

18   *for Discipline of Nebraska Supreme Court v. Beach* (Neb. 2006) 722 N.W.2d 30, 34 [attorney
     disciplined, inter alia, for cumulative acts including sending note to counsel stating "The practice

19   was more enjoyable before feminazi bitches like you came on the scene"]; *In the Matter of
     Blume* (2019) 309 Kan. 1313, 1323. [When attorney presented email message during the

20   deposition, he had no substantial purpose other than to embarrass witness.  Moreover, when
     attorney called the videographer a Nazi, attorney used means that had no substantial purpose

21   other than to embarrass videographer.  Finally, when attorney gestured to witness using his
     middle finger, he used means that had no substantial purpose other than to embarrass witness.

22   Thus, attorney exhibited a lack of respect for the rights of third persons when he repeatedly used
     means that had no substantial purpose other than to embarrass, delay, or burden them and, thus,

23   violated Kansas Rule 4.4(a)].  (See also the following employment cases, *Burns v. McGregor
     Electronic Indus., Inc.* (8th Cir. 1953) 989 F.2d 959, 964 [use of words "bitch," "slut," and

24   "cunt" to a woman constituted harassment based on her sex]; *Badlam v. Reynolds Metals Co.*
     (N.D.N.Y. 1999) 46 F.Supp.2d 187, 191 ["old cunt," "slut," "whore," "bitch," "dyke," and

25   "prostitute"].)

26   [34] The case of *United States v. Wunsch* (9th Cir. 1996) 84 F.3d 1110, which references *Yagman,*
     makes clear that an attorney may not be prosecuted for offensive personality under Business and

27   Professions Code, section 6068, subdivision (f) because that statute is unconstitutionally vague,
     but did not address gender bias toward a judge in the context of a section 6068, subdivision (b)

28                                         15

1  to the administration of justice as the undercurrent of using terms like "succubustic" to describe a

2  female judge's ruling is to rely upon misogynistic stereotypes and impugn her ruling as

3  incompetent or biased for that reason.  While it is one thing to criticize a judge or a judge's

4  ruling, it is quite another to use sexist, gender biased language to promote misogynistic

5  stereotypes.

6      Fourth, respondent argues that his criticism of the judge's ruling as "disgraceful" was an

7  opinion.  The State Bar agrees that the respondent's use of the word "disgraceful," by itself

8  would not warrant a finding of culpability, but it is the reference to the judge's ruling as

9  "succubustic" that renders his conduct disciplinable.[35]  Respondent made those statements to

10  harass and embarrass the judge and to sexualize her, so as to attack the competency of the

11  judge's ruling based upon her gender.  The import was that the female judge was a "succubus" or

12  hyperaggressive sexualized demon when she ruled against respondent's client.

13      **B.    Counts Two through Four – Impugning the Integrity of a Judicial Officer**

14      The import of the allegations in counts two through four is that respondent impugned the

15  integrity of a judicial officer, by falsely representing in his notice of appeal and appellate briefs

16  to the court of appeal that Commissioner Carmen Luege intentionally failed to serve a judgment

17

18  _____

19  violation.  Moreover, while *Wunsch* involved an attorney making sexist statements to opposing counsel, those statements were made in the context of an attorney who had previously been

20  disqualified from a case.  In the instant case, the respondent was acting as an attorney in a pending matter and he made sexist statements evidencing gender bias about the female judge.

21  The Ninth Circuit also made clear in *Wunsch* that it was leaving open whether a single act of bigotry could subject an officer of the court to disciplinary sanctions.  (*Id.* at pp. 1117-1118.)

22  Citing to *Yagman* and *Principe*, the Court in *Wunsch* reiterated that attorney speech may not be sanctioned absent a showing that the conduct was "highly likely" to prejudice the administration

23  of justice.  (See *United States v. Wunsch, supra,* 84 F.3d at 1117-1118 and *Standing Comm. on Discipline v. Yagman, supra,* 55 F.3d at 1442-1443.)  As discussed above, such statements about

24  a judicial officer do prejudice the administration of justice and have no value or place in court proceedings.

25  [35] It should also be noted that, in a notice of appeal, the respondent did not need to make such statements about the judge or her ruling to file his notice of appeal.  (See, *In re Paige, supra,* 738

26  Fed. Appx. at p. 85 where court criticized in pro per attorneys for making unnecessary and extraneous statements not needed in the notice of appeal: "[t]he purpose of such a notice 'is to

27  notify the court of appeals and the opposing party that an appeal is being taken.'[footnote omitted].")

28                          16

in order to thwart appellate review and intentionally failed to follow the law.  It is one thing to argue on appeal that a judge made errors, but it is quite another to accuse a judge of intentionally thwarting and violating the law.

This Court's opinion in *In the Matter of Anderson, supra,* 3 Cal. State Bar Ct. Rptr. 775 and the Supreme Court's decision in *Ramirez v. State Bar*, *supra*, 28 Cal.3d 402 sets forth the analysis where an attorney makes false statements impugning the integrity of a judicial officer. In *Anderson*, the Review Department adopted the Ninth Circuit's approach to this issue, as expressed in *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430.  As stated in *Anderson*, in determining an attorney's culpability under section 6068, subdivision (b), for statements made that may impugn the integrity of judicial officers, we are required to first establish that the statement is capable of being proved true or false, such that it cannot be considered a statement of opinion.[36]  Statements of opinion are punishable as well, if they "imply a false assertion of fact."[37]  Having determined the statement is factual and not opinion, the court then determines if it is false, and, finally, if the false statement was made knowingly or with a reckless disregard of the truth.[38]

First, respondent's statements are statements of fact and not opinion.  In count two. respondent's statement suggests that the trial court attempted to thwart service of the judgment on the plaintiff in an effort to evade appellate review.[39]  In counts three and four, the respondent filed two appellate briefs accusing Commissioner Luege of *intentionally* refusing to follow the law due to bias against plaintiff and/or his counsel.[40]  While it is one thing to criticize a judge for

---

[36] *In the Matter of Anderson, supra*, 3 Cal. State Bar Ct. Rptr. at p. 786.

[37] *Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1437-1438.

[38] *In the Matter of Anderson, supra*, 3 Cal. State Bar Ct. Rptr. at p. 782.

[39] Respondent's Appendix, 2 R 357-366.

[40] 2 R 450-458.

17

1    not following the law, it is quite another thing to accuse the judge of intentionally violating the

2    law.  Respondent asserted knowledge of what Commissioner Luege thought and did, and her

3    motivation for doing so.

4         As set forth above, it is well established that making a false statement—either knowingly

5    or with reckless disregard for the truth—attacking the honesty, motivation, integrity, or

6    competence of a judicial officers—involves disrespect to a court or judicial officer in violation of

7    section 6068, subdivision (b).[41]  In *Snyder v. State Bar* (1976) 18 Cal.3d 286, the California

8    Supreme Court held that making unwarranted charges of bias and prejudice against a judge

9    violates the duty of respect for the court.[42]  And, it impugns the integrity of the court for an

10   attorney to say or imply that the court knows the law but has deliberately chosen not to follow

11   it.[43]

12        That counsel may have proceeded out of an excess of zeal does not justify making

13   scandalous charges against a judge.[44]  Arguing that a court committed error is one thing; arguing

14   that the court intentionally committed error due to an improper motive is quite another.[45]  If a

15   ruling is adverse, it is not counsel's right to resist or insult the judge but just to preserve the point

16   for appeal.[46]  Further, erroneous rulings against a litigant, even when numerous and continuous,

17   ///

18

19

[41] *In the Matter of Anderson, supra,* 3 Cal. State Bar Ct. Rptr. 775, 782; see also *Ramirez v. State
20   Bar, supra,* 28 Cal.3d 402; *Hogan v. State Bar* (1951) 36 Cal.2d 807, 810.

[42] *Snyder v. State Bar* (1976) 18 Cal.3d 286, 292; see also *In re White* (2004) 121 Cal.App.4th
21   1453, 1478; *Hume v. Superior Court* (1941) 17 Cal.2d 506, 510, 515; *McCann v. Municipal
22   Court* (1990) 221 Cal.App.3d 527, 538.

[43] See *In re White, supra,* 121 Cal.App.4th at 1478; *In re Buckley* (1973) 10 Cal.3d 237, 250; *In
23   re Koven* (2005) 134 Cal.App.4th 262, 272.  See also *Hanson v. Superior Court* (2001) 91
24   Cal.App.4th 75, 84; *People v. Chong* (1999) 76 Cal.App.4th 232, 234.

[44] *In re Grossman* (1972) 24 Cal.App.3d 624, 630.
25

[45] See *Peters v. Pine Meadows Ranch Home Ass'n* (Utah 2007) 151 P.3d 962, 964.
26

[46] *In re Buckley, supra,* 10 Cal.3d at 255.
27

28                                                      18

1    form no grounds for a charge of bias or prejudice.[47]

2         Second, the State Bar intends to call Commissioner Luege to testify that the statements

3    are, in fact, false and that she did not fail to serve a judgment to thwart respondent's appeal and

4    did not intentionally fail to follow the law, and even if a court were to disagree and believe she

5    made errors, they were not intentional, and they were not due to any bias or prejudice against

6    respondent or his client.[48]

7         From the information before this Court so far, as it pertains to the allegations in the NDC,

8    it appears respondent's statements were based only on conjecture without factual substantiation,

9    which is sufficient to establish that the statements were false and at a minimum made with a

10   reckless disregard of the truth.[49]  Since there are mixed questions of law and fact to be

11   determined in this matter, this Court should wait until the record is complete following a trial in

12   the hearing department, and at that time, this Court will still be able to address the legal issues

13   involving respondent's First Amendment claims, as well as any factual issues.

14        Respondent knew his statements were false or acted with reckless disregard for the truth

15   because they were based upon rank speculation and no facts or investigation.  To the extent

16   respondent claims he did not know the statements were false, and he did not act with reckless

17   disregard for the truth, those defenses are matters to be raised at trial, and not based upon a

18   motion to dismiss due to insufficiency of the allegations in the NDC.

19   ///

20   ///

21

22

[47] *McEwen v. Occidental Life Insurance Co.* (1916) 172 Cal. 6, 11; *Fishbaugh v. Fishbaugh*
23   (1940) 15 Cal.2d 445, 457; *Ryan v. Welte* (1948) 87 Cal.App.2d 888, 895; *Mackie v. Dyer* (1957)
     154 Cal.App.2d 395, 400; *Dietrich v. Litten Industries* (1970) 12 Cal.App.3d 704, 719; *Andrews*
24   *v. ALRB* (1981) 28 Cal.3d 781, 795-796; *People v. Guerra* (2006) 37 Cal.4th 1067, 1112; *In the*
     *Matter of Regan* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 844, 857.
25
[48] Respondent's Appendix, 2 R 473 and 2 R 504-506.
26
[49] See *In the Matter of Ramirez, supra*, 28 Cal.3d at pp. 411–412 ["conjecture without factual
27   substantiation" demonstrates false statement "made with reckless disregard of the truth"
     sufficient to find culpability under § 6068, subd. (b)].
28                                                                      19

## VIII.  CONCLUSION

Respondent's statements about Commissioner Luege involved gender bias and falsely impugned her integrity knowingly and with reckless disregard for the truth.  These statements by respondent in pleadings before the Court of Appeal, while representing a client in pending litigation, are not protected by the First Amendment.

The motion to dismiss is also premature because there are mixed factual and legal issues to be determined by the hearing judge.

The State Bar asks the Court to deny respondent's petition in its entirety.  In the event that this Court dismisses any of the charged counts, the State Bar asks that the dismissal be without prejudice and with leave to amend.

Respectfully submitted,

THE STATE BAR OF CALIFORNIA
OFFICE OF CHIEF TRIAL COUNSEL

DATED:  January 14, 2021          By: _____
                                       KIMBERLY G. ANDERSON
                                       Senior Trial Counsel

20

DECLARATION OF SERVICE

CASE NUMBER(s): **SBC-20-O-30496 (OCTC-19-O-12069)**

I, the undersigned, am over the age of eighteen (18) years and not a party to the within action, whose business address and place of employment is the State Bar of California, 180 Howard Street, San Francisco, California 94105, , declare that:

- on the date shown below, I caused to be served a true copy of the within document described as follows:

## THE STATE BAR'S RESPONSE TO RESPONDENT'S PETITION FOR INTERLOCUTORY REVIEW OF HEARING JUDGE'S ORDER DENYING RESPONDENT'S MOTION TO DISMISS

## (FILED CONCURRENTLY WITH THE STATE BAR'S SUPPLEMENTAL APPENDIX AND REQUEST FOR JUDICIAL NOTICE; DECLARATION OF KIMBERLY G. ANDERSON)

☐ **By U.S. First-Class Mail: (CCP §§ 1013 and 1013(a))**
- in accordance with the practice of the State Bar of California for collection and processing of mail, I deposited or placed for collection and mailing in the City and County of San Francisco.

☐ **By U.S. Certified Mail: (CCP §§ 1013 and 1013(a))**

☐ **By Overnight Delivery: (CCP §§ 1013(c) and 1013(d))**
- I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for overnight delivery by the United Parcel Service ('UPS').

☐ **By Fax Transmission: (CCP §§ 1013(e) and 1013(f))**
Based on agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed herein below. No error was reported by the fax machine that I used. The original record of the fax transmission is retained on file and available upon request.

☒ **By Electronic Service: (CCP § 1010.6)**
Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the person(s) at the electronic addresses listed herein below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ (for U.S. First-Class Mail) in a sealed envelope placed for collection and mailing at San Francisco, addressed to: *(see below)*

☐ (for Certified Mail) in a sealed envelope placed for collection and mailing as certified mail, return receipt requested,
Article No.: _____ at San Francisco, addressed to: *(see below)*

☐ (for Overnight Delivery) together with a copy of this declaration, in an envelope, or package designated by UPS,
Tracking No.: _____ addressed to: *(see below)*

| Person Served | Business Address | Fax Number | Courtesy Copy to: |
|---|---|---|---|
| Benjamin Laurence Pavone | Pavone & Fonner, LLP, 600 W Broadway, Ste 700, San Diego, CA 92101-3370 | Electronic Address<br>bpavone@cox.net | Hon. Cynthia Valenzuela, Hearing Department<br>ctroomD@calbar.ca.gov |

☐ **via inter-office mail regularly processed and maintained by the State Bar of California addressed to:**

**N/A**

I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for mailing with the United States Postal Service, and overnight delivery by the United Parcel Service ('UPS'). In the ordinary course of the State Bar of California's practice, correspondence collected and processed by the State Bar of California would be deposited with the United States Postal Service that same day, and for overnight delivery, deposited with delivery fees paid or provided for, with UPS that same day.

I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after date of deposit for mailing contained in the affidavit.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

DATED: **January 14, 2021**       SIGNED: _____

Ina Strehle
Declarant

# EXHIBIT 38

**The New York Times**

# Woke Me When It's Over

In the humorless world of Woke, the satire is never funny and the statute of limitations never expires, even when it comes to hamantaschen.

 **By Bret Stephens**
Opinion Columnist

Feb. 22, 2021

In 2015, Bon Appétit ran an article by the food writer Dawn Perry about hamantaschen, the triangular cookies that are a tradition during the Jewish festival of Purim. It was headlined — brace yourself for outrage — "How to Make Actually Good Hamantaschen."

Six years later, a woman named Abigail Koffler found the article while researching hamantaschen fillings. She was not amused.

Perry, Koffler wrote on Twitter, isn't Jewish. Perry's husband, Koffler added, had been forced out of his job at Condé Nast last year based on accusations of racial bias. Above all, Koffler objected, "Traditional foods do not automatically need to be updated, especially by someone who does not come from that tradition."

Most Jews would probably be grateful for an "actually good" hamantasch. Yet within hours of Koffler's tweets, Bon Appétit responded with an editor's note atop the article, now renamed "5 Steps to Really Good Hamantaschen." It's a note that defies summary, parody and belief.

"The original version of this article included language that was insensitive toward Jewish food traditions and does not align with our brand's standards," the editor wrote. "As part of our Archive Repair Project, we have edited the headline, dek, and content to better convey the history of Purim and the goals of this particular recipe. We apologize for the previous version's flippant tone and stereotypical characterizations of Jewish culture."

Behold in this little story, dear reader, the apotheosis of Woke.

No transgression of sensitivities is so trivial that it will not invite a moralizing rebuke on social media.

No cultural tradition is so innocuous that it needn't be protected from the slightest criticism, at least if the critic has the wrong ethnic pedigree.

No writer is so innocent that she should be spared from having her spouse's alleged failings trotted out to suggest discrimination-by-association.

And no charge of cultural insensitivity is so far-fetched that it won't force a magazine into self-abasing self-expurgation. What Bon Appétit blithely calls its "Archive Repair Project" is, according to HuffPost, an effort to scour "55 years' worth of recipes from a variety of Condé Nast magazines in search of objectionable titles, ingredient lists and stories told through a white American lens."

George Orwell warned in "1984" of a world in which "the past was erased, the erasure was forgotten, the lie became the truth." At the Ministry of Truth, Winston Smith was obliged to rewrite what had been said about sweets — chocolate, not cookies — to hide the fact of ever-dwindling rations.

What Bon Appétit — which saw its editor depart last year after a 16-year-old Halloween photo of him trying to look like a Puerto Rican stereotype resurfaced on the internet — is doing with its recipe archive may seem like a farce. But it's a telling one. If a major media company like Condé Nast can choose to erase and rewrite its food archives for the sake of current Woke sensibilities, why stop there?

In the summer of 2008, The New Yorker ran cover art of Barack and Michelle Obama giving each other a fist bump in the Oval Office. He was dressed in Middle Eastern garb. She had a machine gun slung over her shoulder and wore her hair in a big Afro. A portrait of Osama bin Laden hung over the mantel, and an American flag was burning in the fire. Even by the comparatively liberal standards of 2008, the cover was considered egregious.

At the time, The New Yorker's editor, David Remnick, defended the art by saying that it was satirical. But in the humorless world of Woke, the satire is never funny, the statute of limitations never expires, Remnick's intentions are irrelevant and his judgments inherently biased. If Condé Nast is serious about "repairing" its archives for the sake of rectifying past sins, there's no good reason not to erase that cover, too.

What comes next? In January, Jason Kilborn, a law professor at the University of Illinois at Chicago, was placed on indefinite administrative leave, barred from campus and kicked off his committee assignments after students protested that he had included "n____" and "b_____" as part of his semester exam on civil procedure.

No, he didn't use the slurs themselves. He just wrote the first letter followed by a line. It still didn't spare him.

"The visual of the N-word on Professor Kilborn's exam was mental terrorism," claimed a petition from the Black Law Students Association.

Whatever happens to Kilborn, every professor in America has now been put on notice: In the game of Woke, the goal posts can be moved at any moment, the penalties will apply retroactively and claims of fairness will always lose out to the perpetual right to claim offense.

A friend of mine, a lifelong liberal whose patience is running thin with the new ethos of moral bullying, likes to joke, "Woke me when it's over." To which I say: Get comfortable.

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and Instagram.*

Bret L. Stephens has been an Opinion columnist with The Times since April 2017. He won a Pulitzer Prize for commentary at The Wall Street Journal in 2013 and was previously editor in chief of The Jerusalem Post. Facebook

A version of this article appears in print on , Section A, Page 22 of the New York edition with the headline: Woke Me When It's Over